Vincent P. Slusher
State Bar No. 00785480
vincent.slusher@dlapiper.com
DLA Piper LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 743-4572
Facsimile: (972) 813-6267

Thomas R. Califano
New York State Bar No. 2286144
thomas.califano@dlapiper.com
Jeremy R. Johnson
New York State Bar No. 4307617
jeremy.johnson@dlapiper.com
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Tel: (212) 835-6000
Fax: (212) 835-6001

PROPOSED ATTORNEYS FOR THE DEBTORS
AND DEBTORS IN POSSESSION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **CASE NO. 09-[      ]** |
| | § | |
| **ERICKSON RETIREMENT** | § | **CHAPTER 11** |
| **COMMUNITIES, LLC,** *et al.*[1] | § | **Joint Administration Pending** |
| | § | |
| **Debtors.** | § | |

## AFFIDAVIT OF PAUL RUNDELL
## IN SUPPORT OF FIRST DAY MOTIONS

| | |
|---|---|
| State of New York | ) |
| | ) ss.: |
| County of New York | ) |

    1.     I am the Executive Vice President of Restructuring and Finance to Erickson

---

[1] The Debtors in these Chapter 11 cases are Erickson Retirement Communities, LLC, Ashburn Campus, LLC, Columbus Campus, LLC, Concord Campus GP, LLC, Concord Campus, LP, Dallas Campus GP, LLC, Dallas Campus, LP, Erickson Construction, LLC, Erickson Group, LLC, Houston Campus, LP, Kansas Campus, LLC, Littleton Campus, LLC, Novi Campus, LLC, Senior Campus Services, LLC, Warminster Campus GP, LLC, Warminster Campus, LP.

Retirement Communities, LLC ("ERC") which is a partner member of Ashburn Campus, LLC ("Ashburn"), Columbus Campus, LLC ("Columbus"), Concord Campus GP, LLC ("Concord GP"), Concord Campus, LP ("Concord"), Dallas Campus GP, LLC ("Dallas GP"), Dallas Campus, LP ("Dallas LP"), Erickson Construction, LLC ("Erickson Construction"), Erickson Group, LLC ("Erickson Group"), Houston Campus, LP ("Houston"), Kansas Campus, LLC ("Kansas"), Littleton Campus, LLC ("Littleton"), Novi Campus, LLC ("Novi"), Senior Campus Services, LLC ("Senior Campus"), Warminster Campus GP ("Warminster GP"), and Warminster Campus, LP ("Warminster"), the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors").

2.    I am also a Managing Director of Alvarez & Marsal[2] in its Healthcare Industry Group in New York, New York.  I have more than twelve (12) years of experience, specializing in interim management, with a focus on cash management and financial analysis.  I have provided cash management, financial support, crisis management, turnaround consulting, business strategy and planning, market analysis and operational improvement services to clients, and I have advised unsecured and secured creditors and debtors both in and out of court.

3.    In my capacity as Executive Vice President of Restructuring for the Debtors, I have personal knowledge of, and am familiar with, the business affairs, day-to-day operations, books and records, and financial condition of the Debtors, and I am authorized to submit this Affidavit on behalf of the Debtors.

4.    On October 19, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.

---

[2] Alvarez & Marsal was retained by the Debtors in April 2009.  Contemporaneously with this Affidavit, the Debtors are filing an application with this Court to employ and retain Alvarez & Marsal as their financial advisors in these chapter 11 cases.

EAST\42433374.7

(the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court").

5.    The Debtors remain in possession of their assets and continue to manage their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

6.    No trustee, examiner, or committee has been appointed in these cases.

7.    Contemporaneously herewith, the Debtors have filed the following motions and applications (collectively, the "First Day Motions"):

(1)    Motion For Order Directing Joint Administration Of The Debtors' Chapter 11 Cases;

(2)    Motion For An Order Pursuant To Bankruptcy Rule 1007(a)(4) Granting An Extension Of Time For Filing Schedules And Statements Of Financial Affairs;

(3)    Debtors' Motion For An Order Pursuant To 11 U.S.C. § 105(a) And Bankruptcy Rule 2002 Establishing Notice Procedures;

(4)    Motion Of Debtors Pursuant To 11 U.S.C. §§ 105(a) And 363(b) For An Order Authorizing Payment Of Prepetition (I) Wages, Salaries, And Other Compensation Of  Employees, (II) Employee Medical And Similar Benefits, And (III) Reimbursable Employee Expenses, And (IV) Other Miscellaneous Employee Expenses And Benefits;

(5)    Motion For Order (I) Prohibiting Utility Providers From Altering, Refusing Or Discontinuing Service, (II) Deeming Utility Providers Adequately Assured Of Future Performance, And (III) Establishing Procedures For Providing Adequate Assurance of Future Performance To Utility Providers;

(6)    Motion For Order Authorizing (I) Continued Use Of Existing Cash Management System, (II) Maintenance Of Existing Bank Accounts, (III) Continued Use Of Existing Business Forms, And (IV) Maintenance Of Existing Investment Practices;

(7)    Motion Of ERC For Interim And Final Orders (I) Authorizing Use Of Cash Collateral, (II) Granting Adequate Protection, An (III) Scheduling A Final Hearing;

(8)    Motion Of Ashburn Campus, LLC, Columbus Campus, LLC, Concord Campus, LP, Dallas Campus, LP, Houston Campus, LP, Kansas Campus,

LLC, Littleton Campus, LLC, Novi Campus, LLC, And Warminster Campus, LP, For Interim And Final Orders (I) Authorizing The Use Of Cash Collateral, (II) Granting Adequate Protection To Secured Lenders, And (III) Scheduling A Final Hearing; and

(9) Application Of The Debtors For Order Authorizing And Approving The Appointment Of BMC Group, Inc. As Noticing, Claims, And Balloting Agent For The Bankruptcy Court.

8. I am submitting this Affidavit in support of the Debtors' First Day Motions. Capitalized terms not defined in this Affidavit shall have the meanings ascribed to the term in the relevant First Day Motion. Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, my review of relevant documents, my opinion based upon my experience and knowledge of the Debtors' operations and financial condition, and information provided to me by management, advisors, or other representatives of the Debtors. If I were called upon to testify, I would testify consistently with the facts set forth in this Affidavit.

9. The Debtors are leaders in the senior living industry and have built and maintained a successful business over the past twenty-six (26) years. During the past year, however, senior living facilities, including the Debtors' facilities, have suffered substantial declines in sales and occupancy and have faced various obstacles in their construction and development as a result of the struggling economy, the weakened credit environment, limited access to capital, declining real estate values, among other things. Prospective senior residents are having difficulty selling their homes and have lost significant amounts of their retirement funds in the market, making it difficult, if not impossible, for them to move into or remain in senior housing facilities. Because of these challenging market conditions, the Debtors have suffered a substantial loss of revenue and lower than anticipated absorption rates, which in turn have forced the Debtors to seek chapter 11 protection.

10. This Affidavit provides an overview of the Debtors and the circumstances leading

to the commencement of these chapter 11 cases. <u>Section I</u> provides an overview of the Debtors' operations. <u>Section II</u> recounts the events preceding the bankruptcy filing. <u>Section III</u> affirms and incorporates facts that support the First Day Motions.

## I. <u>Overview of the Debtors' Business</u>

11. The Debtors are part of a fully-integrated, privately-owned development and management company that focuses on providing affordable, high-quality senior living for middle-income seniors. The Debtors' expertise in development, acquisition, management, finance, and sale of properties has made them one of the largest and most well-known senior living companies in the United States.

12. As of the Petition Date, the Debtors currently manage and have varying interests in twenty (20) continuing care retirement communities (the "<u>CCRCs</u>"),[3] in various stages of completion or development, in eleven (11) different states, including Colorado, Illinois, Kansas, Maryland, Massachusetts, Michigan, New Jersey, Ohio, Pennsylvania, Texas, and Virginia. In total, the operating CCRCs have approximately 23,000 residents. The CCRCs are large campus-style communities that offer seniors a full life-cycle of retirement services from independent living through skilled nursing on the same property.

---

[3] The CCRCs include: (1) Charlestown located in Catonsville, Maryland; (2) Greenspring located in Springfield, Virginia, (3) Henry Ford Village located in Dearborn, Michigan; (4) Oak Crest located in Parkville, Maryland; (5) Riderwood located in Silver Spring, Maryland; (6) Cedar Crest located in Pompton Plains, New Jersey, (7) Seabrook located in Tinton Falls, New Jersey; (8) Brooksby located in Peabody, Massachusetts; (9) Ann's Choice located in Warminster, Pennsylvania; (10) Eagle's Trace located in Houston, Texas; (11) Fox Run located in Novi, Michigan; (12) Highland Springs located in Dallas, Texas; (13) Linden Ponds located in Hingham, Massachusetts; (14) Maris Grove located in Concord, Pennsylvania; (15) Monarch Landing located in Naperville, Illinois; (16) Sedgebrook located in Lincolnshire, Illinois; (17) Tallgrass Creek located in Overland Park, Kansas; (18) Wind Crest located in Denver, Colorado; (19) Ashby Ponds located in Loudoun, Virginia; and (20) Hickory Chase in Hilliard, Ohio (not open or operating).

### A. Organizational Structure of the Debtors

#### i. Erickson Retirement Communities, LLC

13. John C. Erickson, ERC's current Executive Chair, founded ERC in 1983 to develop and operate large campus-style CCRCs to provide seniors with affordable, high-quality retirement living.[4]

14. ERC is a Maryland limited liability company, which has its principal place of business at 701 Maiden Choice Lane, Baltimore, Maryland.

15. ERC is a wholly-owned subsidiary of Erickson Group and is the developer and manager of the CCRCs. ERC generally develops a CCRC in three (3) phases. First, ERC selects a site for the construction of the new CCRC and creates a wholly-owned subsidiary to purchase the land (the "Landowner"). Second, ERC begins the construction and development of the new CCRC. When ERC begins to market a community or when a CCRC license is obtained, ERC associates with an independent not-for-profit operator (the "NFP") to operate the new campus, and the NFP enters into a management agreement with ERC to manage the campus. Third, when the construction of the CCRC is complete, the land and campus are sold to the NFP, and ERC continues to manage the campus. The complete lifecycle of a CCRC is described in more detail in paragraphs 81-94 below.

16. Of ERC's twenty (20) CCRCs, eight (8) are completely developed and have been sold to a NFP, and eleven (11) are under development and construction but are open and

---

[4] ERC was originally founded in 1983 as Retirement and Health Services Corporation ("RHSC"), which changed its name to Senior Campus Living, Inc. ("Senior Inc.") in 1993. In 1996, Senior Campus Living, LLC ("Senior LLC") was organized as a limited liability company and acquired substantially all of the assets of Senior Inc. Subsequently, in January 2000, Senior LLC changed its name to ERC.

operating and one (1) is under development and construction and not open.[5]  ERC manages all twenty (20) CCRCs and employs more than 700 people in connection with the management of these CCRCs.

17.    As of September 30, 2009, on a book value basis, ERC had approximately $2.7 billion in assets and $3.0 billion in liabilities.  ERC's main assets consist of:  (i) approximately $37.6 million in cash or cash equivalents; (ii) its ownership interests in the Landowners; (iii) certain management agreements between ERC and the respective NFPs for each campus; (iv) certain development agreements between ERC and certain Landowners; (v) approximately $11.5 million in accounts receivable; (vi) property and equipment with a net value of approximately $2.2 billion; (vii) approximately $190 million in notes receivable from the communities.

18.    ERC's main liabilities are:  (i) approximately $195.8 million under a certain revolving credit agreement (the "Corporate Revolver"), dated July 27, 2007, as amended from time to time, in the original principal amount of up to $250 million, between ERC and Erickson Construction, as borrowers, Wilmington Trust FSB ("Wilmington Trust"), as successor administrative agent to PNC Bank, National Association, and other lenders that are party to the agreement from time to time (the "Corporate Revolver Lenders"); (ii) approximately $347.5 million in guarantor obligations for borrowings under various construction lines of credit; (iii) approximately $64 million in accounts payable and accrued expenses; (iv) guarantor obligations of approximately $475 million for Purchase Option Deposits (defined below); and (vi) approximately $47.8 million in subordinated debt.

19.    ERC seeks chapter 11 protection to resolve its outstanding defaults under its

---

[5] The Hickory Chase community in Hilliard, Ohio is the community that is not open or operating because it is in foreclosure.

binding arrangements and obligations and to effectuate a complete restructuring of its business.

        ii.      <u>Erickson Construction, LLC</u>

20.      Erickson Construction, a Maryland limited liability company, is a wholly-owned subsidiary of ERC and is the general contractor and construction manager for each of the CCRC projects under development.  It has its principal place of business at 701 Maiden Choice Lane, Baltimore, Maryland.

21.      Erickson Construction has one (1) employee.

22.      As of September 30, 2009, on a book value basis, Erickson Construction had approximately $22.5 million in assets and $17.8 million in liabilities.  Erickson Construction's main assets consist of:  (i) approximately $4.4 million in cash and cash equivalents; (ii) approximately $12.6 million in receivables; and (iii) approximately $1.2 million in property and equipment.  Erickson Construction's main liabilities are:  (i) its liability as a borrower under the Corporate Revolver; and (ii) approximately $13.8 million in construction payables and accrued expenses.

        iii.     <u>Erickson Group, LLC</u>

23.      All of the Debtors are directly or indirectly owned by Erickson Group, a co-debtor and Maryland limited liability company, with its principal place of business at 701 Maiden Choice Lane, Baltimore, Maryland.

24.      Erickson Group has seven (7) members—Baltimore Community Foundation (3.07% membership interest), JCE Holding Corp. (0.2% membership interest), J&N Nevada Holdings, Inc. (37.7% membership interest), Senior Living Limited Partnership (26.5% membership interest), 2002 John C. Erickson GST Trust (16.2% membership interest), and 2002 Nancy A. Erickson GST Trust (16.2% membership interest).  These entities and trusts are not debtors in these cases, but they are affiliated with John C. Erickson, the current Chairman and

Chief Executive Officer of ERC, and his family members.

25.     Erickson Group is a holding company and the sole member of ERC.  It does not have any employees, and as of September 30, 2009, its only asset is its ownership interests in ERC.  Erickson Group's main liability is as a limited guarantor under the Corporate Revolver.

### iv.     Concord Campus GP, LLC[6]

26.     Concord GP, a Maryland limited liability company, is a wholly-owned subsidiary of ERC that was formed to operate and manage the CCRC located in Concord, Pennsylvania. Concord GP's principal place of business is at 701 Maiden Choice Lane, Baltimore, Maryland. It does not have any employees.

27.     As of September 30, 2009, Concord GP's only assets are its 1% general partner interest and 1% limited partner interest in Concord Campus, L.P., a Landowner and Debtor. Concord GP's main liability is as a guarantor under the Corporate Revolver.

### v.     Dallas Campus GP, LLC[7]

28.     Dallas GP, a Maryland limited liability company, is a wholly-owned subsidiary of ERC that was formed to operate and manage the CCRC located in Dallas, Texas.  Dallas GP's principal place of business is at 701 Maiden Choice Lane, Baltimore, Maryland.  It does not have any employees.

29.      As of September 30, 2009, Dallas GP's only assets are its 1% general partner interest and 1% limited partner interest in Dallas Campus, L.P., a Landowner and Debtor.  Dallas GP's main liability is as a guarantor under the Corporate Revolver.

---

[6] Concord GP is structured as both a general partnership and limited liability company for tax liability purposes.

[7] Dallas GP is structured as both a general partnership and limited liability company for tax liability purposes.

      vi.     <u>Senior Campus Services, LLC</u>[8]

30.     Senior Campus, a Maryland limited liability company, is a wholly-owned subsidiary of ERC that was formed to operate and manage the CCRC located in Houston, Texas. Senior Campus' principal place of business is at 701 Maiden Choice Lane, Baltimore, Maryland. It does not have any employees.

31.     As of September 30, 2009, Senior Campus' only assets are its 1% general partner interest and 1% limited partner interest in Houston Campus, L.P., a Landowner and Debtor. Senior Campus has approximately $32,000 in liabilities, plus its liability as a guarantor under the Corporate Revolver.

      vii.     <u>Warminster Campus GP, LLC</u>[9]

32.     Warminster GP, a Maryland limited liability company, is a wholly-owned subsidiary of ERC that was formed to operate and manage the CCRC in Warminster, Pennsylvania. Warminster GP's principal place of business is at 701 Maiden Choice Lane, Baltimore, Maryland. It does not have any employees.

33.     As of September 30, 2009, Warminster GP's only assets are its 1% general partner interest and 1% limited partner interest in Warminster Campus, L.P., a Landowner and Debtor. Warminster GP's main liability is as a guarantor under the Corporate Revolver.

      viii.     <u>The Debtor Landowners</u>

**Ashburn Campus, LLC**

34.     Ashburn, a Maryland limited liability company, is a wholly-owned subsidiary of ERC with its principal place of business at 701 Maiden Choice Lane, Baltimore, Maryland. It

---

[8] Senior Campus is structured as both a general partnership and limited liability company for tax liability purposes.

[9] Warminister GP is structured as both a general partnership and limited liability company for tax liability purposes.

does not have any employees.

35.     As of September 30, 2009, on a book value basis, Ashburn has approximately $184.7 million in assets and $232.6 million in liabilities.

36.     Ashburn's main assets are:  (i) the improved land located in Loudoun County, Virginia upon which the Ashby Ponds campus is constructed; (ii) cash and cash equivalents in the amount of approximately $280,000; and (iii) a lease agreement entered into between Ashburn and Ashby Ponds, Inc. ("Ashby Ponds"), the NFP that operates the Ashby Ponds campus.

37.     Ashburn's main liabilities are:  (i) approximately $64.4 million under a certain construction loan agreement, dated May 31, 2007, in the original principal amount of $125 million, as amended from time to time, between Ashburn and the financial institutions, which are or may from time to time become parties thereto, and Mercantile-Safe Deposit and Trust Company, now known as PNC Bank, as the administrative agent (the "Ashburn Construction Loan"); (ii) a certain mezzanine loan agreement dated May 31, 2007 between Strategic Ashby Ponds Lender LLC and Ashburn in the amount of $50 million (the "Ashburn Mezzanine Loan"); and (iii) a community loan entered into between Ashburn and Ashby Ponds in the original principal amount of $650,939,631 (the "Ashburn Community Loan").

**Columbus Campus, LLC**

38.     Columbus, a Maryland limited liability company, is a wholly-owned subsidiary of ERC with its principal place of business at 701 Maiden Choice Lane, Baltimore, Maryland.  It does not have any employees.

39.     As of September 30, 2009, on a book value basis, Columbus has approximately $75.5 million in assets and $87.8 million in liabilities.

40.     Columbus' main asset is the improved land located in Hilliard, Ohio upon which the Hickory Chase campus was constructed.  Columbus' main liabilities are:  (i) approximately

- 11 -

$46.9 million under a certain construction loan, dated April 16, 2008, in the amount of $90 million, between Columbus, Keybank National Association, as administrative agent, and First Third Bank, as syndication agent, and the other lenders that are party thereto from time to time (the "Columbus Construction Loan"); (ii) Infrastructure Improvement Revenue Bonds, Series 2008, issued by Hickory Chase Community Authority; and (iii) a certain mezzanine loan agreement dated April 16, 2008, in the amount of $21,350,000, as amended from time to time, between Windsor OH Holdings, LLC and Columbus (the "Columbus Mezzanine Loan").

41.     On or about June 1, 2009, Columbus defaulted under the Columbus Construction Loan.  The lenders for the Columbus Construction Loan foreclosed on the campus property on or about July 1, 2009, and ERC has ceased the construction and development of the campus.

**Concord Campus, L.P.**

42.     Concord, a Maryland limited liability company, is 98% owned by ERC and 2% owned by Concord GP.  Concord's principal place of business is at 701 Maiden Choice Lane, Baltimore, Maryland.  It does not have any employees.

43.     As of September 30, 2009, on a book value basis, Concord has approximately $286.9 million in assets and $315.9 million in liabilities.

44.     Concord's main assets are:  (i) the improved land located in Glenn Mills, Pennsylvania upon which the Maris Grove campus is constructed; (ii) cash and cash equivalents in the amount of approximately $755,000; and (iii) a lease agreement entered into between Concord and Maris Grove, Inc. ("Maris Grove"), the NFP that operates the Maris Grove campus.

45.     Concord's main liabilities are:  (i) approximately $66 million under a certain construction loan, dated August 30, 2005, in the original principal amount of $70 million, as amended from time to time, between Concord, the financial institutions that are or may from time to time become parties thereto, and Mercantile-Safe Deposit and Trust Company, now

- 12 -

known as PNC Bank, as administrative agent (the "Concord Construction Loan"); (ii) a community loan entered into between Concord and Maris Grove in the amount of $436,690,000 (the "Concord Community Loan"); and (iii) a sale/leaseback agreement, in the amount of $25 million, between Concord and Strategic Concord Landholder, LP (the "Concord Sale/Leaseback Agreement").

**Dallas Campus, LP**

46.     Dallas, a Maryland limited liability company, is a 98% owned by ERC and 2% owned by Dallas GP.  Dallas' principal place of business is at 701 Maiden Choice Lane, Baltimore, Maryland.  It does not have any employees.

47.     As of September 30, 2009, on a book value basis, Dallas has approximately $154.3 million in assets and $178 million in liabilities.

48.     Dallas' main assets are:  (i) the improved land located in Dallas, Texas upon which the Highland Springs campus is constructed; (ii) cash and cash equivalents in the amount of approximately $2,000; and (iii) a lease agreement entered into between Dallas and Highland Springs, Inc. ("Highland Springs"), the NFP that operates the Highland Springs campus.

49.     Dallas' main liabilities are:  (i) approximately $54.5 million under a construction loan, dated November 30, 2005, in the original principal amount of $70 million, as amended from time to time, between Dallas, Bank of America, N.A., as administrative agent, other lenders that are parties thereto from time to time (the "Dallas Construction Loan"); (ii) a community loan entered into between Dallas and Highland Springs in the amount of $483 million (the "Dallas Community Loan"); (iii) a sale/leaseback agreement, in the amount of $17.5 million, between Dallas and MSRESS III Dallas Campus, LP (the "Dallas Sale/Leaseback Agreement"); and (iv) a promissory note in the original principal amount of $4.4 million granted by Dallas to the Board of Regents of the Texas A&M University System.

**Houston Campus, LP**

50.     Houston, a Maryland limited liability company, is 98% owned by ERC and 2% owned by Senior Campus Services.  Houston's principal place of business is at 701 Maiden Choice Lane, Baltimore, Maryland.  It does not have any employees.

51.     As of September 30, 2009, on a book value basis, Houston has approximately $161.9 million in assets and $194.2 million in liabilities.

52.     Houston's main assets are:  (i) the improved land located in Houston, Texas upon which the Eagle's Trace campus is constructed; (ii) cash and cash equivalents in the amount of approximately $2 million; and (iii) a lease agreement entered into between Houston and Eagle's Trace, Inc. ("Eagle's Trace"), the NFP that operates the Eagle's Trace campus.

53.     Houston's main liabilities are:  (i) approximately $43.9 million under a certain amended and restated and amended construction loan, dated September 15, 2004, in the original principal amount of $50 million, between Houston and Mercantile-Safe Deposit and Trust Company, now known as PNC Bank, as administrative agent, and other lenders party thereto (the "Houston Construction Loan"); (ii) a community loan entered into between Houston and Eagle's Trace in the amount of $375 million (the "Houston Community Loan"); and (iii) a sale/leaseback agreement between Houston and HCP ER6 (f/k/a CNL Retirement ER6, LP) (the "Houston Sale/Leaseback Agreement").

**Kansas Campus, LLC**

54.     Kansas, a Maryland limited liability company, is a wholly-owned subsidiary of ERC with its principal place of business at 701 Maiden Choice Lane, Baltimore, Maryland.  It does not have any employees.

55.     As of September 30, 2009, on a book value basis, Kansas has approximately $124.5 million in assets and $154.2 million in liabilities.

- 14 -

56.     Kansas' main assets are:  (i) the improved land located in Overland Park, Kansas upon which the Tallgrass Creek campus is constructed; (ii) cash and cash equivalents in the amount of approximately $20,000; and (iii) a lease agreement entered into between Kansas and Tallgrass Creek, Inc. ("Tallgrass Creek"), the NFP that operates Tallgrass Creek.

57.     Kansas' main liabilities are:  (i) approximately $62.3 million under a certain construction loan, dated April 3, 2007, in the original principal amount of $65 million, between Kansas, the financial institutions that are or may from time to time become parties thereto, and Mercantile-Safe Deposit and Trust Company, now known as PNC Bank, as administrative agent (the "Kansas Construction Loan"); (ii) a community loan entered into between Kansas and Tallgrass Creek in the amount of $318,262,000 (the "Kansas Community Loan"); (iii) Transportation Development District Special Assessment Bonds, Series 2006, in the amount of $14,950,000, issued by the City of Overland Park, Kansas; and (iv) a certain mezzanine loan agreement dated April 3, 2007, in the amount of $25 million, as amended from time to time, between MSRESS III Kansas Campus, L.P. and Kansas (the "Kansas Mezzanine Loan").

**Littleton Campus, LLC**

58.     Littleton, a Maryland limited liability company, is a wholly-owned subsidiary of ERC with its principal place of business at 701 Maiden Choice Lane, Baltimore, Maryland.  It does not have any employees.

59.     As of September 30, 2009, on a book value basis, Littleton has approximately $226.1 million in assets and $239.1 million in liabilities.

60.     Littleton's main assets are:  (i) the improved land located in Littleton, Colorado upon which the Wind Crest campus was constructed; (ii) cash and cash equivalents in the amount of approximately $1.5 million; and (iii) a lease agreement entered into between Littleton and Wind Crest, Inc. ("Wind Crest"), the NFP that operates the Wind Crest campus.

61.     Littleton's main liabilities are:  (i) approximately $63.9 million under a certain construction loan, dated March 29, 2006, in the original principal amount of $83 million, as amended from time to time, between Littleton, GMAC Commercial Mortgage Corporation, and the financial institutions that are or may from time to time become parties thereto (the "Littleton Construction Loan"); (ii) a community loan entered into between Littleton and Wind Crest in the amount of $556,770,000 (the "Littleton Community Loan"); and (iii) a sale/leaseback agreement between Littleton and MSRESS II Denver Campus, LLC (the "Littleton Sale/Leaseback Agreement").

## Novi Campus, LLC

62.     Novi, a Maryland limited liability company, is a wholly-owned subsidiary of ERC with its principal place of business at 701 Maiden Choice Lane, Baltimore, Maryland.  It does not have any employees.

63.     As of September 30, 2009, on a book value basis, Novi has approximately $238 million in assets and $252.2 million in liabilities.

64.     Novi's main assets are:  (i) the improved land located in Novi, Michigan upon which the Fox Run campus is constructed; (ii) cash and cash equivalents in the amount of approximately $1.4 million; and (iii) a lease agreement entered into between Novi and Fox Run Village, Inc. ("Fox Run"), the NFP that operates the Fox Run campus.

65.     Novi's main liabilities are:  (i) approximately $31.6 million under a construction loan, dated February 12, 2002, in the original principal amount of $46 million, as amended from time to time, between Novi, PNC Bank, as administrative agent, and the financial institutions that are or may from time to time become parties thereto (the "Novi Construction Loan"); (ii) a community loan entered into between Novi and Fox Run in the amount of $405 million (the

"Novi Community Loan"); and (iii) a sale/leaseback agreement between Novi and HCP ER2, LP (the "Novi Sale/Leaseback Agreement").

**Warminster Campus, LP**

66.     Warminster, a Maryland limited liability company, is 98% owned by ERC and 2% owned by Warminster GP.  Warminster's principal place of business is at 701 Maiden Choice Lane, Baltimore, Maryland.  It does not have any employees.

67.     As of September 30, 2009, on a book value basis, Warminster has approximately $300.1 million in assets and $374.8 million in liabilities.

68.     Warminster's main assets are:  (i) the improved land located in Warminster, Pennsylvania upon which the Ann's Choice campus is constructed; (ii) cash and cash equivalents in the amount of approximately $6.4 million; and (iii) a lease agreement entered into between Warminster and Ann's Choice, Inc. ("Ann's Choice"), the NFP that operates the Ann's Choice campus.

69.     Warminster's main liabilities are:  (i) a community loan entered into between Warminster and Ann's Choice in the amount of $370,646,000 (the "Warminster Community Loan"); (ii) a sale/leaseback agreement between Warminster and HCP ER3 (f/k/a CNL Retirement ER3, LP) (the "Warminster Sale/Leaseback Agreement"); and (iii) the $75 million refund for the Purchase Option Deposit in the event that the NFP does not purchase the community.

**B.      Description of the Debtors' CCRCs**

70.     The Debtors' CCRCs offer seniors a full lifecycle of services during their retirement years from independent living to skilled nursing care on the same campus.  These facilities provide affordable living accommodations and related healthcare and support services to a target market of middle-income seniors aged sixty-two (62) years and older.

- 17 -

71.     Unlike limited purpose senior living facilities that specialize in providing care for a particular set of healthcare needs, the Debtors' CCRCs do not require seniors to relocate as their needs change.  Rather, the CCRCs enable seniors to remain in the same place as they age and their needs change by providing various levels of support and care at the same facility.  In addition, the CCRCs provide the residents with multiple entertainment outlets and other social benefits for all stages of their retirement living.

72.     The Debtors' CCRCs are akin to small college campuses with multiple interconnected buildings which typically include several on-site dining rooms, an on-site medical center, on and off-campus transportation, on-site classes, fully-staffed fitness centers, card rooms, game rooms, an indoor aquatics center for exercise and recreation, an auditorium, an in-house television studio run by the residents, a library, full-service branch banks, beauty salons, convenience stores, and other amenities.  The Debtors' CCRCs are often five (5) times larger than alternative facilities, thereby providing residents with more amenities, offerings, and feeling of community.

73.     The main entities involved in the construction, development, and operation of an individual CCRC are:  (i) ERC, the manager and developer of the community; (ii) a Landowner, the owner of the land upon which the community is constructed; and (iii) a NFP, the operator of the community.

i.      The Not-For-Profits

74.     One of the unique aspects of the CCRCs is the fact that ERC associates with National Senior Campuses, Inc. ("NSC"), a not-for-profit organization, to operate the campuses.

EAST\42433374.7

Each of the Debtors' completed communities, except two (2),[10] are operated by a NFP, which is a supported by NSC.

75.     Each NFP is classified as a 501(c)(3) organization based on its mission to provide affordable senior housing to seniors.  The NFP contracts with ERC to provide for the management of the communities.

76.     ERC's goal upon the completion of the construction and development of a CCRC is to sell the CCRC to the NFP.  After the sale, the NFP owns and operates the CCRC, and ERC continues to manage it pursuant to a management agreement.  This structure allows the NFPs to focus on quality of care rather than profit maximization.

77.     The NFP receives revenue from several sources—residents' initial entrance deposits ("IEDs"), residents' monthly fees, and municipal bond offerings as a result of their 501(c)(3) status.  The municipal bond offerings are explained in more detail below.

78.     Prior to a resident's occupancy of an independent living unit in the community (a "Unit"), the NFP enters into a residence and care agreement (the "Residence and Care Agreement") with the resident.  Under the terms of the Residence and Care Agreement, each resident agrees to pay the NFP an IED and monthly service fees, which average about $1,800 per Unit.  In return, the resident is permitted to occupy a Unit in the community for a lifetime, subject to certain conditions.  Pursuant to the Residence and Care Agreements, the residents receive a full refund of their IEDs upon their death, permanent transfer to a higher acuity unit, or departure from the community, subject to a successful resale of the Unit.  The residents can terminate the Residence and Care Agreement without cause on a thirty-day notice, and the Residence and Care Agreements can be assigned to a new manager/operator of the community if

---

[10] Charlestown, Inc. and Henry Ford Village, Inc.

the manager/operator is certified as a continuing care provider.

ii.    The IEDs

79.    The IEDs paid by the residents prior to their occupancy of a Unit range from $100,000 to $600,000.  When a resident moves out or dies, if the Unit's new entrance deposit is the same or greater than the IED price paid by the departing resident, then the departing resident's IED will be 100% refunded and the NFP will keep the difference between the new entrance deposit and the departing resident's IED from the sale of the Unit.  If the new entrance deposit is less than the departing resident's IED, then the departing resident will generally receive the lesser amount.  In this scenario, the NFP does not participate in the downside risk in this transaction.

80.    As an example, if an IED on a Unit was $270,000 and a new entrance deposit of $300,000 is received, the NFP keeps the $30,000 difference for campus enhancements or improvements (and the $270,000 is returned to the departing resident once the Unit has been re-occupied, subject to payment of outstanding accounts).  If an IED on a Unit was $270,000 and a new entrance deposit of $250,000 is received, then the $250,000 is returned to the departing resident.  Generally the departing resident or his or her descendants must consent to sell the Unit at the lower price prior to the NFP making such a sale.  To date, generally every resident to depart an Erickson community has received 100% of their deposit back.

iii.    The Lifecycle of a CCRC

81.    ERC typically develops and constructs each CCRC in three (3) phases over a period of seven (7) to ten (10) years.  Generally, the total projected cost to complete one CCRC is approximately $300 million to $500 million, including construction financing costs.

82.    A fully developed CCRC is generally comprised of three (3) or more residential neighborhoods.   Each neighborhood has one community building (the average cost of a

community building is $15 million, four (4) to five (5) residential buildings with 80-120 independent living units (the average cost of one residential building is $21 million), and a care center with approximately thirty-six (36) assisted living units and eighty-four (84) skilled nursing units (the average cost of one care center is $13 million).  Residents generally move into a residential building within one year after construction begins.

### a. First Phase: Land Acquisition, Construction, and Development

83. During the first phase of a community, ERC forms a Landowner to purchase the land.  The Landowner has ownership of both the real property and all improvements as they are constructed on the land, until the community is sold to the NFP.  In general, the land acquisition is financed through cash, equity provided by ERC, construction loans, and/or sub-debt

84. Once the land has been acquired, the Landowner begins the construction and development of the community.  The construction is initially financed by the Landowner through a revolving construction loan (the "Construction Loan") from a third party.  This loan is secured by a first priority lien on all assets of the Landowner, all liens rights of the Landowner in and to assets of the NFP (e.g. the Residence and Care Agreements and the residents' IEDs), all liens rights of the Landowner in and to assets of ERC, and all assets of ERC relating to the specific community. In certain communities, the Construction Loan is guaranteed by ERC, Erickson Group, and/or Erickson Construction.

85. At this point, the Landowner and ERC enter into a development agreement (the "Development Agreement"), pursuant to which ERC agrees to plan, administer, and supervise all design, development and construction services and activities of a campus, and the Landowner pays

ERC a development fee, which generally equals 5% of all residents' IEDs collected at a campus.[11]

86.     In addition to the development fees, ERC also receives construction fees, which equal approximately 4% of the hard costs of a campus if Erickson Construction is the general contractor of a campus, or 2% of the hard costs of a campus if Erickson Construction is not the general contractor.[12]

### b.     Second Phase: Occupancy by Residents

87.     At the beginning of the marketing of a new project, a NFP is created to operate the campus on a day-to-day basis.  The NFP and the Landowner enter into a master lease agreement (the "Master Lease"), pursuant to which the NFP leases the land and the improvements from the Landowner.  The Master Lease is typically a twenty-year, triple net lease, requiring the NFPs to pay all ongoing maintenance expenses (e.g. utilities, taxes, and insurance), with a ten-year renewal option.

88.     During the period that the Construction Loan is outstanding, the Landowner also enters into a community loan agreement with the NFP (the "Community Loan"), pursuant to which the NFP lends the Landowner all IEDs collected from the community residents prior to their occupancy of a Unit.  The proceeds of the Community Loan are generally sufficient to pay all construction and development costs of a community, pay off the Construction Loan, and provide a return of the Debtors' investment together with a development profit.  Debt service on the Community Loan paid by the Landowner to the NFP is fully offset by the rental payments made by the NFP to the Landowner under the Master Lease.  The Landowner's obligations are

---

[11] In 2008, ERC received approximately $31.3 million in development fees from all of the campuses. ERC's development fees in 2009 are projected to be approximately $9.5 million for all of the campuses.

[12] In 2008, ERC received approximately $10.7 million in construction fees from all of the campuses. ERC's construction fees in 2009 are projected to be approximately $2.3 million.

secured by a mortgage on the property in favor of the NFP. The Landowner's obligations under the Community Loan are subordinate to its obligations under the Construction Loan.

89.     To fund the working capital deficits of the NFP, the Landowner provides a working capital loan (the "Working Capital Loan") to the NFP. To secure its obligations under the Working Capital Loan, the NFP grants the Landowner a security interest in all assets of the NFP, including the Residence and Care Agreements and the IEDs.

90.     In addition, the NFP and ERC enter into a management and marketing agreement (the "Management Agreement"), pursuant to which ERC is hired by the NFP as the NFP's manager and is permitted to exercise oversight over the NFP's activities. The NFP pays ERC a management fee, which is typically comprised of a base fee generally ranging from 4.0% to 5.5% of resident monthly fees, or a negotiated fixed fee, and which is adjusted according to occupancy levels. The NFP also reimburses ERC for direct and allocated costs. Historically, the term of the Management Agreement was five (5) years, with a provision that allowed the NFP to terminate the agreement after three (3) years, provided that it submitted a thirty-day notice. Currently, however, a majority of the Management Agreements have reached their term and are being continued on a month-to-month contract basis, until their term is extended. The Management Agreement cannot be assigned without consent from the NFP and the Construction Loan lender.[13]

91.     When the CCRC is near completion, the NFP typically secures permanent financing through municipal bond offerings (tax-exempt bonds) (the "Project Bonds"). These Project Bonds are primarily issued two (2) to six (6) years following the commencement of

---

[13]  In 2008, ERC received a total of approximately $26 million in management fees from all of the campuses. ERC's management fees in 2009 are projected to be approximately $29.4 million for all of the campuses.

construction.  The obligors on the Project Bonds are the NFPs, not ERC.  The Project Bonds have a fixed rate component that is typically long-term and a variable rate component that is paid down at stabilization.  The variable rate bonds are typically backed by letters of credit provided by commercial banks.

92.     Upon the issuance of Project Bonds, the NFP enters into a purchase option agreement (the "Purchase Option Agreement") with the Landowner, whereby a significant portion of the proceeds of the Project Bonds are used by the NFP to pay the Landowner a purchase option deposit (the "Purchase Option Deposit") to ensure the sale of the community to the NFP.  Pursuant to the Purchase Option Agreement, the bondholders receive a first priority mortgage on the property.  The Landowner uses proceeds from the Project Bonds to pay off the Construction Loan and fund completion of the campus.

### c.       Third Phase: Sale of the CCRC to the NFP

93.     During the final development phase of a community, the Landowner sells the CCRC to the NFP.  The NFP generally purchases the campus for the lower of (i) 75% of the going-concern value based on a third-party appraisal, plus forgiveness of the Community Loan, or (ii) the Purchase Option Deposit, plus forgiveness of the Community Loan.  Even after the sale of a community is complete, ERC remains the manager of the community, pursuant to the Management Agreement.

94.     Until the sale of the community to the NFP has closed, if the NFP defaults on the Project Bonds or decides not to purchase the community from the Landowner, the Landowner is required to repay the Purchase Option Deposit to the NFP (plus all transaction costs for issuance of the Project Bonds and early redemption costs), which is then used to repay the tax-exempt bondholders.  ERC guarantees the return of the Purchase Option Deposit to the NFP under these circumstances.

### C. State Regulations

95.     The CCRC industry is heavily regulated by state authorities.  Each state in which ERC operates has different regulations concerning, among other things, disclosure of financial statements, solvency of the facility, maintenance of a certain amount of reserves, and the refunding of IEDs.

96.     The NFPs operating the CCRCs are required to satisfy the regulations of each state where its facilities are located.  Remedies for violations of these state regulations include temporary suspension of the facility's license, permitting residents to obtain liens, increased oversight of the facility, restricting the facility's ability to accept new residents, and closing the facility.

### D. The Campuses

97.     There are twenty (20) different campuses, of which eight (8) are completed and have been sold to NFPs, eleven (11) are under development, but are open and operating, and one (1) is under development, but not open.  Each of the campuses is described in detail below.

#### i.     The Completed Campuses

98.     The construction and development of the following communities has been completed, and the campuses have been sold to the respective NFPs operating the communities. ERC manages each of these campuses pursuant to a Management Agreement with the respective NFP.  In general, these campuses are financially stable and profitable.

*Charlestown*

99.     Charlestown, located in Cantonsville, Maryland, opened in December 1983. Charlestown was the first CCRC developed by John C. Erickson.  This campus has been sold to Charlestown Community, Inc., a NFP, which operates the community and contracts with ERC to manage the community.

*Henry Ford Village*

100.    Henry Ford Village, located in Dearborn, Michigan, opened in September 1993. This campus has been sold to Henry Ford Village, Inc., a NFP, which operates the community and contracts with ERC to manage the community.

*Oak Crest Village*

101.    Oak Crest Village, located in Parkville, Maryland, opened in March 1995.  This campus has been sold to Oak Crest Village, Inc., a NFP, which operates the community and contracts with ERC to manage the community.

*Greenspring Village*

102.    Greenspring Village, located in Springfield, Virginia, opened in November 1998. This campus has been sold to Greenspring Village, Inc., a NFP, which operates the community and contracts with ERC to manage the community.

*Riderwood Village*

103.    Riderwood Village, located in Silver Spring, Maryland, opened in May 2000. This campus has been sold to Riderwood Village, Inc., a NFP, which operates the community and contracts with ERC to manage the community.

*Brooksby Village*

104.    Brooksby Village, located in Peabody, Massachusetts, opened in June 2000.  This campus has been sold to Brooksby Village, Inc., a NFP, which operates the community and contracts with ERC to manage the community.

*Seabrook Village*

105.    Seabrook Village, located in Tinton Falls, New Jersey, opened in December 1998. This campus has been sold to Seabrook Village, Inc., a NFP, which operates the community and contracts with ERC to manage the community.

*Cedar Crest Village*

106.     Cedar Crest Village, located in Point View, New Jersey, opened in July 2001. This campus has been sold to Cedar Crest Village, Inc., a NFP, which operates the community and contracts with ERC to manage the community.

ii.     The Developing Campuses

107.     The following campuses are open and operating but are still under development and construction.  They are operated by an NFP, but they have not yet been sold to the NFP, and they are managed by ERC.  The Landowners that have filed for chapter 11 protection in these cases are the owners of these campuses.

*Ann's Choice*

108.     The Ann's Choice campus, located in Warminster, Pennsylvania, opened in August 2003.  Warminster, the Landowner, leases the land and campus to Ann's Choice, the NFP that operates this community, pursuant to a Master Lease.  The average monthly fee at this campus is $1,759, and the average IED is $233,902.  As of September 2009, this community has 1,492 completed units, 1,388 residents, and a 93 % (YTD) occupancy rate.

*Maris Grove*

109.     The Maris Grove campus, located in Glen Mills, Pennsylvania, opened in October 2006.  Concord, the Landowner, leases the land and campus to Maris Grove, the NFP that operates this community, pursuant to a Master Lease.  The average monthly fee at this campus is $1,848, and the average IED is $284,580.  As of September 2009, this community has 963 completed units, 751 residents, and a 78% (YTD) occupancy rate.

*Fox Run*

110.     The Fox Run campus, located in Novi, Michigan, opened in June 2003.  Novi, the Landowner, leases the land and campus to Fox Run, the NFP that operates this community,

pursuant to a Master Lease. The average monthly fee at this campus is $1,968, and the average IED is $197,473. As of September 2009, this community has 758 completed units, 686 residents, and a 90.5% (YTD) occupancy rate.

*Wind Crest*

111. The Wind Crest campus, located in Denver, Colorado, opened in June 2007. Littleton, the Landowner, leases the land and campus to Wind Crest, the NFP that operates this community, pursuant to a Master Lease. The average monthly fee at this campus is $1,991, and the average IED is $298,833. As of September 2009, this community has 575 completed units, 468 residents, and a 81.4% occupancy rate (YTD).

*Ashby Ponds*

112. The Ashby Ponds campus, located in Ashburn, Virginia, opened in September 2008. Ashburn, the Landowner, leases the land and campus to Ashby Ponds, the NFP that operates this community, pursuant to a Master Lease. The average monthly fee at this campus is $1,979, and the average IED is $315,761. As of September 2009, this community has 456 completed units, 311 residents, and a 68.2% (YTD) occupancy rate.

*Highland Springs*

113. Highland Springs, located in Dallas, Texas, opened in September 2006. Dallas, the Landowner, leases the land and campus to Highland Springs, the NFP that operates this community, pursuant to a Master Lease. The average monthly fee at this campus is $1,982, and the average IED is $175,371. As of September 2009, this community has 449 completed units, 324 residents, and a 72.2% (YTD) occupancy rate.

*Eagle's Trace*

114. The Eagle's Trace campus, located in Houston, Texas, opened in October 2005.

Houston, the Landowner, leases the land and campus to Eagle's Trace, the NFP that operates this community, pursuant to a Master Lease. The average monthly fee at this campus is $1,811, and the average IED is $153,568. As of September 2009, this community has 470 completed units, 386 residents, and a 82.1% (YTD) occupancy rate.

<u>Linden Ponds</u>

115. The Linden Ponds campus, located in Hingham, Massachusetts, opened in October 2004. Hingham Campus, LLC, the Landowner, leases the land and campus to Linden Ponds, the NFP that operates this community, pursuant to a Master Lease. The average monthly fee at this campus is $1,999, and the average IED is $281,114. As of September 2009, this community has 988 completed units, 860 residents, and a 87% (YTD) occupancy rate.

<u>Sedgebrook</u>

116. The Sedgebrook campus, located in Lincolnshire, Illinois, opened in July 2005. Lincolnshire Campus, LLC, the Landowner, leases the land and campus to Sedgebrook, the NFP that operates this community, pursuant to a Master Lease. The average monthly fee at this campus is $1,812, and the average IED is $253,528. As of September 2009, this community has 469 completed units, 384 residents, and a 81.9% (YTD) occupancy rate.

<u>Monarch Landing</u>

117. The Monarch Landing campus, located in Naperville, Illinois, opened in July 2006. Naperville Campus, LLC, the Landowner, leases the land and campus to Monarch Landing, the NFP that operates this community, pursuant to a Master Lease. The average monthly fee at this campus is $1,680, and the average IED is $295,204. As of September 2009, this community has 365 completed units, 240 residents, and a 65.8% (YTD) occupancy rate.

*Tallgrass Creek*

118.    The Tallgrass Creek campus, located in Overland Park, Kansas, opened in October 2007.  Kansas, the Landowner, leases the land and campus to Tallgrass Creek, the NFP that operates this community, pursuant to a Master Lease.  The average monthly fee at this campus is $1,734, and the average IED is $154,038.  As of September 2009, this community has 227 completed units, 139 residents, and a 61.2% (YTD) occupancy rate.

*Hickory Chase*

119.    The Hickory Chase campus is located in Hilliard, Ohio.  Columbus is the Landowner, and Hickory Chase is the NFP that was created to operate this community. However, due to financial difficulties prior to the Petition Date, construction of the Hickory Chase community was ceased, deposits received by residents in anticipation of completion of the facility were returned, and the campus has been closed.  There are currently no residents at this facility, and ERC does not anticipate that residents will occupy units in the near future. Moreover, it does not appear that funds are available to complete construction of this campus at this time.

### E.    The Debtors' Prepetition Capital Structure

120.    As of the Petition Date, the Debtors' total consolidated funded debt obligations were approximately $928,823,000 and consisted of, among other things, the Corporate Revolver, the Construction Loans, subdebt, and ERC Funding.  The major components of the Debtors' prepetition debt structure and their prepetition debt obligations are described below.

### i.    The Corporate Revolver

121.    To help partially fund overall development, on July 27, 2007, ERC and Erickson Construction obtained the Corporate Revolver, whereby ERC and Erickson Construction could request loan advances or letters of credit form the Corporate Revolver Lenders in an amount up

to $250 million. As of the Petition Date, the loan balance under the Corporate Revolver is approximately $195.8 million.

122. The Corporate Revolver has an absolute maturity date of August 1, 2010 and is secured by all assets of ERC and Erickson Construction, a pledge by Erickson Group of 100% of the membership interests of ERC, a pledge by ERC of 100% of the membership interests of Erickson Construction, and all assets of Concord GP, Dallas GP, Senior Campus, and Warminster GP (except partnership interests and related rights in the certain subsidiaries—Concord Campus, LP, Dallas Campus, LP, Houston Campus, LP, and Warminster Campus, LP).

123. Concord GP, Dallas GP, Senior Campus, and Warminster GP have granted a full payment and performance guaranty relating to the Corporate Revolver in favor of the Corporate Revolver Lenders. Erickson Group granted a limited payment and performance guaranty in favor of the Corporate Revolver Lenders, pursuant to which the Corporate Revolver Lenders' recovery is limited to Erickson Group's pledged ownership interests in ERC. Together, Concord GP, Senior Campus, Warminster GP, and Erickson Group are referred to as the "Subsidiary Guarantors".

124. Prepetition, ERC and Erickson Construction drew on the funds from the Corporate Revolver (i) to pay the required mandatory redemption of the $75 million maximum ERC Subordinated Taxable Adjustable Mezzanine Put Securities Series 2005 and the ERC Subordinated Taxable Adjustable Interest Rate Securities Series 2003A (described below); (ii) to finance certain permitted land acquisitions; (iii) to finance certain permitted investments in ERC's subsidiaries and to recoup existing permitted investments in ERC's subsidiaries; (iv) to pay certain intercompany debts and other liabilities, such as a certain $10 million revolving line of credit established pursuant to an Amended and Restated Revolving Credit Loan Agreement by

- 31 -

and between Mercantile-Safe Deposit and Trust Company, now known as PNC Bank and ERC dated as of December 1, 2000; (v) for general working capital needs of the Debtors in the ordinary course of their business and consistent with past practices; and (vi) to pay closing costs associated with the loans advanced under the Corporate Revolver.

125.     The Corporate Revolver requires the maintenance of certain covenants, including the maintenance of liquid assets (the "Liquid Assets") by ERC and Erickson Construction of at least the greater of (1) $25 million in excess of the highest liquidity requirement contained in any senior loan, construction loan, or financing agreement executed by any of the Landowners in connection with the development or financing of a CCRC; or (2) $100 million at all times (the "Liquidity Covenant").  See Section 6.1(a) of the Corporate Revolver.  ERC's and/or Erickson Construction's failure to observe the Liquidity Covenant constitutes an event of default under the Corporate Revolver.

### ii.     The Landowners' Prepetition Capital Structure

126.     Generally, the Landowners' prepetition debt consists of a Construction Loan, subdebt, a Community Loan, ERC equity funding, and/or TIF/STDs, depending on the stage of development of the respective community.   Each particular Landowners' prepetition capital structure is described in detail below.

***Ashburn's Prepetition Capital Structure***

127.     In the order of priority, Ashburn's prepetition capital structure is as follows:

- The Ashburn Construction Loan:  this loan is guaranteed by ERC and is secured by a first priority lien on (1) all assets of Ashburn, including any lien rights of Ashburn in the assets of Ashby and/or ERC, (2) all assets of ERC related to Ashby, and (3) a pledge by ERC of its 100% membership interest in Ashburn;

- The Ashburn Community Loan: Ashburn's obligations are secured by a mortgage on the property in favor of Ashby Ponds; and

- The Ashburn Mezzanine Loan:  This loan is secured by, among other things, a mortgage

- 32 -

on the property and an assignment of rents, profits, incomes, and the like and is guaranteed by ERC and Concord (cross-guarantor).

### Columbus' Prepetition Capital Structure

128.    In the order of priority, Columbus' prepetition capital structure is as follows:

- The Columbus Construction Loan:  This loan is guaranteed by ERC and is secured by a first priority lien on (1) all assets of Columbus, including any lien rights of Columbus in the assets of Hickory Chase and/or ERC, (2) all assets of ERC related to Hickory Chase, and (3) a pledge by ERC of its 100% membership interest in Columbus;

- The Columbus Mezzanine Loan:  This loan is secured by, among other things, a mortgage on the property and an assignment of rents, profits, incomes, and the like and is guaranteed by ERC; and

- Equity funding from ERC.

### Concord's Prepetition Capital Structure

129.    In the order of priority, Concord's prepetition capital structure is as follows:

- The Concord Construction Loan:  This loan is guaranteed by ERC, Erickson Group, and Concord GP and is secured by a first priority lien on (1) all assets of Concord, including any lien rights of Concord in the assets of Maris Grove and/or ERC, (2) all assets of ERC related to Maris Grove, and (3) a pledge by ERC of its 100% membership interest in Concord;

- The Concord Community Loan:  Concord's obligations are secured by a mortgage on the property in favor of the NFP;

- The Concord Sale/Leaseback Agreement:  To secure the agreement, ERC pledges its ownership interest in Concord to the buyer/landlord, and Concord pledges its right, title and interest in certain permits, licenses, plans, contracts and warranties to the buyer/landlord; and

- Equity funding from ERC.

### Dallas' Prepetition Capital Structure

130.    In the order of priority, Dallas' prepetition capital structure is as follows:

- The Dallas Construction Loan:  This loan is guaranteed by ERC and Erickson Construction and is secured by a first priority lien on (1) all assets of Dallas, including any lien rights of Dallas in the assets of Highland Springs and/or ERC, (2) all assets of ERC related to Highland Springs, (3) a pledge by ERC of its 100% membership interest in Dallas, and (4) **a** first mortgage on all land and buildings , except for the parcel relating

to the Texas A&M Note (defined below);

- A promissory note (the "Texas A&M Note") in the amount of $4.4 million granted by Dallas to the Board of Regents of the Texas A&M University System, which is secured by a first priority mortgage in a certain parcel of land in connection with Texas A&M University;

- The Dallas Community Loan:  Dallas' obligations are secured by a mortgage on the property in favor of the NFP;

- The Dallas Sale/Leaseback Agreement:  To secure the agreement, ERC pledges its ownership interest in Dallas to the buyer/landlord, and Dallas pledges its right, title and interest in certain permits, licenses, plans, contracts and warranties to the buyer/landlord; and

- Equity funding from ERC.

### Houston's Prepetition Capital Structure

131.    In the order of priority, Houston's prepetition capital structure is as follows:

- The Houston Construction Loan:  This loan is guaranteed by ERC and Erickson Group and is secured by a first priority lien on (1) all assets of Houston, including any lien rights of Houston in the assets of Eagle's Trace and/or ERC, (2) all assets of ERC related to Eagle's Trace, and (3) a pledge by ERC of its ownership interest in Houston;

- The Houston Community Loan:  Houston's obligations are secured by a mortgage on the property in favor of the NFP;

- The Houston Sale/Leaseback Agreement:  This agreement is guaranteed by ERC and Senior Campus.  To secure the agreement, ERC pledges its ownership interest in Houston to the buyer/landlord, and Houston pledges its right, title and interest in certain permits, licenses, plans, contracts and warranties to the buyer/landlord; and

- Equity funding from ERC.

### Kansas' Prepetition Capital Structure

132.    In the order of priority, Kansas' prepetition capital structure is as follows:

- Transportation Development District Special Assessment Bonds, Series 2006, in the amount of $14,950,000, issued by the City of Overland Park, Kansas;

- The Kansas Construction Loan:  This loan is guaranteed by ERC and is secured by a first priority lien on (1) all assets of Kansas, including any lien rights of Kansas in the assets of Tallgrass Creek and/or ERC, (2) all assets of ERC related to Tallgrass Creek, and (3) a pledge by ERC of its 100% membership interest in Kansas;

- The Kansas Community Loan: Kansas' obligations are secured by a mortgage on the property in favor of the NFP;

- The Kansas Mezzanine Loan: This loan is secured by, among other things, a mortgage on the property and an assignment of rents, profits, incomes, and the like, and it is guaranteed by ERC; and

- Equity funding from ERC.

### *Littleton's Prepetition Capital Structure*

133.    In the order of priority, Littleton's prepetition capital structure is as follows:

- The Littleton Construction Loan: This loan is guaranteed by ERC and Erickson Group and is secured by a first priority lien on (1) all assets of Littleton, including any lien rights of Littleton in the assets of Wind Crest and/or ERC, (2) all assets of ERC related to Wind Crest, and (3) a pledge by ERC of its 100% membership interest in Littleton;

- The Littleton Community Loan: Littleton's obligations are secured by a mortgage on the property in favor of the NFP;

- The Littleton Sale/Leaseback Agreement: This agreement is guaranteed by ERC in favor of the buyer/landlord. To secure the agreement, ERC pledges its membership interest in Littleton to the buyer/landlord, and Littleton pledges its right, title and interest in certain permits, licenses, plans, contracts and warranties to the buyer/landlord; and

- Equity funding from ERC.

### *Novi's Prepetition Capital Structure*

134.    In the order of priority, Novi's prepetition capital structure is as follows:

- The Novi Construction Loan: This loan is guaranteed by ERC and Erickson Group and is secured by a first priority lien on (1) all assets of Novi, including any lien rights of Novi in the assets of Fox Run and/or ERC, (2) all assets of ERC related to Fox Run, and (3) a pledge by ERC of its 100% membership interest in Novi;

- The Novi Community Loan: Novi's obligations are secured by a mortgage on the property in favor of the NFP;

- The Novi Sale/Leaseback Agreement: This agreement is guaranteed by ERC in favor of the buyer/landlord. To secure the agreement, ERC pledges its ownership interest in Novi to HCP, and Novi pledges its right, title and interest in certain permits, licenses, plans, contracts and warranties to the buyer/landlord; and

- Equity funding from ERC.

*Warminster's Prepetition Capital Structure*

135.     In the order of priority, Warminster's prepetition capital structure is as follows:

- The Warminster Community Loan:  Warminster's obligations are secured by a mortgage on the property in favor of the NFP;

- The Warminster Sale/Leaseback Agreement:  This agreement is guaranteed by ERC and Senior Campus in favor of HCP.  To secure the agreement, ERC pledges its ownership interest in Warminster to HCP, and Warminster pledges its right, title and interest in certain permits, licenses, plans, contracts and warranties to the buyer/landlord; and

- Equity funding from ERC.

   iii. <u>STAMPS</u>

136.     In addition to the Corporate Revolver, ERC was issued subordinated unsecured debt in the form of Subordinated Taxable Adjustable Mezzanine Put Securities Series 2007 ("<u>STAMPS</u>") up to a maximum amount of $50 million.  ERC used the proceeds from the STAMPS to pay offering and issuance expenses and for the general corporate purposes, including investments in its projects.

137.     The STAMPS are an unsecured obligation of ERC and have a maturity date of March 15, 2018.  The STAMPS were issued in 2007 with an initial interest rate of 11% and a ten-year term.  The STAMPS pay interest semi-annually, and the interest rate on the securities re-sets approximately every two (2) years.  Investors have the option to put the securities thirty (30) days prior to each rate change.

138.     The STAMPS debt is unsecured and subordinate to ERC's and the Landowners' debt.  As of March 31, 2009, the outstanding debt for the STAMPS is $47.5 million.

## II.     <u>Events Leading to Bankruptcy</u>

   i. *The Decline in the Market*

139.     The senior housing market has been hindered over the past twelve (12) months by

a weakened credit environment, including limited access to capital, falling real estate values, and significantly reduced liquidity due to realized and unrealized losses on investments. New senior housing units under construction have significantly declined since 2004. New units under construction in 2008 totaled 15,862, compared to 20,775 units in 2007, a twenty-four percent (24%) decline.

140.    Senior living facilities have experienced substantial declines in occupancy as a result of the market changes. Prospective residents are faced with (i) difficulty selling their homes due to uncertainty in value and (ii) significant declines in their equity portfolio value. This has made it difficult, if not impossible, for seniors to move into or remain in senior housing facilities, as the IEDs are generally significant ($250,000 to $600,000).

141.    The tightening of the credit market has also significantly affected the 2008 bond-issuance volume, making traditional fixed-rate debt essentially unavailable in the last quarter of 2008. The 2008 bond issuance for the senior living sector was $2.7 billion versus $8 billion in 2007, a decline of over sixty-six percent (66%).

142.    These market conditions have contributed to decreased revenue, lower than anticipated absorption rates at certain campuses, and difficulty raising capital. In addition, some of the developing campuses are not cash flow positive until they mature, and as a result, they require additional support from ERC.

143.    Consequently, ERC and Erickson Construction have been unable to maintain the Liquidity Covenant under the Corporate Revolver, leading to a default under the Corporate Revolver.

        ii.    *The Amendments to the Corporate Revolver*

144.    Pursuant to an amendment dated April 16, 2009 (the "First Corporate Revolver

Amendment"), ERC, Erickson Construction, the Corporate Revolver Lenders, and the Subsidiary Guarantors agreed to reduce the required Liquid Assets under the Liquidity Covenant to $69,500,000, but only through May 29, 2009 or earlier if ERC and Erickson Construction defaulted, in exchange for a $15 million pay down. After May 29, 2009, the required amount of Liquid Assets returned to the amount set forth in the original Liquidity Covenant under the Corporate Revolver.

145.    The First Corporate Revolver Amendment expired on May 29, 2009, and on May 30, 2009, the administrative agent delivered a Notice of Events of Default, Notice of Acceleration, and Demand for Payment to ERC, Erickson Construction, and the Subsidiary Guarantors, pursuant to which the Corporate Revolver Lenders declared a default of the Liquidity Covenant.

146.    On June 1, 2009, ERC, Erickson Construction, the Subsidiary Guarantors, and the Corporate Revolver Lenders entered into a second amendment to the Corporate Revolver and a forbearance agreement (the "Second Corporate Revolver Amendment"), pursuant to which, among other things, the parties agreed to (i) temporarily forbear from exercising their rights and remedies under the Corporate Revolver and applicable law during the forbearance period with respect to the Liquidity Covenant and other existing defaults; and (ii) temporarily permit ERC and Erickson Construction to maintain liquid assets in an amount less than the Liquidity Covenant but equal or greater than $64,500,000.

147.    On July 1, 2009, the parties entered into a third amendment to the Corporate Revolver and forbearance agreement (the "Third Corporate Revolver Amendment"), pursuant to which, among other things, the parties agreed to (i) temporarily forbear from exercising their rights and remedies under the Corporate Revolver and applicable law during the forbearance

period with respect to the Liquidity Covenant and other existing defaults; and (ii) temporarily permit ERC and Erickson Construction to maintain liquid assets in an amount less than the Liquidity Covenant but equal or greater than $64,500,000.

148.     On July 10, 2009, the parties entered into a fourth amendment to the Corporate Revolver and forbearance agreement (the "Fourth Corporate Revolver Amendment"), pursuant to which, among other things, the parties agreed to (i) continue to temporarily forbear from exercising their rights and remedies under the Corporate Revolver and applicable law during a 90-day forbearance period with respect to the Liquidity Covenant and other existing defaults; and (ii) continue to temporarily permit ERC and Erickson Construction to maintain liquid assets in an amount less than the Liquidity Covenant but equal or greater than $36,300,000.

149.     ERC and Erickson Construction have attempted to acquire additional extensions, through at least January 2010, in connection with the Liquidity Covenant in the Corporate Revolver, but the Corporate Revolver Lenders have refused to grant such extensions.  Upon a default by the Debtors under the Corporate Revolver, the Corporate Revolver Lenders are entitled to exercise their remedies against ERC, Erickson Construction, and the Subsidiary Guarantors.

iii.     *Corporate Revolver Lenders Attempt to Drawn Down ERC's Cash*

150.     On the Petition Date, prior to the expiration of the forbearance period under the Fourth Corporate Revolver Amendment, the Corporate Revolver Lenders attempted to exercise their remedies under the Corporate Revolver, and they attempted to draw down on ERC's cash in an amount of at least $16 million.  The Debtors reserve all rights against these lenders.

151.     In addition, the Corporate Revolver Lenders froze ERC's operating accounts containing approximately $20 million of ERC's cash, thus making this cash unavailable to ERC.

Without access to these accounts and this cash, ERC cannot continue to operate its business or adequately provide for the residents.

*iv.*      *Prepetition Marketing of Debtors' Assets*

152.      Prior to the Petition Date, the Debtors engaged in extensive marketing efforts to identify potential investors ("Potential Purchasers") to purchase substantially all of the Debtors' assets, operations and business (the "Assets") or support a plan of reorganization as the plan sponsor. In March 2009, the Debtors retained Houlihan, Lokey, Howard & Zukin, Inc. ("Houlihan") to evaluate strategic alternatives and assist in the negotiation with its lenders, and in September 2009, Houlihan commenced a comprehensive marketing process contacting over eighty (80) parties.

153.      Redwood Capital Investments, LLC, a Maryland limited liability company ("Redwood"), submitted a proposal (the "Redwood LOI") to purchase the Assets, in a letter of intent, dated September 12, 2009. The Debtors executed the Redwood LOI on September 17, 2009. On October 19, 2009, after extensive negotiations, the Debtors and Redwood agreed to the terms of the Master Purchase and Sale Agreement (the "Master Purchase and Sale Agreement"). The Debtors' board of directors approved the sale on September 19, 2009.

154.      As part of the marketing process, the Debtors and their professionals have met with several additional Potential Purchasers that have expressed a high level of interest in the Assets. The Debtors have provided each of the interested parties with marketing materials and access to an electronic data room. Several of the interested parties have held meetings with ERC's management and/or NSC. Houlihan will work with the Debtors to continue to negotiate with and engage interested parties until the solicitation period provided in the Shop Provision, as described below, has expired.

### III. Facts in Support of First Day Motions

155. Concurrently with the filing of their chapter 11 petitions, the Debtors have filed the First Day Motions. The Debtors request that each of the First Day Motions described below be granted, as they constitute a critical element in ensuring the Debtors' successful reorganization in these chapter 11 cases.

### A. Motion for Order Directing Joint Administration of the Debtors' Chapter 11 Cases (the "Joint Administration Motion")

156. By the Joint Administration Motion, the Debtors seek an order consolidating, for procedural purposes only, the administration of the Debtors' chapter 11 cases with Debtor ERC as the lead debtor, pursuant to Bankruptcy Rule 1015. In addition, the Debtors request that the Clerk make an entry on the docket of each of the Debtors' cases, other than the ERC case, stating that an order has been entered directing joint administration of the chapter 11 cases and that all further pleadings and other papers shall be filed in and all further docket entries shall be made in the ERC docket.

157. The Debtors are all affiliates and are filing petitions in the same court. I believe that joint administration will be less costly and burdensome than the separate administration of the estates due to the combined docket and combined notice to creditors and parties in interest. Many applications, motions, orders, hearings and notices will be made in these cases and will affect all of the Debtors. Joint administration will keep all parties informed of matters related to these cases without the inconvenience and confusion of reviewing separate dockets.

158. In addition, as the Debtors are only seeking administrative consolidation by this motion, rather than substantive consolidation, I do not believe creditors' interests will be harmed.

159. I believe that if each Debtor's case were administered independently, there would

- 41 -

be a number of duplicative pleadings and overlapping service. This unnecessary duplication of identical documents would be wasteful of the Debtors' resources, as well as other parties' and this Court's resources.

160.     Therefore, I believe that the Debtors' chapter 11 cases should be jointly administered for procedural purposes only.

**B.      Motion for an Order Pursuant to Bankruptcy Rule 1007 Granting an Extension of Time for Filing Schedules and Statements of Financial Affairs (the "<u>Motion for Extension of Time for Filing Schedules and SOFA</u>")**

161.     By the Motion for Extension of Time for Filing Schedules and SOFA, the Debtors seek an order extending their time for filing the Schedules and Statements of Financial Affairs ("<u>SOFAs</u>") for an additional 45 days (for a total of 60 days).

162.     As a result of the nature of the Debtors' chapter 11 filings, the Debtors have not yet commenced preparation of their schedules and statements, and I do not believe that the fifteen-day automatic extension of time to file their Schedules and SOFAs will be sufficient to permit completion of the Schedules and SOFAs.

163.     At this juncture, I believe that an extension of 45 days (for a total of 60 days) will provide sufficient time to prepare and file the Schedules and SOFAs.

**C.      Debtors' Motion for an Order Pursuant to 11 U.S.C. § 105(A) and Bankruptcy Rule 2002 Establishing Notice Procedures (the "<u>Notice Procedures Motion</u>")**

164.     By the Notice Procedures Motion, the Debtors request the entry of an order limiting notice on various matters to only the affected parties.

165.     The Debtors have approximately 250 creditors who may be entitled to receive notice in these cases. Notice of all pleadings and other papers filed in these cases to each creditor is unnecessary and would be extremely burdensome and costly to the estates, as a result of photocopying, postage expenses, and other expenses associated with these mailings.

166.     The Debtors request the establishment of a master service list (the "Master Service List") that would include:  (a) the Office of the United States Trustee; (b) the Debtors' 30 largest unsecured creditors on a consolidated basis (until an official committee of unsecured creditors is appointed and has retained counsel, in which event, such committee's counsel); (c) counsel to the secured lenders; (d) any party whose interests are directly affected by a specific pleading; (e) counsel to each of the not-for-profit organizations and counsel for National Senior Campuses, Inc.; and (f) those persons who have formally appeared and requested service in these proceedings pursuant to Bankruptcy Rule 2002.

167.     The proceedings with respect to which notice would be limited to the Master Service List would include all matters covered by Bankruptcy Rule 2002, with the express exception of the following:  (a) meeting of creditors under sections 341 or 1104(b); (b) any notices related to claims bar dates; (c) the time fixed for filing objections and the hearing to consider approval of a disclosure statement or confirmation of a plan of reorganization or liquidation; and (d) notice of and transmittal of ballots for accepting or rejecting a plan of reorganization.

168.     The Master Service List would also be used for pleadings, papers and procedures that may, pursuant to the Local Rules, require service upon all parties in interest.

169.     The Debtors will update the Master Service List regularly to include the names and addresses of any parties in interest who have made written request for notice.

170.     Further, the Debtors will submit to the Court upon the completion of noticing any particular matter, either an affidavit of service or certification of service annexing the list of those parties receiving notice.

171.     I believe that the administration of these chapter 11 cases would be more efficient

and cost effective if the relief requested is granted, and, therefore, the Debtors submit that the relief requested in this Motion is in the best interests of the Debtors' estates, their creditors, and parties in interest and will not prejudice the rights of any party in interest in this case.

**D.     Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a) and 363(b) for an Order Authorizing Payment of Prepetition (i) Wages, Salaries, and Other Compensation of Employees, (ii) Employee Medical and Similar Benefits, and (iii) Reimbursable Employee Expenses, and (iv) Other Miscellaneous Employee Expenses and Benefits (the "<u>Wage Motion</u>")**

172.     By the Wage Motion, the Debtors request authorization to pay certain prepetition claims, honor obligations and continue programs, in the ordinary course of business related to employee and independent contractor compensation, payroll administration, wage deductions, government withholdings and payroll taxes, reimbursable expenses, and employee benefit programs.  In addition, the Debtors are requesting an order authorizing and directing banks and other financial institutions to honor all related checks and electronic payment requests.

173.     The Debtors have over 794 employees in the aggregate—65 employees are paid full-time hourly, 6 employees are paid temporary hourly and 723 are full-time salaried employees (collectively, the "<u>Employees</u>").  None of the Debtors' Employees are subject to a collective bargaining agreement.  The Debtors estimate that in total, approximately $2,300,000 in unpaid salary, wages and other compensation is owing to their Employees as of the next pay date of October 23, 2009.

174.     I believe that any delay in paying prepetition employee obligations will adversely impact the Debtors' relationship with their Employees and will irreparably impair the Employees' morale, dedication, confidence and cooperation in the chapter 11 process.  At this early stage in the cases, the Debtors simply cannot risk the substantial damage to their businesses that would inevitably result from a decline in the Employees' morale and cooperation attributable to the Debtors' failure to pay wages, salary, benefits and other similar items.

- 44 -

**E.**     **Motion for Order (I) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (II) Deeming Utility Providers Adequately Assured of Future Performance, and (III) Establishing Procedures for Providing Adequate Assurance f Future Performance to Utility Providers (the "<u>Utilities Motion</u>")**

175.     By the Utilities, the Debtors are requesting interim and final orders to (a) determine that the Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, (b) approve the Debtors' proposed adequate assurance of a deposit of approximately one month of the aggregate cost of utility service into a segregated interest bearing account, (c) prohibit the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtors' proposed adequate assurance pending entry of the Final Order, and (d) determine that the Debtors are not required to provide any additional adequate assurance beyond what is proposed by the motion.

176.     In the ordinary course of business, the Debtors obtain gas, water, sewer, electric, data, telephone, and other similar utility services from various utility providers. Approximately fifteen (15) utility providers provide these services to the Debtors. On average, the Debtors spend approximately $350,000 each month for utility services.

177.     At all relevant times, the Debtors have attempted to remain current with regard to their utility bills. Furthermore, to the best of my knowledge, the Debtors are current on all amounts owing to the Utility Providers, other than payment interruptions that may be caused by the commencement of these chapter 11 cases.

178.     I believe that uninterrupted utility services are essential to the ongoing operations of the Debtors, and therefore, to the successful resolution of these cases. Any interruption of utility services, even for a brief period of time, would negatively affect the Debtors' operations, customer relationships, revenues and profits, seriously jeopardizing the Debtors' efforts and,

ultimately, the value of creditor recoveries.  It is, therefore, critical that utility services continue uninterrupted during the chapter 11 cases.

179.    The Debtors propose to deposit into an interest-bearing, newly-created, segregated account (the "Utility Deposit Account") a sum equal to approximately $350,000, which is calculated based on the average monthly payments made by the Debtors to the Utility Providers.  The Debtors propose to make such deposit within twenty (20) days of the Petition Date.

180.    The funds in the Utility Deposit Account will remain segregated, pending further order of this Court, for the purpose of providing each Utility Company with adequate assurance of payment of its postpetition date services to the Debtors.  Such funds will, however, be subject to the liens on the Debtors' cash collateral, until disbursed to the Utility Providers.

181.    The Debtors also expect to receive postpetition financing during the pendency of these chapter 11 cases and to operate at a profit postpetition.  Thus, they expect to have funds available for payment to the Utility Providers.

182.    Further, the Debtors propose to protect the Utility Providers by establishing the Procedures provided herein, whereby any Utility Provider can request additional adequate assurance in the event that it believes there are facts and circumstances with respect to its providing postpetition services to the Debtors that would merit greater protection.

183.    Therefore, I believe that the Utility Providers have adequate assurance of future performance, and the relief sought in the Utility Motion should be granted.

**F.    Motion for Order Authorizing (I) Continued Use of Existing Cash Management System, (II) Maintenance of Existing Bank Accounts, (III) Continued Use of Existing Business Forms, and (IV) Maintenance of Existing Investment Practices (the "Cash Management Motion")**

184.    By the Cash Management Motion, the Debtors seek entry of an order granting the

following relief:

(a) Authorizing the Debtors to continue to use the Cash Management System, subject to any modification or other relief granted by order of this Court relating thereto, including the following:

(i) the continued use of the existing Bank Accounts with the same names and account numbers as such Bank Accounts existed immediately prior to the Petition Date (with the option of streamlining their Cash Management System by closing or consolidating Bank Accounts);

(ii) the ability of the Debtors to deposit funds into and withdraw funds from any of the Bank Accounts (subject to available funds or, in the case of zero balance accounts, subject to the availability of funds in the applicable linked funding accounts) by all usual means, including but not limited to checks, wire transfers, electronic funds transfers and other debits;

(iii) the ability of the Debtors to continue to make intercompany transfers among the Bank Accounts in the ordinary course of their business through the Cash Management System;

(iv) the ability of the Debtors to otherwise treat the Bank Accounts, along with any accounts opened postpetition, for all purposes as debtor in possession accounts;

(v) the waiver of any requirements to establish separate accounts for cash collateral and/or tax payments; and

(vi) authorizing and directing the Banks to maintain, service and administer such deposit accounts or investment accounts, without interruption and in the ordinary course of business, in accordance with applicable non-bankruptcy law and the account agreements and/or other service documentation between the applicable Bank and the Debtors relating to such accounts; and

(vii) authorizing the Banks to charge and collect, and authorizing but not directing the Debtors to pay, the prepetition and postpetition service charges and other fees and expenses to which the Banks are entitled under the terms of their account agreements and/or other service documentation with the Debtors;

(b) Authorizing the Debtors to continue to use their existing business forms without alteration or change; and

(c)     Authorizing the Debtors to maintain their existing investment practices and waiving the requirements of Section 345(b) of the Bankruptcy Code as to the Debtors' Cash Management System.

185.    I believe that by using the existing Bank Accounts, the Debtors will avoid unnecessary expense and delay, which will disrupt the ordinary financial affairs and business operations of the Debtors, delay the administration of the Debtors' estates, and increase the costs to the estates.

186.    Prior to the Petition Date and in the ordinary course of business, ERC, Erickson Construction, Erickson Group, Concord GP, Dallas GP, Warminster GP, and Senior Campus maintained a centralized cash management system through which funds are collected into an operating account and disbursed to various other accounts to pay operating expenses, with excess funds being invested (the "ERC Cash Management System").  A flow chart depicting the ERC Cash Management System is attached to the Cash Management Motion as Exhibit A.

187.    The ERC Cash Management System employs a series of integrated financial accounts, including a centralized operating account maintained at PNC Bank which receives cash from various sources.  The cash maintained in the operating account is used to fund day-to-day operations, including payroll, employee benefits, payments to vendors, and other accounts payable.  Any funds remaining in the operating account are automatically transferred on a daily basis to an interest-bearing sweep account to maximize interest income.

188.    Likewise, prior to the Petition Date and in the ordinary course of business, the Landowners maintained their own separate cash management systems (collectively, the "Landowner Cash Management Systems;" together with the ERC Cash Management System, the "Cash Management System").  Each of the Landowner Cash Management Systems are similar to the ERC Cash Management System in that funds, except for IEDs, are generally collected into an operating account and disbursed to various other accounts to pay operating expenses, with excess

funds being invested.  The IEDs are held in escrow until certain conditions are satisfied and they are transferred to borrower collateral accounts held by the Landowners.  Flow charts depicting each of the Landowner Cash Management Systems are attached to the Cash Management Motion as <u>Exhibit B</u>.

189.    Each Landowner Cash Management System also employs a series of integrated financial accounts, including a centralized operating account, which is generally maintained at PNC Bank and which receives cash from various sources.  The cash maintained in the operating account is used to fund day-to-day operations of the Landowner, including payments to construction vendors, debt service, and other accounts payable.  Any funds remaining in the operating account are typically transferred automatically on a daily basis to an interest-bearing sweep account to maximize interest income.

190.    Furthermore, funds may flow back and forth from the ERC Cash Management System and an individual Landowner's Cash Management System (<u>e.g.</u>, from the ERC Operating Account or Erickson Construction Account to a particular Landowner's operating account) to cover certain operating costs, such as payments to subcontractors or other vendors.  These intercompany transfers are made between ERC, Erickson Construction, and individual Landowners on an as-needed basis.  No intercompany transfers occur between individual Landowners.

191.    As of the Petition Date, the Debtors' Cash Management System employed a total of sixty-nine (69) bank accounts (collectively, the "<u>Bank Accounts</u>") with the following financial institutions (collectively with any other institutions with which the Debtors maintain or establish deposit accounts or investment accounts, the "<u>Banks</u>"):  (a) Bank of America, N.A.; (b) M&T

Bank; (c) Pen Cal Trust; (d) PNC Bank; (e) Sandy Spring Bank; (f) Sovereign Bank; (g) Fifth Third Bank; and (h) Key Bank.

192.     The table attached to the Cash Management Motion as <u>Exhibit C</u> sets forth for each of the Bank Accounts the name of the particular Debtor that maintains the account, the name of the institution at which the account is maintained, the account number (last four digits only) and a description of the purpose of the account.  The Debtors manage their cash receipts, transfers and disbursements through the Bank Accounts.  In doing so, the Debtors routinely deposit, withdraw and otherwise transfer funds to, from and between the Bank Accounts by various methods including check, wire transfer, automated clearing house transfer and electronic funds transfer.  On a daily basis, the Debtors process large numbers of transactions through the Cash Management System.   The Debtors maintain current and accurate records of all transactions processed through the Cash Management System.

193.     The Debtors' Cash Management System is similar to those commonly employed by corporate enterprises of comparable size and complexity.  Among other benefits, the Cash Management System permits the Debtors to accurately monitor cash availability at all times. The Cash Management System also permits the Debtors to centrally manage and track the collection and transfer of funds, including intercompany transfers, which reduces administrative burden and expense and maximizes interest income.

194.     In addition to the Cash Management System and Bank Accounts, the Debtors use in the ordinary course of their business numerous business forms (including but not limited to checks, deposit slips, letterhead, contracts, purchase orders and invoices).  The Debtors have a supply of these forms on hand.  It would be expensive and wasteful, and disruptive to the Debtors' business, to destroy all of these forms and order new ones.

195.    Contemporaneously with the filing of the Cash Management Motion, the Debtors have filed other motions seeking authority to pay certain prepetition obligations, including obligations to employees, taxing authorities and other entities.  With respect to certain of these prepetition obligations, the Debtors already have issued, in the ordinary course of business, checks and other debits that have yet to clear the banking system.  In other instances, the Debtors will issue checks or other debits postpetition on account of the prepetition obligations once the Court has entered an appropriate order permitting the Debtors to do so.  The Debtors intend to inform the Banks which prepetition checks and other debits should be honored pursuant to orders of the Court authorizing such payment.

196.    I believe that the relief requested in the Cash Management Motion will help to ensure the Debtors' orderly entry into and administration in chapter 11 and avoid many of the possible disruptions and distractions that could divert the Debtors' attention from more pressing matters during the initial days of these chapter 11 cases.

197.    Given the size and complexity of the Debtors' business operations, any disruption of their accounting and cash management procedures would be enormously burdensome and disruptive, and could adversely impact the Debtors' efforts to reorganize.  At this critical juncture, the Debtors must be able to conduct "business as usual" to the extent possible.  To this end, it is essential that the Debtors be permitted to continue to use their existing Cash Management System and Bank Accounts.

198.    In light of these factors, I believe that the Debtors should be permitted to maintain their investment practices.

**G.    Motion of ERC for Interim and Final Orders (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, an (III) Scheduling a Final Hearing (the "ERC Cash Collateral Motion")**

199.    By this Motion, the ERC seeks entry of interim and final orders, pursuant to

sections 105(a), 361, 362, 363, 364, 1107 and 1108 of the Bankruptcy Code, (i) authorizing ERC to use Cash Collateral, (ii) approving the form of adequate protection provided to the Secured Lenders, and (iii) scheduling a final hearing.

200.    As described in the Cash Collateral Motion, ERC has secured and subordinated debt.  As of the Petition Date, ERC had approximately $195.7 million in outstanding secured debt under the Corporate Revolver.

201.    In the ordinary course of business, the ERC requires cash on hand and cash flow from their operations to fund their working capital and liquidity needs, satisfy payroll obligations, and pay other routine payables.  Pursuant to the Corporate Revolver, all of ERC's cash and cash proceeds are encumbered by a security interest in favor of the Senior Secured Lenders and, as such, constitute "cash collateral" of the Senior Secured Lenders (as such term is defined in Bankruptcy Code section 363(a), "Cash Collateral").

202.    ERC has an emergency need for the immediate use of Cash Collateral to, among other things, maintain ongoing day-to-day operations, fund its working capital needs, and satisfy its payroll obligations.  Absent the use of Cash Collateral, ERC will be unable to continue managing its CCRCs, and it will be forced to cease operations of its business, thereby jeopardizing its ability to maximize the value of its estate.  Such an abrupt cessation of ERC's business would have devastating effects on the residents of the communities, including leaving many residents without food, medical supplies, and the health and support services that they require.  Many residents may be forced to immediately relocate, and they will suffer extreme hardship, risking both their lives and health.  In addition, absent the use of Cash Collateral, ERC cannot fund payroll for more than 700 employees and will lose many employees.  ERC will also be unable to satisfy other routine payable obligations, thereby leaving ERC's CCRCs in a

complete state of disarray.

203. ERC has requested that the Senior Secured Lenders consent to ERC's use of Cash Collateral, but as of the Petition Date, they have refused and no consensual agreement for the use of Cash Collateral has been reached.

204. I believe that without the use of Cash Collateral, the ERC's business will cease, and the success of these chapter 11 proceedings will be jeopardized.

205. ERC has submitted with the Cash Collateral Motion a proposed interim order granting the relief requested (the "Interim Order").  Attached to the Interim Order is a detailed operating budget (the "Budget").  Certain of the terms of the Interim Order are summarized below:

| Term | Brief Summary |
|---|---|
| **Use of Cash Collateral** | ERC is authorized to use Cash Collateral upon the terms and conditions set forth in this Interim Order and in accordance with the Budget from the Petition Date through and including the date of conclusion of the final hearing on the Motion. |
| **Adequate Protection** | The Senior Secured Lenders are entitled to adequate protection of their interest in the Cash Collateral and other security granted to the Senior Secured Lenders under the Corporate Revolver.  ERC shall provide the Senior Secured Lenders with the following adequate protection (collectively, the "Adequate Protection"):<br><br>(a)  Each month, ERC shall pay the Senior Secured Lenders an amount equal to the interest for the Corporate Revolver, and this amount shall be applied to reduce the principal of the Corporate Revolver;<br><br>(b)  ERC proposes to provide the Senior Secured Lenders additional and replacement security interests and liens (the "Adequate Protection Liens") in and upon all prepetition and postpetition assets and properties (tangible, intangible, real, personal and mixed), whether now existing or newly acquired or arising, and wherever located, including, without limitation, all receivables, other than avoidance actions arising under chapter 5 of the Bankruptcy Code ("Avoidance Actions"), all Cash Collateral, and all cash and non-cash proceeds, substitutions, |

| | |
|---|---|
| | accessions and profits of all of the foregoing; and<br><br>(c)    Subject to the Carve-Out (defined below) for certain professional fees and administrative expenses, the Senior Secured Lenders will receive a superpriority claim as provided in Bankruptcy Code section 507(b) (the "Superpriority Claim") to the extent of any diminution in the value of the Senior Secured Lenders' interest in the Cash Collateral. |
| **Carve-Out** | To the extent unencumbered funds are not available to pay administrative expenses in full, the Adequate Protection granted hereunder to the Senior Secured Lenders shall be subject only to payment of the Carve-Out.  As used in the Interim Order, the term "Carve-Out" means the following: (a) the unpaid fees of the Clerk of the Court and the United States Trustee pursuant to 28 U.S.C. § 1930(a); and (b) the aggregate accrued and unpaid fees and expenses payable under Bankruptcy Code sections 330 and 331 to professionals retained pursuant to an order of the Court by ERC and any statutory committee which may be appointed in these cases, not to exceed the amounts permitted therefor in the Budget. |
| **Priority** | Subject to the Carve-Out, any claim or lien granted by the Interim Order with respect to the Adequate Protection shall not be: (a) subject or junior to any lien that is avoided and preserved for the benefit of ERC's estate, whether under Bankruptcy Code section 551 or otherwise; or (b) subordinated to or made *pari passu* with any other lien, whether under Bankruptcy Code section 364(d) or otherwise.  No claim or lien having a priority superior to or *pari passu* with those granted by the Interim Order with respect to the Adequate Protection shall be granted or allowed until the indefeasible payment in full in cash and satisfaction in the manner provided in the Interim Order of the Adequate Protection. |

206.    I believe that the relief requested in the Cash Collateral Motion is in the best interests of ERC, its estate and its creditors, and absent such relief, the ERC will experience immediate and irreparable harm and their reorganization efforts will be jeopardized.

**H.    Motion Of Ashburn Campus, LLC, Columbus Campus, LLC, Concord Campus, LP, Dallas Campus, LP, Houston Campus, LP, Kansas Campus, LLC, Littleton Campus, LLC, Novi Campus, LLC, And Warminster Campus, LP, For Interim And Final Orders (I) Authorizing The Use Of Cash Collateral, (II) Granting Adequate Protection To Secured Lenders, And (III) Scheduling A Final Hearing (the "Landowner Cash Collateral Motion")**

207.    By this Motion, the Landowners seek entry of interim and final orders, pursuant

- 54 -

to sections 105(a), 361, 362, 363, 364, 1107 and 1108 of the Bankruptcy Code, (i) authorizing the Debtors to use Cash Collateral, (ii) approving the form of adequate protection provided to the Secured Lenders, and (iii) scheduling a final hearing.

208. In the ordinary course of business, the Landowners require cash on hand and cash flow from their operations to pay construction costs and other routine payables. In addition, the Landowners require cash on hand to fund these chapter 11 cases and to successfully reorganize. All of the Landowners' cash and cash proceeds are encumbered by security interests in favor of the Senior Secured Lenders and, as such, constitute "cash collateral" of the Senior Secured Lenders (as such term is defined in Bankruptcy Code section 363(a), "Cash Collateral").

209. The Landowners have an emergency need for the immediate use of Cash Collateral to, among other things, maintain ongoing day-to-day operations and fund their working capital needs. Absent the use of Cash Collateral, the Landowners will be forced to cease operations of their business, thereby jeopardizing their ability to maximize the value of their estates. Such an abrupt cessation of the business would have devastating effects on the residents of the communities, would cause the residents to suffer immediate and irreparable harm, and would leave the CCRCs that are under development in a complete state of disarray.

210. The Landowners have submitted with the Landowners Cash Collateral Motion a proposed interim order granting the relief requested (the "Interim Order"). Attached to the Interim Order is a detailed operating budget (the "Budget"). Certain of the terms of the Interim Order are summarized below:

| Term | Brief Summary |
|---|---|
| Use of Cash Collateral | The Landowners are authorized to use Cash Collateral upon the terms and conditions set forth in this Interim Order and in accordance with the Budget from the Petition Date through and |

| | including the date of conclusion of the final hearing on the Motion. |
|---|---|
| **Adequate Protection** | The Senior Secured Lenders are entitled to adequate protection of their interest in the Cash Collateral and other security granted to the Senior Secured Lenders under the Corporate Revolver. The following adequate protection (collectively, the "<u>Adequate Protection</u>") shall be provided:<br><br>(a)    The Landowners propose to provide the Senior Secured Lenders additional and replacement security interests and liens (the "<u>Adequate Protection Liens</u>") in and upon all prepetition and postpetition assets and properties (tangible, intangible, real, personal and mixed), whether now existing or newly acquired or arising, and wherever located, including, without limitation, all receivables, other than avoidance actions arising under chapter 5 of the Bankruptcy Code ("<u>Avoidance Actions</u>"), all Cash Collateral, and all cash and non-cash proceeds, substitutions, accessions and profits of all of the foregoing; and<br><br>(b)    Subject to the Carve-Out (defined below) for certain professional fees and administrative expenses, the Senior Secured Lenders will receive a superpriority claim as provided in Bankruptcy Code section 507(b) (the "<u>Superpriority Claim</u>") to the extent of any diminution in the value of the Senior Secured Lenders' interest in the Cash Collateral.<br><br>Furthermore, the Landowners shall continue to operate their business, and in doing so, shall preserve the value of the company. The Landowners intend to obtain debtor-in-possession financing and to only require the use of Cash Collateral for 2 weeks following the Petition Date. |
| **Carve-Out** | To the extent unencumbered funds are not available to pay administrative expenses in full, the Adequate Protection granted hereunder to the Senior Secured Lenders shall be subject only to payment of the Carve-Out.  As used in the Interim Order, the term "<u>Carve-Out</u>" means the following: (a) the unpaid fees of the Clerk of the Court and the United States Trustee pursuant to 28 U.S.C. § 1930(a); and (b) the aggregate accrued and unpaid fees and expenses payable under Bankruptcy Code sections 330 and 331 to professionals retained pursuant to an order of the Court by the Landowners and any statutory committee which may be appointed in these cases, not to exceed the amounts permitted therefor in the Budget. |
| **Priority** | Subject to the Carve-Out, any claim or lien granted by the Interim Order with respect to the Adequate Protection shall not be: (a) subject or junior to any lien that is avoided and preserved for the benefit of the Landowner's estates, whether under Section 551 of the Bankruptcy Code or otherwise; or (b) subordinated to or made |

| | *pari passu* with any other lien, whether under Section 364(d) of the Bankruptcy Code or otherwise. No claim or lien having a priority superior to or *pari passu* with those granted by the Interim Order with respect to the Adequate Protection shall be granted or allowed until the indefeasible payment in full in cash and satisfaction in the manner provided in the Interim Order of the Adequate Protection. |
|---|---|

211.    I believe that the relief requested in the Landowners Cash Collateral Motion is in the best interests of the Landowners, their estates and their creditors, and absent such relief, the Landowners will experience immediate and irreparable harm and their reorganization efforts will be jeopardized.

### I.    Application for Authority to Employ and Retain BMC Group as Claims Agent to the Debtors and Debtors in Possession ("BMC Retention Application")

212.    By this application the Debtors are requesting authority to employ BMC Group ("BMC") as their claims agent with respect to these chapter 11 proceedings and to provide services in connection with claims, reporting and other financial responsibilities in these chapter 11 cases.

213.    BMC is a claims agent and provider of restructuring administrative services. The professionals at BMC are well-qualified to advise the Debtors in these bankruptcy proceedings, as they have substantial experience providing restructuring administrative services in bankruptcy cases similar in size and complexity to these chapter 11 cases.

214.    I believe such experience and knowledge will be valuable to the Debtors during these cases. Accordingly, the Debtors wish to retain BMC to provide assistance during these cases.

## <u>CONCLUSION</u>

215.　　For all the foregoing reasons, I respectfully request that the Court grant the relief requested in the First Day Motions.

216.　　I declare under penalty of perjury that the foregoing is true and current.


　　　　　　　　　　　　/s/ Paul Rundell
　　　　　　　　　　　　Paul Rundell

EAST\42433374.7