# Exhibit C

# Agreement

# Exhibit C
# Agreement



<u>*Confidential*</u>

March 19, 2009

Mr. John Erickson
Chairman of the Board
Erickson Retirement Communities, LLC
701 Maiden Choice Lane
Catonsville, Maryland 21228

Dear Mr. Erickson:

This letter agreement (this "Agreement") confirms the terms under which Erickson Retirement Communities, LLC ("Erickson LLC"), and each of its direct and indirect subsidiaries and affiliates, and any entity formed by, or at the direction of, Erickson LLC, including the subsidiaries which own or control the properties listed on Schedule A hereto (all of the foregoing collectively being referred to herein as the "Company") has engaged Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan Lokey"), effective as of the date indicated above (the "Effective Date"), as its lead financial advisor to provide financial advisory and investment banking services in connection with a potential "Transaction" (as more fully defined herein) and with respect to such other financial matters as to which the Company and Houlihan Lokey may agree in writing during the term of this Agreement.

1. **Services**. In connection with each potential Transaction (as defined below), Houlihan Lokey will report directly to the Board of Directors of Erickson LLC and will assist and advise the Company with the analysis, evaluation, pursuit and effectuation of any such Transaction.

   Houlihan Lokey will work with management, the Board and the Company's legal and other advisors to understand the current situation and the perspectives of the various constituents. We will then evaluate strategic alternatives and help the Company implement the selected Transaction(s). Immediately upon engagement, we expect to:

   (i) Review the Company's historical and projected financial statements (consolidated and by asset), operations, liquidity, competitive environment, prospects and related matters

   (ii) Review and analyze market and valuation drivers

   (iii) Evaluate the Company's financial projections and assist the Company with the preparation of any alternate projection scenarios

Chicago • 123 North Wacker Drive, 4th Floor • Chicago, Illinois 60606 • tel.312.456.4700 • fax.312.346.0951
Los Angeles  New York  San Francisco  Washington, D.C.  Minneapolis  Dallas  Atlanta  London  Paris  Frankfurt  Hong Kong  Tokyo  Beijing
Broker/dealer services through Houlihan Lokey Howard & Zukin Capital.   Investment advisory services through Houlihan Lokey Howard & Zukin Financial Advisors.


(iv) Review the Company's debt agreements, as well as all other obligations and guarantees and their relative priorities, including resident agreements (e.g., the treatment of Initial Entrance Deposits ("IEDs") and residents' and creditors' rights with respect to IEDs)

(v) Evaluate the current management and asset management structure of the Company, as well as the strength and impact of the "Erickson" brand in conjunction with any potential strategic alternatives

(vi) Evaluate the lenders' and other constituents' strategies and options given their positions with respect to each asset and overall in the capital structure and the current market dynamics

(vii) Consider the impact of various alternatives (both in and out of Chapter 11) on the Company's strategies and business operations, as well as the lenders' and other constituents' (e.g., residents, regulatory authorities, vendors, etc.) alternatives in such scenarios

Upon completion of this initial due diligence, we expect to evaluate each of the Company's available strategic alternatives and assist with the implementation of the selected strategic alternative(s), which alternatives may include financing, recapitalization, merger, acquisition, divestiture, and/or restructuring alternatives. We anticipate that these services would include:

(i) Assist the Company with lender, regulatory, resident and other constituent discussions to drive collaborative, efficient negotiations toward project-level and comprehensive restructuring solutions

(ii) Manage the process of information flow and the provision of updates about the situation and current status to lenders and other constituents

(iii) Assist the Company with the development, negotiation and implementation of a Transaction(s)

(iv) Serve as the Company's representative and advisor in negotiations with other parties involved in the Transaction(s)

(v) Develop materials to be distributed to the existing lenders and other constituents, as well as prospective lenders/investors, coordinating due diligence and leading negotiations through final transaction documentation

(vi) Provide expert advice and testimony, as necessary, on financial and process matters relating to a Transaction, including the feasibility of any Transaction and the valuation of any securities issued in connection therewith

(vii) Advise the Company and its Board of Directors regarding various alternatives, Transactions and/or other issues related thereto

(viii) Render such other financial advisory and investment banking services as may be mutually agreed upon by Houlihan Lokey and the Company

We expect to commence our due diligence immediately upon our retention and work closely with management, the Board, counsel and CRG Partners to fully evaluate on a consolidated and asset level, liquidity, contribution, capital structure, ranges of realizable value, debt capacity, strategic alternatives, recourse / non-recourse obligations, treatment of IEDs, asset management structures, etc. In our initial phase of our engagement, we anticipate presenting to the Board our assessment of available alternatives and recommended course of action. The next phase of our engagement will be dependent on the Company's chosen course of action. We understand that the


Company's objective is to pursue an out-of-court restructuring solution for the Company that provides a sustainable capital structure and business model going forward. Of course, as with any restructuring, the outcome is not fully predictable and we will continually evaluate the Company's in- and out-of-court options through ongoing contingency planning with management, the Board, counsel and other advisors.

2. **Exclusive Agency.** The Company agrees that none of it, its controlling equity holders or other affiliates, or its management will initiate any discussions regarding a Transaction during the term of this Agreement, except with prior consultation with Houlihan Lokey. In the event the Company, its controlling equity holders or other affiliates, or its management receives any inquiry regarding a Transaction from any party, the Company shall promptly inform Houlihan Lokey of such inquiry so that Houlihan Lokey can assist the Company in evaluating such party and its interest in a Transaction and in any resulting negotiations.

3. **Fees.** In consideration of Houlihan Lokey's acceptance of this engagement and performance of services pursuant to this Agreement, the Company shall pay the following:

   a. *Initial Payment and Monthly Fees*: In addition to the other fees provided for herein, (i) upon the execution of this Agreement, the Company shall be obligated to pay Houlihan Lokey a nonrefundable cash fee of $500,000, which shall be earned as of the Effective Date of this Agreement and payable by the Company on or before April 1, 2009. The $500,000 initial payment shall cover the first two installments of the "Monthly Fee", and (ii) upon the 20th day of the second month after the Effective Date, and on the 20th day of each month thereafter during the term of this Agreement, the Company shall pay Houlihan Lokey in advance, without notice or invoice, a nonrefundable cash fee of $250,000 ("Monthly Fee"). Each Monthly Fee shall be earned by Houlihan Lokey upon receipt thereof in consideration of Houlihan Lokey accepting this engagement and performing services as described herein. If this Agreement is terminated before the end of four months from the Effective Date, the Company hereby agrees to pay to Houlihan Lokey, on the effective date of such termination, any excess of the amount of Monthly Fees for four months over the Monthly Fees actually paid to Houlihan Lokey hereunder.

   b. *Transaction Fee(s)*: In addition to the other fees provided for herein, the Company shall pay Houlihan Lokey the following transaction fee(s) (each of which may be referred to as a "Transaction Fee" and collectively as "Transaction Fees"):

      i. *Sale Transaction Fee.* Upon the closing of each Sale Transaction (as defined in Section 6 below), Houlihan Lokey shall earn, and the Company shall thereupon pay immediately and directly by the Company and/or from the gross proceeds of such Sale Transaction, as a cost of such Sale Transaction, a cash fee ("Sale Transaction Fee") equal to the greater of (a) $525,000 for each such Sale Transaction, and (b) the sum of the following:

| *Adjusted AGC* | *Sale Transaction Fee* |
|---|---|
| From $35.0 million to Tier I Adjusted AGC | $525,000 plus 150 bps times Adjusted AGC over $35.0 million, plus |
| From Tier I to Tier II Adjusted AGC | 300 bps times incremental Adjusted AGC, plus |
| From Tier II to Tier III Adjusted AGC | 500 bps times incremental Adjusted AGC, plus |
| Over Tier III Adjusted AGC | 700 bps times Adjusted AGC over Tier III |



HOULIHAN LOKEY

For purposes of calculating the Sale Transaction Fee, "Adjusted AGC" shall mean an amount equal to seventy percent (70.0%) times actual AGC (as defined in Section 7 below). The Company and Houlihan Lokey shall agree upon the Adjusted AGC levels to be considered "Tier I", "Tier II" and "Tier III" prior to entering the market or otherwise entering into negotiations regarding a Sale Transaction. If more than one Sale Transaction is consummated, Houlihan Lokey shall be compensated based on the Adjusted AGC from all Sale Transactions, calculated in the manner set forth above; subject, however, to a minimum Sale Transaction Fee of $525,000 for each Sale Transaction.

ii. *Financing Transaction Fee.* Upon the closing of each Financing Transaction (as defined in Section 6 below), Houlihan Lokey shall earn, and the Company shall thereupon pay immediately and directly from the gross proceeds of such Financing Transaction, as a cost of such Financing Transaction, a cash fee ("Financing Transaction Fee") equal to the sum of: (a) 1.4% of the gross proceeds of any indebtedness raised or committed that is senior to other indebtedness of the Company, secured by a first priority lien and unsubordinated, with respect to both lien priority and payment, to any other obligations of the Company; (b) 2.8% of the gross proceeds of any indebtedness raised or committed that is secured by a lien (other than a first lien), is unsecured and/or is subordinated; and (c) 4.2% of the gross proceeds of all equity or equity-linked securities (including, without limitation, convertible securities and preferred stock) placed or committed. Any warrants issued in connection with the raising of debt or equity capital shall, upon the exercise thereof, be considered equity for the purpose of calculating the Financing Transaction Fee, and the valuation of such warrants shall be determined pursuant to a valuation prepared by Houlihan Lokey and, if agreed to by the Company, such valuation shall be determinative in calculating Houlihan Lokey's Financing Transaction Fee associated with such warrants; provided, however, if the Company and Houlihan Lokey cannot agree as to such valuation, then that portion of the Financing Transaction Fee associated with such warrants shall be paid upon the exercise of the warrants and from the gross proceeds thereof, regardless of any prior termination or expiration of this Agreement. It is understood and agreed that if the proceeds of any such Financing Transaction are to be funded in more than one stage, Houlihan Lokey shall be entitled to its applicable compensation hereunder upon the closing date of each stage. The Financing Transaction Fee(s) shall be payable in respect of any sale of securities whether such sale has been arranged by Houlihan Lokey, by another agent (or other issuer of the Securities in such Financing Transaction) or directly by the Company or any of its affiliates. Any non-cash consideration provided to or received in connection with the Financing Transaction (including but not limited to intellectual or intangible property) shall be valued for purposes of calculating the Financing Transaction Fee as equaling the number of securities issued in exchange for such consideration multiplied by the per security price paid in the then-current round of financing. The fees set forth herein shall be in addition to any other fees that the Company may be required to pay to any Investor or other purchaser of Securities to secure its financing commitment.

iii. *Amendment Transaction Fee.* Upon the completion of an Amendment Transaction (as defined in Section 6 below), Houlihan Lokey shall earn, and the Company shall thereupon pay to Houlihan Lokey, a cash fee equal to $100,000 for each such Amendment Transaction ("Amendment Transaction Fee"), provided (a) if multiple Amendment Transactions are consummated contemporaneously with multiple lenders (and no individual Amendment Transaction involves the extension of maturities), then the maximum aggregate fee for such contemporaneous Amendment Transactions shall be $500,000 (i.e., 5.0 x the Amendment Transaction Fee); and (b) if multiple Amendment Transactions are consummated contemporaneously with multiple lenders (and any one or more of those Amendment Transactions involve the extension of

Mr. John Erickson
ERICKSON RETIREMENT COMMUNITIES, LLC
March 19, 2009
Page 5



HOULIHAN LOKEY

maturities), then the maximum aggregate fee for such contemporaneous Amendment Transactions shall be $1,000,000 (i.e., 10.0 x the Amendment Transaction Fee).

 iv. *Restructuring Transaction Fee.* Upon the earlier to occur of: (a) in the case of an out-of-court Restructuring Transaction (as defined in Section 6 below), the effectiveness of all necessary waivers, consents, amendments or restructuring agreements between the Company and its creditors; and (b) in the case of an in-court Restructuring Transaction, the confirmation date of a plan under the Bankruptcy Code, Houlihan Lokey shall earn, and the Company shall promptly pay to Houlihan Lokey, a cash fee ("Restructuring Transaction Fee") of (x) $8.25 million or (y) if, on or prior to the ninetieth (90th) day following the Effective Date, the Company elects in writing to pay Houlihan Lokey an alternative Restructuring Fee (herein, the "Tiered Restructuring Transaction Fee") which shall be equal to the greater of (xx) $4,327,500.00 million and (yy) the sum of the following:

| *Amount of Restructured Debt* | *Restructuring Transaction Fee* |
|---|---|
| For up to $700.0 million | 70 bps times amount of Restructured Debt, plus |
| From $700.0 million to up to $1.4 billion | 55 bps times amount of Incremental Restructured Debt, plus |
| From $1.4 billion to up to $2.1 billion | 40 bps times amount of Incremental Restructured Debt (less $500,000), plus |
| Over $2.1 billion | 25 bps times amount of Incremental Restructured Debt |

If the Company consummates a Restructuring Transaction on an out-of-court basis, or through a "prepackaged" or "prearranged" plan (whereby the Restructuring Transaction is confirmed in six months or less from the "Petition Date"), then the Restructuring Transaction Fee shall be increased by a premium of 15.0%.

The Restructuring Transaction Fee as calculated herein is intended to fully compensate Houlihan Lokey for any and all Restructuring Transactions consummated. The parties acknowledge and agree that notwithstanding that there may be multiple Restructuring Transactions consummated (and these Restructuring Transactions may not happen simultaneously), there will be one aggregate Restructuring Transaction Fee that will only be adjusted upward (a) if the Company elects the Tiered Restructuring Transaction Fee and/or (b) if the 15.0% premium set forth in the immediately preceding paragraph is earned.

 c. *Credits / Offsets against Transaction Fees.*

  i. *Monthly Fee Credits.* Twenty-five percent (25.0%) of the Monthly Fees timely received by Houlihan Lokey for the thirteenth through eighteenth month of this Engagement and fifty percent (50.0%) of the Monthly Fees timely received by Houlihan Lokey for the nineteenth month and thereafter shall be credited first against any Financing and Sale Transaction Fees and then against any Restructuring Transaction Fees to which Houlihan Lokey becomes entitled hereunder (it being understood and agreed that no Monthly Fee shall be credited more than once), provided that in no event shall such Transaction Fees be reduced below zero.


  ii. *Financing and Sale Transaction Fee Credits.* Twenty-five percent (25.0%) of all Financing Transaction Fees and Sale Transaction Fees (net of any credits against such Financing and Sale Transaction Fees from the Monthly Fees) paid to Houlihan Lokey shall be credited and offset against any Restructuring Transaction Fees payable to Houlihan Lokey.

  iii. *Amendment Transaction Fee Credits.* One hundred percent (100.0%) of all Amendment Transaction Fees paid to Houlihan Lokey shall be credited and offset against any Restructuring Transaction Fees payable to Houlihan Lokey.

  iv. *Overall Application of Credits.* In no event shall the aggregate of all credits and offsets set forth in this paragraph reduce the Restructuring Transaction Fees or any other Transaction Fees below zero (i.e., Transaction Fees shall always be zero or greater).

 d. *General Interpretations.* Any Restructuring Transaction Fee, Sale Transaction Fee, Financing Transaction Fee and Amendment Transaction Fee is each referred to herein as a "Transaction Fee" and are collectively referred to herein as "Transaction Fees." All payments received by Houlihan Lokey pursuant to this Agreement at any time shall become the property of Houlihan Lokey without restriction. No payments received by Houlihan Lokey pursuant to this Agreement will be put into a trust or other segregated account.

4. **Term and Termination.** This Agreement may be terminated at any time by either party upon thirty days' prior written notice to the other party. The expiration or termination of this Agreement shall not affect (a) any provision of this Agreement other than Sections 1 through 3 and (b) Houlihan Lokey's right to receive, and the Company's obligation to pay, any and all fees, expenses and other amounts due, whether or not any Transaction shall be consummated prior to or subsequent to the effective date of expiration or termination, as more fully set forth in this Agreement. In addition, notwithstanding the expiration or termination of this Agreement, Houlihan Lokey shall be entitled to full payment by the Company of the Transaction Fees described in this Agreement: (a) so long as a Transaction is consummated during the term of this Agreement, or within eighteen (18) months after the date of expiration or termination of this Agreement ("Tail Period"), and/or (b) if an agreement in principle to consummate a Transaction is executed by the Company during the term of this Agreement, or within the Tail Period, and such Transaction is consummated at any time following such execution with the counterparty named in such agreement, or with any affiliate, employee or investor in such counterparty, or any affiliate of any of the foregoing. Notwithstanding the foregoing, the parties agree that the Tail Period shall expire upon the payment in full of the Restructuring Transaction Fee owing under this Agreement.

5. **Agreement from Secured Lenders.** Prior to pursuing a Transaction, upon the Company's consent, Houlihan Lokey may, at its election, seek the execution of a waiver, subordination or similar agreement, in form and substance satisfactory to Houlihan Lokey, pursuant to which the Company's senior secured lenders holding a security interest in the assets involved in such Transaction consent to the payment of the Transaction Fees under this Agreement, as a cost of such Transaction and free and clear of such lenders' security interests in the Company's assets. This provision is solely for the benefit of Houlihan Lokey and may not be used by the Company or its secured creditors as a basis for withholding Transaction Fees from Houlihan Lokey.

6. **Transaction.** As used in this Agreement, the term "Transaction" shall mean any of the following (provided, however, that the sale of a CCRC to the Not For Profit Operating Company, or a borrowing by a Not For Profit Operating Company, consistent with past practice, shall not be considered a Transaction under this Agreement, and no Transaction Fees shall be due Houlihan Lokey for any such sale or financing, however such sale of financing is structured), each of which has been approved by the Company's Board of Directors:


(i) *Financing Transaction.* (a) Any transaction or series of related transactions that constitutes any refinancing of all or any portion of the Company's existing obligations and/or (b) the placement, raising or issuance of any form of equity, equity-linked or debt securities (including, without limitation, any convertible securities, preferred stock, unsecured, non-senior or subordinated debt securities, and/or senior notes or bank debt) or any loan or other financing, including any "debtor in possession financing" or "exit financing" in connection with a case under the Bankruptcy Code by the Company (any or all of which being "Securities"), from any source including, without limitation, any of the Company's existing owners, shareholders, employees, creditors or affiliates, but excluding any increase in the credit available under the Company's loan agreements existing as of the date hereof (whether or not such transaction is effectuated in-court, out-of-court, through the confirmation of a plan of reorganization or otherwise under the Bankruptcy Code, or whether the requisite consents to such transaction(s) are obtained in-court or out-of-court) (each a "Financing Transaction").

(ii) *Sale Transaction.* Any transaction or series of related transactions that constitute the disposition to one or more third parties (including, without limitation, any person, group of persons, partnership, corporation or other entity, and also including, among others, any of the Company's existing owners, shareholders, employees, creditors and/or the affiliates of each, but excluding any transfer of assets or equity of a subsidiary of Erickson LLC to another subsidiary of Erickson LLC existing as of the date hereof) in one or a series of related transactions of (a) one or more of the Company's continuing care retirement communities ("CCRCs") (except as provided in the introductory paragraph of this Section 6) or a material portion of the equity securities of the Company or ownership interests or any interest held by the Company, any direct or indirect subsidiary or affiliate in any joint venture or partnership or other entity formed by any of them and/or (b) any significant portion of the assets (including the assignment of any executory contracts) or operations of the Company, any of its direct or indirect subsidiaries or any joint venture or partnership or other entity formed by it, in either case, including, without limitation, through a sale or exchange of capital stock, options or assets with or without a purchase option, a merger, consolidation or other business combination, an exchange or tender offer, a recapitalization, the formation of a joint venture, partnership or similar entity, or any similar transaction, including, without limitation, any sale transaction under Sections 363, 1129 or any other provision of Title 11, United States Code (11 U.S.C. §§ 101 et seq.) (the "Bankruptcy Code") (each, a "Sale Transaction").

(iii) *Amendment Transaction.* (a) Any forbearance, amendment or waiver, or series of forebearances, amendments or waivers, during any fiscal quarter with respect to the Company's debt obligations or (b) an increase in loan capacity under any existing debt facility from an existing Company lender, either of which does not otherwise constitute a Restructuring Transaction (each, an "Amendment Transaction"). Amendment Transactions shall generally consist of forbearances, amendments and waivers that require a simple majority under the Company's credit agreements; provided, however the Company and Houlihan Lokey have agreed solely for purposes of Houlihan Lokey's entitlement to the Amendment Transaction Fees set forth above, that the extension of maturities shall be included in the definition of Amendment Transaction herein.

(iv) *Restructuring Transaction.* A Restructuring Transaction shall generally be defined as any transaction or series of transactions approved by the Company through its Board that does not simply constitute an "Amendment Transaction" (as defined in paragraph 6(iii) above), but otherwise constitutes a recapitalization or restructuring of the Company's equity and/or debt securities and/or other indebtedness, obligations or liabilities (including, without limitation, preferred stock, partnership interests, lease obligations or guaranty obligations), including accrued and/or accreted interest thereon, which are outstanding as of the Effective Date, including, without limitation, interest bearing trade debt and the


Company's public bonds, which recapitalization or restructuring is effected pursuant to an exchange transaction, tender offer, a plan of under the Bankruptcy Code, a solicitation of consents, waivers, acceptances or authorizations, any refinancing, sale, acquisition, merger, repurchase, exchange, conversion to equity, cancellation, forgiveness, or retirement of any agreements or instruments governing any of the Company's equity and/or debt securities and/or other indebtedness or any combination of the foregoing transactions (each a "Restructuring Transaction").

7.  **Aggregate Gross Consideration ("AGC")**. For the purpose of calculating the Sale Transaction Fee, the AGC shall be the gross proceeds and other consideration paid to, or received by, or to be paid to or received by, the Company, or any of its equity or debt holders, or other parties in interest, including, without limitation, holders of warrants and convertible securities, and holders of options or stock appreciation rights, whether or not vested (collectively "Constituents"), in connection with the relevant Sale Transaction but shall expressly exclude any valuation relating to amounts due under the Community Loan Agreements (which amounts thereunder consist solely of the IEDs) entered into by the Company's subsidiaries with the Not For Profit Operator. Such proceeds and consideration shall be deemed to include, without limitation: amounts in escrow and any deposits or other amounts forfeited by any Investor; cash, notes, securities, and other property; payments made in installments; amounts payable under consulting agreements, above-market employment contracts, non-compete or severance agreements, consulting contracts or similar arrangements with any equity holder; Contingent Payments (as defined below) and/or insurance proceeds upon the occurrence of an insurable event that diminishes the value of the Company. Upon the closing of a Sale Transaction in which less than 100% of the ownership of the equity interests are sold, the AGC shall be calculated as if 100% of the ownership of the equity interests of the Company on a fully diluted basis had been sold by dividing (i) the total consideration, whether in cash, securities, notes or other forms of consideration, received or receivable by the Company and/or its Constituents by (ii) the percentage of ownership which is sold. If, in the Sale Transaction, no consideration is being paid in respect of the existing equity, AGC of the retained equity shall be determined by the good faith agreement of the parties as to the value of such retained equity implied by the Sale Transaction. In addition, if any of the Company's liabilities are assumed, decreased, reinstated, satisfied or otherwise paid off in conjunction with a Sale Transaction (by the Company or any Investor, in the form of "cure" payments or otherwise), or any of the Company's assets are sold or otherwise transferred outside of the Company's ordinary course of business to another party prior to the closing of a Sale Transaction (including, without limitation, any dividends or distributions paid to security holders or amounts paid to repurchase any securities) or are retained by the Company after the closing of the Sale Transaction, the AGC will be increased to reflect the face value of any such liabilities and the fair market value of any such assets. Contingent Payments shall be defined as the consideration received or receivable by the Company, or any of its Constituents and/or any other parties in the form of deferred performance-based payments, "earn-outs", or other contingent payments based upon the future performance of the Company, or any of its businesses or assets.

8.  **Value of Consideration**. For the purpose of calculating the AGC received in a Sale Transaction, any securities, other than a promissory note, will be valued at the time of the closing of the Sale Transaction, without regard to any restrictions on transferability, as follows: (i) if such securities are traded on a stock exchange, the securities will be valued at the average last sale or closing price for the ten trading days immediately prior to the closing of the Sale Transaction; (ii) if such securities are traded primarily in over-the-counter transactions, the securities will be valued at the mean of the closing bid and asked quotations similarly averaged over a ten trading day period immediately prior to the closing of the Sale Transaction; and (iii) if such securities have not been traded prior to the closing of the Sale Transaction, Houlihan Lokey and the Company shall negotiate in good faith to agree on a fair valuation thereof, without regard to any restrictions on transferability, for the purposes of calculating the AGC. For any lease payments and other consideration that is not freely tradeable or has no established public market, if the consideration utilized consists of property other than securities, then the value of such property shall be the fair market value thereof as determined in good faith by Houlihan Lokey and the Company. If any consideration to be paid is computed in any foreign currency, the value of such foreign currency shall, for purposes hereof, be converted into U.S. dollars at the