_____

**MASTER PURCHASE AND SALE AGREEMENT**

**among**

**REDWOOD-ERC SENIOR LIVING HOLDINGS, LLC,**

**REDWOOD-ERC MANAGEMENT, LLC,**

**REDWOOD-ERC DEVELOPMENT, LLC**

**REDWOOD-ERC PROPERTIES, LLC and**

**REDWOOD-ERC KANSAS, LLC**

**and**

**ERICKSON RETIREMENT COMMUNITIES, LLC,**

**ERICKSON GROUP, LLC, and**

**KANSAS CAMPUS, LLC**

**effective as of October 19, 2009**

_____

## CONTENTS

| | | |
|---|---|---|
| **Article I** | **DEFINITIONS; INTERPRETATION** ....................................................1 | |
| | 1.1 | Definitions ...................................................1 |
| | 1.2 | Additional Defined Terms ...................................6 |
| | 1.3 | Interpretation ...............................................9 |
| **Article II** | **THE PURCHASE AND SALE** ..............................................10 | |
| | 2.1 | Purchased Assets ...........................................10 |
| | 2.2 | Excluded Assets ............................................11 |
| | 2.3 | Assumed Liabilities ........................................11 |
| | 2.4 | Excluded Liabilities .......................................12 |
| **Article III** | **COMMITMENT FEE; CONSIDERATION** .............................12 | |
| | 3.1 | Commitment Fee ...........................................12 |
| | 3.2 | Closing Statement ..........................................12 |
| | 3.3 | Consideration ...............................................13 |
| | 3.4 | Allocation ...................................................14 |
| **Article IV** | **CLOSING** ...........................................................14 | |
| | 4.1 | Closing ......................................................14 |
| | 4.2 | Closing Deliveries ..........................................14 |
| | 4.3 | Prorations ...................................................18 |
| **Article V** | **REPRESENTATIONS AND WARRANTIES OF THE ERICKSON PARTIES** .............................................18 | |
| | 5.1 | Organization ................................................19 |
| | 5.2 | Authorization ...............................................19 |
| | 5.3 | Non-Contravention .........................................19 |
| | 5.4 | No Approvals ...............................................20 |
| | 5.5 | Title to, Condition of, and Sufficiency of Assets ...........20 |
| | 5.6 | Financial Matters ...........................................20 |
| | 5.7 | Absence of Changes ........................................22 |
| | 5.8 | Status of Projects ...........................................22 |
| | 5.9 | Related Party Transactions .................................22 |
| | 5.10 | Tax Matters .................................................23 |
| | 5.11 | Exempt and Political Organizations .........................23 |
| | 5.12 | Legal Proceedings ..........................................24 |
| | 5.13 | Compliance With Laws; Permits ............................24 |
| | 5.14 | Questionable Activities .....................................25 |
| | 5.15 | Material Contracts ..........................................25 |
| | 5.16 | Real Property ...............................................27 |
| | 5.17 | Environmental Matters .....................................28 |
| | 5.18 | Intellectual Property .......................................28 |
| | 5.19 | Labor & Employment Matters ..............................29 |
| | 5.20 | Employee Plans ............................................29 |
| | 5.21 | No Brokers .................................................33 |
| | 5.22 | Disclosure ..................................................33 |
| **Article VI** | **REPRESENTATIONS AND WARRANTIES OF REDWOOD** .............33 | |
| | 6.1 | Organization ................................................33 |

|  | 6.2 | Authorization | 33 |
|  | 6.3 | Non-Contravention | 33 |
|  | 6.4 | No Approvals | 34 |
|  | 6.5 | No Brokers | 34 |
|  | 6.6 | Disclosure | 34 |
| **Article VII** | **ADDITIONAL AGREEMENTS** | | **34** |
|  | 7.1 | Bankruptcy Matters | 34 |
|  | 7.2 | Conduct of Business | 35 |
|  | 7.3 | Employee and Employee Benefits Matters | 37 |
|  | 7.4 | ERC Retained Community Contracts | 38 |
|  | 7.5 | No Solicitation | 38 |
|  | 7.6 | Expenses | 40 |
|  | 7.7 | Access to Information | 41 |
|  | 7.8 | Efforts to Satisfy Conditions | 41 |
|  | 7.9 | Further Assurances | 41 |
|  | 7.10 | Transfer Taxes | 41 |
|  | 7.11 | Publicity; Confidentiality | 41 |
|  | 7.12 | Liquidation of Cash Equivalents | 42 |
|  | 7.13 | Exhibits and Schedules | 42 |
| **Article VIII** | **CONDITIONS PRECEDENT** | | **42** |
|  | 8.1 | Conditions to the Obligations of the Redwood Parties | 42 |
|  | 8.2 | Conditions to the Obligations of the Erickson Parties | 44 |
| **Article IX** | **TERMINATION** | | **45** |
|  | 9.1 | Termination | 45 |
|  | 9.2 | Effect of Termination | 46 |
| **Article X** | **INDEMNIFICATION** | | **47** |
|  | 10.1 | By the Erickson Parties | 47 |
|  | 10.2 | By the Redwood Parties | 47 |
|  | 10.3 | Notice of Claims | 47 |
|  | 10.4 | Third Party Actions | 47 |
|  | 10.5 | Satisfaction of Claims | 49 |
|  | 10.6 | Threshold Amount | 50 |
|  | 10.7 | Survival Period | 50 |
|  | 10.8 | Exclusive Remedy | 51 |
| **Article XI** | **MISCELLANEOUS** | | **51** |
|  | 11.1 | Entire Agreement | 51 |
|  | 11.2 | Construction; Headings | 51 |
|  | 11.3 | Severability | 51 |
|  | 11.4 | Waiver and Amendment | 51 |
|  | 11.5 | Governing Law | 52 |
|  | 11.6 | Dispute Resolution | 52 |
|  | 11.7 | Notices | 52 |
|  | 11.8 | Assignment | 53 |
|  | 11.9 | No Third Party Beneficiaries | 53 |
|  | 11.10 | Counterparts | 53 |

**Exhibits:**

Exhibit A ......... Intentionally Reserved
Exhibit B.......... Intentionally reserved
Exhibit C.......... Transferred Landowners
Exhibit D ......... Assumed Contracts
Exhibit E.......... Assumed Kansas Liabilities
Exhibit F.......... Form of ManagementCo Reorg Note
Exhibit G ......... Form of LLC Interest Assignments
Exhibit H ......... Form of Development Contract Assignment
Exhibit I........... Form of Management Contract Assignment
Exhibit J........... Form of Trademark & Domain Name Assignment
Exhibit K ......... Form of Bill of Sale
Exhibit L........... Form of Non-Compete
Exhibit M......... New PropCo Operating Agreement
Exhibit N ......... New DevCo Operating Agreement
Exhibit O ......... Form of Assignment of Distributions
Exhibit P.......... Form of Consulting Agreement
Exhibit Q ......... Form of License and Concurrent Use Agreement
Exhibit R.......... Form of B&R Note Sharing Agreement
Exhibit S .......... Intentionally Reserved
Exhibit T.......... Erickson Disclosure Schedule
Exhibit U ......... Redwood Disclosure Schedule
Exhibit V ......... Intentionally Reserved
Exhibit W ....... Corporate Debt
Exhibit X ......... Project Debt

**Erickson Disclosure Schedule:**

Part 5.1(b)........ ERC Subs
Part 5.1(d)........ NSC-Supported NFPs
Part 5.4............. Erickson Party Approvals
Part 5.5(a) ........ Title to, Condition of, and Sufficiency of Assets
Part 5.6(a) ........ ERC Financials
Part 5.6(b)........ Non-Reporting ERC Subs
Part 5.9............. Certain Related Party Transactions
Part 5.11(b)....... IRS Rulings
Part 5.11(f)....... PACs
Part 5.12........... Legal Proceedings
Part 5.15(a) ...... Material Contracts
Part 5.15(d)...... Forms of Resident Care Agreements
Part 5.15(e) ...... Special Arrangements with Residents
Part 5.16(b)(i) .. Owned Real Property
Part 5.16(b)(ii) . Managed Real Property
Part 5.17(a) ...... Environmental Matters
Part 5.18(b)...... Registered Intellectual Property
Part 5.19(a) ...... Employees and Independent Contractors
Part 5.19(d)...... Certain Labor Matters
Part 5.20........... Employee Plans and Related Matters

**<u>Redwood Disclosure Schedule</u>:**

Part 6.4.............Redwood Party Approvals

# MASTER PURCHASE AND SALE AGREEMENT

**THIS MASTER PURCHASE AND SALE AGREEMENT** (this "<u>Agreement</u>") is effective as of October 19, 2009 (the "<u>Execution Date</u>") among **REDWOOD-ERC SENIOR LIVING HOLDINGS, LLC**, a Maryland limited liability company ("<u>Redwood</u>"), **REDWOOD-ERC MANAGEMENT, LLC**, a Maryland limited liability company ("<u>ManagementCo</u>"), **REDWOOD-ERC DEVELOPMENT, LLC**, a Maryland limited liability company ("<u>DevCo</u>"), **REDWOOD-ERC PROPERTIES, LLC**, a Maryland limited liability company ("<u>PropCo</u>"), **REDWOOD-ERC KANSAS, LLC**, a Maryland limited liability company ("<u>Redwood Kansas</u>" and, together with Redwood, ManagementCo, DevCo and PropCo, the "<u>Redwood Parties</u>"), **ERICKSON RETIREMENT COMMUNITIES, LLC**, a Maryland limited liability company ("<u>ERC</u>"), **ERICKSON GROUP, LLC**, a Maryland limited liability company ("<u>Parent</u>"), **KANSAS CAMPUS, LLC**, a Maryland limited liability company ("<u>Kansas Owner</u>" and, together with ERC, the "<u>Sellers</u>" or the "<u>Erickson Parties</u>"). The Redwood Parties and the Erickson Parties are sometimes referred to herein interchangeably and collectively, as the context requires, as a "<u>Party</u>" or the "<u>Parties</u>."

**WHEREAS**, ERC and its Affiliates (defined below) are engaged in the business of managing, developing and owning continuing care retirement communities (the "<u>Business</u>");

**WHEREAS**, ERC and certain of its Affiliates are planning to file the Reorganization Plans (defined below) under Chapter 11 of Title 11 of the United States Code (as amended, the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "<u>Bankruptcy Court</u>");

**WHEREAS**, upon the terms and conditions set forth herein and as authorized under Sections 105, 363, 365 and/or 1129 of the Bankruptcy Code, ManagementCo, DevCo, PropCo and Redwood Kansas (the "<u>Acquisition Companies</u>"), desire to purchase from the Sellers substantially all of the assets of the Sellers (other than the Excluded Assets (defined below)) in exchange for the payment by Redwood, for the account of Sellers, of certain amounts to creditors of the Sellers and the assumption by the Acquisition Companies of the Assumed Liabilities (defined below);

**WHEREAS**, the Erickson Parties believe, following consultation with their financial advisors and consideration of their available alternatives, that in light of the current circumstances, a sale of the assets of the Business is necessary to maximize value and is in the best interests of the Erickson Parties, their Affiliates and their respective estates, creditors and parties-in-interest; and

**WHEREAS**, the transactions contemplated by this Agreement (the "<u>Transactions</u>") will be subject to the approval of the Bankruptcy Court and other applicable provisions of the Bankruptcy Code.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual covenants and agreements set forth herein, the Parties, intending to be legally bound, agree as follows:

**Article I**        **DEFINITIONS; INTERPRETATION**.

**1.1**      **Definitions**. These terms shall, for all purposes of this Agreement, have the following meaning:

(a)     "Action" means any action, claim, proceeding, arbitration, suit, investigation or regulatory inquiry (whether civil, criminal, administrative or judicial), or any appeal therefrom.

(b)     "Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such Person, where "control" means the power to direct the management and policies of a Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

(c)     "Approval" means any approval, authorization, consent, license, franchise, order, or registration issued or granted by, filing with, or notice to, any Person.

(d)     "B&R Notes" means (i) the Second Amended and Restated Working Capital Promissory Note dated June 30, 2008 in the principal amount of $14,032,807.23 made by Brooksby Village, Inc. in favor of ERC; (ii) the Purchase Money Note dated June 30, 2008 in the amount of $19,715,086 made by Brooksby Village, Inc. in favor of ERC; (iii) the Purchase Money Note in the amount of $2,698,039 made by Riderwood Village, Inc. in favor of Senior Living Limited Partnership; (iv) the Second Amended and Restated Working Capital Promissory Note dated December 31, 2007 in the amount of $5,000,000 made by Riderwood Village, Inc. in favor of ERC.

(e)     "Bankruptcy Case" means one or more cases commenced under Chapter 11 of the Bankruptcy Code concerning a Debtor, as debtor.

(f)     "Business Day" means any day except Saturday, Sunday or any day on which commercial banks are authorized or required by Law to close in Baltimore, Maryland.

(g)     "Code" means the Internal Revenue Code of 1986, as amended.

(h)     "Confirmation Order"  means the order entered by the Bankruptcy Court in the Bankruptcy Case confirming the Reorganization Plan pursuant to Section 1129 of the Bankruptcy Code.

(i)     "Contract" means any written or oral agreement, arrangement, lease, mortgage, contract, note, power of attorney, insurance policy, covenant, understanding, commitment or instrument.

(j)     "Controlled Real Property" means, collectively, the Owned Real Property and the Managed Real Property.

(k)     "Corporate Debt" means the indebtedness identified on Exhibit W.

(l)     "Corporate Lenders" means the Persons to whom the Corporate Debt is owed.

(m)     "Court Approval" means the entry of the Final Confirmation Order by the Bankruptcy Court, together with all other orders necessary to effect the Transactions.

(n)     "Covered Entities" means, interchangeably and collectively as the context requires, the ERC Companies, the PACs and the Standalone NFPs.

(o)     "Damages" means any loss, Liability, diminution of value, fine, penalty, judgment, award, cost or expense (including, without limitation, reasonable attorneys' fees or any other reasonable out-of-pocket expenses incurred in connection with any Action) or damage.

(p)     "Debtors" means ERC, Parent, Kansas Owner and the ERC Subs that file the Bankruptcy Case.

(q)     "Employees" means, interchangeably and collectively as context requires, (i) Erickson Employees and (ii) individuals employed by a Management Agreement Counterparty but managed by an ERC Company (including those who are actively employed or on leave, disability or other absence from employment, and including officers and directors).

(r)     "Erickson Employees" means individuals employed by any ERC Company, (including, in each case, those who are actively employed or on leave, disability or other absence from employment, and including officers and directors).

(s)     "Environmental Claims" means all written accusations, allegations, investigations, written warnings, notice letters, liens, orders, written claims, written demands, suits or administrative or judicial actions for any injunctive relief, fines, penalties or any damage, including personal injury, property damage, lost use of property, natural resource damages or environmental response or remediation or removal costs arising out of Environmental Conditions on any real property.

(t)     "Environmental Conditions" means the state of the environment, including natural resources, soil, air, surface water, subsurface ground water or any present or potential drinking water supply.

(u)     "Environmental Requirements" means all present and future Laws and Permits relating in any way to human health (not including, however, Laws and Permits relating to patient care or services to residents), pollution, or protection of the environment

(v)     "ERC Companies" means, interchangeably and collectively as the context requires, ERC and the ERC Subs.

(w)     "ERC Retained Communities" means the Retirement Communities known as Hickory Chase, Tallgrass Creek, Linden Ponds, Monarch Landing and Sedgebrook.

(x)     "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(y)     "Final Confirmation Order" means the Confirmation Order which, as of the Closing Date, has not been amended, modified, supplemented, reversed or stayed, whether or not an appeal thereof or any other proceeding seeking review is then pending.

(z)     "Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, other than the Final Confirmation Order, the operation or effect of which has not been reversed, stayed, modified, amended, vacated or supplemented and as to which order or judgment the time to appeal or seek review, rehearing, reargument or certiorari has expired and as to which no appeal or petition for review, rehearing, reargument or certiorari has been filed and remains pending.

(aa)    "<u>GAAP</u>" means United States generally accepted accounting principles consistently applied.

(bb)    "<u>Governance Documents</u>" means, with respect to any entity, all documents (i) pursuant to which the legal existence of the entity is established (including, by way of example, the articles of organization of a limited liability company); (ii) that were adopted or approved by the owners, board of directors, managers or other similar management authority of the entity and set forth provisions for the regulation and management of the entity's internal affairs (including, by way of example, the by-laws of a corporation); and (iii) that are binding upon any owners of the entity and establish the governance, economic and/or other rights of such owners in their capacity as such (including, by way of example, the partnership agreement of a partnership or the operating agreement of a limited liability company).

(cc)    "<u>Government Entity</u>" means any federal, state, local or foreign government, court, agency, commission, department or other authority or instrumentality.

(dd)    "<u>Hazardous Materials</u>" means any substance which is or becomes defined as a hazardous substance, hazardous waste, hazardous material, pollutant, contaminant or similar material, including (without limitation) petroleum and petroleum based products, asbestos or any other wastes, substances, products, pollutants or other materials that are regulated pursuant to any Environmental Requirement.

(ee)    "<u>Independent Contractor</u>" means any natural person or any entity that serves primarily as a vehicle through which a single natural person provides products or services, in each case engaged by any Transferred Landowner as an independent contractor.

(ff)    "<u>IP</u>" means, interchangeably and collectively as the context requires, the following: (i) patents and invention disclosures, including continuations, divisionals, continuations-in-part, renewals and reissues; (ii) trademarks, service marks, trade names, trade dress, designs, logos, emblems, signs or insignia, slogans, domain names and other similar designations of source or origin, together with all goodwill symbolized by the foregoing; (iii) copyrights and copyrightable material; (iv) trade secrets and other confidential information, know-how, customer lists, prospect lists, business plans, inventions, proprietary processes, formulae, algorithms, models and methodologies; (v) rights of publicity and privacy relating to the use of the names, likenesses, voices, signatures and biographical information of natural persons; (vi) all rights with respect to hardware, software, computer programs, computer program code, the algorithms underlying any computer program, data and databases, to the extent not otherwise embodied in the foregoing clauses (i)-(vi); (vii) all moral rights and/or rights of attribution and/or integrity in any of the foregoing; (viii) registrations and applications for any of the foregoing; and (ix) the right to sue for past infringement of any of the foregoing.

(gg)    "<u>IRS</u>" means the Internal Revenue Service.

(hh)    "<u>JCE</u>" means John C. Erickson.

(ii)    "<u>Knowledge of the Erickson Parties</u>" means the actual knowledge of the following individuals, and the knowledge such individuals would have after making reasonable inquiry of employees reporting directly to them:  JCE, Gerald F. Doherty, Jeffrey A. Jacobson, Rick Grindrod, Mark R. Erickson, Debra B. Doyle, Adam Kane, Scott Erickson and Matthew J. Narrett, M.D.

(jj)    "Laws" means all applicable federal, state, local and foreign laws (including common law), codes, statutes, rules, regulations, ordinances and policies, and all applicable orders, judgments, arbitration awards, decrees, administrative or judicial promulgations, injunctions, determinations, Permits of, agreements with, and rulings of or by any Government Entity.

(kk)    "Liability" means any debt, liability, commitment or obligation of any kind, character or nature whatsoever, secured or unsecured, accrued, fixed, absolute, contingent or otherwise, and whether due or to become due.

(ll)    "Liens" means all mortgages, liens, pledges, security interests, and charging orders and any other encumbrance, right or interest of any kind or character, whether vested or contingent, that evidences or secures a debt, payment obligation or adverse ownership interest in the property in question, including any (i) interest of joint tenants, tenants in common and tenants by the entirety; (ii) community or other marital property interest; or (iii) interests arising from any divorce decree, separation agreement, prenuptial agreement or other similar domestic relations order or agreement.

(mm)    "Management Agreement Counterparty" means the Person for whom an ERC Company is engaged to perform management services under a Management Agreement currently in effect.

(nn)    "Material Adverse Effect" means, with respect to a Person, any change, effect, circumstance or event that individually or in the aggregate (i) is materially adverse to the business, financial condition, results of operations, prospects or assets of such Person, or (ii) will materially adversely affect the ability of such Person to perform its obligations under this Agreement or timely consummate the Transactions; *provided, however*, that the Parties agree that a decline of up to seventy-five percent (75%) in the amount of initial entrance deposits collected from prospective residents, in the aggregate across all Retirement Communities, over the period from the Execution Date to the Closing Date, shall not constitute a Material Adverse Effect.

(oo)    "NFP" means any not-for-profit entity that is a Management Agreement Counterparty.

(pp)    "NSC" means National Senior Campus, Inc., a Maryland non-stock corporation.

(qq)    "Ordinary Course" means, with respect to any Person, the ordinary course of such Person's business, consistent with past practice in nature, scope and magnitude; *provided, however*, the Parties acknowledge and agree that initial entrance deposits collected from prospective residents, in the aggregate across all Retirement Communities, over the period from the Execution Date to the Closing Date may decline by as much as seventy-five percent (75%).

(rr)    "Permits" means all applicable Approvals, permits (including environmental, construction and operation permits), licenses, certificates, exemptions, classifications and other similar documents, rights and authorizations issued by any Government Entity.

(ss)    "Person" means an individual, a sole proprietorship, a partnership, a corporation, an association, an institution, a joint stock company, a limited liability company, a trust, a joint venture, an unincorporated organization, or a Government Entity or any other legal entity.

(tt)    "Petition Date" means the date on which a Debtor filed its petition for relief commencing the Bankruptcy Case.

(uu)    "Project Debt" means the indebtedness identified on Exhibit X.

(vv)    "Project Lenders" means the Persons to whom the Project Debt is owed.

(ww)    "Reorganization Plans" means a Debtor's plan of reorganization under Chapter 11 of the Bankruptcy Code, as consented to by Redwood, as the same may be amended pursuant to Section 7.1.

(xx)    "Representatives" means, with respect to any person, the directors, officers, employees, financial advisors, attorneys, accountants, consultants, agents and other authorized representatives of such Person.

(yy)    "Required Percentage" means, with respect to any group of creditors, collectively, (i) more than one-half of the number of such creditors and (ii) such creditors representing at least two-thirds of the dollar amount of the debt held by such creditors.

(zz)    "Retirement Communities" means continuing care retirement communities currently owned, managed or under development by ERC or one of its Affiliates.

(aaa)    "Standalone NFPs" means all NFPs other than the NSC-Supported NFPs.

(bbb)    "Subsidiary" means, with respect to any Person, an entity beneficially owned, directly or indirectly through one or more other Persons, by such Person.

(ccc)    "Tax-Exempt Bond" means any security (i) the proceeds of which were used to acquire, finance or refinance any property used or to be used by any ERC Company or any NFP; and (ii) with respect to which there has been delivered an opinion of counsel to the effect that the interest on such security is excludable from gross income for federal income tax purposes.

(ddd)    "Taxes" means all taxes, assessments, charges, duties, fees, levies or other governmental charges (including interest, penalties or additions associated therewith), including income, franchise, capital stock, real property, personal property, tangible, withholding, employment, payroll, social security, unemployment compensation, disability, transfer, sales, use, excise, gross receipts, value-added and all other taxes of any kind imposed by any Government Entity, whether disputed or not, and any charges, interest or penalties imposed or that may be imposed thereon by any Government Entity.

(eee)    "Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

**1.2    Additional Defined Terms**.  In addition to the terms defined in Section 1.1, each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
| --- | --- |
| Acquisition Companies | Recitals |
| Agreement | Preamble |
| Alternative Proposal | 7.5(a) |

- 6 -

Alternative Transaction ................................................................ 7.5(c)
Annual ERC Financials ............................................................ 5.6(a)(i)
Annual ERC Sub Financials ...................................................... 5.6(b)(i)
Annual Standalone NFP Financials ......................................... 5.6(b)(iii)
Annual NSC Financials ............................................................ 5.6(c)(i)
Annual NSC-Supported NFP Financials ..................................... 5.6(c)(i)
Asserted Claim ......................................................................... 10.5(a)
Assignment of Distributions .............................................. 4.2(a)(ii)(D)
Assumed Development Liabilities ................................................ 2.3(a)
Assumed Kansas Liabilities ......................................................... 2.3(c)
Assumed Liabilities ..................................................................... 2.3(c)
Assumed Management Liabilities ................................................ 2.3(b)
B&R Note Sharing Agreement ............................................ 4.2(a)(v)(D)
Bankruptcy Code ......................................................................Recitals
Bankruptcy Court ......................................................................Recitals
Benefit Cutoff Time ..................................................................... 7.3(b)
Bill of Sale .......................................................................... 4.2(a)(i)(F)
Business ....................................................................................Recitals
Claim Notice ................................................................................ 10.3
Closing ........................................................................................... 4.1
Closing Date ................................................................................... 4.1
Closing Cash Payment ............................................................ 3.2(b)(iii)
Closing Date Cash Amount ...................................................... 3.2(b)(i)
Closing Statement ....................................................................... 3.2(b)
Commitment Fee ............................................................................. 3.1
Company Shortfall Amount ...................................................... 3.2(b)(iv)
Confidential Information ................................................................. 7.11
Consulting Agreement ............................................................ 8.1(q)(ii)
Controlled Real Property .......................................................... 5.16(d)
Corporate Lender Payoff Amount ................................................ 3.2(a)
Covered Property and Operations ............................................. 5.17(a)(i)
Credit Facilities ...................................................................... 5.15(a)(v)
Determination Letter ............................................................. 5.11(a)(iii)
DevCo .................................................................................... Preamble
Development Contracts ......................................................... 5.15(a)(iv)
Development Contract Assignment ......................................... 4.2(a)(i)(C)
Disclosure Statement ...................................................................... 7.1
Distributable Cash on Hand ................................................. 3.2(b)(ii)(B)
Employee Plans ........................................................................ 5.20(a)
ERC ........................................................................................ Preamble
ERC Assets ........................................................................... 2.1(c)(iii)
ERC Conveyance Documents ................................................ 4.2(a)(i)(F)
ERC Subs .................................................................................. 5.1(b)
Erickson Agreements .................................................................... 5.2
Erickson Disclosure Schedule ................................. Preamble to Article V
Erickson Financials ................................................................ 5.6(b)(iv)
Erickson Indemnitees ....................................................................10.2
Erickson Losses .............................................................................10.2
Erickson Parties ...................................................................... Preamble
ERISA Affiliate ......................................................................... 5.20(a)
Excluded Affiliates ..................................................................... 2.2(c)

Excluded Assets ...........................................................................2.2
Excluded Contracts......................................................................2.2(d)
Excluded Liabilities.....................................................................2.4
FECA.............................................................................................5.11(f)
Final Losses ............................................................................. 10.4(e)
Final Resolution ..................................................................... 10.5(a)
HSR Act .......................................................................................8.1(p)
Indemnified Party.......................................................................10.3
Indemnifying Party .....................................................................10.3
Interim ERC Financials .......................................................... 5.6(a)(ii)
Interim ERC Sub Financials ................................................... 5.6(b)(ii)
Interim Financials.......................................................................5.6(d)
Interim Standalone NFP Financials........................................ 5.6(b)(iv)
Interim NSC Financials .......................................................... 5.6(c)(iv)
Interim NSC-Supported NFP Financials ................................ 5.6(c)(ii)
IRS Rulings ...............................................................................5.11(b)
JCE ............................................................................................Preamble
Kansas Assets .............................................................................2.1(d)
Kansas Conveyance Documents ...........................................4.2(a)(iv)(A)
Kansas Owner ...........................................................................Preamble
Leased Real Property............................................................. 5.15(a)(iii)
License and Concurrent Use Agreement 8.1(q)(iii)
Licensed IP .............................................................................. 5.18(a)
LLC Interest Assignments...................................................... 4.2(a)(i)(B)
Managed Real Property ........................................................... 5.16(b)(ii)
Management Agreements......................................................... 5.15(a)(i)
Management Contract Assignment .........................................4.2(a)(i)(D)
ManagementCo Reorg Note ................................................... 3.3(a)(ii)
Material Contracts ................................................................... 5.15(a)
NSC Financials........................................................................ 5.6(c)(iv)
NSC-Supported NFP Financials............................................. 5.6(c)(ii)
NSC-Supported NFPs...............................................................5.1(d)
New DevCo Operating Agreement ........................................4.2(a)(ii)(C)
New Operating Agreements ...................................................4.2(a)(ii)(C)
New PropCo Operating Agreement ......................................4.2(a)(ii)(B)
Non-Compete .........................................................................4.2(a)(i)(G)
Non-Reporting ERC Subs ...................................................... 5.6(b)(i)
Other Transferred Assets ....................................................... 2.1(c)(iii)
Outside Closing Date............................................................... 9.1(b)(ii)
Owned IP ................................................................................. 5.18(a)
Owned Real Property .............................................................. 5.16(b)(i)
PAC ............................................................................................5.11(f)
Parent.........................................................................................Preamble
Parties .......................................................................................Preamble
Payoff Letter ............................................................................. 3.2(a)
PropCo.......................................................................................Preamble
Purchase Price Allocation ..........................................................3.4
Purchase Price Cash Offset ................................................... 3.2(b)(ii)(A)
Purchased Assets...................................................................... 2.1(d)
Real Property Leases ............................................................... 5.15(a)(iii)
Redwood....................................................................................Preamble

Redwood Agreements ..................................................................6.2
Redwood Disclosure Schedule .............................. Preamble to Article VI
Redwood Indemnitees ...............................................................10.1
Redwood Kansas ..................................................................Preamble
Redwood Losses .......................................................................10.1
Redwood Parties....................................................................Preamble
Redwood Transaction Costs ......................................................... 7.6(a)
Related Person.........................................................................5.9
Renegotiation Period ................................................................ 7.5(e)
Resolved Indemnity Amount...............................................................10.3
Response Period ..................................................................... 10.4(a)
Retained Employees ................................................................... 2.2(g)
Sellers ..............................................................................Preamble
Set-Off Amount ....................................................................... 10.5(a)
Shop Period End Date ................................................................ 7.5(b)
Superior Proposal ................................................................... 7.5(e)
Tenant................................................................................ 5.16(a)
Termination Fee ...................................................................... 9.2(b)
Third Party Action ................................................................... 10.4(a)
Third Party Action Notice ............................................................ 10.4(a)
Threshold Amount..................................................................... 10.6(a)
Title Policies........................................................................5.16(d)
Transactions ........................................................................Recitals
Trademark & Domain Name Assignment................................ 4.2(a)(i)(E)
Transaction Cost Advance............................................................. 7.6(a)
Transferred Contracts............................................................2.1(c)(iii)(B)
Transferred Development Contracts.................................................7.4(c)
Transferred Employees ............................................................... 7.3(a)
Transferred Landowner Interests ...................................................... 2.1(a)
Transferred Landowners............................................................... 2.1(a)
Transferred Management Contracts ................................................. 7.4(d)
Triggering Event ..................................................................... 9.2(a)
Undisputed Indemnity Amount.........................................................10.3
Working Capital Facility ..............................................................8.1(m)

**1.3** **Interpretation**. Unless the context of this Agreement otherwise clearly requires, (a) references to the plural include the singular, and references to the singular include the plural, (b) references to any gender include the other genders, (c) the words "include," "includes" and "including" do not limit the preceding terms or words and shall be deemed to be followed by the words "without limitation", (d) the terms "hereof", "herein", "hereunder", "hereto" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement, (e) the terms "day" and "days," if not capitalized, mean and refer to calendar day(s), and (f) the terms "year" and "years" mean and refer to calendar year(s). Unless otherwise set forth herein, references in this Agreement to any document, instrument or agreement (including this Agreement) (A) includes and incorporates all schedules and other attachments thereto, (B) includes all documents, instruments or agreements issued or executed in replacement thereof and (C) means such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified or supplemented from time to time in accordance with its terms and in effect at any given time. Unless otherwise specified, (x) all Articles, Sections and Schedules referenced herein are Articles, Sections and Schedules of this Agreement; and (y) all accounting terms not defined in this Agreement shall be construed in accordance with GAAP.

**Article II**  **THE PURCHASE AND SALE**.

**2.1**  **Purchased Assets**.  Subject to the terms, conditions and other provisions of this Agreement, at the Closing:

(a)  ERC shall grant, sell, assign, transfer and deliver to PropCo, and PropCo shall purchase from ERC, all limited liability company interests (the "Transferred Landowner Interests") in and to the ERC Subs listed on Exhibit C (the "Transferred Landowners"), free and clear of all Liens and Liabilities encumbering said ownership interests, with the exception of Liens and Liabilities (if any) arising from or securing the Project Debt, as restructured pursuant to the Reorganization Plans.

(b)  ERC shall grant, sell, assign, transfer and deliver to DevCo, and DevCo shall purchase from ERC, the Transferred Development Contracts (if any) free and clear of all Liens and Liabilities encumbering ERC's interests therein with the exception of Liens and Liabilities (if any) arising from or securing the Project Debt, as restructured pursuant to the Reorganization Plans.

(c)  ERC shall grant, sell, assign, transfer and deliver to ManagementCo, and ManagementCo shall purchase from ERC, free and clear of all Liens and Liabilities encumbering ERC's interests therein, with the exception of Liens and Liabilities (if any) arising from or securing the Project Debt, as restructured pursuant to the Reorganization Plans:

(i)  the Transferred Management Contracts (if any);

(ii)  the B&R Notes (subject to the terms and conditions of the B&R Note Sharing Agreement);

(iii)  all other assets of ERC relating to the Business, other than Excluded Assets and other than assets owned by the Transferred Landowners (which are being transferred indirectly by PropCo's acquisition of the Transferred Landowner Interests) (collectively, the "Other Transferred Assets" and, together with the Transferred Landowner Interests, the Transferred Development Contracts, the Transferred Management Contracts and the B&R Notes, the "ERC Assets"), including:

(A)  cash and cash equivalents in an amount not to exceed Ten Million Dollars ($10,000,000);

(B)  the Contracts listed on Exhibit D (as such Exhibit D may be modified from time to time by Redwood after the Execution Date) (the "Transferred Contracts");

(C)  furnishings, furniture, supplies, tools, machinery, monitoring and other equipment and other personal property and fixed assets;

(D)  all IP, including all data pertaining to Retirement Communities and residents thereof (unless prohibited by Law), and all techniques, methodologies, processes, programs, brand standards and analyses related thereto;

(E)     original books and records, including, to the extent permitted by applicable Law, (x) all personnel records for Transferred Employees, and (y) all Organizational Documents and minute books of the Transferred Landowners;

(F)     Permits, to the extent transferrable pursuant to applicable Law;

(G)     causes of action and rights of recovery related thereto, including avoidance actions arising under the Bankruptcy Code;

(H)     insurance policies; and

(I)     Employee Plans other than ERC's Growth Participation Plan.

(d)     Kansas Owner shall grant, sell, assign, transfer and deliver to Redwood Kansas, and Redwood Kansas shall purchase from Kansas Owner, all assets of Kansas Owner (the "Kansas Assets" and, together with the ERC Assets, collectively the "Purchased Assets") free and clear of all Liens, except for the Liens securing the Assumed Kansas Liabilities.

**2.2     Excluded Assets**.  Notwithstanding anything herein to the contrary, the Purchased Assets will not include the following assets of any Erickson Party (collectively, the "Excluded Assets"):

(a)     cash and cash equivalents in excess of Ten Million Dollars ($10,000,000);

(b)     the real property at 5525 Research Park Drive, Baltimore, Maryland 21250;

(c)     equity securities of, and other ownership interests of any kind in, Affiliates of ERC other than the Transferred Landowners ("Excluded Affiliates");

(d)     all Contracts other than the Transferred Contracts, the Transferred Management Contracts and the Transferred Development Contracts (the "Excluded Contracts"), which Excluded Contracts (to the extent entered into by a Transferred Landowner or by ERC in connection with the ERC Assets) shall be rejected by the applicable Debtor in bankruptcy;

(e)     the Organizational Documents and minute books of ERC and the Excluded Affiliates;

(f)     Permits and residents' records, if any that ERC is prohibited by applicable Law from transferring to ManagementCo;

(g)     personnel records for Erickson Employees who are not Transferred Employees ("Retained Employees") and, to the extent ERC is prohibited by applicable Law from transferring such records to ManagementCo, for Transferred Employees; and

(h)     ERC's Growth Participation Plan.

**2.3     Assumed Liabilities**.  At and effective as of the Closing:

(a)     DevCo shall assume only the Liabilities of ERC under the Transferred Development Contracts that are to be paid, performed or discharged by Seller after the Closing with respect to matters arising from or related to the period after the Closing (the "Assumed Development Liabilities"), but no other Liabilities;

(b)    ManagementCo shall assume only the Liabilities of ERC under the Transferred Management Contracts that are to be paid, performed or discharged by Seller after the Closing with respect to matters arising from or related to the period after the Closing (the "Assumed Management Liabilities"), but no other Liabilities;

(c)    Redwood Kansas shall assume only the Liabilities of Kansas Owner listed on Exhibit E (the "Assumed Kansas Liabilities" and, together with the Assumed Development Liabilities and the Assumed Management Liabilities, collectively the "Assumed Liabilities"), but no other Liabilities; and

(d)    The Transferred Landowners shall assume the Project Debt, as restructured pursuant to the Reorganization Plans.

**2.4    Excluded Liabilities**.    Notwithstanding anything herein to the contrary, except for the Assumed Liabilities, no Redwood Party shall assume, agree to pay, discharge or satisfy, or otherwise have any responsibility for any Liability of any Erickson Party or Affiliate of any Erickson Party (collectively, the "Excluded Liabilities"), including for avoidance of doubt any Liabilities:

(a)    for Taxes (other than real property taxes and assessments ratably attributable to the period after Closing);

(b)    arising out of or related to any Excluded Asset;

(c)    under the Transferred Development Contracts arising from or related to matters occurring thereunder prior to the Closing;

(d)    under the Transferred Management Contracts arising from or related to matters occurring thereunder prior to the Closing;

(e)    related to Retained Employees, or related to Transferred Employees to the extent such Liability is attributable to events or circumstances occurring or existing at or prior to the Closing, including all Liabilities with respect to severance benefits; or

(f)    otherwise attributable to or arising out of the ownership or operation of any Other Transferred Assets or the Business as of or prior to the Closing.

**Article III    COMMITMENT FEE; CONSIDERATION**.

**3.1    Commitment Fee**.    As an inducement for the Redwood Parties to enter into this Agreement, ERC shall pay One Million Five Hundred Thousand Dollars ($1,500,000) (the "Commitment Fee") to Redwood simultaneously with the execution of this Agreement.  Within three (3) Business Days of the Execution Date, the Redwood Parties agree to place, and maintain between the Execution Date and the Closing Date, $25,000,000 in bank accounts in the name of the Acquisition Companies to facilitate consummation of the Transactions.

**3.2    Closing Statement**.  (a) ERC shall obtain an executed letter from each Corporate Lender (each, a "Payoff Letter") setting forth the payoff amount of the applicable Debtor's obligations to such Corporate Lender as the Closing Date (in each case, the "Corporate Lender Payoff Amount").  ERC shall deliver copies of all Payoff Letters to Redwood contemporaneously with the delivery of the Closing Statement.

(b)     One (1) Business Day prior to the Closing Date, ERC shall deliver to Redwood a written statement, certified by the principal financial officer of ERC as being true, complete and accurate to the best of their respective knowledge, information and belief (the "Closing Statement") setting forth:

   (i)     the amount of ERC's cash and cash equivalents on hand (the "Closing Date Cash Amount");

   (ii)    if the Closing Date Cash Amount is:

      (A)     less than Ten Million Dollars ($10,000,000), the difference between the Closing Date Cash Amount and Ten Million Dollars ($10,000,000) (such difference, the "Purchase Price Cash Offset");

      (B)     greater than Ten Million Dollars ($10,000,000), the excess of the Closing Date Cash Amount over Ten Million Dollars ($10,000,000) (such excess, the "Distributable Cash on Hand")

   (iii)   the "Closing Cash Payment," calculated as $75,000,000, less the Purchase Price Cash Offset (if any);

   (iv)    the "Company Shortfall Amount," calculated as the aggregate amount of all Corporate Lender Payoff Amounts, less the sum of the following, to the extent each is actually payable to the Corporate Lenders:

      (A)     the Distributable Cash on Hand (if any),

      (B)     the Closing Cash Payment, and

      (C)     the principal amount of the ManagementCo Reorg Note; and

   (v)     wire transfer instructions for each payee of the Closing Cash Payment.

**3.3     Consideration**.   (a)   In consideration of the Transferred Development Contracts, the Transferred Management Contracts, the B&R Notes and the Other Transferred Assets, Redwood shall, on behalf of ManagementCo and DevCo, at the Closing:

   (i)     pay the Closing Cash Payment, for the account of the Debtors, by wire transfer of immediately available funds in accordance with the Closing Statement;

   (ii)    issue to, or for the account of, the Debtors, a Promissory Note, in the principal amount of Twenty-Five Million Dollars ($25,000,000), in the form attached hereto as Exhibit F (the "ManagementCo Reorg Note"); and

   (iii)   the Company Shortfall Amount and other shortfalls shall be addressed in a manner generally consistent with paragraphs 2 and 3 of the letter of intent, dated September 12, 2009, executed September 17, 2009, between Redwood Capital Investments, LLC and ERC.

(b)　　In consideration of the Transferred Landowner Interests, PropCo shall agree to be bound by the terms of the restructured Project Debt, as contemplated by the Reorganization Plans.

(c)　　The consideration for Kansas Assets shall be the assumption by Redwood Kansas of the Assumed Kansas Liabilities at the Closing.

**3.4**　　**Allocation**.　Prior to Closing, Redwood shall notify ERC in writing as to the manner in which the consideration payable by Redwood under this Agreement will be allocated among the Purchased Assets for Tax purposes (the "Purchase Price Allocation").　The Parties agree to make consistent use of the Purchase Price Allocation for all Tax purposes and in all filings with, and declarations and reports to, all Governmental Entities.　In any Action relating to the determination of any Tax, no Party shall contest the Purchase Price Allocation or assert that the Purchase Price Allocation is not correct.

**Article IV**　　**CLOSING**.

**4.1**　　**Closing**.　The closing of the Transactions (the "Closing") shall occur as soon as reasonably practicable, but in any event no later than the fifth (5th) Business Day, following the day upon which all of the conditions to Closing have been satisfied or waived (other than those conditions which by their terms cannot be satisfied until the Closing), at the offices of Venable LLP in Baltimore, Maryland, or at such other date and location as Redwood and ERC may agree upon in writing.　The date on which the Closing actually occurs, or the date on which Redwood and ERC agree the Closing is deemed to occur, is referred to herein as the "Closing Date."

**4.2**　　**Closing Deliveries**.　(a)　At the Closing:

(i)　　ERC shall execute (as applicable) and deliver:

(A)　　the Distributable Cash on Hand (if any) by wire transfer of immediately available funds in accordance with the Closing Statement;

(B)　　to PropCo, an Assignment of Limited Liability Company Interests with respect to each of the Transferred Landowners, each in substantially the form attached hereto as Exhibit G (the "LLC Interest Assignments");

(C)　　to DevCo, an Assignment and Assumption Agreement with respect to the Transferred Development Contracts in substantially the form attached hereto as Exhibit H (the "Development Contract Assignment");

(D)　　to ManagementCo, an Assignment and Assumption Agreement with respect to the Transferred Management Contracts in substantially the form attached hereto as Exhibit I (the "Management Contract Assignment");

(E)　　to ManagementCo, an Assignment of Trademarks and Domain Names in substantially the form attached hereto as Exhibit J (the "Trademark & Domain Name Assignment")

(F)     to ManagementCo, a Bill of Sale with respect to the Other Transferred Assets (except for those covered by the Trademark & Domain Name Assignment) in substantially the form attached hereto as <u>Exhibit K</u> (the "<u>Bill of Sale</u>" and, together with the LLC Interest Assignments, the Development Contract Assignment, the Management Contract Assignment and the Trademark & Domain Name Assignment the "<u>ERC Conveyance Documents</u>");

(G)     to Redwood, a Non-Competition Agreement in the form attached hereto as <u>Exhibit L</u> (each, a "<u>Non-Compete</u>");

(H)     to Redwood, a certificate executed by its principal executive officer as to the satisfaction of the conditions in <u>Sections 8.1(a)</u> or identifying any material respect in which any representation of ERC is no longer true and correct;

(I)     to Redwood, a certificate executed by the Secretary or an Assistant Secretary of ERC (x) as to the incumbency of the individual(s) signing the applicable Erickson Agreements on behalf of ERC and (y) certifying that the resolutions of the Board of Directors of ERC approving this Agreement and the Transactions (copies of which shall be attached to such certificate) are true and correct, are in full force and effect, and have not been rescinded, modified, amended or supplemented; and

(J)     the B&R Note Sharing Agreement.

(ii)     Parent shall execute (as applicable) and deliver:

(A)     to Redwood, a Non-Compete;

(B)     the Amended and Restated Operating Agreement of PropCo in substantially the form attached hereto as <u>Exhibit M</u> (the "<u>New PropCo Operating Agreement</u>"), which shall provide for the issuance of preferred interests in accordance with the Reorganization Plan;

(C)     the Amended and Restated Operating Agreement of DevCo in substantially the form attached hereto as <u>Exhibit N</u> (the "<u>New DevCo Operating Agreement</u>" and, together with the New PropCo Operating Agreement, the "<u>New Operating Agreements</u>"); *provided*, that the New Operating Agreements may be executed by members of Parent or designees of members of Parent;

(D)     an Assignment of Limited Liability Company Distributions with respect to PropCo and DevCo in substantially the form attached hereto as <u>Exhibit O</u> (the "<u>Assignment of Distributions</u>") *provided, however*, that the Assignment of Distributions shall be

executed by the same member(s) of Parent or designee(s) of member(s) of Parent who execute the New Operating Agreements; and

(E)    to Redwood, a certificate executed by the Secretary or an Assistant Secretary of Parent (x) as to the incumbency of the individual(s) signing the applicable Erickson Agreements on behalf of Parent and (y) certifying that the resolutions of the board of directors or other similar governing body of Parent approving this Agreement and the Transactions (copies of which shall be attached to such certificate) are true and correct, are in full force and effect, and have not been rescinded, modified, amended or supplemented.

(iii)    intentionally reserved;

(iv)    Kansas Owner shall execute and deliver to Redwood Kansas:

(A)    documents necessary to convey title to the Kansas Assets to Redwood Kansas and to provide for the assignment and assumption of the Assumed Kansas Liabilities (the "Kansas Conveyance Documents"); and

(B)    a certificate executed by the Secretary or an Assistant Secretary of Kansas Owner (x) as to the incumbency of the individual(s) signing the applicable Erickson Agreements on behalf of Kansas Owner and (y) certifying that the resolutions of the board of directors or other similar governing body and member(s) of Kansas Owner approving this Agreement and the Transactions (a copy of which shall be attached to such certificate) are true and correct, are in full force and effect, and have not been rescinded, modified, amended or supplemented.

(v)    Redwood shall execute (as applicable) and deliver:

(A)    the Closing Cash Payment and the ManagementCo Reorg Note;

(B)    to ERC, the Commitment Fee plus (if any) the excess of the Transaction Cost Advance over the actual amount of the Redwood Transaction Costs;

(C)    the New Operating Agreements;

(D)    a Sharing Agreement with respect to the B&R Notes in substantially the form attached hereto as Exhibit R (the "B&R Note Sharing Agreement");

(E)    to ERC, a certificate executed by its principal executive officer as to the satisfaction of the conditions in Sections 8.2(a) and 8.2(b); and

(F) to ERC, a certificate executed by the Secretary or an Assistant Secretary of Redwood (x) as to the incumbency of the individual(s) signing the applicable Redwood Agreements on behalf of Redwood and (y) certifying that the resolutions of the board of directors or other similar governing body of Redwood approving this Agreement and the Transactions (copies of which shall be attached to such certificate) are true and correct, are in full force and effect, and have not been rescinded, modified, amended or supplemented.

(vi) PropCo shall execute and deliver:

(A) the LLC Interest Assignments;

(B) intentionally reserved; and

(C) a certificate executed by the Secretary or an Assistant Secretary of PropCo (x) as to the incumbency of the individual(s) signing the applicable Redwood Agreements on behalf of PropCo and (y) certifying that the resolutions of the board of directors or other similar governing body of PropCo approving this Agreement and the Transactions (copies of which shall be attached to such certificate) are true and correct, are in full force and effect, and have not been rescinded, modified, amended or supplemented.

(vii) DevCo shall execute and deliver:

(A) the Development Contract Assignment; and

(B) a certificate executed by the Secretary or an Assistant Secretaryof DevCo (x) as to the incumbency of the individual(s) signing the applicable Redwood Agreements on behalf of DevCo and (y) certifying that the resolutions of the board of directors or other similar governing body of DevCo approving this Agreement and the Transactions (copies of which shall be attached to such certificate) are true and correct, are in full force and effect, and have not been rescinded, modified, amended or supplemented.

(viii) ManagementCo shall execute and deliver:

(A) to ERC, the Management Contract Assignment, the Bill of Sale and Trademark & Domain Name Assignment;

(B) to JCE, the Consulting Agreement and the License and Concurrent Use Agreement; and

(C) to ERC, a certificate executed by the Secretary or an Assistant Secretary of ManagementCo (x) as to the incumbency of the individual(s) signing the applicable Redwood Agreements on

behalf of ManagementCo and (y) certifying that the resolutions of the board of directors or other similar governing body of ManagementCo approving this Agreement and the Transactions (copies of which shall be attached to such certificate) are true and correct, are in full force and effect, and have not been rescinded, modified, amended or supplemented.

(D)     to the Corporate Lenders the ManagementCo Reorg Note.

(ix)     Redwood Kansas shall execute and deliver to Kansas Owner:

(A)     the Kansas Conveyance Documents; and

(B)     a certificate executed by the Secretary or an Assistant Secretary of Redwood Kansas (x) as to the incumbency of the individual(s) signing the applicable Redwood Agreements on behalf of Redwood Kansas and (y) certifying that the resolutions of the board of directors or other similar governing body of Redwood Kansas approving this Agreement and the Transactions (copies of which shall be attached to such certificate) are true and correct, are in full force and effect, and have not been rescinded, modified, amended or supplemented.

(b)     At the Closing, each Party shall execute and deliver such other instruments of transfer and/or assignment, certificates, deeds, bills of sale, evidence of filing and/or recording, and other documents as are reasonably necessary to effectuate the Transactions.

**4.3     Prorations**. The following prorations relating to the PurchasedAssets will be made as of the Closing Date, with ERC and its Affiliates liable to the extent that such items relate to any time period up to and including the Closing Date and Redwood and its Affiliates liable to the extent that such items relate to periods subsequent to the Closing Date, by appropriate cash payments of the applicable amounts from Redwood to ERC and/or from ERC to Redwood, as the case may be, each of which shall be made reasonably promptly after a written request therefor, accompanied by reasonable supporting documentation, is submitted to ERC by Redwood, or vice-versa as the case may be: (a) monthly rent and any additional rent or charges (including common area maintenance charges) with respect to the Leased Real Property; (b) real and personal property taxes and assessments relating to the Assets, the Leased Real Property and the Business; (c) water, sewer and other similar types of taxes, and installments on special benefit assessments; (d) electric, gas, telephone and utility charges; and (e) charges under maintenance and service contracts and fees under licenses transferred to or assumed by Redwood.

**Article V     REPRESENTATIONS AND WARRANTIES OF THE ERICKSON PARTIES**.

Except as expressly set forth in the correspondingly numbered part of the disclosure schedule delivered by the Erickson Parties that is attached hereto as Exhibit T (the "Erickson Disclosure Schedule"), the Erickson Parties make the representations and warranties set forth in this Article V to the Redwood Parties, which representations and warranties are being relied upon by the Redwood Parties and shall survive the Closing:

**5.1**    **Organization**.  (a)  ERC is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Maryland.

(b)    Part 5.1(b) of the Erickson Disclosure Schedule sets forth a true and complete list of all Subsidiaries of ERC (including the Transferred Landowners) (the "ERC Subs"), and identifies the jurisdiction of incorporation or formation for each ERC Sub.  Each ERC Sub that owns a Retirement Community is duly formed, validly existing and in good standing under the laws of the jurisdiction identified as its jurisdiction of incorporation or formation on Part 5.1(b) of the Erickson Disclosure Schedule.

(c)    The Governance Documents of ERC and each of the Transferred Landowners are in full force and effect, and neither ERC nor any of the Transferred Landowners is in violation of any provision of its Governance Documents in any material respect.  The Erickson Parties have previously delivered or made available to the Redwood Parties true and complete copies of the Governance Documents of ERC and each of the Transferred Landowners and all other documents, records, proceedings, actions and similar matters of a material nature relating to the organization and/or organizational status of ERC and each of the Transferred Landowners, including minute books and equity issuance records.

(d)    Part 5.1(d) of the Erickson Disclosure Schedule sets forth a true and complete list of all NFPs, and identifies, to the Knowledge of the Erickson Parties, which NFPs are supported organizations of NSC (the "NSC-Supported NFPs").  To the Knowledge of the Erickson Parties, NSC has no supported organizations other than the NSC-Supported NFPs.

**5.2**    **Authorization**.  Each Erickson Party has the right, power and authority to execute and deliver this Agreement and all other agreements entered into in connection with this Agreement to which it is a party (collectively, the "Erickson Agreements"), and to perform its respective obligations under the Erickson Agreements, and to consummate the transactions contemplated by the Erickson Agreements.  The execution and delivery of the Erickson Agreements by ERC, and the performance by ERC of its obligations under the Erickson Agreements, and the consummation of the transactions provided for in the Erickson Agreements, have been duly and validly authorized and approved by all necessary limited liability company action on the part of ERC.  Each Erickson Agreement (i) has been (or, at the Closing, shall have been) duly executed and delivered by the applicable Erickson Party(ies), and (ii) constitutes (or, at the Closing, shall constitute) a valid and binding agreement of the applicable Erickson Party(ies), enforceable against the applicable Erickson Party(ies) in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting the enforceability of creditors' rights generally, general equitable principles and the discretion of courts in granting equitable remedies.

**5.3**    **Non-Contravention**.  Subject to receipt of the Approvals described on Part 5.4 of the Erickson Disclosure Schedule, neither the execution and delivery of any Erickson Agreement by any Erickson Party, nor the consummation of the transactions contemplated by any Erickson Agreement, does or would, after the giving of notice or the lapse of time or both: (a) conflict with, result in a breach of, constitute a default under, or violate the Governance Documents of ERC or any Transferred Landowner, or any Law applicable to any Erickson Party or any Transferred Landowner that would adversely affect the ability of the Erickson Parties to consummate the Transactions, or would adversely affect the conduct of the Business that is being acquired by the Redwood Parties; (b) conflict with, result in a breach of, constitute a default under, result in the acceleration of any rights or obligations under, create in any Person the right to accelerate any rights or obligations under or amend, modify, cancel or refuse to perform under,

or require any notice under any Transferred Contract or other arrangement, to which any Erickson Party or any Transferred Landowner is a party, or by which any of their respective assets or properties are bound that would adversely affect the ability of the Erickson Parties to consummate the Transactions, or would adversely affect the conduct of the Business that is being acquired by the Redwood Parties; or (c) result in the creation of, or give any Person the right to create, any Lien upon any ERC Asset or any right, property or asset of any Transferred Landowner.

**5.4    No Approvals**.  Except for the Court Approval and except as otherwise set forth on Part 5.4, no Approval of any Government Entity or other Person is required in connection with the execution, delivery and performance of, or the consummation of the transactions contemplated by, any Erickson Agreement by any Erickson Party.

**5.5    Title to, Condition of, and Sufficiency of Assets**.  (a)  Except as set forth in Part 5.5(a) of the Erickson Disclosure Schedule:

(i)    ERC is the sole and exclusive legal and equitable owner of all right, title and interest in, and has good and marketable title to, all of the ERC Assets, free and clear of all Liens other than the Project Debt;

(ii)    Each Transferred Landowner is the sole and exclusive legal and equitable owner of all right, title and interest in, and has good and marketable title to, all of the assets it purports to own (other than the real property owned by the Transferred Landowners), free and clear of all Liens other than the Project Debt;  and

(iii)    Kansas Owner is the sole and exclusive legal and equitable owner of all right, title and interest in, and has good and marketable title to, all of the Kansas Assets (other than the real property owned by the Kansas Owner), free and clear of all Liens, other than the Project Debt.

(b)    The Purchased Assets are except for the Excluded Assets, all (or materially all) of the assets required for the operation by ERC of the business of managing and developing retirement communities as it is presently conducted.

(c)    As of the Closing Date, Erickson Construction, LLC will hold no assets.  All assets of Erickson Construction, LLC that were not disposed of to third Persons prior to the Closing Date, including all construction drawings and documents relating to Retirement Communities, will have been transferred to ERC and will be included in the Other Transferred Assets.

**5.6    Financial Matters**.  (a)  Part 5.6(a) of the Erickson Disclosure Schedule contains a true and complete copy of:

(i)    the audited consolidated balance sheets, statements of income, statements of cash flows and statements of changes in members' deficit and other comprehensive income of ERC and the ERC Subs as of and for the years ended December 31, 2007, together with the report thereon of ERC's independent public accountants (the "Annual ERC Financials"); and

(ii)    the unaudited consolidated balance sheet and statement of income of ERC and the ERC Subs as of and for the year 2008 and for the eight (8) month period ended August 31, 2009 (the "<u>Interim ERC Financials</u>").

(b)    The Erickson Parties have previously delivered or made available to the Redwood Parties true and complete copies of:

(i)    audited financial statements of each ERC Sub that owns a Retirement Community (other than the ERC Subs identified in <u>Part 5.6(b)</u> of the Erickson Disclosure Schedule (the "<u>Non-Reporting ERC Subs</u>")) as of, and for the years ended, December 31, 2007 (collectively, the "<u>Annual ERC Sub Financials</u>");

(ii)    unaudited balance sheets and statements of income of each ERC Sub that owns a Retirement Community (other than the Non-Reporting ERC Subs) as of and for the year ended December 31, 2008 and the eight (8) month period ended August 31, 2009 (the "<u>Interim ERC Sub Financials</u>");

(iii)    audited or unaudited (as the case may be) financial statements of each of the Standalone NFPs as of, and for the years ended, December 31, 2007 and 2008 (collectively, the "<u>Annual Audited NFP Financials</u>"); and

(iv)    unaudited balance sheets and statements of income of each Standalone NFP (other than the ones identified in clause (iii) above) as of and for years ended December 31, 2007 and December 31, 2008 and for the eight (8) month period ended August 31, 2009 (the "<u>Unaudited NFP Financials</u>" and, together with the Annual ERC Financials, the Interim ERC Financials, the Annual ERC Sub Financials, the Interim ERC Sub Financials and the Annual Standalone NFP Financials, the "<u>Erickson Financials</u>").

(c)    The Erickson Parties have previously delivered or made available to the Redwood Parties copies (which, to the Knowledge of the Erickson Parties, are true and complete copies) of:

(i)    audited (to extent available) financial statements of each NSC-Supported NFP as of, and for the years ended, December 31, 2007 and 2008 (collectively, the "<u>Annual NSC-Supported NFP Financials</u>");

(ii)    unaudited balance sheets and statements of income of each NSC-Supported NFP as of and for the eight (8) month period ended August 31, 2009 (the "<u>Interim NSC-Supported NFP Financials</u>" and, together with the Annual NSC-Supported NFP Financials, the "<u>NSC-Supported NFP Financials</u>");

(iii)    audited (to extent available) financial statements of NSC as of, and for the years ended, December 31, 2007 and 2008 (collectively, the "<u>Annual NSC Financials</u>"); and

(iv) unaudited balance sheets and statements of income of NSC as of and for the eight (8) month period ended August 31, 2009 (the "<u>Interim NSC Financials</u>" and, together with the Annual NSC Financials, the "<u>NSC Financials</u>").

(d) Each of the balance sheets included in the Erickson Financials and, to the Knowledge of the Erickson Parties, each of the balance sheets included in the NSC Financials and the NSC-Supported NFP Financials, fairly presents in all material respects the financial position of the Person(s) to which it relates as of the date of such balance sheet, in accordance with GAAP (except, with respect to the Interim ERC Financials, the Interim ERC Sub Financials, the Interim Standalone NFP Financials, the Interim NSC Financials and the Interim NSC-Supported NFP Financials (collectively, the "<u>Interim Financials</u>"), for the omission of footnotes and normal year-end adjustments). Each of the statements of income and statements of cash flows included in the Erickson Financials and, to the Knowledge of the Erickson Parties, each of the statements of income and statements of cash flows included in the NSC Financials and the NSC-Supported NFP Financials, fairly presents in all material respects the results of operations (or, in the case of the NFPs, the changes in net assets) and cash flows of the Person(s) to which it relates as of the date of such statement, in accordance with GAAP (except, with respect to the Interim Financials, for the omission of footnotes and normal year-end adjustments).

(e) Neither ERC nor any Transferred Landowner, has any Liability except for Liabilities (i) reflected or reserved for in the balance sheets included in the Interim Financials, or (ii) incurred in the Ordinary Course since July 31, 2009.

(f) There is no Affiliate or Subsidiary of ERC that is not included in the Erickson Financials, except for (i) the Non-Reporting ERC Subs, (ii) JCE Holding Corp., (iii) J&N Nevada Holding, Inc., (iv) Senior Living Limited Partnership, (v) the 2002 John C. Erickson GST Trust, (vi) the 2002 Nancy A. Erickson GST Trust, (vii) Paul L. Erickson, Trustee of the Irrevocable Trust of John C. Erickson U/A Dated January 1, 2002, (viii) Erickson Media, LLC and the Subsidiaries of Erickson Media, LLC, (ix) Maritime, Inc. and (x) Erickson Aviation, LLC.

**5.7** **Absence of Changes**. Since July 31, 2009, the Covered Entities and, to the Knowledge of the Erickson Parties, NSC and the NSC-Supported NFPs have each conducted their respective business in the Ordinary Course, and there has not been any event, occurrence or development (a) which, individually or in the aggregate, was, or could reasonably be expected to be, materially adverse to the prospects, business, assets, financial condition or results of operations of any of them; or (b) that, if it occurred after the Execution Date, would require the consent of Redwood pursuant to <u>Section 7.1</u>.

**5.8** **Status of Projects**. The Erickson Parties have previously delivered or made available to Redwood a true and complete copy of the most recent project status report provided to each Person who has extended credit to any ERC Company that owns, manages or develops Retirement Communities. Such status reports are complete and accurate in all material respects.

**5.9** **Related Party Transactions**. Neither ERC nor any of the Transferred Landowners has made or entered into any Contract, loan or guaranty with any officer, director, employee, stockholder, member, trustee, beneficiary, partner of, or other Person acting on behalf of (each, a "<u>Related Person</u>") any Covered Entity or any NFP, or any of their respective Affiliates, except for:

(a)     operating transactions in the Ordinary Course among ERC Companies (all material terms of which have been previously disclosed by the Erickson Parties to the Redwood Parties),

(b)     normal compensation arrangements in the Ordinary Course (all material terms of which have been previously disclosed by the Erickson Parties to the Redwood Parties),

(c)     the Management Agreements; and

(d)     the transactions described on Part 5.9 of the Erickson Disclosure Schedule.

5.10    **Tax Matters**.  (a)  ERC and each ERC Sub that owns a Retirement Community, on behalf of itself and any of its Employee Plans which may be required to file Tax Returns, and, to the Knowledge of the Erickson Parties, each of the NFPs, has duly prepared and filed with the appropriate Government Entity all Tax Returns required by Law within the time or extended time required or permitted, and has timely paid all Taxes required to be paid when due and as shown on such Tax Returns.  All such Tax Returns were accurate and complete as filed and/or amended. Neither ERC nor any ERC Sub that owns a Retirement Community is a party to any pending or threatened Action by any Government Entity for the assessment or collection of Taxes.   No amounts are owed or will be owed by any Transferred Landowner with respect to any prior Tax audits or reviews by any Government Entity.

5.11    **Exempt and Political Organizations**.  (a)  Each Standalone NFP and, to the Knowledge of the Erickson Parties, NSC and each NSC-Supported NFP:

(i)     is exempt from federal income Tax under Section 501(a) of the Code by reason of being an organization described in Section 501(c)(3) of the Code;

(ii)    is not a private foundation within the meaning of Section 509 of the Code;

(iii)   has received a determination letter (a "Determination Letter") from the IRS recognizing its status as a tax-exempt public charity (i.e., not a private foundation) described in Section 501(c)(3) of the Code; and

(iv)    is exempt from state income, franchise, sales, use and similar Taxes in each of the states in which it conducts activities, holds property or was chartered, and has applied for and received formal recognition of such status from each such state that does not automatically provide exemptions to organizations whose exempt status is recognized by the IRS.

(b)     Part 5.11(b) of the Erickson Disclosure Schedule sets forth, to the Knowledge of the Erickson Parties, a true and complete list of all determination letters, letter rulings and information letters issued by the IRS, all written technical advice furnished by the IRS, and all closing agreements and correspondence with the IRS, in each case relating to NSC or any NFP (the "IRS Rulings").  The Erickson Parties have:

(i)     previously delivered or made available to the Redwood Parties true and complete copies of all IRS Rulings relating to the Standalone NFPs; and

(ii)    obtained copies (which, to the Knowledge of the Erickson Parties, are true and complete copies) of all IRS Rulings relating to NSC or any NSC-Supported NFP from NSC, and previously delivered or made such copies available to the Redwood Parties.

(c)    Without limiting the generality of <u>Section 5.13(a)</u>:

(i)    the activities of each Standalone NFP and, to the Knowledge of the Erickson Parties, NSC and the NSC-Supported NFPs, are being conducted, and have been conducted at all times since the issuance of each applicable IRS Ruling, in compliance with all IRS Rulings;

(ii)    no Determination Letter has been modified, limited, revoked or superseded by the IRS; and

(iii)    there has been no change in the facts and circumstances which served as the basis for the Determination Letter of any Standalone NFP or, to the Knowledge of the Erickson Parties, NSC or any NSC-Supported NFP, of a nature or to a degree as would warrant any action by the IRS to modify, limit, revoke or supersede any such Determination Letter.

(d)    No NFP is a party to any joint venture or partnership with (i) any ERC Company, (ii) any Affiliate of an ERC Company, or (iii) to the Knowledge of the Erickson Parties, any other Person.

(e)    To the Knowledge of the Erickson Parties, there is no pending, or any basis for, any Action which calls into question (i) the validity or enforceability of any Tax-Exempt Bonds or of any of the other Contracts or certifications entered into or given in relation to any Tax-Exempt Bonds; or (ii) the excludability from gross income for federal income tax purposes of the interest on any Tax-Exempt Bonds.

(f)    <u>Part 5.11(f)</u> of the Erickson Disclosure Schedule sets forth a true and complete list of all committees (each, a "<u>PAC</u>") established as "separate segregated funds" within the meaning of the United States Federal Election Campaign Act ("<u>FECA</u>") for which any ERC Company or any Affiliate of an ERC Company is the "connected organization" within the meaning of FECA.

**5.12**    **Legal Proceedings**.  Except as set forth on <u>Part 5.12</u> of the Erickson Disclosure Schedule and except for such matters where the potential Damages are less than $50,000:

(a)    there are no Actions, orders, awards, decrees or judgments, pending against or binding upon any Transferred Landowner, Employee Plan or real property owned by an ERC Sub; and

(b)    to the Knowledge of the Erickson Parties, there are no Actions, orders, awards, decrees or judgments (i) threatened against any Transferred Landowner, Employee Plan, or real property owned by an ERC Sub; or (ii) pending or threatened against any Controlled Real Property.

**5.13**    **Compliance With Laws; Permits**.  (a) ERC and each Transferred Landowner is in material compliance with all applicable Laws.  Neither ERC nor any Transferred Landowner has

received any notification that has not lapsed or been withdrawn by any Government Entity asserting a violation of any Law or threatening to revoke any Permit.

(b)     Each Covered Entity, and to the Knowledge of the Erickson Parties, NSC and each NSC-Supported NFP, has obtained and maintained, and is in compliance with all Permits necessary for its existence and the conduct of its business and/or activities, all of which are all in full force and effect.

**5.14    Questionable Activities**.   Neither ERC nor any ERC Sub that owns a Retirement Community has directly or indirectly:

(a)     made any unlawful contribution, gift, entertainment, bribe, kickback, rebate, payoff or other payment to any Person in connection with the Business;

(b)     established or maintained any unlawful or unrecorded fund of any such ERC Company monies or other assets; or

(c)     made any false or fictitious entry on the books or records of any such ERC Company.

**5.15    Material Contracts**.   (a)  Part 5.15(a) of the Erickson Disclosure Schedule sets forth, as of the date hereof, a complete and accurate list of all Contracts of the following types to which ERC or any ERC Sub that owns a Retirement Community is a party, or by which such ERC Company or such ERC Company's properties or assets are bound (the "Material Contracts"):

(i)     Contracts to manage any real property, business or charitable activity in connection with a Retirement Community (collectively, the "Management Agreements");

(ii)    Contracts with any provider of health care products or services involving expenditures or revenue in excess of $250,000 annually;

(iii)   Contracts under which any ERC Sub that owns a Retirement Community is a lessor, lessee, sublessor, sublessee, licensor or licensee of any real property (the "Real Property Leases"), stating in each case the street address or other reasonable descriptor of the land, buildings or other improvements covered thereby (the "Leased Real Property");

(iv)    Contracts relating to the development of, or the construction of any improvements on, any real property (collectively, the "Development Contracts");

(v)     Contracts under which ERC, any Transferred Landowner or other ERC Sub that owns a Retirement Community or, to the Knowledge of the Erickson Parties, any NFP, has incurred, assumed or guaranteed any indebtedness for borrowed money in excess of $250,000 individually and $1,000,000 in the aggregate (the "Credit Facilities");

(vi)    Contracts under which any ERC Company has the right or option to purchase any real property;

(vii)    Contracts imposing non-competition or any other restriction with respect to the geographical area, scope or type of operations of any ERC Company;

(viii)    Contracts containing any "change of control" provision with respect to any ERC Company or Parent;

(ix)    Contracts involving an investment by any Transferred Landowner in any Person that is not also an ERC Company, including any partnership, limited liability company or joint venture;

(x)    Contracts under which any revenue, profit or income of the Business is required to be, or may be, shared with any third Person;

(xi)    employment Contracts;

(xii)    Contracts with any Employee containing any restrictive covenants;

(xiii)    Contracts that involve aggregate payments in excess of $250,000 per annum; and

(xiv)    to the extent not described elsewhere in this Section 5.15(a), Contracts that are material to the Business.

(b)    The Erickson Parties have previously delivered or made available to the Redwood Parties a true and complete copy of each written Material Contract, and provided on Part 5.15(a) of the Erickson Disclosure Schedule a reasonably complete and accurate summary description of the material terms of any unwritten Material Contract.

(c)    Each Material Contract is in full force and effect and is legal, valid, binding and enforceable against each ERC Company that is a party thereto and, to the Knowledge of the Erickson Parties, is legal, valid, binding and enforceable against all other parties thereto in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting the enforceability of creditors' rights generally, general equitable principles and the discretion of courts in granting equitable remedies. There does not exist under any Material Contract (other than the Credit Facilities) any default or condition or event that, after notice or lapse of time or both, would constitute a material default on the part of the ERC Company that is a party thereto or to Knowledge of the Erickson Parties, on the part of any other party thereto.

(d)    Attached as Part 5.15(d) of the Erickson Disclosure Schedule are true and correct copies of the current forms of residence and care agreement for each Retirement Community. Each such form has been approved, to the extent necessary, by all applicable Government Entities. All residence and care agreements with present residents of the Retirement Communities conform substantially to the applicable form of residence and care agreement included in Part 5.15(d) of the Erickson Disclosure Schedule.

(e)    Except as set forth on Part 5.15(e) of the Erickson Disclosure Schedule, neither ERC nor any of its Affiliates is a party to any Contract with any Person, or has made any offer to any Person, under which, in connection with any Retirement Community owned or managed by ERC or an ERC Sub, ERC or such Affiliate:

<blockquote>
<blockquote>

(i)      is obligated to provide special, subsidized or unique or discounted services, amenities or cash payments, subsidies or reimbursements that are not generally available to other residents; or

(ii)     has agreed or offered to assist such Person in connection with the sale, leasing or other disposition of their home.

</blockquote>
</blockquote>

**5.16    Real Property**.  (a)  With respect to each Real Property Lease, to the Knowledge of the Erickson Parties, (i) the Person that is the lessee, sublessee or licensee thereunder (the "Tenant") has not subleased or licensed any of the Leased Real Property or given any third Person any license or other right to occupy any portion of the Leased Real Property; (ii) neither the Tenant nor any other party to the Real Property Lease has waived any term or condition thereof, and all covenants to be performed to date by the Tenant and, to the Knowledge of the Erickson Parties, all other parties to thereto, have been performed; (iii) the Tenant has not collaterally assigned or granted any security interest in the Real Property Lease or any interest therein; and (iv) the Tenant is not obligated under or a party to, any option, right of first refusal or other contractual right to purchase any Leased Real Property or any portion thereof or interest therein.

<blockquote>

(b)      A true and complete list of:

<blockquote>

(i)      all real property that is owned by any ERC Company (the "Owned Real Property") is set forth on Part 5.16(b)(i) of the Erickson Disclosure Schedule, including in each case (A) the street address or other reasonable descriptor of the property and (B) the name of the ERC Company that owns such property; and

(ii)     all real property that is managed by an ERC Company, or at which any business is managed by any ERC Company, in each case pursuant to a Management Agreement (the "Managed Real Property") is set forth on Part 5.16(b)(ii) of the Erickson Disclosure Schedule, including in each case (A) the street address or other reasonable descriptor of the property, (B) the name of the owner of such property and (C) the ERC Company that manages such property.

</blockquote>

(c)      With respect to each parcel of Owned Real Property, the ERC Company identified on Part 5.16(b)(i) of the Erickson Disclosure Schedule as the owner of such parcel (i) is the sole owner of such parcel, and (ii) holds good, marketable and insurable title to such parcel free and clear of all Liens, other than the Project Debt and matters set forth on the Title Policies. To the Knowledge of the Erickson Parties, with respect to each parcel of Managed Real Property, the Person identified on Part 5.16(b)(ii) of the Erickson Disclosure Schedule as the owner of such parcel is the sole owner of such parcel.

(d)      With respect to each parcel of Owned Real Property (the ERC Companies obtained the title insurance policies identified in Schedule 5.16(d) (the "Title Policies").

(e)      There are no condemnation, eminent domain or other similar proceedings pending, or to the Knowledge of the Erickson Parties, threatened, with respect to any Owned Real Property.  Except as set forth in the Contracts and documents referenced in the Title Policies that create or evidence conditions or exceptions to title affecting the real property covered thereby, there are no special assessments or other assessments for public improvements or otherwise affecting any Owned Real Property, and, to the Knowledge of the Erickson Parties, there are no

</blockquote>

contemplated improvements affecting any Owned Real Property that may result in a special assessment against such Owned Real Property.

5.17 **Environmental Matters**.   (a)   Except as set forth on Part 5.17(a) of the Erickson Disclosure Schedule:

> (i)   there are no pending, or to the Knowledge of the Erickson Parties threatened, Environmental Claims relating to any Owned Real Property, real property that was previously owned by any Transferred Landowner or any of their predecessors that has been transferred to a Person that is not an ERC Company, or with respect to the development of, or the operation of the Business on, any of the foregoing or on any of the Controlled Properties (collectively, the "Covered Property and Operations");

> (ii)   none of the ERC Companies has received any written notification of any Environmental Claims for any disposal, release or threatened release at any location of any Hazardous Materials generated at, or transported from, the Covered Property and Operations;

> (iii)   to the Knowledge of the Erickson Parties, there are no Environmental Conditions at or on the Owned Property which could result in or give rise to any Environmental Claims, nor are there any Environmental Conditions at any Controlled Properties which could interfere with any Redwood Party's operation of the business of any ERC Company or the performance under any management agreement by ManagementCo or any of its respective Affiliates.

(b)   The Erickson Parties have previously delivered or made available to the Redwood Parties true and complete copies of all correspondence relating to any unresolved Environmental Conditions between any Government Entity and any ERC Company and, to the extent in ERC's possession, between any Government Entity and any NFP.

5.18 **Intellectual Property**.   (a) All IP that is owned by any ERC Company ("Owned IP") and, to the Knowledge of the Erickson Parties, all IP that is used by any ERC Company pursuant to a license agreement ("Licensed IP"), has been duly maintained, is valid and subsisting, is in full force and effect and has not been cancelled, expired or abandoned.   None of the Owned IP, and no aspect of the conduct of the Business, infringes, violates, dilutes, misappropriates or interferes with, any IP rights of any Person.   No ERC Company has brought or threatened a claim against any Person alleging infringement, violation, dilution or misappropriation of, or interference with, any Owned IP.   No Person has brought or threatened a claim against any Covered Entity, or to the Knowledge of the Erickson Parties NSC or any NSC-Supported NFP, alleging infringement, violation, dilution or misappropriation of, or interference with, any IP.   No IP used or held for use in connection with the Business is owned or held by any Affiliate of JCE that is not an ERC Company.   The Owned IP and Licensed IP constitute all of the IP used by ERC and its Affiliates in the operation of the Business as of each of the Execution Date and the Closing Date.

(b)   Part  5.18(b) of the Erickson Disclosure Schedule sets forth a true and complete list of all Owned IP that is registered, or with respect to which any ERC Company has filed an

application, with any Government Entity, stating for each the serial number, registration number and/or application number therefor.

**5.19**   **Labor & Employment Matters**.  (a) Part 5.19(a) of the Erickson Disclosure Schedule sets forth a true and complete list, as of the Execution Date, of all Employees and Independent Contractors to whom any ERC Company or group of ERC Companies has made, or caused any Management Agreement Counterparty to make, payments in the twelve (12) months immediately preceding the Execution Date exceeding One Hundred Thousand Dollars ($100,000).

(b)      At all times, (i) the ERC Companies have properly classified, or caused the applicable Management Agreement Counterparty to properly classify (as the case may be) (A) Employees and Independent Contractors as employees or independent contractors, as appropriate; and (B) Employees as exempt or non-exempt for purposes of the Fair Labor Standards Act and similar state Laws; and (ii) all Employees have been paid properly under applicable federal, state and local wage and hour Laws.

(c)      There is no:

(i)      collective bargaining agreement to which any ERC Company or Management Agreement Counterparty is a party or otherwise bound;

(ii)      labor union representing any Employees;

(iii)      to the Knowledge of the Erickson Parties, (A) overt organizational effort with respect to the formation of a collective bargaining unit presently being made or threatened by any Employees, or (B) any active current efforts by any Person encouraging or soliciting any Employees to engage or participate in any such organizational effort;

(iv)      pending or, to the Knowledge of the Erickson Parties, threatened strike, slowdown, work stoppage, lockout or other collective labor action or dispute by or with respect to any Employees;

(v)      unfair labor practice complaints against any ERC Company or Management Agreement Counterparty pending or, to the Knowledge of the Erickson Parties, threatened before the National Labor Relations Board or other applicable Government Entity; or

(vi)      labor dispute currently subject to any grievance procedure, arbitration or litigation with respect to any Employee.

(d)      Part 5.19(d) of the Erickson Disclosure Schedule sets forth a true and complete list of all matters occurring within the three (3) years immediately prior to the Execution Date that, if they existed today, would be within the scope of the representation and warranty in Section 5.19(c).

**5.20**   **Employee Plans**.  (a) Set forth in Part 5.20 of the Erickson Disclosure Schedule is a complete and correct list of all "employee benefit plans" within the meaning of Section 3(3) of ERISA, all fringe benefit plans within the meaning of Section 6039D of the Code, and all other bonus, incentive-compensation, deferred-compensation, profit-sharing, equity-based (including any option, appreciation-right, profit-interest, phantom-bonus, equity-purchase or employee -

ownership, savings, severance, change-in-control, supplemental-unemployment, layoff, salary-continuation, retirement, pension, health, life-insurance, disability, accident, group-insurance, vacation, holiday, sick-leave, fringe-benefit, or welfare plan, and any other employee compensation or benefit plan, agreement, policy, practice, commitment, contract or understanding, or employment agreement (whether qualified or nonqualified, currently effective or terminated, written or unwritten) that (i) is, or within the last six (6) years has been, maintained or contributed to (or required to be contributed to) by either any of the Erickson Parties, any Management Agreement Counterparty, or any other corporation or trade or business controlled by, controlling, or under common control (within the meaning of Section 414(b), (c), (m) or (o) of the Code or Section 4001(a)(14) or 4001(b) of ERISA with any of the Erickson Parties or any Management Agreement Counterparty ("ERISA Affiliate"), or with respect to which any of the Erickson Parties or Management Agreement Counterparties, or any ERISA Affiliate thereof, has or may have any liability, and (ii) provides benefits to any current or former director, officer, employee, or service provider (or dependent thereof) regardless of how (or whether) liabilities for the provision of benefits are accrued or assets are acquired or dedicated with respect to the funding thereof (individually, a "Employee Plan", and collectively, the "Employee Plans").

(b)  No Employee Plan is (i) a "Defined Benefit Employee Plan" (as defined in Section 414(j) of the Code); (ii) a "Multiemployer Employee Plan" (as defined in Section 3(37) of ERISA); or (iii) a plan subject to Section 412 of the Code or Section 302 or Title IV of ERISA, (collectively, a "Title IV or MP Plan") nor have the Erickson Parties or the Management Agreement Counterparties, nor any ERISA Affiliate thereof, ever maintained or contributed to any such a plan, or had an obligation to contribute to such a Title IV or MP Plan.  Neither the Erickson Parties, the Management Agreement Counterparties, nor any ERISA Affiliate thereof, has an obligation to indemnify or contribute to the obligation of any other party with respect to a Title IV or MP Plan. Also set forth in Part 5.20 is a complete and correct list of all ERISA Affiliates of the Erickson Parties and the Management Agreement Counterparties during the last six (6) years.

(c)  The Erickson Parties have delivered to the Redwood Parties true, accurate, and complete copies of (i) the documents comprising each Employee Plan (or, with respect to any Employee Plan that is unwritten, a detailed written description of eligibility, participation, benefits, funding arrangements, assets, and any other matters that relate to the respective obligations of the Erickson Parties, the Management Agreement Counterparties, and any ERISA Affiliate thereof; (ii) all trust agreements, insurance contracts, or any other funding instruments related to the Employee Plans; (iii) all current rulings, determination letters, no-action letters, or advisory opinions from the IRS, the U.S. Department of Labor, or any other Governmental Entity that pertain to each Employee Plan and any open requests therefor; (iv) the most recent actuarial and financial reports (audited and/or unaudited) and the annual reports filed with any Governmental Entity with respect to the Employee Plans during the current year and each of the three preceding years; (v) all collective bargaining agreements pursuant to which contributions to any Employee Plan(s) have been made or obligations incurred (including both pension and welfare benefits) by the Erickson Parties, the Management Agreement Counterparties, or any ERISA Affiliate thereof; (vi) all securities registration statements filed with respect to any Employee Plan; (vii) all contracts with third-party administrators, actuaries, investment managers, consultants, and other independent contractors that relate to any Employee Plan, and (viii) all summary plan descriptions, summaries of material modifications and employee handbooks, regarding the Employee Plans.

(d)  Full and timely payment has been made of all contributions that are required under applicable law or regulation or the terms of each Employee Plan and premiums due or

payable with respect to insurance policies funding any Employee Plan with respect to all periods prior to the Closing Date.

(e)     The Erickson Parties, the Management Agreement Counterparties, and each ERISA Affiliate thereof have, at all times complied, and currently comply, in all material respects, with the terms of each Employee Plan and the Code, ERISA and all other applicable Laws for their welfare benefit plans, including (i) COBRA and (ii) any applicable state statutes mandating health insurance continuation coverage for employees.

(f)     (i) The form of each all Employee Plan is in compliance with the applicable terms of ERISA, the Code, and any other applicable laws, including the Americans with Disabilities Act of 1990, the Family Medical Leave Act of 1993, and the Health Insurance Portability and Accountability Act of 1996, and such plans have been operated in compliance with terms of the Employee Plan and all such Laws; (ii) neither the Erickson Parties, the Management Agreement Counterparties, nor any fiduciary of an Employee Plan has violated the requirements of Section 404 of ERISA; and (iii) all required reports and descriptions of the Employee Plans (including but not limited to Form 5500 Annual Reports, Summary Annual Reports and Summary Employee Plan Descriptions, and Summaries of Material Modifications) have been (when required) timely filed with the IRS, the U.S. Department of Labor, or other Governmental Entity and distributed as required, and all notices required by ERISA or the Code or any other Laws with respect to the Employee Plans have been appropriately given.

(g)     Each Employee Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the IRS or is the subject of an IRS opinion letter, and there are no circumstances that will or could result in revocation of any such favorable determination or opinion letter.  Each trust created under any Employee Plan (that is intended to be qualified under Section 401(a) of the Code) has been determined to be exempt from taxation under Section 501(a) of the Code, and there is no circumstance that will or could result in a revocation of such exemption.

(h)     No Employee Plan that is an employee welfare benefit plan (as defined in Section 3(1) of ERISA) utilizes a  trust as a funding vehicle.

(i)     With respect to each Employee Plan, no event has occurred or condition exists that will or could give rise to a loss of any intended tax consequence or to any tax liability under Section 511 of the Code.

(j)     With respect to each Employee Plan, neither the Erickson Parties, any Management Agreement Counterparties, nor any ERISA Affiliate thereof, nor any fiduciary of an Employee Plan, has acted or failed to act with respect to such Employee Plan in any manner which constitutes a breach of fiduciary responsibility under ERISA or has engaged in a transaction with respect to any Employee Plan that could subject any of the Erickson Parties, any Management Agreement Counterparties, any ERISA Affiliate thereof, or the Redwood Parties to any tax liability or penalty imposed by either Section 4975 of the Code or Section 502(l) of ERISA, or result in a violation of Section 406 of ERISA.  Neither the entering into of this Agreement, nor the consummation of the Transactions, will result in the potential assessment of a tax liability or penalty under Section 4975 of the Code or Section 502(l) of ERISA nor result in a violation of Section 406 of ERISA. Neither the Erickson Parties, the Management Agreement Counterparties, nor any ERISA Affiliate thereof, is obligated to indemnify or contribute to the liability of any third party with respect to a breach of fiduciary responsibility under ERISA or any tax liability or penalty imposed by either Section 4975 of the Code or Section 502(l) of ERISA.

(k)     Each Seller has maintained workers' compensation coverage as required by applicable state law through purchase of insurance and not by self-insurance or otherwise except as disclosed in Part 5.20 of the Erickson Disclosure Schedule.

(l)     Except as disclosed in Part 5.20 of the Erickson Disclosure Schedule, neither the entering into of this Agreement nor the consummation of the Transactions will accelerate the time of vesting or the time of payment, or increase the amount, of compensation due to any director, employee, officer, former employee, or former officer of any of the Erickson Parties or any Management Agreement Counterparty. There are no contracts or arrangements maintained by the Erickson Parties or any Management Agreement Counterparty providing for payments that could subject any person to liability for tax under Section 4999 of the Code.

(m)     Except for the continuation coverage requirements of COBRA or other similar applicable Laws, neither the Erickson Parties nor any Management Agreement Counterparty, nor any ERISA Affiliate thereof, has any obligations or potential liability for benefits to employees, former employees, directors, or other service providers, or their respective dependents following termination of employment or retirement under any of the Employee Plans that are employee welfare benefit plans (as defined in Section 3(1) of ERISA).

(n)     (i) Neither the entering into of this Agreement nor any of the occurrence of any of the Transactions will result in an amendment, modification, or termination of any of the Employee Plans; (ii) no written or oral representations have been made to any employee or former employee of the Erickson Parties, the Management Agreement Counterparties, or any ERISA Affiliate thereof, promising or guaranteeing any employer payment or funding for the continuation of medical, dental, life, or disability coverage for any period of time (except to the extent of coverage required under COBRA or any similar applicable Laws mandating continuation or conversion coverage)).

(o)     No Employee Plan provides, or has provided, "nonqualified deferred compensation" to any "service provider" (within the meaning of Section 409A of the Code) which could subject such "service provider" to gross income inclusion or tax pursuant to Section 409A of the Code. Any Employee Plan subject to Section 409A of the Code has been operated in compliance with Section 409A of the Code and the regulations and any other guidance promulgated thereunder.

(p)     There have been no material changes in the financial condition of any Employee Plans from that stated in the annual report (as described in Section 103 of ERISA) most recently filed for such Employee Plan.

(q)     There are no actions, lawsuits, arbitrations, audits, inquiries, investigations, proceedings or claims (other than routine claims for benefits made in the ordinary course and qualified domestic relations or medical child support orders) pending or threatened with respect to any Employee Plan or the operation thereof (whether brought or threatened to be brought by or against a participant or beneficiary, a trustee, a plan administrator, an Erickson Party, Management Agreement Counterparty, ERISA Affiliate, or any director, officer or employee thereof and including matters pending before or threatened by the Internal Revenue Service, Department of Labor, or other Governmental Entity), and neither the Erickson Parties, any Management Agreement Counterparties, nor any ERISA Affiliate has knowledge of any facts which could give rise to any such action, lawsuit, arbitration, audit, inquiry, investigation, proceeding or claim

(r)     None of the assets of the Erickson Parties, the Management Agreement Counterparties, or their ERISA Affiliates are subject to any liens under ERISA or the Code, and no event has occurred, or condition exists, which could subject any of such assets to any future liability, obligation or lien with respect to any Employee Plan or Title IV or MP Plan.

(s)     With respect to any Employee Plan that is unfunded, the Erickson Parties, the Management Agreement Counterparties, and all ERISA Affiliates have adequately provided for and their financial statement accurately reflects (in accordance with GAAP), the amount of all accrued benefits and obligations under such Employee Plan.

**5.21    No Brokers**.  There is no investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of any Erickson Party, or any of their respective Affiliates, who is or might be entitled to any fee or commission in connection with the Transactions.

**5.22    Disclosure**.  No representation or warranty or other statement made by any Erickson Party in this Agreement, or in any of the documents delivered pursuant to this Agreement, contains any untrue statement or omits to state a material fact necessary to make any of them, in light of the circumstances in which it was made, not misleading.

**Article VI          REPRESENTATIONS AND WARRANTIES OF REDWOOD**.

Except as expressly set forth in the correspondingly numbered part of the disclosure schedule delivered by Redwood that is attached hereto as Exhibit U (the "Redwood Disclosure Schedule"), Redwood makes the representations and warranties set forth in this Article VI to ERC, which representations and warranties are being relied upon by ERC and shall survive the Closing:

**6.1    Organization**.  Each Redwood Party is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Maryland.  The Governance Documents of each Redwood Party are in full force and effect, and no Redwood Party is in violation of any provision of its Governance Documents.

**6.2    Authorization**.  Each Redwood Party has the right, power and authority to execute and deliver this Agreement and all other agreements entered into in connection with this Agreement to which it is a party (collectively, the "Redwood Agreements"), and to perform its respective obligations under the Redwood Agreements, and to consummate the transactions contemplated by the Redwood Agreements.  The execution and delivery of the Redwood Agreements by each Redwood Party, and the performance by each Redwood Party of its respective obligations under the Redwood Agreements, and the consummation of the transactions provided for in the Redwood Agreements have been duly and validly authorized and approved by all necessary limited liability company action on the part of each Redwood Party.  Each Redwood Agreement (i) has been duly executed and delivered by the applicable Redwood Party(ies), and (ii) constitutes a valid and binding agreement of the applicable Redwood Party(ies), enforceable against the applicable Redwood Party(ies) in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting the enforceability of creditors' rights generally, general equitable principles and the discretion of courts in granting equitable remedies.

**6.3    Non-Contravention**.  Subject to receipt of the Approvals described on Part 6.4 of the Redwood Disclosure Schedule, neither the execution and delivery of any Redwood Agreement by any Redwood Party, nor the consummation of the transactions contemplated by any Redwood

Agreement, does or would, after the giving of notice or the lapse of time or both: (a) conflict with, result in a breach of, constitute a default under, or violate the Governance Documents of any Redwood Party, or any Law applicable to any Redwood Party; (b) conflict with, result in a breach of, constitute a default under, result in the acceleration of any rights or obligations under, create in any Person the right to accelerate any rights or obligations under or amend, modify, cancel or refuse to perform under, or require any notice under any Contract or other arrangement, to which any Redwood Party is a party, or by which any of their respective assets or properties are bound; or (c) result in the creation of, or give any Person the right to create, any Lien upon any right, property or asset of any Redwood Party.

**6.4** **No Approvals**.  Except as otherwise set forth on <u>Schedule 6.4</u>, no Approval of any Government Entity or other Person is required in connection with the execution, delivery and performance of, or the consummation of the transactions contemplated by, any Redwood Agreement by any Redwood Party.

**6.5** **No Brokers**.  There is no investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of any Redwood Party, or any of their respective Affiliates, who is or might be entitled to any fee or commission in connection with the Transactions.

**6.6** **Disclosure**.  No representation or warranty or other statement made by any Redwood Party in this Agreement or in any of the documents delivered pursuant to this Agreement contains any untrue statement or omits to state a material fact necessary to make any of them, in light of the circumstances in which it was made, not misleading.

**Article VII** **ADDITIONAL AGREEMENTS**.

**7.1** **Bankruptcy Matters**.  (a) Within thirty (30) days after the Execution Date, ERC shall commence, and shall cause each of the other Debtors to commence, a Bankruptcy Case and file the Reorganization Plan (which Reorganization Plan shall have been provided to Redwood for in advance of filing and shall be acceptable to Redwood) and a related disclosure statement, (the "<u>Disclosure Statement</u>"), with the Bankruptcy Court and seek to obtain the Confirmation Order with respect to the Reorganization Plan as expeditiously as possible.  The Reorganization Plan, Disclosure Statement and Confirmation Order shall each be in form and substance satisfactory to the Redwood Parties in their sole and absolute discretion.

(b)     The Debtors shall provide the Redwood Parties with copies of all material motions, orders, applications and supporting papers and notices prepared by the Debtors (including without limitation, forms of orders and notices to interested parties), prior to their being filed with the Bankruptcy Court, relating to this Agreement, the Transactions or the Reorganization Plan, and shall consult as reasonably practicable with the Redwood Parties or their counsel prior to taking any significant action with respect to the Transactions or Reorganization Plan.  Without the consent of the Redwood Parties, the Debtors shall not take any significant action with respect to the Reorganization Plan or Transactions that is inconsistent with the transactions and terms contemplated by this Agreement.  With respect to all other motions, orders, applications and supporting papers and notice, the Debtors will use reasonable efforts to provide the Redwood Parties with copies thereof, where practicable, prior to their submission, and shall, in all cases, provide the Redwood Parties and its counsel with copies of such submissions or correspondence after the filing thereof.  All papers forwarded to the Redwood Parties under this section may be provided in draft form.

**7.2** __Conduct of Business__.  (a) From the Execution Date until the Closing, except as otherwise contemplated by this Agreement or to the extent Redwood shall otherwise consent in writing, the Erickson Parties shall:  (a) conduct the Businesses in the Ordinary Course, (b) use commercially reasonable efforts to maintain and preserve intact the organization, employees and advantageous business relationships of the Business and retain the services of its officers and key employees, and (c) take no action which would materially adversely affect or materially delay the ability of the Redwood Parties to obtain any necessary Approvals for the transactions contemplated hereby or to perform their covenants under this Agreement.

(b)     During the period from the Execution Date to the Closing Date, except as expressly contemplated or permitted by this Agreement or as expressly required by applicable Law, ERC shall not, and ERC shall not permit any of the Transferred Landowners to, without the prior written consent of Redwood:

(i)     issue any debt securities or otherwise incur any indebtedness for borrowed money, assume, guarantee, endorse or otherwise as an accommodation become responsible for the obligations of any other Person, or make any loans, advances or renewals thereof in excess of $250,000, except for the DIP financing and any draws thereunder;

(ii)     adjust, split, combine, reclassify, convert or exchange any of its capital stock or equity interests or any securities or obligations convertible into or exchangeable for any shares of its capital stock or equity interests;

(iii)     make, declare or pay any dividend or make any other distribution on, whether payable in cash, stock, equity interests, property or otherwise any of its capital stock or equity interests or any securities or obligations convertible into or exchangeable for any shares of its capital stock or equity interests;

(iv)     redeem, purchase or otherwise acquire, any of its capital stock or equity interests or any securities or obligations convertible into or exchangeable for any shares of its capital stock or equity interests;

(v)     grant any stock appreciation rights, restricted stock, bonus stock, stock options or any similar awards or rights in respect of any of its capital stock or equity interests or any securities or obligations convertible into or exchangeable for any shares of its capital stock or equity interests;

(vi)     sell, pledge or encumber any additional capital stock or equity interests or any securities or obligations convertible into or exchangeable for any shares of its capital stock or equity interests;

(vii)     sell, transfer, mortgage, encumber or otherwise dispose of any of its properties or assets;

(viii)     make any investment either by purchase of stock or securities, contributions to capital, property transfers, or purchase of any property or assets of any other Person;

(ix)     increase or decrease its equity ownership position in any Person;

(x) except in the Ordinary Course, amend or terminate any Material Contract;

(xi) except in the Ordinary Course, enter into any Contract that, if it had existed on the Execution Date, would have been a Material Contract;

(xii) establish, adopt, amend or terminate any plan or any agreement, arrangement or plan of any kind with, or for the benefit of, any officers, directors, members, managers or Employees, including any collective bargaining, bonus, profit sharing, thrift, compensation, stock option, restricted stock, pension, retirement, deferred compensation, employment, termination and severance agreement, trust, fund, policy or arrangement;

(xiii) pay any bonus to any officers, directors, members, managers or Employees;

(xiv) increase in any manner the compensation or fringe benefits of any officers, directors, members, managers or Employees;

(xv) settle, agree to settle or compromise any Action (whether or not commenced prior to the Execution Date and including any Action relating to this Agreement or the Transactions) for an amount in excess of $250,000;

(xvi) amend its Organizational Documents;

(xvii) enter into any new line of business, discontinue any line of business, relocate or terminate any operations or otherwise materially change the business currently conducted by it;

(xviii) acquire or agree to acquire, by merging or consolidating with, or by purchasing an equity interest in, or all or a portion of the assets of, or by any other manner, any other Person;

(xix) incur any capital expenditures in excess of $250,000 individually or $1,000,000 in the aggregate, except in accordance with the DIP Budget;

(xx) change any Tax election, file any amended Tax Return, enter into any closing agreement, settle or compromise any liability with respect to Taxes, agree to any adjustment of any Tax attribute, change (or make a request to any taxing authority to change) any of its methods of reporting income or deductions for federal income tax purposes from those employed in the preparation of its federal income tax return for the taxable year ended December 31, 2008;

(xxi) take any action with respect to changing its accounting methods, principles or practices, other than changes required by applicable Law or GAAP or regulatory accounting as concurred in by ERC's independent accountants;

(xxii)  commit any act or omission which could reasonably be expected to constitute a material breach or default under any Material Contract;

(xxiii)  take any action that is intended or could reasonably be expected to violate any applicable Law or result in any of the conditions set forth in <u>Article VIII</u> not being satisfied in a timely manner; or

(xxiv)  agree or commit to do any of the foregoing.

**7.3**    **Employee and Employee Benefits Matters**.  (a) The Redwood Parties are not obligated to hire any Erickson Employees, but may interview and discuss potential employment with all Erickson Employees; *provided, however*, it is the intention of the Redwood Parties to hire substantially all employees of ERC at Closing, subject to ongoing due diligence.  Prior to Closing, Redwood will provide ERC with a list of Erickson Employees to whom a Redwood Party has made an offer of employment that has been accepted to be effective upon the Closing (the "<u>Transferred Employees</u>").  Effective immediately prior to the Closing, ERC will, or will cause its applicable Affiliate to, terminate the employment of all Transferred Employees.

(b)    ERC shall, or shall cause its applicable Affiliate to, cause all group health plans under which Erickson Employees and their beneficiaries are covered on the Closing Date to continue to cover such Erickson Employees until 11:59 p.m., New York City time, on the last calendar day of the month in which the Closing Date occurs (the "<u>Benefit Cutoff Time</u>").  As of the Benefit Cutoff Time, all Transferred Employees shall cease participation in all Employee Plans, except with respect to benefits accrued as of, or claims incurred on or prior to, such time, and except with respect to Employee Plans that ManagementCo assumes pursuant to this Agreement.  It is anticipated that Redwood will assume all Employee Plans except for ERC's Growth Participation Plan, subject to Redwood's right to reject any such Employee Plans based on further due diligence performed prior to the Closing Date.

(c)    With respect to claims by Transferred Employees and their beneficiaries and dependents for workers' compensation or for the type of benefits described in Section 3(1) of ERISA (whether or not covered by ERISA) that are due under the terms of an Employee Plan, as between ERC and the Redwood Parties for the period of time ending at the Benefit Cutoff Time, (i) ERC shall assume and be responsible for such claims that are incurred on or prior to the Closing Date; and (ii) the Redwood Parties shall assume and be responsible for such claims that are incurred after the Closing Date and prior to the Benefit Cutoff Time.  For purposes of the foregoing, a medical/dental claim shall be considered incurred when the medical services are rendered or medical supplies are provided, and not when the condition arose; *provided* that claims relating to a hospital confinement that commences on or prior to the Closing Date but continuing thereafter shall be treated as incurred on or prior to the Closing Date.  A disability or workers' compensation claim shall be considered incurred on or prior to the Closing Date if the injury or condition giving rise to the claim occurred on or prior to the Closing Date.

(d)    The Erickson Parties shall be responsible (regardless of whether such responsibility would be imposed on the Erickson Parties under Section 54.4980B-9 of the Treasury Regulations) for satisfying any and all Liabilities under the continuation coverage provisions of the *Consolidated Omnibus Budget Reconciliation Act of 1985*, as amended ("<u>COBRA</u>"), and any applicable state Law to provide continuation coverage to or with respect to all employees or former employees of the Erickson Parties, the Management Agreement Counterparties, and any ERISA Affiliates thereof, and the beneficiaries of such employees, as a result of any "qualifying event" occurring prior to the Closing or as a result of the Transactions.

ERC shall not take any action or cause any action to be taken that would trigger Liability to any Redwood Party with respect to any M&A qualified beneficiary within the meaning of Section 54.4980B-9 of the Treasury Regulations of the Code.

(e)      In respect of notices and payments relating to events occurring prior to the Closing or as a result of the Transactions, ERC shall be responsible for and assume all liability for any and all notices, payments, fines or assessments due to any Government Entity, pursuant to any Law with respect to the employment, discharge or layoff of any Erickson Employees as of or before the Closing, including pursuant to the WARN Act.

(f)      Nothing expressed or implied in this Section 7.3 will confer upon any Erickson Employee, any employee of any Redwood Party, or any legal representative of any such Person, any rights or remedies, including any right to employment or continued employment for any specified period, of any nature or kind whatsoever under or by reason of this Agreement. Nothing in this Agreement will limit or restrict in any way the right of the Redwood Parties to modify, amend, terminate or establish employee benefit plans or arrangements in whole or in part at any time after the Closing Date.

**7.4**    **ERC Retained Community Contracts**.  Prior to Closing, Redwood will provide ERC with a list of:

(a)      the existing development Contracts relating to ERC Retained Communities with respect to which DevCo has executed new replacement development Contracts satisfactory to DevCo (to be effective as of Closing);

(b)      the existing management Contracts relating to ERC Retained Communities with respect to which ManagementCo has executed new replacement management Contracts satisfactory to ManagementCo (to be effective as of Closing);

(c)      the existing development Contracts relating to ERC Retained Communities with respect to which DevCo has not executed new replacement development Contracts, and which DevCo has elected to assume at the Closing (the "Transferred Development Contracts"); and

(d)      the existing management Contracts relating to ERC Retained Communities with respect to which ManagementCo has not executed new replacement management Contracts, and which PropCo has elected to assume at the Closing (the "Transferred Management Contracts").

**7.5**    **No Solicitation**.  (a) Except as authorized and directed by the Bidding Procedures Order, which shall be in substance acceptable to Redwood or as set forth in Section 7.5(b), none of the Erickson Parties, any of their Subsidiaries or any of their Representatives will directly or indirectly (i) solicit, initiate, encourage, facilitate (including by way of furnishing information) or take any other action designed to facilitate any inquiries or proposals regarding any merger, share exchange, consolidation, sale of assets, assumption of liabilities, sale of shares of capital stock (including by way of a tender offer) or similar transactions involving any of the Erickson Parties or any of their Subsidiaries that, if consummated, would constitute an Alternative Transaction (any of the foregoing inquiries or proposals being referred to herein as an "Alternative Proposal"); (ii) participate in any discussions or negotiations with third parties regarding an Alternative Transaction; or (iii) enter into any agreement regarding any Alternative Transaction.

(b)      From the Execution Date until the date (the "Shop Period End Date") that is earlier of (x) November 18, 2009 or (y) the Petition Date, the Erickson Parties and their

Representatives shall solicit arms-length Alternative Proposals from Persons other than Redwood; *provided* that:

(i)     the Erickson Parties and their Representatives require each such Alternative Proposal to be (x) in writing, (y) accompanied by reasonable evidence of the bidder's financial ability to consummate the Alternative Transaction contemplated by such Alternative Proposal and (z) submitted no later than October 19, 2009; and

(ii)    the NFPs and their respective boards of directors deal exclusively with the Erickson Parties and their Representatives in pursuing Alternative Proposals.

(c)     As used in this Agreement, "Alternative Transaction" means any of (i) a transaction pursuant to which any Person or group of Persons (other than a Redwood Party), directly or indirectly, acquires or would acquire more than 25% of the outstanding equity ownership interests of any Erickson Party or any of their Subsidiaries; (ii) a merger, share exchange, consolidation or other business combination involving any Erickson Party or any of their Subsidiaries; (iii) any transaction pursuant to which any Person or group of Persons (other than a Redwood Party) acquires or would acquire control of assets of any Erickson Party or any of their Subsidiaries; or (iv) any other consolidation, business combination, share exchange, recapitalization or similar transaction involving any Erickson Party or any of their Subsidiaries, other than the Transactions.

(d)     ERC will notify Redwood promptly (but in no event later than 24 hours) after the receipt by any Erickson Party or any of their Subsidiaries of any Alternative Proposal, or any modification of or amendment to any Alternative Proposal, or any request for information relating to any Erickson Party or any of their Subsidiaries, or for access to the properties, books or records of any Erickson Party or any of their Subsidiaries by any Person who has made, or ERC reasonably believes may make, an Alternative Proposal.  Such notice to Redwood will be made orally and in writing, and will indicate the identity of the Person requesting such information or access, and the material terms of any such Alternative Proposal.  ERC will keep Redwood fully informed, on a current basis, of any material changes in the status and any material changes or modifications in the terms of any such Alternative Proposal, indication or request.

(e)     If ERC receives an Alternative Proposal prior to the Shop Period End Date that ERC concludes in good faith, after consultation with outside counsel and its financial advisors, constitutes a Superior Proposal after giving effect to all of the adjustments to the terms of this Agreement that may be offered by Redwood, ERC may terminate this Agreement in order to enter into a definitive agreement with respect to such Superior Proposal; *provided*, *however*, that ERC may not terminate this Agreement in order to enter into a definitive agreement with respect to such Superior Proposal (it being agreed that any such purported termination will be null and void and of no effect) unless (i) such Superior Proposal did not result from a breach of this Section 7.5 by any Erickson Party or any of their Subsidiaries or Representatives; (ii) ERC pays the Termination Fee pursuant to Section 9.2(b); and (iii) (A) ERC will have provided prior written notice to Redwood of  ERC's intention to take any action contemplated in this Section 7.5(e) with respect to a Superior Proposal at least five (5) Business Days in advance of taking such action (the "Renegotiation Period"), which notice will set forth the material terms and conditions of any such Superior Proposal (including the identity of the party making such Superior Proposal), and will have contemporaneously provided a copy of the relevant proposed transaction agreements with the party making such Superior Proposal and other material

documents, including the then-current form of each definitive agreement with respect to such Superior Proposal; and (B) prior to terminating this Agreement to enter into a proposed definitive agreement with respect to such Superior Proposal, ERC provides Redwood the opportunity to submit an amended written proposal or to make a new written proposal to ERC during the Renegotiation Period and will itself and will cause its Representatives to, during the Renegotiation Period, negotiate in good faith with Redwood to make such adjustments to the terms and conditions of this Agreement so that such Superior Proposal ceases to constitute a Superior Proposal.  In the event of any subsequent revisions to such Superior Proposal, ERC will deliver a new written notice to Redwood and comply with the requirements of this <u>Section 7.5(e)</u>, and the Renegotiation Period will recommence.  As used herein, the term "<u>Superior Proposal</u>" means any bona fide Alternative Proposal made in writing that (A) is on terms that ERC has determined in good faith are more favorable to the creditors of the Debtors from a financial point of view than this Agreement, after giving effect to any modifications (if any) proposed to be made to this Agreement or any other offer by Redwood after Redwood's receipt of notice under this <u>Section 7.5(e)</u>, and (B) ERC has determined in good faith is reasonably likely to be consummated in accordance with its terms (if accepted). The foregoing determinations of the ERC shall be made after consultation with ERC's financial advisors and outside counsel after taking into account all appropriate legal, financial (including the financing terms of such proposal), regulatory and other aspects of such proposal and any other relevant factors permitted under applicable law

(f)     As of the Shop Period End Date, the Erickson Parties and their Subsidiaries and Representatives will immediately cease and cause to be terminated any existing discussions or negotiations with any Persons (other than the Redwood Parties) conducted heretofore with respect to any of the foregoing, and will use commercially reasonable efforts to cause all persons other than the Redwood Parties and their Representatives who have been furnished confidential information regarding the Erickson Parties and their Subsidiaries within the 12 months preceding the Execution Date to return or destroy such information.  The Erickson Parties agree not to, and to cause their Subsidiaries not to, release any third party from the confidentiality provisions of any agreement to which any Erickson Party or any of their Subsidiaries is or may become a party, and will immediately take all steps necessary to terminate any approval that may have been heretofore given under any such provisions authorizing any person to make an Alternative Proposal.

(g)     The Erickson Parties will ensure that all of their Representatives are aware of the restrictions described in this <u>Section 7.5</u>.  It is understood that any violation of the restrictions set forth in this <u>Section 7.5</u> by any Representative of any Erickson Party or any of their Subsidiaries will be deemed to be a breach of this <u>Section 7.5</u> by the Erickson Parties.

**7.6    Expenses**.  (a)  ERC shall pay the reasonable, documented, out-of-pocket expenses incurred by the Redwood Parties in connection with their due diligence investigation of the ERC Companies, the preparation and negotiation of this Agreement, and the closing of the Transactions, up to a maximum amount of Five Hundred Thousand Dollars ($500,000) (the "<u>Redwood Transaction Costs</u>").  ERC has heretofore advanced the sum of Five Hundred Thousand Dollars ($500,000) in cash to Redwood as an advance against ERC's obligation to pay the Redwood Transaction Costs (the "<u>Transaction Cost Advance</u>"), and Redwood acknowledges receipt of same.

(b)     Except as otherwise set forth in this Agreement (including <u>Section 7.6(a)</u>), the Parties shall pay all of their own expenses relating to the transactions contemplated by this Agreement, including, the fees and expenses of their own Representatives.

**7.7**     **Access to Information**.  (a)  At all times prior to the Closing Date, the Erickson Parties shall, and shall cause their Affiliates to, permit the Redwood Parties and their counsel and other professional advisors to have reasonable access to the Business to perform due diligence, to examine the Contracts, books, records and other information of the Business, and make, or have made, copies thereof; *provided; however*, that such access shall be during normal business hours, upon reasonable prior notice and in a manner so as not to interfere with the normal business operations of the Business.

(b)  Following the Closing, unless otherwise prohibited by Law, each Party will afford each other Party, its counsel and its accountants, during normal business hours, reasonable access to the books, records and other data relating to the Business and the right to make copies and extracts therefrom, to the extent that such access may be reasonably required by the requesting Party in connection with (i) the preparation of Tax Returns, (ii) compliance with the requirements of any Government Entity, (iii) any actual or threatened legal action, or (iv) for any other legitimate or proper business purpose.

(c)  No Party shall be entitled to charge any other Party for the cost of providing copies of any Contracts, books, records and other information to such other Party.

**7.8**     **Efforts to Satisfy Conditions**.  Each of the Parties agrees to use commercially reasonable best efforts to cause all conditions to closing for which such Party is responsible to be satisfied as promptly as practicable after the Execution Date.

**7.9**     **Further Assurances**.  From and after the Closing, from time to time and without further consideration, each Party will execute and deliver such instruments and take such other commercially reasonable action reasonably requested by one or more of the other Parties in order to effect the Transactions.

**7.10**     **Transfer Taxes**.  To the extent the Transactions are not exempt from such Taxes pursuant to Section 1146 of the Bankruptcy Code, all transfer Taxes, including excise, sales, use, value added, real property transfer, stamp, documentary, filing, recordation, notarial and other similar taxes and fees that may be imposed or assessed as a result of the transactions contemplated by this Agreement, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties shall be paid one-half by the Redwood Parties and one-half by the Erickson Parties.

**7.11**     **Publicity; Confidentiality**.  A Party may only issue a press release or make a public statement concerning this Agreement and the Transactions if such press release or public statement is made in form and substance, and at a time, to which all other Parties have consented after good faith consultation.  Otherwise, no Party hereto shall make any public disclosure concerning this Agreement, the Transactions, or the existence of and/or particulars of any negotiations related hereto, including the terms, conditions, consideration to be paid or other facts related to this Agreement, except to the extent that public disclosure is required by applicable Law, in which case, to the extent practicable, the Parties will use their reasonable best efforts to reach mutual agreement on disclosure language prior to making such disclosure.  Each Party will, and will cause its Affiliates and Representatives to, maintain in confidence all written, oral or other information obtained in confidence ("Confidential Information") from another Party in connection with this Agreement or the Transactions, including this Agreement and the terms hereof, unless the use or disclosure of such Confidential Information is reasonably necessary in connection with (a) any obtaining any Approval; (b) the Bankruptcy Case; (c) negotiations with the Corporate Lenders, Project Lenders and other holders of ERC's debt and other obligations

(and each of the foregoing party's representatives) and applicable state regulatory authorities; or (d) a valid court order; *provided, however*, that no Party shall disclose, or knowingly permit any other Person to disclose, any Confidential Information of the other Party without such other Party's prior written consent. Notwithstanding the foregoing, prior to the Shop Period End Date, ERC may disclose this Agreement and the Letter of Intent dated September 19, 2009 between ERC and Redwood in connection with the solicitation of arms-length Alternative Proposals from Persons other than Redwood pursuant to <u>Section 7.5(b)</u>.

**7.12** **Liquidation of Cash Equivalents**. Prior to Closing, ERC shall liquidate all of its cash equivalents to cash, as necessary to permit ERC to deliver the Distributable Cash on Hand in accordance herewith in the form of cash, and not cash equivalents.

**7.13** **Exhibits and Schedules**. The Parties shall use commercially reasonable good faith efforts to agree upon final versions of all Exhibits and Schedules to this Agreement within ten (10) days after the Execution Date.

**Article VIII** **CONDITIONS PRECEDENT**.

**8.1** **Conditions to the Obligations of the Redwood Parties**. The obligations of the Redwood Parties to effect the Transactions are subject to the satisfaction at or prior to the Closing of the following conditions, unless waived in writing by Redwood:

(a) the representations and warranties of ERC set forth in this Agreement shall be true and correct in all material respects (except that those representations and warranties that are limited by materiality shall be true and correct in all respects) as of the Execution Date and as of the Closing Date as if made at and as of the Closing Date (except where such representations or warranties are made expressly as of a specific date, and then as of such date; *provided, however*, that notwithstanding anything herein to the contrary, Redwood shall only be entitled to elect not to close the Transactions under Section 8.1(a), (b) or (c), or terminate this Agreement pursuant to Section 9.1(b)(i), if the aggregate amount of the inaccuracies of the representations and warranties of ERC or the breaches of the covenants of the Erickson Parties exceeds One Million Dollars ($1,000,000); it being further agreed that if such inaccuracies or breaches exceed Two Hundred Fifty Thousand Dollars ($250,000), but are less than One Million Dollars ($1,000,000), the cash consideration payable hereunder by the Redwood Parties shall be reduced dollar-for-dollar by the amount of such inaccuracies and breaches;

(b) the Erickson Parties shall have performed in all material respects all obligations required to be performed by each of them under this Agreement at or prior to the Closing;

(c) the Erickson Parties shall have executed, as applicable, and delivered to Redwood all of the documents and other items required to be delivered by each of them at the Closing pursuant to <u>Section 4.2(a)</u>;

(d) no Action shall be pending or threatened before any Government Entity that seeks to or does, and no Law shall be in effect that does, prevent consummation of any of the Transactions;

(e) since the Execution Date there shall not have occurred any event, change or circumstance that could reasonably be expected to constitute a Material Adverse Effect on ERC; *provided, however*, that the Redwood Parties acknowledge and agree that no Material Adverse Effect on ERC shall be deemed to arise from the filing of the Reorganization Plans;

(f) the Court Approval shall have been obtained and be in full force and effect;

(g) intentionally reserved;

(h) intentionally reserved;

(i) all applicable counterparties shall have executed and delivered:

(i) a waiver and release of all claims against the Redwood Parties and the Purchased Assets, in form and substance acceptable to Redwood in its sole and exclusive discretion;

(ii) intentionally reserved;

(iii) the Assignment of Distributions;

(iv) the New PropCo Operating Agreement;

(v) the B&R Note Sharing Agreement; and

(vi) the Closing Statement (solely for the purpose of acknowledging and agreeing with the allocations set forth therein).

(j) with respect to each Retirement Community (other than the ERC Retained Communities):

(i) DevCo shall have executed new development Contracts satisfactory to DevCo (to be effective as of Closing) to replace all development Contracts existing as of the Execution Date, each of which shall (x) contain substantially the same economic terms as are contained in the development Contract being replaced and (y) have a term of at least seven (7) years;

(ii) ManagementCo shall have executed new management Contracts satisfactory to ManagementCo (to be effective as of Closing) to replace all management Contracts existing as of the Execution Date, each of which shall (x) contain substantially the same economic terms as are contained in the management Contract being replaced and (y) have a term of at least five (5) years, subject to a three (3) year right of review; and

(iii) ERC shall have terminated all Development Contracts and Management Contracts existing as of the Execution Date.

(k) intentionally reserved;

(l) all third Persons whose Approval is necessary for the consummation of the Transactions under a Contract or applicable Law (including all Approvals identified in Part 5.4 of the Erickson Disclosure Schedule) shall have given such Approval in writing, or the Bankruptcy Court shall have entered orders binding such persons in lieu of such Approvals;

(m)      (i) all necessary third Persons shall have agreed to that Redwood's $50,000,000 credit facility, the purpose of which is to fund post-Closing working capital and project development needs of the Acquisition Companies (the "Working Capital Facility"), shall have a first lien on all assets of the Acquisition Companies; *provided, however*, that such lien shall be subordinated to the ManagementCo Reorg Note, except that ManagementCo may make debt service payments on the Working Capital Facility provided no default exists and is continuing under the ManagementCo Reorg Note; and (ii) Redwood shall have provided ERC with a copy of the executed documents evidencing the Working Capital Facility;

(n)      ERC, Parent and such other Affiliates of ERC as Redwood may identify prior to Closing shall have each changed their respective entity name to a different name satisfactory to Redwood;

(o)      such Affiliates of ERC as Redwood may identify prior to Closing shall have been dissolved; and

(p)      the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Act") applicable to the consummation of the Transactions shall have expired or been terminated; and

(q)      JCE shall have executed and delivered:

(i)      a Non-Compete;

(ii)      a Consulting Agreement in the form attached hereto as Exhibit P (the "Consulting Agreement"); and

(iii)      a License and Concurrent Use Agreement in the form attached hereto as Exhibit Q (the "License and Concurrent Use Agreement".

(r)      Scott Erickson, Mark Erickson and such other Persons as Redwood may identify prior to Closing shall have executed and delivered a Non-Compete; and

(s)      Redwood and ERC shall have entered into a lease satisfactory to Redwood with respect to the real property at 5525 Research Park Drive, Baltimore, Maryland 21250.

**8.2      Conditions to the Obligations of the Erickson Parties**.  The obligations of the Erickson Parties to effect the Transactions are subject to the satisfaction at or prior to the Closing of the following conditions, unless waived in writing by ERC:

(a)      the representations and warranties of Redwood set forth in this Agreement shall be true and correct in all material respects (except that those representations and warranties that are limited by materiality shall be true and correct in all respects) as of the Execution Date and as of the Closing Date as if made at and as of the Closing Date (except where such representations or warranties are made expressly as of a specific date, and then as of such date);

(b)      Redwood shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing;

(c)     the Redwood Parties shall have executed, as applicable, and delivered to ERC all of the documents and other items required to be delivered by each of them at the Closing pursuant to Section 4.2(a);

(d)     no Action shall be pending or threatened before any Government Entity that seeks to or does, and no Law shall be in effect that does, prevent consummation of any of the Transactions;

(e)     the Court Approval shall have been obtained and be in full force and effect; and

(f)     the waiting period under the HSR Act applicable to the consummation of the Transactions shall have expired or been terminated.

**Article IX     TERMINATION.**

**9.1     Termination.**  This Agreement may be terminated prior to the Closing:

(a)     by mutual written consent of Redwood and ERC;

(b)     by Redwood:

(i)      if there has been a material breach by any Erickson Party of any representation or warranty contained herein or in the due and timely performance of any covenant or agreement contained herein;

(ii)     if the Closing shall not have occurred on or before the date (the "Outside Closing Date") that is one hundred twenty (120) days after the Petition Date by reason of the failure of any condition precedent under Section 8.1 (unless such failure was solely within the control of a Redwood Party);

(iii)    if the Court Approval shall not have been obtained by the Outside Closing Date, or the Confirmation Order has been entered but stayed as of such date or has not become a final order within ten (10) days thereafter;

(iv)     if any condition precedent under Section 8.1 shall have become incapable of fulfillment other than as a result of breach by Redwood, and such condition is not waived by Redwood;

(v)      if ERC of any of its Affiliates has filed any pleading or entered into any agreement (other than this Agreement and other than the Bidding Procedures Motion approved by Redwood) relating or otherwise regarding (A) the sale, transfer, lease or other disposition, directly or indirectly, of a material portion of the Purchased Assets or (ii) a proposed plan of reorganization that is not acceptable to Redwood or that differs from the terms of this Agreement;

(vi)     if the Bankruptcy Court has not entered the Bidding Procedures Order by November 26, 2009, or such order has been entered but stayed as of such date;

<div style="margin-left: 2em;">

(vii)     if ERC or any of its Affiliates selects a bid by someone other than Redwood as the "highest and best offer" in accordance with the Bidding Procedures Order;

(viii)     if any secured lenders to ERC or any of its Affiliates exercise rights under Section 363(k) of the Bankruptcy Code; or

(ix)     if all Exhibits and Schedules to this Agreement have not been mutually agreed upon by the tenth (10th) day after the Execution Date.

</div>

(c)     by ERC:

<div style="margin-left: 2em;">

(i)     if there has been a material breach by any Redwood Party of any representation or warranty contained herein or in the due and timely performance of any covenant or agreement contained herein, ERC has notified Redwood of such breach in writing, and the breach has not been cured within ten (10) Business Days after delivery of such notice;

(ii)     if the Closing shall not have occurred on or before the Outside Closing Date by reason of the failure of any condition precedent under <u>Section 8.2</u> (unless such failure was solely within the control of an Erickson Party); or

(iii)     in accordance with, and subject to the terms and conditions of, <u>Section 7.5(e)</u>.

</div>

**9.2**     <u>**Effect of Termination**</u>. (a)  A "<u>Triggering Event</u>" shall be deemed to have occurred if:

<div style="margin-left: 2em;">

(i)     Redwood terminates this Agreement pursuant to <u>Section 9.1(b)(i)</u> on account of a breach of <u>Section 7.5</u> by any Erickson Party;

(ii)     Redwood terminates this Agreement pursuant to any of <u>Section 9.1(b)(ii), (iii), (iv), (v), (vi), (vii), (viii) or (ix);</u>  or

(iii)     any Alternative Transaction is consummated on or before September 12, 2010.

</div>

(b)     Immediately upon the occurrence of any Triggering Event, and provided that Redwood is not otherwise in material breach of this Agreement, ERC shall pay Redwood (collectively, the "<u>Termination Fee</u>"):

<div style="margin-left: 2em;">

(i)     One Million Five Hundred Thousand Dollars ($1,500,000),

(ii)     <u>plus</u>, if the Triggering Event under <u>Section 9.2(a)(iii)</u> occurs, an additional One Million Five Hundred Thousand Dollars ($1,500,000) payable at the closing of the Triggering Event, and

(iii)     <u>less</u> the Commitment Fee then held by Redwood.

</div>

**Article X**          **INDEMNIFICATION**.

**10.1**    **By the Erickson Parties**. Each Erickson Party shall, jointly and severally, in accordance with this <u>Article IX</u>, indemnify, defend, protect and hold harmless the Redwood Parties and their respective assigns, successors and Affiliates (collectively, the "<u>Redwood Indemnitees</u>") from, against and in respect of all Actions asserted against, and all Damages asserted against or suffered, sustained, incurred or paid by, any Redwood Indemnitee (collectively, "<u>Redwood Losses</u>") in connection with or arising out of (a) the breach or inaccuracy of any representation or warranty of the Erickson Parties set forth in this Agreement or any other Erickson Agreement; or (b) the nonfulfillment of any covenant or agreement in this Agreement or any other Erickson Agreement on the part of any Erickson Party.

**10.2**    **By the Redwood Parties**. Each Redwood Party shall, jointly and severally, in accordance with this <u>Article IX</u>, indemnify, defend, protect and hold harmless the Erickson Parties and their respective assigns, successors and Affiliates (collectively, the "<u>Erickson Indemnitees</u>") from, against and in respect of all Actions asserted against, and all Damages asserted against or suffered, sustained, incurred or paid by, any Erickson Indemnitee (collectively, "<u>Erickson Losses</u>") in connection with or arising out of (a) the breach or inaccuracy of any representation or warranty of the Redwood Parties set forth in this Agreement or any other Redwood Agreement, or (b) the nonfulfillment of any covenant or agreement in this Agreement or any other Redwood Agreement on the part of any Redwood Party.

**10.3**    **Notice of Claims**. A Person entitled to indemnification under this <u>Article IX</u> (an "<u>Indemnified Party</u>") shall notify the Persons obligated to provide such indemnification under this <u>Article IX</u> (the "<u>Indemnifying Party</u>") in writing promptly after becoming aware of any Damages which an Indemnified Party shall have determined has given rise to a claim for indemnification under <u>Article IX</u>. Such written notice (a "<u>Claim Notice</u>") shall include an estimate of the Damages, if known, the method of computation thereof and a reference to the specific provisions of this Agreement in respect of which it seeks indemnification. If the Indemnifying Party notifies the Indemnified Party that it does not dispute the claim or the estimated amount of Damages described in such Claim Notice, or fails to notify the Indemnified Party within thirty (30) days after delivery of such Claim Notice whether the Indemnifying Party disputes the claim or the estimated amount of Damages described in such Claim Notice, the estimated Damages in the amount specified in the Indemnified Party's Claim Notice (an "<u>Undisputed Indemnity Amount</u>") will be conclusively deemed a Liability of the Indemnifying Party and the Indemnifying Party shall pay the amount of such Damages to the Indemnified Party. If the Indemnifying Party has timely disputed its liability with respect to such claim or the estimated amount of Damages, the dispute shall be resolved, and the amount, if any, of Damages payable by the Indemnifying Party to the Indemnified Party (a "<u>Resolved Indemnity Amount</u>") shall be determined, in accordance with <u>Section 11.6</u>. The provisions of this <u>Section 10.3</u> do not apply to Third Party Actions.

**10.4**    **Third Party Actions**. (a) If any third Person shall commence an Action against any Indemnified Party (a "<u>Third Party Action</u>") with respect to any matter which may give rise to a claim for indemnification under this <u>Article IX</u>, then the Indemnified Party shall notify the Indemnifying Party as the case may be, in writing promptly after becoming aware of such Third Party Action describing in reasonable detail the Third Party Action (such notice being hereinafter called a "<u>Third Party Action Notice</u>"), which notice shall include a reference to the specific provisions of this Agreement in respect of which it seeks indemnification. It is agreed that no delay on the part of any Indemnified Party in notifying the Indemnifying Party shall relieve the Indemnifying Party from its obligations hereunder, except to the extent said Indemnifying Party is prejudiced by such failure to give notice. The Indemnifying Party will have thirty (30) days from

the delivery of such Third Party Action Notice (the "<u>Response Period</u>") to determine whether or not (i) the Indemnifying Party will, at its sole cost and expense, defend against such Third Party Action and/or (ii) the Indemnifying Party is disputing the claim for indemnity hereunder

(b)     If the Indemnifying Party (i) does not respond to the Third Party Action Notice by 5:00 p.m., Baltimore, Maryland time on the last day of the Response Period, (ii) responds to the Third Party Action Notice, but disputes the claim for indemnity hereunder and elects not to assume the defense, or (iii) responds to the Third Party Action Notice and does not dispute the claim for indemnity but elects not to assume the defense, in each case within the period allowed after delivery of the Third Party Action Notice, the Indemnified Party shall have the right to defend against any such Third Party Action by appropriate proceedings or to settle or pay any such Third Party Action for such an amount as the Indemnified Party shall deem appropriate and the Indemnifying Party shall promptly pay all Damages resulting from such Third Party Action in accordance with subparagraph (e) below; *provided* that in the case of clause (ii), any right of the Indemnified Party to recover from the Indemnifying Party shall depend on the resolution of the dispute as to the right of indemnity in accordance with <u>Section 11.6</u>.

(c)     If the Indemnifying Party affirmatively disputes the right to indemnity, but nevertheless elects to defend against any such Third Party Action or settle or pay any such Third Party Action, any right of the Indemnified Party to recover from the Indemnifying Party shall depend on the resolution of the dispute as to the right of indemnity in accordance with <u>Section 11.6</u>.

(d)     Notwithstanding anything herein to the contrary, if the Indemnifying Party notifies the Indemnified Party that it will defend against or settle any Third Party Action:

    (i)     such defense or settlement shall be at the sole cost and expense of the Indemnifying Party, except for costs and expenses of the Indemnified Party's counsel, if any, pursuant to clause (vi) below;

    (ii)     the Indemnifying Party and its counsel shall conduct such defense or settlement at all times in good faith;

    (iii)     the Indemnifying Party and its counsel shall, at the reasonable request of the Indemnified Party, provide periodic updates to the Indemnified Party in order to keep the Indemnified Party reasonably informed as to its conduct of such defense or settlement, and shall not compromise or settle such Third Party Action without the prior written consent of the Indemnified Party (not to be unreasonably withheld or delayed) unless such settlement or compromise does not subject the Indemnified Party to any monetary liability, and includes a complete, unconditional release of the Indemnified Party from all Liability with respect to such Third Party Action;

    (iv)     the Indemnified Party shall reasonably cooperate with the Indemnifying Party, including making available to the Indemnifying Party, all relevant witnesses and pertinent documents and information and appropriate personnel;

    (v)     the Indemnified Party may employ its own counsel and participate in such defense or settlement at the Indemnified Party's sole cost and

expense, but the control of such defense and the settlement shall rest with the Indemnifying Party;

(vi)     notwithstanding the Indemnifying Party's election to defend against or settle the Third Party Action, the Indemnified Party may, upon written notice to the Indemnifying Party, elect to employ its own counsel (who shall be reasonably acceptable to the Indemnifying Party) at the Indemnifying Party's expense (except that the Indemnifying Party shall not be obligated to pay the fees of more than one separate counsel for all Indemnified Parties, taken together) if (A) the Indemnifying Party is also a Person against whom the Third Party Action is made and the Indemnified Party has been advised by counsel that (x) representation of both parties by the same counsel would be inappropriate under applicable standards of professional conduct or (y) the Indemnified Party has available to it one or more defenses or counterclaims that are inconsistent with, different from, or in addition to one or more of those that may be available to the Indemnifying Party with respect to such Third Party Action; or (B) the Indemnifying Party shall not in fact have employed counsel reasonably satisfactory to the Indemnified Party for the defense or settlement of such Third Party Action; provided, however, that the assumption of control of the defense or settlement of a Third Party Action by the Indemnified Party pursuant to this item (vi) shall not relieve the Indemnifying Party of its obligation to indemnify and hold the Indemnified Party harmless; and

(vii)     in no event shall the Indemnified Party consent to the entry of any judgment or enter into any settlement with respect to such Third Party Action without the prior written consent of the Indemnifying Party (which consent shall not be unreasonably withheld or delayed).

(e)     The Damages resulting from the settlement or the final, non-appealable adjudication of such Third Party Action, or that portion thereof as to which the defense is unsuccessful (such Damages, together with Undisputed Indemnity Amounts and Resolved Indemnity Amounts, are interchangeably and collectively referred to herein as "<u>Final Losses</u>"), shall be conclusively deemed a Liability of the Indemnifying Party to the Indemnified Party if the Indemnifying Party: (i) does not respond to a Third Party Action Notice by 5:00 p.m., Baltimore, Maryland time on the last day of the Response Period; (ii) does not elect to defend against any Third Party Action for which it does not dispute the Indemnified Party's right to indemnity; (iii) does not elect to defend against any Third Party Action for which it disputes the Indemnified Party's right to indemnity, and such dispute is resolved, in accordance with <u>Section 11.6</u>, in a manner affirming the Indemnified Party's right to indemnity; (iv) elects to defend against any Third Party Action for which it does not dispute the Indemnified Party's right to indemnity hereunder; or (v) elects to defend against any Third Party Action for which it does dispute the right to indemnity, to the extent the dispute is resolved in a manner affirming the Indemnified Party's right to indemnity.

**10.5**     <u>Satisfaction of Claims</u>. (a)  Notwithstanding anything to the contrary in this Agreement, the New Operating Agreements or the ManagementCo Reorg Note, upon the assertion of any good faith claim for indemnification hereunder by any Redwood Indemnitee (an "<u>Asserted Claim</u>"), with respect to Redwood's good faith estimate of the amount of such Asserted Claim (the "<u>Set-Off Amount</u>"), Redwood shall have the right, as its sole remedy (except in the case of

fraud, willful misconduct and intentional misrepresentation), upon notice to the other members of PropCo and/or DevCo (as the case may be), to set off the Set-Off Amount against distributions that would otherwise be payable to Parent (or the other members of PropCo and/or DevCo who are Affiliates of JCE), and cause PropCo and/or DevCo (as the case may be) to distribute the Set-Off Amount to Redwood, in each case pending (x) the resolution of such claim pursuant to a final, non-appealable judgment of a tribunal of competent jurisdiction or (y) the execution of a written settlement agreement with respect to such claim (a "<u>Final Resolution</u>"); *provided* that, with respect to any Asserted Claim, the combined amount Redwood may set off pursuant to this <u>Section 10.5</u> shall not exceed the Set-Off Amount of such Asserted Claim.

(b)     Upon the Final Resolution of any Asserted Claim, if the Set-Off Amount of such Asserted Claim is:

(i)     exceeds the actual amount of the Final Losses incurred by Redwood in connection with such Asserted Claim, Redwood shall promptly pay such excess portion of the Set-Off Amount to the other members of PropCo and/or DevCo, in proportion to the amounts they would have received if Redwood had not exercised the right of set-off provided in this <u>Section 10.5</u>; or

(ii)     is greater than the actual amount of the Final Losses incurred by Redwood in connection with such Asserted Claim, the Erickson Parties shall compensate the Redwood Indemnitee for such difference by payment of cash, by check or wire transfer of immediately available funds within thirty (30) days of the date of the Final Resolution of such matter.

(c)     The exercise of the right of set-off provided in this <u>Section 10.5</u> by Redwood, whether or not ultimately determined to be justified, will not, by itself, constitute a breach of any of the provisions of this Agreement, either of the New Operating Agreements.

**10.6     Threshold Amount**.  Notwithstanding anything herein to the contrary:

(a)     the Erickson Parties shall have no obligation to indemnify Redwood Indemnitees pursuant to this <u>Article IX</u>, and the Redwood Indemnitees shall not exercise any rights pursuant to Section 10.5, until the aggregate amount of Redwood Losses exceeds Two Hundred Fifty Thousand Dollars ($250,000) (the "<u>Threshold Amount</u>"), whereupon the Erickson Parties shall be liable to the Redwood Indemnitees for all Redwood Losses including the Threshold Amount; and

(b)     the Redwood Parties shall have no obligation to indemnify Erickson Indemnitees pursuant to this <u>Article IX</u> until the aggregate amount of Erickson Losses exceeds the Threshold Amount, whereupon the Redwood Parties shall be liable to the Erickson Indemnitees for all Erickson Losses including the Threshold Amount.

**10.7     Survival Period**.  (a)  The period during which a claim for indemnification may be asserted hereunder (the "<u>Claims Period</u>") with respect to:

(i)     a breach or inaccuracy of any of <u>Sections 5.2</u> (Authority), <u>5.10</u> (Tax Matters) or <u>5.17</u> (Environmental Matters) or 5.20 (Employee Plans) shall continue until thirty (30) days after the end of the applicable statute of limitations;

(ii)      a breach or inaccuracy <u>Sections 5.5(a) (Title to Assets)</u> shall continue indefinitely; and

(iii)     all other matters shall continue until the date that is two (2) years after the Closing Date.

(b)     Notwithstanding <u>10.6(a)</u>, if, prior to the close of business on the last day of the Claims Period, an Indemnifying Party shall have been properly notified of a claim for indemnity hereunder and such claim shall not have been finally resolved or disposed of at such date, such claim shall continue to survive and shall remain a basis for indemnity hereunder until such claim is finally resolved or disposed of in accordance with the terms hereof. All representations and warranties herein shall survive the Closing until the last day of the Claims Period applicable thereto or until all unresolved claims relating thereto have been finally resolved or disposed of.

**10.8**    <u>**Exclusive Remedy**</u>. Except in the case of fraud, willful misconduct and intentional misrepresentation, the indemnification provisions in this <u>Article IX</u> constitute the sole and exclusive remedy or recourse of any Indemnified Party against any Indemnifying Party for any Damages arising under or related to this Agreement.

**Article XI**      <u>**MISCELLANEOUS**</u>.

**11.1**    <u>**Entire Agreement**</u>. This Agreement embodies the entire agreement and understanding of the Parties with respect to the Transactions, and supersedes all other prior commitments, arrangements or understandings, both oral and written, among the Parties with respect to the subject matter hereof.

**11.2**    <u>**Construction; Headings**</u>. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. The headings herein are for convenience only, do not constitute a part of this Agreement, and shall not be deemed to limit or affect any of the provisions hereof.

**11.3**    <u>**Severability**</u>. The provisions of this Agreement are intended to be interpreted and construed in a manner so as to make such provisions valid, binding and enforceable. In the event that any provision of this Agreement is determined to be partially or wholly invalid, illegal or unenforceable, then such provision shall be deemed to be modified or restricted to the extent necessary to make such provision valid, binding and enforceable, or, if such provision cannot be modified or restricted in a manner so as to make such provision valid, binding and enforceable, then such provision shall be deemed to be excised from this Agreement and the validity, binding effect and enforceability of the remaining provisions of this Agreement shall not be affected or impaired in any manner.

**11.4**    <u>**Waiver and Amendment**</u>. No waiver, amendment, modification or change of any provision of this Agreement shall be effective unless and until made in writing and signed by the Parties. No waiver, forbearance or failure by any Party of its rights to enforce any provision of this Agreement shall constitute a waiver or estoppel of such Party's right to enforce any other provision of this Agreement or a continuing waiver by such Party of compliance with any provision hereof.

**11.5**     **Governing Law**.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Maryland without regard to principles of conflicts of laws.

**11.6**     **Dispute Resolution**.  The Parties shall attempt in good faith to resolve by negotiation all controversies or claims arising out of or relating to this Agreement or the breach hereof.  In the event that such a controversy or claim cannot be resolved within thirty (30) days of written notice from one Party to the other Party (which notice shall specifically describe the controversies or claims being submitted to arbitration), such controversy or claim shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules before a single arbitrator in Baltimore, Maryland.  The expenses of the arbitration shall be borne equally by the parties to the arbitration, provided, however, that each such party shall pay for and bear the cost of its own experts, evidence and legal counsel, unless the arbitrator rules otherwise in the arbitration.  Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  The award rendered by the arbitrator shall be final and non-appealable, except as permitted under the United States Federal Arbitration Act.

**11.7**     **Notices**.

(a)     Each Redwood Party (other than Redwood) hereby appoints Redwood as its agent to receive all notices and other communications given or to be given to, and to give all notices and other communications given or to be given by, each of them pursuant hereto.  Each Erickson Party (other than ERC) hereby appoint ERC as his/its agent to receive all notices and other communications given or to be given to, and to give all notices and other communications given or to be given by, each of them pursuant hereto.

(b)     Any notices or other communications required or permitted hereunder shall be in writing and sent to the appropriate addresses designated below (or to such other address or addresses as may hereafter be furnished by one Party to the other Parties in compliance with the terms hereof), by hand delivery, by facsimile transmission to the respective facsimile numbers designated below (with electronic confirmation of delivery), by UPS, FedEx or DHL next-day service, or by registered or certified mail, return receipt requested, postage prepaid:

| *If to any Erickson Party:* | *with copies (which shall not constitute notice) to:* |
|---|---|
| Erickson Retirement Communities, LLC<br>701 Maiden Choice Lane<br>Baltimore, Maryland  21228<br>Fax: (__) ___-____<br>Attn: _____ | Erickson Retirement Communities, LLC<br>701 Maiden Choice Lane<br>Baltimore, Maryland  21228<br>Fax: (410) 402-2348<br>Attn: Gerald F. Doherty, Esq.<br><br>*- and -*<br><br>DLA Piper LLP (US)<br>203 North LaSalle Street<br>Chicago, Illinois  60601<br>Fax: (312) 236-7516<br>Attn: John T. Cusack, Esq.<br>        Ross Green, Esq. |

|                                                        |                                                        |
|--------------------------------------------------------|--------------------------------------------------------|
| *If to any Redwood Party:*                             | *with copies (which shall not constitute notice) to:*  |

|                                                        |                                                        |
|--------------------------------------------------------|--------------------------------------------------------|
| Redwood-ERC Senior Living Holdings, LLC<br>c/o Allegis Group, Inc.<br>7301 Parkway Drive<br>Hanover, Maryland  21076<br>Fax:  (410) 579-3505<br>Attn:  R. Alan Butler | Allegis Group, Inc.<br>7301 Parkway Drive<br>Hanover, Maryland  21076<br>Fax:  (410) 579-3136<br>Attn:  Randall D. Sones, Esq.<br><br>*- and -*<br><br>Venable LLP<br>750 East Pratt Street, Suite 900<br>Baltimore, Maryland  21202<br>Fax: (410) 244-7742<br>Attn:  Michael J. Baader, Esq. |

**11.8**   **Assignment**.  This Agreement may not be assigned (whether by operation of law or otherwise) by any Party without the prior written consent of the other Party.  This Agreement will be binding upon, inure to the benefit of, and be enforceable by, the Parties' respective successors and permitted assigns.

**11.9**   **No Third Party Beneficiaries**.  Unless otherwise expressly stated herein, this Agreement shall not benefit or create any right of action in or on behalf of any Person other than the Parties.

**11.10**   **Counterparts**. This Agreement may be executed in counterparts (including by facsimile or optically-scanned electronic mail attachment), each of which shall be deemed to be original, but all of which together shall constitute one and the same instrument.

* * *

***The remainder of this page is left blank intentionally.   Signatures follow on next page.***

**IN WITNESS WHEREOF**, the Parties have each executed and delivered this Master Purchase and Sale Agreement as of the Execution Date.

*Redwood:*

REDWOOD-ERC SENIOR LIVING
HOLDINGS, LLC

By: _____
Name: R. ALAN BUTLER
Title: MANAGER

*ManagementCo:*

REDWOOD-ERC MANAGEMENT, LLC

By: _____
Name: R. ALAN BUTLER
Title: MANAGER

*DevCo:*

REDWOOD-ERC DEVELOPMENT, LLC

By: _____
Name: R. ALAN BUTLER
Title: MANAGER

*PropCo:*

REDWOOD-ERC PROPERTIES, LLC

By: _____
Name: R. ALAN BUTLER
Title: MANAGER

*Redwood Kansas:*

REDWOOD-ERC KANSAS, LLC

By: _____
Name: R. ALAN BUTLER
Title: MANAGER

*ERC:*

ERICKSON RETIREMENT
COMMUNITIES, LLC

By: _____
Name:
Title:

*Parent:*

ERICKSON GROUP, LLC

By: _____
Name:
Title:

*Kansas Owner:*

KANSAS CAMPUS, LLC

By: _____
Name:
Title:

*Signature Page to Master Purchase and Sale Agreement*

**IN WITNESS WHEREOF**, the Parties have each executed and delivered this Master Purchase and Sale Agreement as of the Execution Date.

*Redwood:*

REDWOOD-ERC SENIOR LIVING
HOLDINGS, LLC

By: _____
Name:
Title:

*ManagementCo:*

REDWOOD-ERC MANAGEMENT, LLC

By: _____
Name:
Title:

*DevCo:*

REDWOOD-ERC DEVELOPMENT, LLC

By: _____
Name:
Title:

*PropCo:*

REDWOOD-ERC PROPERTIES, LLC

By: _____
Name:
Title:

*Redwood Kansas:*

REDWOOD-ERC KANSAS, LLC

By: _____
Name:
Title:

*ERC:*

ERICKSON RETIREMENT
COMMUNITIES, LLC

By: _____
Name:   Mark R. Erickson
Title:   Chief Operating Officer

*Parent:*

ERICKSON GROUP, LLC

By: _____
Name:   Gerald F. Doherty
Title:   Secretary

*Kansas Owner:*

KANSAS CAMPUS, LLC
By: Erickson Retirement Communities, LLC,
    Member

By: _____
Name:   Mark R. Erickson
Title:   Chief Operating Officer

*Signature Page to Master Purchase and Sale Agreement*

**Exhibit C**

**<u>Transferred Landowners</u>**

Ashburn Campus, LLC
Concord Campus, L.P.
Dallas Campus, LP
Houston Campus, L.P.
Littleton Campus, LLC
Novi Campus, LLC
Warminster Campus, L.P.