Vincent P. Slusher
State Bar No. 00785480
DLA PIPER LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 743-4572
Facsimile: (972) 813-6267

-and-

Thomas R. Califano
Jeremy R. Johnson
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York  10020-1104
Tel:  (212) 835-6000
Fax:  (212) 835-6001

PROPOSED ATTORNEYS FOR THE DEBTORS
AND DEBTORS IN POSSESSION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **CASE NO. 09-37010** |
| | § | |
| **ERICKSON RETIREMENT** | § | **CHAPTER 11** |
| **COMMUNITIES, LLC,** *et al.*[1] | § | |
| | § | **(Jointly Administered)** |
| **Debtors.** | § | |

### DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS
### (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING ON A SENIOR SECURED SUPERPRIORITY BASIS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, AND 364; (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS PURSUANT TO 11 U.S.C. §§ 361, 363 AND 364; (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(b) AND (c); AND (IV) GRANTING RELATED RELIEF

---

[1] The Debtors in these chapter 11 cases are Erickson Retirement Communities, LLC, Ashburn Campus, LLC, Columbus Campus, LLC, Concord Campus GP, LLC, Concord Campus, LP, Dallas Campus GP, LLC, Dallas Campus, LP, Erickson Construction, LLC, Erickson Group, LLC, Houston Campus, LP, Kansas Campus, LLC, Littleton Campus, LLC, Novi Campus, LLC, Senior Campus Services, LLC, Warminster Campus GP, Warminster Campus, LP.

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by their proposed attorneys, DLA Piper LLP (US), hereby move (the "Motion") this Court for entry of an interim order (the "Interim Order") and a final order (the "Final Order", collectively with the Interim Order, the "DIP Orders"): (i) authorizing the Debtors to obtain postpetition financing on a senior secured superpriority basis pursuant to sections 105, 361, 362, 363, and 364 of title 11 of the United States Code (the "Bankruptcy Code"); (ii) granting adequate protection to prepetition secured lenders pursuant to Bankruptcy Code sections 361, 363 and 364; (iii) scheduling a final hearing pursuant to Rule 4001(b) and (c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and (iv) granting related relief. In support of this Motion, the Debtors respectfully represent as follows:

## SUMMARY OF RELIEF REQUESTED

1. Postpetition financing is vital to the Debtors' ability to continue to operate their business during these chapter 11 cases and to the Debtors' successful reorganization. Based on the unique and sensitive nature of the Debtors' business and the fact that it is highly regulated, it is imperative that the Debtors exit chapter 11 as expeditiously as possible. If the Debtors are unable to properly finance their business, they risk having a receiver appointed and being forced to cease all operations. The Debtors' inability to operate would have devastating consequences for not only the Debtors and the value of their company, but also the residents of the communities, who would not receive proper care and who would lose their homes.

2. To obtain postpetition financing, the Debtors have engaged in good faith and arms-length negotiations with several parties, including the Prepetition Senior Lenders (as defined below), who have refused to provide postpetition financing, and other unrelated third parties. The Debtors have also negotiated in good faith and at arms-length with ERC Funding

Co. LLC (the "DIP Lender", collectively with the Redwood Purchasers (as defined below), "Redwood"). These negotiations have culminated in the DIP Lender's agreement to provide the Debtors with postpetition financing (the "DIP Facility") on the terms and subject to the conditions set forth in the term sheet attached hereto as **Exhibit A** and summarized below.[2]

3.      In addition to the DIP Facility, the Redwood Purchasers have agreed to act as potential purchasers of substantially all of the Debtors' assets and sponsors of the Debtors' plan of reorganization. Prepetition, the Debtors, with their advisors, marketed their assets to over eighty (80) potential investors. As a result of these marketing efforts, the Debtors secured a proposal from the Redwood Purchasers to act as potential purchasers and plan sponsors. Under the proposed sale terms, the Redwood Purchasers would purchase substantially all of the Debtors' assets in exchange for consideration in the amount of $100 million in cash and notes, the assumption of campus-level debt of approximately $500 million, the commitment of $50 million in new capital for future development and working capital and certain other consideration. Furthermore, the Redwood Purchasers have participated in numerous dealings with the Debtors' lenders and the not-for-profit operators of the communities and have helped to ensure that the Debtors' business remains operating, that the value of the company is preserved, and that neither the Debtors nor the residents suffer any harm. Without the DIP Facility provided by the DIP Lender, the Debtors will have insufficient funds to continue the operation of their business, and the Debtors' reorganization will be jeopardized.

4.      Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, below are the essential

---

[2] The parties are in the process of negotiating a definitive agreement that is consistent with the terms and conditions described in the term sheet and herein.

terms of the DIP Facility.[3]  The Debtors submit that these terms are customary and reasonable for financing of this type.[4]

| | |
|---|---|
| **Borrowers:** | Hingham Campus, LLC, Lincolnshire Campus, LLC and Naperville Campus, LLC, as non-debtor entities (collectively, the "Non-Debtors"), and Erickson Retirement Communities, LLC ("ERC"), Ashburn Campus, LLC ("Ashburn"), Columbus Campus, LLC ("Columbus"), Concord Campus GP, LLC ("Concord GP"), Concord Campus, LP ("Concord"), Dallas Campus GP, LLC ("Dallas GP"), Dallas Campus, LP ("Dallas"), Erickson Construction, LLC ("Erickson Construction"), Erickson Group, LLC ("Erickson Group"), Houston Campus, LP ("Houston"), Kansas Campus, LLC ("Kansas"), Littleton Campus, LLC ("Littleton"), Novi Campus, LLC ("Novi"), Senior Campus Services, LLC ("Senior Campus"), Warminster Campus GP, LLC ("Warminster GP"), Warminster Campus, LP ("Warminster"), as debtors and debtors in possession in these chapter 11 cases (collectively with the Non-Debtors, the "Borrowers"). |
| **DIP Lender:** | ERC Funding Co. LLC |
| **DIP Facility:** | A revolving credit facility made available to the Borrowers in a principal amount of up to $20,000,000 (the "DIP Facility") of which up to $5,000,000 shall be available during the period from the Closing Date (as defined below) through the entry of the Final Order approved on a final basis by the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") approving the DIP Facility.  All loans outstanding under the Facility (the "Loans") shall become due and payable on the Maturity Date (defined below). |
| | On a business day and on two (2) business days written notice, and not more frequently than twice per calendar week, the Borrowers shall be permitted to request a borrowing under the DIP Facility. |
| **Maturity Date:** | The maturity date ("Maturity Date") shall be the earlier to occur of (i) sixty (60) days after the date upon which a bidder other than Redwood Capital Investments, LLC (or its affiliates) (herein the "Redwood Purchasers") is selected as the purchaser and/or plan sponsor of substantially all of the Debtors' assets/operations pursuant to an auction process envisioned in the Master Purchase and Sale |

---

[3] All capitalized terms herein, but not otherwise defined, shall have the meanings ascribed to them in the DIP Facility.
[4] To the extent the following summaries and descriptions in this Motion conflict with the express provisions of the DIP Facility and Interim Order, as applicable, the express provisions of the DIP Facility and Interim Order shall control.

Agreement, dated October 19, 2009, between the Debtors and the Redwood Purchasers (the "Purchase Agreement"), provided that if the Redwood Purchasers are not selected on or before December 16, 2009, another bidder will be deemed to have been selected as of such date; or (ii) the effective date of a plan of reorganization under chapter 11 of the Bankruptcy Code in a bankruptcy proceeding in which the Debtors are debtors and debtors in possession (the "Chapter 11 Cases"); or (iii) February 16, 2010, with the right to extend the foregoing maturity in item (iii) hereof for an additional 60 days subject to payment of an extension fee of 3.0% of the outstanding principal balance of the Loans as of February 16, 2010; provided, in no event will such Maturity Date be extended beyond April 17, 2010, such extension may only be exercised if there is no Event of Default other than the occurrence of the Maturity Date in (iii) above, and Redwood Purchasers shall have been announced as the winner bidder as provided above.

Any confirmation order entered in these Chapter 11 Cases shall not discharge or otherwise affect in any way any of the joint and several obligations of the Borrowers to the DIP Lenders under the DIP Facility and any loan documents, other than after the payment in full and in cash on or before the effective date of a plan of reorganization.

**Closing Date:** On or before October [_____], 2009 (the "Closing Date").

**Purpose/Use of Proceeds:** Proceeds of the Loans under the DIP Facility will be used solely in accordance with the Borrowers' cash flow projections showing anticipated cash receipts and disbursements on a weekly basis for the periods required under the loan documentation and in form and substance satisfactory to the DIP Lender (the "Budget"), which will include the following payments: (i) interest, fees, and expenses with respect to the DIP Facility to the DIP Lender in accordance with the DIP Facility loan documentation; (ii) funding of the Borrowers' postpetition operating expenses incurred in the ordinary course of business; (iii) funding of the postpetition operating expenses of the affiliated NFPs (defined below) in the ordinary course of business, pursuant to a Working Capital Loan (defined below) between the respective NFP and Landowner (defined below); and (iv) certain other costs and expenses of administration of the Debtors' chapter 11 cases.

**Rate:** (i) The Loans will bear interest at the Applicable Margin plus the LIBOR Rate, payable at the end of the relevant interest period.

(ii) "LIBOR Rate" means the higher of (i) 2.5% or (ii) the then current LIBOR Rate for interest periods of one month.

(iii) "<u>Applicable Margin</u>" means 7.5% *per annum*.

Interest shall be calculated on the basis of the actual number of days elapsed in a 360-day year.

| | |
|---|---|
| **Default Rate:** | Effective immediately upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Facility loan documentation), Loans will bear interest at an additional 3.0% *per annum*. |
| **Unused Line Fee:** | From and after the Closing Date, a non-refundable unused commitment fee of 0.5% *per annum* will accrue as a percentage of the daily average unused portion of the DIP Facility (whether or not then available), payable monthly in arrears and on the Maturity Date. |
| **Upfront Commitment Fee:** | On the Closing Date, the Borrowers shall pay a fee of 3.0% of the DIP Facility amount. |
| **Exit Fee:** | On the Maturity Date, the Borrowers shall pay a fee of 2.0% of the DIP Facility amount. |
| **Optional Commitment Reductions:** | The Borrowers may permanently and irrevocably reduce the commitments under the DIP Facility upon at least five (5) business days' notice; <u>provided</u> <u>that</u> each such reduction shall be in an amount of $250,000 or multiples of $250,000 in excess thereof and any mandatory prepayment resulting from such reduction shall have been made. |
| **Mandatory Repayments:** | Mandatory repayments of the Loans under the DIP Facility shall be required in an amount equal to (i) 100% of the net sale proceeds from non-ordinary course asset sales (including, without limitation, a sale of all or substantially all of the Debtors' assets), (ii) 100% of extraordinary receipt proceeds, (iii) 100% of the proceeds of the incurrence of any indebtedness other than in the ordinary course of business, and (iv) 100% of insurance and condemnation proceeds, in each case received by the Borrowers. Mandatory repayments shall result in a permanent reduction of the DIP Facility. |
| **Voluntary Prepayments:** | Upon three (3) business days written notice and not more frequently than once per calendar week, permitted in whole or in part, with prior written notice but without premium or penalty, subject to limitations as to minimum amounts of prepayments and customary indemnification. Such repayments shall only be in increments of $250,000. |
| **Repayment at Maturity** | The DIP Facility will be repaid in full at the Maturity Date. |
| | • In the event that the DIP Facility is not repaid on the Maturity Date with the Collateral (defined below) or other proceeds, the DIP |

Lender shall have the option to seek to surcharge the cash and cash equivalents of ERC in the amount of the unpaid DIP Facility.

- The DIP Lender shall have the right to credit bid the amount outstanding on the DIP Facility against the purchase price to be paid by the Redwood Purchasers of the sale transaction, provided that the credit bid amount shall equal 110% of the amount outstanding under the DIP Facility as of the date of the Auction.

**Priority:** Subject to the Carve Out (defined below), all amounts owing by the Borrowers under the DIP Facility shall be joint and several as to each Debtor and (a) will be entitled to super priority claim status pursuant to section 364(c)(1) of the Bankruptcy Code with priority over any or all administrative expense claims of every kind and nature whatsoever, and (b) will be secured by a perfected security interest pursuant to section 364(c)(2), section 364(c)(3) and section 364(d) of the Bankruptcy Code with priority over the security interest securing the Borrowers' existing senior secured credit facilities (the "Existing Facilities") pursuant to section 364(d)(1) of the Bankruptcy Code in all of the assets of the Borrowers, whether consisting of real, personal, tangible or intangible property (including, without limitation, all of the outstanding shares of capital stock of the Borrowers' subsidiaries) and all proceeds and products of all of the foregoing (collectively, the "Collateral," described more fully below). The Collateral shall not include cash and cash equivalents held by ERC in an approximate amount equal to $35,700,000 (the "Separate Funds"). The relative priority of all amounts owed under the DIP Facility will be subject only to a carve-out for (i) the Debtors' professional fees incurred in the Chapter 11 Cases in an amount acceptable to the DIP Lender, (ii) other professional fees incurred in the Chapter 11 Cases in an amount acceptable to the DIP Lender, (iii) the payment of fees pursuant to 28 U.S.C. § 1930, and (iv) costs and administrative expenses permitted to be incurred by any chapter 7 trustee under section 726(b) of the Bankruptcy Code pursuant to an order of the Bankruptcy Court following any conversion of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code in an amount not to exceed $100,000 (collectively, the "Carve-Out"). Nothing herein shall be construed as impairing the ability of any party to object to any fees and expenses of a professional in these cases.

No portion of the Carve-Out, any cash collateral or proceeds of the DIP Facility may be used for the payment of the fees and expenses of any person incurred challenging, or in relation to the challenge of the DIP Lender liens or in any way that is materially adverse to the DIP Lender's rights under the DIP Facility.

All of the liens described herein shall be effective and perfected as of

the entry of any DIP Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements.

**Separate Cash Account**

The proceeds of the DIP Facility and all other cash from operation of the Borrowers (other than the Separate Funds and the proceeds thereof) shall be maintained in a segregated account over which the DIP Lender shall have a Lien as described above. The Borrowers shall also enter into an account control agreement with respect to that account.

**Collateral:**

All amounts owing by the Borrowers under the DIP Facility in respect thereof will be secured by a first priority perfected security interest in and lien on all assets (tangible, intangible, real, personal and mixed) of the Borrowers, whether now owned or hereafter acquired, including, without limitation, management contracts, accounts, inventory, equipment, receivables, capital stock or other ownership interest in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks, avoidance actions and other general intangibles, and all products and proceeds thereof, subject only to the Carve-Out and all other prepetition perfected and unavoidable security interests. Collateral shall include all initial entrance deposits ("IEDs") (whether existing or new) which will be deposited in a separate escrow account over which the DIP Lender will have a first lien as described in the "Priority" section above.

The DIP Facility shall be joint and several obligations of each Debtor and the DIP Lender may exercise its rights with respect to any asset or grouping of assets, through foreclosure or otherwise. The Borrowers shall waive and the DIP Orders shall prohibit marshalling of any of the Collateral or other interest of the DIP Lender or under any similar theory. In the event of foreclosure, all lenders will be subrogated to the rights of the DIP Lender.

The DIP Lender shall reserve the right to retain expert consultants and financial advisors, in consultation with the Borrowers, at the expense of the Borrowers, which consultants and advisors shall be given reasonable access for purposes of monitoring the business of the Borrowers and the value of the Collateral.

**Adequate Protection:**

The lenders under the Existing Facilities (the "Prepetition Senior Lenders") shall consent or the Bankruptcy Court shall find otherwise pursuant to the DIP Orders that the Prepetition Lenders are adequately protected by: (i) the preservation of the cash and cash equivalents held by ERC as of the Closing Date and/or (ii) the preservation of the enterprise value of the Borrowers, jointly and severally.

**Conditions Precedent to the Closing:**

The loan documentation will contain conditions to the closing of the DIP Facility customarily found in loan agreements for similar debtor in possession financings and other conditions deemed by the DIP Lender to be appropriate to the specific transaction, and in any event including without limitation:

- All fees and expenses (including reasonable fees and expenses of counsel) required to be paid to the DIP Lender on or before the Closing Date shall have been paid, and the Borrowers shall fund a $250,000 deposit to cover such fees and expenses (whether or not the DIP Orders are entered).

- All motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the DIP Facility and the approval thereof shall be in form and substance reasonably satisfactory to the DIP Lender.

- The DIP Lender shall have received and approved the Budget, which shall include the items set forth in "<u>Use of Proceeds</u>" and any changes or amendments to the Budget.

- Approval of bidding procedures as approved by the Redwood Purchasers.

**Conditions Precedent to Each Loan:**

On the Closing Date and the funding date of each Loan, the following conditions precedent shall have been satisfied:

- Each of the DIP Orders, as the case may be, shall be in a form that is acceptable to the DIP Lender in its sole and absolute discretion;

- The Interim Order or Final Order, as the case may be, shall be in full force and effect, and shall not have been reversed, modified, amended, stayed for a period of five (5) business days or longer, vacated or subject to a stay pending appeal, in the case of any modification, amendment or stay pending appeal, in a manner, or relating to a matter, that is materially adverse to the interests of the DIP Lender;

- The Borrowers' use of the proceeds is consistent with the Budget;

- There shall exist no default under the loan documentation; and

- The representations and warranties of the Borrowers shall be true and correct immediately prior to, and after giving effect to, funding.

| **Representations and Warranties:** | The loan documentation will contain representations and warranties customarily found in loan agreements for similar debtor in possession financings and other representations and warranties deemed by the DIP Lender appropriate to the specific transaction, including, without limitation, with respect to: valid existence, requisite power, due authorization, no conflict with agreements or applicable law, enforceability of loan documentation, accuracy of financial statements and all other information provided, compliance with law, absence of material adverse change, no default under the loan documentation, absence of material litigation, absence of liens on assets, ownership of properties and necessary rights to intellectual property, no burdensome restrictions, inapplicability of Investment Company Act, compliance and continued effectiveness of the applicable DIP Order. |
|---|---|
| **Affirmative, Negative and Financial Covenants:** | The loan documentation will contain affirmative, negative and financial covenants deemed by the DIP Lender appropriate to the transaction in its reasonable discretion, including, without limitation, the following: |

- The DIP Orders shall prohibit and the Borrowers shall waive the claims arising under Bankruptcy Code section 506(c) against the DIP Lender or the DIP Facility or the commencement of other actions adverse to the DIP Lender or its rights and remedies under the DIP Facility;

- Compliance with total net cash flow of the Budget reported weekly and tested weekly on a rolling four (4) week basis;

- The definitive documentation will contain additional financial covenants as reasonably determined by the DIP Lender;

- Interim Order or the Final Order; and

- Deliver to the DIP Lender each month of the Borrowers' rolling 13-week cash flow projections (together with a comparison of actual payments to budgeted line items for the prior monthly period) in form and substance reasonably satisfying to the DIP Lender.

Certain Affirmative Covenants – the Borrowers and their affiliates and affiliated not-for-profit entities (collectively referred to herein for ease of reference as "Affiliates" and each an "Affiliate") shall:

- Deliver weekly updates of the cash flow forecast and weekly variance reports;

- Deliver monthly updates by the Chief Restructuring Officer with respect to asset sales, cost savings, construction progress, and other matters reasonably requested by the DIP Lender;

- Deliver to the DIP Lender as soon as practicable in advance of filing with the Bankruptcy Court the Interim Order and the Final Order (which must be in form and substance reasonably satisfactory to the DIP Lender), all other proposed orders and pleadings related to the DIP Facility (which must be in form and substance reasonably satisfactory to the DIP Lender), any plan of reorganization or liquidation, and/or any disclosure statement related to such plan;

- Comply with milestones with respect to the Chapter 11 Cases to be determined in any definitive documentation;

- Comply with additional reporting requirements reasonably requested by the DIP Lender;

- Provide access to the DIP Lender for information (including historical information) and personnel, including, without limitation, regularly scheduled meetings as mutually agreed with senior management and the Chief Restructuring Officer and other Borrowers' advisors; and

- Such other ordinary and customary affirmative covenants proposed by the DIP Lender.

Certain Negative Covenants – the Borrowers shall be barred from and its Affiliates shall be barred from:

- Creating or permitting to exist any liens or encumbrances on any assets, other than liens securing the DIP Facility and any permitted liens (which liens shall include scheduled liens in existence on the Closing Date) and other liens described in "Priority" above;

- Creating or permitting to exist any other super priority claim which is *pari passu* with or senior to the claims of the DIP Lender under the DIP Facility, except for the Carve-Out and liens of the DIP Lender;

- Disposing of assets (including, without limitation, any sale and leaseback transaction and any disposition under Bankruptcy Code section 363 or otherwise) out of the ordinary course of business or in excess of $1,000,000;

- Modifying or altering (i) in any material manner the nature and

type of its business or the manner in which such business is conducted or (ii) its organizational documents, except as required by the Bankruptcy Code;

- Asserting any right of subrogation or contribution against any other Debtor until all borrowings under the DIP Facility are paid in full and the commitments are terminated;

- Paying amounts not within the Budget (subject to the variances allowed above) without the DIP Lender's consent;

- Making any material investment in excess of $500,000 (subject to the variances allowed above) not approved in the Budget without the DIP Lender's consent; and

- Such other ordinary and customary negative covenants proposed by the DIP Lender.

**Events of Default:** The loan documentation will contain events of default customarily found in the DIP Lender's loan agreements for similar debtor in possession financings and other events of default deemed by the DIP Lender appropriate to the specific transaction, including, without limitation, failure to make payments when due; noncompliance with covenants; breaches of representations and warranties; failure to satisfy or stay execution of judgments in excess of specified amounts; impairment of loan documentation or security; change of ownership or control; dismissal of the Chapter 11 Cases or conversion to chapter 7 cases; appointment of a chapter 11 trustee; judgment against the Borrowers or an Affiliate in an amount to be determined by the DIP Lender; appointment of a responsible officer or examiner with enlarged powers beyond those set forth in section 1106(3) and (4) of the Bankruptcy Code (excluding the incumbent Chief Restructuring Officer or the appointment by the Borrowers or their Affiliates of a successor); granting of relief from the automatic stay to permit foreclosure on assets of the Borrowers (other than "friendly foreclosures" agreed to by the Borrowers and the DIP Lender) or that would otherwise have a material adverse affect on the Borrowers or their businesses; entry of an order granting any super priority claim which is senior or *pari passu* with the DIP Lender's claims under the DIP Facility; entry of an order without the prior consent of the DIP Lender, or the Borrowers otherwise agreeing to incur indebtedness, other than trade debt in the ordinary course of the Borrowers' businesses or under the DIP Facility; entry of an order without the prior consent of the DIP Lender amending, supplementing or otherwise modifying either DIP Order; reversal, vacation or stay of the effectiveness of either DIP Order; non-entry of the Final Order within forty-five (45) days of commencement of the Chapter 11 Cases; plan is

confirmed without repayment of the DIP Facility in full in cash without consent of the DIP Lender; reversing, amending, supplementing, vacating, appealing or otherwise modifying any of the DIP Orders without consent of the DIP Lender; the Borrowers or an Affiliate shall take any action in support of any person who contests the DIP Orders or the Borrowers fail to contest in good faith the foregoing; the filing of any motion, pleading or proceeding by any of the Borrowers that could reasonably be expected to result in a material impairment of the rights or interest of the DIP Lender; cross-default of any material indebtedness or material commitment of the Borrowers or their Affiliates; payment of or granting adequate protection with respect to prepetition debt (other than as set forth in the Budget or provided in the DIP Orders); cessation of liens or super priority claims granted with respect to the DIP Facility to be valid, perfected and enforceable in all respects.

Further, it shall be deemed an Event of Default if the following consents in support of the Redwood Purchasers' transaction have not been received on or before the second business day preceding the Auction (herein the "Stalking Horse Consent Defaults"): (i) requisite consent (as defined below) from the Construction Lenders (defined below) at each community, (ii) requisite consent from the Corporate Lenders, if any is required and (iii) affirmation of the consent from National Senior Campuses, Inc. and each of the individual campus boards of directors. "Requisite Consent" of the lenders shall mean the consent of lenders holding claims representing at least two-thirds of the value of the facility and one-half in the number of holders. Subject to otherwise complying with the requirements for extension of the Maturity Date as set forth above, the DIP Lender shall standstill and refrain from exercising remedies in connection with a Stalking Horse Consent Default and shall continue to fund the DIP facility until the Maturity Date, on account of a Stalking Horse Consent Default; provided, however, interest shall be payable at the Default Rate during such period.

**Taxes**

The DIP Facility will include customary provisions reasonably acceptable to the DIP Lender, as to the DIP Facility, to the effect that all payments are to be made free and clear of any taxes (other than applicable franchise taxes and taxes on overall net income), imposts, assessments, withholdings or other deductions whatsoever.

**Assignments and Participations**

The DIP Lender may assign all or any part of the DIP Facility to one or more affiliates, banks, financial institutions or other entities. Upon such assignment, such affiliate, bank, financial institution or entity will become a DIP Lender for all purposes under the loan documents.

| | |
|---|---|
| **Indemnification** | The Borrowers shall jointly and severally provide customary indemnifications for the DIP Lender and its representatives. |
| **Expenses** | The Borrowers shall pay all customary and reasonable costs and expenses of the DIP Lender and, and upon Bankruptcy Court approval, shall fund a deposit of $250,000 to cover actual costs and expenses. |
| **Counsel to DIP Lender:** | Venable LLP<br>Michael J. Baader<br>750 E. Pratt Street, Suite 900<br>Baltimore, MD 21202 |

## JURISDICTION

5.     The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

6.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7.     The statutory bases for the relief requested herein are Bankruptcy Code sections 105, 361, 362, 363, and 364.

## BACKGROUND

8.     On October 19, 2009 (the "Petition Date"), the Debtors commenced these cases by each filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

9.     The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

10.     No trustee, examiner or committee has been appointed in any of the Debtors' chapter 11 cases.

11.     A complete description of the Debtors' background and business is set forth in the

Affidavit of Paul Rundell in Support of First Day Motions, dated October 19, 2009 [Doc. No. 15] (the "Rundell Affidavit") and is incorporated herein by reference.

## A.    Debtors' Current Business Operations

12.    The Debtors are a fully-integrated, privately-owned, real estate manager and developer of continuing care retirement communities ("CCRCs") which focuses on providing affordable, high-quality senior living to middle-income seniors.  ERC was founded in 1983 by John C. Erickson, the current Executive Chair of the company, based on the mission of delivering an exceptional level of service and care to seniors in all levels of health at an affordable price.  The Debtors' expertise in the acquisition, development, management, and sale of real estate properties has made them one of the largest developers and managers of CCRCs in the United States.

13.    As of the Petition Date, the Debtors currently manage and have varying interests in 20 CCRCs, in various stages of completion or development, in 11 different states, including Colorado, Illinois, Kansas, Maryland, Massachusetts, Michigan, New Jersey, Ohio, Pennsylvania, Texas, and Virginia.  Of the 20 CCRCs, 8 are completely developed and have been sold to not-for-profit operators, 11 are under development and construction but are open and operating, and one is under development and construction but not open.[5]  In total, the operating CCRCs have approximately 23,000 residents.  ERC manages all twenty (20) CCRCs and employs more than 700 people in connection with the management of these communities, not including the 10,000 employees of the not-for-profit operators.

14.    The CCRCs are large campus-style communities that offer seniors a full life-cycle of retirement services from independent living through skilled nursing on the same property.  ERC

---

[5] The Hickory Chase community in Hilliard, Ohio does not have any residents and is not open or operating.  This property has been foreclosed upon.

generally develops a CCRC in three (3) phases. First, ERC selects a site for the construction of the new CCRC and creates a wholly-owned subsidiary to purchase the land (a "<u>Landowner</u>"). Second, ERC begins the construction and development of the new CCRC. Once ERC begins to market a community, ERC associates with an independent not-for-profit operator (a "<u>NFP</u>") to operate the new campus, and the NFP enters into a management agreement with ERC to manage the campus. Third, when the construction of the CCRC is complete, the land and campus are sold to the NFP, and ERC continues to manage the campus. The complete lifecycle of a CCRC is described in more detail in the Rundell Affidavit.

## B. The CCRCs

15. The main entities involved in the construction, development, and operation of each of the Debtors' CCRCs are: (i) ERC, which is the manager and developer of each CCRC, (ii) the respective NFP, which operates the CCRC, and (iii) the particular Landowner associated with the community. For each CCRC, there are separate Landowner entities and NFP entities, which are described in detail in the Rundell Affidavit.

16. In connection with the construction, development, and operation of each community, ERC, the respective NFP, and the respective Landowner enter into various agreements. The main agreements are described below.[6]

- <u>Construction Loan:</u> The construction of a community is initially financed by the Landowner through a revolving construction loan (the "<u>Construction Loan</u>") from a third party. This loan is secured by a first priority lien on all assets of the Landowner, all liens rights of the Landowner in and to assets of the NFP (<u>e.g.</u> the Residence and Care Agreements (defined below) and the residents' IEDs), all lien rights of the Landowner in and to assets of ERC, and all assets of ERC relating to the specific community. In certain

---

[6] This is a general overview of a CCRC's structure and the agreements associated with a CCRC. The particular structure of each CCRC varies depending on the level of development of the particular community.

communities, the Construction Loan is guaranteed by ERC, Erickson Group, and/or Erickson Construction.

- Community Loan:  During the period that the Construction Loan is outstanding, the Landowner enters into a community loan agreement with the NFP (the "Community Loan"), pursuant to which the NFP lends the Landowner all IEDs collected from the community residents pursuant to the Residence and Care Agreements.  The proceeds of the Community Loan are generally sufficient to pay all construction and development costs of a community, pay off the Construction Loan, and provide a return of the Debtors' investment together with a development profit.  The Landowner's obligations are secured by a mortgage on the property in favor of the NFP and are subordinate to its obligations under the Construction Loan.

- Master Lease:  The NFP and the Landowner also enter into a master lease agreement (the "Master Lease"), pursuant to which the NFP leases the land and the improvements from the Landowner.  Debt service on the Community Loan paid by the Landowner to the NFP is fully offset by the rental payments made by the NFP to the Landowner under the Master Lease.  The Master Lease is typically a 20-year, triple net lease, requiring the NFPs to pay all ongoing maintenance expenses (e.g. utilities, taxes, and insurance), with a 10-year renewal option.

- Development Agreement:  The Landowner and ERC enter into a development agreement (the "Development Agreement"), pursuant to which ERC agrees to plan, administer, and supervise all design, development and construction services and activities of a campus, and the Landowner agrees to pay ERC a development fee, which generally equals 5% of all residents' IEDs collected at a campus.  The Landowner's obligations under the Development Agreement are subordinate to its obligations under the Construction Loan, Community Loan, and any subdebt of the Landowner relating to the community.

- Management Agreement:  ERC enters into a marketing and management agreement (the "Management Agreement") with the NFP, pursuant to which ERC is hired by the NFP as the NFP's manager and is permitted to exercise oversight over the NFP's activities.  The NFP pays ERC a management fee, which is typically comprised of a base fee generally ranging from 4.0% to 5.5% of resident monthly fees and which is adjusted according to occupancy levels.  The NFP also reimburses ERC for direct and allocated costs.

- Working Capital Loan:  At each campus, to fund the working capital deficits of the NFP, the Landowner provides a working capital loan (the "Working Capital Loan") to the NFP.  To secure its obligations under the Working Capital Loan, the NFP grants the Landowner a security interest in all assets of the NFP, including the Residence and Care Agreements and the IEDs.

- Residence and Care Agreement:  Prior to a resident's occupancy of an independent living unit in the community (a "Unit"), the NFP enters into a residence and care agreement (the "Residence and Care Agreement") with the resident.  Under the terms of the Residence and Care Agreement, each resident agrees to pay the NFP (i) an IED, which generally

ranges from $100,000 to $600,000 and (ii) monthly service fees, which generally average $1,800, to occupy a Unit for a lifetime, subject to certain conditions. The residents receive a full refund of their IEDs upon their death, permanent transfer to a higher acuity unit, or departure from the community, subject to a successful resale of the Unit.

- Project Bonds: Near the completion of a community, the NFP typically secures permanent financing through tax-exempt bonds (the "Project Bonds"). These Project Bonds are primarily issued 2 to 6 years following the commencement of construction and have a fixed rate component that is typically long-term (approximately 35 years) and a variable rate component, backed by a letter of credit that is paid down at stabilization. After the bond issuance, the IEDs are used to fund bond debt service and community working capital needs prior to being lent to the Landowner for construction and development costs. The Project Bonds are solely obligations of the NFP and not the Landowner.

- Purchase Option Agreement: Upon the issuance of the Project Bonds, the NFP enters into a purchase option agreement (the "Purchase Option Agreement") with the Landowner, whereby a significant portion of the proceeds of the Project Bonds are used by the NFP to pay to the Landowner a purchase option deposit (the "Purchase Option Deposit"). Until the sale of the community to the NFP has closed, if the NFP defaults on the Project Bonds or decides not to purchase the community from the Landowner, the Landowner is required to repay the Purchase Option Deposit to the NFP (plus all transaction costs for issuance of the Project Bonds and early redemption costs), which is then used to repay the tax-exempt bondholders. ERC guarantees the return of the Purchase Option Deposit to the NFP under these circumstances. Pursuant to the Purchase Option Agreement, the bondholders receive a first priority mortgage on the property.

## C.     The Debtors' Cash Flow System

17.     ERC generates revenue from 4 main sources: (i) community management fees collected under the Management Agreements, (ii) development fees collected under the Development Agreements, (iii) construction fees; and (iv) development profit upon the sale of a community to the NFP. The cash received by ERC is deposited into a centralized operating account and is used to fund day-to-day operations, including payroll, employee benefits, payments to vendors, and other accounts payable. Any funds remaining in the operating account are automatically transferred on a daily basis to an interest-bearing sweep account to maximize interest income.

18.     Each Landowner maintains a separate cash management system that employs a series of integrated financial accounts, including a centralized operating account, a sweep account, and a borrower collateral account.   Generally, the Landowners receive cash from several sources, including (a) the rent paid by the NFP under the Master Lease; (b) advances of the IEDs from the NFP pursuant to the Community Loan; and (c) repayment of the Working Capital Loan by the NFP. Except for the IEDs, the Landowner's funds are generally deposited into the Landowner's operating account and are used to fund day-to-day operations, including payments to construction vendors, debt service, and other accounts payable.   Any funds remaining in the operating account are typically transferred automatically on a daily basis to an interest-bearing sweep account to maximize interest income.

19.     The flow of the IEDs is generally as follows:   Pursuant to an escrow agreement among the NFP, ERC and an escrow agent, the NFP appoints ERC to perform its obligations regarding the acceptance and deposit of IEDs from prospective residents.   ERC deposits all IEDs received from residents into an escrow account held at a third-party bank, and the escrow agent holds all IEDs until they are eligible for release and payable to the NFP.   Once eligible for release, the IEDs are released from escrow and are disbursed on behalf of the NFP to the respective Landowner, pursuant to the Community Loan.  The funds are disbursed directly to the Landowner's "Borrower Collateral Account" and are applied to the Construction Loan on certain dates of each month.

### D.     Prepetition Funding of the Debtors' Business

#### i.     *The Corporate Revolver*

20.     On July 27, 2007, ERC and Erickson Construction obtained a revolving line of credit in an amount up to $250 million (the "Corporate Revolver") from Wilmington Trust Corporation

("Wilmington Trust"), as successor administrative to PNC Bank, National Association ("PNC Bank"), and other lenders that are party to the agreement from time to time (collectively, the "Corporate Revolver Lenders"), whereby ERC and Erickson Construction could request loan advances or letters of credit. As of September 30, 2009, the loan balance under the Corporate Revolver is approximately $195.7 million.

21.     The Corporate Revolver is secured by all assets of ERC and Erickson Construction, a pledge by Erickson Group of 100% of the membership interests of ERC, a pledge by ERC of 100% of the membership interests of Erickson Construction, and all assets of Concord GP, Dallas GP, Senior Campus, and Warminster GP, (except partnership interests and related rights in the certain Landowner subsidiaries: Concord, Dallas, Houston, and Warminster). Concord GP, Dallas GP, Senior Campus, and Warminster GP have granted a full payment and performance guaranty relating to the Corporate Revolver in favor of the Corporate Revolver Lenders. Erickson Group granted a limited payment and performance guaranty in favor of the Corporate Revolver Lenders, pursuant to which the Corporate Revolver Lenders' recovery is limited to Erickson Group's pledged ownership interests in ERC. Together, Concord GP, Senior Campus Services, Warminster GP, and Erickson Group are referred to as the "Subsidiary Corporate Guarantors".

22.     Furthermore, the Corporate Revolver requires the maintenance of certain covenants, including the maintenance of liquid assets (the "Liquid Assets") by ERC and Erickson Construction of at least the greater of (1) $25 million in excess of the highest liquidity requirement contained in any senior loan, construction loan, or financing agreement executed by any of the Landowners in connection with the development or financing of a CCRC; or (2) $100 million at all times (the "Liquidity Covenant"). ERC's and/or Erickson Construction's failure to observe the Liquidity Covenant constitutes an event of default under the Corporate Revolver.

23.     Prepetition, ERC and Erickson Construction drew on the funds from the Corporate Revolver (i) to pay the required mandatory redemption of the $75 million maximum ERC STAMPS (defined below); (ii) to finance certain permitted land acquisitions; (iii) to finance certain permitted investments in ERC's subsidiaries and to recoup existing permitted investments in ERC's subsidiaries; (iv) to pay certain intercompany debts and other liabilities, such as a certain $10 million revolving line of credit established pursuant to an Amended and Restated Revolving Credit Loan Agreement by and between Mercantile-Safe Deposit and Trust Company, now known as PNC Bank and ERC dated as of December 1, 2000; (v) for general working capital needs of the Debtors in the ordinary course of their business and consistent with past practices; and (vi) to pay closing costs associated with the loans advanced under the Corporate Revolver.

   *ii.*  *STAMPS*

24.     In addition to the Corporate Revolver, ERC issued subordinated unsecured debt in the form of Subordinated Taxable Adjustable Mezzanine Put Securities Series 2007 (the "STAMPS") up to a maximum amount of $50 million.  ERC used the proceeds from the STAMPS to pay offering and issuance expenses and for general corporate purposes, including investments in its projects.  The STAMPS debt is subordinated to ERC's debt under the Corporate Revolver.  This subordination applies to both interest payments and payments of purchase price of the STAMPS in the event that any of the securities put by the investors are not remarketed.  As of September 30, 2009, the outstanding debt for the STAMPS is $47.5 million.

   *iii.*  *The Project-Level Funding*

**Ashburn's Prepetition Debt Structure**

25.     Ashburn, the Landowner for the Ashby Ponds campus, owns the land located in

Loudoun County, Virginia upon which the Ashby Ponds campus is constructed. Ashby Ponds, Inc. ("Ashby"), the NFP, operates this community and leases the land from Ashburn pursuant to a Master Lease. As of September 30, 2009, Ashburn's total consolidated debt obligations are approximately $232.6 million. In the order of priority, its prepetition debt structure is as follows:

- Approximately $64.4 million under a certain Construction Loan (the "Ashburn Construction Loan"), dated May 31, 2007, in the original principal amount of $125 million, as amended from time to time, between Ashburn and the financial institutions, which are or may from time to time become parties thereto, and PNC Bank, formerly known as Mercantile-Safe Deposit and Trust Company, as the administrative agent (the "Ashburn Construction Loan Lenders"). This loan is guaranteed by ERC and is secured by a first priority lien on (1) all assets of Ashburn, including any lien rights of Ashburn in the assets of Ashby and/or ERC, (2) all assets of ERC related to Ashby, and (3) a pledge by ERC of its 100% membership interest in Ashburn;

- A Community Loan outstanding between Ashburn and Ashby Ponds in the amount of $107,156,000 (the "Ashburn Community Loan"). Ashburn's obligations are secured by a mortgage on the property in favor of Ashby Ponds; and

- A certain mezzanine loan agreement dated May 31, 2007 between Strategic Ashby Ponds Lender LLC (the "Ashburn Subdebt Lender") and Ashburn in the amount of $50 million (the "Ashburn Mezzanine Loan"). This loan is secured by, among other things, a mortgage on the property and an assignment of rents, profits, incomes, and the like and is guaranteed by ERC and Concord (cross-guarantor).

**Columbus' Prepetition Debt Structure**

26.     Columbus, the Landowner for the Hickory Chase campus, owns the land located in Hilliard, Ohio upon which the Hickory Chase campus is constructed. This campus is not open or operating, it does not have any residents. On or about June 1, 2009, Columbus defaulted under the Columbus Construction Loan (defined below). The lenders for the Columbus Construction Loan foreclosed on the campus property on or about July 1, 2009, and ERC has ceased the construction and development of the campus.

27.     As of September 30, 2009, Columbus' total consolidated debt obligations are approximately $88 million. In the order of priority, its prepetition debt structure is as follows:

- Infrastructure Improvement Revenue Bonds, Series 2008, issued by Hickory Chase Community Authority;

- Approximately $46.9 million under a certain Construction Loan (the "Columbus Construction Loan"), dated April 16, 2008, in the amount of $90 million, between Columbus, Keybank National Association, as administrative agent, and First Third Bank, as syndication agent, and the other lenders that are party thereto from time to time (the "Columbus Construction Loan Lenders"). This loan is guaranteed by ERC and is secured by a first priority lien on (1) all assets of Columbus, including any lien rights of Columbus in the assets of Hickory Chase and/or ERC, (2) all assets of ERC related to Hickory Chase, and (3) a pledge by ERC of its 100% membership interest in Columbus;

- A certain mezzanine loan agreement dated April 16, 2008, in the amount of $21,350,000, as amended from time to time, between Windsor OH Holdings, LLC (the "Columbus Subdebt Lender") and Columbus (the "Columbus Mezzanine Loan"). This loan is secured by, among other things, a mortgage on the property and an assignment of rents, profits, incomes, and the like and is guaranteed by ERC; and

- Equity funding from ERC.

### Concord's Prepetition Debt Structure

28.     Concord, the Landowner for the Maris Grove campus, owns the land located in Concord, Pennsylvania upon which the Maris Grove campus is constructed. Maris Grove, Inc. ("Maris Grove"), the NFP, operates this community and leases the land from Concord pursuant to a Master Lease. As of September 30, 2009, Concord's total consolidated debt obligations are approximately $316 million. In the order of priority, its prepetition debt structure is as follows:

- Approximately $66 million under a certain Construction Loan (the "Concord Construction Loan"), dated August 30, 2005, in the original principal amount of $70 million, as amended from time to time, between Concord, the financial institutions that are or may from time to time become parties thereto, and Mercantile-Safe Deposit and Trust Company, now known as PNC Bank, as administrative agent (the "Concord Construction Loan Lenders"). This loan is guaranteed by ERC, Erickson Group, and Concord GP and is secured by a first priority lien on (1) all assets of Concord, including any lien rights of Concord in the assets of Maris Grove and/or ERC, (2) all assets of ERC related to Maris Grove, and (3) a pledge by ERC of its 100% membership interest in Concord;

- A Community Loan outstanding between Concord and Maris Grove in the amount of $204,206,000 (the "Concord Community Loan"). Concord's obligations are secured by a mortgage on the property in favor of the NFP;

- A sale/leaseback agreement, in the amount of $25 million, between Concord and Strategic Concord Landholder, LP (the "Concord Subdebt Lender") (the "Concord Sale/Leaseback Agreement"). To secure the agreement, ERC pledges its ownership interest in Concord to the buyer/landlord, and Concord pledges its right, title and interest in certain permits, licenses, plans, contracts and warranties to the buyer/landlord; and

- Equity funding from ERC.

**Dallas' Prepetition Debt Structure**

29.     Dallas, the Landowner for the Highland Springs campus, owns the land located in Dallas, Texas upon which the Highland Springs campus is constructed. Highland Springs, Inc. ("Highland Springs"), the NFP, operates this community and leases the land from Dallas pursuant to a Master Lease. As of September 30, 2009, Dallas' total consolidated debt obligations are approximately $178 million. In the order of priority, its prepetition debt structure is as follows:

- Approximately $54.5 million under a Construction Loan (the "Dallas Construction Loan"), dated November 30, 2005, in the original principal amount of $70 million, as amended from time to time, between Dallas, Bank of America, N.A., as administrative agent, other lenders that are parties thereto from time to time (the "Dallas Construction Loan Lenders"). This loan is guaranteed by ERC and Erickson Construction and is secured by a first priority lien on (1) all assets of Dallas, including any lien rights of Dallas in the assets of Highland Springs and/or ERC, (2) all assets of ERC related to Highland Springs, (3) a pledge by ERC of its 100% membership interest in Dallas, and (4) a first mortgage on all land and buildings , except for the parcel relating to the Texas A&M Note (defined below);

- A promissory note (the "Texas A&M Note") in the amount of $4.4 million granted by Dallas to the Board of Regents of the Texas A&M University System, which is secured by a first priority mortgage in a certain parcel of land in connection with Texas A&M University;

- A Community Loan outstanding between Dallas and Highland Springs in the amount of $86,356,000 (the "Dallas Community Loan"). Dallas' obligations are secured by a mortgage on the property in favor of the NFP;

- A sale/leaseback agreement, in the amount of $17.5 million, between Dallas and MSRESS III Dallas Campus, LP (the "Dallas Subdebt Lender") (the "Dallas Sale/Leaseback Agreement"). The agreement is guaranteed by ERC. This agreement is guaranteed by ERC. To secure the agreement, ERC pledges its ownership interest in Dallas to the buyer/landlord, and Dallas pledges its right, title and interest in certain permits, licenses, plans, contracts and warranties to the buyer/landlord; and

- Equity funding from ERC.

**Houston's Prepetition Debt Structure**

30.     Houston, the Landowner for the Eagle's Trace campus, owns the land located in Houston, Texas upon which the Eagle's Trace campus is constructed. Eagle's Trace, Inc. ("Eagle's Trace"), the NFP, operates this community and leases the land from Houston pursuant to a Master Lease. As of September 30, 2009, Houston's total consolidated debt obligations are approximately $194.2 million. In the order of priority, its prepetition debt structure is as follows:

- Approximately $43.9 million under a certain Construction Loan (the "Houston Construction Loan"), dated September 15, 2004, in the original principal amount of $50 million, between Houston and Mercantile-Safe Deposit and Trust Company, now known as PNC Bank, as administrative agent, and other lenders party thereto (the "Houston Construction Loan Lenders"). This loan is guaranteed by ERC and Erickson Group and is secured by a first priority lien on (1) all assets of Houston, including any lien rights of Houston in the assets of Eagle's Trace and/or ERC, (2) all assets of ERC related to Eagle's Trace, and (3) a pledge by ERC of its ownership interest in Houston;

- A Community Loan outstanding between Houston and Eagle's Trace in the amount of $87,837,000 (the "Houston Community Loan"). Houston's obligations are secured by a mortgage on the property in favor of the NFP;

- A sale/leaseback agreement between Houston and HCP ER6 (f/k/a CNL Retirement ER6, LP) (the "Houston Subdebt Lender") (the "Houston Sale/Leaseback Agreement"). To secure the agreement, ERC pledges its ownership interest in Houston to the buyer/landlord, and Houston pledges its right, title and interest in certain permits, licenses, plans, contracts and warranties to the buyer/landlord; and

- Equity funding from ERC.

**Kansas' Prepetition Debt Structure**

31.     Kansas, the Landowner for the Tallgrass Creek campus, owns the land located in Overland Park, Kansas upon which the Tallgrass Creek campus is constructed. Tallgrass Creek, Inc. ("Tallgrass Creek"), the NFP, operates this community and leases the land from Kansas pursuant to a Master Lease. As of September 30, 2009, Kansas' total consolidated debt obligations are approximately $154.2 million. In the order of priority, Kansas' prepetition debt structure is as

follows:

- Transportation Development District Special Assessment Bonds, Series 2006, in the amount of $14,950,000, issued by the City of Overland Park, Kansas;

- Approximately $62.3 million under a certain Construction Loan (the "<u>Kansas Construction Loan</u>"), dated April 3, 2007, in the original principal amount of $65 million, between Kansas, the financial institutions that are or may from time to time become parties thereto, and Mercantile-Safe Deposit and Trust Company, now known as PNC Bank, as administrative agent (the "<u>Kansas Construction Loan Lender</u>"). This loan is guaranteed by ERC and is secured by a first priority lien on (1) all assets of Kansas, including any lien rights of Kansas in the assets of Tallgrass Creek and/or ERC, (2) all assets of ERC related to Tallgrass Creek, and (3) a pledge by ERC of its 100% membership interest in Kansas;

- A Community Loan outstanding between Kansas and Tallgrass Creek in the amount of $33,484,000 (the "<u>Kansas Community Loan</u>"). Kansas' obligations are secured by a mortgage on the property in favor of the NFP;

- A certain mezzanine loan agreement dated April 3, 2007, in the amount of $25 million, as amended from time to time, between MSRESS III Kansas Campus, L.P. (the "<u>Kansas Subdebt Lender</u>") and Kansas (the "<u>Kansas Mezzanine Loan</u>"). This loan is secured by, among other things, a mortgage on the property and an assignment of rents, profits, incomes, and the like, and it is guaranteed by ERC; and

- Equity funding from ERC.

**<u>Littleton's Prepetition Debt Structure</u>**

32. Littleton, the Landowner for the Wind Crest campus, owns the land located in Denver, Colorado, upon which the Wind Crest campus is constructed. Wind Crest, Inc. ("<u>Wind Crest</u>"), the NFP, operates this community and leases the land from Littleton pursuant to a Master Lease. As of September 30, 2009, Littleton's total consolidated debt obligations are approximately $239 million. In the order of priority, Littleton's prepetition debt structure is as follows:

- Approximately $63.9 million under a certain Construction Loan (the "<u>Littleton Construction Loan</u>"), dated March 29, 2006, in the original principal amount of $83 million, as amended from time to time, between Littleton, Capmark (formerly known as GMAC Commercial Mortgage Corporation), and the financial institutions that are or may from time to time become parties thereto (the "<u>Littleton Construction Loan Lenders</u>"). This loan is guaranteed by ERC and Erickson Group and is secured by a first priority lien

on (1) all assets of Littleton, including any lien rights of Littleton in the assets of Wind Crest and/or ERC, (2) all assets of ERC related to Wind Crest, and (3) a pledge by ERC of its 100% membership interest in Littleton;

- A Community Loan outstanding between Littleton and Wind Crest in the amount of $139,393,000 (the "Littleton Community Loan"). Littleton's obligations are secured by a mortgage on the property in favor of the NFP;

- A sale/leaseback agreement between Littleton and MSRESS II Denver Campus, LLC (the "Littleton Subdebt Lender") (the "Littleton Sale/Leaseback Agreement"): To secure the agreement, ERC pledges its membership interest in Littleton to the buyer/landlord, and Littleton pledges its right, title and interest in certain permits, licenses, plans, contracts and warranties to the buyer/landlord; and

- Equity funding from ERC.

### Novi's Prepetition Debt Structure

33.     Novi, the Landowner for the Fox Run campus, owns the land located in Novi, Michigan upon which the Fox Run campus is constructed. Fox Run, Inc. ("Fox Run"), the NFP, operates this community and leases the land from Novi pursuant to a Master Lease. As of September 30, 2009, Novi's total consolidated debt obligations are approximately $252.2 million. In the order of priority, its prepetition debt structure is as follows:

- Approximately $31.6 million under a certain Construction Loan (the "Novi Construction Loan"), dated February 12, 2002, in the original principal amount of $46 million, as amended from time to time, between Novi, PNC Bank, as administrative agent, and the financial institutions that are or may from time to time become parties thereto (the "Novi Construction Loan Lenders"). This loan is guaranteed by ERC and Erickson Group and is secured by a first priority lien on (1) all assets of Novi, including any lien rights of Novi in the assets of Fox Run and/or ERC, (2) all assets of ERC related to Fox Run, and (3) a pledge by ERC of its 100% membership interest in Novi;

- A Community Loan outstanding between Novi and Fox Run in the amount of $165,149,000 (the "Novi Community Loan"). Novi's obligations are secured by a mortgage on the property in favor of the NFP;

- A sale/leaseback agreement between Novi and HCP ER2, LP (the "Novi Subdebt Lender") (the "Novi Sale/Leaseback Agreement"). To secure the agreement, ERC pledges its ownership interest in Novi to HCP, and Novi pledges its right, title and interest in certain permits, licenses, plans, contracts and warranties to the buyer/landlord; and

- Equity funding from ERC.

**Warminster's Prepetition Debt Structure**

34.    Warminster, the Landowner for the Ann's Choice campus, owns the land located in Warminster, Pennsylvania upon which the Ann's Choice campus is constructed.  Ann's Choice, Inc. ("Ann's Choice"), the NFP, operates this community and leases the land from Warminster pursuant to a Master Lease.  As of September 30, 2009, Warminster's total consolidated debt obligations are approximately $374.8 million.  In the order of priority, its prepetition debt structure is as follows:

- A mortgage securing tax exempt bonds issued for payment of a Purchase Option Deposit (made for the benefit of the NFP);

- A Community Loan outstanding between Warminster and Ann's Choice in the amount of $273,110,000 (the "Warminster Community Loan").  Warminster's obligations are secured by a mortgage on the property in favor of the NFP;

- A sale/leaseback agreement between Warminster and HCP ER3 (f/k/a CNL Retirement ER3, LP) (the "Warminster Subdebt Lender") (the "Warminster Sale/Leaseback Agreement").  This agreement is guaranteed by ERC and Senior Campus in favor of HCP.  To secure the agreement, ERC pledges its ownership interest in Warminster to HCP, and Warminster pledges its right, title and interest in certain permits, licenses, plans, contracts and warranties to the buyer/landlord; and

- Equity funding from ERC.

35.    Together, the Corporate Revolver and each of the Landowners' senior secured credit facilities are referred to herein as the "Existing Facilities", as defined above in the summary of the DIP Facility.  The Corporate Revolver Lenders and each of the Landowners' senior secured lenders are referred to herein as the "Prepetition Senior Lenders", as defined above in the summary of the DIP Facility.

### E.    Events Leading to Chapter 11 Filing

*i.    The Decline in the Market*

36.    The senior housing market has been hindered over the past twelve (12) months by a weakened credit environment, including limited access to capital, falling real estate values, and significantly reduced liquidity due to realized and unrealized losses on investments. New senior housing units under construction have significantly declined since 2004. New units under construction in 2008 totaled 15,862, compared to 20,775 units in 2007, a 24% decline.

37.    Senior living facilities have experienced substantial declines in occupancy as a result of the market changes. Prospective residents are faced with (i) difficulty selling their homes due to uncertainty in value and (ii) significant declines in their equity portfolio value. This has made it difficult, if not impossible, for seniors to move into or remain in senior housing facilities, as the IEDs are generally significant ($100,000 to $600,000).

38.    The tightening of the credit market has also significantly affected the 2008 bond-issuance volume, making traditional fixed-rate debt essentially unavailable in the last quarter of 2008. The 2008 bond issuance for the senior living sector was $2.7 billion versus $8 billion in 2007, a decline of over 66%.

39.    These market conditions have contributed to decreased revenue, lower than anticipated absorption rates at certain campuses, and difficulty raising capital. In addition, some of the developing campuses are not cash flow positive until they mature, and as a result, they require additional support from ERC.

40.    Consequently, ERC and Erickson Construction have been unable to maintain the

Liquidity Covenant under the Corporate Revolver, leading to a default under the Corporate Revolver. In addition, the Landowners have had difficulties satisfying their binding obligations under their respective agreements. The Debtors attempted to reconcile these defaults with both the corporate and project-level lenders prior to the Petition Date, but they were unable to do so. Therefore, the Debtors seek chapter 11 protection to rectify any defaults under their binding obligations and to complete a restructuring of the whole company.

### iii. Corporate Revolver Lenders Attempt to Drawn Down ERC's Cash

41. On the Petition Date, prior to the scheduled expiration of the forbearance period under the Fourth Corporate Revolver Amendment, the Corporate Revolver Lenders attempted to exercise their remedies under the Corporate Revolver and draw down on ERC's cash in an amount of at least $16 million. In addition, the Corporate Revolver Lenders froze ERC's operating accounts containing approximately $20 million of ERC's cash, thus making this cash unavailable to ERC. Without access to these accounts and this cash, ERC could not continue to operate its business or adequately provide for the residents.

### iv. Prepetition Marketing of ERC's Assets

42. Prior to the Petition Date, the Debtors engaged in extensive marketing efforts to identify potential investors ("Potential Purchasers") to purchase substantially all of the Debtors' assets, operations and business (the "Assets") or support a plan of reorganization as the plan sponsor. In March 2009, the Debtors retained Houlihan, Lokey, Howard & Zukin, Inc. ("Houlihan") to, among other things, evaluate strategic alternatives and assist in the negotiation with its lenders, and in September 2009, Houlihan commenced a comprehensive marketing process contacting over eighty (80) parties.

43.     The Redwood Purchasers submitted a proposal (the "Redwood LOI") to purchase the Assets, in a letter of intent, dated September 12, 2009.  The Debtors executed the Redwood LOI on September 17, 2009.  The Debtors' board of directors approved the sale on September 19, 2009.  On October 19, 2009, after extensive negotiations, the Debtors and Redwood Purchaser agreed to the terms of the Purchase Agreement.  As part of the marketing process, the Debtors and their professionals have met with several additional Potential Purchasers that have expressed a high level of interest in the Assets.  The Debtors have provided each of the interested parties with marketing materials and access to an electronic data room.  Several of the interested parties have held meetings with ERC's management and/or National Senior Campuses, Inc. ("NSC").  Houlihan Lokey will work with the Debtors to continue to negotiate with and engage interested parties until the solicitation period has expired.

## F.      DIP Financing Efforts

44.     Prior to the Petition Date, the Debtors and their financial advisors surveyed various sources of postpetition financing, including financing from the Prepetition Senior Lenders and other unrelated bank financing sources.  The Debtors engaged in good faith, arms-length negotiations with the Prepetition Senior Lenders, but the Prepetition Senior Lenders declined to provide the necessary financing.

45.     In addition, the Debtors approached various other parties having the capability of providing a facility of the size required by the Debtors, including the proposed DIP Lender.  After good faith, arms-length negotiations, the DIP Lender offered the best postpetition financing proposal, and the Debtors selected the DIP Lender to finance their restructuring.  In addition to proposing the best offer, the DIP Lender has played a key role in these restructurings, including

participating in negotiations with the Debtors' Prepetition Senior Lenders and dealing with the NSC and community boards. These actions have contributed to the Debtors' ability to continue to operate their business during these Chapter 11 Cases.

## G. The Debtors' Need for Postpetition Financing

46.     Prior to the Petition Date, the Debtors financed their operations with cash from operating activities and a variety of financing arrangements, including the Corporate Revolver, the Landowner's Construction Loans, the Landowner's Community Loans, subdebt, and various other financing agreements. Because of the substantial decline in the housing market, the Debtors are unable to generate sufficient cash to operate their business or satisfy their obligation under the various binding agreements described above.

47.     On the Petition Date, the Debtors filed a motion for entry of an interim and final order authorizing ERC to use its cash collateral [Doc. No. 11] (the "ERC Cash Collateral Motion") and a motion for entry of an interim and final order authorizing the Landowners to use their cash collateral [Doc. 10] (the "Landowner Cash Collateral Motion"). This Court held a hearing on these motions on October 21, 2009, and on October 22, 2009, this Court entered an order granting ERC's use of cash collateral on an interim basis [Doc. No. 63] and an order granting the Landowners' use of cash collateral on an interim basis [Doc. No. 59]. The Prepetition Senior Lenders have only agreed to permit the Debtors to use their cash collateral to operate their business for a period of two (2) weeks. After that time, the Debtors will have insufficient funds to operate. If the Debtors are unable, on a consistent basis, to maintain their business and demonstrate financial stability to existing and future residents, the Debtors will lose existing residents, employees, and vendors, will be unable to attract new residents, and will be forced to cease operations. This will not only cause harm to the Debtors,

but it will also cause harm to the residents, who will not receive proper care and may be forced to move. Therefore, postpetition financing is essential to the Debtors' continued ability to operate, to maintaining the value of their assets, and to the Debtors' successful reorganization.

48. The DIP Facility provides that the Borrowers may draw on funds immediately (on an interim basis) to meet their administrative and operational obligations in the period leading up to confirmation of their plan of reorganization and resolution of these chapter 11 cases. The DIP Facility will instill confidence in existing and future residents, employees, and vendors, and it will help relieve any uncertainty that people may have concerning the Debtors' reorganization. In order to stabilize and continue to operate their business, the Debtors have determined, in the exercise of their sound business judgment, that the DIP Facility is necessary and appropriate.

## RELIEF REQUESTED

49. By this Motion, the Debtors request the entry of the Interim Order and Final Order (i) authorizing the Debtors to obtain the DIP Facility from the DIP Lender on a senior secured superpriority basis, pursuant to Bankruptcy Code sections 105, 361, 362, 363, and 364; (ii) granting adequate protection to the Prepetition Senior Lenders pursuant to Bankruptcy Code sections 361, 363 and 364; and (iii) scheduling a final hearing pursuant to Bankruptcy Rule 4001(b) and (c).

## BASIS FOR EXPEDITED RELIEF

### A.  Applicable Authority for Obtaining DIP Financing

50. Bankruptcy Code section 364(c) and (d) provides:

> (c)  If the trustee is unable to obtain unsecured credit allowable under section 503(b)(l) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt -

        (1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

        (2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or

        (3)     secured by a junior lien on property of the estate that is subject to a lien.

(d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:

        (A)     the trustee is unable to obtain such credit otherwise; and

        (B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2)     In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

51.     Debtors who exercise sound business judgment, within the confines of the policies underlying the Bankruptcy Code, in obtaining postpetition financing are afforded deference by courts.  See In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).

52.     Bankruptcy Rule 4001(c) governs the procedures for obtaining authorization for debtor in possession financing and provides, in relevant part:

The court may commence a final hearing on a motion for authority to obtain credit no earlier than 15 days after service of the motion.  If the motion so requests, the court may conduct a hearing before such 15 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

53.     The Debtors seek entry of the Interim Order in order to avoid immediate and irreparable harm to the estate.  Accordingly, pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, the Court is authorized to grant the relief requested herein.

**B.** **The DIP Lenders Are Entitled to Priming Liens as Set Forth in the DIP Facility**

54.     Pursuant to Bankruptcy Code section 364(c), if a debtor is unable to obtain postpetition credit on an unsecured basis, a court may authorize the debtor to obtain postpetition credit or incur postpetition debt which entitles the postpetition lender to priming liens, a first-priority lien on unencumbered property of the debtor, and superpriority administrative expense status.  11 U.S.C. § 364(c)(1), (2), and (3).  A debtor seeking postpetition financing must make reasonable efforts to seek credit on an unsecured basis, but the debtor is granted deference by the court if the court finds the debtor acted within its business judgment when seeking out alternative sources of financing.  See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085 (4th Cir. 1986).  Moreover, a debtor is not required to exhaustively seek out every potential source of postpetition financing.  See id.; see also In re Mid-State Raceway, Inc., 323 B.R. 40, 58 (Bankr. N.D.N.Y. 2005); In re Baxco Corp., 148 B.R. 855, 860 (Bankr. N.D. Ill. 1992).

55.     The Debtors have negotiated in good faith and at arms-length with the Prepetition Senior Lenders and provided them with an opportunity to provide the debtor in possession financing.  All of the Prepetition Senior Lenders declined to provide the DIP Facility.  The Debtors also negotiated in good faith and at arms-length with the DIP Lender.  The DIP Lender was the only lender that offered sufficient postpetition financing to the Debtors during these chapter 11 proceedings.  Accordingly, the Debtors' efforts to obtain necessary postpetition financing satisfy the requirements of Bankruptcy Code section 364(c).

**C.** **The Debtors Could Not Obtain Alternative Financing and the Prepetition Senior Secured Lenders' Interests Are Adequately Protected**

56.     Bankruptcy Code section 364(d) allows postpetition financing that provides a postpetition lender a senior or equal lien on a debtor's encumbered property (a "priming" lien) if (i)

the debtor could not obtain alternative financing and (ii) the interests of the secured parties whose security interests are being primed are adequately protected.  <u>See</u> 11 U.S.C. § 364(d)(1).

57.     Substantially all of the Debtors' assets are encumbered and, despite the diligent efforts of the Debtors and their financial advisors, the Debtors have been unable to procure the required funding absent the proposed super priority claims and priming lines.  The Debtors have negotiated the best possible terms to obtain the funding they need to maintain sufficient liquidity to preserve their assets over the course of their chapter 11 cases, and the DIP Lender is unwilling to provide the DIP Facility without the priming liens.  Accordingly, the first requirement of Bankruptcy Code section 364(d)(1) is satisfied.

58.     Additionally, the Prepetition Senior Lenders' security interests are adequately protected.  Although the Bankruptcy Code does not define what constitutes adequate protection, Bankruptcy Code section 361, lists three (3) nonexclusive examples:  to the extent of any decrease in value if an entity's interest in property resulting from the grant of a priming lien (i) a cash payment or periodic cash payments; (ii) an additional or replacement lien; or (iii) "granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property."  Whether the protection offered by a debtor is adequate protection is determined on a case-by-case basis.  <u>See</u> <u>MNBank Dallas, N.A. v. O'Connor (In re O'Connor)</u>, 808 F.2d 1393, 1396 (10th Cir. 1987); <u>Martin v. United States (In re Martin)</u>, 761 F.2d 472 (8th Cir. 1995).  Further, the adequate protection requirement is designed to protect a lienholder from the diminution of the value of its interest due to use of priming.  <u>See</u> <u>In re Swedeland Dev. Group, Inc.</u>, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained

prebankruptcy.") (internal citations omitted).

59.     The Prepetition Senior Lenders are entitled, pursuant to Bankruptcy Code sections 361, 363(c)(2) and 363(e), to adequate protection of their interest in the prepetition Collateral, in an amount equal to the aggregate diminution in value of the Prepetition Senior Lenders' respective prepetition Collateral, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of the prepetition Collateral, and the imposition of the automatic stay pursuant to Bankruptcy Code section 362.

60.     The Corporate Revolver Lenders will receive adequate protection in the form of the preservation of the cash and cash equivalents held by ERC as of the Closing Date.  Furthermore, the Landowners' senior secured lenders will receive adequate protection in the form of the preservation of the enterprise value of the Debtors, jointly and severally.   These protections are fair and reasonable and will protect the Prepetition Senior Lenders from diminution in value of the Prepetition Senior Lenders' interests in the Collateral.  Accordingly, the requirements for priming existing liens are duly satisfied.

**D.      The DIP Facility is Necessary to Preserve the Value of the Debtors' Estates**

61.     Given the nature of the Debtors' business, the residents', the employees', the NFPs', and the trade creditors' confidence in the viability of the enterprise is key to the Debtors' ability to continue operations without interruption.  Therefore, having the DIP Facility in place will assure the above-listed parties that the Debtors remain vital and have the working capital necessary to continue operations, including payroll and capital expenditures, during these chapter 11 cases with the ultimate goal of preserving and maximizing the going concern value of the Debtors' business which will inure to the benefit of all creditor constituencies.

**E.**     **The DIP Facility Should Be Authorized as Fair and Reasonable and a Sound Exercise of the Debtors' Business Judgment**

62.     The terms and Conditions of the DIP Facility are fair and reasonable and were negotiated by the Debtors and DIP Lender at arms-length and in good faith.  Additionally, the Carve-Out for professional fees is reasonable and necessary to ensure any statutory committee and the Debtors' estate may retain the assistance of outside counsel.  See Ames Dep't Stores, 115 B.R. at 38.

63.     Moreover, approval of the DIP Facility will provide the Debtors with immediate and ongoing access to funds to pay its current and ongoing operating expenses, including postpetition wages and salaries and vendor costs.  Unless these expenditures are made, the Debtors will be forced to cease operations, which would result in irreparable harm to the business, deplete going concern value, and jeopardize the Debtors' ability to reorganize.  Because cash collateral is insufficient to fund such expenditures, the credit provided under the DIP Facility is necessary to preserve and enhance the value of the estates for the benefit of all stakeholders.  Additionally, the availability of credit under the DIP Facility will provide confidence to the residents, employees, and trade vendors, thereby promoting a successful reorganization.  Accordingly, the timely approval of the relief requested herein is imperative.

64.     The Debtors submit that the circumstances of this case require the Debtors to obtain financing under Bankruptcy Code sections 364(c) and (d), and accordingly, the DIP Facility reflects the exercise of sound business judgment.

**F.**     **Section 364(e) Protections Should Apply to the DIP Financing**

65.     The terms and conditions of the DIP Facility are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arms-length.

Accordingly, the DIP Lender and all obligations incurred under the DIP Facility should be accorded the benefits of Bankruptcy Code section 364(e).

## G. The Automatic Stay Should Be Modified on a Limited Basis

66. The relief requested herein contemplates a modification of the automatic stay pursuant to Bankruptcy Code section 362 to permit the DIP Lender to exercise, upon the occurrence and during the continuance of an Event of Default and, with respect to set off and other remedies in respect of the Collateral, after five (5) business days' notice thereof, all rights and remedies under the DIP Facility. This kind of modification is an ordinary and standard feature of postpetition debtor in possession financing facilities and, in the Debtors' business judgment, is reasonable and fair under the present circumstances.

## H. Interim Approval And Scheduling Of Final Hearing

67. Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit pursuant to Bankruptcy Code section 364, respectively, may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

68. Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtors request that the Court conduct an expedited preliminary hearing on this motion and (a) authorize the Debtors to borrow up to $5,000,000 under the DIP Facility on an interim basis, pending entry of a Final Order, in order to (i) maintain and finance the ongoing operations of the Debtors and (ii) avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest, and (b) schedule the

Final Hearing.

69.     The Debtors have an urgent and immediate need for cash to continue to operate. Without postpetition financing the Debtors will not have sufficient funds with which to operate the business on an ongoing basis during these chapter 11 cases.  Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending the Final Hearing, the Debtors will be immediately and irreparably harmed.  Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtors and facilitating its reorganization efforts.

**I.      Waiver of Bankruptcy Rules 6004(a) and (h)**

70.     The Debtors believe an efficient and expeditious approval and implementation of the DIP Facility is in the best interests of its creditors and other parties in interests.  Accordingly, the Debtors seek waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 10-day stay of orders authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**NOTICE**

71.     Notice of this Motion has been provided to (i) the United States Trustee for the Northern District of Texas; (ii) the Debtors' 30 largest unsecured creditors on a consolidated basis or counsel to a committee, if any; (iii) counsel to the DIP Lender; (iv) counsel to the prepetition secured lenders; and (iv) any known lienholders whose liens are being primed under the DIP Financing.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice is necessary or required.

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the

relief requested herein and such other relief as is just and proper.

Dated: October 22, 2009

By: __*Vincent P. Slusher*_____
Vincent P. Slusher
State Bar No. 00785480
DLA PIPER LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 743-4572
Facsimile: (972) 813-6267

- and –

Thomas R. Califano
Jeremy R. Johnson
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Tel:    (212) 835-6000
Fax:    (212) 835-6001

PROPOSED ATTORNEYS FOR THE
DEBTORS AND DEBTORS IN POSSESSION

## EXHIBIT A

## Proposed Term Sheet