**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**TAWANA C. MARSHALL, CLERK**
**THE DATE OF ENTRY IS**
**ON THE COURT'S DOCKET**



**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed November 6, 2009**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 09-37010 |
| | § | |
| **ERICKSON RETIREMENT** | § | Chapter 11 |
| **COMMUNITIES, LLC, *et al.*,**[1] | § | |
| | § | Jointly Administered |
| Debtors. | § | |

### INTERIM ORDER (I) AUTHORIZING BORROWERS TO OBTAIN POSTPETITION FINANCING ON A SENIOR SECURED SUPERPRIORITY BASIS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, AND 364; (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS PURSUANT TO 11 U.S.C. §§ 361, 363 AND 364; AND (III) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**"), dated October 22, 2009, of Erickson Retirement

Communities, LLC and certain of its affiliates (collectively, the "**Borrowers**")[2] and each of their

---

[1] The Debtors in these chapter 11 cases are Erickson Retirement Communities, LLC, Ashburn Campus, LLC, Columbus Campus, LLC, Concord Campus GP, LLC, Concord Campus, LP, Dallas Campus GP, LLC, Dallas Campus, LP, Erickson Construction, LLC, Erickson Group, LLC, Houston Campus, LP, Kansas Campus, LLC, Littleton Campus, LLC, Novi Campus, LLC, Senior Campus Services, LLC, Warminster Campus GP, Warminster Campus, LP.

[2] The Borrowers under the DIP Credit Agreement are each of the Debtors in these Cases (all terms as defined

affiliated debtors, each as debtor and debtor in possession (collectively, the **"Debtors"**), in the above-captioned cases (the **"Cases"**) pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the **"Bankruptcy Code"**), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**) and the Local Bankruptcy Rules for the Northern District of Texas (the **"Local Rules"**), seeking, among other things, entry of an interim order (the **"Interim Order"**) and a final order (the **"Final Order"**):

(i)     authorizing the Borrowers to obtain postpetition financing (the **"Financing"**) with superpriority claims and first priority priming liens senior to any prepetition liens, pursuant to sections 105, 361, 362, 363, and 364 of the Bankruptcy Code from ERC Funding Co. LLC (the **"Lender"**);

(ii)     authorization for the Borrowers to execute and deliver final documentation substantially in the form of the Super-Priority Debtor-in-Possession Loan Agreement (attached hereto as **Exhibit A**, the **"DIP Credit Agreement"**)[3] and any other document requested by the Lender in connection with the Financing including, without limitation, security agreements, pledge agreements, mortgages, financing statements, deeds of trust and other security documents (along with the DIP Credit Agreement and all of the forgoing whenever executed, collectively, the **"DIP Documents"**);

(iii)     granting adequate protection to prepetition secured creditors of the Borrowers (together with any of their administrative agents, collateral agents, indenture trustees or similar agents, and any entity with a Lien as of the date hereof, collectively, the **"Prepetition Secured**

---

herein), except Columbus Campus, LLC; Warminster Campus GP; and Warminster Campus, LP.
[3]  All capitalized terms not otherwise defined herein shall have the meaning ascribed in the DIP Credit Agreement.

**Lenders**") under the prepetition facilities (collectively, the "**Prepetition Secured Loans**") pursuant to Bankruptcy Code sections 361, 363 and 364;

(iv)    scheduling a final hearing pursuant to Bankruptcy Rules 4001(b), (c) and (d); and

(v)    granting related relief.

This Court having considered the Motion, examined the exhibits attached thereto, and having completed the Interim Hearing (defined below) as provided for under section 364 of the Bankruptcy Code, Bankruptcy Rule 4001(c), and applicable Local Bankruptcy Rules and finding the Debtors provided notice as set forth below to all necessary parties and that no further notice is required:

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.    **Petition Date**.  Commencing on October 19, 2009 (the "**Petition Date**"), the Debtors each filed voluntary petitions under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**" or this "**Court**").  The Debtors have continued in the management and operation of their business and property as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Cases.

B.    **Jurisdiction**.  This Court has core jurisdiction over the Cases, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  The statutory predicates for the relief sought herein are sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004 and 9014 and the Local Bankruptcy Rules.

C.    **Notice**. Due and appropriate notice of the Motion, the relief requested therein and the Interim Hearing having been served by the Debtors on: (i) the Office of the United States

Trustee for the Northern District of Texas; (ii) the Debtors' 30 largest unsecured creditors on a consolidated basis; (iii) counsel to the Lender; (iv) counsel to the Prepetition Secured Lenders; and (iv) any known lienholders whose liens are being primed under the Financing in compliance with Bankruptcy Rule 4001(b) and (c) and the Local Bankruptcy Rules.

D.      **Opportunity to be Heard**. Pursuant to Bankruptcy Rule 4001, that an interim hearing (the **"Interim Hearing"**) on the Motion was held before this Court to consider entry of the proposed Interim Order on or about October 29, 2009.

E.      **Disposition**. The Motion is granted on an interim basis in accordance with the terms of this Interim Order. Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled for purposes of this Interim Order.

F.      **Lender's Protections**.  The Lender is willing to lend money and provide other financial accommodations to the Borrowers only on the terms and conditions and with the protections provided herein and in the DIP Documents and are relying on such terms, conditions, and protections in agreeing to lend money and provide financial accommodations to the Borrowers hereunder.

G.      **Immediate Entry of the Order**.  The Debtors have requested that this Interim Order become immediately effective and enforceable upon entry, notwithstanding any provisions that may apply in Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure.  The Borrowers have demonstrated good cause for the entry of this Interim Order and for this Interim Order to become immediately effective and enforceable upon entry.  Among other things, entry of this Order and the immediate effectiveness and enforceability of this Interim Order upon entry will minimize the disruption of

the Borrowers' business operations and permit the Borrowers to satisfy their operating expenses, will increase the possibilities for confirmation of a successful chapter 11 plan for the Borrowers, and is in the best interests of the Borrowers, their creditors, and the Borrowers' bankruptcy estates. The terms of the borrowings and other financial accommodations authorized hereby are fair and reasonable under the circumstances and reflect the Borrowers' exercise of prudent business judgment consistent with their fiduciary duties.

H.     **Findings Regarding the Financing**.

i.     Good cause has been shown for the entry of this Interim Order;

ii.     The Borrowers have an immediate need to obtain the Financing, to the extent set forth in the Budget (defined herein), to (a)  to fund the postpetition operating expenses of the Borrowers incurred in the ordinary course of business; (b) to fund the postpetition operating expenses of the affiliated not-for-profit entity in the ordinary course of business through the Working Capital Loan (as defined in the DIP Credit Agreement); (c) to pay interest and expenses in respect of the Financing to the Lender in accordance with the DIP Documents; and (d) to pay certain other costs and expenses of administration of the Cases. The access of the Borrowers to sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the going concern values of the Borrowers and to a successful reorganization of the Borrowers;

iii.     The Borrowers currently are unable to obtain financing on more favorable terms from sources other than the Lender under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Borrowers are also unable to obtain secured

credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP Documents without the Borrowers granting to the Lender, subject to the Carve-Out as provided for herein, the DIP Liens (as defined below) and the Superpriority Claims (as defined below) under the terms and conditions set forth in this Interim Order and in the DIP Documents;

iv.     The terms of the Financing are fair and reasonable, reflect the Borrowers' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration;

v.     The Financing has been negotiated in good faith and at arm's length among the Borrowers and the Lender, and all of the Borrowers' obligations and indebtedness arising under, in respect of or in connection with the Financing and the DIP Documents, including without limitation, all loans pursuant to the DIP Documents, and any other expenses or obligations under the DIP Documents (all of the foregoing collectively, the "**DIP Obligations**"), shall be deemed to have been extended by the Lender and its affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Obligations, the DIP Liens (as defined below) and the Superpriority Claims (as defined below) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise;

vi.     Entering into the Financing and the DIP Documents reflects the Borrowers' exercise of prudent business judgment consistent with their fiduciary duties; and

vii.     The Debtors have requested entry of this Interim Order pursuant to

Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules. Absent granting the relief sought by this Interim Order, the Borrowers' estates will be immediately and irreparably harmed. Consummation of the Financing in accordance with this Interim Order and the DIP Documents is therefore in the best interests of the Borrowers' estates consistent with their fiduciary duties.

viii.    The Official Committee of Unsecured Creditors reserves the right to object to any of the inclusion of any of the above findings in a final order.

**ACCORDINGLY, IT IS HEREBY ORDERED THAT:**

1.    **Authorization of the Financing and DIP Documents**.

(i)    The Borrowers are hereby authorized to execute and enter into the DIP Documents, and the DIP Documents are hereby approved -- on an interim basis and to the extent consistent with the terms of the Interim Order and the term sheet attached to the Motion -- and incorporated herein by reference, including, without limitation:

a.   the execution, delivery and performance of the DIP Credit Agreement, any notes, security and pledge agreements, mortgages contemplated thereby and the other agreements referred to as and in the DIP Documents; and

b.   the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents not inconsistent with the terms of this Order for, among other things, the purpose of adding additional financial institutions as Lenders and reallocating the commitments for the Financing among

any Lender (and any assignees or successors), in each case in such form as the Lender may decide (it being understood that no further approval of the Court shall be required for amendments, waivers, consents or other modifications to and under the DIP Documents (or any reasonable fees paid in connection therewith).

(ii)     The Borrowers are hereby authorized to borrow money pursuant to the DIP Documents and any related promissory notes, and the Borrowers are hereby authorized to incur indebtedness up to an aggregate principal amount of $5,000,000 (the "**Interim Amount**"), which shall be used as permitted under the DIP Documents and in accordance with the Budget (as defined in the DIP Credit Agreement), and to enter into any and all other and further agreements and arrangements in connection therewith and to pay interest and expenses and incur DIP Obligations all in accordance with this Interim Order and the DIP Documents, including, without limitation, the non-refundable payment to the Lender of reasonable costs and expenses as may be due from time-to-time, including, without limitation, fees and expenses of the professionals retained as provided for in the DIP Documents.

(iii)    In no event will the Borrowers use any of the Interim Amount at the non-Debtor landowners at Linden Ponds, Sedgebrook, Monarch Landing and Ann's Choice or the Debtor landowners at Columbus Campus, LLC, Warminster Campus GP and Warminster Campus, LP.

(iv)    For purposes of this Interim Order only, the Lender has agreed to waive all fees in the DIP Documents and reserves rights to assert such fees at the final

hearing on this Motion, but for the avoidance of doubt, shall be entitled to such expense reimbursement as provided in Section 4.11(d) of the DIP Credit Agreement; and

(v)     In furtherance of the foregoing and without further approval of this Court, each Borrower is authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements) that may be reasonably required or necessary for the Borrowers' performance of their obligations under the Financing and under the DIP Documents.

2.      **Valid, Binding, Non-Avoidable Obligations**. Upon execution and delivery of the DIP Credit Agreement and the other DIP Documents, such DIP Documents shall constitute and represent valid, binding and non-avoidable obligations of the Borrowers enforceable against each Borrower party thereto jointly and severally in accordance with their terms and subject to the terms of this Interim Order for all purposes during the Cases, any subsequently converted case of any Borrower under chapter 7 of the Bankruptcy Code or after the dismissal of any Case. No obligation, payment, right, transfer or grant of security or lien under the DIP Credit Agreement, the other DIP Documents or this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

3.     **Superpriority Claims**. Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations approved under this Interim Order shall constitute allowed senior administrative expense claims against each of the Borrowers (the "**Superpriority Claims**") with priority over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Borrowers, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which shall be payable from and have recourse to all pre- and postpetition property of the Borrowers and all proceeds thereof (provided, however, that no party shall have recourse to Avoidance Actions (defined below) and proceeds thereof pursuant to this Interim Order), subject only to the payment of the Carve-Out to the extent specifically provided for herein.

4.     **DIP Liens**. As security for the DIP Obligations, effective and perfected upon the date of, and through, this Interim Order and without the necessity of the execution, recordation of filings by the Borrowers of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Lender of, or over, any DIP Collateral (defined below), the Lender shall have a DIP Lien (as defined below) in the DIP Collateral, subject, only in the event of the occurrence and during the continuance of an Event of Default (as defined in the DIP Documents), to the payment of the

Carve-Out**:**

    (a)    <u>DIP Collateral.</u> Lender shall have DIP Liens on all assets (tangible, intangible, real, personal and mixed) of the Borrowers, whether now owned or hereafter acquired, including, without limitation, management contracts, accounts, inventory, equipment, receivables, capital stock or other ownership interest in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks, Corporate Cash (as defined in the DIP Credit Agreement), all Initial Entrance Deposits (as defined in the DIP Credit Agreement), and other general intangibles, and all products and proceeds thereof (collectively, all of the foregoing is defined herein as the "**DIP Collateral**"), but the DIP Collateral shall not include the Debtors' claims and causes of action that arise as on or subsequent to the Petition Date under chapter 5 of the Bankruptcy Code including sections 544, 545, 547 and 548 and any other avoidance actions under the Bankruptcy Code and the proceeds thereof and property received thereby whether by judgment, settlement or otherwise (collectively, "**Avoidance Actions**"); and

    (b)    <u>First Priority Priming Lien on Collateral.</u> The Lender shall be secured by a perfected security interest pursuant to section 364(c)(2), section 364(c)(3) and section 364(d) of the Bankruptcy Code with a valid, binding, continuing, enforceable, fully-perfected, first priority priming lien that is senior to any and all security interests in and liens on the DIP Collateral (which is expressly senior in priority to, without limitation, any Prepetition Secured Lenders with respect to the Prepetition Secured Loans) (collectively, the "**DIP Liens**"). The DIP Liens shall

be senior in priority to any lien, right of setoff or recoupment or any similar right (whether arising by common law, statute or contract) of any party, including, without limitation, the Prepetition Secured Lenders, regardless of whether such party is in possession of the DIP Collateral or otherwise. Notwithstanding anything herein, the DIP Liens shall be subject to the Carve Out, but, for the avoidance of doubt, payment of the Carve Out shall not reduce the amounts payable to the Lender hereunder or under the DIP Documents.

(c) **Adequate Protection for Prepetition Secured Lenders.** The Prepetition Secured Lenders are granted a lien, to the same extent, validity and priority as such Prepetition Secured Lender's lien (which, for the avoidance of doubt, shall be junior to the DIP Liens) on all of the Borrowers' assets and proceeds thereof to the extent of any diminution (including, without limitation, any diminution on account of any payment of DIP Obligations from collateral that secures such Prepetition Secured Lender's prepetition claims) in the value of their respective collateral from the Petition Date through the date of consummation of a transaction or any payment of DIP Obligations from Borrowers' property which is collateral that secures the prepetition obligations of the respective Prepetition Secured Lenders.

5. **Carve-Out**. means (a) professional fees (including Borrowers' professional fees) incurred and allowed in the Chapter 11 Case, (b) other professional fees and expenses incurred and allowed in the Chapter 11 Case (which, together with the fees set forth in (a) shall not exceed Six Million Dollars ($6,000,000.00)), (c) the payment of fees pursuant to 28 U.S.C. § 1930, and (d) costs and administrative expenses permitted to be incurred by any Chapter 7

trustee under section 726(b) of the Bankruptcy Code pursuant to an order of the Bankruptcy Court following any conversion of the Chapter 11 Case pursuant to section 1112 of the Bankruptcy Code in an amount not to exceed One Hundred Thousand Dollars ($100,000.00).

6. **Resolution of NSC Concerns.**

(a)     Reimbursement of expenses for NSC-NFPs.  So long as the management agreements between ERC and the NSC-NFPs[4] remain in place and until such time as a plan of reorganization becomes effective in the Borrowers' cases, on the 15th and 30th day of each month, the Borrowers shall advance the aggregate amount of $300,000 ($150,000.00 per payment) to the NSC-NFPs to partially defray the postpetition fees and costs incurred by the NSC-NFPs for professional services related to the Borrowers' reorganization efforts.  Every three months, the NSC-NFPs shall provide a reconciliation of the actual fees and expenses incurred and, to the extent there is a surplus, future payments to the NSC-NFPs will be adjusted to account for the surplus payments.  To the extent that the payments directed herein are insufficient to defray the full amount of such reasonable fees and expenses incurred by the NSC-NFPs (the "Shortfall"), the NSC-NFPs reserve their rights with respect to any such Shortfall. Neither the NSC-NFPs nor their professionals are required to apply to this Court for allowance or approval for payment of any fees or expenses incurred by the NSC-NFPs for services provided by their professionals whether such fees and expenses are paid by the Borrowers or a buyer or buyers of the Borrowers' assets.  However, the reimbursement of such fees and expenses is without prejudice to any party's right to dispute the reasonableness of such fees and

---

[4]The NSC-NFPs are:  (i) Ann's Choice, Inc.; (ii) Ashby Ponds, Inc.; (iii) Brooksby Village, Inc.; (iv) Cedar Crest Village, Inc.; (v) Eagle's Trace, Inc.; (vi) Fox Run Village, Inc.; (vii) Greenspring Village, Inc.; (viii) Hickory Chase, Inc.; (ix) Highland Springs, Inc.; (x) Linden Ponds, Inc.; (xi) Monarch Landing, Inc.; (xii) Oak Crest Village, Inc.; (xiii) Riderwood Village, Inc.; (xiv) Seabrook Village, Inc.; (xv) Sedgebrook, Inc.; (xvi) Tallgrass Creek, Inc.; (xvii) and Wind Crest, Inc.; all of which are Maryland nonstock corporations;  and (xviii) Maris Grove, Inc., a Pennsylvania corporation.

CENTRAL\31279208.11

expenses. In the event the Successful Bidder, for any reason, ceases or fails to reimburse or pay the NSC-NFPs' fees and expenses, the NSC-NFPs reserve the right to seek payment of any Shortfall.

(b)  Reservation of rights of all NFPs. Except as expressly provided herein, nothing in this Order limits, reduces, impairs or alters any of the rights or claims of the NFPs and their communities (the "Communities"), or the residents of those Communities (the "Residents") against or with respect to the Borrowers, the Borrowers' property, the Borrowers' lenders, the Borrowers' lenders' collateral, Redwood or the Successful Bidder. These NFP and Resident rights and claims, to the extent of the validity and priority of such rights and claims, include, but are not limited to:  (i) the rights and claims of the Residents to occupy their units, to utilize the facilities of their community, to receive the services promised under their Residence and Care Agreements, and the right to receive a refund of their Initial Entrance Deposit or Entrance Deposit pursuant to said Residence and Care Agreements; (ii) the rights and claims of the NFPs pursuant to their management agreements, lease agreements, licensing agreements, development agreements, loan agreements, working capital agreements, purchase option agreements, guarantee agreements, indemnity agreements, warranty agreements, and any other agreements with the Borrowers; and (iii) any rights of setoff or recoupment and any other common law or statutory rights relating to any of the above arising from the relationship between the NFPs and the Borrowers.

(c)  The NFPs and Debtors are authorized and directed to maintain the flow of funds with respect to the Community Loan and the Working Capital Loan (as defined in the DIP Credit Agreement) consistent with past practice, and subject to all orders of this Court, including orders related to escrowing initial entrance deposits.  The NFPs also agree to continue to pay all

management fees and pay or reimburse the Borrowers for other services in each as contemplated by the Budget.

(d)     Reservation of Rights.  This Order shall not prejudice or affect in any manner the rights of any party against the NSC-NFPs on account of the use of the proceeds of the financing authorized herein or the use of the Prepetition Secured Lenders' collateral or any other legal or contractual rights, claims or remedies that any party may have against the NSC-NFPs in law or equity, all of which rights, claims or remedies are expressly preserved.  To the extent that the NSC-NFPs fail to comply with the terms of their contractual agreements with the Borrowers and the Prepetition Secured Lenders, the Prepetition Secured Lenders reserve their rights to seek a modification of this Order.

7.     **Protection of Lender's Rights**.

(a)     All DIP Collateral shall not be subject to any liens, claims and encumbrances, except for those liens, claims and encumbrances expressly permitted under the DIP Documents or this Interim Order;

(b)     So long as there are any outstanding DIP Obligations under the Financing which have not been indefeasibly paid and the Borrowers are entitled to request any borrowing under the Financing, all persons or entities, including, without limitation, the Prepetition Secured Lenders shall (i) be prohibited from taking any action to foreclose upon or recover in connection with any lien granted thereto pursuant to the Prepetition Secured Loans or any other lien or security interest or this Interim Order, or otherwise exercise remedies against any DIP Collateral, except to the extent authorized by an order of this Court, and (ii) be deemed to have consented to any release of DIP Collateral as may be required under the DIP Documents. The Debtors shall not pay any amounts or

transfer any property on account of such lenders claims or otherwise, without the written consent of the Lender;

(c)     On five (5) business days notice to the Debtors, the official committee of unsecured creditors ("**Creditors' Committee**"), Prepetition Secured Lenders and the United States Trustee, the automatic stay provisions of section 362 of the Bankruptcy Code will be deemed vacated and modified to the extent necessary to permit the Lender to exercise immediately upon the occurrence of an Event of Default (as defined in the DIP Documents), all rights and remedies under the DIP Documents absent an order of this Court to the contrary.  In any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtors and the Prepetition Secured Lenders hereby waive their right to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the Lender set forth in this Interim Order or the DIP Documents, absent an order of this Court to the contrary.  Subject to the payment provisions described below, in no event shall the Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or otherwise.  The delay or failure to exercise rights and remedies under the DIP Documents or this Interim Order by the Lender shall not constitute a waiver of the Lender's rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable DIP Documents.  The Debtors waive and shall not be entitled to any right of setoff against the Lender relating to the DIP Obligations; and

(d)     The Lender hereby agrees to accept payment in cash in full of all DIP Obligations at any time prior to a hearing on a Final Order, without prepayment penalty.

8.     **Limitation on Charging Expenses Against Collateral**. So long as, and to the extent that, any DIP Obligations remain outstanding, except to the extent of the Carve-Out, no costs or expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law without the prior written consent of the Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by the Lender.

9.     **Adequate Protection/Cash Collateral**. The following shall be deemed adequate protection for the Prepetition Secured Lenders and other lien holders pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code.  Until the Final Hearing, the Debtors reserve their rights to seek from the Bankruptcy Court authority to use of the Corporate Cash and, consistent with the obligations in the DIP Credit Agreement, agree to maintain all covenants provided therein.

As Adequate Protection, the Lender has agreed to be repaid as provided below:

(a)     Sale Transaction.  Upon consummation of a Sale (as defined in the DIP Credit Agreement), the Financing and other DIP Obligations shall be repaid as follows:

(i)     First, from Corporate Cash (as defined in the DIP Credit Agreement) to the extent of Corporate Borrowings (as defined in the DIP Credit Agreement);

(ii)     Second, from Net Cash Proceeds of the Sale (as defined in the DIP Credit Agreement);

(iii)    Third, from each Project, the Initial Entrance Deposits (as defined in the DIP Credit Agreement) made at that Project, subject to any applicable escrow agreements in place with respect to such Initial Entrance Deposits or otherwise applicable state law, to the extent of Project Borrowings (as defined in the DIP Credit Agreement) at that specific Project

(iv)    Fourth, from all or any portion of the DIP Collateral, jointly and severally, in such manner and order as Lender may elect with no obligation to marshal or look to any particular asset of any Borrower; provided, that to the extent the Financing and other DIP Obligations are repaid from Prepetition Collateral (as defined in the DIP Credit Agreement) of a Prepetition Secured Lender, such Prepetition Secured Lender shall have rights of subrogation and contribution against any other Prepetition Secured Lender.

The foregoing priority of recovery shall occur in the order set forth above in clauses (a)(i) through (iv); provided, however, that if any of the collateral listed above is unavailable on demand for any reason, the Lender shall be free to immediately move to the next level of priority without delay.

(b)     Non-Sale.  After the exercise of remedies provided for in Section 11.1 of the DIP Credit Agreement (or after the Financing has automatically

become immediately due and payable), the Financing and other DIP Obligations shall be repaid as follows:

(i)     First, from Corporate Cash to the extent of Corporate Borrowings;

(ii)    Second, from each Project, the Initial Entrance Deposits (as defined in the DIP Credit Agreement) made at that Project, subject to any applicable escrow agreements in place with respect to such Initial Entrance Deposits or otherwise applicable state law, to the extent of Project Borrowings (as defined in the DIP Credit Agreement) at that specific Project; and

(iii)   Third, from all or any portion of the DIP Collateral, jointly and severally, in such manner and order as Lender may elect with no obligation to marshal or look to any particular asset of any Borrower; provided, that to the extent the Financing and other DIP Obligations are repaid from Prepetition Collateral of a Prepetition Secured Lender, such Prepetition Secured Lender may assert any right of subrogation or contribution against any other Prepetition Secured Lender.

The foregoing priority of recovery shall occur in the order set forth above in clauses (b)(i) through (iii); provided, however, that if any of the collateral listed above is unavailable on demand for any reason, the Lender shall be free to immediately move to the next level of priority without delay.

Notwithstanding anything in this Interim Order to the contrary, each Prepetition Secured Lender reserves all rights and defenses against all other Prepetition Secured Lenders as to the allocation of Net Cash Proceeds of the Sale.

10. **Reservation of Rights of Adequate Protection Parties**. Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Lenders. However, Prepetition Secured Lenders may request further or different adequate protection, and the Debtors or any other party may contest any such request; *provided* that any such further or different adequate protection shall at all times be subordinate and junior to the claims and liens of the Lender granted under this Interim Order and the DIP Documents.

11. **Monitoring of DIP Collateral**. The Lender reserves the right, in consultation with the Debtors, to retain expert consultants, financial advisors or other professionals at the expense of the Borrowers, which consultants and advisors shall be given reasonable access for purposes of monitoring the business of the Debtors and the value of the DIP Collateral.

12. **Financial Reporting**. The Borrowers shall provide the Lender and the project and corporate lender agents with financial and other reporting as described in the DIP Documents, with copies simultaneously provided to the Creditors' Committee.

13. **Perfection of DIP Liens**.

(a)     The Borrowers, the Lender and the Prepetition Secured Lenders are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over, or take any other action in order to

validate and perfect the liens and security interests granted to them hereunder; provided however, the Borrowers shall perform any act in furtherance thereof if requested by the Lender or the Prepetition Secured Lenders. Whether the Lender or the Prepetition Secured Lenders, in their sole discretion, chooses to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge dispute or subordination, at the time and from the date of entry of this Interim Order forward. Upon the request of the Lender or the Prepetition Secured Lenders, without any further consent of any party (including the Debtors, Prepetition Secured Lenders (in the case of the Lender) or any Official Committee) the Lender and Borrowers are each authorized to take, execute, deliver and file such instruments (in each case without representation or warranty of any kind) to enable the Lender and the Prepetition Secured Lenders to validate, perfect, preserve and enforce DIP Liens. By this Interim Order, the Lender and Prepetition Secured Lenders shall be deemed to have executed all such agreements, financing statements, instruments and other documents as the may reasonably be requested to more fully evidence, confirm, validate, perfect, preserve and enforce the DIP Liens;

(b)     A certified copy of this Interim Order may, in the discretion of the Lender or the Prepetition Secured Lenders, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of

this Interim Order for filing and recording; and

(c)     Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Borrower to pledge, grant, sell, assign or otherwise transfer any such leasehold interest, or the proceeds thereof, or other postpetition collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Any such provision shall have no force and effect with respect to the transactions granting postpetition liens, in such leasehold interest or the proceeds of any assignment and/or sale thereof by any Borrower, in favor of the Lender or the Prepetition Secured Lenders in accordance with the terms of the DIP Documents or this Interim Order.

14.     **Preservation of Rights Granted Under the Order**.

(a)     No claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the Lender shall be granted or allowed while any portion of the Financing (or any refinancing thereof) or the commitments thereunder or the DIP Obligations remain outstanding, and the DIP Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Borrowers' estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise;

(b)     Unless all DIP Obligations shall have indefeasibly been paid in cash in full, the Debtors shall not seek, and others shall not seek, and it shall constitute an Event of Default (as defined in the DIP Documents), if there is, (i) any modification or

extension of this Interim Order without the prior written consent of the Lender, and no such consent shall be implied by any other action, inaction or acquiescence, or (ii) an order converting or dismissing any of the Cases. All of the Creditors' Committee's rights to contest the Final Order at the Final Hearing are reserved in full;

(c)     If an order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the Superpriority Claims, priming liens, security interests and replacement security interests granted to the Lender and the adequate protection superpriority claims and adequate protection liens granted to the Prepetition Secured Lenders pursuant to this Interim Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations shall have been indefeasibly paid in cash in full and any claims for diminution have been satisfied (and that such Superpriority Claims, priming liens, replacement security interests, adequate protection superpriority claims and adequate protection liens shall, notwithstanding such dismissal, remain binding on all parties in interest); and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in (i) above;

(d)     To the extent of applicable law, if any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity, priority or enforceability of any DIP Obligations, DIP Liens and adequate protection liens incurred prior to the actual receipt of written notice by the Lender of the effective

date of such reversal, stay, modification or vacation or (ii) the validity or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Credit Agreement with respect to any DIP Obligations. Notwithstanding any such reversal, stay, modification or vacation, DIP Obligations incurred by the Borrowers prior to the actual receipt of written notice by the Lender of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Interim Order, and the Lender shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order and pursuant to the DIP Documents with respect to all uses of DIP Obligations. The Debtors shall not seek to modify, vacate, or amend this Order without the written consent of the Lender; and

(e)       Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the Superpriority Claims, the adequate protection liens and the adequate protection superpriority claims granted by the provisions of this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases or by any other act or omission or (ii) the entry of an order confirming a plan of reorganization in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations. The terms and provisions of this Interim Order and the DIP Documents shall continue in these Cases, in any successor cases if these Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, the DIP

Liens, the Superpriority Claims and all other rights and remedies of the Lender, and the adequate protection liens and the adequate protection superpriority claims granted by the provisions of this Interim Order and the DIP Documents shall continue in full force and effect until the DIP Obligations are indefeasibly paid in cash in full and any claims for diminution have been satisfied.

15. **Limitation on Use of Financing Proceeds and Collateral**. Notwithstanding anything herein or in any other order by this Court to the contrary, no DIP Collateral, portion of the proceeds of the Financing or part of the Carve-Out may be used for any of the following (each, a **"Lender Claim"**) without the prior written consent of the Lender : (a) to object, contest or raise any defense to the validity, perfection, priority, extent or enforceability of any amount due under any DIP Document, or the liens or claims granted under this Interim Order, any DIP Document, (b) to assert any claim or cause of action against the Lender or its respective agents, representatives, attorneys or advisors with respect to the DIP Documents, (c) except to contest the occurrence or continuation of an Event of Default, to prevent, hinder or otherwise delay the Lender's assertion, enforcement or realization on the DIP Collateral in accordance with the DIP Documents or this Interim Order, (d) to assert or prosecute any action for preferences, fraudulent conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses against the Lender or its respective representatives, attorneys or advisors in connection with matters related to the Financing or the DIP Documents to the extent approved under this Interim Order, or (e) to seek to modify any of the rights granted to the Lender hereunder.

16. **Enforcement of Remedies.**

(a)     Upon an Event of Default or the occurrence of the Maturity Date, the

Borrowers shall immediate make payment in full in cash of all of the outstanding non-contingent DIP Obligations. In the absence of immediate and full payment in cash of all of the outstanding DIP Obligations the automatic stay is hereby deemed vacated as provided in this Interim Order, and the Lender shall be permitted to exercise such rights and remedies under such agreements, documents, and applicable law as to all or such part of the DIP Collateral as the Lender shall, in its sole discretion, elect, including, but not limited to, the Lender's right to foreclose on the mortgages and seek to take possession of any cash of the Borrowers. Upon such enforcement by the Lender, the Borrowers shall cooperate with the Lender in the disposition of the Collateral and shall not otherwise interfere or actively encourage others to interfere with the Lender's enforcement of its rights; and

(b)     Upon an Event of Default of any of the DIP Obligations, as applicable, the Default Rate set forth in the DIP Documents shall immediately be applicable.

17.     **Enforcement of Remedies in the Bankruptcy Court.**  In addition to the remedies set forth in the DIP Documents and to provide for an orderly disposition of the DIP Collateral, upon an occurrence and during the continuation of an Event of Default, the Borrowers shall, at the sole expense of the Borrowers' bankruptcy estates and on such terms as set forth by the Lender, file:  (i) a motion or motions seeking to sell, assume and assign, or otherwise dispose of any or all of the DIP Collateral as the Lender may direct pursuant to sections 363 and 365 of the Bankruptcy Code; and (ii) any further motions necessary to maximize the value received from the sale or disposition of the DIP Collateral, including, but not limited to, motions to retain any additional professionals to assist the Borrowers in the sale of the DIP Collateral.  The Borrowers shall file any such motions within five (5) business days after the Lender's request and

shall diligently prosecute all such motions. If the Debtors fail to so file or diligently pursue such motions, the Lender may file and prosecute such motions in the name of and at the expense of the Borrowers, and the Lender is hereby specifically given such authority and standing. In the event of any sale or disposition of the DIP Collateral in accordance with this paragraph or otherwise, the Lender shall have the right to credit bid any or all of the Obligations under section 363(k) of the Bankruptcy Code or otherwise.

18. **Effect of Stipulations on Third Parties**.

(a)     Each stipulation, admission and agreement contained in this Interim Order shall be binding upon the Borrowers or Debtors as applicable, and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors or Borrowers as applicable) under all circumstances and for all purposes, and the Borrowers are deemed to have irrevocably waived and relinquished all Lender Claims as of the date of entry of this Interim Order; and

(b)     Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including the Creditors' Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates.

19. **Agent**. To the extent the Lender appoints any agent (collateral agent, administrative agent or otherwise) in connection with any DIP Document, such agent may be considered (at the election of the Lender) the Lender for the purposes of any account control agreement, as loss payee under the Borrowers' insurance policies or as the secured party under the Financing, and such agent shall have all rights and powers attendant to that position (including, without limitation, rights of enforcement). Each such agent appointed shall serve as agent for purposes of perfecting Lender's security interests and liens on all DIP Collateral that is

of a type such that perfection of a security interest therein may be accomplished only by possession or control by a secured party.

20. **Order Governs**. In the event of any inconsistency between the provisions of this Interim Order and the DIP Documents, the provisions of this Interim Order shall govern.

21. **Binding Effect; Successors and Assigns**. The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Cases, including, without limitation, the Lender, the Prepetition Secured Lenders, any Committee appointed in these Cases, and the Borrowers and of the respective successors and assigns of the foregoing (including, with respect to the Borrowers, any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Borrowers, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of any of the Borrowers or with respect to the property of the estate of any of the Borrowers) and shall inure to the benefit of the Lender and its respective successors and assigns, *provided, however,* that the Lender shall have no obligation to permit the use of DIP Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors. In determining to make any loan (whether under the DIP Credit Agreements, a promissory notes or otherwise), or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the Lender shall not (i) be deemed to be in control of the operations of the Debtors, (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates or (iii) be deemed to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, *et seq.,* as

amended, or any similar federal or state statute).

22.     **No Impact on Certain Contracts or Transactions**. No rights of any entity in connection with a contract or transaction of the kind listed in sections 555, 556, 559, 560 or 561 of the Bankruptcy Code, whatever they might or might not be, are affected by the provisions of this Interim Order.

23.     **Exclusions**. For the avoidance of doubt, nothing herein or in any of the DIP Documents shall operate as a release or waiver of, or a limit on expenditures in pursuit of, any claims or causes of action held or assertable by the Lender (including, without limitation, any of the Debtors or any other party in interest) against any Debtor, any "affiliate" of any Debtor (as such term is defined in the Bankruptcy Code) or any officer, director or direct or indirect shareholder (or affiliate thereof) of any Debtor.

24.     **Credit Bid**.  In connection with any sale of the Borrowers' assets or stock, under a plan of reorganization or pursuant to 363 of the Bankruptcy Code or in any other form, the Lender shall have the right to credit bid the amount outstanding on the Financing against the purchase price to be paid by Redwood Capital Investments, LLC or any of its affiliate in such transaction, provided that the credit bid amount shall equal 100% of the amount outstanding under the Financing as of the date of such bid.

25.     **Effectiveness**. This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

26.     **Headings**. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

27.     **Final Hearing**. The Final Hearing will be held by this Court on December 4, 2009 at 9:30 a.m. (prevailing Central Time) to consider entry of a Final Order. The Debtors shall promptly transmit copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, to any party that has filed a request for notices with this Court and to the Creditors' Committee. Any party in interest objecting to the relief sought at the Final Hearing shall file a written objection, which shall be served upon (a) DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020 (attn: Thomas R. Califano), counsel for the Debtors; (b) the Office of the United States Trustee for the Northern District of Texas; (c) the Debtors' 30 largest unsecured creditors on a consolidated basis and Bracewell & Giuliani LLP, 1445 Ross Avenue, Suite 3800, Dallas, Texas 75202 (Attn: Sam Stricklin) and Bracewell & Giuliani LLP, 1177 Avenue of the Americas, New York, New York 10036 (Attn: Mark Joachim), counsel for the Creditors' Committee; (d) counsel to the Lender; (e) counsel to the prepetition secured lenders; and (f) any known lienholders whose liens are being primed under the Financing in compliance with Bankruptcy Rule 4001(b) and (c) and the Local Bankruptcy Rules, and shall be filed with the Clerk of the United States Bankruptcy Court, Northern District of Texas, in each case to allow actual receipt by the foregoing no later than November 30, 2009 at 4:00 p.m. (prevailing Central Time).

**###END OF ORDER###**

**SUPER-PRIORITY DEBTOR-IN-POSSESSION**

**LOAN AGREEMENT**

dated November ___, 2009

by and among

**ERICKSON RETIREMENT COMMUNITIES, LLC and EACH OF THE OTHER PARTIES NAMED IN <u>EXHIBIT A</u>**, as Co-Borrowers, Debtors and Debtors-in-Possession under Chapter 11 of the Bankruptcy Code

and

**ERC FUNDING CO. LLC**, as Lender

| **ARTICLE** | | | **PAGE** |
|---|---|---|---|

ARTICLE 1       INCORPORATION AND DEFINITIONS ..........................2

    1.1    Incorporation and Definitions .................................................2

ARTICLE 2       REPRESENTATIONS AND WARRANTIES ...........................13

    2.1    Representations and Warranties.............................................13
    2.2    Continuation of Representations and Warranties ...................14

ARTICLE 3       AMOUNT AND TERMS OF COMMITMENTS .........................14

    3.1    Agreement to Lend and to Borrow; Note................................14
    3.2    Use of Loan Proceeds...........................................................15
    3.3    Prepayments and Reduction of Aggregate Commitment.........15
    3.4    Super-Priority Nature of Obligations and Status of Lender's Liens ....................17
    3.5    No Discharge; Survival of Liens and Claims; Waiver of Priming Rights ...........18
    3.6    Adequate Protection .............................................................18
    3.7    Payment of Obligations ........................................................18
    3.8    Escrow of Postpetition Initial Entrance Deposits ..................18
    3.9    Joint and Several Obligations ...............................................19
    3.10   No Marshalling .....................................................................19

ARTICLE 4       PRINCIPAL, INTEREST; SPECIAL PROVISIONS ..................19

    4.1    Interest Rate ........................................................................19
    4.2    Payment of Principal and Interest.........................................19
    4.3    Intentionally Deleted ............................................................20
    4.4    Computation of Interest and Fees..........................................20
    4.5    Inability to Determine Interest Rate ......................................20
    4.6    Intentionally Deleted ............................................................20
    4.7    Illegality..............................................................................21
    4.8    Legal Requirements..............................................................21
    4.9    Taxes...................................................................................22
    4.10   Loan Indemnification ...........................................................23
    4.11   Fees and Expenses................................................................23

ARTICLE 5       CONDITIONS PRECEDENT TO EACH ADVANCE ................24

    5.1    Conditions Precedent to Each Advance .................................24

ARTICLE 6       CONDITIONS TO CLOSING ................................................25

    6.1    Conditions to Closing ...........................................................25

ARTICLE 7       FUNDING CONDITIONS AND MECHANICS .........................27

    7.1    Funding Conditions and Mechanics ......................................27

ARTICLE 8       FURTHER AGREEMENTS OF BORROWER ..........................28

    8.1    Furnishing Information.........................................................28

| | | |
|---|---|---|
| 8.2 | Affirmative Covenants | 29 |
| 8.3 | Negative Covenants | 31 |

**ARTICLE 9      ASSIGNMENTS; CONFIDENTIALITY** ........................34

| | | |
|---|---|---|
| 9.1 | Successors and Assigns | 34 |
| 9.2 | Intentionally Deleted | 34 |
| 9.3 | Intentionally Deleted | 34 |
| 9.4 | Confidentiality | 34 |
| 9.5 | Dissemination of Information | 34 |

**ARTICLE 10      EVENTS OF DEFAULT BY BORROWER** ........................35

| | | |
|---|---|---|
| 10.1 | Event of Default Defined | 35 |

**ARTICLE 11      LENDER'S REMEDIES UPON EVENT OF DEFAULT** ...........37

| | | |
|---|---|---|
| 11.1 | Remedies | 37 |
| 11.2 | Setoff Rights | 37 |
| 11.3 | Intentionally Deleted | 37 |
| 11.4 | Right of Lender to Make Advances to Cure Event of Defaults; Obligatory Advances | 37 |
| 11.5 | Attorneys' Fees | 37 |
| 11.6 | No Waiver | 38 |
| 11.7 | Application of Funds | 38 |

**ARTICLE 12      MISCELLANEOUS** ........................39

| | | |
|---|---|---|
| 12.1 | Time is of the Essence | 39 |
| 12.2 | Amendments, Etc. | 39 |
| 12.3 | Determination of Facts | 39 |
| 12.4 | Prior Agreements | 40 |
| 12.5 | Disclaimer by Lender | 40 |
| 12.6 | Borrower Indemnification | 40 |
| 12.7 | Captions | 40 |
| 12.8 | Inconsistent Terms and Partial Invalidity | 40 |
| 12.9 | Gender and Number | 41 |
| 12.10 | Notices | 41 |
| 12.11 | Effect of Agreement | 42 |
| 12.12 | Governing Law | 42 |
| 12.13 | Waiver of Defenses | 42 |
| 12.14 | Consent to Jurisdiction | 42 |
| 12.15 | Waiver of Jury Trial | 42 |
| 12.16 | Usury Savings Clause | 43 |
| 12.17 | Counterparts; Facsimile Signatures | 43 |

**SCHEDULES**

Schedule 1.1 – Permitted Existing Contingent Obligations
Schedule 1.2 – Permitted Existing Indebtedness
Schedule 1.3 – Permitted Existing Liens
Schedule 3.1 - Commitment

**EXHIBITS**

EXHIBIT A    -    SCHEDULE OF CO-BORROWERS, CORPORATE BORROWERS AND PROJECT BORROWERS
EXHIBIT B    -    BUDGET
EXHIBIT C    -    SCHEDULE OF NFPS
EXHIBIT D    -    FORM OF NOTE
EXHIBIT E    -    SCHEDULE OF PROJECTS
EXHIBIT F    -    BORROWER FORMATION / QUALIFICATION

<u>**SUPER-PRIORITY DEBTOR IN POSSESSION LOAN AGREEMENT**</u>
**THIS SUPER-PRIORITY DEBTOR IN POSSESSION LOAN AGREEMENT**

("**Agreement**"), is made and entered into as of November __, 2009, by and among **ERICKSON**

**RETIREMENT COMMUNITIES, LLC,** a Maryland limited liability company**, and each of**

**the other parties named in <u>EXHIBIT A</u>** attached hereto, as Co-Borrowers, Debtors and

Debtors-in-Possession under Chapter 11 of the Bankruptcy Code (individually and collectively,

as appropriate, "**Borrower**"), and **ERC FUNDING CO. LLC**, a Maryland limited liability

company and its successors and assigns ("**Lender**").

## R E C I T A L S:

A.      On October 19, 2009 ("**Filing Date**"), Borrower commenced a case ("**Chapter 11 Case**") under Chapter 11 of Title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas ("**Bankruptcy Court**"), and Borrower has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its businesses as debtor-in-possession.

B.      Borrower has requested that Lender provide a revolving credit debtor-in-possession facility to Borrower in an aggregate principal amount not to exceed Twenty Million Dollars ($20,000,000.00) ("**Loan**"), and subject to the terms and conditions set forth herein, Lender is willing to extend such credit to Borrower.

C.      The proceeds of the Loan hereunder shall be used as provided in Section 8.2(d).

D.      Lender has indicated its willingness to agree to extend such credit to Borrower, all on the terms and conditions set forth herein and in the other Loan Documents and in accordance with the Bankruptcy Code, so long as, inter alia, such postpetition credit obligations are (i) secured by Liens on all of the property and interests, real and personal, tangible and intangible, of Borrower whether now owned or hereafter acquired, subject in priority only to certain Liens and the Carve Out as hereinafter provided, and (ii) given super-priority status as provided in the Orders.

E.      Lender has agreed to provide the Loan made pursuant to this Agreement with the express understanding that Borrower has agreed to the super-priority status and priming liens subject to the approval of the Bankruptcy Court.

**NOW, THEREFORE**, in consideration of the mutual representations, warranties,

covenants and agreements herein contained, the sufficiency of which is hereby acknowledged,

the parties hereto represent and agree as follows:

# ARTICLE 1

# INCORPORATION AND DEFINITIONS

1.1 **Incorporation and Definitions**. The foregoing recitals and all exhibits hereto are hereby made a part of this Agreement. The following terms shall have the following meanings in this Agreement:

**Advance**: An advance of Loan Proceeds made by Lender to Borrower hereunder.

**Affiliate**: Any Person which, directly or indirectly, controls or is controlled by or is under common control with Borrower. A Person shall be deemed to control another Person if the controlling Person is the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934) of ten percent (10%) or more of any class of voting securities (or other voting interests) of the controlled Person or possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of the controlled Person, whether through ownership of Capital Stock, any other Equity Interest, by contract or otherwise. In no event shall Lender be considered an Affiliate of Borrower. Notwithstanding the foregoing, in no event shall Warminster Campus, L.P., Hingham Campus, LLC, Lincolnshire Campus, LLC or Naperville Campus, LLC be considered an Affiliate of Borrower for purposes of this Agreement or any Loan Document.

**Aggregate Commitment**: The aggregate of the Commitment, as reduced from time to time pursuant to the terms hereof. The aggregate Commitment as of the Closing Date is Twenty Million Dollars ($20,000,000.00).

**Agreement**: As defined in the Preamble.

**Applicable Commitment Fee Percentage**: From and after the Final Order Entry Date, as at any date of determination, a non-refundable unused commitment fee of 0.50% *per annum* of the daily average unused portion of the Aggregate Commitment (whether or not then available), payable monthly in arrears and on the Maturity Date.

**Applicable Margin**: Seven and one-half percent (7.5%) *per annum*.

**Asset Sale**: With respect to any Person, the sale, lease, conveyance, disposition or other transfer by such Person of any of its assets (including by way of a sale-leaseback transaction and including the sale or other transfer of any of the Equity Interests of any Subsidiary of such Person).

**Available Commitment**: The difference at any time, and from time to time, between (a) the amount of the Aggregate Commitment, and (b) the aggregate principal amount of all Advances outstanding hereunder.

**Availability Period**: The period commencing on the Closing Date and ending on the Maturity Date.

**Avoidance Actions**: means claims and causes of action under sections 544, 547 and 548 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code and the proceeds thereof and property received thereby whether by judgment, settlement or otherwise.

**Bankruptcy Code**: Title 11 of the United States Code.

**Bankruptcy Court**: The United States Bankruptcy Court for the Northern District of Texas, Dallas Division or any other court having jurisdiction over the Chapter 11 Case from time to time.

**Borrower**: As defined in the Preamble, each of who shall be jointly and severally liable for payment of the Obligations and performance of the covenants set forth herein and in the Loan Documents.

**Borrowing Date**: Any date on which an Advance hereunder is made.

**Budget**: The cash flow projections prepared by Borrower and attached hereto as **Exhibit B** showing anticipated cash receipts and disbursements on a weekly basis for the term of the Loan, together with any amendments, modifications or updates to such projections, but only to the extent the same have been approved by Lender in its sole but reasonable discretion.

**Business Day**: Any day other than a Saturday, Sunday or other day on which lenders in the State of Maryland are required or permitted to close, or any day on which lenders are not open for dealings in dollar deposits on the London interbank market.

**Capitalized Lease**: Means, with respect to any Person, any lease of property by such Person (as lessee) which would be capitalized on a balance sheet of such Person prepared in accordance with GAAP.

**Capital Stock**: Means (a) in the case of a corporation, corporate stock, (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock, (c) in the case of a partnership, partnership interests (whether general or limited), (d) in the case of a limited liability company, membership, ownership or other equity interests, and (e) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

**Carve Out**: means (a) professional fees, (including Borrower's professional fees) incurred in the Chapter 11 Case, (b) other professional fees and expenses incurred in the Chapter 11 Case (which, together with the fees set forth in (a) shall not exceed Six Million Dollars ($6,000,000.00)), (c) the payment of fees pursuant to 28 U.S.C. § 1930, and (d) costs and administrative expenses permitted to be incurred by any Chapter 7 trustee under section 726(b) of the Bankruptcy Code pursuant to an order of the Bankruptcy Court following any conversion of the Chapter 11 Case pursuant to section 1112 of the Bankruptcy Code in an amount not to exceed One Hundred Thousand Dollars ($100,000.00).

**Chapter 11 Case**: As defined in the Recitals.

**Closing Date**: The date on which the Interim Order is granted and all conditions precedent to the first Advance are satisfied or waived.

**Collateral**: All property and interests in property (whether tangible or intangible, real property or Personal Property), whether now owned or hereafter acquired by Borrower in or upon which a security interest, lien or mortgage is granted to Lender, whether under this Agreement, under any of the other Loan Documents, or under the Orders or any other order of the Bankruptcy Court. The definition of Collateral shall be deemed to include, without limitation, management contracts, accounts, inventory, equipment, receivables, capital stock or other ownership interest in Subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, and all products and proceeds thereof. For the avoidance of doubt, the Collateral shall also include (i) all Initial Entrance Deposits (whether existing or new) and (ii) Corporate Cash. Collateral shall not include Avoidance Actions.

**Commitment**: Lender's commitment to make the Loan under this Agreement.

**Community Loan**: has the meaning set forth in Section 3.8.

**Contingent Obligation**: As applied to any Person, (i) any Contractual Obligation, contingent or otherwise, of that Person with respect to any Indebtedness of another or other obligation or liability of another, including, without limitation, any such Indebtedness, obligation or liability of another directly or indirectly guaranteed, endorsed (otherwise than for collection or deposit in the ordinary course of business), co-made or discounted or sold with recourse by that Person, or in respect of which that Person is otherwise directly or indirectly liable, including Contractual Obligations (contingent or otherwise) arising through any agreement to purchase, repurchase, or otherwise acquire such Indebtedness, obligation or liability or any security therefor, or to provide funds for the payment or discharge thereof (whether in the form of loans, advances, stock purchases, capital contributions or otherwise), or to maintain solvency, assets, level of income, or other financial condition, or to make payment other than for value received, and (ii) any other contingent obligation or liability of such Person, whether or not reflected in financial statements of such Person as a liability.

**Contractual Obligation**: As applied to any Person, any provision of any equity or debt securities issued by that Person or any indenture, mortgage, deed of trust, security agreement, pledge agreement, guaranty, contract, undertaking, agreement or instrument, in any case in writing, to which that Person is a party or by which it or any of its properties is bound, or to which it or any of its properties is subject.

**Corporate Borrower**: means a Borrower identified on Exhibit A as a Corporate Borrower.

**Corporate Borrowings**: means that portion of the Loan advanced to a Corporate Borrower.

**Corporate Cash**. All cash, cash equivalents or securities which are held in segregated accounts, securities accounts or the principal deposit accounts of Erickson Retirement Communities, LLC, including, without limitation, the Separate Funds, and any proceeds thereof or interest earned thereon.

**Customary Permitted Liens**:

(a)     Liens with respect to the payment of taxes, assessments or governmental charges in all cases which are not yet due or (if foreclosure, distraint, sale or other similar proceedings shall not have been commenced) which are being contested in good faith by appropriate proceedings properly instituted and diligently conducted and, in each case, with respect to which adequate reserves or other appropriate provisions are being maintained;

(b)     Statutory Liens of landlords and Liens of suppliers, mechanics, carriers, materialmen, warehousemen or workmen and other similar Liens imposed by law created in the ordinary course of business for amounts not yet due or which are being contested in good faith by appropriate proceedings properly instituted and diligently conducted and with respect to which adequate reserves or other appropriate provisions are being maintained;

(c)     Liens incurred or deposits made in the ordinary course of business in connection with worker's compensation, unemployment insurance or other types of social security benefits or to secure the performance of bids, tenders, sales, contracts (other than for the repayment of borrowed money), surety, appeal and performance bonds; provided that (i) all such Liens do not in the aggregate materially detract from the value of Borrower's assets or property taken as a whole or materially impair the use thereof in the operation of the businesses taken as a whole, and (ii) all Liens securing bonds to stay judgments or in connection with appeals do not secure at any time an aggregate amount exceeding Five Hundred Thousand Dollars ($500,000.00);

(d)     Liens arising with respect to zoning restrictions, easements, licenses, reservations, covenants, rights-of-way, utility easements, building restrictions and other similar charges or encumbrances on the use of real property which do not in any case materially detract from the value of the property subject thereto or interfere with the ordinary conduct of the business of Borrower;

(e)     Liens of attachment or judgment with respect to judgments, writs or warrants of attachment, or similar process against any which do not constitute an Event of Default;

(f)     Normal and customary rights of setoff upon deposits of cash in favor of banks or other depository institutions;

(g)     Liens of a collection bank arising on items in the course of collection; and

(h)     Any interest or title of the lessor in the property subject to any operating lease entered into by Borrower in the ordinary course of business.

**Debt Issuance**:  The incurrence by Borrower or any Subsidiary of any Indebtedness after the Closing Date.

**Default**:  A condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

**Domestic Subsidiaries**:  Any Subsidiary of any Person organized under the laws of any state of the United States and substantially all of the operations of which are conducted within the United States.

**Equity Interests**:  Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

**Equity Issuance**:  The issuance by Borrower or any Subsidiary of any Capital Stock after the Closing Date.

**Event of Default**:  One or more of the events or occurrences referred to in Article 10 of this Agreement.

**Exchange Act**:  The Securities Exchange Act of 1934, and regulations promulgated thereunder.

**Existing Indebtedness**:  All Indebtedness owing by Borrower as of the date hereof, as identified in **Schedule 1.2** hereto.

**Existing Loan Agreements**:  Those certain loan agreements and other debt instruments

evidencing Borrowers' Existing Indebtedness (as heretofore amended, modified, supplemented, or restated from time to time).

**Filing Date**:  As set forth in the Recitals.

**Final Order**:  A final non-appealable order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) granting final approval of this Agreement and the other Loan Documents and granting the priming liens and super-priority claims and other benefits and protections with respect to Borrower described herein and in the Loan Documents (including the Interim Order) in favor of the Lender, substantially on the terms provided in the Interim Order, with such changes thereto as may be satisfactory to Lender.

**Final Order Entry Date**:  The date the Final Order is entered in the Chapter 11 Case.

**GAAP**:  Generally accepted accounting principles in the United States of America in effect from time to time as applied by nationally recognized accounting firms.

**Governmental Authority**:  Any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

**Highest Lawful Rate**:  The maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow.

**Indebtedness**:  As to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(i)  all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(j)  all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business);

(k)  indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(l)  capital leases and synthetic lease obligations;

(m)  all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any equity interest in such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(n)  all guarantees of such Person in respect of any of the foregoing.  For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.

**Initial Entrance Deposits**.  (a) all initial entrance deposits received by the NFP from each first occupant of a "living unit" pursuant to the Residence and Care Agreements for

the Projects prior to the Filing Date which, except for Ashburn Campus, LLC, have not been deposited into a Borrower's collateral account with any Prepetition Lender and (b) all Postpetition Initial Entrance Deposits.

**Interest Period**: The period commencing on the date of the initial Advance hereunder and ending on the date that is one month thereafter; provided that:

each Interest Period occurring after the initial Interest Period shall commence on the day on which the preceding Interest Period expires;

(o)     if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the following Business Day, unless the result of such extension would be to carry such Interest Period into another calendar month, in which event such Interest Period shall end on the preceding Business Day;

(p)     any Interest Period that begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(q)     no Interest Period shall extend beyond the scheduled Maturity Date.

**Interest Rate**: For each Interest Period, the amount that is the <u>greater of</u>: (i) two hundred fifty (250) basis points in excess of the Applicable Margin, or (ii) the then-current LIBOR Rate for interest periods of one month <u>plus</u> the Applicable Margin.

**Interim Availability Amount**: Five Million Dollars ($5,000,000.00).

**Interim Availability Period**: The period commencing on the date of entry of the Interim Order and ending on the Final Order Entry Date.

**Interim Order**: A non-appealable order of the Bankruptcy Court, pursuant to section 364 of the Bankruptcy Code, granting interim approval of this Agreement and the other Loan Documents, including (i) the granting of the super-priority claims and first priority lien status, (ii) the waiver of rights under section 506(c) of the Bankruptcy Code, (iii) the payment of all fees constituting Obligations hereunder, (iv) modifying the automatic stay solely to permit Borrower to perform its obligations hereunder and under the other Loan Documents, (v) granting the Lender the right to exercise its rights and remedies in accordance with Article XI of this Agreement, and (vi) authorizing the incurrence by Borrower of secured and super-priority Indebtedness in accordance with this Agreement, as to which no stay has been entered and which has not been reversed, vacated or overturned, and which has not been amended, supplemented or otherwise modified without the prior written consent of Lender and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied unless Lender waives such requirement.

**Land**: All real estate in which Borrower held an interest on the Filing Date.

**Legal Requirements**: As to any person or party, the certificate of incorporation and by-laws or other organizational or governing documents of such person or party, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such person or party or any of its property or to which such person or party or any of its property is subject.

**Lender**: As identified in the Preamble.

**LIBOR Rate**: For any Interest Period, the per annum rate of interest at which United States dollar deposits in an amount comparable to the amount of such Loan and for a one month period are offered in the London Interbank Eurodollar market at 11:00 a.m. (London time) two (2) Business Days prior to the commencement of such Interest Period (or three Business Days prior to the commencement of such Interest Period if banks in London, England were not open and dealing in offshore United States dollars on such second preceding Business Day), as displayed in the *Bloomberg Financial Markets* system (or other authoritative source selected by Lender in its sole discretion).

**Lien**:  With respect to any property or assets, any right or interest therein of a creditor to secure liabilities owed to it or any other arrangement with such creditor which provides for the payment of such liabilities out of such property or assets or which allows such creditor to have such liabilities satisfied out of such property or assets prior to the general creditors of any owner thereof, including any lien, mortgage, security interest, pledge, deposit, production payment, rights of a vendor under any title retention or conditional sale agreement or lease substantially equivalent thereto, tax lien, mechanic's or materialman's lien, or any other charge or encumbrance for security purposes, whether arising by law or agreement or otherwise, but excluding any right of offset which arises without agreement in the ordinary course of business with trade creditors.

**Loan**:  The loan to be made by Lender pursuant to this Agreement.

**Loan Documents**:  This Agreement, all agreements, instruments and documents executed in connection with this Agreement that are intended to create, perfect, or evidence Liens to secure the Obligations, including, without limitation, all security agreements, pledge agreements, mortgages, deeds of trust, loan agreements, notes, guarantees, subordination agreements, pledges, powers of attorney, consents, assignments, contracts, fee letters, notices, leases, financing statements and all other written matter whether heretofore, now, or hereafter executed by or on behalf of Borrower and delivered to Lender, together with all agreements and documents referred to therein or contemplated thereby.

**Loan Notice**:  As set forth in Section 7.1(a).

**Loan Proceeds**:  All amounts advanced as part of the Loan, whether advanced directly to Borrower or otherwise.

**Master Purchase and Sale Agreement**:  That certain agreement dated as of October 19, 2009 between (i) Redwood-ERC Senior Living Holdings, LLC, Redwood-ERC Management, LLC, Redwood-ERC Development, LLC, Redwood-ERC Properties, LLC, and Redwood-ERC Kansas, LLC, as purchaser, and (ii) Erickson Retirement Communities, LLC, Erickson Group, LLC, and Kansas Campus, LLC, as seller.

**Material Adverse Effect**:  Any event, condition, obligation, liability or circumstance or set of events, conditions, obligations, liabilities or circumstances or any change(s) which:

has, had or reasonably could be expected to have a material adverse effect upon or change in (i) the legality, validity or enforceability of any Loan Document, or (ii) the perfection or priority of any Lien granted to Lender under any of the Loan Documents;

(r)        has been or reasonably could be expected to be material and adverse to the value of any of the Collateral or to the business, operations, prospects, properties, assets, liabilities or condition (financial or otherwise) of Borrower; or

(s)        has materially impaired or reasonably could be expected to materially impair the ability of Borrower to perform any of the Obligations or its obligations, or to consummate the transactions, under the Loan Documents.

**Maturity Date**:  The earlier of:

(a)        the date that is sixty (60) days after the date upon which a bidder other than Redwood Capital Investments, LLC (or its affiliates) is selected as the purchaser and/or plan sponsor of substantially all of the Borrower's assets/operations pursuant to an auction process described in the Master Purchase and Sale Agreement as modified by the order approving the bid and auction procedures for the Sale; provided, however, if Redwood Capital Investments, LLC (or its affiliates) are not selected on or before December 31, 2009, another bidder shall be deemed to have been selected as of such date;

(b)        the effective date of a plan of reorganization in the Chapter 11 Case;

(c)        February 16, 2010; provided, however, that Borrower shall have the right to extend the February 16, 2010 maturity date until April 17, 2010, subject to:

(i)        payment, on or before February 16, 2010, of an extension fee in the amount of three percent (3.0%) of the outstanding principal balance of the Loan as of February 16, 2010;

(ii)        there being no Default or Event of Default under the Loan; and

(iii)        Redwood Capital Investments, LLC (or its affiliates) shall have been announced as the winning bidder of substantially all of the Borrowers' assets/operations pursuant to an auction process described in the Master Purchase and Sale Agreement by December 31, 2009 as modified by the order approving the bid and auction procedures for the Sale;

(d)     the acceleration of the Obligations and the termination of the Commitment in accordance with the terms hereof.

**Maximum Availability Period**:  The period commencing on the Final Order Entry Date and ending on the Maturity Date.

**Net Cash Proceeds**:  Cash received by any Person or any Domestic Subsidiary of such Person from any Asset Sale by any Person (including cash received as consideration for the assumption or incurrence of liabilities incurred in connection with or in anticipation of such Asset Sale), after (i) in connection with any Asset Sale, provision for all income or other taxes actually paid with respect to such Asset Sale in the taxable year thereof or in the following taxable year, (ii) payment of all reasonable brokerage and underwriting commissions and other fees and expenses related to such Asset Sale, including, without limitation, transaction fees payable to Borrower's professional advisors, financial advisors and restructuring advisors, (iii) in connection with any Asset Sale, all amounts used to repay Indebtedness secured by a prior Lien on any asset disposed of in such Asset Sale or which is or may be required (by the express terms of a post-petition instrument governing such Indebtedness or an order of the Bankruptcy Court) to be repaid in connection with such Asset Sale (including payments made to obtain or avoid the need for the consent of any holder of such Indebtedness), and (iv) in connection with any Asset Sale, deduction of appropriate amounts to be provided by such Person or a Domestic Subsidiary of such Person as a reserve, in accordance with GAAP, against any liabilities associated with the assets sold or disposed of in such Asset Sale and retained by such Person or a Domestic Subsidiary of such Person after such Asset Sale, including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with the assets sold or disposed of in such Asset Sale.

**NFP** or **NFPs**: means those not-for-profit entities identified on **Exhibit C** hereto.

**Note**:  Collectively, the promissory note or notes made by Borrower and payable to Lender in the form of **Exhibit D** hereto.

**Obligations**:  All obligations of every nature of Borrower from time to time owed to Lender, or any indemnitee under any Loan Document, whether for principal, interest (including interest which, but for the filing of a petition in Bankruptcy with respect to Borrower, would have accrued on any Obligation, whether or not a claim is allowed against Borrower for such interest in the related Bankruptcy proceeding), fees, expenses, indemnification or otherwise.

**Orders**:  The Interim Order and the Final Order.

**Permitted Existing Contingent Obligations**:  The Contingent Obligations of Borrower existing on the date hereof and identified as such on **Schedule 1.1** to this Agreement.

**Permitted Existing Indebtedness**:  The Indebtedness of Borrower existing on the date hereof and identified as such on **Schedule 1.2** to this Agreement.

**Permitted Existing Liens**:  The Liens on assets of Borrower existing on the date hereof and identified as such on **Schedule 1.3** to this Agreement.

**Permitted Lien**:  Any Lien of any type that is found by the Bankruptcy Court to be legal, valid, enforceable, perfected and non-avoidable.

**Permitted Purchase Money Indebtedness**:  As defined in Section 8.3(a)(v).

**Person**:  Natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

**Personal Property**.  The personal property owned by Borrower and used in connection with the Projects.

**Postpetition Initial Entrance Deposits.**  All initial entrance deposits received by the NFP from each first occupant of a "living unit" pursuant to the Residence and Care Agreements for the Projects on or after the Filing Date.

**Prepetition Agent**:  The "Administrative Agent," as defined in the Existing Loan Agreements.

**Prepetition Collateral**:  All collateral securing the Existing Indebtedness pursuant to the Prepetition Loan Documents.

**Prepetition Indebtedness**:  All Indebtedness and any other obligations of Borrower outstanding on the Filing Date.

**Prepetition Lender(s)**:  All "Lenders," as defined in the Existing Loan Agreements.

**Prepetition Loan**:  All "Loans," as defined in the Existing Loan Agreements.

**Prepetition Loan Documents**:  All "Loan Documents," as defined in the Existing Loan Agreements.

**Project** or **Projects**: The continuing care retirement communities managed by Erickson Retirement Communities and identified on **Exhibit E** hereto.

**Project Borrower**: means a Borrower identified on Exhibit A as a Project Borrower.

**Project Borrowings**: means that portion of the Loan advanced to a Project Borrower.

**Regulatory Change**: As to Lender, the introduction of, or any change in any applicable law, treaty, rule, regulation or guideline or in the interpretation or administration thereof by any Governmental Authority or any central bank or other fiscal, monetary or other authority having jurisdiction over the Lender or its lending offices.

**Requisite Consent**: means, with respect to any group of creditors, collectively, (i) more than one-half of the number of such creditors, and (ii) such creditors representing at least two-thirds of the dollar amount of the debt held by such creditors.

**Revolving Credit Maximum Amount**: At any particular time, the Aggregate Commitment; provided, that in no event shall the Revolving Credit Maximum Amount exceed the maximum principal amount of the Loan approved by the Bankruptcy Court pursuant to the then-effective Order.

**Revolving Credit Obligations**: At any particular time, the outstanding principal amount of the Loan.

**Sale**: means the sale of substantially all of the assets of a Borrower pursuant to a plan of reorganization in the Chapter 11 Case or otherwise.

**Separate Funds**: All cash, cash equivalents or securities which are held in segregated accounts, securities accounts or in the principal deposit accounts of Erickson Retirement Communities, LLC in an approximate amount equal to Thirty Five Million Seven Hundred Thousand Dollars ($35,700,000.00), and any proceeds thereof or interest earned thereon.

**Stalking Horse Consent Defaults**: As defined in Section 10.1.

**Subsidiary**: As to any Person, (i) any corporation more than fifty percent (50%) of the outstanding securities having ordinary voting power of which shall at the time be owned or controlled, directly or indirectly, by such Person or by one or more of its Subsidiaries or by such Person and one or more of its Subsidiaries, or (ii) any partnership, association, joint venture or similar business organization more than fifty percent (50%) of the ownership interests of which shall at the time be so owned or controlled. For purposes of this Agreement, a Person or Persons shall be deemed to have a majority ownership interest in a partnership, association, joint venture or similar business organization if such Person or Persons shall be allocated a majority of the partnership, association, joint venture or similar business organization gains or losses or shall be or control the managing general partner of such partnership, association, joint venture or similar business organization. Notwithstanding the foregoing, in no event shall Warminster Campus, L.P., Hingham Campus, LLC, Lincolnshire Campus, LLC or Naperville Campus, LLC be considered a Subsidiary of Borrower for purposes of this Agreement or any Loan Document

**Working Capital Loan**: has the meaning set forth in Section 3.8.

# ARTICLE 2

## REPRESENTATIONS AND WARRANTIES

2.1 **Representations and Warranties**. To induce Lender to execute and perform this Agreement, Borrower hereby represents, covenants and warrants to Lender as follows:

(a) At the Closing and at all times thereafter until the Loan is paid in full, Borrower will have good and indefeasible fee simple title to the Land and good title to the Personal Property, subject only to the Permitted Liens and the Lien of the Loan Documents, and to any and all intellectual property necessary to the conduct of Borrower's business.

(b) Borrower is a duly formed limited liability company or limited partnership, as the case may be, formed under the laws of the State of Maryland and is duly qualified to do business under the laws of each jurisdiction in which failure to be so qualified could reasonably be expected to have a Material Adverse Effect. A schedule identifying the

form of entity, the place of formation and the location(s) where Borrower is qualified to conduct business is attached hereto as **Exhibit F.**

(c)     Subject to the approval of the Bankruptcy Court, the execution, delivery and performance of this Agreement and the Loan Documents have been duly authorized by all necessary action on the part of Borrower, and no consent of any other party is required for the performance by Borrower of its obligations hereunder and under the Loan Documents.

(d)     The Loan Documents and any other documents and instruments required to be executed and delivered by Borrower in connection with this Loan, when executed and delivered, will constitute the duly authorized, valid and legally binding obligations of the party required to execute the same and will be enforceable strictly in accordance with their respective terms.

(e)     The execution, delivery and performance of the Loan Documents and any other documents or instruments to be executed and delivered by Borrower pursuant to this Agreement or in connection with the Loan and the construction, occupancy and use of the Collateral will not:  (i) violate any Legal Requirements, or (ii) conflict with, be inconsistent with, or result in any breach or default of any of the terms, covenants, conditions or provisions of any indenture, mortgage, deed of trust, instrument, document, agreement or contract of any kind to which Borrower is a party or by which it may be bound.

(f)     Except for the defaults under the Existing Indebtedness which have been disclosed to Lender, Borrower is not in default under any contract or agreement entered into on or after the Filing Date to which it is a party, the effect of which default will have a Material Adverse Effect on the performance by Borrower of its obligations pursuant to and as contemplated by the terms and provisions of this Agreement or the other Loan Documents.

(g)     No condition, circumstance, event, agreement, document, instrument, restriction, litigation or proceeding (or to the knowledge of Borrower, litigation threatened in writing) exists which could (i) adversely affect the validity or priority of the Liens and security interests granted Lender under the Loan Documents; (ii)  could reasonably be expected to have a Material Adverse Effect on the ability of Borrower to perform its obligations under the Loan Documents; or (iii) constitute an Event of Default under any of the Loan Documents or an event which, with the giving of notice, the passage of time or both, would constitute such an Event of Default.

(h)     All governmental permits and licenses required by applicable law to conduct Borrower's business are validly issued and in full force and effect.

(i)     The financial reports and other information provided by Borrower to Lender is true, correct and accurate in all material respects.

(j)     There is no claim, action, litigation, arbitration or other proceeding pending against Borrower which relates to the Collateral or which could result in the imposition of a lien against the Collateral, which lien is either pari passu or senior to the Liens granted to Lender.  To the best of Borrower's knowledge, there is no action threatened against Borrower or

the Collateral which, if adversely determined, could give rise to an event, condition, liability or circumstance that would constitute a Material Adverse Effect.

(k)     To the best of Borrower's knowledge, it is in full and complete compliance with the Orders.

(l)     Neither the Borrower nor any Affiliate (individually or in the aggregate) or, after giving effect to the transactions contemplated by the Loan Documents will be, an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

2.2     **Continuation of Representations and Warranties**.  Borrower represents and warrants to Lender that each of the foregoing statements is true and correct on the date hereof, and, subject to Section 7.1, will be true and correct and at all times thereafter so long as any part of the Loan shall remain outstanding.

## ARTICLE 3

## AMOUNT AND TERMS OF COMMITMENTS

3.1     **Agreement to Lend and to Borrow; Note**.

(a)     Subject to the terms and conditions set forth herein, Lender agrees to make Advances under the Loan to Borrower from time to time.  At no time shall Lender have any obligation to make any Advance hereunder which would cause the Revolving Credit Obligations to exceed the Revolving Credit Maximum Amount.  In addition, at no time during the Interim Availability Period shall Lender have any obligation to make any Advance hereunder which would cause the Revolving Credit Obligations to exceed the Interim Availability Amount. Subject to the terms of this Agreement, Borrower may borrow, repay and re-borrow the Loan Proceeds at any time prior to the Maturity Date.  On the Maturity Date, Borrower shall repay in full in cash the Revolving Credit Obligations, together with all accrued and unpaid interest thereon.

(b)     The Loan and all Advances made in connection therewith shall be evidenced by a Note executed by Borrower, substantially in the form of **Exhibit D** hereto and payable to the order of Lender.  The date and amount of each Advance, the payment or prepayment of principal and/or interest with respect thereto, and the length of each Interest Period with respect thereto shall be recorded by Lender on its books.  Each such recordation shall constitute prima facie evidence of the accuracy of the information so recorded in the absence of manifest error.  The Note shall (i) be dated the date hereof or, if a Lender's interest is hereafter assigned, the effective date of such assignment, (ii) be stated to mature on the Maturity Date, and (iii) provide for the payment of interest in accordance with Article 4 hereof.

3.2     **Use of Loan Proceeds**.  Loan Proceeds may be used solely in accordance with the Budget, and as required under the Loan Documents.  Loan Proceeds shall be used for the following purposes:

(a) to pay interest, fees and expenses in connection with the Loan to Lender in accordance with the Loan Documents;

(b) to fund the post-petition operating expenses incurred by Borrower in the ordinary course of business;

(c) to fund the post-petition operating expenses incurred by the affiliated NFP in the ordinary course of business through the "Working Capital Loan" (as defined in Section 3.8); and

(d) to pay certain other costs and expenses in connection with the administration of the Chapter 11 Case.

### 3.3 **Prepayments and Reduction of Aggregate Commitment**.

(a) Borrower may, upon notice to Lender, at any time or from time to time voluntarily prepay all or part of the Revolving Credit Obligations, without premium or penalty; provided that (i) such notice must be received by Lender not later than 11:00 a.m. on the date that is two (2) Business Days prior to any date of prepayment; (ii) any prepayment shall be in a principal amount of Two Hundred Fifty Thousand Dollars ($250,000.00) or a whole multiple of Two Hundred Fifty Thousand Dollars ($250,000.00) in excess thereof or, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment, and Borrower shall make such prepayment in the amount and on the date specified in such notice. Any prepayment shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required hereunder.

(b) Borrower may, upon notice to Lender, at any time or from time to time reduce the Aggregate Commitment; provided that (i) such notice must be received by Lender not later than 11:00 a.m. on the date that is five (5) Business Days prior to the date of such reduction; (ii) any such reduction shall be in a principal amount of Two Hundred Fifty Thousand Dollars ($250,000.00) or a whole multiple of Two Hundred Fifty Thousand Dollars ($250,000.00) in excess thereof; and (iii) any mandatory prepayment resulting from such prepayment shall have been made. Any reduction of the Aggregate Commitment shall be permanent and irrevocable.

(c) **Mandatory Prepayments**. Each of the following shall require that Borrower make a mandatory prepayment of the Revolving Credit Obligations. Once such prepayments are made, the Aggregate Commitment shall thereafter be permanently reduced.

(i) Asset Sale Prepayments. Upon the consummation of any Asset Sale by Borrower, other than those Asset Sales permitted pursuant to Section 8.3(b), Borrower shall make a mandatory prepayment of the Revolving Credit Obligations in an amount equal to one hundred percent (100%) of Net Cash Proceeds.

(ii) Extraordinary Receipt Proceeds. Upon receipt of any proceeds arising from insurance, condemnation, eminent domain, tax refunds, pension plan reversions, indemnity payments or any purchase price adjustments related to a sale of any or all of its assets, Borrower shall make a mandatory prepayment of the Revolving Credit Obligations in an amount equal to one hundred percent (100%) of the proceeds so received.

(iii) <u>Proceeds of Any Indebtedness or Equity Issuance</u>.  Upon receipt of any proceeds arising from any Equity Issuance or the incurrence of any indebtedness (other than a trade indebtedness incurred in the ordinary course of business), including any Debt Issuance, Borrower shall make a mandatory prepayment of the Revolving Credit Obligations in an amount equal to one hundred percent (100%) of the proceeds so received.

(d) Unless an Event of Default shall have occurred and is continuing, each mandatory prepayment required by clauses (c)(i) through (iii) of this Section 3.3 shall be applied:

<u>First</u>, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest), including fees, charges and disbursements of counsel to Lender and amounts payable under Section 4.11;

<u>Second</u>, to payment of accrued and unpaid interest on the Loan and the other Obligations; and

<u>Third</u>, to payment of unpaid principal on the Loan and the other Obligations.

(e) If for any reason the Revolving Credit Obligations at any time exceed the Revolving Credit Maximum Amount, Borrower shall immediately prepay the Revolving Credit Obligations in an amount equal to such excess.

3.4 **<u>Super-Priority Nature of Obligations and Status of Lender's Liens</u>**.

(a) On and after the Closing Date, subject to Section 3.4(b) below, the provisions of the Loan Documents and the Orders (as applicable) shall be effective to create in favor of Lender, legal, valid and perfected Liens on and security interests in all right, title and interest of Borrower in the Collateral, enforceable against Borrower:

(i) Pursuant to section 364(c)(2) of the Bankruptcy Code and the Orders (as applicable), all Obligations shall be secured by a perfected first priority senior Lien on all Collateral that is not otherwise subject to valid, perfected and non-avoidable Liens as of the Filing Date;

(ii) Pursuant to section 364(c)(3) of the Bankruptcy Code and the Orders (as applicable), all Obligations shall be secured by a perfected second priority junior Lien on all Collateral that is otherwise subject to (1) valid, perfected and non-avoidable Liens as of the Filing Date or (2) valid Liens in existence at the Filing Date that are perfected subsequent to the Filing Date as permitted by section 546(b) of the Bankruptcy Code and perfected thereafter as permitted by section 546(b) of the Bankruptcy Code (other than with respect to the Liens

described in clause (iii) below, which Liens shall be primed by the Liens described in such clause); and

(iii)    Pursuant to section 364(d)(1) of the Bankruptcy Code and the Orders (as applicable), all Obligations shall be secured by a perfected first priority senior priming Lien on the Prepetition Collateral.

Subject to the Orders, no filings, recordings or other actions shall be necessary to perfect and maintain the perfection and status of such Liens.

(b)    Notwithstanding anything in this Agreement to the contrary, the Lender's Liens shall be subject to the Carve Out, but, for the avoidance of doubt, payment of the Carve Out shall not reduce the amounts payable to the Lender hereunder or under the Loan Documents or affect the rights of Lender to receive such payment.

(c)    Pursuant to section 364(c)(1) of the Bankruptcy Code and Orders (as applicable), all Obligations at all times shall constitute allowed super-priority administrative expense claims in the Chapter 11 Case having priority over all allowed administrative expenses, subject only to the Carve Out.

(d)    Except for the Carve Out, no costs or expenses of administration shall be imposed against the Lender or any of the Collateral under section 105 or 506(c) of the Bankruptcy Code, or otherwise, and Borrower hereby waives for itself and on behalf of its estate in Bankruptcy, any and all rights under section 105 or 506(c), or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against the Lender or the Collateral.

(e)    Subject to the priorities set forth in subsection (a) above and to the Carve Out, as to all Land, Borrower hereby assigns and conveys as security, grants a security interest in, hypothecates, mortgages, pledges and sets over unto Lender or such trustees as are designated by Lender all of the right, title and interest of Borrower in all of such Land, together in each case with all of the right, title and interest of Borrower in and to all buildings, improvements, and fixtures related thereto, any leases or subleases thereof, all general intangibles relating thereto and all proceeds thereof.  Borrower acknowledges that, pursuant to the Orders, the Liens in favor of Lender in all of such Land shall be perfected without the recordation of any instruments of mortgage or assignment.  Borrower acknowledges that, pursuant to the Orders, the Liens in favor of Lender on all of Borrower's right, title and interest in all Collateral, including all such real property and leasehold interests, shall be perfected without the filing or recordation of any UCC financing statements, notices of Lien or other instruments of mortgage or assignment and without the necessity of any party delivering, filing, registering or recording any other financing statements, filings, notices, recordings or other instruments or otherwise taking any other action to perfect such security interests or Liens.  Borrower further agrees that, upon the request of Lender and its counsel, it shall enter into and execute separate mortgages, deeds of trust or similar instruments in recordable form with respect to its owned and leased real properties on terms reasonably satisfactory to Lender and Lender's counsel.

3.5      **No Discharge; Survival of Liens and Claims; Waiver of Priming Rights**.

    (a)      Borrower agrees that the Obligations hereunder shall not be discharged by (i) the entry of an order confirming a Chapter 11 plan of reorganization or liquidation in the Chapter 11 Case (and Borrower pursuant to section 1141(d)(4) of the Bankruptcy Code hereby waive any such discharge), (ii) converting the Chapter 11 Case to a chapter 7 case, or (iii) dismissing the Chapter 11 Case.

    (b)      Borrower agrees that the Liens and super-priority administrative expense claim granted to Lender pursuant to the Orders shall not be affected in any manner by the entry of an order confirming a Chapter 11 plan of reorganization or liquidation in the Chapter 11 Case.

    (c)      Upon the Closing Date, and on behalf of itself and its estate, and for so long as any Obligations shall be outstanding, Borrower hereby irrevocably waives any right, pursuant to section 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien on the Collateral that is of equal or greater priority than the Liens securing the Obligations, or to approve a claim of equal or greater priority than the super-priority administrative expense claim granted to the Obligations

3.6      **Adequate Protection**.   Borrower acknowledges and agrees that, as adequate protection for the use of the Prepetition Lenders' cash collateral, the use, sale, or lease of the Prepetition Collateral (other than such cash collateral), the Prepetition Lenders' interests in the Liens that are being primed as set forth in this Agreement and the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code, the Prepetition Lenders shall be granted the protections provided in the Orders.   The Prepetition Lenders for the Projects shall be granted a Lien on the Net Cash Proceeds of a Sale (which, for the avoidance of doubt, shall be junior to the Liens of Lender thereon) to the extent of any diminution in value of a Prepetition Lender's Prepetition Collateral at such Prepetition Lender's Project.

3.7      **Payment of Obligations**.   On the Maturity Date, Borrower shall pay to Lender in cash all of the Obligations owed by Borrower to Lender hereunder or under any of the Loan Documents.   Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, Lender shall be entitled to immediate payment of such Obligations in cash without further application to or order of the Bankruptcy Court.

3.8      **Escrow of Postpetition Initial Entrance Deposits**.

    (a)      Each Project is operated by an NFP which leases the facility from Borrower.   Pursuant to a community loan, the NFP loans to Borrower the Initial Entrance Deposits received by the NFP from the settlement of units within the Projects ("**Community Loan**").   In turn, Borrower provides a loan to the NFP ("**Working Capital Loan**") pursuant to which Borrower agrees to fund certain operating expenses of the NFP.   The Working Capital Loan is secured by, among other things, the Initial Entrance Deposits and the related residence and care agreement executed by each resident of the Project.   The foregoing flow of funds pursuant to the Community Loan and the Working Capital Loan will continue during the term of this Agreement, subject to Section 3.8(b) below.

    (b)      Subject to applicable state regulatory requirements, Borrower and the NFP shall cause all Postpetition Initial Entrance Deposits to be transferred to Borrower and deposited into an escrow account with a third party financial institution acceptable to applicable state regulators, which escrow account will be subject to a

first priority Lien in favor of Lender; <u>provided</u>, in no event shall the escrow account be property of the Borrower's estate in the Chapter 11 Case.

(c)    Subject to the escrow of the Postpetition Initial Entrance Deposits as provided in Section 3.8(b) above, all Initial Entrance Deposits will be applied to the repayment of the Obligations in accordance with Section 11.7 hereof.

3.9    **Joint and Several Obligations**.  Subject to Section 11.7, payment of the Obligations set forth herein and in the Loan Documents shall be joint and several obligations of the Persons comprising Borrower. Performance of the covenants set forth herein and in the Loan Documents shall be joint and several obligations of the Persons comprising Borrower.

3.10    **No Marshalling**.  Borrower agrees that in no event shall Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral or otherwise, and no Borrower will assert any such theory of law or equity as it relates to the Collateral or collection under the Loan.

# ARTICLE 4

# PRINCIPAL, INTEREST; SPECIAL PROVISIONS

4.1    **Interest Rate**.  Borrower promises to pay interest on the Revolving Credit Obligations for the period commencing on the date of each Advance until such Advance is paid in full at a rate per annum equal to the Interest Rate.

4.2    **Payment of Principal and Interest**.

(a)    Through and including the Maturity Date, accrued interest on each Advance shall be payable in arrears on the first Business Day of each calendar month and on the Maturity Date.  The Revolving Credit Obligations shall be due and payable in full on the Maturity Date.

(b)    Payments shall be applied as required under applicable law and in the absence of any such requirements, payments may be applied to amounts owed hereunder and under the Loan Documents in such order as Lender shall determine, in its sole discretion.

(c)    All payments of principal (including prepayments) and accrued interest shall be paid by wire transfer in United States Dollars, to Lender, at such place as Lender may from time to time direct.

(d)    All payments (including prepayments) to be made by Borrower hereunder and under the Note, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 1:00 P.M., Eastern Standard Time, on the due date thereof.

(e)    If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day, and, with respect to payments of principal, interest thereon shall be payable at the then applicable Interest Rate during such extension.

(f)      Prepayments of the Revolving Credit Obligations shall be made in accordance with Article 3.

4.3      **Intentionally Deleted**.

4.4      **Computation of Interest and Fees**.

(a)      Fees and interest shall be calculated on the basis of a 360-day year for the actual days elapsed in any portion of a month in which interest is due.  In no event shall the Interest Rate hereunder exceed the Highest Lawful Rate.

(b)      After the occurrence and during the continuance of an Event of Default, the Interest Rate shall be increased by three hundred (300) basis points above the rate otherwise applicable thereto.

(c)      Each determination of the Interest Rate for any Interest Period made by Lender pursuant to any provision of this Agreement shall be conclusive and binding upon the parties hereto in the absence of manifest error.

4.5      **Inability to Determine Interest Rate**.  If Lender determines for any reason that (i) Dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and Interest Period, (ii) adequate and reasonable means do not exist for determining the LIBOR Rate for any Interest Period, or (iii) the LIBOR Rate for any Interest Period does not adequately and fairly reflect the cost to Lender of funding the Loan, Lender will promptly so notify Borrower, and thereafter, the obligation of Lender to make additional Advances shall be suspended until Lender revokes such notice.

4.6      **Intentionally Deleted**.

4.7      **Illegality**.  Notwithstanding any other provision herein, if Lender shall reasonably determine that any Regulatory Change shall make it unlawful for Lender to make or maintain the Loan as contemplated by this Agreement, Lender shall give notice of such determination to Borrower.  Upon receipt of such notice, the right of Borrower to request further Advances and the obligation of Lender to make further Advances shall immediately cease, and the Revolving Credit Obligations shall immediately become due and payable.

4.8      **Legal Requirements**.

(a)      If any Regulatory Change made subsequent to the date hereof shall:

(i)      subject Lender to any tax of any kind whatsoever with respect to this Agreement, the Note, or the Loan, or change the basis of taxation of payments to Lender in respect thereof (except for Non-Excluded Taxes covered by Subsection 4.9 and changes in the rate of tax on the overall net income of such Lender); or

(ii)      impose on Lender any other condition regarding the Loan or Lender's funding thereof;

and the result of any of the foregoing is to increase the cost to Lender, by an amount which Lender in good faith deems to be material, then, in any such case, Borrower shall promptly pay to Lender, upon demand, any additional amounts necessary to compensate Lender for such increased cost or reduced amount receivable.

(b)     If Lender shall have reasonably determined that any Regulatory Change regarding capital adequacy or in the interpretation or application thereof or compliance by Lender or any corporation controlling Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority, in any such case made subsequent to the date hereof, does or shall have the effect of reducing the rate of return on Lender's or such corporation's capital as a consequence of its obligations hereunder to a level below that which Lender or such corporation could have achieved but for such change or compliance (taking into consideration Lender's or such corporation's policies with respect to capital adequacy) by an amount deemed by Lender to be material, then from time to time, after submission by Lender to Borrower of a written request therefor, Borrower shall pay to Lender such additional amount as will compensate Lender for such reduction.

(c)     If Lender becomes entitled to claim any additional amounts pursuant to this subsection, it shall promptly notify Borrower of the event by reason of which it has become so entitled.  A certificate as to any additional amounts payable pursuant to this subsection submitted by Lender to Borrower shall be conclusive in the absence of manifest error. This covenant shall survive the termination of this Agreement and the payment of the Note and all other amounts payable hereunder.

(d)     Notwithstanding anything to the contrary contained in this subsection, Borrower shall not be required to pay any additional amounts to Lender pursuant to this subsection to the extent such additional amounts result from Lender's gross negligence or willful misconduct as found in a final non-appealable judgment by a court of competent jurisdiction.

4.9     **Taxes**.

(a)     All payments made by Borrower under this Agreement and the Note shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding net income taxes and franchise taxes (imposed in lieu of net income taxes) imposed on Lender as a result of a present or former connection between Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or the Note).  If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings ("**Non-Excluded Taxes**") are required to be withheld from any amounts payable to Lender hereunder or under the Note, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after payment of all Non-Excluded Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement; provided, however, that Borrower shall not be required to increase any such amounts payable to Lender that is not organized under the laws of the

United States of America or a state thereof if Lender fails to comply with the requirements of paragraph (b) of this subsection. Whenever any Non-Excluded Taxes are payable by Borrower, as promptly as possible thereafter, Borrower shall send to Lender a certified copy of an original official receipt received by Borrower showing payment thereof. If Borrower fails to pay any Non-Excluded Taxes when due to the appropriate taxing authority or fails to remit to Lender the required receipts or other required documentary evidence, Borrower shall indemnify Lender for any incremental taxes, interest or penalties that may become payable by Lender as a result of any such failures. The agreements in this subsection shall survive the termination of this Agreement and the payment of the Obligations, as set forth in the Loan Documents. Notwithstanding anything to the contrary contained in this subsection, Borrower shall not be required to pay any additional amounts to Lender pursuant to this subsection to the extent such additional amounts result from such Lender's negligence.

(b) Each Lender that is not incorporated under the laws of the United States of America or a state thereof shall:

(i) deliver to Borrower two duly completed copies of United States Internal Revenue Service Form 1001 or 4224, or successor applicable form, as the case may be, and an Internal Revenue Service Form W-8 or W-9, or successor applicable form, as the case may be;

(ii) deliver to Borrower two further copies of any such form or certification on or before the date that any such form or certification expires or becomes obsolete and after the occurrence of any event requiring a change in the most recent form previously delivered by it to Borrower; and

(iii) obtain such extensions of time for filing and complete such forms or certifications as may reasonably be requested by Borrower; unless in any such case an event (including, without limitation, any change in treaty, law or regulation) has occurred prior to the date on which any such delivery would otherwise by required which renders all such forms inapplicable or which would prevent Lender from duly completing and delivering any such form with respect to it and Lender so advises Borrower. Lender shall certify (i) in the case of a Form 1001 or 4224, that it is entitled to receive payments under this Agreement without deduction or withholding of any United States federal income taxes, and (ii) in the case of a Form W-8 or W-9, that it is entitled to an exemption from United States backup withholding tax. Each party that shall become a transferee pursuant to Section 9.1 shall, upon the effectiveness of the related transfer, be required to provide all of the forms and statements required pursuant to this Section, provided that in the case of a Participant (as defined in Section 9.2) such Participant shall furnish all such required forms and statements to the Lender from which the related participation shall have been purchased.

4.10 **Loan Indemnification**. Borrower shall indemnify and hold harmless Lender and its Affiliates, officers, directors, employees, agents, advisors, attorneys and representatives (each, "**Indemnified Party**") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or relating to any investigation, litigation or proceeding

or the preparation of any defense with respect thereto, arising out of or in connection with or relating to this Agreement, the Loan Documents or the transactions contemplated hereby, or any use made or proposed to be made with the proceeds of the Loan, whether or not such investigation, litigation or proceeding is brought by Borrower, any of its shareholders or creditors, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated, except to the extent such claim, damage, loss, liability or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.  No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to Borrower or any of its shareholders or creditors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.  In no event, however, shall any Indemnified Party be liable on any theory of liability for any special, indirect, consequential or punitive damages.

       4.11   **Fees and Expenses**.

       (a)   Borrower shall pay to Lender an unused commitment fee equal to the Applicable Commitment Fee Percentage.  The unused commitment fee shall accrue at all times during the period from the Final Order Entry Date to the Maturity Date and shall be due and payable monthly in arrears on the first Business Day of each calendar month (for the prior calendar month), commencing with the first such date to occur after the Final Order Entry Date. Any portion of the unused commitment fee which has not been paid in accordance with the immediately preceding sentence shall be due and payable on the Maturity Date.

       (b)   Borrower shall pay to Lender a commitment fee on the Final Order Entry Date in the amount of 3.0% of the Aggregate Commitment or such other amount as shall be approved by the Bankruptcy Court.

       (c)   In addition to the other amounts due and payable hereunder and under the Loan Documents, on the Maturity Date, Borrower shall pay to Lender an exit fee in the amount of 2.0% of the Aggregate Commitment or such other amount as shall be approved by the Bankruptcy Court.

       (d)   Subject to approval of the Bankruptcy Court, Borrower shall deposit Two Hundred Fifty Thousand Dollars ($250,000.00) into an account to pay the fees and expenses that may become due and owing to Lender from time to time.  Upon demand, Borrower shall reimburse Lender for all fees (including legal fees), costs, charges and reasonable out-of-pocket expenses (including fees, costs, charges and expenses in excess of Two Hundred Fifty Thousand Dollars ($250,000.00)) associated with (i) the preparation and negotiation of this Agreement and the Loan Documents, (ii) the consummation of the transactions described in this Agreement and the Loan Documents, (iii) administration of the Loan, and (iv) the enforcement of rights and remedies set forth in this Agreement and the Loan Documents, that have been billed to Lender. Such reimbursements shall commence with the first such demand to occur after the Closing Date, but the obligation of Borrower to make any final reimbursement shall survive the Maturity Date.

## ARTICLE 5

## CONDITIONS PRECEDENT TO EACH ADVANCE

5.1    **Conditions Precedent to Each Advance**.  The obligation of Lender to honor any Loan Notice is subject to the following conditions precedent:

(a)    During the Interim Availability Period, the Corporate Cash on hand and available shall not be less than the Interim Availability Amount; and after the expiration of the Interim Availability Period and until the Maturity Date, the amount of Corporate Cash on hand and available shall not be less than an amount reasonably agreed to among Borrower and Lender.

(b)    There exists no Default or Event of Default.

(c)    The representations and warranties contained in this Agreement and each of the other Loan Documents are true and correct in all material respects as of such Borrowing Date except for changes reflecting events, conditions or transactions permitted or not prohibited by this Agreement; provided, that the words "in all material respects" in this subsection (b) shall, as to any representation or warranty that contains a materiality standard, operate without duplication with such standard.

(d)    During the Interim Availability Period, (i) the Interim Order shall be in full force and effect and shall not have been stayed, reversed, modified or amended in any respect without the prior written consent of Lender, and (ii) the Revolving Credit Obligations shall not exceed the Interim Availability Amount.

(e)    During the Maximum Availability Period, (i) the Final Order shall be in full force and effect and shall not have been stayed, reversed, modified or amended in any respect without the prior written consent of Lender, and (ii) the Revolving Credit Obligations shall not exceed the Revolving Credit Maximum Amount.

(f)    The Interim Order and the Final Order, as applicable, are final, non-appealable orders.

(g)    Before and after giving effect to the requested Advance and the application of the proceeds thereof, Borrower shall be in compliance in all respects with the Budget.

(h)    There has been no event, condition, obligation, liability, or circumstance that would constitute a Material Adverse Effect; provided that, any changes attributable to the commencement of the Chapter 11 Case or regulatory rulings shall not constitute a Material Adverse Effect.

(i)    Borrower shall have executed such Loan Documents as Lender shall reasonably require to secure the performance of Borrower's obligations and to perfect Lender's interest in the Collateral.

(j)     Lender shall have received such other information and materials relating to the Collateral as Lender shall reasonably require, including, without limitation, mortgagee title insurance policies, casualty and liability insurance policies, surveys and environmental site assessments.

Each request for an Advance shall constitute a representation and warranty by Borrower that the conditions contained in this Section 5.1 have been satisfied or waived in writing by Lender.

## ARTICLE 6

## CONDITIONS TO CLOSING

6.1     **Conditions to Closing**.  The obligation of Lender to close and make the initial Advance on the Closing Date is subject to the satisfaction, or waiver in accordance with Section 12.2, of the following conditions on or before the Closing Date:

(a)     **Delivery of Documents**.  Borrower shall have furnished to Lender each of the following, all in form and substance satisfactory to Lender:

(i)     Executed copies of this Agreement and each of the other Loan Documents required to be executed and delivered by Borrower on or prior to the Closing Date;

(ii)     A copy of the certificates of incorporation or formation for each Person constituting Borrower, as amended, certified as of a recent date by the Secretary of State of the state of their incorporation or formation;

(iii)     A certificate of the Secretary of State in the state of Borrowers' incorporation or formation, dated as of a recent date, as to the good standing of and payment of taxes by Borrower;

(iv)     A certificate of the Secretary or an Assistant Secretary of Borrower dated the Closing Date and certifying on behalf of Borrower (A) that attached thereto is a true and complete copy of the by-laws or limited liability company agreement of Borrower as in effect on the date of such certification, (B) that attached thereto is a true and complete copy of resolutions adopted by the board of directors, managers, or sole member, as the case may be, of Borrower authorizing the filing of its bankruptcy petition and authorizing the execution, delivery and performance in accordance with the terms of this Agreement, each of the Loan Documents, and any other documents required or contemplated hereunder or thereunder, the granting of the security interests contemplated by the Loan Documents, and the other transactions contemplated by this Agreement, (C) that the certificate of incorporation or formation of Borrower has not been amended since the date of the last amendment thereto indicated on the certificate of the Secretary of State furnished pursuant to clause (iii) above, and (D) as to the incumbency and specimen signature of each officer or manager of that entity executing this Agreement and the other Loan Documents or any other document delivered by it in connection herewith or therewith; and

(v)     Copies of the Budget.

(b)  **Fees and Expenses**.  All costs, charges, fees, expenses (including, without limitation, legal fees and expenses and the commitment fee) and other compensation payable to Lender shall have been paid to the extent due.

(c)  **Entry of Orders**.  Lender shall have obtained a copy (to be followed by a certified copy when available) of the Interim Order granting interim approval of the Loan Documents and granting the super-priority claim status and first-priority priming lien described in this Agreement, which Interim Order (i) shall have be in form and substance satisfactory to Lender, (ii) shall authorize extensions of credit in amounts satisfactory to Lender, (iii) shall approve the payment by Borrower of all of the fees contemplated under this Agreement and the fees of professionals of Lender, (iv) shall be in full force and effect, and (v) shall not have been stayed, reversed, modified or amended in any respect without the prior written consent of Lender.

(d)  **Objections to Lender's Liens and Security**.  No timely objection shall have been filed challenging (i) the amount, validity, enforceability or non-avoidability of the Lender's Liens, or (ii) the validity, enforceability, perfection, non-avoidability or seniority of the Obligations.

(e)  **First Day Order**.  All orders approving all of the First Day Motions (**"First Day Orders"**) shall have been entered by the Bankruptcy Court at the commencement of the Chapter 11 Case, and they shall be substantially similar in form and substance to those reviewed and approved by Lender immediately prior to the commencement of the Chapter 11 Case.

(f)  **Motions and Other Documents**.  Borrower shall not have filed any motion or pleading which has or may have an affect on the rights granted to Lender hereunder or under the Orders without first providing Lender with sufficient and reasonable notice of such a motion or pleading.  Notwithstanding the foregoing, Borrower waives any right to file any motion or pleading that materially and adversely alters Lender's rights hereunder or under the Orders.

(g)  **Approval of Bidding Procedures**.  The Bankruptcy Court shall have entered an order approving the bidding procedures set forth in the motion dated October 22, 2009 and Lender shall have approved any amendments to such bidding procedures.

(h)  **No Material Adverse Effect**.  No change shall have occurred that results in a Material Adverse Effect; provided that, any changes attributable to the commencement of the Chapter 11 Case or regulatory rulings shall not constitute a Material Adverse Effect.

(i)  **Additional Documents**.  Lender shall have received such other papers, reports and documents regarding Borrower or the Collateral as Lender or its counsel may reasonably require.

## ARTICLE 7

## FUNDING CONDITIONS AND MECHANICS

7.1 **Funding Conditions and Mechanics**.  The obligation of Lender to honor any Loan Notice is subject to the following conditions precedent:

(a)     Each request for an Advance shall be made by Borrower in an irrevocable Loan Notice to Lender, which may be given by telephone.  Each such Loan Notice must be received by Lender not later than 11:00 a.m. two (2) Business Days prior to the requested date of any Advance.  Each telephonic notice by Borrower pursuant to this Section 7.1(a) must be confirmed promptly by delivery to Lender of a written Loan Notice, appropriately completed and signed by a responsible officer of Borrower.  Each Advance shall be in a principal amount of Five Hundred Thousand Dollars ($500,000.00) or a whole multiple of Two Hundred Fifty Thousand Dollars ($250,000.00) in excess thereof.  Each Loan Notice (whether telephonic or written) shall specify (i) the requested date of the Advance (which shall be a Business Day), and (ii) the principal amount of the Advance requested to be borrowed.

(b)     Borrower shall have no right to request, and Lender shall have no obligation to honor, more than two requests for Advances in any calendar week.

(c)     Following receipt of a Loan Notice, and upon satisfaction of the applicable conditions set forth in Section 5.1 (and, if such borrowing is the initial Advance, Section 6.1), Lender shall make the amount of the requested Advance available to Borrower by wire transfer not later than 1:00 p.m. on the Business Day specified in the Loan Notice.  Lender shall make the Advance in accordance with instructions provided by Borrower to (and reasonably acceptable to) Lender.

(d)     During the existence of a Default, Lender shall have no obligation to honor any Borrower request for an Advance.

(e)     At Borrower's request, Lender shall promptly notify Borrower of the Interest Rate applicable to any Interest Period upon determination by Lender of such Interest Rate.

## ARTICLE 8

## FURTHER AGREEMENTS OF BORROWER

8.1 **Furnishing Information**.  Borrower will deliver and cause its Affiliates to:

(a)     deliver to Lender weekly updates of the cash flow results and weekly variance reports;

(b)     deliver to Lender monthly updates certified by the Chief Restructuring Officer with respect to Asset Sales, cost savings, construction progress, and other matters reasonably requested by Lender;

(c)  deliver to Lender reports demonstrating compliance within 10% of the total net cash flow as shown in the Budget, reported weekly and tested weekly on a rolling four week basis;

(d)  deliver to Lender, as soon as practicable, and in advance of filing with the Bankruptcy Court: (i) the Interim Order and the Final Order, (ii) all other proposed orders and pleadings related to the Collateral, (iii) any plan of reorganization or liquidation, and/or (iv) any disclosure statement related to such plan.  All of the forgoing must be in form and substance reasonably satisfactory to Lender;

(e)  file a plan of reorganization in the Chapter 11 Case by December 31, 2009;

(f)  not later than the 15th Business Day of each month after the date of this Agreement, deliver to Lender, (i) an updated rolling cash flow forecast setting forth on a line-item basis anticipated cash receipts and expenditures for Borrower for the succeeding 13-week period (together with a comparison of actual payments to budgeted line items for the immediately preceding monthly period).

(g)  promptly supply Lender with such information concerning Borrower's assets, liabilities and affairs, as Lender may reasonably request from time to time hereafter; which shall include, without necessity of any request by Lender, as soon as available and in no event later than ninety (90) days after the close of each fiscal year, and within thirty (30) days of the end of each fiscal quarter, unaudited financial statements of Borrower showing the results of operations and consisting of a balance sheet, cash flow statement, and statement of income and expense prepared in accordance with GAAP and signed by an officer of Borrower;

(h)  promptly notify Lender of any condition or event which constitutes (or which, with the giving of notice or lapse of time, or both, would constitute) an Event of Default;

(i)  promptly notify Lender of any circumstance or condition that would constitute a Material Adverse Effect, and of any material adverse change in the financial condition of Borrower or the value of the Collateral;

(j)  promptly after the same is available (to the extent not otherwise previously delivered), furnish to Lender's counsel all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of Borrower with the Bankruptcy Court or the United States Trustee in the Chapter 11 Case, or distributed by or on behalf of Borrower to the Committee, if any (other than confidential information provided to Borrower by any other bidder for Borrower's assets);

(k)  file Borrower's bankruptcy schedules and statements of financial affairs no later than the date set forth in the Federal Rules of Bankruptcy Procedure or in any order entered by the Bankruptcy Court on or about the Filing Date with respect to an extension of time to file such schedules and statements (and shall not, without the consent of Lender, seek a further extension of time to file such schedules and statements) and shall promptly deliver a copy thereof to Lender and its counsel; and

(l)    promptly upon receiving a request therefor from Lender, prepare and deliver to Lender such other information with respect to Borrower or the Collateral, including, without limitation, schedules identifying and describing the Collateral and any dispositions thereof or any Asset Sale (other than those Asset Sales permitted pursuant to Section 8.3(b) (and the use of the Net Cash Proceeds thereof), as from time to time may be reasonably requested by Lender.

8.2    **Affirmative Covenants**.  For purposes of this Section 8.2, the term "Borrower" shall be deemed to include Borrower's Affiliates.

(a)    **Existence, Etc**.  Borrower shall at all times maintain its organizational existence and preserve and keep, or cause to be preserved and kept, in full force and effect its rights and franchises material to its businesses.

(b)    **Powers; Conduct of Business**.  Borrower shall qualify and remain qualified to do business in each jurisdiction in which the nature of its business requires it to be so qualified and where the failure to be so qualified will have or could reasonably be expected to have a Material Adverse Effect.  Borrower shall carry on and conduct its business in substantially the same manner and in substantially the same fields of enterprise as it is presently conducted.

(c)    **Compliance with Laws, Etc.**  Borrower shall (i) comply with all Legal Requirements and all restrictive covenants affecting such Person or the business, properties, assets or operations of such Person, and (ii) obtain, as needed, all permits necessary for its operations and maintain such permits in good standing unless failure to comply or obtain could not reasonably be expected to have a Material Adverse Effect.

(d)    **Use of Proceeds**.  Borrower will solely and exclusively use the Loan Proceeds in the manner specified in the Budget and the Orders. In no event will Borrower use any portion of the Loan advanced from the Interim Availability Amount at the Projects known as Linden Ponds, Sedgebrook, Monarch Landing, Hickory Chase or Ann's Choice or for the landowners at such Projects.  No portion of the Loan Proceeds shall be used in any manner that causes or might cause the Loan or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System or any other regulation thereof or to violate the Exchange Act.

(e)    **Payment of Taxes**.  To the extent provided for in the Budget, Borrower shall pay all post-petition taxes, assessments and other governmental charges imposed upon it or on any of its properties or assets or in respect of any of its franchises, business, income or property before any penalty or interest accrues thereon; provided, however, that no such taxes, assessments and governmental charges (and interest, penalties or fines relating thereto) need be paid if being contested in good faith by appropriate proceedings diligently instituted and conducted.

(f)    **Insurance**.  Borrower shall maintain in full force and effect insurance policies and programs or other policies and programs as reflect coverage that is reasonably consistent with prudent industry practice.  Not later than ten (10) Business Days following the

Closing Date, Borrower shall deliver to Lender endorsements in form and substance acceptable to Lender (i) to all "All Risk" physical damage insurance policies on all of such Borrower's tangible real and personal property and assets and business interruption insurance policies naming Lender as loss payee, and (ii) to all general liability and other liability policies naming Lender as an additional insured.  In the event Borrower at any time or times hereafter shall fail to obtain or maintain any of the policies or insurance required herein or to pay any premium in whole or in part relating thereto, then Lender, without waiving or releasing any obligations or resulting Event of Default hereunder and without obligation to do so, may at any time or times thereafter obtain and maintain such policies of insurance and pay such premiums and take any other action with respect thereto which Lender deems advisable.  All sums so disbursed by Lender shall constitute part of the Obligations, payable as provided in this Agreement.

(g) **Inspection of Property; Books and Records; Discussions**.  Borrower shall permit any authorized representative(s) designated by Lender to visit and inspect any of the properties of Borrower to examine, audit, check and make copies of its financial and accounting records, books, journals, orders, receipts and any correspondence and other data relating to their respective businesses or the transactions contemplated hereby (including, without limitation, in connection with environmental compliance, hazard or liability), and to discuss their affairs, finances and accounts with their officers and independent certified public accountants, all upon reasonable notice and at such reasonable times during normal business hours, as often as may be reasonably requested.  Without limiting the foregoing, Borrower shall permit any authorized representatives designated by Lender to complete each such audit, collateral analysis, appraisal, field examination, environmental survey, or other business analysis with respect to Borrower as Lender shall request, all upon reasonable notice and at such reasonable times during normal business hours, as often as may be reasonably requested.

(h) **Insurance and Condemnation Proceeds**.  Borrower hereby directs all insurers under policies of property damage, boiler and machinery and business interruption insurance and payors of any condemnation claim or award relating to the property to pay all proceeds payable under such policies or with respect to such claim or award for any loss with respect to the Collateral directly to Lender.

(i) **Final Order**.  Borrower shall cause the Final Order Entry Date to occur no later than December 7, 2009.

(j) **Maintenance of Property**.  Borrower shall cause all property used or useful in the conduct of its business to be maintained and kept in good condition, repair and working order and supplied with all necessary equipment and shall cause to be made all necessary repairs, renewals, replacements, betterments and improvements thereof, all as in the judgment of the applicable Borrower may be necessary so that the business carried on in connection therewith may be properly and advantageously conducted at all times; provided, however, that nothing contained herein shall prevent Borrower from discontinuing the operation or maintenance of any of such property if such discontinuance is, in the judgment of Borrower, desirable in the conduct of its business and not disadvantageous in any material respect to the interests of Lender.

(k)     **Waiver of Claims**.  Borrower shall waive any claims arising under Bankruptcy Code section 506(c) against Lender or the Loan, and shall not commence any actions adverse to Lender or its rights and remedies under the Loan.

(l)     **Further Assurance**.  At Lender's request, Borrower will execute and deliver such documents as may be necessary to perfect and maintain perfected and valid Liens upon the Collateral and the personal property located thereon, the Liens granted to Lender pursuant to this Agreement or any of the other Loan Documents, and to fully consummate the transactions contemplated by this Agreement.

(m)     **Minimum Cash on Hand**.  Borrower shall at all times maintain available Corporate Cash on hand (i) during the Interim Availability Period, in an amount not less than the Interim Availability Amount; and (ii) after the expiration of the Interim Availability Period and until the Maturity Date, not less than an amount reasonably agreed to among Borrower and Lender.

(n)     **Budget**.  Borrower shall only incur and make expenditures, and shall only advance funds to other Persons, including without limitation, the NFPs, (i) as provided for in the Budget, tested weekly on a rolling four (4) week basis with regards to total cash flow (subject to a cumulative ten percent (10%) variance), or (ii) with the prior written approval of, and subject to any conditions set forth by, Lender in its reasonable discretion.

8.3     **Negative Covenants**.  For purposes of this Section 8.3, the term "Borrower" shall be deemed to include Borrower's Affiliates.

(a)     **Indebtedness**.  Neither Borrower nor its Subsidiaries shall directly or indirectly create, incur, assume or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except:

(i)     the Obligations and the Prepetition Indebtedness;

(ii)     Permitted Existing Indebtedness;

(iii)     Indebtedness with respect to the Community Loan;

(iv)     intercompany Indebtedness, if any, not to exceed the amounts set forth in the Budget;

(v)     Indebtedness constituting Contingent Obligations permitted by Section 8.3(d);

(vi)     secured or unsecured purchase money Indebtedness (including Capitalized Leases) incurred subsequent to the Filing Date to finance the acquisition of assets used in the business, if (1) at the time of such incurrence, no Default or Event of Default has occurred and is continuing or would result from such incurrence, (2) such Indebtedness has a scheduled maturity and is not due on demand, (3) such Indebtedness does not exceed the lower of the fair market value or the cost of the applicable fixed assets on the date acquired, (4) such Indebtedness does not exceed Two Hundred Fifty Thousand Dollars ($250,000.00) in the

aggregate outstanding at any time, and (5) any Lien securing such Indebtedness is permitted under Section 8.3(c) (such Indebtedness being referred to herein as **"Permitted Purchase Money Indebtedness"**); and

(vii)    unsecured Indebtedness with respect to surety, appeal and performance bonds obtained by Borrower in the ordinary course of business.

(b)    <u>Sales of Assets</u>.  Borrower will not sell, transfer, lease, exchange, alienate or dispose of any or all Collateral, other than (i) in the ordinary course of Borrower's business, and then only to the extent such transfers are limited to One Million Dollars ($1,000,000.00) in the aggregate, and (ii) in accordance with the Orders.

(c)    <u>Liens</u>.  Neither Borrower nor its Subsidiaries shall directly or indirectly create, incur, assume or permit to exist any Lien on or with respect to any of their respective property or assets except:

(i)    Liens created by the Loan Documents or otherwise securing the Obligations;

(ii)    Permitted Existing Liens;

(iii)    Customary Permitted Liens;

(iv)    Replacement Liens in favor of the Pre-Petition Lenders as adequate protection granted pursuant to the Orders, which Liens are junior to the Liens contemplated hereby in favor of Lender, <u>provided</u> that the Orders provide that the holders of such junior Liens shall not be permitted to take any action to foreclose with respect to such junior Liens so long as any amounts shall remain outstanding hereunder or any Commitment shall be in effect; and

(v)    purchase money Liens (including the interest of a lessor under a Capitalized Lease and Liens to which any property is subject at the time of the applicable Borrower's acquisition thereof) securing Permitted Purchase Money Indebtedness; <u>provided</u> that such Liens shall not apply to any property of Borrower other than that purchased or subject to such Capitalized Lease.

(d)    <u>Contingent Obligations</u>.  Neither Borrower nor its Subsidiaries shall directly or indirectly create or become or be liable with respect to any Contingent Obligation, except:  (i) recourse obligations resulting from endorsement of negotiable instruments for collection in the ordinary course of business; (ii) Permitted Existing Contingent Obligations; (iii) obligations, warranties, and indemnities, not relating to Indebtedness of any Person, which have been or are undertaken or made in the ordinary course of business and not for the benefit of or in favor of an Affiliate of Borrower; (iv) Contingent Obligations entered into in connection with any Indebtedness of Borrower permitted by Section 8.3(a)(v); and (v) Contingent Obligations with respect to surety, appeal and performance bonds obtained by Borrower in the ordinary course of business.

(e)     **Sales and Leasebacks**.  Borrower shall not become liable, directly, by assumption or by Contingent Obligation, with respect to any lease, whether an operating lease or a Capitalized Lease, of any property (whether real or personal or mixed) (i) which it or one of its Subsidiaries sold or transferred or is to sell or transfer to any other Person, or (ii) which it or one of its Subsidiaries intends to use for substantially the same purposes as any other property which has been or is to be sold or transferred by it or one of its Subsidiaries to any other Person in connection with such lease.

(f)     **Distributions**.  Borrower shall not make any distributions to its members, partners or shareholders.

(g)     **Material Investments**.  Borrower shall not make any material investment in excess of Five Hundred Thousand Dollars ($500,000.00) unless authorized by Lender or otherwise in accordance with the United States Trustee's Guidelines for Debtors-in-Possession.

(h)     **Restriction on Fundamental Changes**.  Borrower shall not enter into any merger or consolidation, or liquidate, wind-up or dissolve (or suffer any liquidation or dissolution), or convey, lease, sell, transfer or otherwise dispose of, in one transaction or series of transactions, all or substantially all of Borrower's business or property, whether now or hereafter acquired.

(i)     **Subrogation Rights**.  Borrower shall not assert any right of subrogation or contribution against any other Borrower until all Obligations are paid in full and the Commitment is terminated.

(j)     **Corporate Documents**.  Borrower shall not amend, modify or otherwise change any of the terms or provisions in any of its constituent documents as in effect on the date hereof, without the prior written consent of Lender.

(k)     **Prohibition Against Additional Recordings**.  Borrower will not record or permit to be recorded any document, instrument, agreement or other writing against the Collateral without the prior written consent of Lender.

(l)     **Chapter 11 Claims; Adequate Protection**.  Borrower shall not incur, create, assume, suffer to exist or permit any (i) administrative expense, unsecured claim, or other super-priority claim or Lien (except Permitted Liens) that is pari passu with or senior to the claims of Lender against Borrower hereunder, or apply to the Bankruptcy Court for authority to do so, except for the Carve Out, or (ii) obligation to make adequate protection payments, or otherwise provide adequate protection, other than with respect to the Obligations, the Existing Indebtedness or otherwise as approved by Lender.

(m)     **Limitation on Prepayments of Prepetition Indebtedness**.  Except as otherwise permitted by the Orders or agreed to by Lender, including with respect to the Existing Indebtedness, Borrower shall not (i) make any payment or prepayment on or redemption or acquisition for value (including, without limitation, by way of depositing with the trustee with respect thereto money or securities before due for the purpose of paying when due) of any Prepetition Indebtedness, (ii) pay any interest on any Prepetition Indebtedness (whether in cash, in kind securities or otherwise), (iii) make any payment or create or permit any Lien pursuant to

section 361 of the Bankruptcy Code (or pursuant to any other provision of the Bankruptcy Code authorizing adequate protection), or (iv) apply to the Bankruptcy Court for the authority to do any of the foregoing; provided, that (x) Borrower shall make payments required to be made by the Bankruptcy Code, including under section 365 of the Bankruptcy Code and adequate protection payments approved by the Bankruptcy Court consented to by Lender, and (y) Borrower may make payments permitted by any of the "first day" orders consented to by Lender and any other orders of the Bankruptcy Court consented to by Lender.

(n) **Orders**.  Borrower shall not make or permit to be made any change, amendment or modification, or shall make any application or motion for any change, amendment or modification, to the Orders other than as approved in writing by Lender.

# ARTICLE 9

# ASSIGNMENTS; CONFIDENTIALITY

9.1 **Successors and Assigns**.  The terms and provisions of the Loan Documents shall be binding upon and inure to the benefit of Borrower, Lender and their respective successors and assigns, except that Borrower shall not have the right to assign its rights or obligations under the Loan Documents.  Lender may at any time, and from time to time, assign or transfer the Loan or sell participation interests in the Loan without the consent of Borrower; provided, however, that no such assignment or participation shall release Lender from its obligations hereunder.  Any assignee, transferee or participant agrees by acceptance thereof to be bound by all the terms and provisions of the Loan Documents.  Any request, authority or consent of any Person, who at the time of making such request or giving such authority or consent is the holder of the Note, shall be conclusive and binding on any subsequent holder, transferee, assignee or participant of the Note or of any instruments issued in exchange therefore.

9.2 **Intentionally Deleted**.

9.3 **Intentionally Deleted**.

9.4 **Confidentiality**.  Subject to Section 9.5, Lender and its representatives, consultants and advisors shall hold all nonpublic information obtained pursuant to the requirements of this Agreement and identified as such by Borrower in accordance with such Person's customary procedures for handling confidential information of this nature and in accordance with safe and sound banking practices; provided, however, such Persons may make disclosure (i) to Affiliates of Lender, (ii) to prospective transferees or participants in connection with the contemplated participation or assignment, or (iii) as required or requested by any Governmental Authority or representative thereof or pursuant to legal process and shall require any such Affiliate or transferee to agree (and require any of its transferees to agree in writing) to comply with this Section 9.4.  In no event shall Lender or any of its Affiliates be obligated or required to return any materials furnished by any Borrower; provided, however, each prospective transferee shall be required to agree that if it does not become a participant or assignee, it shall return all materials furnished to it by or on behalf of Borrower in connection with this Agreement.

9.5     **Dissemination of Information**.  Borrower authorizes Lender and its Affiliates to disclose to any prospective participant or transferee any and all information in Lender's or Affiliate's possession concerning each of Borrower and its Subsidiaries and the Collateral; provided that prior to any such disclosure, such prospective participant or transferee shall agree in writing to preserve, in accordance with Section 9.4, the confidentiality of any confidential information described therein

## ARTICLE 10

## EVENTS OF DEFAULT BY BORROWER

10.1     **Event of Default Defined**.  The occurrence of any one or more of the following shall constitute an "Event of Default" hereunder, and any Event of Default which may occur hereunder shall constitute an Event of Default under each of the other Loan Documents:

(a)     Borrower shall fail to pay when due hereunder or under the other Loan Documents any of the Obligations, including without limitation, any interest or other charges required to be paid;

(b)     Borrower fails to perform or cause to be performed any other obligation or observe any other condition, covenant, term, agreement or provision required to be performed or observed by Borrower under this Agreement or under the other Loan Documents;

(c)     The existence of any inaccuracy or untruth in any material respect in any representation or warranty contained in this Agreement or any of the other Loan Documents or of any statement or certification as to facts delivered to Lender by Borrower;

(d)     The dissolution, termination or merger of Borrower;

(e)     The occurrence of an "Event of Default" under the Note or any of the other Loan Documents;

(f)     The Bankruptcy Court shall dismiss the Chapter 11 Case or shall convert the Chapter 11 Case to a Chapter 7 Case;

(g)     Borrower, or any of its Affiliates, shall file, support or fail to oppose a motion seeking, or the Bankruptcy Court shall enter, an order in the Chapter 11 Case appointing (i) a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, (ii) a responsible officer or (iii) an examiner, in each case with enlarged powers relating to the operation of the business (powers beyond those set forth in subclauses (3) and (4) of section 1106(a) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code in the Chapter 11 Case (in each case other than the incumbent Chief Restructuring Officer of Borrower or the appointment by Borrower or its Affiliates of a successor);

(h)     Borrower, or any of its Affiliates, shall file, support or fail to oppose a motion seeking, or the Bankruptcy Court shall enter, an order in the Chapter 11 Case (i) approving additional financing under section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement, (ii) granting any Lien (other than Liens

expressly permitted in the Orders) upon or affecting any Collateral which are pari passu or senior to the Liens on the Collateral in favor of Lender, (iii) granting any claim priority senior to or pari passu with the claims of Lender under the Loan Documents or any other claim having priority over any or all administrative expenses of the kind specified in section 503(b) or section 507(b) of the Bankruptcy Code, or (iv) granting any other relief that is adverse to Lender's interests under any Loan Document or its rights and remedies hereunder or their interest in the Collateral;

(i)     Borrower shall fail to comply with the terms of the Orders or any other Bankruptcy Court Order in any material respect;

(j)     The Orders shall be amended, supplemented, stayed, reversed, vacated or otherwise modified without the written consent of Lender;

(k)     Borrower, or any of its Affiliates, shall file a motion for reconsideration or other motion which seeks to materially and adversely affect Lender's rights;

(l)     The right of Borrower to borrow under this Agreement is terminated by an order entered by the Bankruptcy Court;

(m)     Borrower, or any of its Affiliates, shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of Borrower) any other Person's motion to, disallow in whole or in part the Lender's claim in respect of the Obligations or to challenge the validity, perfection, non-avoidability or enforceability of the Liens in favor of Lender;

(n)     Borrower shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Prepetition Indebtedness, including, without limitation, from the Separate Funds;

(o)     Unless in connection with a duly confirmed plan of reorganization, the Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest (i) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of Borrower which have an aggregate value in excess of One Hundred Thousand Dollars ($100,000.00), or (ii) to permit other actions that would have a Material Adverse Effect on Borrower or the Chapter 11 estates;

(p)     Any judgments which, to the extent not covered by insurance, are in the aggregate in excess of One Hundred Thousand Dollars ($100,000.00) as to any postpetition obligation shall be rendered against Borrower and the enforcement thereof shall not be stayed (by court ordered stay or by consent of the party litigants); or there shall be rendered against Borrower a non-monetary judgment with respect to a postpetition event which causes or would reasonably be expected to cause a material adverse change or a Material Adverse Effect on the ability of Borrower to perform its obligations under the Loan Documents;

(q)     Absent the written consent of Lender and unless in connection with a duly confirmed plan of reorganization, entry by the Bankruptcy Court of an order under section 363 or 365 of the Bankruptcy Code authorizing or approving the sale or assignment of any of

Borrower's assets, or procedures in respect thereof, or Borrower, or any of its Affiliates, shall seek, support, or fail to contest in good faith, the entry of such an order in the Chapter 11 Case;

(r) A Chapter 11 plan of reorganization or liquidation with respect to Borrower is filed and (i) the treatment of the claims of Lender in such plan is not approved by Lender, or (ii) such plan does not provide for the payment in full, in cash, of the Obligations on or prior to the date of consummation thereof;

(s) The Final Order Entry Date shall not have occurred by December 7, 2009 (or such later date as Lender may agree in its sole discretion);

(t) Borrower, or any of its Affiliates, shall be in default under any material commitment or Indebtedness (other than in connection with any Prepetition Indebtedness) affecting such Persons or the Collateral;

(u) Borrower's failure to substantially comply with the Budget, tested weekly on a rolling four (4) week basis with regards to total cash flow (after giving effect to the cumulative ten percent (10%) variance permitted hereunder);

(v) The failure by any Borrower Affiliate to perform or satisfy, as applicable, the covenants set forth in Sections 8.2 and 8.3 of this Agreement applicable to such Borrower Affiliate; or

(w) In addition to the foregoing, it shall be an Event of Default hereunder if any the following consents in support of Redwood Capital Investments, LLC's efforts to buy Borrower's assets and operations, as described in the Master Purchase and Sale Agreement, have not been received on or before the earlier of: (1) second business day preceding the auction, or (2) December 27, 2009 ("**Stalking Horse Consent Defaults**"):

(i) Each Project Borrower has not obtained the Requisite Consent of its Project lenders so as to comply with sections 1126 and 1122 of the Bankruptcy Code with respect to such Borrower;

(ii) Each corporate Borrower has not obtained the Requisite Consent of its corporate lenders so as to comply with sections 1126 and 1122 of the Bankruptcy Code with respect to such Borrower; and

(iii) affirmation of the consent by National Senior Campuses, Inc. and each of the individual campus boards of directors.

If no other Event of Default shall have occurred other than a Stalking Horse Consent Default, Lender agrees to refrain from exercising its remedies in connection with the Stalking Horse Consent Default, and shall continue to fund the Loan until the Maturity Date; provided, however, that interest on the Loan shall be payable at the Default Rate during the period of any Stalking Horse Consent Default.

# ARTICLE 11

## LENDER'S REMEDIES UPON EVENT OF DEFAULT

11.1 **Remedies**. Upon the occurrence of any Event of Default (other than during the first sixty days after a Stalking Horse Consent Default), at the request of (or with the consent of) Lender, and upon notice to Borrower:

  (a) the Commitment shall immediately terminate;

  (b) all Obligations, including the unpaid principal amount of and accrued interest on the Loan, shall immediately become due and payable, in each case without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by Borrower;

  (c) Lender may enforce any and all Liens and security interests created pursuant to the Loan Documents; and

  (d) Lender may enforce its other rights and remedies under the Loan Documents or applicable Law.

11.2 **Setoff Rights**. In addition to any rights of setoff that Lender may have under applicable law, Lender, without notice of any kind to Borrower, may appropriate and apply to the payment of the Note or of any sums due under this Agreement or the other Loan Documents, any and all balances, deposits, credits, accounts, certificates of deposit, instruments or money of Borrower then or thereafter in the possession of Lender or any participant of Lender.

11.3 **Intentionally Deleted**

11.4 **Right of Lender to Make Advances to Cure Event of Defaults; Obligatory Advances**. If Borrower shall fail to perform any of its covenants or agreements herein or in any of the other Loan Documents, Lender may (but shall not be required to) perform any of such covenants and agreements, and any amounts expended by Lender in so doing, and any amounts advanced by Lender pursuant to this Agreement shall be deemed advanced by Lender under an obligation to do so regardless of the identity of the person or persons to whom said funds are disbursed. Loan Proceeds advanced by Lender to protect its security for the Loan are obligatory advances hereunder and shall constitute additional indebtedness payable on demand and evidenced and secured by the Loan Documents.

11.5 **Attorneys' Fees**. Borrower will pay Lender's reasonable attorneys' fees and costs in connection with the negotiation, preparation, administration and enforcement of this Agreement and will pay Lender's reasonable attorneys' fees and costs in connection with the administration and enforcement of this Agreement and the other Loan Documents. Without limiting the generality of the foregoing, if at any time or times hereafter Lender employs counsel for advice or other representation with respect to any matter concerning Borrower, this Agreement, the Collateral or the Loan Documents (including any bankruptcy proceeding) or if Lender employs one or more counsel to protect, collect, lease, sell, take possession of, or liquidate any of the Collateral, or to attempt to enforce or protect any security interest or Lien or

other right in any of the Collateral or under any of the Loan Documents, or to enforce any rights of Lender or obligations of Borrower or any other person, firm or corporation which may be obligated to Lender by virtue of this Agreement or under any of the Loan Documents or any other agreement, instrument or document, heretofore or hereafter delivered to Lender in furtherance hereof, then in any such event, all of the attorneys' fees arising from such services, and any expenses, costs and charges relating thereto, shall constitute an additional indebtedness owing by Borrower to Lender payable on demand and evidenced and secured by the Loan Documents.

11.6  **No Waiver**.  No failure by Lender to exercise, and no delay by Lender in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof.  No single or partial exercise of any right, remedy, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

11.7  **Application of Funds**.

(a)  Sale Transaction.

(i)  Upon consummation of a Sale, the Loan and other Obligations shall be repaid as follows:

(A)  **First**, from Corporate Cash to the extent of Corporate Borrowings;

(B)  **Second**, from Net Cash Proceeds of the Sale;

(C)  **Third**, from Initial Entrance Deposits at a Project solely to the extent of Project Borrowings for such Project, subject to the provisions of Section 3.8(b) with respect to the escrow of Postpetition Initial Entrance Deposits or applicable state law; and

(D)  **Fourth**, from all or any portion of the Collateral, jointly and severally, in such manner and order as Lender may elect with no obligation to marshal or look to any particular asset of any Borrower; provided, that to the extent the Loan and other Obligations are repaid from Prepetition Collateral of a Prepetition Lender, such Prepetition Lender shall have rights of subrogation and contribution against any other Prepetition Lender.

The foregoing priority of recovery shall occur in the order set forth above in clauses (a)(i)(A) through (a)(i)(D); provided, however, that if any source of repayment listed above is unavailable on demand for any reason, Lender shall be free to immediately move to the next level of priority without delay.

(b)  Non-Sale Transaction.

(i)     After the exercise of remedies provided for in Section 11.1 (or after the Loan has automatically become immediately due and payable as set forth in Section 11.1), the Loan and other Obligations shall be repaid as follows:

(A)     **First**, from Corporate Cash to the extent of Corporate Borrowings;

(B)     **Second**, from Initial Entrance Deposits at a Project solely to the extent of Project Borrowings for such Project, subject to the provisions of Section 3.8(b) with respect to the escrow of Postpetition Initial Entrance Deposits or applicable state law; and

(C)     **Third**, from all or any portion of the Collateral, jointly and severally, in such manner and order as Lender may elect with no obligation to marshal or look to any particular asset of any Borrower; provided, that to the extent the Loan and other Obligations are repaid from Prepetition Collateral of a Prepetition Lender, such Prepetition Lender shall have rights of subrogation and contribution against any other Prepetition Lender.

The foregoing priority of recovery shall occur in the order set forth above in clauses (b)(i)(A) through (b)(i)(C); provided, however, that if any source of repayment listed above is unavailable on demand for any reason, Lender shall be free to immediately move to the next level of priority without delay.

(c)     Application of Proceeds.  The repayment of the Loan and other Obligations pursuant to Section 11.7(a)(i)(A), (B) and (C) and Section 11.7(b)(i)(A), (B) and (C) shall be applied in the following order of priority:

(i)     **First**, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to Lender, including fees, charges and disbursements of counsel to Lender and other amounts payable under Section 4.11;

(ii)     **Second**, to payment of accrued and unpaid interest on the Loan and the other Obligations; and

(iii)     **Third**, to payment of unpaid principal on the Loan and the other Obligations.

## **ARTICLE 12**

## **MISCELLANEOUS**

12.1     **Time is of the Essence**.  Borrower agrees that time is of the essence with respect to all of its covenants and obligations under this Agreement.

12.2     **Amendments, Etc**.  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by Borrower therefrom, shall be

effective unless in writing and signed by Lender and Borrower, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

12.3 **Determination of Facts**.  Lender shall be free at all times to establish independently to its satisfaction and in its or sole and absolute discretion the existence or nonexistence of any fact or facts, the existence or nonexistence of which is a condition of this Agreement.

12.4 **Prior Agreements**.  This Agreement and the other Loan Documents, and any other documents or instruments executed pursuant thereto or contemplated thereby, shall represent the entire, integrated agreement between the parties hereto with respect to the transactions contemplated hereby, and shall supersede all prior negotiations, representations or agreements pertaining thereto, either oral or written.  This Agreement and any provision hereof shall not be modified, amended, waived or discharged in any manner other than by a written amendment executed by all parties to this Agreement.

12.5 **Disclaimer by Lender**.  Lender shall not be liable to any subcontractor, supplier, laborer, architect, engineer or any other party for services performed or materials supplied, nor shall Lender be liable for any debts or claims accruing in favor of any such parties against Borrower or against the Collateral.  Borrower is not and shall not be an agent of Lender for any purposes, nor shall it be venture partners with Lender in any manner whatsoever.  Lender shall not be deemed to be in privity of contract with any subcontractor, or provider of services on or to any Collateral, nor shall any payment of funds directly to a subcontractor, or provider of services be deemed to create any third party beneficiary status or recognition of same by Lender unless and until Lender expressly assumes such status in writing.  No subcontractor, supplier, laborer, architect, engineer or other party shall be deemed to be a third party beneficiary of this Agreement or any of the Loan Documents.  Approvals granted by Lender for any matters covered under this Agreement shall be narrowly construed to cover only the parties and facts identified in any written approval or, if not in writing, such approvals shall be solely for the benefit of Borrower.

12.6 **Borrower Indemnification**.  To the fullest extent permitted by law, Borrower hereby agrees to protect, indemnify, defend and save harmless Lender and its directors, officers, Agents and employees from and against any and all liability, expense or damage of any kind or nature and from any suits, claims or demands, including legal fees and expenses on account of any matter or thing or action or failure to act by Lender, whether or not in litigation, arising out of this Agreement or in connection herewith unless such suit, claim or damage is caused solely by any act, omission or willful malfeasance of Lender, its directors, officers, Agents and authorized employees.  This indemnity is not intended to excuse Lender from performing hereunder.  This obligation on the part of Borrower shall survive the repayment of the Loan and any cancellation of this Agreement.  Borrower shall pay, and hold Lender harmless from, any and all claims of any brokers, finders or Agents claiming a right to any fees in connection with arranging the financing contemplated hereby.

12.7 **Captions**.  The captions and headings of various Articles and Sections of this Agreement and exhibits pertaining hereto are for convenience only and are not to be considered as defining or limiting in any way the scope or intent of the provisions hereof.

12.8    **Inconsistent Terms and Partial Invalidity**.  In the event of any inconsistency among the terms hereof (including incorporated terms), or between such terms and the terms of any other Loan Document, Lender may elect which terms shall govern and prevail.  If any provision of this Agreement, or any paragraph, sentence, clause, phrase or word, or the application thereof, in any circumstances, is adjudicated by a court of competent jurisdiction to be invalid, the validity of the remainder of this Agreement shall be construed as if such invalid part were never included herein.

12.9    **Gender and Number**.  Any word herein which is expressed in the masculine or neuter gender shall be deemed to include the masculine, feminine and neuter genders.  Any word herein which is expressed in the singular or plural number shall be deemed, whenever appropriate in the context, to include the singular and the plural.

12.10    **Notices**.  Any notices, communications and waivers under this Agreement shall be in writing and shall be (i) delivered in person, (ii) mailed, postage prepaid, either by registered or certified mail, return receipt requested, or (iii) by overnight express carrier, addressed in each case as follows:

To a Lender:

With copy to:

To Borrower:                                    701 Maiden Choice Lane
                                                Baltimore, MD 21228
                                                Attn:  Paul Rundell
                                                Tel:  (410) 242-2880
                                                Fax:  (410) 737-8854

With copy to:                                   701 Maiden Choice Lane
                                                Baltimore, MD 21228
                                                Attn:  Gerald Doherty
                                                Tel:  (410) 242-2880
                                                Fax:  (410) 737-8854

                                                DLA Piper LLP (US)
                                                203 North LaSalle Street
                                                Chicago, Illinois  60601
                                                Attn:  John Cusack
                                                Tel:      (212) 335-4849
                                                Fax:      (212) 335-4501

                                                Houlihan Lokey
                                                123 North Wacker Drive, 4th Floor
                                                Chicago, IL 60606
                                                Attn:  David Watson
                                                Tel:      (312) 462-6470
                                                Fax:      (312) 795-9480

or to any other address as to any of the parties hereto, as such party shall designate in a written

notice to the other party hereto.  All notices sent pursuant to the terms of this Section 12.10 shall

be deemed received (a) if personally delivered, then on the date of delivery, (b) if sent by overnight, express carrier, then on the next federal banking day immediately following the day sent, or (c) if sent by registered or certified mail, then on the earlier of the third federal banking day following the day sent or when actually received.

12.11  **Effect of Agreement**.  The submission of this Agreement and the Loan Documents to Borrower for examination does not constitute a commitment or an offer by Lender to lend money to Borrower.  This Agreement shall become effective only upon execution and delivery hereof by Lender to Borrower.

12.12  **Governing Law**.  This Agreement shall be construed and enforced in accordance with the laws of the State of Maryland, without reference to the choice of law or conflicts of law principles of such State.

12.13  **Waiver of Defenses**.  **OTHER THAN CLAIMS BASED UPON THE FAILURE OF LENDER TO ACT IN A COMMERCIALLY REASONABLE MANNER, BORROWER HEREBY WAIVES EVERY PRESENT AND FUTURE DEFENSE (OTHER THAN THE DEFENSE OF PAYMENT IN FULL), CAUSE OF ACTION, COUNTERCLAIM OR SETOFF WHICH BORROWER MAY NOW HAVE OR HEREAFTER MAY HAVE TO ANY ACTION BY LENDER IN ENFORCING THIS AGREEMENT.  PROVIDED THAT LENDER ACTS IN GOOD FAITH, BORROWER RATIFIES AND CONFIRMS WHATEVER LENDER MAY DO PURSUANT TO THE TERMS OF THIS AGREEMENT.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER GRANTING ANY FINANCIAL ACCOMMODATION TO BORROWER.**

12.14  **Consent to Jurisdiction**.  **TO INDUCE LENDER TO ACCEPT THE NOTE, BORROWER IRREVOCABLY AGREES THAT ALL ACTIONS OR PROCEEDINGS IN ANY WAY ARISING OUT OF OR RELATED TO THE LOAN DOCUMENTS WILL BE LITIGATED IN COURTS HAVING SITUS IN MARYLAND.  BORROWER HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY COURT LOCATED WITHIN MARYLAND, WAIVES PERSONAL SERVICE OF PROCESS UPON BORROWER, AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL DIRECTED TO BORROWER AT THE ADDRESS STATED HEREIN AND SERVICE SO MADE WILL BE DEEMED TO BE COMPLETED UPON ACTUAL RECEIPT.**

12.15  **Waiver of Jury Trial**.  **BORROWER AND LENDER, HAVING BEEN REPRESENTED BY COUNSEL EACH KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (A) UNDER THIS AGREEMENT OR ANY RELATED AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS AGREEMENT OR (B) ARISING FROM ANY BANKING RELATIONSHIP EXISTING IN CONNECTION WITH THIS**

**AGREEMENT, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. BORROWER AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST LENDER OR ANY OTHER PERSON INDEMNIFIED UNDER THIS AGREEMENT ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.**

12.16 **Usury Savings Clause.** Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law, shall not exceed the Highest Lawful Rate. If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loan made hereunder shall bear interest at the Highest Lawful Rate.

12.17 **Counterparts; Facsimile Signatures**. This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute but one and the same Agreement. Receipt of an executed signature page to this Agreement by facsimile or other electronic transmission shall constitute effective delivery thereof. Electronic records of executed Loan Documents maintained by Lender shall be deemed to be originals thereof.

**THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE**

**PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR,**

**CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, Lender and Borrower have caused these presents to be executed the day and year first above written.

**BORROWER**:

_____, a

_____

By: _____
    Name: _____
    Its: _____

**LENDER**:

_____, a

_____

By: _____
    Name: _____
    Its: _____

## SCHEDULE 1.1

## Permitted Existing COntingent Obligations

[To be attached at closing]

# SCHEDULE 1.2

## Permitted Existing INDEBTEDNESS

[To be attached at closing]

CENTRAL\31279208.11

## SCHEDULE 1.3

## Permitted Existing LIENS

[To be attached at closing]

# SCHEDULE 3.1

## THE COMMITMENT

| LENDER | COMMITMENT | PRO RATA SHARE |
|--------|-----------|----------------|
| _____ |  | % |
| _____ |  |  |
| Attn: _____ |  |  |

CENTRAL\31279208.11

# EXHIBIT A
## SCHEDULE OF CO-BORROWERS, CORPORATE BORROWERS AND PROJECT BORROWERS

**CO-BORROWERS**
**Erickson Construction, LLC**
**Erickson Group, LLC**
**Senior Campus Services, LLC**
**Ashburn Campus, LLC**
**Concord Campus GP, LLC**
**Concord Campus, L.P.**
**Dallas Campus GP, LLC**
**Dallas Campus, LP**
**Houston Campus, L.P.**
**Kansas Campus, LLC**
**Littleton Campus, LLC**
**Novi Campus, LLC**

**Corporate Borrowers:**

**ERICKSON RETIREMENT COMMUNITIES, LLC**
**Erickson Construction, LLC**
**Erickson Group, LLC**

**Project Borrowers:**

**Ashburn Campus, LLC**
**Concord Campus GP, LLC**
**Concord Campus, L.P.**
**Dallas Campus GP, LLC**
**Dallas Campus, LP**
**Houston Campus, L.P.**
**Kansas Campus, LLC**
**Littleton Campus, LLC**
**Novi Campus, LLC**
**Senior Campus Services, LLC**

# EXHIBIT B
## BUDGET

## See Attached.

CENTRAL\31279208.11

**EXHIBIT C**

**SCHEDULE OF NFPS**

1. Ashby Ponds, Inc.
2. Eagle's Trace, Inc.
3. Fox Run Village, Inc.
4. Highland Springs, Inc.
5. Maris Grove, Inc.
6. Tallgrass Creek, Inc.
7. Wind Crest, Inc.

# **EXHIBIT D**
# **PROMISSORY NOTE**
### **See attached**

CENTRAL\31279208.11

# EXHIBIT E
# PROJECTS

1. Ashby Ponds
2. Eagle's Trace
3. Fox Run
4. Highland Springs
5. Maris Grove
6. Tallgrass Creek
7. Wind Crest

**BORROWER FORMATION / QUALIFICATION**

| Name of Borrower | Type of Entity | State of Formation |
|---|---|---|
| Ashburn Campus, LLC | limited liability company | Maryland |
| Concord Campus GP, LLC | limited liability company | Maryland |
| Concord Campus, L.P. | limited partnership | Maryland |
| Dallas Campus GP, LLC | limited liability company | Maryland |
| Dallas Campus, LP | limited partnership | Maryland |
| Erickson Construction, LLC | limited liability company | Maryland |
| Erickson Group, LLC | limited liability company | Maryland |
| Erickson Retirement Communities, LLC | limited liability company | Maryland |
| Houston Campus, L.P. | limited partnership | Maryland |
| Kansas Campus, LLC | limited liability company | Maryland |
| Littleton Campus, LLC | limited liability company | Maryland |
| Novi Campus, LLC | limited liability company | Maryland |
| Senior Campus Services, LLC | limited liability company | Maryland |