G. Martin Green - marty.green@bakerbotts.com
Texas Bar No. 08351500
Artoush Varshosaz - artoush.varshosaz@bakerbotts.com
Texas Bar No. 24066234
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, Texas 75201-2980
Telephone:        214.953.6500
Facsimile:        214.664.6503

**COUNSEL TO THE MICHIGAN RETIREMENT SYSTEM ENTITIES**

Peter M. Gilhuly - peter.gilhuly@lw.com
Kimberly A. Posin - kim.posin@lw.com
Lucas R. Bailey - lucas.bailey@lw.com
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, California 90071-1560
Telephone:        213.485.1234
Facsimile:        213.891.8763

**COUNSEL TO THE HCPI LANDHOLDER ENTITIES**

Tobey M. Daluz - daluz@ballardspahr.com
Matthew G. Summers[1] - summersm@ballardspahr.com
BALLARD SPAHR LLP
919 North Market Street,12th Floor
Wilmington, Delaware 19801
Telephone:        (302) 252-4428
Facsimile:        (410) 361-8930

**COUNSEL TO THE MSRESS III ENTITIES**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | **CASE NO. 09-37010** |
| | § | |
| **ERICKSON RETIREMENT COMMUNITIES,** | § | **CHAPTER 11** |
| **LLC, _et al._[2]** | § | **Jointly Administered** |
| | § | |
| **Debtors.** | § | |

---

[1]      Admitted in Maryland.  Admission to Delaware pending.

[2]      The debtors in these Chapter 11 Cases are Erickson Retirement Communities, LLC, Ashburn Campus, LLC, Columbus Campus, LLC, Concord Campus GP, LLC, Concord Campus, LP, Dallas Campus GP, LLC, Dallas Campus, LP, Erickson Construction, LLC, Erickson Group, LLC, Houston Campus, LP, Kansas Campus, LLC, Littleton Campus, LLC, Novi Campus, LLC, Senior Campus Services, LLC, Warminster Campus GP, LLC, Warminster Campus, LP (collectively, the "Debtors").

**MOTION OF THE CCRC MEZZANINE LENDERS FOR**
**ORDER APPOINTING EXAMINER PURSUANT TO 11 U.S.C. § 1104**

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON JANUARY 13, 2010 AT 9:30 A.M. CENTRAL TIME IN COURTROOM NUMBER ONE (1) OF THE EARLE CABELL BUILDING, UNITED STATES BANKRUPTCY COURT, NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION, 1100 COMMERCE STREET, 14TH FLOOR, DALLAS, TEXAS.**

**IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING, SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN TWENTY-THREE (23) DAYS FROM THE DATE YOU WERE SERVED WITH THIS PLEADING. YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

Strategic Ashby Ponds Lender LLC ("Ashby Ponds Lender") and Strategic Concord Landholder, LP ("Concord Landholder" and together with Ashby Ponds Lender, the "Michigan Retirement System Entities"); HCP ER6, LP in Houston, Texas (the "Houston Landholder"), HCP ER2, LP in Novi, Michigan (the "Novi Landholder") and HCP ER3, LP in Warminster, Pennsylvania (the "Warminster Landholder" and together with the Houston and Novi Landholders, the "HCPI Landholder Entities"); and MSRESS III Dallas Campus, L.P. (the "Dallas Landholder"), MSRESS III Denver Campus, LLC (the "Littleton Landholder"), and MSRESS III Kansas Campus, L.P. (the "Kansas Lender" and together with the Dallas Landholder and the Littleton Landholder, the "MSRESS III Entities") respectfully file this Motion for Order Appointing Examiner Pursuant to 11 U.S.C. § 1104 (the "Motion"). The Michigan Retirement System Entities, the HCPI Landholder Entities, and the MSRESS III Entities shall be collectively referred to as the "CCRC Mezzanine Lenders."

In support thereof, the CCRC Mezzanine Lenders would show the Court that the complexity of these cases, with the myriad of issues that they pose regarding multiple inter-related debtor and non-debtor entities, each with independent (although at times somewhat

similar capital structures), and competing interests in what appear to be limited, but again independent, pools of assets, makes the appointment of an independent examiner at this juncture critical to assisting the Court and parties in interest in moving these cases forward to a fair and successful conclusion for all constituencies. Many of these issues have already been raised in the limited proceedings that have occurred in the few short weeks since the cases were commenced, and those issues, as well as the following, suggest that this type of case is precisely what Congress intended in making the appointment of an examiner mandatory under 11 U.S.C. § 1104.

## I. JURISDICTION

1.      The Court has jurisdiction over the subject matter of this Motion pursuant to 28 U.S.C. §§ 157 and 1334. The statutory authority for the Motion is 11 U.S.C. § 1104. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## II. FACTUAL BACKGROUND

*The Filing of the Cases*

2.      On October 19, 2009, the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

3.      The Debtors remain in possession of their assets and continue to manage their businesses as debtors in possession.

4.      No trustee, or examiner has been appointed in these cases, although the CCRC Mezzanine Lenders request the appointment of an examiner by this Motion.

*The Debtors' Businesses*

5.      The structure of the Debtors' business is somewhat complex and involves a number of different legal entities.  *See Affidavit of Paul Rundell in Support of First Day Motions* (the "Rundell Affidavit"), Docket No. 27, ¶ 197.  The Rundell Affidavit sets forth a detailed discussion of the Debtors' various businesses, the structure and inter-relationship of the various entities, the capital structure of the overall organization, and how the Debtors were intended to operate.

6.      The Debtors consist of three general types of entities: (a)  Erickson Retirement Communities, LLC ("ERC") and Erickson Group, LLC, which are essentially holding companies; (b) certain single-asset real estate entities that have been formed solely to own certain properties that the Debtors were to develop,[3] and (c) certain service companies that ERC formed to provide services or otherwise enter into contractual relationships with the Landowners.

7.      Generally, the Debtors—through various affiliates—construct, develop, and operate a number of continuing care retirement communities (each, a "CCRC") in various states.  These retirement communities constitute the primary physical assets of the Debtors, but each such facility is owned individually by the special purpose subsidiary entity formed by ERC to hold title to the property.   In order to develop the CCRC, each of the subsidiaries that owns a facility (each a "CCRC Subsidiary Debtor") has incurred multiple levels of indebtedness secured

---

[3]      Even though these entities may not necessarily own the land, they are defined as "Landowners" in the Amended and Restated Master Purchase and Sale Agreement, effective as of November 11, 2009 (the "PSA"), hereinafter described in more detail.

by the property and may have also incurred unsecured obligations in the ownership, development, and/or operation of the facility.[4]

8.     ERC also caused each of the CCRC Subsidiary Debtors to enter into a series of contracts with other ERC-related entities (the "Related Party Contracts").  Upon information and belief, at all times ERC had complete control of the management of the CCRC Subsidiary Debtors and the CCRC Subsidiary Debtors were not represented by separate counsel in connection with the Related Party Contracts.  Accordingly,  the Related Party Contracts are by no means arms length agreements.

9.     According to the Rundell Affidavit, the Debtors currently have twelve CCRCs under development, eleven of which are open and operating and one of which is still under construction.[5]  *See Rundell Affidavit,* Docket No. 27, ¶ 16.

10.     As set forth in the Rundell Affidavit, the Debtors also formed not-for-profit entities that were each designed to ultimately take title to a particular CCRC (each, an "NFP").  It was contemplated that the Debtors' interest in each CCRC would ultimately be transferred to an NFP at some point during the development and, through a complex series of transactions, the NFP would receive title to the CCRC property and the construction and related debts incurred in developing the properties would be repaid, and the CCRC Subsidiary Debtor would be paid an additional amount reflecting their return on the investment.   To ensure the funds flowed to the Debtors as ERC wished, certain transactions created "debt" obligations of each Landholder in favor of the applicable NFP, but at the conclusion of the transaction, when

---

[4]     In addition, certain of ERC's other subsidiaries have been formed to handle specific functions in connection with the construction, development and/or operations of the overall business (the "Service Subsidiaries").

[5]     In addition, ERC has completely developed 8 additional CCRCs that each have been sold to a separate not-for-profit entity created to purchase the CCRC.  Certain of the Debtors may have continuing management and perhaps other agreements with the NFP, notwithstanding the sale of the CCRC.

title was finally transferred to the NFP, the "debt" was simply to be forgiven. *See Rundell Affidavit,* Docket No. 27, ¶ 93.

11.     Upon information and belief, each NFP, as a newly-created entity, had little or no assets upon creation, other than the leasehold or similar assets that were created and conveyed to the NFP as a consequence of the transactions between the NFP and the Debtors. Upon further information and belief, the structure of each NFP was primarily designed to facilitate ERC's ultimate take out with respect to each of the CCRCs.  This exit strategy was to be accomplished on a tax-advantaged basis as a result of the NFP's status as a Section 501(c)(3) entity under the United States Tax Code, which enabled the NFP to issue tax free bonds to ultimately fund the NFP's acquisition of the CCRC.

12.     Upon information and belief, it is uncertain if each NFP paid any value in connection with the transfer of the interests in the CCRCs to the NFP, much less whether each NFP paid reasonably equivalent value for the transfer of the interests it received under the transactions with the Debtors.

13.     As set forth in the Rundell Affidavit, each of the CCRCs is developed in phases, is situated on large tracts of land and requires the construction of substantial amenities to be fully functional and operational.  *See Rundell Affidavit*, Docket No. 27, ¶¶ 15, 81-94.  As a result, much of the anticipated profit from the overall transaction is typically not generated until after sufficient phases have been developed to offset the large development costs because the cost of the infrastructure is then spread over a much larger number of units.

14.     Accordingly, one of the CCRC Subsidiary Debtors that has built a sufficient number of units to recover the costs of construction would presumably have a greater value than one with an interest in a CCRC that is at the initial stages of the construction process.

***The Michigan Retirement System Entities and the Transactions with the Debtors***

15.     Each of the Michigan Retirement System Entities is owned by the retirement fund for the state of Michigan Retirement Systems, which created the entity for the sole purpose of entering into the transaction(s) with certain of the Debtors. Accordingly, the determination of issues impacting the rights of the Michigan Retirement System Entities will necessarily impact a variety of retiree beneficiaries, including public school employees, state employees, state police officers, and judges.

16.     Soon after each of the Michigan Retirement System Entities was created, it entered into the contemplated transactions with certain of the Debtors.

17.     In October of 2005, Concord Landholder entered into a transaction with Concord Campus L.P. (the "Concord Debtor"), whereby Concord Landholder purchased the approximately 87 acres on which the Concord campus now resides and leased the property back to the Concord Debtor under the terms of a Ground Lease Agreement (the "Concord Ground Lease").[6] Under the Concord Ground Lease, the Concord Debtor has the right to purchase the Leased Property (as defined in the Concord Ground Lease) for a specified purchase price, which includes the $25,000,000 that the Concord Landholder paid to the Concord Debtor to purchase the property initially, plus certain additional amounts. *See* Concord Ground Lease, Art. 24.2. Upon a default by the Concord Debtor under the Concord Ground Lease (plus under certain additional circumstances), the Concord Landholder has the right to require the Concord Debtor to exercise the purchase option. *See* Concord Ground Lease, Art. 24.3.[7]

---

[6]     There are a number of ancillary agreements that were entered into in connection with the Concord Ground Lease and such agreements include a Limited Guaranty and Indemnity Agreement by ERC in favor of the Concord Landholder. These ancillary agreements are, with the Concord Ground Lease, collectively referred to as the Concord Ground Lease Transaction.

[7]     The obligations under the Concord Ground Lease are also secured on a subordinated basis by an Assignment of Licenses, Permits, Plans, Contracts, and Warranties, as well as certain UCC filings.

18.     In May of 2007, Ashby Ponds Lender entered into a transaction with Ashburn Campus, L.L.C. (the "Ashburn Debtor"), whereby Ashby Ponds Lender provided mezzanine financing to the Ashburn Debtor in the amount of $50,000,000, which was secured by a subordinate lien on approximately 135 acres in Loudoun County, Virginia upon which the Ashby Ponds retirement community is situated.   The transactions between the Ashby Ponds Lender and the Ashburn Debtor (collectively, the "Ashburn Mezzanine Transaction") is evidenced by, among other things, a Promissory Note, a Loan Agreement, and a Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixtures Filing. The Ashburn Mezzanine Transaction includes a Guaranty of the indebtedness in favor of the Ashby Ponds Lender by ERC.[8]

19.     Accordingly, the Michigan Retirement System Entities collectively hold claims totaling approximately $75,000,000 in these proceedings and are involved in transactions with two of the eleven CCRC Subsidiary Debtors currently operating facilities occupied by residents.

***The HCPI Landholder Entities and the Transactions with the Debtors***

20.     HCP Inc., through the HCPI Landholder Entities, holds significant secured debt interests on three of the Debtors properties:  the Houston campus, the Novi campus, and the Warminster campus.  All three campuses are open and operating but still under construction and development.  The HCPI Landholder Entities were all created for the sole purpose of entering into the transactions with certain of the CCRC Subsidiary Debtors.

---

[8]     The Michigan Retirement System Entities will provide electronic copies of the relevant loan documents upon request.

21.     In June of 2003, the Warminster Landholder entered into a transaction with the Warminster Campus, LP (the "Warminster Debtor"), whereby the Warminster Landholder purchased the land on which the Warminster campus resides and leases this property back to the Warminster Debtor, pursuant to the terms of the Amended and Restated Ground Lease Agreement dated June 2, 2003 (the "Warminster Ground Lease").[9]  Under the Warminster Ground Lease, the Warminster Debtor has the right to purchase the Leased Property (as defined in the Warminster Ground Lease) for a specified purchase price, which includes the $19,500,000 that the Warminster Landholder paid to the Warminster Debtor as part of the initial purchase price, plus certain additional amounts.  *See* Warminster Ground Lease, Art. 24.2.  Upon a default by the Warminster Debtor under the Warminster Ground Lease (subject to certain additional circumstances), the Warminster Landholder has the right to require the Warminster Debtor to exercise the purchase option.  *See* Warminster Ground Lease, Art. 24.2(f).

22.     In March of 2004, the Novi Landholder entered into a transaction with the Novi Campus, LP (the "Novi Debtor"), whereby the Novi Landholder purchased the land on which the Novi campus resides and leases this property back to the Novi Debtor, pursuant to the terms of the Amended and Restated Ground Lease Agreement dated March 30, 2004 (the "Novi Ground Lease").[10]  Under the Novi Ground Lease, the Debtor has the right to purchase the

---

[9]     A number of related agreements were entered into by the Warminster Landholder and the Warminster Debtor in connection with the Warminster Ground Lease, including the Master Lease and Use Agreement, as amended; the Ann's Choice Retirement Community Non-Disturbance, Recognition and Attornment Agreement; the Limited Partnership Interest Pledge Agreement; and the Real Estate Financing Contract all dated June 2, 2003; in addition to the Lessor – Developer Agreement dated May 30, 2003; and the Limited Guaranty and Indemnity Agreement dated February 28, 2003 (collectively, with the Warminster Ground Lease, the "Warminster Ground Lease Transaction").

[10]     A number of related agreements were entered into by the Novi Landholder and the Novi Debtor in connection with the Novi Ground Lease, including the Master Lease and Use Agreement, as amended; the Fox Run Village Non-Disturbance, Recognition and Attornment Agreement; the Lessor – Developer Agreement; the Limited Guaranty and Indemnity Agreement; and the Membership Interest Pledge Agreement, all dated February 28, 2003 (collectively, with the Novi Ground Lease, the "Novi Ground Lease Transaction").

Leased Property (as defined in the Novi Ground Lease) for a specified purchase price, which includes the $17,000,000 that the Novi Landholder paid to the Novi Debtor as part of the initial purchase price, plus certain additional amounts. *See* Novi Ground Lease, Art. 24.2. Upon a default by the Novi Debtor under the Novi Ground Lease (subject to certain additional circumstances), the Novi Landholder has the right to require the Novi Debtor to exercise the purchase option. *See* Novi Ground Lease, Art. 24.2(f).

23. In November of 2004, the Houston Landholder entered into a transaction with the Houston Campus, LP (the "Houston Debtor"), whereby the Houston Landholder purchased the land on which the Houston campus resides and leases this property back to the Houston Debtor, pursuant to the terms of a Ground Lease Agreement dated November 18, 2004 (the "Houston Ground Lease").[11] Under the Houston Ground Lease, the Debtor has the right to purchase the Leased Property (as defined in the Houston Ground Lease) for a specified purchase price, which includes the $23,000,000 that the Houston Landholder paid to the Houston Debtor as part of the initial purchase price, plus certain additional amounts. *See* Houston Ground Lease, Art. 24.2. Upon a default by the Houston Debtor under the Houston Ground Lease (subject to certain additional circumstances), the Houston Landholder has the right to require the Houston Debtor to exercise the purchase option. *See* Houston Ground Lease, Art. 24.2(f).

24. HCPI Landholder Entities' total pre-petition mezzanine debt interests are approximately $59.5 million. In addition, HCP Inc. also holds a participation interest in the

---

[11] A number of related agreements were entered into by the Houston Landholder and the Houston Debtor in connection with the Houston Ground Lease, including the Eagle's Trace Non-Disturbance, Recognition and Attornment Agreement; the Lessor – Developer Agreement; the Limited Partnership Interest Pledge Agreement, all dated November 18, 2004; in addition to several other agreements related to the transaction and entered into on September 15, 2004, including the Master Lease and Use Agreement; the Community Loan Agreement; the Working Capital Loan Agreement; the Security Agreement, Pledge, and Collateral Assignment of Licenses and Residence and Care Agreements; the Lockbox Account Agreement; the Management and Marketing Agreement; and the Eagle's Trace Development Agreement (collectively, with the Houston Ground Lease, "Houston Ground Lease Transaction").

senior secured Construction Revolver arranged by PNC Bank National Association ("PNC") on the Houston campus in the amount of $9.6 million.

***The MSRESS III Entities and the Transactions with the Debtors***

25.    Each of the MSRESS III Entities was created for the sole purpose of entering into the transaction(s) with certain of the Debtors.  The MSRESS III Entities hold substantial claims relating to the Dallas Campus, the Littleton Campus, and the Kansas Campus.

26.    In April 2006, the Dallas Landholder entered into a transaction with Dallas Campus, LP (the "Dallas Debtor"), whereby the Dallas Landholder purchased the land on which the Highland Springs retirement community is located and leases this property back to the Dallas Debtor pursuant to the terms of a Ground Lease Agreement dated April 28, 2006 (the "Dallas Ground Lease").[12]  Under the Dallas Ground Lease, the Dallas Debtor has the right to purchase the Leased Property (as defined in the Dallas Ground Lease) for a specified price, which includes the $17,500,000 that the Dallas Landholder paid to the Dallas Debtor as part of the initial purchase price, plus certain additional amounts.  *See* Dallas Ground Lease, Article 24.2.  Upon a default by the Dallas Debtor under the Dallas Ground Lease (subject to certain additional circumstances), the Dallas Landholder has the right to require the Dallas Debtor to exercise the purchase option.  *See* Dallas Ground Lease, Article 24.2(f).[13]

27.    In October 2006, the Littleton Landholder entered into a transaction with Littleton Campus, LLC (the "Littleton Debtor"), whereby the Littleton Landholder purchased the land on which the Wind Crest retirement community is located and leases this property back to

---

[12]    A number of related agreements were entered into by the Dallas Landholder and the Dallas Debtor in connection with the Dallas Ground Lease and such agreements include a Limited Guaranty and Indemnity Agreement by ERC in favor of the Dallas Landholder.

[13]    The obligations under the Dallas Ground Lease are also secured on a subordinated basis by, among other things, an Assignment of Licenses, Permits, Plans, Contracts, and Warranties, as well as certain UCC filings.

the Littleton Debtor pursuant to the terms of a Ground Lease Agreement dated October 11, 2006 (the "Littleton Ground Lease").[14] Under the Littleton Ground Lease, the Littleton Debtor has the right to purchase the Leased Property (as defined in the Littleton Ground Lease) for a specified price, which includes the $25,000,000 that the Littleton Landholder paid to the Littleton Debtor as part of the initial purchase price, plus certain additional amounts. *See* Littleton Ground Lease, Article 24.2. Upon a default by the Littleton Debtor under the Littleton Ground Lease (subject to certain additional circumstances), the Littleton Landholder has the right to require the Littleton Debtor to exercise the purchase option. *See* Littleton Ground Lease, Article 24.2(f).[15]

28.     In April 2007, the Kansas Lender entered into a transaction with Kansas Campus, LLC (the "Kansas Debtor"), whereby the Kansas Lender provided mezzanine financing to the Kansas Debtor in the original principal amount of $25,000,000, which was secured by a subordinate lien on approximately 65 acres in Overland Park, Kansas upon which the Tallgrass Creek retirement community is located. The transaction between the Kansas Lender and the Kansas Debtor (collectively, the "Kansas Mezzanine Transaction") is evidenced by, among other things, a Promissory Note, a Loan Agreement, and a Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing. The Kansas Mezzanine Transaction includes a Limited Guaranty and Indemnity Agreement in favor of the Kansas Lender by ERC.

29.     Accordingly, MSRESS III Entities collectively hold claims totaling approximately $67,500,000.00 in these proceeding and are involved in transactions with three of the eleven CCRC Subsidiary Debtors currently operating facilities occupied by residents.

---

[14]     A number of related agreements were entered into by the Littleton Landholder and the Littleton Debtor in connection with the Littleton Ground Lease and such agreements include a Limited Guaranty and Indemnity Agreement by ERC in favor of the Littleton Landholder.

[15]     The obligations under the Littleton Ground Lease are also secured on a subordinated basis by, among other things, an Assignment of Licenses, Permits, Plans, Contracts, and Warranties, as well as certain UCC filings.

*The Proposed Auction Process and the PSA*

30.　　Only three days after filing for bankruptcy relief, the Debtors filed a motion seeking approval of bidding procedures and the sale of substantially all the Debtors' assets. *See* Docket No. 81.　The contemplated purchase and sale agreement is by and among Redwood-ERC Senior Living Holdings, LLC, Redwood-ERC Management, LLC, Redwood-ERC Development, LLC, Redwood-ERC Properties, LLC and Redwood-ERC Kansas, LLC (collectively, "Redwood"), on the one hand, and ERC, Erickson Group, LLC and Kansas Campus, LLC (collectively, "Sellers"), on the other hand.

31.　　Approval of this motion was sought on an expedited basis and on October 29, 2009, the Court considered the Debtors' Bidding Procedures Motion and subsequently entered its Bidding Procedures Order on November 6, 2009 commencing the auction process. Bids are now required to be received by the Debtors no later than December 14, 2009 and an auction is scheduled to proceed on December 22, 2009.

32.　　The PSA, by its terms, seeks to transfer a number of assets of the Sellers to Redwood, including ERC's limited liability interests in each of the Landowners.　The PSA, however, does not directly seek to transfer title to the real property and improvements with respect to the CCRCs, because that property is owned by the CCRC Subsidiary Debtors that are not parties to the PSA.

33.　　However, as hereinafter described, the Debtors' Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code (the "Debtors' Plan"), which implements the PSA, makes apparent that the intent is to transfer each of the operating CCRCs to Redwood, but only after reducing or eliminating debt incurred to construct the CCRC.　Clearly, the principal value under the PSA is each of the CCRC Subsidiary Debtors' interest in the

facilities they own (and perhaps some limited, incremental value associated with the Related Party Contracts).

34.    The PSA provides that the purchase price will be $100 million (less $5 million of the Debtors' cash that is to be part of the transferred assets), plus the assumption of certain debt at the CCRC Subsidiary Debtor level, after such debt is modified by the Debtors' Plan.  Significantly, however, the PSA provides no indication on an entity-by-entity or asset-by-asset basis, on how these proceeds would be allocated among the assets being sold.

35.    The PSA is explicitly subject to confirmation of the Debtors' Plan and, in fact, provides that the debt to be assumed by the purchaser under the PSA will be assumed only as restructured under the Debtors' Plan.  *See* PSA, Arts. 8.1, 8.2.

36.    Accordingly, at the time of the initiation of the auction process, parties in interest did not have any specific information about how the Debtors intended to treat their claims under a plan of reorganization, making it particularly difficult to evaluate the merits of pursuing the proposed auction process.

***The Debtors' Proposed Plan***

37.    On November 12, 2009, the Debtors filed the Debtors' Plan and the Disclosure Statement for the Debtors' Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code (the "Disclosure Statement").  The Debtors' Plan included the PSA, attached thereto as Plan Exhibit A.

38.    Since the Debtors' Plan was filed a few weeks ago, the CCRC Mezzanine Lenders and other parties in interest have now had an opportunity to review the Debtors' Plan, the Disclosure Statement and the PSA to better understand what the Debtors contemplate as an ultimate reorganization strategy.

39.     It is now apparent to the CCRC Mezzanine Lenders that the proposed bidding procedures and auction process may not have been designed to truly establish a competitive bidding process for the Debtors' assets in hopes of generating higher and better offers, but may instead be an orchestrated process designed to add legitimacy (and perhaps a sense of urgency) to a contemplated plan of reorganization that may very well be contrary to both the intent and purpose of the Bankruptcy Code.

40.     The Debtors' Plan, in essence, seeks to preserve ERC's equity interest in each of the CCRC Subsidiary Debtors solely so that this equity interest can be transferred to Redwood under the PSA.  The Debtors' Plan proposes to accomplish this transaction in a very creative, although perhaps wholly illegal manner.

41.     The Debtors' Plan proposes that certain secured indebtedness regarding the CCRCs is either substantially reduced (as it is with certain first lien debt on some properties) or is eliminated altogether (as it is with the mezzanine debt with respect to each of the CCRC Subsidiary Debtors).  For each CCRC Subsidiary Debtor, the Debtors' Plan provides that the first lien holder for each CCRC Subsidiary Debtor will be required to conduct a foreclosure sale and essentially foreclose all junior interests in the property securing the first liens.  But the Debtors' Plan fails to account for the fact that there are no assurances that the first lien holders will be the successful bidders at the foreclosure auctions.  Nor does the Debtors' Plan provide for the impact of another bidder acquiring the property on the implementation of the Debtors' Plan or the proposed sale to Redwood.  The foundation of the Debtors' Plan (including what appears to be a collusive foreclosure process) is comprised entirely of a series of contingent events, each of which must somehow work perfectly in sequence in order to obtain the contemplated (i) restructuring of the "desired" debt, (ii) elimination of the debt that the Debtors' Plan will

disregard, and (iii) preservation of what appears to be non-existent equity in favor of the Debtors (which is then to be sold to Redwood).[16]

42.     Since the first lien holders with respect to certain CCRC Subsidiary Debtors are not being paid in full under the Debtors' Plan, it is clear that the debt held by the NFPs with respect to those particular CCRC Subsidiary Debtors, if even valid, is unsecured. Notwithstanding that fact, the Debtors' Plan purports to eliminate other allegedly unsecured debt without providing any meaningful recovery on its account while reinstating the NFP debt. Likewise, the equity interests (which would also be eliminated by the foreclosure) are also somehow preserved. In certain instances, the Debtors' Plan provides that the senior lien holder is required not only to facilitate the foreclosure of junior interests in the property, but is also required to take a substantial haircut. In each such instance, the "lien" and "debt" of the NFP is maintained and the purported equity of the Landholder is also preserved.

43.     It is apparent that the true purpose of the Debtors' Plan is to transfer the value attributable to the various operating CCRCs to Redwood on an aggregate basis, when these assets are owned individually by the CCRC Subsidiary Debtors and are largely, if not completely, encumbered.

44.     Accordingly, on confirmation of the Debtors' Plan, it is contemplated that Redwood would pay a mere $100 million to own the equity in the CCRC Subsidiary Debtors and the other assets acquired under the PSA (principally the Related Party Contracts). The CCRC Subsidiary Debtors would own the CCRCs  (which cost hundreds of millions of dollars to construct and develop), subject to a fraction of the debt currently encumbering the properties.

---

[16]     Of course the assumption of the NFP "debt" by Redwood  and preservation of this "lien" is suspect since the NFP is contractually obligated to forgive the debt at the end of the day.

And the NFPs that were created to provide a tax-advantaged exit strategy for ERC would be preserved for the benefit of Redwood.

45.     The CCRC Mezzanine Lenders submit that the Debtors' Plan fails to adequately provide for and protect the interests of the creditors of the CCRC Subsidiary Debtors and that those interests must be considered and addressed before any sale of the CCRCs or their assets occurs.  Moreover, the Debtors' Plan unfairly discriminates between similarly situated creditors and is not fair and equitable, and the underlying motives for the Debtors' Plan must be reviewed before the Debtors are permitted to go forward.

46.     The Debtors' proposals are problematic from any number of perspectives. First, with respect to the proposed auction procedures, the failure to allocate the purchase price in any meaningful fashion may have made it impossible or impractical for parties to bid on the assets on other than an aggregate basis.  Moreover, because neither the PSA nor the Debtors' Plan provides any guidance regarding the allocation of the purchase price, at least one of the CCRC Mezzanine Lenders or any other party wishing to only bid on the assets of a particular CCRC Subsidiary Debtor, are left to guess as to what they are bidding against and are provided absolutely zero guidance on how such bids will be considered in the context of any auction, assuming any such auction ultimately occurs.  To make matters worse, the ultimate disposition of the relatively modest sales proceeds projected to be generated by the PSA (modest at least compared to the overall aggregate debt in this case) is left wholly up in the air and the Debtors' Plan simply provides that it will be determined by the Court, without any further explanation about a process.  Without this information, at least one of the CCRC Mezzanine Lenders and other creditors specifically entitled to credit bid their indebtedness under 11 U.S.C. Section 363(k) in an auction, cannot properly determine whether their interests would be better served by

bidding at the proposed auction, by pursuing the projected distribution under the Debtors' Plan (when information regarding the allocation of proceeds an distribution thereof is finally provided), or by perhaps proposing a stand alone plan (if exclusivity is terminated or expires) with respect to each of the CCRC Subsidiary Debtors against which the CCRC Mezzanine Lenders have claims.

47.     While the proposed auction process, the entry into the PSA and the proposal of the Debtors' Plan may make huge economic sense to Redwood, it is baffling to understand how these proposals benefit creditors, particularly creditors of the CCRC Subsidiary Debtors.  Accordingly, the CCRC Mezzanine Lenders strongly believe that the appointment of an independent third party examiner is required to assist the Court and other parties in interest in evaluating the merits of pursuing the proposed auction, the PSA, and the Debtors' Plan of Reorganization.  This appointment is particularly critical given (i) the impending dates for the proposed auction, (ii) the necessity for oversight and review of the proposed auction process, (iii) the number of questions that exist regarding the operation of the Debtors' businesses, (iv) the fact that the Debtors' Plan contemplates that the Court will have to ultimately determine the disposition of the sales proceeds if the proposed sale to Redwood is ultimately consummated, and an independent third party that has thoroughly examined the Debtors will be instrumental to that process.

### III.  RELIEF REQUESTED

48.     Pursuant to section 1104 of the Bankruptcy Code, the CCRC Mezzanine Lenders request that this Court appoint an examiner to investigate the Debtors, including any non-debtor affiliated entities, and the matters discussed in this Motion, along with other such

matters as the examiner or the Court sees appropriate for investigation, including, without limitation the following:

    i.  Intercompany accounts;

    ii.  Pre and post-petition acts and omission of the Debtors' officers and directors impacting their fiduciary duties;

    iii.  Propriety of the Debtors' decision to sell all or substantially all of their assets and, in particular, the proposed method of such sale on a bulk basis;

    iv.  Whether a conflict of interest exists based on the inter-creditor relationship between the various Debtors based on the Related Party Contracts or otherwise, making common counsel for the Debtors prejudicial to creditors and other parties in interest of the CCRC Subsidiary Debtors;

    v.  Whether separate counsel should be appointed for each of the CCRC Subsidiary Debtors, including the Concord Debtor, Ashburn Debtor, Concord Campus GP, LLC, Warminster Debtor, Novi Debtor, Houston Debtor, Dallas Debtor, Littleton Debtor, and the Kansas Debtor to insure that the interests of all such Debtors are properly protected;

    vi.  Potential mismanagement, dishonesty, and self-dealing involved in managing the Debtors' businesses, including with respect to the perspective proceeds of the sale of the Debtors' assets;

    vii.  Issues regarding the proposed auction and/or the PSA, including whether the proposed sale of the assets on an aggregate basis is necessary, appropriate, or can adequately protect the individual interests of the creditors of the subsidiary Debtors.

    viii.  Whether the auction procedures should be clarified or supplemented to more clearly provide how any bids for assets other than on a bulk basis would be evaluated;

    ix.  Whether an allocation of the proposed purchase price on an asset-by-asset or entity-by-entity basis is necessary to properly maximize the benefits of the stalking horse sale and/or the auction process;

    x.  Whether the auction procedures need to be modified, supplemented or clarified as it relates to credit bidding to ensure that parties rights under 11 U.S.C. Section 363 are properly preserved and protected;

    xi.  Whether the Debtors have truly engaged in adequate marketing efforts before and after execution of the PSA;

xii. Whether the interests of the NFP entities in any property of any Landholder is subject to attack under 11 U.S.C. Sections 544, 547, or 548 of the Bankruptcy Code (or any other provision of the Bankruptcy Code or applicable state law);

xiii. Whether the purported "debt" owed to any NFP is truly "debt", is truly owed, is properly calculated and other analysis of these transactions between any Debtor and an NFP;

xiv. Whether the assumption and assignment of the some or all of the Related Party Contracts as contemplated by the Debtors' Plan and the PSA is in the best interest of creditors of the CCRC Subsidiary Debtors;

xv. Whether the Debtors' Plan strategy, which seeks to transfer assets that are individually owned on an aggregate basis is permissible or can be accomplished in the manner proposed without violating the interests of the creditors of the CCRC Subsidiary Debtors;

xvi. Suggested proposals regarding the proper allocation of any sales proceeds between the various debtor entities and the creditors having claims with respect to each such entity;

xvii. Whether the directors and officers of the CCRC Subsidiary Debtors are acting consistent with their fiduciary duties, particularly in light of the paragraph 7.5 of the PSA, which precludes the CCRC Subsidiary Debtors from entertaining other transactions involving the sale of their asset, even though such entities are not parties to the PSA;

xviii. Any and all value that will be received pursuant to the sale of assets to Redwood, under the Debtors' Plan, or otherwise in connection with the chapter 11 cases and the transactions related thereto by John C. Erickson, any person related to John C. Erickson by blood or marriage, and any entity directly or indirectly owned or controlled by any of the foregoing;

xix. Intercompany transfers and transfers to affiliates and/or NFPs and any claims related thereto;

xx. Relationships between the Debtors, the Debtors' affiliates, the NFPs and Redwood, and any and all claims arising out of or related to those relationships; and

xxi. Such other matters as the Court deems appropriate.

# IV. BASIS FOR RELIEF

49.     Appointment of an examiner is mandatory and warranted in this case pursuant to section 1104(c) of the Bankruptcy Code.  Section 1104(c) provides:

> If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if—
>
> (1)     such appoint is in the interest of the creditors, any equity security holders, and other interests of the estate; or
>
> (2)     the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C. § 1104(c)(1) and (2).

50.     The Debtors book value revealed liabilities of approximately $3.0 billion—nearly $1 billion of which consist of funded debt obligations pursuant to certain lending agreements.  *See Rundell Affidavit*, Docket No. 27, ¶¶ 18, 120.

51.     The plain language of section 1104(c)(2) requires the appointment of an examiner "when the total fixed, liquidated, unsecured debt exceeds $5 million."  *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500-01 (6th Cir. 1990).  "Section 1104(c)(2) does not leave any room for the court to exercise discretion about whether an examiner should be appointed, as long as the $5,000,000 threshold is met and a motion for appointment of an examiner is made by a party in interest."  *In re Loral Space & Comm., Ltd.*, No. 04 Civ. 8645, 2004 WL 2979785, *4 (S.D.N.Y. Dec. 23, 2004); *see also In re UAL Corp.*, 307 B.R. 80, 84 (Bankr. N.D. Ill. 2004) (best reading of statute is that examiner appointment is

mandatory if requirements of section 1104(c)(2) are satisfied); *In re Schepps Food Stores, Inc.*, 148 B.R. 27, 30 (S.D. Tex. 1992) (appointment is not discretionary).

52.     ERC, the Ashburn Debtor, the Concord Debtor, the Warminster Debtor, the Novi Debtor, the Houston Debtor, the Dallas Debtor, the Littleton Debtor, and the Kansas Debtor each owe more than $5,000,000 on an individual basis, and the Debtors owe more than $1 billion on a collective basis, according to recently filed schedules.

53.     In addition, the legislative history of section 1104(c)(2) of the Bankruptcy Code indicates that Congress intended third-party intervention upon request in large reorganization cases. *See* Barry L. Zaretsky, *Chapter 11 Issues: Trustees and Examiners in Chapter 11*, 44 S.C. L. Rev. 907, 940 (1993). Only in extraordinary situations—none of which are present in this case—have courts declined to appoint an examiner. *See, e.g., In re Schepps Food Stores, Inc.*, 148 B.R. at 31 (appointment sought on the eve of confirmation is basis for waiver); *In re Bradlees Stores, Inc.*, 209 B.R. 36, 38 (Bankr. S.D.N.Y. 1997) (appointment sought late in case).

54.     Not only is the appointment of an examiner required under Bankruptcy Code section 1104(c)(2), it is also warranted under Bankruptcy Code section 1104(c)(1). An investigation by an unbiased third party will provide creditors, parties in interest, and the Court with answers to questions that are critical to the administration of these cases. A proper examination of the Debtors' pre and post-petition conduct and business transactions will assist all parties in evaluating (i) whether the pursuit of the proposed auction and prospective sale to Redwood are is in the best interest of each Debtor (not just ERC), (ii) how bids at the proposed auction should be properly evaluated, (iii) the propriety of the various provisions of the Debtors' Plan, (iv) whether a standalone plan for one or more of the Debtors is in the best interest of

creditors of any such Debtor, and (v) the possible formulation of an alternative plan of reorganization.

55.     The requested scope of investigation is well within the broad authority granted to examiners.  "The investigation of an examiner in bankruptcy . . . is supposed to be a 'fishing expedition,' as exploratory and groping as appears proper to the examiner."  *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 432 (Bankr. S.D.N.Y. 1993).

56.     For all of these reasons, the CCRC Mezzanine Lenders request the appointment of an examiner in accordance with Section 1104 of the Bankruptcy Code.


*(Intentionally Blank)*

WHEREFORE, the CCRC Mezzanine Lenders request that the court (i) appoint

an examiner pursuant to section 1104(c)(1) and (2) of the Bankruptcy Code to investigate all

matters that the examiner, in consultation with the U.S. Trustee, determines to be relevant to the

case, the auction, or the Debtors' Plan and (ii) grant all other relief that is just and proper.


Dated: December 14, 2009                    Respectfully Submitted,

                                            **BAKER BOTTS L.L.P.**

                                            _____*/s/ Martin Green*_____
                                            G. Martin Green
                                            Texas Bar No. 08351500
                                            marty.green@bakerbotts.com
                                            Artoush Varshosaz
                                            Texas Bar No. 24066234
                                            artoush.varshosaz@bakerbotts.com
                                            2001 Ross Avenue
                                            Dallas, Texas 75201-2980
                                            Telephone:    214.953.6500
                                            Facsimile:    214.664.6503

                                            **COUNSEL FOR THE MICHIGAN
                                            RETIREMENT SYSTEM ENTITIES**

                                            **LATHAM & WATKINS LLP**

                                            Peter M. Gilhuly
                                            California Bar No. 151516
                                            peter.gilhuly@lw.com
                                            Kimberly A. Posin
                                            California Bar No. 223091
                                            kim.posin@lw.com
                                            Lucas R. Bailey
                                            California Bar No. 258496
                                            lucas.bailey@lw.com
                                            355 South Grand Avenue
                                            Los Angeles, California 90071-1560
                                            Telephone:    213.485.1234
                                            Facsimile:    213.891.8763

                                            **COUNSEL TO THE HCPI
                                            LANDHOLDER ENTITIES**

**BALLARD SPAHR LLP**

Tobey M. Daluz
daluzt@ballardspahr.com
Delaware Bar Number 3939
Matthew G. Summers
summersm@ballardspahr.com
919 North Market Street
Wilmington, Delaware 19801
Telephone:     (302) 252-4428
Facsimile:     (410) 361-8930

**COUNSEL TO THE MSRESS III
ENTITIES**

## CERTIFICATE OF SERVICE

The undersigned certifies that on this, the 14th day of December 2009, a true and correct copy of the above Motion was served via email through the Bankruptcy Court's Electronic Case Filing System on those parties that have consented to such service and on all parties listed on the service list filed on December 7, 2009 (Docket No. 484).

_____/s/  Martin Green_____

## CERTIFICATE OF CONFERENCE

The undersigned certifies that on December 14, 2009, he called counsel for the Debtors, Mr. Thomas R. Califano, concerning the relief requested in this Motion, but Mr. Califano did not answer the phone. The undersigned left a voicemail for Mr. Califano regarding the relief sought in this Motion and has not been contacted in return. In addition, the undersigned contacted counsel for the Official Unsecured Creditor's Committee, Mr. Samuel M. Stricklin, concerning the relief requested in this Motion. Mr. Stricklin was unable to comment with regard to the committee's position concerning the relief requested.

_____/s/  Martin Green_____