William James Brattain
101 Eastwood Drive
Palm Coast, Florida 32164
386-437-3954

CLAIMANT



FILED
FEB 17 2010
TAWANA C. MARSHALL, CLERK
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

In re:
ERICKSON RETIREMENT COMMUNITITES, LLC, et al
Debtors

CASE NO. 09-37010
CHAPTER 11
Jointly Administered

### OBJECTION TO AMENDED DISCLOSURE STATEMENT
### FOR JOINT PLAN OF REORGANIZATION FOR THE DEBTORS PROPOSED BY
### ERICKSON RETIREMENT COMMUNITIES, LLC

Pursuant to the "ORDER SETTING HEARING AND DEADLINE TO OBJECT TO AMENDED DISCLOSURE STATEMENT FOR JOINT PLAN OF REORGANIZATION FOR THE DEBTORS PROPOSED BY ERICKSON RETIREMENT COMMUNITIES, LLC", the Claimant, William James Brattain, herewith files his objection.

### SUMMARY

The Amended Disclosure Statement unfairly denies appropriate and obligated compensation to William Brattain and his laid off employees on several levels:

1. The Amended Disclosure Statement allocates 0% ($0) to Unsecured Creditors. This is not a fair and equitable distribution and is contrary to typical bankruptcy precedents where a dollar amount is set aside or carved out for some level of compensation to Unsecured Creditors.

1

2. The Amended Disclosure Statement, while correctly proposing that Other Priority Claims will receive 100% of amount owed, does not appear to list any dollar amounts in Schedule F to be set aside for such Other Priority Claims to fulfill that obligation.

3. There are unique claims of inequitable treatment in regards to unpaid Accrued Vacation (Paid Time Off, hereinafter referred to as PTO) that affect YOUR NAME and a very small group of former employees (approx. 5-10 employees) out of the approximately 450 laid off employees. This group has been unfairly denied payment that should have been paid out in full per the Separation Agreement prior to the Bankruptcy date and despite other severed employees with the same termination date receiving payment for Accrued Vacation. Paying this obligation is essential to providing a greater opportunity for the restructured company to achieve success through restoring employee morale by demonstrating that the Company will honor its basic obligations to employees. In addition, the Amended Plan anticipates future Development and Construction to bring more financial stability to uncompleted Communities through recovering more initial entrance deposits and acquiring a more stable revenue stream through increased numbers of monthly deposits. To achieve the greatest success in bringing stability to these Communities, the restructured Company will need the expertise provided by those employees who were laid off just prior to bankruptcy and denied basic obligations such as Accrued Vacation (PTO) as described in each employee's Separation Agreement.

4. There are unique claims of Severance payment that should be paid out as part of the Amended Plan. Similar to Accrued Vacation, there are a number of employees (approx. 94) who have had their Separation Agreements violated by having needed income from Severance payments suspended. This occurred despite the employees' good faith and hard work for the good of the Company in performing necessary tasks in bringing the Development/Construction process to a close to maximize recovery of Entrance Deposits. These efforts have materially helped enhance the value of the restructured Company and given it a greater chance to succeed in its business going forward. In addition, as cited above for PTO, the Amended Plan and Disclosure Statement anticipates future Development and Construction to bring more financial stability to uncompleted Communities through recovering more initial entrance deposits and acquiring a more stable revenue stream through increased numbers of monthly deposits. To achieve the greatest success in bringing stability to these Communities, the restructured Company will need the expertise provided by those employees who were laid off just prior to bankruptcy and denied basic obligations such as Severance as described in each employee's Separation Agreement.

5. In regards to Severance and PTO/Accrued Vacation, former employees are in unique class for several reasons. First, employees were told by the Company that Severance and PTO were safe from Bankruptcy, and thus employees acted in good faith in the administration of their obligations per the Separation Agreement only to find that their Severance and PTO have been

suspended/denied to date (some have received $0 in Severance and $0 in PTO). Employees acted in good faith in remaining with the Company and have subsequently suffered and continue to suffer significant financial hardship. The impact of unpaid Severance and PTO has the greatest effect on these employees. Unlike other Creditors, employees do not have multiple customers. Other Creditors through these multiple customers can better withstand/dilute the effects of bankruptcy by relying on business with other customers. For employees, their employment represented their whole livelihood, so cutting off these payments has the most injurious effect and thus rises to the highest level of injustice. Furthermore, no other Creditors would have been told by the Debtor Company that the money owed them would be safe from bankruptcy. This was the case with these severed employees, and combined with an employee's income being his or her financial livelihood, this class of former employees has a unique and high priority claim that the Court should use its broad authority to protect. Indeed, the Debtors/Debtors in Possession have expressed their strong support for these employees to be paid their Severance and PTO, as evidenced by the "MOTION OF DEBTORS PURSUANT TO 11 U.S.C. SECTION 105(a) AND 363(b) FOR AN ORDER AUTHORIZING PAYMENT OF PREPETITION EMPLOYEE SEVERANCE BENEFITS" (item #130 on the Court Docket and hereinafter referred to as "Motion for Severance"). **Finally, while the proper payout of Severance and PTO would have a hugely positive impact on the affected employees' financial hardship, the total**

4

**dollar amount would have a microscopic effect on other creditors. The full and proper payout of PTO claims would be less than 0.0005 (or 5/100 of 1%) of the total $365 million sale of the Company. Similarly, the proper payout of Severance claims, though larger than PTO, would still be miniscule and would be less than 0.005 (or less than ½ of 1%) of the total $365 million sale of the Company.**

6. There are unique claims of inequitable treatment in regards to the disbursement or lack of disbursement of the GPP Employment Benefit Plan. A small group of employees never received the first three installments of the GPP disbursement that the bulk of GPP members received. These employees achieved the required vesting BEFORE the Bankruptcy date and should have been compensated upon vesting. Furthermore, the dollar amounts of the first three installments were held in individual escrow accounts for these employees until such time as they were vested. Since the vesting occurred prior to the Bankruptcy, the Company was in error and wrongfully denied payment of these vested escrow accounts. The Court should right this inequity and award these employees as a priority class to receive payment of the vested, escrowed amounts from the first three installments of the GPP Old Plan disbursement.

**BASIS FOR OBJECTION**

## Unsecured Creditors

7. Unsecured Creditors Should Not Receive $0 as outlined in the Amended Disclosure Statement. The original Plan as filed (Docket #293) listed Unsecured Creditors as an Impaired Class entitled to vote based on an estimated recovery TBD, the same designation given for Corporate Revolver Claims and UMBC Building Construction Loan Claims, who are now slated to receive 49.6% and 62.7% estimated recoveries. William Brattain objects to the diminishment of such allocation from an impaired class with some percentage recovery anticipated to $0 recovery. With the increase of Cash from the Auction and Sale of the Company from an original offer of $100 million to the current sale of $365 million in Cash, the Court should insist that an appropriate and reasonable percentage of the $365 million be set aside for payment to Unsecured Creditors, consistent with percentages allocated in other Bankruptcy cases to Unsecured Creditors.

## Other Priority Claims

8. The full payment of Other Priority Claims is reasonable and consistent with Bankruptcy provisions, which include Severance and Accrued Vacation. However, the Court should make sure that Schedule F, which lists the various allocations to different Classes of Claims, properly allocates the appropriate dollars for such Other Priority Claims.

## Accrued Vacation/PTO

9. William Brattain was part of the Reduction in Force announced in July 2009. However, William Brattain agreed along with other critical employees, as part of his Separation Agreement, to work until October 1, 2009 to provide essential services to Erickson in the closing down of the Development and Construction group.

10. The Separation Agreement clearly stipulates that the severed employee shall receive their PTO/Accrued Vacation in a lump sum to be paid on the first pay date following the termination date.

11. The first pay date after the termination date of October 2, 2009 was October 9, 2009. Thus, the full PTO lump sum payment should have been made prior to the October 19, 2009 bankruptcy declaration. Out of equity and fairness, the Court should allocate and release those funds, since the proper payment on October 9, 2009 should have occurred, and the employees denied such payment through no fault of their own should not be penalized.

12. Other payments to employees were made between the regular October 9 and October 23 paydates (including distributions to Executive Management on October 15), so there was ample opportunity for Erickson to make these PTO payments after the prescribed October 9 date but still prior to the October 19 bankruptcy filing.

13. These employees suffered extreme financial hardship by finding out on October 22, only one day before they were to receive their lump sum PTO payouts on regular paydate of October 23 that the payout would not occur the next day. This was described by the Company as a "glitch" in the

bankruptcy process that should be resolved by the following week when the Motion for Severance was supposed to be heard. The Motion was not heard and still has not been heard, and these Employees have been suffering compounded financial hardship.

14. Other employees with the same October 2, 2009 termination date and/or within the same week did receive their full PTO/accrued vacation payouts. Out of fairness and equity, the Court should allocate and pay the remaining employees their full PTO amount.

15. PTO/Accrued Vacation is recognized by state laws and regulations as an enforceable part of the wage agreement. In Texas, the Texas Pay Day Law holds that if accrued leave is promised in a written policy or agreement (which is clearly the case with Erickson's Separation Agreement), then that accrued leave is an enforceable part of the wage agreement (from twc.state.tx.us website). In Maryland (where many of the terminated employees worked for Erickson), the Court of Special Appeals in *Catapult Technology, LTD v. Paul Wolfe*, No. 997 (Aug 20, 2007) stated that accrued, unused time off (PTO) must be paid to employees upon termination as it constitutes a "wage" under the Maryland Wage Payment and Collection Law. Maryland Guide to Wage Payment and Employment Standards states: "When an employee has earned or accrued his or her leave in exchange for work, an employee has a right to be compensated for unused leave upon the termination of his or her employment regardless of the employer's policy or language in the employee handbook." (as reported from

jacksonlewis.com/legal updates/article.cfm?aid=1268). In the case at hand, Erickson employees had the added protection of having Separation Agreements spelling out that they would be paid for PTO/unused leave. Furthermore, a general rule of employment law would be applicable here: "whenever two or more statutes or principles of law apply to an employee's situation, the one that results in a greater benefit to the employee must be applied...Wage agreements that exceed state or federal minimums will take precedence under general contract principles and under most state wage payment laws, including the Texas Payday Law." (from twc.state.tx.us website). In this case, the enforceability of the Separation Agreement is of greater benefit to the employee and should be applied.

16. Employees are the most vulnerable of Classes in a bankruptcy case (beyond assuring that the Business is viable and thus protects the Residents in this particular case). Unlike other Creditors, employees do not have multiple customers. Other Creditors through these multiple customers can better withstand/dilute the effects of bankruptcy by relying on business with other customers. For employees, their employment represented their whole livelihood, so cutting off these payments has the most injurious effect and thus rises to the highest level of injustice. The Court in its established role as a Court of equity, is empowered with broad remedial powers to fashion relief for Creditors in a fair and equitable manner.

17. Employees are a unique class in this particular case, in that they were assured by the Company that their Separation Agreements and

accompanying Severance benefits would be honored even if future Bankruptcy occurred. Paying out PTO was a matter of state law and thus would be protected. No other class of Creditors can assert this claim. A business who is a Creditor necessarily understands that part of doing business involves risk that a customer may not pay them back and could be protected from collection of debt through bankruptcy. Out of equity and fairness, these employees, who were promised Severance and PTO payment, and continued to work in good faith based upon such promises from the Company, should be paid their PTO in full to honor that Separation Agreement.

18. The Company (Debtor/Debtor in Possession) has already stated their support and reasoning for former Employees to be paid per the Separation Agreement. The Motion for Severance referenced in Paragraph 5 above and found as item #130 on the Court Docket expresses strong arguments for these employees to be paid their severance. A similar motion for PTO payout is anticipated and has been promised to be coming soon from the Debtors/Debtors in Possession.

19. The arguments in the Motion contained within Docket item #130 are adopted by reference into this document and briefly outlined in the following paragraphs 20-25.

20. The Motion effectively outlines that the severed employees were essential to close down projects and other necessary functions. "If the retained personnel had not completed their work, the Debtors, and therefore the

bankruptcy estates would be in a materially worse position than they are today."

21. For example, the essential tasks required to open buildings in Ashby Ponds RB 1.4 and 1.5 and Maris Grove RB 2.2 and 2.4 resulted in an increase in cash entrance deposits for the bankruptcy estate of $43.4 million.

22. The Debtors have experienced a loss in key talent that the Company had hoped to retain. If the Company cannot restore and maintain the confidence of its employees, the continued success of the Company and ultimately the security and quality of life of the Residents would be negatively impacted.

23. Honoring the Separation Agreements will help the Company going forward to retain its employees and reduce the incentive for further erosion of key employees seeking employment elsewhere. As the Motion states, if these obligations are not honored, "the morale of current Employees would suffer, which would adversely impact the Debtors' business. Failure to honor the Prepetition Obligations could also result in extreme hardship to the Laid-Off Employees depending on the payments as their sole remaining source of income. This would inevitably result in lowered Employee morale and lead to unmanageable Employee turnover. Indeed, the Debtors may be unable to sustain operations and effectuate a successful reorganization without the ongoing good will of their Employees."

24. As the Debtors' Motion outlines, "Debtors' inability to retain or hire back a qualified work force would inhibit the estates' ability to move beyond bankruptcy. The Debtors or their successor hope to continue development of

certain projects in the future in order to attract new residents and continue to add value to the projects." The Amended Disclosure Statement, along with the original plan, calls for a $50 million facility for future construction, which will be necessary to stabilize the developing communities. "If Debtors are unable to retain or hire back employees due to a lack of confidence in Debtors' ability to fulfill their employee agreements with individuals who have development expertise, the ability to conduct that future development that is essential to both the potential purchaser, Redwood, and the National Senior Campuses, Inc. Board which holds the management contracts is put at risk."

25. Bankruptcy code 105 (a) and 363 (c) and the "necessity of payment" doctrine provide the basis for relief. Bankruptcy code 105(a) grants broad authority to carry out the provisions of the Bankruptcy code. For prepetition employee compensation and benefits being upheld as necessary and priority claims, cited cases are <u>CoServ LLC,</u> 273 B. R. 487, 494 ) Bankr. N.D. Tex, 2002 and <u>Mich. Bureau of Workers' Disability Comp v. Chateaugay Corp</u> 80 B. R. 279, 285-286 (S.D. N.Y. 1987).

26. **The proper payout of PTO claims would be less than 0.0005 (or 5/100 of 1%) of the total $365 million sale of the Company. This microscopic portion of the total Sale would not materially and negatively affect the other Creditors but would have a significantly positive impact on the livelihoods of the affected employees.**

## Severance Payment

27. William Brattain was part of the Reduction in Force announced in July 2009. However, William Brattain agreed along with other critical employees, as part of his Separation Agreement, to work until October 1, 2009 to provide essential services to Erickson in the closing down of the Development and Construction group.

28. The Separation Agreement clearly stipulates that the severed employee shall receive their severance to be paid on an ongoing paycheck by paycheck basis for the specified number of weeks at the employee's current rate of pay (ie, at termination).

29. These employees suffered extreme financial hardship by finding out on October 22, only one day before they were to receive their lump sum PTO payouts that the payout would not occur the next day. This was described by the Company as a "glitch" in the bankruptcy process that should be resolved by the following week when the Motion for Severance was supposed to be heard. The Motion was not heard and still has not been heard, and these Employees have been suffering compounded financial hardship.

30. Severance is recognized by state laws and regulations as an enforceable part of the wage agreement. In Texas, per the Office of the Commissioner representing employers on the Texas Workforce Commission under the authority of Texas Labor Code Section 301.002(a)(2) (TWC website is twc.state.tx.us), "Severance pay that is promised in a written policy or other form of agreement is an enforceable part of the wage agreement under the

13

Texas Payday Law. Under Section 821.25(b) of the Texas Payday Law rules, severance pay is additional pay for an employee's past work that is given at the end of the employee's employment, and is usually, but not always, based upon a set formula such as length of prior service. It is a payment that the employer has somehow previously obligated itself to give, either orally or in writing....As a matter of enforcement policy, TWC's Labor Law Department will enforce whatever severance payment interval and conditions are set forth in the written policy or agreement creating the obligation to make the payment. " Furthermore, a general rule of employment law would be applicable here: "whenever two or more statutes or principles of law apply to an employee's situation, the one that results in a greater benefit to the employee must be applied...Wage agreements that exceed state or federal minimums will take precedence under general contract principles and under most state wage payment laws, including the Texas Payday Law." (from twc.state.tx.us website). In this case, the enforceability of the Separation Agreement is of greater benefit to the employee and should be applied.

31. Employees are the most vulnerable of Classes in a bankruptcy case (beyond assuring that the Business is viable and thus protects the Residents in this particular case). Unlike other Creditors, employees do not have multiple customers. Other Creditors through these multiple customers can better withstand/dilute the effects of bankruptcy by relying on business with other customers. For employees, their employment represented their whole livelihood, so cutting off these payments has the most injurious effect and

14

thus rises to the highest level of injustice. The Court in its established role as a Court of equity, is empowered with broad remedial powers to fashion relief for Creditors in a fair and equitable manner.

32. Employees are a unique class in this particular case, in that they were assured by the Company that their Separation Agreements and accompanying Severance benefits would be honored even if future Bankruptcy occurred. No other class of Creditors can assert this claim. A business who is a Creditor necessarily understands that part of doing business involves risk that a customer may not pay them back and could be protected from collection of debt through bankruptcy. Out of equity and fairness, these employees, who were promised Severance and PTO payment, and continued to work in good faith based upon such promises from the Company, should be paid their severance in full to honor that Separation Agreement.

33. The Company (Debtor/Debtor in Possession) has already stated their support and reasoning for former Employees to be paid per the Separation Agreement. The Motion for Severance referenced in Paragraph 5 above and found as item #130 on the Court Docket expresses strong arguments for these employees to be paid their severance.

34. The arguments in the Motion contained within Docket item #130 are adopted by reference into this document and briefly outlined in the following paragraphs 35-40.

35. The Motion effectively outlines that the severed employees were essential to close down projects and other necessary functions. "If the retained personnel had not completed their work, the Debtors, and therefore the bankruptcy estates would be in a materially worse position than they are today."

36. For example, the essential tasks required to open buildings in Ashby Ponds RB 1.4 and 1.5 and Maris Grove RB 2.2 and 2.4 resulted in an increase in cash entrance deposits for the bankruptcy estate of $43.4 million.

37. The Debtors have experienced a loss in key talent that the Company had hoped to retain. If the Company cannot restore and maintain the confidence of its employees, the continued success of the Company and ultimately the security and quality of life of the Residents would be negatively impacted.

38. Honoring the Separation Agreements will help the Company going forward to retain its employees and reduce the incentive for further erosion of key employees seeking employment elsewhere. As the Motion states, if these obligations are not honored, "the morale of current Employees would suffer, which would adversely impact the Debtors' business. Failure to honor the Prepetition Obligations could also result in extreme hardship to the Laid-Off Employees depending on the payments as their sole remaining source of income. This would inevitably result in lowered Employee morale and lead to unmanageable Employee turnover. Indeed, the Debtors may be unable to sustain operations and effectuate a successful reorganization without the ongoing good will of their Employees."

39. As the Debtors' Motion outlines, "Debtors' inability to retain or hire back a qualified work force would inhibit the estates' ability to move beyond bankruptcy. The Debtors or their successor hope to continue development of certain projects in the future in order to attract new residents and continue to add value to the projects." The Amended Disclosure Statement, along with the original plan, calls for a $50 million facility for future construction, which will be necessary to stabilize the developing communities. "If Debtors are unable to retain or hire back employees due to a lack of confidence in Debtors' ability to fulfill their employee agreements with individuals who have development expertise, the ability to conduct that future development that is essential to both the potential purchaser, Redwood, and the National Senior Campuses, Inc. Board which holds the management contracts is put at risk."

40. Bankruptcy code 105 (a) and 363 (c) and the "necessity of payment" doctrine provide the basis for relief. Bankruptcy code 105(a) grants broad authority to carry out the provisions of the Bankruptcy code. For prepetition employee compensation and benefits being upheld as necessary and priority claims, cited cases are <u>CoServ LLC,</u> 273 B. R. 487, 494 ) Bankr. N.D. Tex, 2002 and <u>Mich. Bureau of Workers' Disability Comp v. Chateaugay Corp</u> 80 B. R. 279, 285-286 (S.D. N.Y. 1987).

41. **The proper payout of PTO claims would be less than 0.005 (or 1/2 of 1%) of the total $365 million sale of the Company. This microscopic portion of the total Sale would not materially and negatively affect the**

**other Creditors but would have a significantly positive impact on the livelihoods of the affected employees.**

### GPP Payout of First Three Installments to Vested Employees

42. A small group of employees never received the first three installments of the GPP disbursement that the bulk of GPP members received. These employees achieved the required vesting BEFORE the Bankruptcy date and should have been compensated upon vesting. Furthermore, the dollar amounts of the first three installments were held in individual escrow accounts for these employees until such time as they were vested. As such, these escrow accounts would be the assets of the individual employee, not the Company, provided that the individual employee achieved their vesting date. Since the vesting occurred prior to the Bankruptcy, the Company was in error and wrongfully denied payment of these vested escrow accounts. To not pay out these first three installments would be an injustice to those employees whose loyalty and dedication was rewarded with inequitable treatment. **The Court should right this inequity and award these few employees as a priority class to receive payment of the vested, escrowed amounts from the first three installments of the GPP Old Plan disbursement.**

### CONCLUSION

Given the foregoing arguments, I have filed my Objection to the Amended Disclosure Statement and Object to its approval in its current iteration. I believe

that the Disclosure Statement and Plan should be modified to equitably address the proper payout of all items noted above. This Objection per instructions from the Court, will be sent to Debtors' counsel as noted below before February 2, 2010:

Vincent Slusher
DLA Piper LLC
1700 Main Street Suite 4600
Dallas, TX 75201

Thomas R. Califano
DLA Piper LLC
1251 Avenue of the Americas
New York, New York 10020-1104

Dated: February 1, 2010
William Brattain