

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

_____
**Signed March 5, 2010**                         **United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| IN RE: § | |
| § | |
| ERICKSON RETIREMENT COMMUNITIES, § | CASE NO. 09-37010-SGJ-11 |
| LLC, et al.[1], § | (Jointly Administered) |
| DEBTORS. § | |
| § | |

<u>MEMORANDUM OPINION AND ORDER DENYING MOTION FOR ORDER APPOINTING
EXAMINER PURSUANT TO 11 U.S.C. § 1104 [DE # 520]</u>

BEFORE THIS COURT is the *Motion of the CCRC Mezzanine Lenders for Order Appointing Examiner Pursuant to 11 U.S.C. § 1104* [DE # 520] (the "*Examiner Motion*") and various objections

---

[1] The debtors in these jointly-administered cases are Erickson Retirement Communities, LLC, Ashburn Campus, LLC, Columbus Campus, LLC, Concord Campus GP, LLC, Concord Campus, LP, Dallas Campus GP, LLC, Dallas Campus, LP, Erickson Construction, LLC, Erickson Group, LLC, Houston Campus, LP, Kansas Campus, LLC, Littleton Campus, LLC, Novi Campus, LLC, Senior Campus Services, LLC, Warminster Campus GP, LLC, Warminster Campus, LP (collectively, the "Debtors" or "Erickson Debtors").

thereto.

## I. Introduction: Context for the *Examiner Motion*.

The Debtors' chapter 11 cases[2] were commenced voluntarily on October 19, 2009. The *Examiner Motion* was filed on December 14, 2009,[3] and was first set for a hearing on January 13, 2010, then continued, per the request of parties, to February 5, 2010. After the February 5, 2010 hearing, the court requested post-hearing briefing from the parties by a deadline of February 22, 2010.

The *Examiner Motion* was originally being urged by three different sets of subordinated debt holders (collectively, the "CCRC Mezzanine Lenders") with respect to several of the Erickson Debtors. Since the filing of the *Examiner Motion*, much has transpired. There has been a competitive auction of the Debtors' business, with a third-party purchaser—ERC Senior Living Holdings, LLC ("Redwood")—emerging as the high bidder (with an approximately $365 million cash bid). Redwood is, by all accounts, poised to close an acquisition that would be accomplished as part of a proposed Debtors' plan of

---

[2] The sixteen bankruptcy cases of the Debtors will collectively sometimes be referred to herein as the "Erickson Case."

[3] The court has jurisdiction to consider the *Examiner Motion* pursuant to 28 U.S.C. § 1334. The contested matter presented by the *Examiner Motion* is a core proceeding, pursuant to 28 U.S.C. § 157(b).

reorganization ("Plan"). Additionally, various significant settlements in principal have been reached among most of the major secured and unsecured constituencies in the cases, which are incorporated into the Debtors' proposed Plan on file (all of which settlements are awaiting court approval; the Debtors' Disclosure Statement describing all of this is set for hearing on March 5, 2010). In light of these case developments, the original *Examiner Motion* is now narrower in two respects:

> (a) First, two sets of CCRC Mezzanine Lenders have withdrawn their support of the *Examiner Motion*. Now, the sole movants on the *Examiner Motion* are: Strategic Ashby Ponds Lender, LLC (the "Ashby Mezzanine Lender") and Strategic Concord Landholder, LP (the "Concord Subordinated Ground Lessor") (collectively, sometimes referred to as the "Michigan Retirement System Entities" or the "Subordinated Creditor"). Ashburn Campus, LLC (the "Ashburn Debtor") is the Debtor that is obligated to the Ashby Mezzanine Lender, and Concord Campus, LP (the "Concord Debtor") is the Debtor that is obligated to the Concord Subordinated Ground Lessor. The Michigan Retirement System Entities assert claims totaling approximately $75 million (approximately $50 million owed to the Ashby Mezzanine Lender and approximately $25 million owed to the Concord Subordinated Ground Lessor), which claims are cross-collateralized among the Ashburn and Concord Debtors, and which claims are also backed by certain guarantees of the Debtor/Parent "flagship," Erickson Retirement Communities, LLC ("ERC").
>
> (b) Second, the *Examiner Motion* is narrower in that the movants originally sought an examiner to probe into 21 areas of inquiry, and now the Michigan Retirement System Entities merely seek an examiner to investigate and report to the court on one sole issue: the appropriateness/fairness of the allocation of value (*i.e.,* sales proceeds) among the sixteen different Debtors' estates, as set forth in the Debtors' Plan that will presumably soon be set for confirmation.

**II. Applicable Statutory Authority.**

Section 1104(c) is, of course, the governing authority, with respect to the *Examiner Motion*. This statute provides that a bankruptcy court **shall** appoint an examiner in a chapter 11 case if: (a) the time frame involved is **before** confirmation of a plan; (b) there is a **request** of a party-in-interest or the United States Trustee; (c) there has been **notice and a hearing**; and (d)(i) if it is in the **interests of creditors, any equity security holders and other interests of the estate**; or (ii) the debtor's fixed, liquidated, **unsecured debts** (other than for goods, services, or taxes or insider debt) **exceed $5 million**. The contemplated duties of an examiner under the statute are to "conduct such an investigation of the debtor as is appropriate," such as investigating allegations of (a) fraud; (b) dishonesty; (c) incompetence; (d) misconduct; (e) mismanagement; (f) irregularity in the management of the affairs of the debtor of or by current or former management of the debtor.

Here, there is no dispute in the Erickson Case that the time frame is **before** confirmation; that there has been a **request** of a purported party-in-interest (*i.e.,* a creditor owed $75 million); that there has been **notice and a hearing;** and that the Debtors

who are implicated by the *Examiner Motion*[4] have fixed, liquidated, unsecured debts (other than for goods, services, or taxes or insider debt) that exceed $5 million. However, this court does not believe that appointment of an examiner is in the interests of creditors, equity security holders, or other interests of the estates or is necessary to conduct any investigations. There are no allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, irregularity in the management of the affairs of the Debtors of or by current or former management of the Debtors. Moreover, this case is well on its way to a confirmation hearing where virtually all of the key constituencies in the cases (except for the Michigan Retirement System Entities) have expressed general support for the Plan.[5] The question, against this backdrop, is whether the court **must** appoint an examiner?

At first blush, the issue here seems to be whether, because the $5 million unsecured debt threshold is met with regard to the

---

[4] To be clear, the Debtors who are "implicated" by the *Examiner Motion* are, at this point, the Ashburn Debtor, the Concord Debtor, and ERC—who are the only Debtors against whom the Michigan Retirement System Entities hold claims. The Michigan Retirement System Entities have urged that an examiner should be appointed over all of the Debtors' cases. The court stated orally at the hearing on this matter that the Michigan Retirement System Entities clearly did not have standing to seek an examiner in the cases of the Debtors who were not liable to it, and the court now reiterates this in this Memorandum Opinion.

[5] There is well over $1 billion of creditor claims in these cases.

Ashburn Debtor, the Concord Debtor and ERC, the appointment of an examiner is **mandatory**. Many courts have been confronted with this issue and have held yes—an examiner is required whenever the $5 million unsecured debt threshold of Section 1104(c)(2) is met. *In re Loral Space & Comm., Ltd.*, No. 04-CV-8645RPP, 2004 WL 2979785, at *4 (S.D.N.Y. Dec. 23, 2004); *see also In re UAL Corp.*, 307 B.R. 80, 84 (Bankr. N.D. Ill. 2004); *see also In re Schepps Food Stores, Inc.*, 148 B.R. 27, 30 (S.D. Tex. 1992). This court agrees with such courts that, where the $5 million unsecured debt threshold is met, a bankruptcy court ordinarily has no discretion. The only judicial discretion that comes into play is in defining the scope of the examiner's role/duties. The court can make the scope of an examiner's duties very broad or very narrow. *In re Revco D.S., Inc.*, 898 F.2d 498, 501 (6th Cir. 1990) (holding that the bankruptcy court retains broad discretion to direct the examiner's investigation, including its nature, extent and duration); *see also UAL Corp.*, 307 B.R. at 86-87. However, here, there is a more pertinent question: whether the Michigan Retirement System Entities have genuine **standing** as a "party in interest," for purposes of Section 1104(c), and/or whether the concept of "**waiver**" might apply to them, as a result of certain prepetition subordination agreements to which they are parties.

**III. The Subordination Agreements.**

There are two subordination agreements (collectively, the "Subordination Agreements") involved here: (a) a "Subordination and Standstill Tri-Party Agreement" among (i) the Ashby Ponds Lender, (ii) certain of the Ashburn Debtor's senior, secured lenders (hereinafter, "Ashburn Project Lenders"), and (iii) the Ashburn Debtor; and (b) a "Ground Lessor Tri-Party Agreement" among (i) the Concord Landholder, (ii) certain of the Concord Debtor's senior secured lenders (hereinafter, the "Concord Project Lenders"), and (iii) the Concord Debtor.[6] In each of these Subordination Agreements, the Subordinated Creditors (*i.e.,* the Michigan Retirement System Entities) agreed, among other things, not just to subordinate their right to payment until the Ashburn and Concord Project Lenders were paid in full (*see* Sections 2.1-2.2 of the Subordination Agreements), but also agreed not to "***exercise any rights or remedies or take any action or proceeding to collect or enforce any of the Subordination Obligations***" without "the prior written consent of the Agent"[7]

---

[6] The two Subordination Agreements were attached as Exhibits 1 and 2 to DE # 843 in this case. The authenticity of these Exhibits appears not to be in controversy.

[7] The "Agent" for both the Ashburn Project Lenders and the Concord Project Lenders is now PNC Bank, National Association (hereinafter, the "Agent"). While various parties in the case have objected to the *Examiner Motion*, the Agent's objection is the one that the court considers most meritorious and is the one on which this Memorandum Opinion primarily focuses.

until the senior secured lenders had been "fully satisfied." *See* Section 2.5 of each of the Subordination Agreements (emphasis is the court's). Each Subordination Agreement also provides that the Subordinated Creditor "waives, for the benefit of the Agent and the Lenders . . . any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms of this Agreement and any legal or equitable discharge of [the Subordinated Creditor's] obligations hereunder." *See* Section 4.4(d)(v) of each Subordination Agreement. Section 5.14 of each of the Subordination Agreements provides for an assignment to the Agent by the Subordinated Creditors of their interests in the Subordinated Creditors' loan documents and also provides that, upon a request of the Agent, the Subordinated Creditors shall endorse and deliver over to the Agent their loan documents (apparently the Agent has made such an endorsement/delivery request; see DE # 976) and, in the event the Subordinated Creditor does not comply, the Agent "is appointed attorney-in-fact of the [Subordinated Creditors]." Finally, in one of the Subordination Agreements (the Ashburn Subordination Agreement) there is a specific section entitled "Bankruptcy Financing" that provides that the Subordinated Creditor may not oppose any agreement by the Agent in any bankruptcy case to provide debtor-in-possession financing or to allow cash collateral usage by the Ashburn Debtor (and may not take a

contrary position to the Agent with regard to debtor-in-possession financing or cash collateral usage generally), but the Subordinated Creditor "shall not be prohibited from taking any action to request adequate protection of its interest." *See* Section 4.6 of Ashburn Subordination Agreement.

**IV. ARGUMENTS OF THE PARTIES.**

The Michigan Retirement System Entities claim that they have the "right" as a party-in-interest to bring the *Examiner Motion* under Section 1104(c) of the Bankruptcy Code and that this court should follow the lead of certain other courts that have found that subordination agreements are unenforceable as a violation of public policy if they interfere with the exercise of procedural rights in bankruptcy cases. *In re 203 N. LaSalle St. P'ship*, 246 B.R. 325, 330-31 (Bankr. N.D. Ill. 2000); *In re Hart Ski Mfg. Co.*, 5 B.R. 734, 736 (Bankr. D. Minn. 1980).

The Agent, in contrast, argues that Section 510(a) of the Bankruptcy Code and the Subordination Agreements collectively prohibit the Michigan Retirement System Entities from pursuing their *Examiner Motion*. Section 510(a), of course, provides that, "A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." The Subordination Agreements, as mentioned above, contain the Subordinated Creditors' agreement not to "exercise any rights or remedies or take any action or

proceeding to collect or enforce any of the Subordination Obligations" without "the prior written consent of the Agent" until the senior secured lenders have been "fully satisfied." *See* Section 2.5 of each of the Subordination Agreements. The Subordination Agreements also provide that the Subordinated Creditor "waives, for the benefit of the Agent and the Lenders . . . any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms of this Agreement and any legal or equitable discharge of [the Subordinated Creditor's] obligations hereunder." *See* Section 4.4(d)(v) of each Subordination Agreement. The Agent argues that, by operation of these and other sections of the Subordination Agreements, the Michigan Retirement System Entities lack **standing** and/or have **waived** their right to pursue the *Examiner Motion* because they essentially agreed to stand still, be "silent seconds," and yield in all respects to the senior, secured lenders until the senior secured lenders are paid in full. The Agent argues that the request for an examiner is an **indirect demand for payment**. Here, not only do the Michigan Retirement System Entities not have the prior written consent of the Agent to pursue an examiner in these cases (again, *see* Section 2.5 of the Subordination Agreements), but the Agent for the Ashburn Project Lenders and the Concord Project Lenders vehemently opposes the request and believes that the Michigan

Retirement System Entities are breaching the Subordination Agreements.

**V.    RULING DENYING *EXAMINER MOTION*.**

The court agrees with the Agent that the Subordination Agreements are enforceable in this case, pursuant to Section 510 of the Bankruptcy Code, and that, because of these agreements, the Michigan Retirement System Entities **lack standing** and/or have **contractually waived** the right to seek an examiner in these cases.  Accordingly, the court hereby denies the *Examiner Motion*.

A. Enforceability of Subordination Agreements Generally.

First, as earlier noted, Section 510(a) of the Bankruptcy Code provides that, "A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law."  The Subordination Agreements in question are governed by Maryland law.  *See* Section 5.10.  Under Maryland law, subordination agreements are fully enforceable.  *See Mercantile-Safe Deposit & Trust Co. v. Mroz*, No. CCB-07-2255, 2009 WL 792276 (D. Md. March 20, 2009).  Moreover, case law also provides that subordination agreements are interpreted and enforced in accordance with general contract principles.  *Mroz*, 2009 WL 792276, at *4; *In re Gen. Homes Corp., FGMC, Inc.*, 134 B.R. 853, 864 (Bankr. S.D. Tex. 1991).  Maryland courts follow the objective theory of contract law in interpreting contracts, such that a court must "look at

what a reasonable person in the same position would have understood as the meaning of the agreement." *Walton v. Mariner Health of Maryland, Inc.*, 894 A.2d 584, 594 (Md. 2006).

Here, the court believes that a reasonable person in the position of the Michigan Retirement System Entities would understand the meaning of the Subordination Agreements to be that, until the Ashburn and Concord Project Lenders are paid in full, the Michigan Retirement System Entities must "stand still." The Michigan Retirement System Entities agreed not to file any actions or pursue any remedies to collect on their claims or enforce their rights, unless the Agent consents. Section 2.5. The court finds that the *Examiner Motion* is tantamount to both a pursuit of a remedy and the commencement of an action (*i.e.,* a contested matter) that is aimed, ultimately, at collection of the Michigan Retirement System Entities' claims.[8] The *Examiner*

---

[8] The court notes that there is very specific language in the Ashburn Subordination Agreement (mentioned earlier), dealing with "Bankruptcy Financing," that provides that the Subordinated Creditor may not oppose any agreement by the Agent in any future bankruptcy case to provide debtor-in-possession financing or to allow cash collateral usage by the Ashburn Debtor (and may not take a contrary position to the Agent with regard to debtor-in-possession financing or cash collateral usage generally), and also adds that the Subordinated Creditor "shall not be prohibited from taking any action to request adequate protection of its interest." *See* Section 4.6 of Ashburn Subordination Agreement. The court acknowledges that an argument could be made that this specific language prohibiting one type of activity in a bankruptcy case might be inferred to mean that other types of actions in a bankruptcy case are not prohibited. However, the court does not agree with such an argument. Rather, the Subordination Agreements **prohibit offensive pursuit of actions**

*Motion* in the context of these cases at this time (where no allegations of fraud, dishonesty, misconduct, mismanagement and the like are involved) is unmistakably aimed at slowing down the confirmation process and gaining leverage to enhance or create recoveries for the Subordinated Creditors. This is the very type of obstructionist behavior that the agreements are intended to suppress. *See In re ION Media Networks, Inc.,* 419 B.R. 585, 595 (Bankr. S.D.N.Y. 2009). The court acknowledges that the Subordination Agreements in the case at bar are not as specific in their prohibitions or restrictions as is sometimes the case. For example, there is no provision that the senior secured lenders are entitled to vote the claims of the Subordinated Creditors. Nevertheless, the court believes that the initiation of a contested matter or the request for a remedy in a bankruptcy case (such as with the *Examiner Motion*) clearly run afoul of Sections 2.5 and 4.4(d)(v) of the Subordination Agreements.[9]

---

***and remedies generally*** by the Michigan Retirement System Entities until the senior lenders are paid in full, and this "Bankruptcy Financing" section both: (a) sets forth a ***specific defensive posture*** that the Subordinated Creditor may not take (*i.e.,* opposing debtor-in-possession financing or cash collateral usage that the Agent provides or supports), and (b) carves out one ***specific offensive action*** that ***is*** permissible (*i.e.,* the Michigan Retirement System Entities' seeking adequate protection). This "Bankruptcy Financing" section is not inconsistent with the overall notion that the Subordinated Creditors generally may not take offensive actions or affirmatively pursue remedies.

[9] This court will resist the temptation to articulate what types of case participation by the Michigan Retirement System Entities are permissible versus those that are not. The court

The Michigan Retirement System Entities are sophisticated commercial entities who knowingly waived all legal and statutory rights that would be in conflict with their obligation to "standstill" until the Ashburn and Concord Project Lenders' indebtedness is paid in full. Section 4.4(d). Waiver is a voluntary relinquishment of a known right. *Holloway v. HECI Exploration Co. Employee's Profit Sharing Plan,* 76 B.R. 563, 572 (N.D. Tex. 1987). It is well-settled that rights under statute may be contractually waived.[10] *See Collin County v. Siemens Business Servs., Inc.,* 250 Fed. Appx. 45, 50 (5th Cir. 2007). This is precisely what occurred here with Michigan Retirement System Entities. This court is bound to pay deference to this waiver, pursuant to Section 510(a) of the Bankruptcy Code.

---

simply holds that the pursuit of the *Examiner Motion* (particularly in the context of these cases at this time—where the apparent goal of the subordinated creditors is to challenge value being allocated to senior, secured creditors) is the type of "action" or "remedy" prohibited by the Subordination Agreements.

[10] The court notes that there is conflicting authority on whether a prepetition waiver of the automatic stay by a debtor, or an agreement of a debtor not ever to commence a bankruptcy case, are enforceable waivers of statutory rights (given that other parties in interests' rights may be implicated by such an agreement). This ruling is not so broad as to address these type of waivers. This ruling simply addresses whether the Subordination Agreements in the case at bar are enforceable (the answer being yes, pursuant to Section 510(a)) and whether the *Examiner Motion* in the context of this case runs afoul of them (the answer, again, being yes).

### B. Awkward Procedural Posture?

The court notes that it does not have before it either a declaratory judgment action (where, for example, either PNC or the Michigan Retirement System Entities have sought interpretation and enforcement of the Subordination Agreement) or an adversary proceeding urging breach of contract and/or requesting an injunction to prohibit the Michigan Retirement System Entities' conduct in taking actions and pursuing remedies inconsistent with the Subordination Agreements. Judge Peck was confronted with a similar situation in the *ION Media* case when a subordinated lender was objecting to a plan and (in doing so) was essentially attacking the collateral position of a senior lender, without first seeking a declaration of rights under an intercreditor agreement. Judge Peck noted that the subordinated creditor in the *ION Media* case was "objecting as if it had the right to do so" but, notwithstanding the fact that there had been no declaratory judgment action, the court could and would find that the subordinated creditor lacked standing to object to the plan and was in breach of such intercreditor agreement by virtue of its objections to confirmation. *ION Media*, 419 B.R. at 590. Similarly, this court finds that it is duty-bound to give deference to the Subordination Agreements, pursuant to Section 510(a), and must sustain the position of the Agent that the Michigan Retirement System Entities lack standing and have waived

the right to bring the *Examiner Motion*, and, thus, the *Examiner Motion* must be denied.

    C.    <u>Bona Fides (of Lack Thereof) of the *Examiner Motion*</u>.

As earlier stated, the court does not believe that it is in the interests of creditors or the estate to appoint an examiner in this case. Here, again, there are no allegations of wrongdoing on the part of the Debtors. There is simply the desire that an examiner investigate and report to the court on appropriate value allocation among the estates as to the sale proceeds. Indeed, the court will have to make findings of fact on the allocation of sale proceeds, as part of the Plan confirmation process, in order to preserve the integrity of the separate estates. The allocation cannot be subjective and must be reflective of the assets' fair value or otherwise legally justifiable. The court cannot simply defer to the Debtors' business judgment on the question of allocation of value. Rather, the court must independently determine if the allocation is fair and reasonable. There is no precise formula or methodology for allocation mandated under the law. It is true, as has been argued by the Michigan Retirement System Entities, that this is a factually complicated case and involves a complex capital structure. However, there is no reason, in the court's view, why the multitude of experts involved in this case cannot testify as to value and let the court decide whether the Debtors'

proposed allocation of value is appropriate.  Bankruptcy courts, such as this one, do this often, and it is not generally necessary to have an examiner employed to opine for the court.

The Michigan Retirement System Entities suggest that there is manipulation of the allocation of value between the Concord Debtor and the Ashburn Debtor.  They also argue that certain data suggests that the Concord Debtor has the more valuable property, while the allocation proposed in the Plan is that the Concord Debtor receive $8.9 million less than the Ashburn Debtor (*i.e.,* the Concord Debtor would receive $59.866 million and the Ashburn Debtor would receive $68.775 million).  If these numbers were reversed, the Michigan Retirement System Entities argue that they would receive approximately $6 million in distribution on their claims (as opposed to $0 under the present proposed allocation).

As earlier indicated, the court will hear evidence in connection with confirmation and decide if the Debtors meet their burden of establishing fair allocations among the Debtors of the sale proceeds/value.  But the court does not believe that an examiner is needed to wade in on this, in addition to the experts for the various parties in the Erickson Cases.

It is for the above reasons that this court, **were there no standing/waiver problem on the part of the Michigan Retirement System Entities**, would be hard pressed to find any useful purposes for an examiner.  Much like Judge Schmidt did in the

case of *In re Asarco, LLC*, No. 05-21207, docket entry 7081 (Bankr. S.D. Tex. March 4, 2008), this court (in light of the mandate of Section 1104(c)) would (again, were there no standing/waiver issue) appoint an examiner with no duties, unless and until otherwise ordered by the court. But because of the standing/waiver issues addressed herein, there is no requirement of even a limited-scope examiner.

**VI. CONCLUSION.**

WHEREFORE, for all of the above reasons, the *Examiner Motion* is **DENIED**. This Memorandum Opinion constitutes the court's findings of fact and conclusions of law, pursuant to Fed. R. Bankr. Pro. 7052, in connection with the *Examiner Motion*. The court reserves the right to supplement or amend these findings and conclusions.

It is so **Ordered.**
###END OF ORDER###