## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 09-37010 (SGJ) |
| | § | |
| **ERICKSON RETIREMENT** | § | **Chapter 11** |
| **COMMUNITIES, LLC,** *et al.* | § | |
| | § | **(Jointly Administered)** |
| **Debtors.** | § | |

### DISCLOSURE STATEMENT FOR DEBTORS' FOURTH AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Vincent P. Slusher
State Bar No. 00785480
vince.slusher@dlapiper.com
DLA Piper LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas 75201
Telephone:  (214) 743-4572
Facsimile:  (972) 813-6267

Thomas R. Califano
New York State Bar No. 2286144
thomas.califano@dlapiper.com
Jeremy R. Johnson
New York State Bar No. 4307617
jeremy.johnson@dlapiper.com
Camisha L. Simmons
New York State Bar No. 4576294
Texas State Bar No. 24056328
camisha.simmons@dlapiper.com
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York  10020-1104
Telephone:  (212) 835-6000
Facsimile:  (212) 835-6001

Dated:  March 8, 2010

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND INFORMATION ..................................................................... 2

        A.      Debtors' Business and History.................................................................. 2

        B.      Organizational Structure of the Debtors .................................................. 3

                1.      Erickson Retirement Communities, LLC ..................................... 3
                2.      Erickson Construction, LLC ......................................................... 4
                3.      Erickson Group, LLC.................................................................... 4
                4.      Concord Campus GP, LLC. ........................................................... 5
                5.      Dallas Campus GP, LLC. .............................................................. 5
                6.      Senior Campus Services, LLC....................................................... 5
                7.      Warminster Campus GP, LLC....................................................... 5
                8.      Ashburn Campus, LLC .................................................................. 6
                9.      Columbus Campus, LLC ............................................................... 6
                10.     Concord Campus, L.P ................................................................... 7
                11.     Dallas Campus, LP........................................................................ 7
                12.     Houston Campus, LP ..................................................................... 7
                13.     Kansas Campus, LLC .................................................................... 8
                14.     Littleton Campus, LLC ................................................................. 8
                15.     Novi Campus, LLC........................................................................ 9
                16.     Warminster Campus, LP ............................................................... 9

        C.      The Not-For-Profits ................................................................................ 10

        D.      The IEDs ................................................................................................. 11

        E.      The Life Cycle of a CCRC/Campus ....................................................... 11

                1.      First Phase:  Land Acquisition, Construction, and Development ........... 12
                2.      Second Phase:  Occupancy by Residents.................................... 12
                3.      Third Phase:  Sale of the CCRC to the NFP ............................. 14

        F.      The Campuses ......................................................................................... 14

                1.      The Completed Campuses ........................................................... 14
                2.      The Developing Campuses .......................................................... 15

        G.      The Debtors' Prepetition Capital Structure............................................ 18

                1.      The Corporate Revolver............................................................... 18
                2.      The Landowners' Prepetition Capital Structure ......................... 19
                3.      Unsecured Debt:  STAMPS ......................................................... 22

III.    EVENTS LEADING TO BANKRUPTCY ....................................................... 23

        A.      The Decline in the Market ...................................................................... 23

        B.      The Amendments to the Corporate Revolver ......................................... 24

        C.      Corporate Revolver Lenders Attempt to Draw Down ERC's Cash ................... 25

# TABLE OF CONTENTS
(continued)

D. Prepetition Marketing of Debtors' Assets ............................................................ 25

IV. EVENTS OCCURRING DURING DEBTORS' CHAPTER 11 CASES ...................... 25

A. Bankruptcy Filing and First Day Orders ............................................................ 25

B. Postpetition DIP Financing .................................................................................. 26

C. Bidding Procedures Motion and Auction ........................................................... 26

D. Motion to Escrow IEDs for Protection of Residents ......................................... 26

E. Retention and Employment of Professionals ..................................................... 27

F. Appointment of Creditors Committee ................................................................ 27

G. Motions Filed By Michigan Retirement System Entities .................................. 27

V. IMPLEMENTATION OF THE PLAN ............................................................................ 28

A. The Auction and New NSC Term Sheet ............................................................. 28

NEW MANAGEMENT AGREEMENTS ....................................................................................... 28

MASTER LEASE ............................................................................................................................ 29

COMMUNITY LOANS ................................................................................................................... 29

B. The Recharacterization Adversary Proceedings ............................................... 31

C. Creditors Committee Settlement ......................................................................... 34

D. The Redwood Purchase Transaction .................................................................. 34

1. Purchased Assets ....................................................................................... 34
2. Excluded Assets ......................................................................................... 35
3. Purchase Consideration ........................................................................... 36
4. PropCo ........................................................................................................ 36
5. DevCo .......................................................................................................... 37
6. ManagementCo .......................................................................................... 37

a. Management of Bond Communities ............................................. 37
b. Management Structure of ManagementCo ................................. 38

7. Assumption of Liabilities by Redwood .................................................. 38
8. Kansas ......................................................................................................... 38
9. B&R Notes .................................................................................................. 38
10. Working Capital Facility .......................................................................... 38
11. Employment Agreements ......................................................................... 39
12. Remaining ERC Assets ............................................................................. 39
13. Non-Competition Agreement .................................................................. 39

E. The Landowner Restructurings, Erickson Construction and Erickson Group .......................................................................................................................... 39

1. Ashburn ...................................................................................................... 39

# TABLE OF CONTENTS
(continued)

|  |  | a. | Transferred Assets | 39 |
|  |  | b. | The Community Loan and Other NFP Agreements | 40 |
|  |  | c. | Guaranties | 40 |
|  |  | d. | New Ashburn Revolver | 40 |
| 2. | Columbus | | | 40 |
| 3. | Concord | | | 40 |
|  |  | a. | Transferred Assets | 40 |
|  |  | b. | The Community Loan and Other NFP Agreements | 41 |
|  |  | c. | Guaranties | 41 |
|  |  | d. | New Concord Revolver | 41 |
| 4. | Dallas | | | 41 |
|  |  | a. | Transferred Assets | 41 |
|  |  | b. | The Community Loan and Other NFP Agreements | 42 |
|  |  | c. | Guaranties | 42 |
|  |  | d. | New Dallas Revolver | 42 |
| 5. | Houston | | | 42 |
|  |  | a. | Transferred Assets | 42 |
|  |  | b. | The Community Loan and Other NFP Agreements | 43 |
|  |  | c. | Guaranties | 43 |
|  |  | d. | New Houston Revolver | 43 |
| 6. | Kansas | | | 43 |
|  |  | a. | Transferred Assets | 43 |
|  |  | b. | The Community Loan and Other NFP Agreements | 44 |
|  |  | c. | Bonds and Other Debt | 44 |
|  |  | d. | New Kansas Revolver | 44 |
| 7. | Littleton | | | 44 |
|  |  | a. | Transferred Assets | 44 |
|  |  | b. | The Community Loan and Other NFP Agreements | 45 |
|  |  | c. | Guarantees | 45 |
|  |  | d. | New Littleton Revolver | 45 |
|  |  | e. | Littleton Letters of Credit | 45 |
| 8. | Novi | | | 45 |
|  |  | a. | Transferred Assets | 45 |
|  |  | b. | The Community Loan and Other NFP Agreements | 46 |
|  |  | c. | Guarantees | 46 |
|  |  | d. | New Novi Revolver | 46 |
| 9. | Warminster | | | 46 |

|  |  |  |  |
|---|---|---|---|
| | a. | Warminster Purchase Option Deposit And Purchase Option Deposit Refund Obligation | 46 |
| | b. | Development Rights | 47 |
| | c. | Guarantees | 47 |
| | d. | Interests in Warminster | 47 |
| | e. | Community Loan | 47 |
| | f. | Other Bond Obligations | 47 |
| | g. | New Warminster Revolver | 47 |
| | h. | TIP Funding | 48 |
| | i. | Warminster Letters of Credit | 48 |
| | 10. | Erickson Construction | 48 |
| | 11. | Erickson Group | 48 |
| | 12. | Payment in Full Claims | 48 |
| F. | Liquidating Creditor Trust | | 49 |
| | 1. | Establishment of Liquidating Creditor Trust | 49 |
| | 2. | Exclusions | 50 |
| | 3. | Purpose of Liquidating Creditor Trust | 51 |
| | 4. | Prosecution of Actions | 51 |
| | 5. | Trust Funding | 51 |
| | 6. | D&O Indemnification | 52 |
| | 7. | GST Loan and Collection | 52 |
| | 8. | Participation | 52 |
| | 9. | Distributions to Three Subclasses of Claims | 52 |
| | 10. | Lender Waivers | 55 |
| | 11. | Formation | 55 |
| | 12. | Claims Process | 56 |
| | 13. | Information Preservation and Production | 56 |
| | 14. | Notice of Causes of Action | 56 |
| | 15. | No Substantive Consolidation | 56 |
| | 16. | Tax Treatment of Transfers to Liquidating Creditor Trust | 57 |
| | 17. | Tax Treatment of Beneficiaries | 57 |
| | 18. | Trust Expenses | 57 |
| | 19. | Creditors Committee Professional Fees | 57 |
| | 20. | Limitation of Liability | 58 |
| VI. | TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN | | 59 |
| A. | Classification and Treatment of Claims | | 59 |
| | 1. | Treatment of Erickson Group Claims and Interests | 59 |
| | 2. | Treatment of ERC Claims and Interests | 60 |
| | 3. | Treatment of Erickson Construction Claims and Interests | 61 |
| | 4. | Treatment of Senior Campus Claims and Interests | 62 |
| | 5. | Treatment of Ashburn Claims and Interests | 63 |

6. Treatment of Columbus Claims and Interests .......................................... 64
7. Treatment of Concord Claims and Interests ........................................... 65
8. Treatment of Concord GP Claims and Interests ..................................... 66
9. Treatment of Dallas Claims and Interests .............................................. 67
10. Treatment of Dallas GP Claims and Interests ........................................ 68
11. Treatment of Houston Claims and Interests............................................ 69
12. Treatment of Kansas Claims and Interests ............................................. 70
13. Treatment of Littleton Claims and Interests ........................................... 71
14. Treatment of Novi Claims and Interests ................................................. 72
15. Treatment of Warminster Claims and Interests ...................................... 73
16. Treatment of Warminster GP Claims and Interests ................................ 74

B. Treatment of Unclassified Claims under the Plan ................................ 74

1. Administrative Expense Claims ............................................................. 74
2. Compensation and Reimbursement Claims ............................................ 75
3. Priority Tax Claims ................................................................................ 75
4. DIP Funding Claims ............................................................................... 75

C. Treatment of Classified Claims under the Plan ................................... 76

1. Erickson Group ...................................................................................... 76

   a. Other Priority Claims (Class 1) .................................................. 76
   b. Secured Tax Claims (Class 2) ..................................................... 76
   c. Corporate Revolver Guaranty Claims (Class 3) ......................... 76
   d. Erickson Group Guaranty Claims (Class 4) ................................ 76
   e. Interests in Erickson Group (Class 5) ......................................... 76

2. ERC ........................................................................................................ 77

   a. Other Priority Claims (Class 1) .................................................. 77
   b. Secured Tax Claims (Class 2) ..................................................... 77
   c. Corporate Revolver Claims (Class 3) ......................................... 77
   d. Interest Rate Swap Claims (Class 4) ........................................... 78
   e. Other Secured Claims (Class 5) .................................................. 78
   f. UMBC Building Construction Loan Claims (Class 6) ............... 78
   g. Management Agreement Claims (Class 7) ................................... 79
   h. General Unsecured Claims (Class 8) ........................................... 79
   i. Interests in ERC (Class 9) ........................................................... 79

3. Erickson Construction ............................................................................ 79

   a. Other Priority Claims (Class 1) .................................................. 79
   b. Secured Tax Claims (Class 2) ..................................................... 79
   c. Mechanic's Lien Claims (Class 3) ............................................... 80
   d. Corporate Revolver Claims (Class 4) .......................................... 80
   e. UMBC Building Construction Loan Claims (Class 5) ............... 80
   f. Erickson Construction Letters of Credit Claims (Class 6)........... 81

EAST\42647303.46

g.      General Unsecured Claims (Class 7) ........................................... 81
h.      Interests in Erickson Construction (Class 8)............................... 81

4.      Senior Campus .................................................................................... 81

a.      Other Priority Claims (Class 1)................................................ 81
b.      Secured Tax Claims (Class 2)................................................... 82
c.      UMBC Building Construction Loan Claims (Class 3) ............. 82
d.      Corporate Revolver Guaranty Claims (Class 4) ........................ 83
e.      General Unsecured Claims (Class 5) ........................................ 83
f.      Interests in Senior Campus (Class 6) ....................................... 83

5.      Ashburn ............................................................................................... 83

a.      Other Priority Claims (Class 1)................................................ 83
b.      Secured Tax Claims (Class 2)................................................... 83
c.      Mechanic's Lien Claims (Class 3).............................................. 84
d.      Ashburn Construction Loan Claims (Class 4) ............................ 84
e.      Ashburn Community Loan Claims (Class 5).............................. 84
f.      Ashburn Junior Loan Claims (Class 6)...................................... 84
g.      NFP Claims (Class 7). ............................................................... 85
h.      General Unsecured Claims (Class 8) ......................................... 85
i.      Interests in Ashburn (Class 9).................................................... 85

6.      Columbus ............................................................................................ 85

a.      Other Priority Claims (Class 1)................................................ 85
b.      Secured Tax Claims (Class 2)................................................... 85
c.      Columbus Improvement Bond Claims (Class 3) ........................ 86
d.      Mechanic's Lien Claims (Class 4).............................................. 86
e.      Columbus Construction Loan Claims (Class 5)........................... 86
f.      Columbus Community Loan Claims (Class 6) ............................ 86
g.      Columbus Junior Loan Claims (Class 7) .................................... 87
h.      General Unsecured Claims (Class 8) ......................................... 87
i.      Interests in Columbus (Class 9)................................................. 87

7.      Concord ............................................................................................... 87

a.      Other Priority Claims (Class 1)................................................ 87
b.      Secured Tax Claims (Class 2)................................................... 87
c.      Mechanic's Lien Claims (Class 3).............................................. 88
d.      Concord Construction Loan Claims (Class 4) ............................ 88
e.      Concord Community Loan Claims (Class 5)............................... 88
f.      Concord Junior Loan Claims (Class 6)....................................... 88
g.      Other Secured Claims (Class 7).................................................. 89
h.      NFP Claims (Class 8) ................................................................ 89
i.      General Unsecured Claims (Class 9) ......................................... 89
j.      Interests in Concord (Class 10).................................................. 89

EAST\42647303.46

| | | |
|---|---|---|
| 8. | Concord GP | 89 |
| | a. Other Priority Claims (Class 1) | 89 |
| | b. Secured Tax Claims (Class 2) | 89 |
| | c. Corporate Revolver Guaranty Claims (Class 3) | 90 |
| | d. General Unsecured Claims (Class 4) | 90 |
| | e. Interests in Concord GP (Class 5) | 90 |
| 9. | Dallas | 90 |
| | a. Other Priority Claims (Class 1) | 90 |
| | b. Secured Tax Claims (Class 2) | 90 |
| | c. Mechanic's Lien Claims (Class 3) | 91 |
| | d. Dallas Construction Loan Claims (Class 4) | 91 |
| | e. Texas A&M Note Claims (Class 5) | 92 |
| | f. Dallas Community Loan Claims (Class 6) | 92 |
| | g. Dallas Junior Loan Claims (Class 7) | 92 |
| | h. NFP Claims (Class 8) | 92 |
| | i. General Unsecured Claims (Class 9) | 92 |
| | j. Interests in Dallas (Class 10) | 92 |
| 10. | Dallas GP | 93 |
| | a. Other Priority Claims (Class 1) | 93 |
| | b. Secured Tax Claims (Class 2) | 93 |
| | c. Corporate Revolver Guaranty Claims (Class 3) | 93 |
| | d. General Unsecured Claims (Class 4) | 93 |
| | e. Interests in Dallas GP (Class 5) | 93 |
| 11. | Houston | 94 |
| | a. Other Priority Claims (Class 1) | 94 |
| | b. Secured Tax Claims (Class 2) | 94 |
| | c. Mechanic's Lien Claims (Class 3) | 94 |
| | d. Houston Construction Loan Claims (Class 4) | 94 |
| | e. Houston Community Loan Claims (Class 5) | 95 |
| | f. Houston Junior Loan Claims (Class 6) | 95 |
| | g. NFP Claims (Class 7) | 95 |
| | h. General Unsecured Claims (Class 8) | 95 |
| | i. Interests in Houston (Class 9) | 95 |
| 12. | Kansas | 96 |
| | a. Other Priority Claims (Class 1) | 96 |
| | b. Secured Tax Claims (Class 2) | 96 |
| | c. Mechanic's Lien Claims (Class 3) | 96 |
| | d. Kansas Special Assessment Bond Claims (Class 4) | 96 |
| | e. Kansas Construction Loan Claims (Class 5) | 97 |
| | f. Kansas Community Loan Claims (Class 6) | 97 |

EAST\42647303.46

g.   Kansas Junior Loan Claims (Class 7) ........................................ 97
h.   NFP Claims (Class 8) .............................................................. 97
i.   General Unsecured Claims (Class 9) ........................................ 97
j.   Interests in Kansas (Class 10) .................................................. 97

13.   Littleton ............................................................................................ 98

a.   Other Priority Claims (Class 1) ............................................... 98
b.   Secured Tax Claims (Class 2) .................................................. 98
c.   Mechanic's Lien Claims (Class 3) ............................................ 98
d.   Littleton Construction Loan Claims (Class 4) ........................... 99
e.   Littleton Community Loan Claims (Class 5) .............................. 99
f.   Littleton Junior Loan Claims (Class 6) ..................................... 99
g.   Other Secured Claims (Class 7) ............................................... 99
h.   NFP Claims (Class 8) ............................................................ 100
i.   General Unsecured Claims (Class 9) ...................................... 100
j.   Interests in Littleton (Class 10) ............................................. 100

14.   Novi ................................................................................................ 100

a.   Other Priority Claims (Class 1) ............................................. 100
b.   Secured Tax Claims (Class 2) ................................................ 100
c.   Mechanic's Lien Claims (Class 3) .......................................... 101
d.   Novi Construction Loan Claims (Class 4) ............................... 101
e.   Novi Community Loan Claims (Class 5) .................................. 101
f.   Novi Junior Loan Claims (Class 6) ......................................... 101
g.   NFP Claims (Class 7) ............................................................ 101
h.   General Unsecured Claims (Class 8) ...................................... 102
i.   Interests in Novi (Class 9) ..................................................... 102

15.   Warminster ...................................................................................... 102

a.   Other Priority Claims (Class 1) ............................................. 102
b.   Secured Tax Claims (Class 2) ................................................ 102
c.   Mechanic's Lien Claims (Class 3) .......................................... 102
d.   Warminster Community Loan Claims (Class 4) ....................... 103
e.   Warminster Purchase Option Deposit Refund Agreement
     Claims (Class 5) ................................................................... 103
f.   Warminster Junior Loan Claims (Class 6) ............................... 103
g.   Other Secured Claims (Class 7) ............................................. 104
h.   NFP Claims (Class 8) ............................................................ 104
i.   General Unsecured Claims (Class 9) ...................................... 104
j.   Interests in Warminster (Class 10) .......................................... 104

16.   Warminster GP ................................................................................ 104

a.   Other Priority Claims (Class 1) ............................................. 104
b.   Secured Tax Claims (Class 2) ................................................ 104

EAST\42647303.46

c. Corporate Revolver Guaranty Claims (Class 3) ........................ 105
d. General Unsecured Claims (Class 4) ......................... 105
e. Interests in Warminster GP (Class 5).................... 105

VII. VOTING PROCEDURES AND REQUIREMENTS .................................... 105

A. Vote Required for Acceptance by a Class ........................ 106

B. Classes Entitled to Vote ....................... 106

C. Classes Not Entitled to Vote ....................... 106

D. Voting Procedures....................... 106

VIII. FINANCIAL INFORMATION, PROJECTIONS AND VALUATION...................... 107

A. Introduction....................... 107

B. Operations....................... 107

C. Financial Projections....................... 107

IX. GOVERNANCE OF REORGANIZED DEBTORS .................... 119

A. Board of Managers....................... 119

B. Officers ....................... 119

C. Continued Corporate Existence ....................... 119

D. Transfer of Assets; Successor Liability ....................... 120

X. OTHER PLAN COMPONENTS....................... 120

A. Distribution Procedures ....................... 120

1. Timing and Conditions ....................... 120

a. Distribution Record Date ....................... 120
b. Date of Distributions....................... 121
c. Postpetition Interest ....................... 121
d. Disbursing Agent ....................... 121
e. Powers of Disbursing Agent ....................... 121
f. Surrender of Instruments....................... 121
g. Delivery of Distributions ....................... 121
h. Manner of Payment....................... 122
i. Minimum Distributions....................... 122
j. Allocations Between Principal and Interest....................... 122
k. Setoffs ....................... 122

2. Treatment of Disputed Claims ....................... 123

a. Objections ....................... 123
b. Estimation ....................... 123
c. Payments and Distributions ....................... 123

EAST\42647303.46

|  |  | d. | Distributions After Effective Date | 123 |
|  |  | e. | Disallowed Claims | 124 |
|  | B. | Executory Contracts and Unexpired Leases |  | 124 |
|  |  | 1. | Executory Contracts and Unexpired Leases | 124 |
|  |  | 2. | Cure of Defaults | 125 |
|  |  | 3. | Rejection Damages Claims | 125 |
|  |  | 4. | Assignment | 125 |
|  | C. | Effect of Confirmation |  | 125 |
|  |  | 1. | Vesting of Assets | 125 |
|  |  | 2. | Injunction | 126 |
|  |  | 3. | Terms of Injunctions or Stays | 127 |
|  |  | 4. | Indemnification | 127 |
|  | D. | Releases and Exculpation. |  | 128 |
|  |  | 1. | Releases | 128 |
|  |  | 2. | Releases by Holders of Claims and Interests. | 129 |
|  |  | 3. | Exculpation | 129 |
|  | E. | Preservation of Causes of Action/Reservation of Rights | | 130 |
|  | F. | Administrative Provisions |  | 130 |
|  |  | 1. | Retention of Jurisdiction | 130 |
|  |  | 2. | Governing Law | 132 |
|  |  | 3. | Corporate Action | 132 |
|  |  | 4. | Modification or Amendments to the Plan and Plan Supplement | 132 |
|  |  | 5. | Revocation or Withdrawal of the Plan | 133 |
|  |  | 6. | Exemption from Certain Transfer Taxes | 133 |
|  |  | 7. | Section 1145 Exemption | 133 |
|  |  | 8. | Binding Effect of Plan | 134 |
|  |  | 9. | Dissolution of Statutory Committees | 134 |
|  |  | 10. | Dissolution of the Liquidating Creditor Trust | 134 |
|  |  | 11. | Time | 134 |
| XI. | RISKS AND CONSIDERATIONS | | | 134 |
|  | A. | Bankruptcy Considerations | | 134 |
|  | B. | Risks Inherent in Financial Projections | | 135 |
|  | C. | Competition | | 136 |
|  | D. | Government Regulation | | 136 |
|  | E. | Transfer Restrictions | | 136 |
|  | F. | Lack of Marketability | | 136 |

EAST\42647303.46

G.  No Duty to Update Disclosures .......................................................................... 137

H.  Representations Outside this Disclosure Statement........................................... 137

I.  No Admission ................................................................................................... 137

J.  Tax and Other Related Considerations ............................................................. 137

XII.  PLAN CONFIRMATION AND CONSUMMATION...................................................... 137

A.  Plan Confirmation Hearing .............................................................................. 137

B.  Plan Confirmation Requirements Under the Bankruptcy Code........................ 138

C.  Plan Consummation ......................................................................................... 138

D.  Best Interests Test ........................................................................................... 138

E.  Liquidation Analysis ........................................................................................ 139

F.  Feasibility......................................................................................................... 140

G.  Section 1129(b)................................................................................................ 140

   1.  No Unfair Discrimination ......................................................................... 140
   2.  Fair and Equitable ..................................................................................... 140

      a.  Class of Secured Claims: ............................................................. 141
      b.  Class of Unsecured Creditors: ..................................................... 141
      c.  Class of Interests:......................................................................... 141

XIII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
PLAN ................................................................................................................. 141

A.  Chapter 7 Liquidation ...................................................................................... 141

B.  Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code ................... 142

C.  Section 363 Sale............................................................................................... 142

XIV.  CERTAIN FEDERAL TAX CONSEQUENCES ......................................................... 142

A.  Consequences to the Debtors ........................................................................... 144

   1.  Sale Transaction and Funding of the Liquidating Creditor Trust .......... 144
   2.  Cancellation of Debt ................................................................................. 144

B.  Consequences to Holders ................................................................................. 144

   1.  Distributions in Discharge of Claims or Interests.................................... 144
   2.  Market Discount........................................................................................ 145
   3.  Distributions in Discharge of Accrued Interest or OID ........................... 145
   4.  Taxation of the Liquidating Creditor Trust and Holders ........................ 146

C.  Information Reporting and Withholding ........................................................... 146

XV.  RECOMMENDATION AND CONCLUSION............................................................. 148

EAST\42647303.46

# GLOSSARY

**Acquisition Companies**

The following acquisition companies formed to acquire substantially all of the assets relating to the Business: Redwood, ManagementCo, DevCo, PropCo, Redwood Kansas, Redwood Concord, Redwood Dallas, Redwood Houston, Redwood Ashburn, Redwood Littleton, Redwood Novi, Redwood-ERC Tinton Falls II, LLC, and Redwood-ERC Senior Care, LLC.

**Administrative Expense Claim**

Any Allowed Claim pursuant to Bankruptcy Code sections 503(b) and 507(a)(1) arising from actual, necessary cost or expense of administration of the Chapter 11 Cases and preservation of the Debtors' Estates.

**Advisors**

The Debtors' financial advisor, investment banker, accountant, and attorneys, and each of their respective employees, members, parent corporations, subsidiaries, affiliates and partners.

**Agents**

Collectively, PNC Bank, National Association, as collateral and administrative agent with respect to the syndicated Ashburn Construction Loan, syndicated Concord Construction Loan, syndicated Kansas Construction Loan and syndicated Houston Construction Loan, and as the lender with respect to the participated Novi Construction Loan; Capmark Finance, Inc., as collateral and administrative agent with respect to the syndicated Littleton Construction Loan; Bank of America, N.A., as collateral and administrative agent with respect to the syndicated Dallas Construction Loan; Wilmington Trust FSB, as collateral and administrative agent with respect to the syndicated Corporate Revolver; and Manufacturers and Traders Trust Company, as collateral and administrative agent with respect to the syndicated UMBC Building Construction Loan.

**Allowed**
With respect to any Claim, (i) a Claim against a Debtor which has been listed on the Debtor's Schedules, as such Schedules may be amended from time to time pursuant to Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary Proof of Claim has been filed, (ii) any Claim for which a Proof of Claim was properly and timely filed in accordance with any order of the Bankruptcy Court, the Plan, the Bankruptcy Code, and the Bankruptcy Rules, as to which no objection to allowance has been interposed by a party in interest or as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective Holder, or (iii) any Claim expressly allowed by a Final Order or pursuant to the Plan. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed, and for which no Proof of Claim has been timely filed, is not considered Allowed and shall be expunged on the Effective Date without further action by the Debtors or the Reorganized Debtors and without any further notice to or action, order or approval of the Bankruptcy Court.

**Ann's Choice Bonds**
That certain issue of $81,945,000 Bucks County Industrial Development Authority Retirement Community Revenue Bonds (Ann's Choice, Inc. Facility) Series 2005 A and B.

**Ann's Choice Trustee**
Wells Fargo Bank, National Association, not individually but as indenture trustee under that certain Trust Indenture dated as of December 1, 2005 between Bucks County Industrial Development Authority and Manufacturers and Traders Trust Company, as trustee (the "**Ann's Choice Indenture**") and any successor trustee under the Ann's Choice Indenture.

**Ashburn Community Loan**
That certain loan between Ashby Ponds, Inc., as lender, and Ashburn, as borrower, with a balance of $107,114,950.

**Ashburn Community Loan Claim**
A Claim arising under the Ashburn Community Loan.

**Ashburn Construction Loan**
The loan made pursuant to that certain Construction Loan Agreement entered into as of May 31, 2007 in the

maximum principal amount of $100 million, as amended from time to time, between Ashburn, as borrower, and the financial institutions, which are or may from time to time become parties thereto, and PNC Bank, as successor to Mercantile-Safe Deposit and Trust Company, as the administrative agent.

**Ashburn Construction Loan Claim**    A Claim arising under the Ashburn Construction Loan.

**Ashburn Junior Loan**    That certain loan made and entered into as of May 31, 2007 by and between Strategic Ashby Ponds Lender LLC, a Delaware limited liability company, as lender, and Ashburn, as borrower.

**Ashburn Junior Loan Claim**    A Claim arising under the Ashburn Junior Loan.

**Assumed Liability**    A liability assumed by Redwood, the Transferred Landowner, or the Acquisition Companies pursuant to Section 2.3 of the Definitive Agreement.

**Auction**    The auction of the Debtors' Assets which commenced at 10:00 a.m. (prevailing Eastern Time) on December 22, 2009.

**Auction Fee**    $9 million deemed Allowed Administrative Expense Claim of Coastwood pursuant to the agreement made at the Auction, representing 10% of the difference between Redwood's prevailing all Cash bid of $365 million and $275 million.

**B&R Notes**    All notes receivable due to ERC or any of its affiliates from each of Brooksby Village, Inc. and Riderwood Village, Inc., including, (i) the Second Amended and Restated Working Capital Promissory Note dated June 30, 2008 in the principal amount of $14,032,807.23 made by Brooksby Village, Inc. in favor of ERC; (ii) the Purchase Money Note dated June 30, 2008 in the amount of $19,715,086 made by Brooksby Village, Inc. in favor of Senior Living Limited Partnership; (iii) the Purchase Money Note in the amount of $2,698,039 made by Riderwood Village, Inc., in favor of Senior Living Limited Partnership; and (iv) the Second Amended and Restated Working Capital Promissory Note dated December 31, 2007 in the amount of

|                        |                                                                                                                                                                    |
| ---------------------- | ------------------------------------------------------------------------------------------------------------------------------------------------------------------ |
|                        | $5,000,000 made by Riderwood Village, Inc. in favor of ERC.                                                                                                         |
| ***Bankruptcy Code***  | Title 11 of the United States Code.                                                                                                                                 |
| ***Bankruptcy Court*** | The United States Bankruptcy Court for the Northern District of Texas, Dallas Division.                                                                             |
| ***Bankruptcy Rules*** | The Federal Rules of Bankruptcy Procedure and any local rules of the Bankruptcy Court applicable to the Chapter 11 Cases.                                           |
| ***Beneficiaries***    | Holders of Allowed General Unsecured Claims against the Estates of ERC, Erickson Construction, and each of the Landowner Debtors as of the Effective Date, as beneficiaries of the Liquidating Creditor Trust, as defined in the Trust Agreement. |
| ***Bond Documents***   | Any trust indenture, loan agreement, mortgage, security agreement, or any other agreement executed in connection with or otherwise serving as collateral in connection with tax exempt bond financing at one or more of the Bonded Communities. |
| ***Bond Trustee***     | Any indenture trustee then serving as indenture trustee under any Bond Document, including without limitation the Ann's Choice Trustee.                             |
| ***Bonded Community*** | Any of the retirement communities relating to the following Campuses: Ann's Choice, Linden Ponds, Monarch Landing, and Sedgebrook.                                  |
| ***Borrower***         | Has the meaning defined in the DIP Facility.                                                                                                                        |
| ***Business***         | The Debtors' businesses as of the Petition Date, including managing, developing and owning continuing care retirement communities.                                  |
| ***Business Day***     | Any day of the calendar week, except Saturday, Sunday, a "legal holiday," as defined in Bankruptcy Rule 9006(a), or any day on which commercial banks are authorized or required by law to close in Baltimore, Maryland. |

iv

| | |
|---|---|
| ***Campus*** | Each of the following retirement communities: Ann's Choice; Ashby Ponds; Eagle's Trace; Fox Run Village; Hickory Chase; Highland Springs; Linden Ponds; Maris Grove; Monarch Landing; Sedgebrook; Tallgrass Creek; Wind Crest; Brooksby Village; Cedar Crest Village; Charlestown; Greenspring Village; Henry Ford Village; Oak Crest Village; Riderwood Village; and Seabrook Village. Various Campuses are full-service facilities which offer residents a full life cycle of services during their retirement years from independent living to skilled nursing care. These retirement communities provide affordable living accommodations and related healthcare and support services to a target market of middle-income residents aged sixty-two (62) years and older. |
| ***Cash*** | Legal tender of the United States of America. |
| ***Cash Collateral*** | All cash collateral securing any Assumed Liability, pursuant to the terms of the Definitive Agreement. |
| ***Cash on Hand*** | Cash and cash equivalents held by the Company and Erickson Construction other than Medical Claims Cash and Cash Collateral. |
| ***Cash Transaction Proceeds*** | The Cash portion of the Transaction Proceeds, in the amount of $365,000,000, as adjusted pursuant to the Definitive Agreement (which adjustments include, without limitation, (i) deduction of the amount of all IEDs relating to Landowner Debtors collected after November 27, 2009, excluding those IEDs collected at Kansas and, after November 27, 2009, at Warminster, (ii) to the extent Cash on Hand as of the Closing is less than $10,000,000, deduction of such shortfall), and (iii) deduction of the amount of the NSC Payment which Redwood is responsible for making pursuant to the Definitive Agreement. |
| ***Causes of Action*** | Any and all claims, causes of action and enforceable rights of a person against third parties, or assertable by a person or on behalf of its creditors, its estate, or itself, whether brought in the Bankruptcy Court or any other forum for recovery or avoidance, that has not been settled or resolved as of the Effective Date, of, among other things: |

a.      obligations, transfers of property or interests in property, offsets, debt forgiveness, Cash, and other types of kinds of property or interests in property or the value thereof, recoverable or avoidable pursuant to Chapter 5 of the Bankruptcy Code or other sections of the Bankruptcy Code or any applicable law ("***Chapter 5 Avoidance Actions***");

b.      damages, general or statutory or exemplary (or all) or other relief, including but not limited to actions relating to or based upon –

(i) indebtedness owing to a person, (ii) fraud, negligence gross negligence, willful injury or misconduct, acts or malice, or any other tort actions, including but not limited to defamation, malicious prosecution, or tortious interference with contract, (iii) breaches of contract, (iv) violations of federal or state securities laws, (v) violations of applicable corporate, limited liability company or partnership laws, (vi) breaches of fiduciary or agency duties, including, but not limited to, the duties of care and/or loyalty, (vii) recharacterization, (viii) illegal dividends, (ix) misrepresentations, (x) causes of action based on disregard of the corporate form or piercing the corporate veil or other liability theories, (xi) corporate waste, (xii) corporate opportunity, (xiii) any theory of recovery against a lending institution not otherwise released by the Plan, including any action or any action causing harm to a person, (xiv) equitable or legal subordination, (xv) indemnity rights against third parties, or (xvi) any other action listed in Bankruptcy Rule 7001; and

c.      damages or other relief based upon any other claim of a person to the extent not specifically compromised or released pursuant to the Plan ((b) and (c) above, "***Non-Avoidance Causes of Actions***").

*Cedar Crest Receivable*

The receivable set forth on the books of Point View Campus II, LLC owed by Cedar Crest in an amount equal to (i) the IEDs not yet received by Cedar Crest, plus (ii) the IEDs used by Cedar Crest to fund the reserves under the Cedar Crest Bonds, less (iii) the outstanding principal, interest and fees due to PPF MF 3900 Gracefield Road, LLC ("***PPF***") under that certain

Promissory Note dated November 1, 2006 in the principal amount of $25,000,0000, which was subsequently amended and restated by the Amended and Restated Promissory Note dated July 28, 2009 in the principal amount of $26,250,000 and amended by that certain Modification Agreement dated July 28, 2009 among PVC II, Erickson Retirement Communities, LLC and PPF, after application of those funds currently being held for payment to PPF.

| | |
|---|---|
| ***Chapter 11 Cases*** | The cases commenced in the Bankruptcy Court by the Debtors pursuant to chapter 11 of the Bankruptcy Code. |
| ***Claim*** | A "claim," as that term is described in Bankruptcy Code section 101(5), against the Debtors. |
| ***Class*** | Any group of Claims or Interests classified in Section 3 of the Plan pursuant to Bankruptcy Code section 1122. |
| ***Closing*** | The closing of the transactions contemplated under the Definitive Agreement, pursuant to the terms thereof. |
| ***Closing Date*** | The date on which the Closing actually occurs or the date on which Redwood and ERC agree the Closing is deemed to occur. |
| ***Coastwood*** | ERC Investment Holdings, LLC, an entity formed by affiliates of Coastwood Senior Housing Partners, LLC, Kohlberg Kravis Roberts & Co., and Beecken Petty O'Keefe & Company, LLC. |
| ***Collateral*** | Any property or interest in property of the Estate of any Debtor subject to a valid lien, charge, or other encumbrance to secure the payment or performance of a Claim. |
| ***Columbus Community Loan*** | That certain loan between Hickory Chase, Inc. and Columbus in the maximum principal amount of $493,262,437, with a current balance of zero ($0). |
| ***Columbus Community Loan Claim*** | A Claim arising under the Columbus Community Loan. |
| ***Columbus Construction Loan*** | That certain construction loan, dated April 16, 2008, in the maximum principal amount of $90 million, between Columbus, as borrower, and KeyBank National |

|  | Association, as administrative agent, and Fifth Third Bank, as syndication agent, and the other lenders that are party thereto from time to time. |
|---|---|
| ***Columbus Construction Loan Claim*** | A Claim arising under the Columbus Construction Loan. |
| ***Columbus Improvement Bond Claim*** | A Claim arising under the Hickory Chase Community Authority Infrastructure Improvement Revenue Bonds Series 2008 (Hickory Chase Project), dated April 29, 2008. |
| ***Columbus Junior Loan*** | The loan made pursuant to that certain Loan Agreement made and entered into as of April 16, 2008 by and between Windsor OH Holdings, LLC, a Delaware limited liability company, as lender, and Columbus, as borrower, in the maximum principal amount of $21,350,000, as amended from time to time. |
| ***Columbus Junior Loan Claim*** | A Claim arising under the Columbus Junior Loan. |
| ***Company*** | Erickson Retirement Communities, LLC. |
| ***Compensation and Reimbursement Claim*** | A Claim for compensation for services rendered or reimbursement of expenses incurred through and including the Plan Confirmation Date pursuant to Bankruptcy Code section 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5). |
| ***Completed Campus*** | A Campus which is completely developed (mature) and no longer under construction. The Completed Campuses are: Brooksby Village; Cedar Crest Village; Charlestown; Greenspring Village; Henry Ford Village; Oak Crest Village; Riderwood Village; and Seabrook Village. |
| ***Concord Community Loan*** | The loan made pursuant to that certain Community Loan Agreement between Concord, as borrower, and Maris Grove, Inc., a Maryland non-profit corporation, as lender, with a balance of $204,127,559. |
| ***Concord Community Loan Claim*** | A Claim arising under the Concord Community Loan. |

| | |
|---|---|
| ***Concord Construction Loan*** | The loan made pursuant to that certain Construction Loan Agreement made and entered into as August 30, 2005 by and between Concord, as borrower, the financial institutions that are or may from time to time become parties thereto and PNC Bank, National Association as successor to Mercantile-Safe Deposit and Trust Company, as administrative agent, in the maximum principal amount of $70 million. |
| ***Concord Construction Loan Claim*** | A Claim arising under the Concord Construction Loan. |
| ***Concord Junior Loan*** | That certain transaction entered into pursuant to that certain "Purchase Agreement" made and entered into as of October 11, 2005, by and among Concord, ERC, and Strategic Concord Landholder, LP, a Delaware limited partnership, as may be amended, modified and supplemented from time to time, in the amount of $25 million. |
| ***Concord Junior Loan Claim*** | A Claim arising under the Concord Junior Loan. |
| ***Concord Letters of Credit*** | Letters of credit numbered 18106171 and 18106910 issued by PNC Bank, National Association. |
| ***Construction Lender*** | Each of the lenders under the Construction Loans made to each of the Landowner Debtors. |
| ***Contingent Claim*** | Any contingent or unliquidated Claim asserted or which may be asserted against the Debtors. |
| ***Corporate Headquarters*** | The real property at each of 701, 703, 705 and 813 Maiden Choice Lane, Baltimore, Maryland 21228. |
| ***Corporate Revolver*** | The loan made pursuant to that certain Credit Agreement among ERC, the other loan parties thereto, the several lenders from time to time thereto, PNC Bank, National Association, as Administrative Agent, with PNC Capital Markets LLC, as Arranger, dated as of July 27, 2007, in the amount of $236.5 million, as amended, modified or otherwise supplemented from time to time. Wilmington Trust FSB is successor Administrative Agent to PNC Bank, National Association. The Agent for the Corporate Revolver |

Lenders asserts that the Corporate Revolver is projected to have an outstanding balance of approximately $190,682,573.00 as of December 31, 2009.

**Corporate Revolver Claim**

Any Claim arising under the Corporate Revolver.

**Corporate Revolver Guaranty Claim**

A Claim arising from a guarantee of the Corporate Revolver.

**Corporate Revolver Lenders**

The lenders which are party to the Corporate Revolver as of the Voting Record Date.

**Dallas Community Loan**

That certain loan between Dallas, as borrower, and Highland Springs, Inc., a Maryland non-profit corporation, as lender, with a balance of $86,977,930.

**Dallas Community Loan Claim**

A Claim arising under the Dallas Community Loan.

**Dallas Construction Loan**

That certain Revolving and Construction Loan between Bank of America, as Administrative Agent for itself and other lenders, and Dallas, as borrower, for Highland Springs, Dallas, Texas, pursuant to the loan agreement, dated November 30, 2005, in the maximum principal amount of $70 million, as amended, restated, modified and supplemented from time to time.

**Dallas Construction Loan Claim**

A Claim arising under the Dallas Construction Loan.

**Dallas Junior Loan**

That certain transaction entered into pursuant to that certain "Purchase Agreement" made and entered into as of April 28, 2006 by and among Dallas, ERC, and MSRESS III Dallas Campus, L.P., a Delaware limited partnership, in the amount of $17.5 million, as amended, modified and supplemented from time to time.

**Dallas Junior Loan Claim**

A Claim arising under the Dallas Junior Loan.

**Debtors**

Erickson Group, LLC ("**Erickson Group**"); Erickson Retirement Communities, LLC ("**ERC**" or the "**Company**"); Ashburn Campus, LLC ("**Ashburn**"); Columbus Campus, LLC ("**Columbus**"); Concord

Campus, L.P. ("**Concord**"); Concord Campus GP, LLC ("**Concord GP**"); Dallas Campus, LP ("**Dallas**"); Dallas Campus GP, LLC ("**Dallas GP**"); Erickson Construction, LLC ("**Erickson Construction**"); Houston Campus, L.P. ("**Houston**"); Kansas Campus, LLC ("**Kansas**"); Littleton Campus, LLC ("**Littleton**"); Novi Campus, LLC ("**Novi**"); Senior Campus Services, LLC ("**Senior Campus**"); Warminster Campus, L.P. ("**Warminster**"); and Warminster Campus GP, LLC ("**Warminster GP**").

| | |
|---|---|
| ***Debtors in Possession*** | The Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to Bankruptcy Code sections 1101, 1107(a) and 1108. |
| ***Definitive Agreement*** | That certain Second Amended and Restated Master Purchase and Sale Agreement, effective as of February 16, 2010, among Redwood, ManagementCo, DevCo, PropCo, Redwood Kansas, Redwood Concord, Redwood Dallas, Redwood Houston, Redwood Ashburn, Redwood Littleton, Redwood Novi, Redwood-ERC Tinton Falls II, LLC, Redwood-ERC Senior Care, LLC and ERC, Erickson Group, LLC, a Maryland limited liability company, Concord, Dallas, Houston, Ashburn, Littleton, Novi, Kansas, Tinton Falls Campus II, LLC, a Maryland limited liability company, Senior Campus Care, LLC, a Maryland limited liability company, and Erickson Construction, LLC, a Maryland limited liability company, including any amendments. |
| ***Developing Campus*** | A Campus that is owned by a respective Landowner, has been opened for operation, but is under development and construction. Each of the following is a Developing Campus: Ann's Choice; Ashby Ponds; Eagles Trace; Fox Run; Hickory Chase; Highland Springs; Linden Ponds; Maris Grove; Monarch Landing; Sedgebrook; Tallgrass Creek; and Wind Crest. |
| ***Development Agreement*** | An agreement between a Landowner or other Campus owner and ERC pursuant to which ERC agrees to plan, administer, and supervise all design, development and construction services and activities of a Campus, and |

the Landowner (or other Campus owner) pays ERC a development fee.

**DevCo**                    Redwood-ERC Development, LLC, a Maryland limited liability company formed by Redwood to enter into Development Agreements for the purpose of performing development-related services in connection with the Campuses.

**DIP Facility**             That certain Amended and Restated Super-Priority Debtor-in-Possession Loan Agreement, dated December 23, 2009, by and among ERC and each of the other parties named in Exhibit A thereto, as Co-Borrowers, Debtors and Debtors-in-Possession under Chapter 11 of the Bankruptcy Code and ERC Funding Co. LLC, as lender, in the principal amount of up to $20 million.

**DIP Funding Claim**        Any Claim arising under the DIP Facility.

**Disbursing Agent**         Any entity, including any Debtor, which acts as a Disbursing Agent under Section 8.4 of the Plan.

**Disclosure Statement**     This document together with any annexed exhibits and schedules, including any amendments or modifications from time to time.

| | |
|---|---|
| *Disputed Claim* | A Claim (excluding the $2.5 million payment to be made to the Liquidating Creditor Trust pursuant to Section 6.4 herein) that has neither been Allowed or disallowed pursuant to a Final Order of the Bankruptcy Court, and (a) if no Proof of Claim has been filed by the applicable deadline: (i) a Claim that has been or hereafter is listed on the Schedules as disputed, contingent, or unliquidated; or (ii) a Claim that has been or hereafter is listed on the Schedules as other than disputed, contingent, or unliquidated, but as to which the Debtors or Reorganized Debtors or any other party in interest has interposed an objection or request for estimation which has not been withdrawn or determined by a Final Order; or (b) if a Proof of Claim or other request for payment has been filed by the applicable deadline: (i) a Claim for which no corresponding Claim has been or hereafter is listed on the Schedules or Allowed in the Plan; (ii) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as other than disputed, contingent, or unliquidated, but the nature or amount of the Claim or as asserted in the Proof of Claim varies from the nature and amount of such Claim as listed on the Schedules to the extent of such variance; (iii) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as disputed, contingent, or unliquidated; or (iv) a Claim for which a timely objection or request for estimation is interposed by the Debtors, the Reorganized Debtors or any other party in interest which has not been withdrawn or determined by a Final Order. |
| *Distribution* | Cash, property, interests in property or other value distributed to Holders of Allowed Claims, or their designated agents, under the Plan (excluding the $2.5 million payment to be made to the Liquidating Creditor Trust pursuant to Section 6.4 of the Plan). |
| *Distribution Record Date* | Five (5) Business Days prior to the Plan Confirmation Date. The $2.5 million payment to be made to the Liquidating Creditor Trust pursuant to Section 6.4 of the Plan shall not be subject to the Distribution Record Date. |
| *Effective Date* | The first Business Day after the Plan Confirmation |

| | |
|---|---|
| | Date on which the conditions precedent specified in Section 11 of the Plan have been satisfied or waived. |
| **ERC** | Erickson Retirement Communities, LLC. |
| **ERC Letters of Credit** | Letters of credit numbered 18106086, 18106388, 18106392, 18106690, 18107082, 18107083, 18107421, 18108167 issued by PNC Bank, National Association. |
| **Erickson Construction Letters of Credit** | Letter of credit numbered 18106730 issued by PNC Bank, National Association. |
| **Erickson Construction Letters of Credit Claim** | A Claim arising under the Erickson Construction Letters of Credit. |
| **Erickson Group Guaranty Claim** | A Claim arising from Erickson Group's guarantee of payment or performance of the respective obligors' obligations under the Concord Construction Loan, Novi Construction Loan, Houston Construction Loan, and Littleton Construction Loan. |
| **Estate** | The estate created in each Debtor's chapter 11 bankruptcy case containing all property and other interests of the Debtor pursuant to Bankruptcy Code section 541. |
| **Final Order** | An order or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument, or rehearing shall have expired; provided, however, that |

the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or Bankruptcy Rule 9024, may be filed relating to such order shall not cause such order to not be a Final Order.

**General Unsecured Claim**  Any Claim asserted against any Debtor which is not included within the other specifically defined Classes under the Plan or which is otherwise determined by the Bankruptcy Court to be a General Unsecured Claim, including any Claims arising from a guarantee of the Debtors' and ERC's non-debtor subsidiaries' prepetition obligations.

**Growth Participation Plan**  That certain Erickson Retirement Communities Amended and Restated Growth Participation Plan, effective as of January 1, 2009, annexed hereto as Exhibit I. The Growth Participation Plan is a profit sharing compensation program for managerial employees holding the title of manager and above.

**GST Loan**  That certain loan in the original principal amount of $49,648,620 between Erickson Group, LLC, as lender and John C. Erickson GST Trust and 2002 Nancy A. Erickson GST Trust, as borrowers, dated as of May 4, 2005, as amended, modified, and supplemented from time to time.

**Holder**  The legal or beneficial holder of a Claim or Interest.

**Houlihan**  Houlihan Lokey Howard & Zukin Capital, Inc., investment bankers and financial advisors to the Debtors.

**Houston Community Loan**  That certain loan made pursuant to that certain Community Loan Agreement between Houston, as borrower, and Eagle's Trace, Inc., a Maryland non-profit corporation, as lender, with a balance of $88,515,330, as amended, modified and supplemented from time to time.

**Houston Community Loan Claim**  A Claim arising under the Houston Community Loan.

**Houston Construction Loan**  The loan made pursuant to that certain Construction

| | |
|---|---|
| | Loan Agreement, amended and restated, dated September 15, 2004, in the maximum principal amount of $50 million, between Houston, as borrower, and PNC Bank, as successor to Mercantile-Safe Deposit and Trust Company, as administrative agent, and other lenders party thereto. |
| **Houston Construction Loan Claim** | A Claim arising under the Houston Construction Loan. |
| **Houston Junior Loan** | That certain transaction entered into pursuant to that certain "Purchase Agreement" made and entered into as of November 18, 2004 by and among CNL Retirement ER6, LP, a Delaware limited partnership and Houston, as may be amended, modified and supplemented from time to time. |
| **Houston Junior Loan Claim** | A Claim arising under that certain Houston Junior Loan. |
| **IED** | The initial entrance deposit that the first resident to occupy each unit at a given Campus pays to the NFP operating the Campus pursuant to a residence and care agreement entered into between the resident and the respective NFP. |
| **Impaired** | With respect to a Claim or Interest, that such Class of Claims or Interests is impaired, within the meaning of Bankruptcy Code section 1124. |
| **Interest** | The interest of any Holder of an equity security of any Debtor, within the meaning of Bankruptcy Code section 101(16), (17), represented by any issued and outstanding shares of common or preferred stock or other instrument evidencing a present ownership or membership interest in any of the Debtors, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest, including a partnership, limited liability company or similar interest in a Debtor. |
| **Interest Rate Swap Claims** | A Claim arising under that certain Master Agreement (related to the Corporate Revolver) between PNC Bank, National Association and ERC (Obligor), dated |

as of July 27, 2007.

| | |
|---|---|
| ***Kansas Community Loan*** | That certain loan between Kansas, as borrower, and Tallgrass Creek, Inc., as lender, with a balance of $33,484,353, as may be amended, modified and supplemented from time to time. |
| ***Kansas Community Loan Claim*** | A Claim arising under the Kansas Community Loan. |
| ***Kansas Construction Loan*** | The loan made pursuant to that certain Construction Loan Agreement made and entered into as of April 3, 2007, in the maximum principal amount of $65 million, by and between Kansas, as borrower, the financial institutions that are or may from time to time become parties thereto and their respective successors and assigns and PNC Bank as successor to Mercantile-Safe Deposit and Trust Company, as Collateral and Administrative Agent for the Lenders. |
| ***Kansas Construction Loan Claim*** | A Claim arising under the Kansas Construction Loan. |
| ***Kansas Junior Loan*** | The loan made pursuant to that certain Loan Agreement made and entered into as of April 3, 2007 by and between MSRESS III Kansas Campus, L.P., a Delaware limited liability partnership, as lender, and Kansas, as borrower, in the maximum principal amount of $25 million. |
| ***Kansas Junior Loan Claim*** | A Claim arising under the Kansas Junior Loan. |
| ***Kansas Special Assessment Bonds*** | The City of Overland Park, Kansas Transportation Development District Special Assessment Bonds Series 2006 (Tallgrass Creek Project) in the principal amount of $15 million, as amended, modified and supplemented from time to time. |
| ***Kansas Special Assessment Bond Claim*** | A Claim arising under the Kansas Special Assessment Bonds. |
| ***Landowner*** | A direct or indirect wholly-owned subsidiary of ERC which owns the land (or is lessee under a sale/leaseback) and improvements associated with a Developing Campus. |

| | |
|---|---|
| ***Landowner Debtor*** | Ashburn; Columbus; Concord; Dallas; Houston; Kansas; Littleton; Novi; and Warminster. |
| ***Landowner Retained Cash*** | The minimum cash balances to be retained by certain of the Landowners, as follows: (i) $1,900,000 by Ashburn Campus, LLC; (ii) $6,300,000 by Concord Campus, LP; (iii) $1,700,000 by Dallas Campus, LP; (iv) $1,800,000 by Houston Campus, LP; (v) $2,100,000 by Littleton Campus, LLC; and (vi) $5,600,000 by Novi Campus, LLC. |
| ***Lenders*** | Collectively, those lenders, parties or participants to the Ashburn Construction Loan, Concord Construction Loan, Dallas Construction Loan, Houston Construction Loan, Littleton Construction Loan, Novi Construction Loan, Kansas Construction Loan, Corporate Revolver and the UMBC Building Construction Loan. |
| ***Lender Allocation*** | The allocation of Distributable Cash (as defined in Section 6.1.3 of the Plan) among the Debtors' Estates and the creation and application of a transaction implementation pool (the "TIP"), as more fully described in Exhibit B to the Plan, and which terms are incorporated and a necessary part of this Plan. |
| ***Liquidating Creditor Trust*** | The grantor trust to be created upon the Effective Date for the benefit of the Beneficiaries. |
| ***Littleton Community Loan*** | That certain loan between Littleton, as borrower, and Wind Crest, Inc., a Maryland non-profit corporation, as lender, with a balance of $141,340,375. |
| ***Littleton Community Loan Claim*** | A Claim arising under the Littleton Community Loan. |
| ***Littleton Construction Loan*** | The loan made pursuant to that certain Construction Loan Agreement made as of March 29, 2006, in the maximum principal amount of $83 million, by and between Littleton, as borrower, and Capmark Finance, Inc., f/k/a GMAC Commercial Mortgage Corporation, a California corporation, as may be amended, modified and supplemented from time to time. |
| ***Littleton Construction Loan Claim*** | A Claim arising under the Littleton Construction Loan. |

| | |
|---|---|
| ***Littleton Junior Loan*** | That certain transaction entered into pursuant to that certain "Purchase Agreement" made and entered into as of October 11, 2006 by and among Littleton, ERC, and MSRESS III Denver Campus, LLC, a Delaware limited liability company, as may be amended, modified and supplemented from time to time. |
| ***Littleton Junior Loan Claim*** | A Claim arising under the Littleton Junior Loan. |
| ***Littleton Letters of Credit*** | Letters of credit issued for the benefit of Littleton in favor of the Board of County Commissioners of the County of Douglas by PNC Bank, National Association, which letters of credit are numbered 18105092, 18106893, 18109581 and 18106895. |
| ***Littleton Out-Parcel*** | The real property consisting of Lot 1, Block 1 (consisting of 12.5 acres) and Lot 1, Block 2 (consisting of 18 acres), as shown on the Erickson Subdivision Plat recorded on November 29, 2005 at Reception No. 2005113790, County of Douglas, State of Colorado. |
| ***Management Agreement*** | A management and marketing agreement entered into among an NFP and ERC pursuant to which ERC agrees to manage a Campus for a management fee. |
| ***Management Agreement Claim*** | A Claim arising under the Management Agreements. |
| ***ManagementCo*** | Redwood-ERC Management, LLC, a Maryland limited liability company formed by Redwood to acquire ERC's goodwill, personal and ongoing business relationships, trade secrets, know-how and knowledge in connection with the Business of providing management services to Retirement Communities, as well as certain other assets related to the management services aspect of the Business for the purpose of operating as the manager of certain Retirement Communities. |
| ***Master Lease*** | A master lease and use agreement entered into between an NFP and a respective Landowner whereby the NFP leases the land and the Developing Campus from the related Landowner. |

| | |
|---|---|
| ***Mechanic's Lien Claims*** | A Secured Claim arising from a valid, properly perfected, enforceable and non-avoidable mechanic's lien arising under state or other applicable law. |
| ***Medical Claims Cash*** | All cash held by ERC for the purpose of paying self-funded medical or dental claims, medical or dental insurance premiums (including stop-loss premiums), and related administrative expenses, including amounts reflected as accounts 10250 and 10255 on the ERC balance sheet. |
| ***Morgan Stanley Settlement*** | An agreement by and among by and among ERC, Erickson Construction, Erickson Group, Houston, Novi, Senior Campus, Littleton, Dallas, Kansas, MSRESS III Dallas Campus, L.P., MSRESS III Denver Campus, LLC, and MSRESS III Kansas Campus, L.P that will be filed as a Plan Supplement and which will provide for a settlement amongst such parties, subject to confirmation of the Plan. |
| ***New Management Agreement*** | A new management and marketing agreement entered into among an NFP and ManagementCo pursuant to which ManagementCo agrees to manage a Campus for a management fee. Each such new management agreement shall be effective as of Closing and will replace the existing Management Agreement with respect to the respective Campus. Each new management agreement shall have a minimum term of ten (10) years, subject to a three (3) year and seven (7) year right to review the management fee terms of the agreements to determine whether the fees reflect current market pricing and shall contain mutually agreeable terms consistent with the economic terms agreed to with the NSC on the record as part of the Auction. To the extent that any party holds valid consent rights with regards to the contemplated New Management Agreements, such rights will continue to be enforceable to the extent that they are valid in the context of the Plan and related transactions. The Debtors reserve the right to seek approval of any new agreements and the Plan over the objection of such a party on any basis available to the Debtors. |
| ***NFP*** | A non-profit organization that either owns a Campus or leases a Campus from the Landowner and operates the |

Campus. The following NFPs have leased the applicable Campuses from the applicable Landowners and entered into various agreements in connection therewith: Ann's Choice, Inc., a Maryland non-profit corporation; Ashby Ponds, Inc., a Maryland non-profit corporation; Eagle's Trace, Inc., a Maryland non-profit corporation; Fox Run Village, Inc., a Maryland non-profit corporation; Hickory Chase, Inc., a Maryland non-profit corporation; Highland Springs, Inc., a Maryland non-profit corporation; Linden Ponds, Inc., a Maryland non-profit corporation; Maris Grove, Inc., a Pennsylvania non-profit corporation; Monarch Landing, Inc., a Maryland non-profit corporation; Sedgebrook, Inc., a Maryland non-profit corporation; Tallgrass Creek, Inc., a Maryland non-profit corporation; and Wind Crest, Inc., a Maryland non-profit corporation.

***NSC/NFP Carveout Claims***   Shall have the meaning ascribed in Section 12.2 of the Plan.

***NFP Claim***   With respect to the Landowner Debtors, a Claim arising under the Working Capital Loans or Master Leases entered into between a respective Landowner and a respective NFP.

***Novi Community Loan***   That certain loan between Novi, as borrower, and Fox Run Village, Inc., as lender, with a balance of $165,504,127.

***Novi Community Loan Claim***   A Claim arising under the Novi Community Loan.

***Novi Construction Loan***   The loan made pursuant to that certain Construction Loan Agreement made and entered into as of February 12, 2002, in the maximum principal amount of $46 million, by and between Novi, as borrower, and PNC Bank, as successor to Mercantile-Safe Deposit and Trust Company, a Maryland banking corporation, as amended, modified and supplemented from time to time.

***Novi Construction Loan Claim***   A Claim arising under the Novi Construction Loan.

| | |
|---|---|
| ***Novi Junior Loan*** | That certain transaction entered into pursuant to that certain "Purchase Agreement" made and entered into as February 28, 2003, by and among CNL Retirement ER2, LP, a Delaware limited partnership, as buyer, and Novi, as seller, as may be amended, modified and supplemented from time to time, in the principal amount of $17 million. |
| ***Novi Junior Loan Claim*** | A Claim under the Novi Junior Loan. |
| ***Novi Letters of Credit*** | Letters of credit issued by PNC Bank, National Association numbered 18106429, 18106432, 18106433, 18106434, 18106435, 18106436, 18106437, 18106438, 18106440, 18107820, 18106431. |
| ***NSC*** | National Senior Campuses, Inc., a non-profit corporation which supports the NSC-NFPs. |
| ***NSC Interim Payments*** | Any payments the NSC and NSC-NFPs have received from the Debtors for reimbursement of certain professional fees and expenses incurred by the NSC and NSC-NFPs since the Petition Date in connection with the Debtors' restructuring efforts. |
| ***NSC-NFP*** | The "NSC-NFPs" are Oak Crest Village, Inc., Greenspring Village, Inc., Riderwood Village, Inc., Brooksby Village, Inc., Seabrook Village, Inc., Cedar Crest Village, Inc., Ann's Choice, Inc., Maris Grove, Inc., Fox Run Village, Inc., Wind Crest, Inc., Ashby Ponds, Inc., Highland Springs, Inc., Eagle's Trace, Inc., Linden Ponds, Inc., Sedgebrook, Inc., Monarch Landing, Inc. and Tallgrass Creek, Inc. |
| ***NSC Payment*** | The $9 million payment to be made directly by Redwood at Closing on the Definitive Agreement from the Cash Transaction Proceeds to NSC, which payment will be distributed by NSC pursuant to Section 6.1.3.1 of the Plan. |
| ***NSC Payment Rebate*** | $2 million of the $9 million NSC Payment that NSC will pay to the TIP upon receipt of the NSC Payment pursuant to Section 6.1.3.1 of the Plan. |
| ***Other Priority Claim*** | Any Claim entitled to priority pursuant to Bankruptcy Code section 507(a) other than an Administrative |

Expense Claim or Priority Tax Claim.

**Petition Date**

October 19, 2009, the date on which the Debtors' chapter 11 bankruptcy petitions were filed with the Bankruptcy Court.

**Plan**

Debtors' Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code as amended or modified from time to time, annexed to the Disclosure Statement as Exhibit A.

**Plan Confirmation Date**

The date on which the Clerk of the Bankruptcy Court enters the Plan Confirmation Order.

**Plan Confirmation Hearing**

The hearing to be held by the Bankruptcy Court to consider approval of the Plan, as such hearing may be adjourned or continued from time to time.

**Plan Confirmation Order**

Any order entered by the Bankruptcy Court confirming the Plan pursuant to Bankruptcy Code section 1129.

**Plan Documents**

All documents, forms of documents, schedules, and exhibits to the Plan to be executed, delivered, assumed and/or performed in conjunction with consummation of the Plan on the Effective Date.

**Plan Supplement**

The compilation of all Plan Documents to be entered into as of the Effective Date. The Plan Supplement will be filed with the Clerk of the Bankruptcy Court no later than five (5) Business Days prior to the Plan Confirmation Hearing (or such later date as may be approved by the Bankruptcy Court on notice to parties in interest) and shall be considered a part of the Plan for all purposes.

**Priority Tax Claim**

Any Allowed Claim of a governmental unit pursuant to Bankruptcy Code sections 502(i) and 507(a)(8); provided, however, any Claims for penalties asserted by governmental units shall not be Priority Tax Claims.

**Professional**

Any professional firm or professional person retained by the Debtors in connection with these Chapter 11 Cases pursuant to a Final Order in accordance with

sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

**Project Debt**

The debt identified on Exhibit X to the Definitive Agreement.

**Proof of Claim**

A written statement conforming substantially to the appropriate official form and Bankruptcy Rule 3001 describing the basis and amount of a Claim or Interest, together with supporting documentation evidencing the such Claim or Interest, which complies with applicable provisions of the Plan, the Bankruptcy Code, other Bankruptcy Rules, and any orders of the Bankruptcy Court.

**PropCo**

Redwood-ERC Properties, LLC, a Maryland limited liability company formed by Redwood to acquire all ERC's right, title, and interest in the Transferred Landowners for the purpose of operating as owner of the acquired Campuses.

**Redwood**

Redwood-ERC Senior Living Holdings, LLC, a Maryland limited liability company.

**Redwood Ashburn**

Redwood-ERC Ashburn, LLC, a Maryland limited liability company.

**Redwood Concord**

Redwood-ERC Concord L.P., a Maryland limited partnership.

**Redwood Dallas**

Redwood-ERC Dallas, LLC, a Maryland limited liability company.

**Redwood Houston**

Redwood-ERC Houston, LLC, a Maryland limited liability company.

**Redwood Kansas**

Redwood-ERC Kansas, LLC, a Maryland limited liability company formed by Redwood to acquire certain assets of Kansas.

**Redwood Littleton**

Redwood-ERC Littleton, LLC, a Maryland limited

liability company.

| | |
|---|---|
| ***Redwood Novi*** | Redwood-ERC Novi, LLC, a Maryland limited liability company. |
| ***Redwood Retained Employees*** | All current officers, directors and employees of the Debtors employed by Redwood on the Effective Date through the ninety (90) day anniversary thereof, other than John Erickson and members of the Erickson family, including, but not limited to, those individuals listed on the annexed schedule in Exhibit C to the Plan. |
| ***Reorganized Debtors*** | The Debtor entities, as reorganized, or the Acquisition Companies, both as they exist on or after the Effective Date, pursuant to the terms of the Plan. |
| ***Restructuring Transactions*** | Those transactions described in the Definitive Agreement and Section 6 of the Plan. |
| ***Schedules*** | The schedules of assets and liabilities and the statement of financial affairs filed by the Debtors pursuant to Bankruptcy Code section 521, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules as such schedules and statements have been or may be supplemented or amended from time to time through the Plan Confirmation Date. |
| ***SEC*** | The Securities and Exchange Commission. |
| ***Secured Claim*** | A Claim (i) secured by a valid and perfected lien on collateral that is enforceable pursuant to applicable law, the amount of which is equal to or less than the value of such collateral (a) as set forth in the Plan, (b) as agreed to by the Holder of such Claim and the Debtors, or (c) as determined by a Final Order in accordance with Bankruptcy Code section 506(a), or (ii) secured by the amount of any rights of setoff of the Holder thereof under Bankruptcy Code section 553. |
| ***Secured Tax Claim*** | Any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under Bankruptcy Code section 507(a)(8) (determined irrespective of any time limitations therein), and |

| | |
|---|---|
| | including any related Secured Claim for penalties. |
| *Securities Act* | The Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder. |
| *Sellers* | ERC, Erickson Group, Concord, Dallas, Houston, Ashburn, Littleton, Novi, Kansas, Tinton Falls Campus II, LLC, Senior Campus Care, LLC, Warminster Campus, L.P., and Erickson Construction. |
| *Solicitation Package* | The package that will be distributed by the Voting Agent to Holders of Claims in Classes entitled to vote to accept or reject the Plan. The Solicitation Package shall include, without limitation, copies of (i) the notice of the Plan Confirmation Hearing; (ii) the Plan; (iii) the Disclosure Statement; (iv) a ballot and postage-paid return envelope; and (v) such other information as directed or authorized by the Bankruptcy Court. |
| *STAMPS* | The Subordinated Taxable Adjustable Mezzanine Put Securities Series 2007 issued pursuant to that certain Trust Indenture, dated as of November 1, 2007 between ERC and The Bank of New York, as Trustee, as amended, modified and supplemented from time to time. |
| *Texas A&M Note* | That certain promissory note in the original amount of $4.4 million granted by Dallas to the Board of Regents of the Texas A&M University System, secured by a first priority mortgage on a portion of a certain parcel of land acquired by Dallas from Texas A&M University. |
| *Texas A&M Note Claim* | A Claim arising under the Texas A&M Note. |
| *TIP* | Shall have the meaning set forth herein and Section 1.183 to the Plan and Exhibit B to the Plan. |
| *Tax Code* | Title 26 of the United States Code. |
| *Transferred Claims* | The Transferred Chapter 5 Avoidance Actions (defined below) and the Transferred D&O Claims (defined |

below).

| | |
|---|---|
| ***Transaction Proceeds*** | The gross proceeds received for the Purchased Assets, as defined in the Definitive Agreement. |
| ***Transferred Employees*** | Employees of the Debtors to whom Redwood has made an offer of employment that has been accepted to be effective upon the Closing. |
| ***Transferred Landowners*** | Warminster and Warminster GP. |
| ***Trust Agreement*** | The agreement, substantially in the form included in the Plan Documents, governing the operations of the Liquidating Creditor Trust, as it may be subsequently modified from time to time. |
| ***Trustee*** | The individual or entity designated and retained as the trustee to the Liquidating Creditor Trust, as of the Effective Date or as soon as reasonably practicable thereafter, as the fiduciary responsible for administering the Liquidating Creditor Trust. |
| ***UMBC Building*** | That certain building owned by ERC located at the following address: 5525 Research Park Drive, Baltimore, Maryland 21250. |
| ***UMBC Building Construction Loan*** | The loans made pursuant to that certain Building Loan Agreement between Erickson Construction, Senior Campus, Senior Campus Care, LLC, and SCL Realty, LLC, as Borrowers, ERC, as guarantor, Manufacturers and Traders Trust Company as Lender and Administrative Agent, and Wilmington Trust, FSB, as Lender, dated July 31, 2008. |
| ***UMBC Building Construction Loan Claim*** | A Claim arising under the UMBC Building Construction Loan. |
| ***Unimpaired*** | With respect to a Claim or Interest, a Class of Claims or Interests that is not Impaired, within the meaning of Bankruptcy Code section 1124. |
| ***Voting Agent*** | BMC Group, Inc. |

| | |
|---|---|
| ***Voting Deadline*** | The date provided for actual receipt of properly completed ballots by the Voting Agent. The Voting Deadline will be specified in the Solicitation Package provided to creditors entitled to vote to accept or reject the Plan. |
| ***Voting Record Date*** | The date of the final hearing on the Disclosure Statement. |
| ***Warminster Community Loan*** | That certain loan agreement between Warminster and Ann's Choice, Inc., a Maryland non-profit corporation, relating to a loan with balance of approximately $276,759,374 as of the Petition Date. |
| ***Warminster Community Loan Claim*** | A Claim arising under the Warminster Community Loan. |
| ***Warminster Junior Loan*** | A real estate financing contract between Warminster and HCP ER3 (f/k/a CNL Retirement ER3, LP), a Delaware limited partnership, as may be amended, modified and supplemented from time to time. |
| ***Warminster Junior Loan Claim*** | A Claim arising under the Warminster Junior Loan. |
| ***Warminster Letters of Credit*** | Letters of credit numbered 18106642, 18106643 and 18107298 issued by PNC Bank, National Association. |
| ***Warminster Purchase Option Deposit Refund Agreement*** | That certain amended and restated purchase option agreement dated December 1, 2005 by and among Warminster, ERC and Ann's Choice, Inc., including any obligations thereunder to refund the purchase option deposit described therein. |
| ***Warminster Purchase Option Deposit Refund Agreement Claim*** | A Claim arising under the Warminster Purchase Option Deposit Refund Agreement. |
| ***Wind Down Fund*** | $3 million set aside to fund the Estates' post Plan Confirmation Date expenses. |
| ***Working Capital Loan*** | A loan entered into between a Landowner and NFP, pursuant to which the Landowner loans the NFP the funds necessary to cover operating deficiencies of the NFP. |

# I.       Introduction

The Debtors prepared this Disclosure Statement in connection with solicitation of votes for acceptance of the Plan.  This Disclosure Statement is intended to provide adequate information of a kind, and in sufficient detail, to enable the Debtors' creditors to make an informed judgment about the Plan, including whether to accept or reject the Plan.

*The preceding Glossary provides definitions of terms used herein.  In some instances, a term that is used only in a specific Section will be defined only in that Section.*

The Disclosure Statement provides the following categories of information:

| Section | Summary of Contents |
| --- | --- |
| II. | Background information regarding the Debtors' Business and organizational and prepetition capital structure |
| III. | Events leading to the Debtors' chapter 11 bankruptcy filings |
| IV. | A selection of certain events which have occurred after the Petition Date |
| V. | A description of the Restructuring Transactions contemplated under the terms of the Plan |
| VI. | The treatment of creditors and equity interest holders of the Debtors under the terms of the Plan |
| VII. | A listing of which Classes of creditors are entitled to vote to accept or reject the Plan and the requirements and procedures for voting |
| VIII. | A summary of certain financial information of the Debtors, including historical financials, financial projections and valuation information |
| IX. | A summary of who will govern the Reorganized Debtors, the continued existence of the Debtor entities, and the obligations of any successor to the Debtor entities |
| X. | Outline of, among other things, how Distributions contemplated under the Plan will be made, how Disputed Claims will be resolved, assumption and rejection of executory contracts and unexpired leases and cure of any defaults, the effect of confirmation of the Plan, releases and exculpation, and preservation of causes of action and reservation of rights, and administrative matters |

XI.                              Discussion of certain risks and other considerations creditors should be aware of prior to voting

XII.                           Outline of the procedure for confirming the Plan and discussion of the liquidation analysis of the Debtors

XIII.                         Discussion of alternatives to confirmation and consummation of the proposed Plan

To the extent that the information provided in this Disclosure Statement and the Plan (including any attached exhibits and Plan Supplements) are in conflict, the terms of the Plan (including any attached exhibits and Plan Supplements) will control.

Creditors should refer only to this Disclosure Statement and the Plan to determine whether to vote to accept or reject the Plan.

The Plan was developed through extensive negotiations between the Debtors, the Debtors' financial advisors, Redwood, the Committee, and the Agents.  The Debtors and Redwood have now entered into the Definitive Agreement.  The Debtors believe that approval of the Plan is in the best interests of the Debtors' creditors.

Creditors may request additional copies of this Disclosure Statement from the Voting Agent at the following address:

| If by regular mail: | If by messenger or overnight delivery: |
| --- | --- |
| ERC Ballot Processing | ERC Ballot Processing |
| c/o BMC Group Inc | c/o BMC Group Inc |
| PO BOX 3020 | 18750 Lake Drive East |
| Chanhassen, MN 55317-3020 | Chanhassen, MN 55317 |
| Telephone:  (888) 909-0100 | Telephone:  (888) 909-0100 |
| Email:  info@bmcgroup.com | Email:  info@bmcgroup.com |

Pursuant to the Bankruptcy Code, only creditors who actually vote on the Plan will be counted for purposes of determining whether the required number of acceptances have been obtained.  Failure to deliver a *properly completed* ballot by the Voting deadline will result in an abstention, consequently, the vote will neither be counted as an acceptance or rejection of the Plan.

## II.    Background Information

### A.    Debtors' Business and History.

The Debtors are part of a fully-integrated, privately-owned development and management company that focuses on providing affordable, high-quality senior living for middle-income seniors.  The Debtors' expertise in development, acquisition, management, finance, and sale of properties has made them one of the largest and most well-known senior living companies in the United States.

As of the Petition Date, the Debtors currently manage and have varying interests in twenty (20) continuing care retirement communities (the "**CCRCs**" used interchangeably herein with the term **Campuses**) in various stages of completion or development, in eleven (11) different states, including Colorado, Illinois, Kansas, Maryland, Massachusetts, Michigan, New Jersey, Ohio, Pennsylvania, Texas, and Virginia. In total, the operating CCRCs have approximately 23,000 residents. Certain of the CCRCs are large campus-style communities that offer seniors a full life cycle of retirement services from independent living through skilled nursing on the same property.

### B. Organizational Structure of the Debtors.

#### 1. Erickson Retirement Communities, LLC.

John C. Erickson, ERC's current Chairman and CEO, founded ERC in 1983 to develop and operate large campus-style CCRCs to provide seniors with affordable, high-quality retirement living.[1]

ERC is a Maryland limited liability company, which has its principal place of business at 701 Maiden Choice Lane, Baltimore, Maryland.

ERC is a wholly-owned subsidiary of Erickson Group and is the developer and manager of the CCRCs. ERC generally develops a CCRC in three (3) phases. First, ERC selects a site for the construction of the new CCRC and creates a wholly-owned subsidiary to purchase the land, a Landowner. Second, ERC begins the construction and development of the new CCRC. When ERC begins to market a campus or when a CCRC license is obtained, ERC associates with an independent not-for-profit operator, NFP, to operate the new campus, and the NFP enters into a management agreement with ERC to manage the campus. Third, when the construction of the CCRC is complete, the land and campus are sold to the NFP, and ERC continues to manage the campus. The complete life cycle of a CCRC is described in more detail below.

Of ERC's twenty (20) CCRCs, eight (8) are Completed Campuses and have been sold to an NFP, and twelve (12) are Developing Campuses of which eleven (11) are open and operating and one (1) is no longer under development and/or construction and has not opened. ERC manages all twenty (20) Campuses and employs more than 700 people in connection with the management of these Campuses.

As of September 30, 2009, on a book value basis, ERC had approximately $2.7 billion in assets and $3.0 billion in liabilities. ERC's main assets consist of: (i) approximately $37.6 million in Cash or cash equivalents; (ii) its ownership interests in the Landowners; (iii) certain Management Agreements; (iv) certain Development Agreements; (v) approximately

---

[1] ERC was originally founded in 1983 as Retirement and Health Services Corporation, which changed its name to Senior Campus Living, Inc. ("**Senior Inc.**") in 1993. In 1996, Senior Campus Living, LLC ("**Senior LLC**") was organized as a limited liability company and acquired substantially all of the assets of Senior Inc. Subsequently, in January 2000, Senior LLC changed its name to ERC.

$11.5 million in accounts receivable; (vi) property and equipment with a net value of approximately $2.2 billion; and (vii) approximately $190 million in notes receivable from the communities.

ERC's main liabilities are: (i) approximately $190,682,573.00 under the Corporate Revolver; (ii) approximately $347.5 million in guarantor obligations for borrowings under various construction lines of credit; (iii) approximately $64 million in accounts payable and accrued expenses; (iv) guarantor obligations of approximately $475 million for Purchase Option Deposits (defined below); and (vi) approximately $47.8 million in subordinated debt.

## 2. Erickson Construction, LLC.

Erickson Construction, a Maryland limited liability company, is a wholly-owned subsidiary of ERC and is the general contractor and construction manager for each of the CCRC projects under development. It has its principal place of business at 701 Maiden Choice Lane, Baltimore, Maryland. Erickson Construction has one (1) employee.

As of September 30, 2009, on a book value basis, Erickson Construction had approximately $22.5 million in assets and $17.8 million in liabilities. Erickson Construction's main assets consist of: (i) approximately $4.4 million in Cash and cash equivalents; (ii) approximately $12.6 million in receivables; and (iii) approximately $1.2 million in property and equipment. Erickson Construction's main liabilities are: (i) its liability as a borrower under the Corporate Revolver; and (ii) approximately $13.8 million in construction payables and accrued expenses.

## 3. Erickson Group, LLC.

All of the Debtors are directly or indirectly owned by Erickson Group, a co-debtor and Maryland limited liability company, with its principal place of business at 701 Maiden Choice Lane, Baltimore, Maryland.

Erickson Group has seven (7) members—Baltimore Community Foundation (3.07% membership interest), JCE Holding Corp. (0.2% membership interest), J&N Nevada Holdings, Inc. (37.7% membership interest), Senior Living Limited Partnership (26.5% membership interest), 2002 John C. Erickson GST Trust (16.2% membership interest), and 2002 Nancy A. Erickson GST Trust (16.2% membership interest). These entities and trusts are not debtors in these cases, but they are affiliated with John C. Erickson, the current Chairman and Chief Executive Officer of ERC, and his family members.

Erickson Group is a holding company and the sole member of ERC. It does not have any employees, and as of September 30, 2009, its only assets are its ownership interests in ERC and the GST Loan. Erickson Group's main liabilities are the Erickson Group Guaranty Claims and its limited guarantee under the Corporate Revolver.

4. **Concord Campus GP, LLC.**[2]

Concord GP, a Maryland limited liability company, is a wholly-owned subsidiary of ERC that was formed to operate and manage the CCRC located in Concord, Pennsylvania, known as Maris Grove. Concord GP's principal place of business is at 701 Maiden Choice Lane, Baltimore, Maryland. It does not have any employees.

As of September 30, 2009, Concord GP's only assets are its 1% general partner interest and 1% limited partner interest in Concord Campus, L.P., a Landowner and Debtor. Concord GP's main liability is as a guarantor under the Corporate Revolver.

5. **Dallas Campus GP, LLC.**[3]

Dallas GP, a Maryland limited liability company, is a wholly-owned subsidiary of ERC that was formed to operate and manage the CCRC located in Dallas, Texas, known as Highland Springs. Dallas GP's principal place of business is at 701 Maiden Choice Lane, Baltimore, Maryland. It does not have any employees.

As of September 30, 2009, Dallas GP's only assets are its 1% general partner interest and 1% limited partner interest in Dallas Campus, L.P., a Landowner and Debtor. Dallas GP's main liability is as a guarantor under the Corporate Revolver.

6. **Senior Campus Services, LLC.**[4]

Senior Campus, a Maryland limited liability company, is a wholly-owned subsidiary of ERC that was formed to operate and manage the CCRC located in Houston, Texas, known as Eagle's Trace. Senior Campus' principal place of business is at 701 Maiden Choice Lane, Baltimore, Maryland. It does not have any employees.

As of September 30, 2009, Senior Campus' only assets are its 1% general partner interest and 1% limited partner interest in Houston Campus, L.P., a Landowner and Debtor. Senior Campus has approximately $32,000 in liabilities, plus its liability as a guarantor under the Corporate Revolver.

7. **Warminster Campus GP, LLC.**[5]

Warminster GP, a Maryland limited liability company, is a wholly-owned subsidiary of ERC that was formed to operate and manage the CCRC in Warminster, Pennsylvania, known as Ann's Choice. Warminster GP's principal place of business is at 701 Maiden Choice Lane, Baltimore, Maryland. It does not have any employees.

---

[2] Concord is structured as both a general partnership and limited liability company for tax liability purposes.

[3] Dallas is structured as both a general partnership and limited liability company for tax liability purposes.

[4] Senior Campus is structured as both a general partnership and limited liability company for tax liability purposes.

[5] Warminster is structured as both a general partnership and limited liability company for tax liability purposes.

As of September 30, 2009, Warminster GP's only assets are its 1% general partner interest and 1% limited partner interest in Warminster Campus, L.P., a Landowner and Debtor. Warminster GP's main liability is as a guarantor under the Corporate Revolver.

*Landowner Debtors*

### 8. Ashburn Campus, LLC.

Ashburn, a Maryland limited liability company, is a wholly-owned subsidiary of ERC with its principal place of business at 701 Maiden Choice Lane, Baltimore, Maryland. It does not have any employees.

As of September 30, 2009, on a book value basis, Ashburn has approximately $184.7 million in assets and $232.6 million in liabilities.

Ashburn's main assets are: (i) the improved land located in Loudoun County, Virginia upon which the Ashby Ponds Campus is constructed; (ii) all improvements constructed on that land; (iii) Cash and cash equivalents in the amount of approximately $280,000; and (iv) a lease agreement entered into between Ashburn and Ashby Ponds, Inc., the NFP that operates the Ashby Ponds campus.

Ashburn's main liabilities are: (i) approximately $61.8 million under the Ashburn Construction Loan; (ii) obligations under the Ashburn Community Loan of approximately $107.1 million; and (iii) obligations under the Ashburn Junior Loan.

### 9. Columbus Campus, LLC.

Columbus, a Maryland limited liability company, is a wholly-owned subsidiary of ERC with its principal place of business at 701 Maiden Choice Lane, Baltimore, Maryland. It does not have any employees or residents.

As of September 30, 2009, on a book value basis, Columbus has approximately $75.5 million in assets and $87.8 million in liabilities.

Columbus' main assets are (i) the improved land located in Hilliard, Ohio upon which the Hickory Chase Campus was constructed and (ii) all improvements constructed on that land. Columbus' main liabilities are: (i) approximately $46.9 million under the Columbus Construction Loan; (ii) $25.8 million Infrastructure Improvement Revenue Bonds, Series 2008, issued by Hickory Chase Community Authority; and (iii) obligations under the Columbus Junior Loan.

On or about June 1, 2009, Columbus defaulted under the Columbus Construction Loan. The lenders for the Columbus Construction Loan commenced a foreclosure action against the Campus property on or about July 1, 2009, and ERC has ceased the construction and development of the Campus. In connection with the foreclosure action, the lenders for the Columbus Construction Loan sought the appointment of a receiver, which currently has possession of the Campus.

The Columbus Improvement Bond claim is secured by a first priority tax lien on

the Hickory Chase Campus. This tax lien is senior to all other liens on the Campus property and will be unaltered by these Chapter 11 Cases.

### 10. Concord Campus, L.P.

Concord, a Maryland limited liability company, is 98% owned by ERC and 2% owned by Concord GP. Concord's principal place of business is at 701 Maiden Choice Lane, Baltimore, Maryland. It does not have any employees.

As of September 30, 2009, on a book value basis, Concord has approximately $286.9 million in assets and $315.9 million in liabilities.

Concord's main assets are: (i) the improved land located in Glenn Mills, Pennsylvania upon which the Maris Grove Campus is constructed; (ii) all improvements constructed on that land; (iii) Cash and cash equivalents in the amount of approximately $755,000; and (iv) a lease agreement entered into between Concord and Maris Grove, Inc., the NFP that operates the Maris Grove Campus.

Concord's main liabilities are: (i) approximately $64.6 million under the Concord Construction Loan; (ii) obligations under the Concord Community Loan of approximately $204.1 million; and (iii) obligations under the Concord Junior Loan.

### 11. Dallas Campus, LP.

Dallas, a Maryland limited liability company, is a 98% owned by ERC and 2% owned by Dallas GP. Dallas' principal place of business is at 701 Maiden Choice Lane, Baltimore, Maryland. It does not have any employees.

As of September 30, 2009, on a book value basis, Dallas has approximately $154.3 million in assets and $178 million in liabilities.

Dallas' main assets are: (i) the improved land located in Dallas, Texas upon which the Highland Springs Campus is constructed; (ii) all improvements constructed on that land; (iii) Cash and cash equivalents in the amount of approximately $2,000; and (iv) a lease agreement entered into between Dallas and Highland Springs, Inc., the NFP that operates the Highland Springs Campus.

Dallas' main liabilities are: (i) approximately $53.7 million under the Dallas Construction Loan; (ii) obligations under the Dallas Community Loan of approximately $87 million; (iii) obligations under the Dallas Junior Loan; and (iv) a promissory note in the original principal amount of $4.4 million granted by Dallas to the Board of Regents of the Texas A&M University System.

### 12. Houston Campus, LP.

Houston, a Maryland limited liability company, is 98% owned by ERC and 2% owned by Senior Campus. Houston's principal place of business is at 701 Maiden Choice Lane, Baltimore, Maryland. It does not have any employees.

As of September 30, 2009, on a book value basis, Houston has approximately $161.9 million in assets and $194.2 million in liabilities.

Houston's main assets are: (i) the improved land located in Houston, Texas upon which the Eagle's Trace Campus is constructed; (ii) all improvements constructed on that land; (iii) Cash and cash equivalents in the amount of approximately $2 million; and (iv) a lease agreement entered into between Houston and Eagle's Trace, Inc., the NFP that operates the Eagle's Trace Campus.

Houston's main liabilities are: (i) approximately $43.2 million under the Houston Construction Loan; (ii) obligations under the Houston Community Loan in the amount of approximately $88.5 million; and (iii) obligations under the Houston Junior Loan.

### 13. Kansas Campus, LLC.

Kansas, a Maryland limited liability company, is a wholly-owned subsidiary of ERC with its principal place of business at 701 Maiden Choice Lane, Baltimore, Maryland. It does not have any employees.

As of September 30, 2009, on a book value basis, Kansas has approximately $124.5 million in assets and $154.2 million in liabilities.

Kansas' main assets are: (i) the improved land located in Overland Park, Kansas upon which the Tallgrass Creek Campus is constructed; (ii) all improvements constructed on that land; (iii) Cash and cash equivalents in the amount of approximately $20,000; and (iv) a lease agreement entered into between Kansas and Tallgrass Creek, Inc., the NFP that operates the Tallgrass Creek Campus.

Kansas' main liabilities are: (i) approximately $62.3 million under the Kansas Construction Loan; (ii) obligations under the Kansas Community Loan of approximately $ 33.5 million; (iii) Transportation Development District Special Assessment Bonds, Series 2006, in the amount of $14,950,000, issued by the City of Overland Park, Kansas; and (iv) obligations under the Kansas Junior Loan.

### 14. Littleton Campus, LLC.

Littleton, a Maryland limited liability company, is a wholly-owned subsidiary of ERC with its principal place of business at 701 Maiden Choice Lane, Baltimore, Maryland. It does not have any employees.

As of September 30, 2009, on a book value basis, Littleton has approximately $226.1 million in assets and $239.1 million in liabilities.

Littleton's main assets are: (i) the improved land located in Littleton, Colorado upon which the Wind Crest Campus was constructed; (ii) all improvements constructed on that land; (iii) Cash and cash equivalents in the amount of approximately $1.5 million; (iv) a lease agreement entered into between Littleton and Wind Crest, Inc., the NFP that operates the Wind Crest Campus, and (v) the Littleton Out-Parcel.

Littleton's main liabilities are: (i) approximately $62.9 million under the Littleton Construction Loan, in the original principal amount of $83 million; (ii) obligations under the Littleton Community Loan in the amount of approximately $141.3 million; and (iii) obligations under the Littleton Junior Loan.

### 15. Novi Campus, LLC.

Novi, a Maryland limited liability company, is a wholly-owned subsidiary of ERC with its principal place of business at 701 Maiden Choice Lane, Baltimore, Maryland. It does not have any employees.

As of September 30, 2009, on a book value basis, Novi has approximately $238 million in assets and $252.2 million in liabilities.

Novi's main assets are: (i) the improved land located in Novi, Michigan upon which the Fox Run Village Campus is constructed; (ii) all improvements constructed on that land; (iii) Cash and cash equivalents in the amount of approximately $1.4 million; and (iv) a lease agreement entered into between Novi and Fox Run Village, Inc., the NFP that operates the Fox Run Village campus.

Novi's main liabilities are: (i) approximately $31.1 million under a construction loan, dated February 12, 2002, in the original principal amount of $46 million under the Novi Construction Loan; (ii) obligations under the Novi Community Loan in the amount of approximately $165.1 million; and (iii) obligations under the Novi Junior Loan.

### 16. Warminster Campus, LP.

Warminster, a Maryland limited liability company, is 98% owned by ERC and 2% owned by Warminster GP. Warminster's principal place of business is at 701 Maiden Choice Lane, Baltimore, Maryland. It does not have any employees.

As of September 30, 2009, on a book value basis, Warminster has approximately $300.1 million in assets and $374.8 million in liabilities.

Warminster's main assets are: (i) the improved land located in Warminster, Pennsylvania upon which the Ann's Choice Campus is constructed; (ii) all improvements constructed on that land; (iii) Cash and cash equivalents in the amount of approximately $6.4 million; and (iv) a lease agreement entered into between Warminster and Ann's Choice, Inc., the NFP that operates the Ann's Choice Campus.

Warminster's main liabilities are: (i) the Warminster Community Loan in the amount of approximately $276.8 million; (ii) obligations under the Warminster Junior Loan; and (iii) the $75 million Warminster Purchase Option Deposit Refund Agreement.

Warminster's assets are encumbered by a first position mortgage as security for the Ann's Choice Bonds; a mortgage securing the Warminster Community Loan; and a mortgage securing the Warminster Purchase Option Deposit Refund Agreement.

## C.     The Not-For-Profits.

One of the unique aspects of the CCRCs is the fact that ERC associates with the NSC-NFPs, which are not-for-profit organizations, to operate the Campuses.  Each of the Debtors' completed communities, except two (2),[6] are operated by an NFP which is a supported by the NSC.  The NSC is the nation's second largest not-for-profit senior living organization based on total number of senior living units.

All corporate authority at the NSC resides in its board of directors (the "***Board***" or "***Directors***"), who support the NSC-NFP boards who serve as fiduciaries of the Campuses.  As fiduciaries, the NSC-NFPs are stewards of the assets of the Campuses.  The NSC-NFPs have the responsibility of seeing that the Campus mission is being fulfilled and that the Campus assets are effectively used for that purpose.  While the interests of the various stakeholders are considered by the Board, each NSC-NFP views its duty of loyalty as being to each respective Campus and the Campus mission.  ERC, the management company, not the Board, is responsible for managing the Campuses.  The NSC-NFP's view their responsibility, however, as regularly monitoring the quality and effectiveness of ERC's management performance and decisions.

Each NFP is classified as a 501(c)(3) organization based on its mission to provide affordable senior housing to seniors.  The NFP contracts with ERC to provide for the management of the communities.

ERC's goal upon the completion of the construction and development of a Campus is to sell the Campus to an NFP.  After the sale, the NFP owns and operates the Campus, and ERC continues to manage it pursuant to a Management Agreement.  This structure allows the NFPs to focus on quality of care rather than profit maximization.

The NFP, which operates a Campus, receives funds from several sources—IEDs, residents' monthly fees, and municipal bond offerings as a result of their 501(c)(3) status.

Prior to a resident's occupancy of an independent living unit at a Campus (a "***Unit***"), the NFP enters into a residence and care agreement (the "***Residence and Care Agreement***") with the resident.  Under the terms of the Residence and Care Agreement, each resident agrees to pay the NFP an IED and monthly service fees.  The monthly service fees average approximately $1,800 per Unit.  In return for payment of the IED, the resident is permitted to occupy a Unit at the Campus for a lifetime, subject to certain conditions.  Pursuant to the Residence and Care Agreements, the residents receive a full refund of their IEDs upon their death, permanent transfer to a higher acuity unit, or departure from the Campus, subject to a successful resale of the Unit.  The residents can terminate the Residence and Care Agreement without cause on a thirty (30) day notice, and the Residence and Care Agreements can be assigned to a new manager/operator of the Campus if the new manager/operator is certified as a continuing care provider.

---

[6] Charlestown, Inc. and Henry Ford Village, Inc.

### D. The IEDs.

The IEDs paid by the residents prior to their occupancy of a Unit range from $100,000 to $600,000. When a resident moves out or dies, if the Unit's new entrance deposit is the same or greater than the IED price paid by the departing resident, then the departing resident's IED will be 100% refunded and the NFP will keep the difference between the new entrance deposit and the departing resident's IED from the sale of the Unit. If the new entrance deposit is less than the departing resident's IED, then the departing resident will generally receive the lesser amount. In this scenario, the NFP does not participate in the downside risk in this transaction.

As an example, if an IED on a Unit was $270,000 and a new entrance deposit of $300,000 is received, the NFP keeps the $30,000 difference for Campus enhancements or improvements (and the $270,000 is returned to the departing resident once the Unit has been re-occupied, subject to payment of outstanding accounts). If an IED on a Unit was $270,000 and a new entrance deposit of $250,000 is received, then the $250,000 is returned to the departing resident. Generally the departing resident or his or her descendants must consent to sell the Unit at the lower price prior to the NFP making such a sale. To date, generally every resident to depart a Campus has received 100% of their deposit back.

Pursuant to the Bankruptcy Court's initial order approving the IED Motion (the "**Initial IED Order**"), certain IEDs relating to the Landowner Debtors collected postpetition are escrowed, and residents whose postpetition IEDs have been escrowed are entitled to refunds of their respective IEDs in the event they decide not to occupy a Unit, to the extent such IEDs were deposited in an escrow account pursuant to the Initial IED Order. The Bankruptcy Court issued a subsequent order providing additional procedures with respect to the IEDs (the "**Additional IED Procedures Order**"), pursuant to which residents are entitled to receive a refund of their IED upon the closure of the CCRC to which they have paid a deposit. Additionally, the Additional IED Procedure Order provides that, upon either disposition of the assets of the respective Debtor Landowner (through sale, transfer of equity interests or otherwise other than a closure event), or the confirmation of a plan of reorganization, except for the IEDs and escrow account associated with the Ann's Choice Campus, the respective Debtor Landowners and NFPs shall jointly deliver to the respective prepetition Agent and DIP Facility lender notice of their request to release all IEDs held in escrow. Thereafter, providing there are no objections, the escrow agent will turn over all IEDs either to, as applicable in accordance with the Additional IED Procedures Order and the DIP Facility, (a) the DIP Facility lender to be used to satisfy the individual Debtors' obligations under the DIP Facility, (b) the respective prepetition Agents to the Construction Loan (defined below) and applied to the Debtor's obligations under the Construction Loan, (c) Redwood in accordance with the terms of the Definitive Agreement, and the Plan, or (d) with respect to IEDs associated with Warminster, as set forth in Sections 6.3.9.6 and 6.3.9.8 of the Plan, all subject to confirmation of the Plan.

### E. The Life Cycle of a CCRC/Campus.

ERC typically develops and constructs each Campus in three (3) phases over a period of seven (7) to ten (10) years. Generally, the total projected cost to complete one Campus is approximately $300 million to $500 million, including construction financing costs.

A fully developed Campus is generally comprised of three (3) or more residential neighborhoods. Each neighborhood has one community building (the average cost of a community building is $15 million), four (4) to five (5) residential buildings with 80-120 independent living units (the average cost of one residential building is $21 million), and a care center with approximately thirty-six (36) assisted living units and eighty-four (84) skilled nursing units (the average cost of one care center is $13 million). Residents generally move into a residential building within one year after construction begins.

## 1.     First Phase:  Land Acquisition, Construction, and Development.

During the first phase of a Campus, ERC forms a Landowner to purchase the land. The Landowner has ownership of both the real property and all improvements as they are constructed on the land, until the Campus is sold to an NFP. In general, the land acquisition is financed through Cash, equity provided by ERC, construction loans, and/or sub-debt.

Once the land has been acquired, the Landowner begins the construction and development of the Campus. The construction is initially financed by the Landowner through a revolving construction loan (the "**Construction Loan**") from a third party. This loan is secured by, among other things, a first priority lien on all assets of the Landowner, all lien rights of the Landowner in and to assets of the NFP (*e.g.*, the Residence and Care Agreements and the residents' IEDs), all lien rights of the Landowner in and to assets of ERC, and all assets of ERC relating to the specific Campus. With respect to certain Campuses, the Construction Loan is guaranteed by ERC, Erickson Group, and/or Erickson Construction.

At this point, the Landowner and ERC enter into a Development Agreement, pursuant to which ERC agrees to plan, administer, and supervise all design, development and construction services and activities of the Campus, and the Landowner pays ERC a development fee, which generally equals 5% of all residents' IEDs collected at the Campus.[7]

In addition to the development fees, ERC also receives construction fees, which equal approximately 4% of the hard costs of a Campus if Erickson Construction is the general contractor of a Campus, or 2% of the hard costs of a Campus if Erickson Construction is not the general contractor.[8]

## 2.     Second Phase:  Occupancy by Residents.

At the beginning of the marketing of a new Campus, an NFP is created to operate the Campus on a day-to-day basis. The NFP and the Landowner enter into a Master Lease, pursuant to which the NFP leases the land and the improvements from the Landowner. The Master Lease is typically a twenty-year, triple net lease, requiring the NFPs to pay all ongoing

---

[7] In 2008, ERC received approximately $31.3 million in development fees from all of the Campuses. ERC's development fees in 2009 are projected to be approximately $9.5 million for all of the Campuses.

[8] In 2008, ERC received approximately $10.7 million in construction fees from all of the Campuses. ERC's construction fees in 2009 are projected to be approximately $2.3 million.

maintenance expenses (*e.g.*, utilities, taxes, and insurance), with a ten-year renewal option.

During the period that the Construction Loan is outstanding, the Landowner also enters into a community loan agreement with the NFP (the "***Community Loan***"), pursuant to which the NFP lends the Landowner all IEDs collected from Campus residents prior to their occupancy of a Unit. The proceeds of the Community Loan are generally sufficient to pay all construction and development costs of a Campus, pay off the Construction Loan, and provide a return of the Debtors' investment together with a development profit. Debt service on the Community Loan paid by the Landowner to the NFP is fully offset by the rental payments made by the NFP to the Landowner under the Master Lease. The Landowner's obligations are secured by a mortgage on the property in favor of the NFP. The Landowner's obligations under the Community Loan are subordinate to its obligations under the Construction Loan.

To fund the working capital deficits of the NFP, the Landowner provides a Working Capital Loan to the NFP. To secure its obligations under the Working Capital Loan, the NFP grants the Landowner a security interest in all assets of the NFP, including the Residence and Care Agreements and the IEDs.

In addition, the NFP and ERC enter into a Management Agreement, pursuant to which ERC is hired by the NFP as the NFP's manager and is permitted to exercise oversight over the NFP's activities. The NFP pays ERC a management fee, which is typically comprised of a base fee generally ranging from 4.0% to 5.5% of resident monthly fees, or a negotiated fixed fee, and which is adjusted according to occupancy levels. The NFP also reimburses ERC for direct and allocated costs. Historically, the term of the Management Agreement was five (5) years, with a provision that allowed the NFP to terminate the agreement after three (3) years, provided that it submitted a thirty (30) day notice. Currently, however, a majority of the Management Agreements have reached their term and are being continued on a month-to-month contract basis, until their term is extended.

When the Campus is near completion, the NFP typically secures permanent financing through municipal bond offerings (tax-exempt bonds) (the "***Project Bonds***"). These Project Bonds are primarily issued two (2) to six (6) years following the commencement of construction. The obligors on the Project Bonds are the NFPs, not ERC. In connection with the issuance of Project Bonds, an indenture trustee, as representative of the holders of the Project Bonds for a specific Campus receives a first priority mortgage on the Campus. The Project Bonds have a fixed rate component that is typically long-term and a variable rate component that is paid down at stabilization. The variable rate bonds are typically backed by letters of credit provided by commercial banks.

Upon the issuance of Project Bonds, the NFP enters into a purchase option agreement (the "***Purchase Option Agreement***") with the Landowner, whereby a significant portion of the proceeds of the Project Bonds are used by the NFP to pay the Landowner a purchase option deposit (the "***Purchase Option Deposit***") to ensure the sale of the Campus to the NFP. The Landowner's obligations with respect to the Purchase Option Deposit are secured by a mortgage that is junior to the mortgage granted in connection with the Project Bonds. The Landowner uses proceeds from the Project Bonds to pay off the Construction Loan and fund completion of the Campus.

### 3.    Third Phase:  Sale of the CCRC to the NFP.

During the final development phase of a Campus, the Landowner sells the CCRC to the NFP.  The NFP generally purchases the Campus for the lower of (i) 75% of the going-concern value based on a third-party appraisal, plus forgiveness of the Community Loan, or (ii) the Purchase Option Deposit, plus forgiveness of the Community Loan.  Even after the sale of a Campus is complete, ERC remains the manager of the Campus, pursuant to the Management Agreement.

Until the sale of the Campus to the NFP has closed, if the NFP defaults on the Project Bonds or decides not to purchase the Campus from the Landowner, the Landowner is required to refund the Purchase Option Deposit to the NFP (plus all transaction costs for issuance of the Project Bonds and early redemption costs), which is then used to repay the tax-exempt bondholders.  ERC guarantees the return of the Purchase Option Deposit to the NFP under these circumstances.

### F.    The Campuses.

Each of the twenty (20) Campuses is described below.

### 1.    The Completed Campuses.

The construction and development of the following Campuses has been completed, and these Campuses have been sold to NFPs.  ERC manages each of these Campuses pursuant to a Management Agreement with the respective NFP.  In general, these Campuses are financially stable and profitable.

*Charlestown*

Charlestown, located in Cantonsville, Maryland, opened in December 1983.  Charlestown was the first CCRC developed by John C. Erickson.  This Campus has been sold to Charlestown Community, Inc., an NFP, which operates the Campus and contracts with ERC to manage the Charlestown Campus.

*Henry Ford Village*

The Henry Ford Village Campus is located in Dearborn, Michigan.  This Campus was opened in September 1993.  Henry Ford Village has been sold to Henry Ford Village, Inc., an NFP, which operates the Campus.  ERC manages this Campus.

*Oak Crest Village*

Oak Crest Village, located in Parkville, Maryland, opened in March 1995.  This Campus has been sold to Oak Crest Village, Inc., an NSC-NFP which operates the Campus.  ERC manages this Campus.

*Greenspring Village*

Greenspring Village, located in Springfield, Virginia, opened in November 1998.

Greenspring Village, Inc., an NSC-NFP, purchased this Campus. Greenspring Village, Inc. operates this Campus. ERC manages this Campus.

### *Riderwood Village*

Riderwood Village, located in Silver Spring, Maryland, opened in May 2000. Riderwood Village, Inc., an NSC-NFP, purchased this Campus. Riderwood Village, Inc. operates the Campus, and ERC manages the Riderwood Village Campus.

### *Brooksby Village*

Brooksby Village, located in Peabody, Massachusetts, opened in June 2000. Brooksby Village, Inc., an NSC-NFP, purchased this Campus. Brooksby Village, Inc. is the operator of the Campus. ERC manages the Brooksby Village Campus.

### *Seabrook Village*

Seabrook Village, located in Tinton Falls, New Jersey, opened in December 1998. Seabrook Village, Inc., an NSC-NFP, is the owner and operator of this Campus. ERC manages the Seabrook Village Campus.

### *Cedar Crest Village*

Cedar Crest Village, located in Point View, New Jersey, opened in July 2001. Cedar Crest Village, Inc., an NSC-NFP, is the owner and operator of this Campus. ERC serves as the manager of the Cedar Crest Village Campus.

### 2. The Developing Campuses.

The following Developing Campuses are open and operating but are still under development and construction. They are operated by an NFP, but they have not yet been sold to any NFP. ERC manages the Developing Campuses. The Debtor Landowners own these Campuses.

### *Ann's Choice*

The Ann's Choice Campus, located in Warminster, Pennsylvania, opened in August 2003. Warminster, the Landowner, leases the land and Campus facilities to Ann's Choice, Inc., the NSC-NFP that operates this Campus, pursuant to a Master Lease. The average monthly fee paid by residents of this Campus is $1,755, and the average IED collected is $239,640. As of September 2009, the Ann's Choice Campus has 1,493 completed units, 1,847 residents, and a 90% (YTD) occupancy rate.

### *Maris Grove*

The Maris Grove Campus, located in Glen Mills, Pennsylvania, opened in October 2006. Concord, the Landowner, leases the land and Campus facilities to Maris Grove, Inc., the NSC-NFP that operates this Campus, pursuant to a Master Lease. The average monthly fee paid by residents of this Campus is $1,919, and the average IED collected is $285,338. As of

September 2009, the Maris Grove Campus has 964 completed units, 1,084 residents, and an 80% (YTD) occupancy rate.

*Fox Run Village*

  The Fox Run Village Campus, located in Novi, Michigan, opened in June 2003. Novi, the Landowner, leases the land and Campus facilities to Fox Run Village, Inc., the NSC-NFP that operates this Campus, pursuant to a Master Lease. The average monthly fee paid by residents of this Campus is $1,984, and the average IED collected is $242,331. As of September 2009, this Campus has 758 completed units, 822 residents, and an 84% (YTD) occupancy rate.

*Wind Crest*

  The Wind Crest Campus, located in Denver, Colorado, opened in June 2007. Littleton, the Landowner, leases the land and Campus facilities to Wind Crest, Inc., the NSC-NFP that operates this Campus, pursuant to a Master Lease. The average monthly fee paid by residents of this Campus is $1,989, and the average IED collected is $310,182. As of September 2009, this Campus has 579 completed units, 632 residents, and a 77% (YTD) occupancy rate.

*Ashby Ponds*

  The Ashby Ponds Campus, located in Ashburn, Virginia, opened in September 2008. Ashburn, the Landowner, leases the land and Campus facilities to Ashby Ponds, Inc., the NSC-NFP that operates this Campus, pursuant to a Master Lease. The average monthly fee paid by residents of this Campus is $1,994, and the average IED collected is $348,553. As of September 2009, this Campus has 456 completed units, 460 residents, and a 70% (YTD) occupancy rate.

*Highland Springs*

  Highland Springs, located in Dallas, Texas, opened in September 2006. Dallas, the Landowner, leases the land and Campus facilities to Highland Springs, Inc., the NSC-NFP that operates this Campus, pursuant to a Master Lease. The average monthly fee paid by residents at this Campus is $1,978, and the average IED collected is $261,196. As of September 2009, this Campus has 450 completed units, 462 residents, and a 72% (YTD) occupancy rate.

*Eagle's Trace*

  The Eagle's Trace Campus, located in Houston, Texas, opened in October 2005. Houston, the Landowner, leases the land and Campus facilities to Eagle's Trace, Inc., the NSC-NFP that operates this Campus, pursuant to a Master Lease. The average monthly fee paid by residents of this Campus is $1,788, and the average IED collected is $231,305. As of September 2009, this Campus has 471 completed units, 483 residents, and a 76% (YTD) occupancy rate.

*Linden Ponds*

The Linden Ponds Campus, located in Hingham, Massachusetts, opened in October 2004. Hingham, the Landowner, leases the land and Campus facilities to Linden Ponds, Inc., the NSC-NFP that operates this Campus pursuant to a Master Lease. The average monthly fee paid by residents of this Campus is $2,008, and the average IED collected is $288,980. As of September 2009, this Campus has 988 completed units, 1,111 residents, and an 87% (YTD) occupancy rate.

*Sedgebrook*

The Sedgebrook Campus, located in Lincolnshire, Illinois, opened in July 2005. Lincolnshire Campus, LLC, the Landowner, leases the land and Campus facilities to Sedgebrook, Inc., the NSC-NFP that operates this Campus pursuant to a Master Lease. The average monthly fee paid by residents of this Campus is $1,812, and the average IED collected is $320,105. As of September 2009, this Campus has 470 completed units, 506 residents, and an 81% (YTD) occupancy rate.

*Monarch Landing*

The Monarch Landing Campus, located in Naperville, Illinois, opened in July 2006. Naperville Campus, LLC, the Landowner, leases the land and Campus facilities to Monarch Landing, Inc., the NSC-NFP that operates this Campus pursuant to a Master Lease. The average monthly fee at this Campus is $1,693, and the average IED collected is $313,103. As of September 2009, this Campus has 361 completed units, 340 residents, and a 65% (YTD) occupancy rate.

*Tallgrass Creek*

The Tallgrass Creek Campus, located in Overland Park, Kansas, opened in October 2007. Kansas, the Landowner, leases the land and Campus facilities to Tallgrass Creek, Inc., the NSC-NFP that operates this Campus pursuant to a Master Lease. The average monthly fee paid by residents of this Campus is $1,783, and the average IED collected is $230,037. As of September 2009, this Campus has 227 completed units, 216 residents, and a 66% (YTD) occupancy rate.

*Hickory Chase*

The Hickory Chase Campus is located in Hilliard, Ohio. Columbus is the Landowner, and Hickory Chase, Inc. is the NFP that was created to operate this Campus. However, due to financial difficulties prior to the Petition Date, construction of the Hickory Chase Campus ceased, deposits received from residents in anticipation of completion of the Campus were returned, and the Campus has been closed. There are currently no residents at this Campus, and ERC does not anticipate that residents will occupy units in the near future. Moreover, it does not appear that funds are available to complete construction of this Campus at this time. The Hickory Chase Campus is being foreclosed upon by prepetition lenders.

G.     **The Debtors' Prepetition Capital Structure.**

As of the Petition Date, the Debtors' total consolidated funded debt obligations (excluding the Community Loans) were approximately $939,139,000 and consisted of, among other things, the Corporate Revolver, the Construction Loans, subordinated debt at ERC and certain of the Landowner Debtors, and certain Campus-level funding from ERC. The Debtors' prepetition debt structure is described below.

1.     **The Corporate Revolver.**

To help partially fund overall development, on July 27, 2007, ERC and Erickson Construction obtained the Corporate Revolver, whereby ERC and Erickson Construction could request loan advances or letters of credit from the Corporate Revolver Lenders in an amount up to approximately $250 million. As of the Petition Date, the loan balance under the Corporate Revolver is approximately $190,682,573.00.

The Corporate Revolver has an absolute maturity date of August 1, 2010 and is secured by all assets of ERC and Erickson Construction, a pledge by Erickson Group of 100% of the membership interests of ERC, a pledge by ERC of 100% of the membership interests of Erickson Construction, and all assets of Concord GP, Dallas GP, Senior Campus, and Warminster GP (except partnership interests and related rights in the certain subsidiaries—Concord, Dallas, Houston, and Warminster).

Concord GP, Dallas GP, Senior Campus, and Warminster GP have granted a full payment and performance guaranty relating to the Corporate Revolver in favor of the Corporate Revolver Lenders. Erickson Group has granted a limited payment and performance guaranty in favor of the Corporate Revolver Lenders, pursuant to which the Corporate Revolver Lenders' recovery is limited to Erickson Group's pledged ownership interests in ERC. Together, Concord GP, Senior Campus, Warminster GP, and Erickson Group are referred to as the "***Subsidiary Guarantors.***"

Prepetition, ERC and Erickson Construction drew on the funds from the Corporate Revolver (i) to pay the required mandatory redemption of the $75 million maximum ERC Subordinated Taxable Adjustable Mezzanine Put Securities Series 2005 and the ERC Subordinated Taxable Adjustable Interest Rate Securities Series 2003A (described below); (ii) to finance certain permitted land acquisitions; (iii) to finance certain permitted investments in ERC's subsidiaries and to recoup existing permitted investments in ERC's subsidiaries; (iv) to pay certain intercompany debts and other liabilities, such as a certain $10 million revolving line of credit established pursuant to an Amended and Restated Revolving Credit Loan Agreement by and between Mercantile-Safe Deposit and Trust Company, now known as PNC Bank and ERC dated as of December 1, 2000; (v) for general working capital needs of the Debtors in the ordinary course of their business and consistent with past practices; and (vi) to pay closing costs associated with the loans advanced under the Corporate Revolver.

The Corporate Revolver requires the maintenance of certain covenants, including the maintenance of liquid assets (the "***Liquid Assets***") by ERC and Erickson Construction of at least the greater of (1) $25 million in excess of the highest liquidity requirement contained in any senior loan, construction loan, or financing agreement executed by any of the Landowners in

connection with the development or financing of a Campus; or (2) $100 million at all times (the "**_Liquidity Covenant_**").  ERC's and/or Erickson Construction's failure to observe the Liquidity Covenant constitutes an event of default under the Corporate Revolver.

## 2.    The Landowners' Prepetition Capital Structure.

Generally, the Landowners' prepetition debt consists of a Construction Loan, a Community Loan, subdebt, ERC equity funding, and/or TIF/STD bonds, depending on the stage of development of the respective Campus.  Each particular Landowners' prepetition capital structure is described in detail below.

### Ashburn's Prepetition Capital Structure

In the order of priority, Ashburn's prepetition capital structure is as follows:

*The Ashburn Construction Loan*:  This loan is guaranteed by ERC and is secured by a first priority lien on (1) all assets of Ashburn, including any lien rights of Ashburn in the assets of the Ashby Ponds Campus and/or ERC, (2) all assets of ERC related to the Ashby Ponds Campus, and (3) a pledge by ERC of its 100% membership interest in Ashburn;

*The Ashburn Community Loan*:  Ashburn's obligations are secured by a mortgage on the real property in favor of Ashby Ponds, Inc.;

*The Ashburn Junior Loan*:  This loan is secured by, among other things, a mortgage on the property and an assignment of rents, profits, incomes, and the like and is guaranteed by ERC and Concord (cross-guarantor); and

Equity funding from ERC.

### Columbus' Prepetition Capital Structure

Columbus' assets are encumbered by a first position tax lien as security for the Infrastructure Improvement Revenue Bonds, Series 2008, issued by Hickory Chase Community Authority.  In the order of priority, Columbus' prepetition capital structure is otherwise as follows:

*The Columbus Construction Loan*:  This loan is guaranteed by ERC and is secured by a first priority lien on (1) all assets of Columbus, including any lien rights of Columbus in the assets of the Hickory Chase Campus and/or ERC, (2) all assets of ERC related to the Hickory Chase Campus, and (3) a pledge by ERC of its 100% membership interest in Columbus;

*The Columbus Junior Loan*:  This loan is secured by, among other things, a mortgage on the real property and an assignment of rents, profits, incomes, and the like and is guaranteed by ERC; and

Equity funding from ERC.

***Concord's Prepetition Capital Structure***

In the order of priority, Concord's prepetition capital structure is as follows:

*The Concord Construction Loan*:  This loan is guaranteed by ERC, Erickson Group, and Concord GP and is secured by a first priority lien on (1) all assets of Concord, including any lien rights of Concord in the assets of the Maris Grove Campus and/or ERC, (2) all assets of ERC related to the Maris Grove Campus, and (3) a pledge by ERC of its 100% membership interest in Concord;

*The Concord Community Loan*:  Concord's obligations are secured by a mortgage on the real property in favor of the NFP;

*The Concord Junior Loan*:  To secure the agreement, ERC pledges its ownership interest in Concord, and Concord pledges its right, title and interest in certain permits, licenses, plans, contracts and warranties; and

Equity funding from ERC.

***Dallas' Prepetition Capital Structure***

In the order of priority, Dallas' prepetition capital structure is as follows:

*The Dallas Construction Loan*:  This loan is guaranteed by ERC and Erickson Construction and is secured by a first priority lien on (1) all assets of Dallas, including any lien rights of Dallas in the assets of the Highland Springs Campus and/or ERC, (2) all assets of ERC related to the Highland Springs Campus, (3) a pledge by ERC of its 100% membership interest in Dallas, and (4) a first mortgage on all land and buildings, except for the parcel relating to the Texas A&M Note (defined below);

*The Texas A&M Note*:  Dallas' obligations are secured by a first priority mortgage in a portion of a certain parcel of land acquired by Dallas from Texas A&M University;

*The Dallas Community Loan*:  Dallas' obligations are secured by a mortgage on the real property in favor of the NFP;

*The Dallas Junior Loan*:  To secure the Dallas Junior Loan, ERC pledges its ownership interest in Dallas to the buyer/landlord, and Dallas pledges its right, title and interest in certain permits, licenses, plans, contracts and warranties to the buyer/landlord; and

Equity funding from ERC.

***Houston's Prepetition Capital Structure***

In the order of priority, Houston's prepetition capital structure is as follows:

*The Houston Construction Loan*:  This loan is guaranteed by ERC and Erickson Group and is secured by a first priority lien on (1) all assets of Houston, including any lien rights of Houston in the assets of the Eagle's Trace Campus and/or ERC, (2) all assets of ERC related to the

Eagle's Trace Campus, and (3) a pledge by ERC of its ownership interest in Houston;

*The Houston Community Loan*:  Houston's obligations are secured by a mortgage on the real property in favor of the NFP;

*The Houston Junior Loan Agreement*:  This agreement is guaranteed by ERC and Senior Campus.  To secure the agreement, ERC pledges its ownership interest in Houston to the buyer/landlord, and Houston pledges its right, title and interest in certain permits, licenses, plans, contracts and warranties to the buyer/landlord; and

Equity funding from ERC.

### Kansas' Prepetition Capital Structure

In the order of priority, Kansas' prepetition capital structure is as follows:

*Kansas Special Assessment Bonds*:  Transportation Development District Special Assessment Bonds, Series 2006, in the amount of $14,950,000, issued by the City of Overland Park, Kansas;

*The Kansas Construction Loan*:  This loan is guaranteed by ERC and is secured by a first priority lien on (1) all assets of Kansas, including any lien rights of Kansas in the assets of the Tallgrass Creek Campus and/or ERC, (2) all assets of ERC related to the Tallgrass Creek Campus, and (3) a pledge by ERC of its 100% membership interest in Kansas;

*The Kansas Community Loan*:  Kansas' obligations are secured by a mortgage on the real property in favor of the NFP;

*The Kansas Junior Loan*:  This loan is secured by, among other things, a mortgage on the real property and an assignment of rents, profits, incomes, and the like, and it is guaranteed by ERC; and

Equity funding from ERC.

### Littleton's Prepetition Capital Structure

In the order of priority, Littleton's prepetition capital structure is as follows:

*The Littleton Construction Loan*:  This loan is guaranteed by ERC and Erickson Group and is secured by a first priority lien on (1) all assets of Littleton, including any lien rights of Littleton in the assets of the Wind Crest Campus and/or ERC, (2) all assets of ERC related to the Wind Crest Campus, and (3) a pledge by ERC of its 100% membership interest in Littleton;

*The Littleton Community Loan*:  Littleton's obligations are secured by a mortgage on the real property in favor of the NFP;

*The Littleton Junior Loan Agreement*:  This agreement is guaranteed by ERC in favor of the buyer/landlord.  To secure the agreement, ERC pledges its membership interest in Littleton to the buyer/landlord, and Littleton pledges its right, title and interest in certain permits, licenses, plans, contracts and warranties to the buyer/landlord; and

Equity funding from ERC.

*Novi's Prepetition Capital Structure*

In the order of priority, Novi's prepetition capital structure is as follows:

*The Novi Construction Loan*:  This loan is guaranteed by ERC and Erickson Group and is secured by a first priority lien on (1) all assets of Novi, including any lien rights of Novi in the assets of the Fox Run Village Campus and/or ERC, (2) all assets of ERC related to the Fox Run Village Campus, and (3) a pledge by ERC of its 100% membership interest in Novi;

*The Novi Community Loan*:  Novi's obligations are secured by a mortgage on the real property in favor of the NFP;

*The Novi Junior Loan Agreement*:  This agreement is guaranteed by ERC in favor of the buyer/landlord.  To secure the agreement, ERC pledges its ownership interest in Novi to the buyer/landlord, and Novi pledges its right, title and interest in certain permits, licenses, plans, contracts and warranties to the buyer/landlord; and

Equity funding from ERC.

*Warminster's Prepetition Capital Structure*

Warminster's assets are encumbered by a first position mortgage as security for the Ann's Choice Bonds.  In the order of priority, Warminster's prepetition capital structure is as follows:

*The Warminster Community Loan*:  Warminster's obligations are secured by a mortgage on the property;

*The Warminster Purchase Option*:  Warminster's obligations are secured by a mortgage on the property;

*The Warminster Junior Loan Agreement*:  This agreement is guaranteed by ERC and Senior Campus in favor of the buyer/landlord.  To secure the agreement, ERC pledges its ownership interest in Warminster to the buyer/landlord, and Warminster pledges its right, title and interest in certain permits, licenses, plans, contracts and warranties to the buyer/landlord; and

Equity funding from ERC.

## 3. Unsecured Debt:  STAMPS.

In 2003, ERC issued approximately $110 million in "STAIRS," an investment offering that preexisted the subordinated unsecured debt in the form of "STAMPS."  As a growth company with specific campus level financing, the proceeds of the "STAIRS," net of issuance costs, was used for general Company purposes including increasing liquidity and supporting growth.

In 2007, ERC completed the financing of the Corporate Revolver lead by PNC.

As a condition of this financing, the original "STAIRS" were paid off. Subsequent to this repayment, the "STAMPS" offering was completed under the terms permitted by the Corporate Revolver. As with the "STAIRS" offering proceeds, the "STAMPS" proceeds, net of issuance costs, were used for general purposes, including liquidity investments in its projects, to pay expenses of offering and issuance, and support of campus involvement. ERC issued the STAMPS up to a maximum amount of $50 million. The STAMPS are subordinate to all other debt of ERC.

The STAMPS are an unsecured obligation of ERC and have a maturity date of March 15, 2018. The STAMPS were issued in 2007 with an initial interest rate of 11% and a ten-year term. The STAMPS pay interest semi-annually, and the interest rate on the securities re-sets approximately every two (2) years. Investors have the option to put the securities thirty (30) days prior to each rate change.

The STAMPS debt is subordinated to ERC's senior debt under the Corporate Revolver. This subordination applies to both interest payments and payments of purchase price of the STAMPS in the event that any of the securities put by the investors are not remarketed. As of September 30, 2009, the outstanding debt in 2007 and accrued interest related to the STAMPS was $50.9 million. Holders of STAMPS may have claims, including rights of recission under applicable securities laws, which may be released under the Plan. Holders of STAMPS are advised to consult counsel of their choosing if they desire analysis of such claims."

## III.  Events Leading to Bankruptcy

### A.  The Decline in the Market.

The senior housing market has been hindered over the past twelve (12) months by a weakened credit environment, including limited access to capital, falling real estate values, and significantly reduced liquidity due to realized and unrealized losses on investments. New senior housing units under construction have significantly declined since 2004. New units under construction in 2008 totaled 15,862, compared to 20,775 units in 2007, a twenty-four percent (24%) decline.

Senior living facilities have experienced substantial declines in occupancy as a result of recent market changes. Seniors are faced with (i) difficulty selling their existing homes due to uncertainty in value and (ii) significant declines in their equity portfolio value. This has made it difficult, if not impossible, for seniors to move into or remain in senior housing facilities, as the IEDs are generally significant ($100,000 to $600,000).

The tightening of the credit market has also significantly affected the 2008 bond-issuance volume, making traditional fixed-rate debt essentially unavailable in the last quarter of 2008. The 2008 bond issuance for the senior living sector was $2.7 billion versus $8 billion in 2007, a decline of over sixty-six percent (66%).

These market conditions have contributed to decreased revenue, lower than anticipated absorption rates at certain Campuses and have made it difficult for the Landowners to raise capital. In addition, some of the Developing Campuses are not cash flow positive until they are completed, and as a result, they require additional support from ERC.

Consequently, ERC and Erickson Construction were unable to maintain the Liquidity Covenant under the Corporate Revolver, leading to a default under the Corporate Revolver.

## B. The Amendments to the Corporate Revolver.

Pursuant to an amendment dated April 16, 2009 (the "***First Corporate Revolver Amendment***"), ERC, Erickson Construction, the Corporate Revolver Lenders, and the Subsidiary Guarantors agreed to reduce the required Liquid Assets under the Liquidity Covenant to $69,500,000, but only through May 29, 2009 or earlier if ERC and Erickson Construction defaulted, in exchange for a $15 million pay down. After May 29, 2009, the required amount of Liquid Assets returned to the amount set forth in the original Liquidity Covenant under the Corporate Revolver.

The First Corporate Revolver Amendment expired on May 29, 2009, and on May 30, 2009, the administrative agent delivered a Notice of Events of Default, Notice of Acceleration, and Demand for Payment to ERC, Erickson Construction, and the Subsidiary Guarantors, pursuant to which the Corporate Revolver Lenders declared a default of the Liquidity Covenant.

On June 1, 2009, ERC, Erickson Construction, the Subsidiary Guarantors, and the Corporate Revolver Lenders entered into a second amendment to the Corporate Revolver and a forbearance agreement, pursuant to which, among other things, the parties agreed to (i) temporarily forbear from exercising their rights and remedies under the Corporate Revolver and applicable law during the forbearance period with respect to the Liquidity Covenant and other existing defaults and (ii) temporarily permit ERC and Erickson Construction to maintain Liquid Assets in an amount less than the Liquidity Covenant but equal to or greater than $64,500,000.

On July 1, 2009, the parties entered into a third amendment to the Corporate Revolver and forbearance agreement, pursuant to which, among other things, the parties agreed to (i) temporarily forbear from exercising their rights and remedies under the Corporate Revolver and applicable law during the forbearance period with respect to the Liquidity Covenant and other existing defaults; and (ii) temporarily permit ERC and Erickson Construction to maintain Liquid Assets in an amount less than the Liquidity Covenant but equal to or greater than $64,500,000.

On July 10, 2009, the parties entered into a fourth amendment to the Corporate Revolver and forbearance agreement (the "***Fourth Corporate Revolver Amendment***"), pursuant to which, among other things, the parties agreed to (i) continue to temporarily forbear from exercising their rights and remedies under the Corporate Revolver and applicable law during a 90-day forbearance period with respect to the Liquidity Covenant and other existing defaults; and (ii) continue to temporarily permit ERC and Erickson Construction to maintain Liquid Assets in an amount less than the Liquidity Covenant but equal to or greater than $36,300,000.

### C. Corporate Revolver Lenders Attempt to Draw Down ERC's Cash.

On the October 19, 2009 Petition Date, the Corporate Revolver Lenders exercised their remedies under the Corporate Revolver and drew down on their collateral. Approximately $5 million in collateral was received by the Corporate Revolver Lenders prior to the filing of the petition. In response to a control notice issued by the Corporate Revolver Lenders, PNC Bank temporarily froze ERC's operating accounts containing approximately $20 million of ERC's cash, thus making this cash unavailable to ERC.

### D. Prepetition Marketing of Debtors' Assets.

Prior to the Petition Date, the Debtors engaged in extensive marketing efforts to identify potential investors (the "*Potential Purchasers*") to purchase substantially all of the assets of the Debtors' Business (the "*Assets*") or support a plan of reorganization as the plan sponsor. In March 2009, the Debtors retained Houlihan to evaluate strategic alternatives and assist in the negotiation with its Lenders, and in September 2009, Houlihan commenced a comprehensive marketing process contacting over eighty (80) parties regarding the sale of the Assets. Houlihan's efforts included soliciting individual bids for each of the corporate and project Debtors' assets, as well as marketing the entire enterprise.

Redwood submitted a proposal (the "*Redwood LOI*") to purchase the Assets, in a letter of intent, dated September 12, 2009. The Debtors executed the Redwood LOI on September 17, 2009. The Debtors' board of directors approved the sale on September 19, 2009. On October 19, 2009, after extensive negotiations, the Debtors and Redwood agreed to the terms of a Master Purchase and Sale Agreement (the "*Original Agreement*"). As a result of the Auction and further negotiations, the Original Agreement was amended, as set forth in the Definitive Agreement, a copy of which is attached to the Plan as Exhibit A.

As part of the marketing process, the Debtors and their professionals met with several additional Potential Purchasers that had expressed a high level of interest in the Assets. The Debtors provided each of the interested parties with marketing materials and access to an electronic data room. Several of the interested parties held meetings with ERC's management and/or NSC. Houlihan continued to negotiate with and engage interested parties until December 14, 2009.

## IV. Events Occurring During Debtors' Chapter 11 Cases

### A. Bankruptcy Filing and First Day Orders.

The Debtors commenced the Chapter 11 Cases on October 19, 2009, the Petition Date, by filing voluntary petitions under chapter 11 of the Bankruptcy Code. The debtors are considered debtors in possession pursuant to Bankruptcy Code section 1107(a) and 1108. The Debtors remain in possession of their assets and continue to operate their Business without interruption.

On October 21, 2009, the Bankruptcy Court held an initial hearing to consider certain "first day" matters and entered orders (i) permitting the joint administration of the Debtors' Chapter 11 Cases; (ii) authorizing the use of prepetition secured lenders' cash collateral

on an interim two-week basis; (iii) approving the Debtors' continued use of their existing cash management system and business forms; and (iv) authorizing, but not directing, the Debtors to make certain payroll payments to employees and continue certain employee benefit plans and other practices.

On October 27, 2009, the Debtors filed the Motion of the Debtors Pursuant to 11 U.S.C. §§ 105(a) and 363(b) for an Order Authorizing Payment of Prepetition Employee Severance Benefits (the "***Severance Motion***") [Dkt. No. 130]. The Severance Motion sought to make immediate payment of the priority amount of severance to former employees as an administrative expense claim. The Debtors did not pursue the motion at that time. The payments which would have been made under the motion will be made under the Plan. The Debtors are investigating whether other or further relief may be available.

### B. Postpetition DIP Financing.

Prepetition, the Debtors began negotiating in good faith at arms-length with its prepetition secured lenders and several other parties to obtain postpetition financing. The Debtors reached a deal, the DIP Facility, with ERC Funding Co. LLC whereby ERC Funding Co. LLC will provide postpetition financing to certain of the Debtors (identified in the DIP Facility as "Borrowers") in the form of a revolving credit facility in the principal amount of up to $20 million. On November 6, 2009, the Bankruptcy Court entered an order approving the DIP Facility on an interim basis and allowing the Borrowers to use $5 million of the funding provided under the DIP Facility to fund operations on an interim basis. On December 18, 2009, the Court entered an order approving the DIP Facility on a final basis.

### C. Bidding Procedures Motion and Auction.

On October 29, 2009, the Bankruptcy Court considered the Debtors' motion (the "***Bidding Procedures Motion***") for, among other things, approval of (i) a timeline for the sale of the Debtors' Assets and filing of the Plan and Disclosure Statement; (ii) scheduling an auction of the Debtors' Assets; (iii) procedures for bidding on the Debtors' Assets; (iv) break-up fee, expense reimbursement and shop provisions of the Original Agreement; (v) procedures for cure, assumption and assignment of contracts and unexpired leases; and (vi) other related relief. The Court entered an ordered granting the relief requested in the Bidding Procedures Motion on November 6, 2009 (the "***Bidding Procedures Order***"). Pursuant to the Bidding Procedures Order, the Debtors and their Advisors were allowed to solicit interest from Potential Purchasers and accept any bids from such Potential Purchasers until 4:00 p.m. (prevailing Eastern Time) on December 14, 2009.

### D. Motion to Escrow IEDs for Protection of Residents.

The Debtors filed a motion (the "***IED Motion***") for an order authorizing the Debtors to escrow certain IEDs received postpetition from residents of Landowner Debtor Campuses to ensure the refunds of the residents' deposits will be secure during the Debtors' Chapter 11 Cases. The Bankruptcy Court entered an order approving the IED Motion on November 6, 2009. The Bankruptcy Court issued the Additional IED Procedures Order, on November 24, 2009, pursuant to which certain residents are entitled to receive a refund of their IED upon the closure of the CCRC to which they have paid a deposit. Additionally, the

Additional IED Procedure Order provides that, upon either disposition of the assets of the respective Debtor Landowner (through sale, transfer of equity interests or otherwise other than a closure event), or the confirmation of a plan of reorganization, except for the IEDs and escrow account associated with the Ann's Choice Campus, the respective Debtor Landowners and NFPs shall jointly deliver to the respective prepetition Agent and DIP Facility lender notice of their request to release all IEDs held in escrow. Thereafter, providing there are no objections, the escrow agent will turn over all IEDs either to, as applicable in accordance with the Additional IED Procedures Order and the DIP Facility, (a) the DIP Facility lender to be used to satisfy the individual Debtors' obligations under the DIP Facility, (b) the respective prepetition Agents to the Construction Loan (defined below) and applied to the Debtor's obligations under the Construction Loan, (c) Redwood in accordance with the terms of the Definitive Agreement and the Plan, or (d) with respect to IEDs associated with Warminster, as set forth in Sections 6.3.9.6 and 6.3.9.8 of the Plan, all subject to confirmation of the Plan.

### E. Retention and Employment of Professionals.

During the Chapter 11 Cases, the Court has approved the Debtors' retention and employment of the following Professionals to assist in the administration of the Debtors' Chapter 11 Cases: (i) DLA Piper LLP (US), as primary bankruptcy counsel to the Debtors; (ii) Houlihan, as investment bankers and financial advisors to the Debtors; (iii) Alvarez & Marsal Healthcare Industry, LLC, as Chief Restructuring Officer and crisis managers to the Debtors; and (iv) BMC Group, Inc., as claims, noticing and balloting agent to the Debtors.

### F. Appointment of Creditors Committee.

On November 2, 2009, an Official Committee of Unsecured Creditors was appointed by the United States Trustee (the "*Creditors Committee*"). The current members of the Creditors Committee, as of January 8, 2010, are: (i) BNY Mellon Corporate Trust; (ii) W.H. Boyer; (iii) Regional Construction Resources, Inc.; (iv) Northwest Electric, Inc.; (v) Morgan Stanley; and (vi) La Posada at Park Centre, Inc. The law firm of Bracewell & Giuliani LLP is counsel to the Creditors Committee.

### G. Motions Filed By Michigan Retirement System Entities.

Strategic Ashby Ponds Lender LLC and Strategic Concord Landholder, LP (together, the "*Michigan Retirement System Entities*") have pursued a motion to appoint an examiner in certain of the Debtors' cases (see Dkt. Nos. 520, 622, 627, 631, 640, 835, 843, and 844). This motion was originally supported by the HCP Entities (defined below) and MSRESS III Dallas Campus, L.P. and MSRESS III Denver Campus, LLC (together, "*Morgan Stanley*") who thereafter withdrew their support. The Debtors, Lenders and the Creditors Committee opposed this Motion. The Bankruptcy Court denied the motion by memorandum opinion and order on March 5, 2010 [Dkt. No. 993].

The Michigan Retirement System Entities filed a Motion for Order Determining Appropriate Allocation of Sales Proceeds to be Generated under the Second Amended and Restated Purchase and Sale Agreement and to be Distributed under the Debtors Second Amended and Restated Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Dkt. No. 906]. The Michigan Retirement System Entities object to the valuation and allocations

embodied in this Disclosure Statement and the Plan but do not propose any alternative. The Debtors believe this motion is procedurally and substantively deficient. A hearing has been scheduled on this motion for March 23, 2010.

## V.      Implementation of the Plan

### A.      The Auction and New NSC Term Sheet.

The Auction of the Debtors' Assets commenced at 10:00 a.m. (prevailing Eastern Time) on December 22, 2009. Redwood and Coastwood were qualified to bid on the Debtors' Assets at the Auction.

During the Auction, the Debtors' Advisors engaged in extensive negotiations with NSC and the project lenders resulting in NSC's and the NSC-NFP's offer of 10 year management agreements (as opposed to 5 year management agreements) to all bidders. Pursuant to the new management agreements, the NFPs will have a third year and seventh year right to review the management fee terms of the agreements to determine whether the fees reflect current market pricing. The NSC's offer of an extended term of the management agreements significantly increased the value of the Debtors' Assets.

Erickson's restructuring committee agreed that in exchange for the NSC and the relevant NSC-NFPs offering identical 10 year management agreements to both qualified bidders, the Debtors will provide that any plan confirmed in these chapter 11 cases will provide for releases of NSC, the NSC-NFPs, all of their directors, professionals, advisors, employees and vendors together with the broadest possible injunction against claims of any and all third parties against any of the foregoing.

The following table sets forth a summary of the NSC term sheet:

### New Management Agreements

| | |
|---|---|
| **Term:** | Ten Years |
| **Management Fees:** | A schedule of Management Fees, consisting of Base Fees and Incentive Fees, has been agreed upon, with a mechanism to reset said fees to then-market rates on the third and seventh anniversaries. |
| **Termination Rights:** | The applicable NFP will have certain performance-based termination rights. |
| **Executive Director:** | The applicable NFP will have certain rights to approve the appointment and removal of the executive director of the Community. |
| **Tax Matters:** | The New Management Agreements will comply with Rev. Proc. 97-13 and shall not affect the 501(c)(3) status of the NFP. |

## Master Lease

**Term:**        27½ years, with the NFP having 3 10-year renewal options (subject to a 50-year maximum term)

**Purchase Option:**    Exercisable by the NFP at the end of the initial term and each renewal term.  Purchase price is sum of (i) the outstanding balance of the Community Loan, (ii) IEDs from unsold inventory, and (iii) the fair market value of the Community.

## Community Loans

**Reinstatement:**    Community Loans will be reinstated at par on terms to be mutually agreed.

At the commencement of the Auction, the Debtors and their advisors deemed Coastwood's initial bid, consisting of Cash, Term Loan A securities, and subordinated preferred Term Loan B securities, to be higher and/or better than Redwood's stalking horse bid.  Because of the inherent uncertainty in valuing the different components of the competing bids during the Auction, the Debtors and their advisors determined that the best way to maximize the value of the Estates and to ensure the feasibility of the Plan would be to switch the bidding to "all Cash."

To ensure the continued participation of both Redwood and Coastwood in the Auction process, thereby maximizing the potential recovery to all creditors and stakeholders, the Debtors, consistent with section VI of Exhibit A to the Bidding Procedures Order, agreed to pay the Auction Fee (10% of the final purchase consideration over $275 million) to the unsuccessful bidder after consulting with the Debtors' advisors and the Debtors' constituencies.  After 18 hours of negotiations and spirited bidding, Redwood was determined to be the successful bidder at the Auction with a final all Cash bid price of $365 million.  The sale of the Debtors' Assets will be consummated pursuant to the terms of the Plan.  As the unsuccessful bidder, Coastwood is entitled to the Auction Fee of $9 million (*i.e.*, 10% of the difference between $365 million and $275 million).  The Debtors deem the Auction Fee to be an Administrative Expense Claim.  The Debtors will seek approval of the Auction Fee at the Plan Confirmation Hearing.  The Auction Fee will be paid to Coastwood no later than the earlier of the Closing Date and the Effective Date.

The following is a summary of the allocation of the Transaction Proceeds among the Debtors, which is based upon the percentage of proceeds allocated to each entity pursuant to the all-cash proposal provided by Redwood in their December 18, 2009 term sheets.[9] To the extent any creditor objects to the allocations provided herein and such objection is not resolved by the Debtors through negotiations with the applicable creditor, the Debtors will request that the Bankruptcy Court resolve such a dispute. *Note*: the below Lender Allocation represents a holistic deal amongst the Debtors and the Lenders and their Agents. The Lenders and their Agents have indicated that they will not vote to support a deal that provides for allocations that differ from those set forth below.

| | | |
|---|---|---|
| Gross Cash Sale Proceeds | $ | 365,000 |
| NSC Allocation | | (9,000) |
| **Cash Proceeds Available for Distribution** | **$** | **356,000** |

| Campus | | Purchase Price Allocation | % Total |
|---|---|---|---|
| Ashburn | $ | 68,775 | 19.3% |
| Concord | | 59,866 | 16.8% |
| Dallas | | 26,554 | 7.5% |
| Houston | | 12,689 | 3.6% |
| Kansas | | - | 0.0% |
| Littleton | | 55,850 | 15.7% |
| Novi | | 36,563 | 10.3% |
| Warminster | | - | 0.0% |
| **Total Campuses** | **$** | **260,298** | **73.1%** |
| | | | |
| **Corporate** | | **95,702** | **26.9%** |
| | | | |
| **Total** | **$** | **356,000** | **100.0%** |

---

[9] A summary of the analysis of the recovery of the Holders of Claims against the Debtors' Estates as of February 10, 2010 is attached hereto as Exhibit F. **Employees will have the following recoveries: (i) 43% of employees will receive 100% of their Claims as Other Priority Claims; (ii) 65% will receive at least 50% as an Other Priority Claim; and (iii) every employee received either three months of severance or notice.**

## B.     The Recharacterization Adversary Proceedings.

On December 22, 2009, the Debtors through their respective bankruptcy counsel and conflicts counsel filed complaints commencing adversary proceedings against various counterparties to the Concord Junior Loan, the Dallas Junior Loan, the Houston Junior Loan, the Littleton Junior Loan, the Novi Junior Loan, and the Warminster Junior Loan agreements. The following adversary proceedings were commenced: Concord Campus, LP, Concord Campus GP, LLC, and Erickson Retirement Communities, LLC v. Strategic Concord Landholder, LP, Case No. 09-03464; Dallas Campus, LP, Dallas Campus GP, LLC, and Erickson Retirement Communities, LLC v. MSRESS III Dallas Campus, L.P., Case No. 09-03465; Houston Campus, LP, Senior Campus Service, LLC, and Erickson Retirement Communities, LLC v. HCP ER6, LP (f/k/a CNL Retirement ER6, LP), Case No. 09-03468; Littleton Campus, LLC and Erickson Retirement Communities, LLC v. MSRESS III Denver Campus, LLC, Case No. 09-03466; Novi Campus, LP and Erickson Retirement Communities, LLC v. HCP ER2, LP, (f/k/a CNL Retirement ER2, LP), Case No. 09-03467; and Warminster Campus, LP, Warminster Campus GP, and Erickson Retirement Communities, LLC v. HCP ER3, LP (f/k/a CNL Retirement ER3, LP), Case No. 09-03469. Farrell Fritz, LLP, as proposed conflicts counsel to the Debtors, is counsel to the Debtors with respect to all of the adversary proceedings, except Concord's case number 09-03464. The Debtors are seeking a declaratory judgment determining that certain junior loan transactions between the above listed plaintiffs and defendants are financings and not leases. If the Court properly characterizes the transactions as financing transactions, pursuant to applicable bankruptcy and non-bankruptcy law, the Debtors will be deemed the owners of the property subject to the junior loans and the lenders under the junior loans will hold secured or unsecured claims (depending on the secured status of the claims) against the Debtors for any amounts outstanding under the junior loans. If the Debtors are not successful in obtaining the relief they seek in the adversary proceedings, the terms of the Plan will not fail, moreover, confirmation would not likely be delayed. In such instance, the Debtors will pursue alternative theories of relief and recourse. ***Subject to confirmation of the Plan, the Debtors have settled all but one of the adversary proceedings.*** The Debtors will dismiss the adversary proceedings once the settlements are finalized and approved by the court.

### *The HCP Settlement*

Prior to the Petition Date, HCP, Inc., HCP ER2, LP, HCP ER3, LP, and HCP ER6, LP (collectively, the "***HCP Entities***") entered into certain transactions (collectively, the "***Financing Transactions***") with Debtors Novi, Warminster, and Houston. Specifically, the Financing Transactions consisted of the following: (i) on March 30, 2004, Novi entered into certain amended and restated agreements styled as a purchase agreement and ground lease with CNL Retirement ER2, LP, now known as HCP ER2, LP; (ii) on June 2, 2003, Warminster entered into certain agreements styled as a purchase agreement and ground lease with CNL Retirement ER3, LP, now known as HCP ER3, LP; and (iii) on November 18, 2004, Houston entered into certain agreements styled as a purchase agreement and ground lease with CNL Retirement ER6, LP, now known as HCP ER6, LP.

On January 13, 2010, the HCP Entities filed proofs of claim in the Debtors' cases that arise from the Financing Transactions (the "***Claims***"). Specifically, HCP ER2, LP filed a claim against Novi in the amount of $17,000,000 [Claim Nos. 446, 456]; HCP ER3, LP filed a

claim against Warminster in the amount of $19,500,000 [Claim Nos. 447, 458]; and HCP ER6, LP filed a claim against Houston in the amount of $23,000,000 [Claim Nos. 448, 455].

On February 4, 2010, the Debtors filed a motion pursuant to Bankruptcy Rule 9019 seeking authorization to enter into a proposed settlement agreement (the "***HCP Settlement Agreement***") between the Debtors and the HCP Entities to settle the below adversary proceedings (the "***Adversary Proceedings***") against the HCP Entities in which they sought a declaratory judgment that the Financing Transactions were financings and not leases. [Dkt. No. 791].

- Novi Campus, LLC and Erickson Retirement Communities, LLC v. HCP ER2, LP (f/k/a CNL Retirement ER2, LP), Adv. Pro. No. 09-03467;

- Warminster Campus, LP, Warminster Campus GP, LLC, and Erickson Retirement Communities, LLC, v. HCP ER3, LP (f/k/a CNL Retirement ER3, LP), Adv. Pro. No. 09-03469; and

- Houston Campus, LP, Senior Campus Services, LLC, and Erickson Retirement Communities, LLC. v. HCP ER6, LP (f/k/a CNL Retirement ER6, LP), Adv. Pro. No. 09-03468.

Pursuant to the HCP Settlement Agreement, the Debtors and the HCP Entities have agreed to, among other things, the following:

- The HCP Entities will receive in the aggregate $8.2 million in Cash (payment of such amount from the TIP will be unconditional upon the occurrence of the Effective Date), which amount shall be allocated to repayment of the Warminster obligations owed to the HCP Entities;

- The HCP Entities will retain the security deposits provided to the respective HCP Entities by Houston, Novi, and Warminster, pursuant to the respective Financing Transactions, which as of December 31, 2009 were valued in the aggregate at $4,994,025.36;

- The HCP Entities will withdraw the Claims and Proofs of Claim filed with respect to the ground leases held by the HCP Entities for the Houston campus (Eagle's Trace), the Novi campus (Fox Run Village) and the Warminster campus (Ann's Choice). The HCP Entities will not file any additional proofs of claim or adversary proceedings. This withdrawal shall not affect the HCP Entities' syndicated interest in the construction loan on the Houston Campus (the "***Houston Participation Interest***");

- The HCP Entities will withdraw: (i) their joinder to the PNC Bank objection to the DIP financing motion and the PNC Bank objection to the bidding procedures, (ii) their 2004 Examination Motion, and (iii) their participation in the Subdebt Lenders' Examiner Motion;

- The HCP Entities agree to transfer (upon receipt of $8.2 million Cash) legal ownership by quitclaim deed of the Warminster, Novi and Houston properties in a form reasonably acceptable to the Debtors and Redwood, as directed under the Plan;

- The Debtors will dismiss the Adversary Proceedings upon the effective date of the HCP Settlement Agreement; and

- The HCP Entities and the Debtors will provide mutual releases from any claims which may arise out of any of the HCP Entities' claims on the Warminster, Novi and Houston campuses, except for the HCP Entities' Houston Participation Interest.

HCP is receiving $8.2 million Cash as part of an overall compromise. The Debtors intend to fund the $8.2 million Cash payment with $6 million from the TIP and $2.2 million funding from IEDs and Cash currently available at Warminster. The HCP Settlement Agreement requires that HCP be paid $8.2 million Cash, and the Debtors have an obligation to pay HCP only upon confirmation of the proposed Plan. If the proposed Plan is not confirmed, then the parties reserve all their rights and remedies available under applicable bankruptcy and non-bankruptcy law. The HCP Settlement Agreement is subject to confirmation of the Plan and the provisions of the other global settlements incorporated into the Plan and is pending court approval.

### Morgan Stanley Settlement

The Debtors have settled on the principal terms of the Morgan Stanley Settlement, which will be subject to a separate agreement to be filed with the Court as a Plan Supplement, with respect to the following adversary proceedings: Dallas Campus, LP, Dallas Campus GP, LLC, and Erickson Retirement Communities, LLC v. MSRESS III Dallas Campus, L.P., Case No. 09-03465 and Littleton Campus, LLC and Erickson Retirement Communities, LLC v. MSRESS III Denver Campus, LLC, Case No. 09-03466. The Morgan Stanley Settlement is conditioned upon the global settlement with all other settlement parties that are incorporated into the terms of the Plan, including, but not limited to, settlements with HCP and the Creditors' Committee. The principal terms of the Morgan Stanley Settlement are outlined as follows:

- MSRESS III Denver Campus, LLC ("**MSRESS**") will receive $1 million Cash from the TIP and the net proceeds of the Littleton Out-Parcel over $6 million, which will be split equally between MSRESS and the Agent under the Littleton Construction Loan for the benefit of the Holders of such loan, with such payments being allocated to repayment of Littleton's obligations owed to MSRESS;

- MSRESS will withdraw its participation in the subdebt lenders' motion seeking appointment of an examiner;

- MSRESS agrees to transfer legal ownership by quitclaim deed of the Dallas and Littleton properties in a form reasonably acceptable to the Debtors and Redwood, as directed under the Plan; and

- The Debtors will dismiss the adversary proceedings upon the effective date of the MSRESS settlement agreement.

The MSRESS settlement agreement is subject to confirmation of the Plan.

### C. Creditors Committee Settlement.

The Debtors and Agents have discussed a proposed global settlement agreement with the Creditors' Committee, the terms of which are incorporated into the Plan and are subject to Plan conformation.

### D. The Redwood Purchase Transaction.

#### 1. Purchased Assets.

As more fully described in Section 2.1 of the Definitive Agreement, Redwood formed the Acquisition Companies to acquire substantially all of the assets of the Sellers relating to the Business and the equity interests in the Transferred Landowners, other than certain excluded assets (the "***Purchased Assets***") free and clear of all liens and liabilities encumbering the assets, except for certain permitted encumbrances, including certain Community Loans, Special District Tax Bonds, and Purchase Option Deposits, and in the case of Warminster, certain other obligations and encumbrances associated with the Ann's Choice Bonds (as set forth in the Definitive Agreement) as restructured pursuant to the Plan. The Purchased Assets include, but are not limited to, the following: (i) the intellectual property owned or used by the Company in the Business (which will include all rights to the name "Erickson Retirement Communities" and variations thereof owned or in use by the Company); (ii) certain contracts and all tangible and intangible personal property owned or used by the Company in the Business; (iii) all original books and records relating to the Business; (iv) all of the Company's right, title, and interest in the B&R Notes; (v) Cash (other than Medical Claims Cash, Cash Collateral, and Landowner Retained Cash), including Cash equivalents, not to exceed $10,000,000; (vi) permits, to the extent transferrable pursuant to applicable law; (vii) Medical Claims Cash, Cash Collateral, and Landowner Retained Cash available at Closing at the applicable Landowner; (viii) insurance policies; (ix) furnishings, furniture, supplies, tools, machinery, monitoring and other equipment and other personal property and fixed assets; (x) Corporate Headquarters; (xi) all IEDs with respect to the Tallgrass Creek Campus and all IEDs collected after November 27, 2009 at Warminster campus, all of which remain subject to the terms of the applicable community loans; and (xii) ERC's interests in the Transferred Landowners; (xiii) all Transferred Claims (other than those described in Section X(D) and those waived or released pursuant to the Plan). The Cash Collateral, including certificates of deposit securing the Erickson Construction Letters of Credit and ERC Letters of Credit, shall be transferred subject to existing liens. Unless provided otherwise in the Plan or in the Plan Documents, any valid liens with respect to the Purchased Assets, shall be satisfied and released to the extent of treatment of Allowed Claims in accordance with the Plan. From and after the sale of the Purchased Assets, Redwood shall permit each of the Bonded Communities known as Monarch Landing, Sedgebrook and Linden Ponds access to use intellectual property, personal property, permits, insurance or other Purchased Assets as and to the extent used by each such Bonded Community prior to the sale on reasonable business terms and under pricing consistent with industry standards and as mutually agreed by the Redwood, the applicable NSC-NFP, and the applicable Bond Trustee. Such use shall cease one (1) year after the management agreement for the applicable Bonded Community is terminated.

2. **Excluded Assets.**

The Purchased Assets shall exclude the following assets (the "***Excluded Assets***"):

a. Cash and cash equivalents in excess of $10,000,000 (other than Medical Claims Cash, Cash Collateral, and Landowner Retained Cash);

b. all IEDs which have been placed in escrow pursuant to the Bankruptcy Court's Order Granting Motion Authorizing Additional Protections to Residents' Initial Entrance Deposits dated November 24, 2009 [D.I. No. 362] except those specifically referenced in Section 6.1.1 of the Plan[10];

c. the UMBC Building;

d. equity securities of, and other ownership interests of any kind in, affiliates of ERC other than the Transferred Landowners;

e. all contracts other than those contracts specifically included in the Purchased Assets pursuant to the terms of the Definitive Agreement, which contracts shall be rejected by the applicable Debtor in bankruptcy;

f. the organizational documents and minute books of ERC and Excluded Affiliates (as defined in the Definitive Agreement);

g. permits and residents' records, if any, that ERC is prohibited by applicable law from transferring to ManagementCo;

h. personnel records for the Debtors' employees who are not Transferred Employees and, to the extent ERC is prohibited by applicable law from transferring such records to ManagementCo, for Transferred Employees;

i. all employee compensation and benefit plans, programs, policies and arrangements, including Employee Plans (defined in the Definitive Agreement);

---

10  Other than as set forth herein regarding IEDs collected at Tallgrass Creek Campus and the Warminster Campus, all IEDs received at other Campuses and placed in escrow pursuant to the Bankruptcy Court's Order Granting Motion Authorizing Additional Protections to Residents' Initial Entrance Deposits dated November 24, 2009 [D.I. No. 362] will be treated, as to the applicable NFP, as follows – all such IEDs received will be considered as disbursements draws under the applicable community loans.  All such IEDs received after November 27, 2009 will result in a corresponding reduction in the Cash Transaction Proceeds allocable to the applicable Campus and will also be considered as draws under the applicable community loans.

  j.   the Littleton Out-Parcel.;

  k.   the GST Loan; and

  l.   title to all real property, building, fixtures, and any and all other improvements made to the Bond Communities (defined below).

### 3.  Purchase Consideration.

Redwood shall pay the Cash Transaction Proceeds at the Closing. The Cash Transaction Proceeds (a) plus Cash on Hand at Closing (to the extent in excess of the $10,000,000 included in the Purchased Assets, if any) and (b) less the Landowner Retained Cash (which shall be retained by each applicable Landowner Debtor in accordance with the allocation described in the definition of "Landowner Retained Cash" which will be transferred to an Acquisition Company, to the extent available at the applicable Landowner at Closing) (collectively, the "***Distributable Cash***") will be available for distribution to Holders of Claims. Redwood will acquire all IEDs with respect to the Tallgrass Creek Campus and, subject to the conditions set forth in Schedule 6.3.9.6 of the Plan, Warminster may use all IEDs escrowed after November 27, 2009 with respect to Warminster pursuant to the terms of the IED Orders. Holders of certain Allowed Claims will be assigned an interest in up to a total of $7 million of the Cedar Crest Receivable as further set forth in the Plan. Funds that are collected on account of the Cedar Crest Receivable will flow through to Holders of Allowed Claims, as specified under the Plan, pursuant to the terms of the documents that will be included in the Plan Supplement.

At closing, the NSC Payment in the amount of $9 million shall be made by Redwood directly to NSC. Immediately thereafter, NSC shall make the NSC Payment Rebate by transferring $2 million of the $9 million to the TIP. NSC shall retain the full $7 million of the NSC Payment and all NSC Interim Payments in full without the need for any further court order or approval process, and free and clear of all claims (including without limitation (subordination, subrogation, contribution, setoff, recoupment, assignment and lien claims) by the Debtors, the Lenders, Redwood, and any other person, which sums the NSC and the NSC-NFPS shall allocate and distribute among themselves as they determine appropriate to satisfy and resolve claims and disputes with the Debtors, including their 2009 purchase services true up, certain Medicare billing issues, and their pre and post-petition professional fees and expenses associated with the Debtors' restructuring efforts.

**PropCo, DevCo and ManagementCo.**

### 4.  PropCo.

Pursuant to the Definitive Agreement, ERC shall grant, sell, assign, transfer and deliver to PropCo all of its interests in the Transferred Landowners, which hold property or assets in connection with a current or planned Campus. On the Closing Date, Redwood will own 100% of PropCo.

## 5.     DevCo.

On the Closing Date, Redwood will own 100% of DevCo.  DevCo shall acquire all assets and properties of Erickson Construction other than its Cash on Hand.   Any Development Agreement relating to the three Bonded Communities that are not being acquired by Redwood under the Plan (the Linden Ponds, Monarch Landing and Sedgebrook Communities) shall be on terms reasonably acceptable to the relevant Bond Trustee and Redwood.

## 6.     ManagementCo.

ManagementCo shall be formed to (a) acquire the Company's goodwill, personal and ongoing business relationships, trade secrets, and know-how and (b) knowledge in connection with the Company's business of providing management services with respect to the Campuses, as well as other assets related to the management aspect of the Business as set forth in the Definitive Agreement.  ManagementCo will enter into New Management Agreements with certain Campuses, which New Management Agreements shall have a minimum term of ten (10) years, subject to a three (3) year and seven (7) year right to review the management fee terms of the agreements to determine whether the fees reflect current market pricing.  Pursuant to the New Management Agreements, ManagementCo will provide management services to the Developing Campuses and Completed Campuses, including the right to receive all management fees thereunder.  On the Closing Date, Redwood will own 100% of ManagementCo.  Any New Management Agreement relating to the three Bonded Communities that are not being acquired by Redwood under the Plan (the Linden Ponds, Monarch Landing and Sedgebrook Communities) shall be on terms reasonably acceptable to the relevant Bond Trustee and Redwood.   To the extent that any party holds valid consent rights with regards to the contemplated New Management Agreements, such rights will continue to be enforceable to the extent that they are valid in the context of the Plan and related transactions.  The Debtors reserve the right to seek approval of any new agreements and the Plan over the objection of such a party on any basis available to the Debtors.

### a.     Management of Bond Communities.

Redwood through ManagementCo will manage Linden Ponds (Hingham), located in Hingham, Massachusetts; Sedgebrook (Lincolnshire), located in Lincolnshire, Illinois, and Monarch Landing (Naperville), located in Naperville, Illinois (collectively, the "***Bond Communities***") during the 90 day period immediately following the Plan Confirmation Date. During this 90 day period, Redwood will negotiate (non-exclusively) with the applicable NFPs and Indenture Trustee in good faith to reach a resolution regarding the Bond Communities.  At the conclusion of this 90 day period, if the parties have reached a resolution, then the Debtors will facilitate an definitive agreement regarding a restructuring plan for the Bond Communities. If Redwood does not reach a deal with the applicable NFPs and Indenture Trustee with respect to these Bond Communities at the close of the 90 day period, ERC's interests in the Bond Communities will be resolved pursuant to section 554 of the Bankruptcy Code, and Redwood will have no further obligation to manage the Bond Communities.

b. <u>Management Structure of ManagementCo.</u>

ManagementCo will be run by an experienced management team that will include James C. Davis as Chairman. ManagementCo intends to enter into a consulting agreement with John Erickson under which John Erickson would make himself available to provide consulting and advisory services; provided, however, that John Erickson would not have any decision making authority in ManagementCo, PropCo or DevCo.

**7. Assumption of Liabilities by Redwood.**

Except as otherwise provided in this Plan, neither Redwood nor any Acquisition Company will assume any obligation of the Company, other than obligations with respect to the period after the Closing Date under any agreement expressly assumed by an Acquisition Company in connection with the Restructuring Transactions contemplated under the Definitive Agreement. However, the Purchased Assets will be transferred to the Acquisition Companies subject to certain debt obligations of the Landowners, including the Community Loans and the other Landowner obligations expressly provided under the Definitive Agreement.

**8. Kansas.**

Redwood Kansas will acquire the assets of Kansas in exchange for assuming the obligations under the Kansas Special Assessment Bonds in full. Kansas shall assume the Kansas Community Loan. All IEDs (relating both to units sold pre- and postpetition) will be included in the assets acquired by Redwood Kansas from Landowner. The Holders of Kansas Construction Loan Claims shall retain their deficiency claims and participate in the Liquidating Creditor Trust, as provided below and in the Plan. The assumed debt will not be guaranteed.

**9. B&R Notes.**

Pursuant to the Definitive Agreement and the Plan Documents, Redwood shall acquire a 100% interest in the B&R Notes.

**10. Working Capital Facility.**

Redwood will establish a $50,000,000 working capital facility ("***Working Capital Facility***") that will be available to fund, on a senior secured priming basis, working capital and/or project development needs of the Acquisition Companies and/or Transferred Landowners through an aggregate facility and/or through new revolvers at each Acquisition Company and/or Transferred Landowner. The Working Capital Facility shall have a first lien on the assets of all the Acquisition Companies and/or Transferred Landowners, senior to any and all other indebtedness of the Acquisition Companies and/or Transferred Landowners and specific Campuses. Notwithstanding any other term of the Disclosure Statement, Plan, or any orders relating to the Disclosure Statement or Plan, to the extent the Working Capital Facility is made available to Warminster, it must be on terms mutually agreeable to Redwood and Ann's Choice, and, to the extent they have approval rights under the relevant Bond Documents, the Ann's Choice Trustee.

### 11. Employment Agreements.

As set forth in the Definitive Agreement, Redwood will have the opportunity during the due diligence investigation to identify and meet key employees of the Business and assess the compensation and benefits available to such employees and the likelihood such employees will accept employment with the applicable Acquisition Company and/or Transferred Landowner. It is anticipated that, at or before the Closing, the Acquisition Companies and/or Transferred Landowners will offer employment to certain employees and enter into employment agreements with these employees. Such employment agreements will contain customary provisions such as noncompetition, non-solicitation and confidentiality provisions. Redwood will be liable for only those employment agreements expressly acquired pursuant to the Definitive Agreement.

### 12. Remaining ERC Assets.

All assets of ERC which are not purchased or otherwise transferred to Redwood pursuant to the Definitive Agreement or otherwise transferred under the terms of this Plan will be liquidated in an orderly fashion as provided in the Plan.

### 13. Non-Competition Agreement.

At the Closing, Redwood, Erickson Group and the ERC and certain of their members will enter into noncompetition agreements for a mutually agreeable number of years pursuant to which ERC and such shareholders will agree that it or they and its or their affiliates will not compete with Redwood's or the Acquisition Companies' and/or Transferred Landowners' operation of the Purchased Assets after the Closing and containing agreements not to solicit or hire the Acquisition Companies' and/or Transferred Landowners' employees. Notwithstanding the foregoing, Redwood and the Company shall reasonably cooperate with the Landowner, NFP and/or relevant Bond Trustee for the Bond Communities known as Monarch Landing, Sedgebrook or Linden Ponds to ensure the ease of transition of the new manager or managers for each of these Bond Communities. The obligation to "reasonably cooperate" shall terminate one (1) year after the applicable Management Agreement is terminated.

### E. The Landowner Restructurings, Erickson Construction and Erickson Group.

### 1. Ashburn.

#### a. Transferred Assets.

Ashburn shall grant, sell, assign, transfer and deliver to Redwood Ashburn, upon receipt by PNC Bank, National Association, as collateral and administrative agent for the Holders of the Ashburn Construction Loan Claims, $60,626,000 in Cash and $732,000 from the Cedar Crest Receivable as required under Section 4 of the Plan, and Redwood Ashburn shall purchase from Ashburn, free and clear of all liens and liabilities (except for expressly assumed liabilities, if any, by Redwood Ashburn and the liens securing such liabilities) all assets and properties of Ashburn of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible, owned, leased or licensed, including all real property, all Transferred Claims of Ashburn, and all transferred contracts to which Ashburn is a

party, but not including any Excluded Assets.

b. The Community Loan and Other NFP Agreements.

The Ashburn Community Loan shall be amended and restated at the outstanding balance amount and assumed by Redwood Ashburn, as modified. Redwood Ashburn's obligations under the Ashburn Community Loan shall be subordinate to all other debt owed by Redwood Ashburn or its successor (including, without limitation, any new capital equity funding or debt incurred by Redwood Ashburn or its successor). The Working Capital Loan agreement and note and other agreements between Ashburn and Ashby Ponds, Inc. will be terminated as of the Effective Date, and Redwood Ashburn and Ashby Ponds, Inc. will enter into new agreements on mutually agreed upon terms consistent with the terms agreed to with the NSC on the record as part of the Auction.

c. Guaranties.

All guarantees of the Ashburn Construction Loan, Ashburn Junior Loan and Concord Junior Loan will be terminated and released.

d. New Ashburn Revolver.

Redwood will make available a revolver to fund costs of the borrower, including construction costs, marketing costs, departmental charges, development fees and taxes (the "*New Ashburn Revolver*"). Any funds drawn under the New Ashburn Revolver will be secured by a priming lien against the same collateral that secured the prepetition debt, including IEDs. The available commitment amount under the New Ashburn Revolver will be mutually determined by Redwood and borrower. Redwood would provide a separate revolving facility for the purpose of funding reasonable working capital needs of Ashby Ponds, Inc., secured by a priming lien on funds received by Ashburn from Ashby Ponds, Inc (excluding proceeds of the Community Loan).

2. Columbus.

The indebtedness related to Columbus will not be restructured. This Landowner's property is currently being foreclosed on by prepetition construction lenders. This Landowner expects to liquidate the property by delivering to the construction lenders a deed in lieu of foreclosure prior to the Effective Date or allowing the construction lenders to complete their pending foreclosure process.

3. Concord.

a. Transferred Assets.

Concord shall grant, sell, assign, transfer and deliver to Redwood Concord, upon receipt by PNC Bank, National Association, as collateral and administrative agent for the Holders of the Concord Construction Loan Claims, $62,757,000 in Cash and $637,000 from the Cedar Crest Receivable as required under Section 4 of the Plan, the Concord Letters of Credit, undrawn, and Redwood Concord shall purchase from Concord, free and clear of all liens and liabilities (except for expressly assumed liabilities, if any, by Redwood Concord and

the liens securing such liabilities) all assets and properties of Concord of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible, owned, leased or licensed, including all real property, all Transferred Claims of Concord, and all transferred contracts to which Concord is a party, but not including any Excluded Assets.

b. <u>The Community Loan and Other NFP Agreements.</u>

The Concord Community Loan shall be amended and restated at the outstanding balance amount and assumed by Redwood Concord, as modified. Redwood Concord's obligations under the Concord Community Loan shall be subordinate to all other debt owed by Redwood Concord or its successor (including, without limitation, any new capital equity funding or debt incurred by Redwood Concord or its successor). The Working Capital Loan agreement and note and other agreements between Concord and Maris Grove, Inc. will be terminated as of the Effective Date, and Redwood Concord and Maris Grove, Inc. will enter into new agreements on mutually agreed upon terms consistent with the terms agreed to with the NSC on the record as part of the Auction.

c. <u>Guaranties</u>.

Except as set forth in Section 6.4.8 of the Plan with respect to the Erickson Group Guaranty Claims, all guarantees of the Concord Construction Loan, Concord Junior Loan and Ashburn Junior Loan will be terminated and released.

d. <u>New Concord Revolver</u>

Redwood will make available a revolver to fund costs of the borrower, including construction costs, marketing costs, departmental charges, development fees and taxes (the "***New Concord Revolver***"). Any funds drawn under the New Concord Revolver will be secured by a priming lien against the same collateral as the collateral that secured the prepetition debt, including IEDs. The available commitment amount under the New Concord Revolver will be mutually determined by Redwood and borrower. Redwood will provide a separate revolving facility for the purpose of funding reasonable working capital needs of Maris Grove, Inc., secured by a priming lien on funds received by Concord from Maris Grove, Inc (excluding proceeds of the Community Loan).

**4.** **Dallas.**

a. <u>Transferred Assets.</u>

Dallas shall grant, sell, assign, transfer and deliver to Redwood Dallas, upon receipt by the Holders of the Texas A & M Note of a distribution of $3,440,000 and by Bank of America, NA, as collateral and administrative agent for the Holders of the Dallas Construction Loan Claims, of $19,496,000 in Cash (inclusive of $2,000,000 in Cash from the TIP), allowance of the right of Bank of America, N.A., as collateral and administrative agent for the Holders of the Dallas Construction Loan Claims, to setoff $34,531.09 in amounts held in deposit pursuant to the Expense Reserve Account (as defined in the Dallas Construction Loan Claim documents) without further motion, request and/or Bankruptcy Court approval against the portion of the Dallas Construction Loan Claims that is unsecured, without the requirement that Bank of

America, N.A. setoff such amount against or credit such amount to the Cash distribution received by Bank of America, N.A., as collateral and administrative agent for the Holders of the Dallas Construction Loan Claims, pursuant to the Plan and $282,000 from the Cedar Crest Receivable as required under Section 4, and Redwood Dallas shall purchase from Dallas, free and clear of all liens and liabilities (except for expressly assumed liabilities, if any, by Redwood Dallas and the liens securing such liabilities) all assets and properties of Dallas of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible, owned, leased or licensed, including all real property, all Transferred Claims of Dallas, and all transferred contracts to which Dallas is a party, but not including any Excluded Assets.

b.      The Community Loan and Other NFP Agreements.

The Dallas Community Loan shall be amended and restated at the outstanding balance amount and assumed by Redwood Dallas, as modified.  Redwood Dallas' obligations under the Dallas Community Loan shall be subordinate to all other debt owed by Redwood Dallas or its successor (including, without limitation, any new capital equity funding or debt incurred by Redwood Dallas or its successor).  The Working Capital Loan agreement and note and other agreements between Dallas and Highland Springs, Inc. will be terminated as of the Effective Date, and Redwood Dallas and Highland Springs, Inc. will enter into new agreements on mutually agreed upon terms consistent with the terms agreed to with the NSC on the record as part of the Auction.

c.      Guaranties.

All guarantees of the Dallas Construction Loan, the Texas A&M Note, and Dallas Junior Loan will be terminated and released.

d.      New Dallas Revolver.

Redwood will make available a revolver to fund costs of the borrower, including construction costs, marketing costs, departmental charges, development fees and taxes (the "*New Dallas Revolver*").  Any funds drawn under the New Dallas Revolver will be secured by a priming lien against the same collateral as the collateral that secured the prepetition secured debt, including IEDs.  The available commitment amount under the New Dallas Revolver will be mutually determined by Redwood and borrower.  Redwood will provide a separate revolving facility for the purpose of funding reasonable working capital needs of Highland Springs, Inc., secured by a priming lien on funds received by Dallas from Highland Springs, Inc (excluding proceeds of the Community Loan).

**5.      Houston.**

a.      Transferred Assets.

Houston shall grant, sell, assign, transfer and deliver to Redwood Houston, upon receipt by PNC Bank, National Association, as collateral and administrative agent for the Holders of the Houston Construction Loan Claims, $7,041,000 in Cash and $135,000 from the Cedar Crest Receivable as required under Section 4 of the Plan and Redwood Houston shall purchase from Houston, free and clear of all liens and liabilities (except for expressly assumed

liabilities, if any, by Redwood Houston and the liens securing such liabilities) all assets and properties of Houston of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible, owned, leased or licensed, including all real property, all Transferred Claims of Houston, and all transferred contracts to which Houston is a party, but not including any Excluded Assets.

b. The Community Loan and Other NFP Agreements.

The Houston Community Loan shall be amended and restated at the outstanding balance amount and assumed by Redwood Houston, as modified. Redwood Houston's obligations under the Houston Community Loan shall be subordinate to all other debt owed by Redwood Houston or its successor (including, without limitation, any new capital equity funding or debt incurred by Redwood Houston or its successor). The Working Capital Loan agreement and note and other agreements between Houston and Eagle's Trace, Inc. will be terminated as of the Effective Date, and Redwood Houston and Eagle's Trace, Inc. will enter into new agreements on mutually agreed upon terms consistent with the terms agreed to with the NSC on the record as part of the Auction.

c. Guaranties.

Except as set forth in Section 6.4.8 of the Plan with respect to the Erickson Group Guaranty Claims, all guarantees of the Houston Construction Loan and Houston Junior Loan will be terminated and released.

d. New Houston Revolver.

Redwood will make available a revolver to fund costs of the borrower, including construction costs, marketing costs, departmental charges, development fees and taxes (the "*New Houston Revolver*"). Any funds drawn under the New Houston Revolver will be secured by a priming lien against the same collateral as the collateral that secured the prepetition debt, including IEDs. The available commitment amount under the New Houston Revolver will be mutually determined by Redwood and borrower. Redwood will provide a separate revolving facility for the purpose of funding reasonable working capital needs of Eagles Trace, Inc., secured by a priming lien on funds received by Houston from Eagles Trace, Inc (excluding proceeds of the Houston Community Loan).

6. **Kansas.**

a. Transferred Assets.

Kansas shall grant, sell, assign, transfer and deliver to Redwood Kansas, upon receipt by PNC Bank, National Association, as collateral and administrative agent for the Holders of the Kansas Construction Loan Claims, $2,778,000 from the TIP as required under Section 4 of the Plan and Redwood Kansas shall purchase from Kansas, all assets of Kansas, free and clear of all liens and liabilities (except for Assumed Liabilities to be assumed by Redwood Kansas and the liens securing such liabilities) all assets and properties of Kansas of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible, owned, leased or licensed, including all real property, all Transferred Claims of Kansas, all

initial entrance deposits collected by Kansas, and all transferred contracts to which Kansas is a party, but not including any Excluded Assets.

        b.        <u>The Community Loan and Other NFP Agreements</u>.

The Kansas Community Loan shall be amended and restated at the outstanding balance amount and assumed by Redwood Kansas, as modified. Redwood Kansas' obligations under the Kansas Community Loan shall be subordinate to all other debt owed by Kansas or its successor (including, without limitation, any new capital equity funding or debt incurred by Redwood Kansas or its successor). The Working Capital Loan agreement and note and other agreements between Kansas and Tallgrass Creek, Inc. will be terminated as of the Effective Date, and Redwood Kansas and Tallgrass Creek, Inc. will enter into new agreements on mutually agreed upon terms consistent with the terms agreed to with the NSC on the record as part of the Auction.

        c.        <u>Bonds and Other Debt</u>.

Redwood Kansas will acquire the assets of Kansas in exchange for the assumption of the obligations under the Kansas Special Assessment Bonds. All IEDs (relating to units sold both pre- and postpetition) will be included in the assets to be acquired by Redwood Kansas from Landowner. Guaranties from ERC and Erickson Construction will be terminated.

        d.        <u>New Kansas Revolver</u>.

Redwood will make available a revolver to fund costs of the borrower, including construction costs, marketing costs, departmental charges, development fees and taxes (the "***New Kansas Revolver***"). Any funds drawn under the New Kansas Revolver will be secured by a priming lien against the all assets of Kansas, including IEDs, but junior to the Kansas Special Assessment Bonds. The available commitment amount under the New Kansas Revolver will be mutually determined by Redwood and borrower. Redwood will provide a separate revolving facility for the purpose of funding reasonable working capital needs of Tallgrass Creek, Inc., secured by a priming lien on funds received by Kansas from Tallgrass Creek, Inc. (excluding proceeds of the Kansas Community Loan).

    **7.**        **Littleton.**

        a.        <u>Transferred Assets.</u>

Littleton shall grant, sell, assign, transfer and deliver to Redwood Littleton, upon receipt by Capmark Finance, Inc., as collateral and administrative agent for the Holders of the Littleton Construction Loan Claims, $46,400,000 in Cash, $594,000 from the Cedar Crest Receivable and 100% of the net proceeds from the sale of the Littleton Out-Parcel up to $6 million and 50% above $6 million as required under Section 4 of the Plan and Redwood Littleton shall purchase from Littleton, free and clear of all liens and liabilities (except for expressly assumed liabilities, if any, by Redwood Littleton and the liens securing such liabilities) all assets and properties of Littleton of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible, owned, leased or licensed, including all real

property, all Transferred Claims of Littleton, and all transferred contracts to which Littleton is a party, but not including any Excluded Assets.

b.     The Community Loan and Other NFP Agreements.

The Littleton Community Loan shall be amended and restated at the outstanding balance amount and assumed by Littleton, as modified.   Redwood Littleton's obligations under the Littleton Community Loan shall be subordinate to all other debt owed by Redwood Littleton or its successor (including, without limitation, any new capital equity funding or debt incurred by Redwood Littleton or its successor).  The Working Capital Loan agreement and note and other agreements between Redwood Littleton and Wind Crest, Inc. will be terminated as of the Effective Date, and Redwood Littleton and Wind Crest, Inc. will enter into new agreements on mutually agreed upon terms consistent with the terms agreed to with the NSC on the record as part of the Auction.

c.     Guarantees.

Except as set forth in Section 6.4.8 of the Plan with respect to the Erickson Group Guaranty Claims, all guarantees of the Littleton Construction Loan and Littleton Junior Loan will be terminated and released.

d.     New Littleton Revolver.

Redwood will make available a revolver to fund costs of the borrower, including construction costs, marketing costs, departmental charges, development fees and taxes (the "**New Littleton Revolver**").  Any funds drawn under the New Littleton Revolver will be secured by a priming lien against the same collateral as the collateral that secured the prepetition debt, including IEDs.  The available commitment amount under the New Littleton Revolver will be mutually determined by Redwood and borrower.  Redwood will provide a separate revolving facility for the purpose of funding reasonable working capital needs of Wind Crest, Inc., secured by a priming lien on funds received by Littleton from Wind Crest, Inc. (excluding proceeds of the Littleton Community Loan).

e.     Littleton Letters of Credit.

The claims of PNC Bank, National Association, on account of the Littleton Letters of Credit shall be deemed allowed as of the Effective Date.  Unless PNC Bank, National Association agrees to different treatment, PNC shall not release its liens on those certificates of deposit pledged as collateral for the Littleton Letters of Credit except to the extent the Littleton Letters of Credit are returned, undrawn, to PNC Bank, National Association.

**8.     Novi.**

a.     Transferred Assets.

Novi shall grant, sell, assign, transfer and deliver to Redwood Novi, upon receipt by PNC Bank, National Association, as collateral and administrative agent for the Holders of the Novi Construction Loan Claims, $24,914,000 in Cash and $389,000 from the Cedar Crest Receivable as required under Section 4 of the Plan and Redwood Novi shall

purchase from Novi, free and clear of all liens and liabilities (except for expressly assumed liabilities, if any, by Redwood Novi and the liens securing such liabilities) all assets and properties of Novi of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible, owned, leased or licensed, including all real property, all Transferred Claims of Novi, and all transferred contracts to which Novi is a party, but not including any Excluded Assets. Redwood shall provide replacement adequate collateral to secure the Novi Letters of Credit in exchange for release of existing collateral.

b.     <u>The Community Loan and Other NFP Agreements</u>.

The Novi Community Loan shall be amended and restated at the outstanding balance amount and assumed by Redwood Novi, as modified. Redwood Novi's obligations under the Novi Community Loan shall be subordinate to all other debt owed by Redwood Novi or its successor (including, without limitation, any new capital equity funding or debt incurred by Redwood Novi or its successor). The Working Capital Loan agreement and note and other agreements between Novi and Fox Run Village, Inc. will be terminated as of the Effective Date, and Redwood Novi and Fox Run Village, Inc. will enter into new agreements on mutually agreed upon terms consistent with the terms agreed to with the NSC on the record as part of the Auction.

c.     <u>Guarantees</u>.

Except as set forth in Section 6.4.8 of the Plan with respect to the Erickson Group Guaranty Claims, all guarantees of the Novi Construction Loan and Novi Junior Loan will be terminated and released.

d.     <u>New Novi Revolver</u>

Redwood will make available a revolver to fund costs of the borrower, including construction costs, marketing costs, departmental charges, development fees and taxes (the "***New Novi Revolver***"). Any funds drawn under the New Novi Revolver will be secured by a priming lien against the same collateral as the collateral that secured the prepetition debt, including IEDs. The available commitment amount under the New Novi Revolver will be mutually determined by Redwood and borrower. Redwood will provide a separate revolving facility for the purpose of funding reasonable working capital needs of Fox Run Village, Inc., secured by a priming lien on funds received by Novi from Fox Run Village, Inc. (excluding proceeds of the Novi Community Loan).

**9.     Warminster.**

a.     <u>Warminster Purchase Option Deposit And Purchase Option Deposit Refund Obligation</u> .

The outstanding balance of the purchase option deposit refund obligation reflected in the Warminster Purchase Option Deposit Refund Agreement in the amount of $75,000,000 shall be reinstated in full. The collateral securing the Warminster Purchase Option Deposit Refund Agreement shall remain unchanged. Warminster's obligations under the Purchase Option Refund Deposit Agreement will be guaranteed by IEDs collected by

Warminster after November 27, 2009 not to exceed $10 million. Any cross-defaults relating to other Landowners shall be eliminated. Reorganized Warminster shall assume the Warminster Purchase Option Deposit Refund Agreement as it currently exists, or otherwise on terms mutually agreeable to Ann's Choice and the Ann's Choice Trustee.

b. Development Rights.

Redwood shall assume the existing Development Agreement relating to the Ann's Choice Campus or otherwise enter into a new Development Agreement on terms mutually agreeable to Redwood, Ann's Choice and the Ann's Choice Trustee.

c. Guarantees.

All guarantees of ERC and its affiliates will be terminated. Redwood, DevCo and PropCo shall provide a new completion guaranty on the same terms as the existing completion guaranty associated with the Ann's Choice Bonded Community.

d. Interests in Warminster.

ERC's ownership interests in Warminster will be transferred to PropCo.

e. Community Loan.

The Warminster Community Loan shall be amended and restated at the outstanding balance amount and assumed by Warminster, on terms mutually agreeable to Redwood, Ann's Choice and the Ann's Choice Trustee.

f. Other Bond Obligations.

Warminster shall assume, reinstate and/or ratify the mortgage securing the Ann's Choice Bonds and Warminster and Warminster GP shall each otherwise assume, reinstate and/or ratify all other obligations, encumbrances, and agreements relating to the Ann's Choice Bonds to which it was a party as of the Petition Date. Any amendments or modifications to the terms of any Master Lease relating to the Ann's Choice Campus shall be on terms mutually agreeable to the Ann's Choice Trustee and Redwood. Any IED funds relating to the Ann's Choice Campus that remain in escrow on the occurrence of a Trigger Event as that term is used in the Initial IED Order and Additional IED Procedures Order shall be released to Warminster and such formerly escrowed monies shall thereafter be available for use pursuant to the Bond Documents provided that there then exist no defaults under one or more of the provisions of the Bond Documents set forth in Schedule 6.3.9.6 to the Plan.

g. New Warminster Revolver

Redwood will make available a revolver to fund costs of the borrower, including construction costs, marketing costs, departmental charges, development fees and taxes (the "New Warminster Revolver"). The available commitment amount under the New Warminster Revolver will be mutually determined by Redwood and borrower. Redwood will provide a separate revolving facility for the purpose of funding reasonable working capital needs of Ann's Choice Campus (together with the New Warminster Revolver, the "New Warminster

Revolvers"). The terms of the New Warminster Revolvers must be mutually agreeable to Redwood, Ann's Choice and, to the extent they have approval rights under the relevant Bond Documents, the Ann's Choice Trustee.

> h.     <u>TIP Funding</u>.

The Warminster IEDs collected prior to November 27, 2009 will be transferred to the TIP. To the extent that the Ann's Choice Trustee is unwilling to facilitate the transfer, the Debtors reserve the right prior to or at the Plan Confirmation Hearing to seek the Court's intervention.

> i.     <u>Warminster Letters of Credit</u>.

The claims of PNC Bank, National Association, on account of the Warminster Letters of Credit shall be allowed as of the Effective Date. Unless PNC agrees to different treatment, PNC Bank, National Association shall not release its liens on the certificates of deposit pledged to secure the Warminster Letters of Credit except to the extent the Warminster Letters of Credit are returned, undrawn, to PNC Bank, National Association. Upon release of the liens on the certificates of deposit pledged to secure the Warminster Letters of Credit as set forth in this paragraph, such certificates of deposit shall then be Purchased Assets.

## 10. Erickson Construction.

Erickson Construction shall grant, sell, assign, transfer and deliver to DevCo, and DevCo shall purchase from Erickson Construction, free and clear of all liens and liabilities, all assets and properties of Erickson Construction of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible, owned, leased or licensed, including all transferred contracts to which Erickson Construction is a party, but not including any Excluded Assets. Unless PNC Bank, National Association agrees to different treatment, PNC shall not release the certificates of deposit pledged to secure the Erickson Construction Letters of Credit except to the extent Erickson Construction Letters of Credit and ERC Letters of Credit are returned, undrawn, to PNC Bank, National Association. Following release of certificates of deposit as set forth in this paragraph, such certificates of deposit shall be Purchased Assets.

## 11. Erickson Group.

Erickson Group will be liquidated and dissolved in accordance with applicable law, subject to the terms and conditions of the Plan.

## 12. Payment in Full Claims.

To the extent unpaid as of the Effective Date, Allowed Administrative Expense Claims (including, without limitation, the Auction Fee), Allowed Compensation and Reimbursement Claims, Allowed Priority Tax Claims, Allowed DIP Funding Claims, Allowed Other Priority Claims, Allowed Secured Tax Claims, and Allowed Mechanic's Lien Claims (to the extent these Claims are not junior to other Claims pursuant to applicable state law) shall be reserved for or paid from the Transaction Proceeds, subject to the terms and conditions of the Plan.

## F. Liquidating Creditor Trust.

### 1. Establishment of Liquidating Creditor Trust.

On the Effective Date, the Liquidating Creditor Trust will be established pursuant to the Trust Agreement and other documents to be included in the Plan Supplement. Under the Definitive Agreement, Redwood is acquiring the Causes of Action, counterclaims and defenses listed below which the Debtors would have otherwise been entitled to bring and which are not transferred, waived or released under the Plan. Redwood will assign the Causes of Action listed below to the Liquidating Creditor Trust for the exclusive benefit of the Beneficiaries that consent to the Global Settlement.

- All Chapter 5 Avoidance Actions of ERC, Erickson Construction, and the Landowner Debtors (collectively, the "***Subject Debtors***"), including, but not limited to, actions against John Erickson and members of the Erickson family (the "***Transferred Chapter 5 Avoidance Actions***"). Chapter 5 Avoidance Actions against Redwood Retained Employees will be excluded from the Transferred Chapter 5 Avoidance Actions assigned to the Liquidating Creditor Trust. Further and except with respect to John Erickson and members of the Erickson family, the Liquidating Creditor Trust will covenant not to prosecute Chapter 5 Avoidance actions against employees of the Subject Debtors (including the Redwood Retained Employees) if (A) such employees received transfers during the period ending October 18, 2008 and beginning on the date that the applicable statute of limitations for fraudulent conveyances for such transfer began to run and (B) such transfers during that period do not exceed $350,000, in the aggregate; *provided*, that the covenant not to sue will not apply to transfers to such employees within one (1) year prior to October 19, 2009 (such employees falling below the foregoing threshold, "***Non-Threshold Employees***").

- All Non-Avoidance Causes of Action against the directors and officers of the Subject Debtors in their capacities as such (the "***Transferred D&O Claims***").

The assignment of claims of the Subject Debtors and Erickson Group to the Trust (or other such third party with respect to assets of Erickson Group other than the Estate Assigned Claims) shall be exclusive of any and all claims or Causes of Action against the Lenders and Agents (and each of their respective affiliates, officers, directors, employees, agents, attorneys and advisors) both in their capacities as Lenders and/or Agents and in any other capacities, all of which claims and/or Causes of Action, including but not limited to Chapter 5 Avoidance Actions and any other avoidance actions, shall be expressly waived, pursuant to the Plan, by the Debtors, each of the Acquisition Companies, the Creditors Committee, the Liquidating Creditor Trust, Holders of each of the Ashburn Junior Loan Claims, Columbus Junior Loan Claims, Concord Junior Loan Claims, Dallas Junior Loan Claims, Houston Junior Loan Claim, Kansas Junior Loan Claim, Littleton Junior Loan Claim, Novi Junior Loan Claim, Warminster Junior Loan Claim, any other mezzanine lender, Holders of Claims under the STAMPS, the Lenders, Agents, and the NSC-NFPs and Holders of Allowed Claims that receive Distributions under the Plan (subject to the right of each creditor to opt-out with respect to the Third Party Releasees pursuant to Section 12.6 of the Plan). In addition to the Causes of Action described above, on and after the Effective Date, the Debtors will assign the following Causes of Action to the Liquidating Creditor Trust: (i) Non-Avoidance Causes of Action against all directors, officers, managing members and

managers of Erickson Group (the "***Estate Assigned D&O Claims***"), (ii) all Chapter 5 Avoidance Actions of Erickson Group, other than such claims against Redwood Retained Employees (subject to the limitations described herein with respect to Non-Threshold Employees) (the "***Estate Assigned Chapter 5 Avoidance Actions***"), (iii) all Non-Avoidance Causes of Action not acquired by Redwood and not otherwise released by the Plan (together with the Estate Assigned D&O Claims and Estate Assigned Chapter 5 Avoidance Actions, the "***Estate Assigned Claims***"), (iv) unencumbered assets of the Debtors' Estates, and (v) Excluded Assets (excluding those Excluded Assets subject to prior liens, to the extent of the value of such liens, or other disposition pursuant to the terms of the Plan, including but not limited to the Littleton Out-Parcel and the UMBC Building) (collectively with the Transferred Claims and the Trust Cash, the "***Trust Assets***") (except for those assets held by Erickson Group that may be transferred to another third party entity, including but not limited to the GST Loan). The Trust Assets transferred to the Liquidating Creditor Trust, subject to the applicable provisions of Section 6.4 of the Plan, will fully vest in, the Liquidating Creditor Trust, free and clear of all claims, liens, encumbrances and other liabilities, including all Claims against and Interests in the Debtors, with all Liquidating Creditor Trust proceeds to be distributed by the Trustee in accordance with the provisions of the Plan. The Debtors estimate that the value of the potential preference Causes of Action is approximately $7.5 million. The Debtors believe that claims may exist with respect to D&O coverage but the Debtors express no opinion with respect to those claims. **Any reference in the Plan to potential Causes of Action against any director, officer or other insider of any of the Debtors should not be construed to suggest that the Debtors believe that any such valid claim exists or is worthy of pursuit, and the confirmation of the Plan, and any agreements consummated pursuant to the Plan, shall be without prejudice to any such parties' defenses to any such potential claims and all defenses to such potential claims under applicable bankruptcy and nonbankruptcy law shall be fully preserved.** On the Effective Date, the Liquidating Creditor Trust will be provided with funding in an amount specified in the Plan Confirmation Order or other Plan Documents, which amount may be used as set forth in Section 6.4.18 of the Plan and as otherwise determined by the Creditors Committee and/or the Trustee of the Liquidating Creditor Trust, including to pay the reasonable fees and expenses incurred by the Liquidating Creditor Trust or the Trustee in administering the Liquidating Creditor Trust. The Trustee will be appointed pursuant to the Plan Confirmation Order. Notwithstanding any provision of the Plan, the Disclosure Statement or any order on the Disclosure Statement and/or Plan, the Company's membership interests in Lincolnshire Campus, LLC, Naperville Campus, LLC, and Hingham Campus, LLC shall remain subject to all liens granted to the relevant Bond Trustee under the relevant Bond Documents or such terms as agreed to by the parties. Nothing in this Section or otherwise in the Plan, and nothing in the Plan Confirmation Order, shall operate to transfer the Excluded Assets free and clear of, or release or in any manner affect, the claims, liens, encumbrances or other liabilities of any lender (or other creditor), or agent for such lender (or other creditor), against or with respect to any person or entity that is not one of the Debtors or the property of any such person or entity; *provided*, *however*, the Bond Trustee shall not be entitled to receive any distributions from the Trust Assets other than the Excluded Assets that are the subject of the Bond Trustee's liens.

## 2. Exclusions.

Holders of the following types of claims may not participate as Beneficiaries of the Liquidating Creditor Trust and will not be included in the definition of Beneficiary as used in

the in Plan: (1) except for Permitted Non-Debtor Obligations (defined below), all deficiency claims of Corporate Revolver Lenders (including, but not limited to, deficiency Interest Rate Swap Claims), which shall be waived as against all of the Debtors except Erickson Group (the "*Revolver Deficiency Waiver*"), (2) except for Permitted Non-Debtor Obligations and the Non-Consenting Construction Lenders (defined below), all loan deficiency and guarantee claims of Construction Lenders, which shall be waived as against all of the Debtors except Erickson Group (the "*Construction Loan Deficiency Waivers*"), (3) all intercompany claims, (4) all obligations with respect to purchase option deposits, (5) claims under the Growth Participation Plan (6) except for Permitted Non-Debtor Obligations, guarantees of ERC's non-debtor subsidiaries' prepetition obligations, (7) UMBC Building Construction Loan deficiency claims, (8) all mezzanine loan/sale-leaseback deficiency claims and guarantee claims that have been waived in writing or pursuant to the Plan, (9) community loan claims, (10) NFP Claims, and (11) purchase deposit claims (the "*Excluded Claims*"). *Claims arising under the Growth Participation Plan are expressly excluded because pursuant to the terms of the Growth Participation Plan, payments under the plan are deferred until all outstanding obligations owed to the Debtors' lenders are paid in full.* Notwithstanding the foregoing, in the event that an NFP is entitled to any distribution from the Liquidating Creditor Trust , then such distribution shall be paid to the Agent with whom that NFP is party to a subordination agreement, and such Claim shall not be an Excluded Claim (for the avoidance of doubt, NFPs are not entitled to a distribution from the Liquidating Creditor Trust pursuant to the terms of the Plan). For the avoidance of doubt, Holders of General Unsecured Claims against Erickson Group do not assign or waive such Claims or the treatment of such Claims.

### 3. Purpose of Liquidating Creditor Trust.

The purposes of the Liquidating Creditor Trust are (i) to liquidate any non-cash Trust Assets; (ii) to prosecute and resolve the Causes of Action; (iii) to maximize recovery of the Trust Assets for the benefit of Beneficiaries; and (iv) to distribute the proceeds of the Trust Assets to Beneficiaries.

### 4. Prosecution of Actions.

The Liquidating Creditor Trust may commence adversary or other legal proceedings to pursue any Causes of Action. Proceeds recovered through any such proceeding will be deposited into the Liquidating Creditor Trust and will be distributed by the Trustee to Beneficiaries in accordance with the provisions of the Plan. The Trustee will have the authority to settle any and all Causes of Action without the need for approval by the Bankruptcy Court. Further, the Trustee may, in its discretion, elect to abandon any non-cash Trust Assets.

### 5. Trust Funding.

On the Effective Date, the Liquidating Creditor Trust will be provided with funding in an amount of $2.5 million in Cash (the "*Trust Cash*") from the TIP, which amount may be used as set forth in Section 6.4.18 of the Plan and as otherwise determined by the Trustee, including to pay the reasonable fees and expenses incurred by the Liquidating Creditor Trust or the Trustee in administering the Liquidating Creditor Trust.

### 6. D&O Indemnification.

The Liquidating Creditor Trust shall not be liable, directly or indirectly, for the Debtors' postpetition obligation to indemnify directors and officers under the Plan.

### 7. GST Loan and Collection.

Under the Plan and/or the Plan Documents, the rights of Erickson Group with respect to GST Loan will be assigned to the Liquidating Creditor Trust (or other third party or entity) for the benefit of Construction Lenders with Erickson Group Guaranty Claims (which guarantee claims are expressly reserved and not otherwise waived against Erickson Group). The Committee and lenders with Erickson Group Guaranty Claims will discuss in good faith the terms under which the Liquidating Creditor Trust (or other third party or entity) may receive the right to prosecute collection claims arising from the GST Loan and distribution of proceeds therefrom.

### 8. Participation.

A Beneficiary may only participate in the recoveries of the claims and Causes of Action assigned to the Liquidating Creditor Trust if such Beneficiary consents to the global settlement (the "*Global Settlement*") between the Creditors Committee and the Debtors. Any Beneficiary that does not consent to the Global Settlement will not be a beneficiary of (i) the Revolver Deficiency Waivers, (ii) Construction Loan Deficiency Waivers, (iii) the Lender Pay-Over Waivers (defined below), (iv) the Trust Cash, (v) the recoveries from the claims and Causes of Actions assigned to the Liquidating Creditor Trust and (vi) recoveries from any other Trust Asset. Any objection filed by a Beneficiary to the Global Settlement or vote against the Plan and the releases contained therein, will disqualify a Beneficiary from participating in the Liquidating Creditor Trust.

### 9. Distributions to Three Subclasses of Claims.

**Tier A Subclass – Trade Claims:**

(a)     *Participants:* Tier A will consist of Beneficiaries that that are not Holders of (i) a mezzanine loan/sale-leaseback deficiency claim, (ii) mezzanine loan/sale-leaseback guarantee claim, (iii) Permitted Non-Debtor Obligations (defined below) or (iv) Participating Construction Claims (defined below) (collectively, the "*Trade Class*"). The Trade Class shall include General Unsecured Claims held by current and former employees of the Debtors (excluding Claims arising under the Growth Participation Plan).

(b)     *Recovery:* Tier A shall receive, *pro rata*, the first $7 million of dividends paid by the Liquidating Creditor Trust ("*Trade Dividend*"). Following the payment of the Trade Dividend in full, Tier A will not be entitled to any further distributions from the Liquidating Creditor Trust, subject to the Proration Trigger Event (defined below).

**Tier B Subclass – Construction Claims:**

(a)  *Participants:* Tier B will consist of Beneficiaries which are Holders of the following:

(i)  guarantees by a Subject Debtor of pre-petition obligations (including letters of credit) of non-debtor ERC subsidiaries or affiliates ("***Permitted Non-Debtor Obligations***"), *provided* that Permitted Non-Debtor Obligations shall not include (i) any claim held by, (ii) guarantees of pre-petition obligations of, or (iii) letters of credit issued to the following: John Erickson, any member of the Erickson family, any trust or special purpose vehicle created or managed primarily for the benefit of John Erickson or any member of the Erickson family ("***Excluded Insider Obligations"*)* and;

(ii)  deficiency and guarantee claims of the construction lenders (the "***Construction Claims***") to Columbus (the "***Columbus Lender***") and Kansas (the "***Non-Consenting Construction Lenders***").  For the avoidance of doubt, the Non-Consenting Construction Lenders are not waiving their deficiency and guaranty claims.

(b)  *Recovery:*  Tier B will not receive any distribution from the Liquidating Creditor Trust until the Trade Dividend has been paid in full.  Thereafter Tier B shall participate in all dividends from the Liquidating Creditor Trust, *pro rata*, with other Tier B participants only, up to $2 million (the "***Tier C Trigger Event***"), and thereafter, with Tier C participants *pro rata*, subject to the Proration Trigger Event (defined below).

(c)  *Limitations:*

(i)  The amount of Permitted Non-Debtor Obligations that may participate in Tier B shall be capped at $21 million (the "***Participating Permitted Non-Debtor Obligations***").  To the extent that Permitted Non-Debtor Obligations exceed $21 million (the "***Excess Permitted Non-Debtor Obligations***"), the Participating Permitted Non-Debtor Obligations of each Tier B participant shall be reduced *pro rata*.  The holders of Excess Permitted Non-Debtor Obligations shall be deemed to have waived the right to receive a distribution from the Liquidating Creditor Trust on account of such excess amounts.

(ii)  The amount of Construction Claims of the Non-Consenting Construction Lenders that may participate in Tier B shall be capped at $70 million (the "***Participating Construction Claims***").  To the extent that Construction Claims exceed $70 million (the "***Excess Construction Claims***"), the Participating Construction Claims of each Tier B participant shall be reduced *pro rata*.  The holders of Excess Construction Claims shall be deemed to have waived the right to receive a distribution from the Liquidating Creditor Trust on account of such excess amounts.

(iii)  Holders of Permitted Non-Debtor Obligations and the Columbus Lender shall use their respective reasonable good faith efforts to satisfy their claims first from the assets of the applicable non-debtor ERC subsidiary or affiliate or Columbus collateral, respectively, before seeking to enforce their right to receive a distribution from the Liquidating Creditor Trust. To the extent that a holder of a Participating Permitted Non-Debtor Obligation or the Columbus Lender has received payment in respect of their claims from the assets of the applicable non-

debtor ERC subsidiary or affiliate or Columbus collateral, respectively, such payment will be deemed to be first applied to such creditors' respective Excess Permitted Non-Debtor Obligation or Excess Construction Claim and then to reduce the amount of its Participating Permitted Non-Debtor Obligations or Participating Construction Claims, respectively.

(iv)     For the avoidance of doubt, holders of Participating Construction Claims shall only be entitled to one distribution on account of their deficiency and guarantee claims.

## Tier C Subclass– Mezzanine/Sale-Lease Back Claims:

(d)     *Participants*: Tier C will consist of Beneficiaries that hold mezzanine loan/sale-leaseback guarantee claims and deficiency claims that have not been voluntarily waived in writing ("*Mezzanine Claims*").

(e)     *Recovery*: Tier C shall not participate in dividends from the Liquidating Creditor Trust until the occurrence of the Tier C Trigger Event.  Thereafter, Tier C shall participate with Tier C in all dividends of the Liquidating Creditor Trust, *pro rata*, subject to the Proration Trigger Event (defined below).

(f)     *Limitations*:

(i)     The amount of Mezzanine Claims that may participate in Tier B shall be capped at $100 million ("*Participating Mezzanine Claims"*).  To the extent that mezzanine loan/sale-leaseback guarantee claims and deficiency claims that have not been voluntarily waived in writing exceed $100 million (the "*Excess Mezzanine Claims*"), the Participating Mezzanine Claims of each Tier C participant shall be reduced *pro rata*.  The holders of Excess Mezzanine Claims shall be deemed to have waived the right to receive a distribution from the Liquidating Creditor Trust on account of such excess amounts.

(ii)     For the avoidance of doubt, holders of Participating Mezzanine Claims shall only be entitled to one distribution on account of their mezzanine loan/sale-lease back deficiency claims and guarantee claims.

## STAMPS:

(g)     *Stamps Pay-Over Obligation and Tier A Subclass Participation*:  For purposes of distributions from the Liquidating Creditor Trust and subject to (b) below, the holders of STAMPS shall participate in Tier A, *provided, however,* any amount distributable to the STAMPS shall be paid to the holders of Senior Indebtedness[11], subject to the Lender Pay-Over Waivers (defined below) in Tier A *pro rata* (the "*STAMPS Pay-Over Obligation*").  To the extent permitted under section 13.10 of the STAMPS Indenture (defined below), the fees of the

---

[11] "Senior Indebtedness" shall have the meaning ascribed to such term in that Trust Indenture, dated November 1, 2007, by and among, Erickson Retirement Communities, LLC and The Bank of New York, as Trustee (the "*STAMPS Indenture*").

STAMPS indenture trustee, up to $250,000, will not be subject to the STAMPS Pay-Over Obligation (the "***STAMP Fees***").

(h)     *Waiver of Stamps Pay-Over Obligation.*  Without limiting the Lender Pay-Over Waivers, upon the occurrence of the Proration Trigger Event, the STAMPS Pay-Over Obligation shall be deemed waived in its entirety and, thereafter, holders of the STAMPS shall be entitled to a *pro rata* share of all Liquidating Creditor Trust distributions.

Proration Trigger Event:

(i)     Relevant Definitions:

(i)     "***Tier A Percentage Recovery***" means the quotient of $7 million divided by the total amount of Allowed Claims entitled to participate in Tier A plus the STAMP Fees, but excluding all other Claims of the STAMPS.

(ii)     "***Tier B/C Percentage Recovery***" means the quotient of the total amount of distributions made by the Liquidating Creditor Trust to Tier B and Tier C participants, in the aggregate, divided by the total amount of Allowed Claims entitled to participate in Tier B and Tier C, in the aggregate.

(j)     *Application*:  As set forth above, upon the payment of the Trade Dividend to Tier A, in full, Tier A will not be entitled to participate in any further distributions from the Liquidating Creditor Trust.  However, if as a result of future distributions to participants in Tier B and Tier C, the Tier B/C Percentage Recovery equals or exceeds the Tier A Percentage Recovery (the "***Proration Trigger Event***"), all subsequent distributions from the Liquidating Creditor Trust will then be made to Tier A, Tier B and Tier C, *pro rata.*

## 10.     Lender Waivers.

Subordination/Pay-Over:  Corporate Revolver Lenders, Construction Lenders and holders of Permitted Non-Debtor Obligations will waive all subordination and pay-over rights with respect to distributions from the Liquidating Creditor Trust and the recipients thereof (the "***Lender Pay-Over Waivers***"); *provided* that a Lender Pay-Over Waiver shall only be effective with respect to a holder of mezzanine loan/sale-leaseback deficiency claims or mezzanine loan/sale-leaseback guarantee claims if the beneficiary of such waiver shall have first entered into a settlement agreement, acceptable to the relevant lenders granting such waiver.

Subrogation:  The grant of an effective Lender Pay-Over Waiver shall include a lender's waiver of subrogation rights with respect to (1) Excess Mezzanine Claims or (2) mezzanine loan/sale-leaseback deficiency claims or mezzanine loan/sale-leaseback guarantee claims voluntarily waived by holders thereof in writing.

## 11.     Formation.

The Creditors Committee shall have authority with respect to drafting the definitive trust documents, governance and selection of a Trustee, subject to approval by the Bankruptcy Court.  The Creditors Committee shall consult with the Agents with respect to the drafting and governance of the Liquidating Creditor Trust.

12.     **Claims Process**.

The Liquidating Creditor Trust will have the right to object to Claims in connection with the post-Effective Date Claims allowance process; *provided* that the Liquidating Creditor Trust shall not object to any Claims of the Corporate Revolver Lenders and Construction Lenders, lenders under the UMBC Building Construction Loan, and Agents, all of which shall be Allowed. Prior to the Effective Date, the Debtors shall consult with the Creditors Committee in connection with such Claims allowance process.

13.     **Information Preservation and Production.**

The Debtors and the Acquisition Companies will agree to preserve all documents and electronic data and provide access to such information to the Liquidating Creditor Trust to facilitate the prosecution of any and all Causes of Action, including but not limited to Chapter 5 Avoidance Actions and claims related to director and officers, the GST Loan and other claims. The Debtors' and Acquisition Companies' obligation to preserve documents and electronic data pursuant to Section 6.4.13 of the Plan shall terminate on the first year anniversary of the Effective Date *provided*, that the Debtors, the Acquisition Companies and the Trustee shall negotiate in good faith the terms under which such documents and electronic data shall be transferred to the possession of the Liquidating Creditor Trust, at the Liquidating Creditor Trust's expense at the conclusion of the one year period. .

14.     **Notice of Causes of Action.**

Subject to the releases and limitations expressly described herein and under the Plan (including with respect to the Redwood Retained Employees), the intent of the Global Settlement and the Plan is to transfer all claims, Causes of Action, counter-claims and other defenses of the Debtors (including the right to recoveries therefrom) to the Liquidating Creditor Trust, with certain exceptions expressly set forth in the Plan. The Liquidating Creditor Trust is receiving such Causes of Action as the representative of the estate under section 1123(b)(3)(B) of the Bankruptcy Code and Trustee shall have standing to prosecute such Causes of Action. Neither the Creditors Committee nor the Trustee have commenced an investigation of the Debtors' books and records with respect to potential Causes of Action. To the extent that a Cause of Action against a Holder of a Claim against or Interest in the Debtors or any other party, is not specifically identified or described in the Plan, the failure to identify such Cause of Action should not be construed as a waiver or defense to such Cause of Action. For the avoidance of doubt, no claims or Causes of Action against the Lenders and Agents (and each of their respective affiliates, officers, directors, employees, agents, attorneys and advisors) shall be transferred to the Liquidating Creditor Trust, the Trustee shall not have standing to pursue such claims or Causes of Action, and all such claims and Causes of Action shall be waived, released and discharged pursuant to the Plan.

15.     **No Substantive Consolidation.**

The formation and implementation of the Liquidating Creditor Trust is not, and shall not be deemed, to constitute or cause in effect a substantive consolidation of the Debtors and distributions from the Liquidating Creditor Trust shall be made accordingly. The governing

body of the Liquidating Creditor Trust shall endeavor to account for creditor recoveries amongst the creditors of the various Estates to the extent possible.

16.    **Tax Treatment of Transfers to Liquidating Creditor Trust**.

The transfer of the Trust Assets to the Liquidating Creditor Trust will be treated for all purposes of the Internal Revenue Code of 1986, as amended, e.g., Sections 61(a)(12), 483, 1001, 1012 and 1274, as a deemed transfer first to Beneficiaries (in proportion to the fair market value of the Liquidating Creditor Trust interests received by each) in exchange for the Claims held by each that are to be satisfied by the interests in the Liquidating Creditor Trust. This will be followed by a deemed transfer by each such Beneficiary to the Liquidating Creditor Trust.

17.    **Tax Treatment of Beneficiaries**.

Beneficiaries will be treated as the grantors of the Liquidating Creditor Trust, and the Trustee will file tax returns for the Liquidating Creditor Trust as a "grantor trust" pursuant to Section 1.671-4(a) of the U.S. Treasury Regulations. Items of income, gain, loss, expense and other tax items will be allocated to those Beneficiaries that would be entitled to receive such items if they constituted cash distributions or reductions therefrom and such Beneficiaries shall be responsible for the payment of taxes on a current basis that result from such allocations.

18.    **Trust Expenses**.

All Liquidating Creditor Trust expenses will be charged against and paid from either the Trust Cash or the proceeds of any Causes of Action and proceeds from asset sales of other Trust Assets as determined by the Creditors Committee and the Trustee, as applicable. All such expenses will be paid by the Trustee when due and payable. Counsel and any other professionals retained by the Trustee or the Liquidating Creditor Trust (the "*Trust Professionals*") will submit monthly statements ("*Monthly Fee Statements*") for services rendered and costs incurred to the Trustee for review and approval. The Trustee will have thirty (30) days from receipt of each Monthly Fee Statement to object to the Monthly Fee Statement. In the event that any objection is received by the relevant Trust Professional and cannot be promptly resolved by the Trust Professional and the Trustee, the dispute will be submitted by the Trustee to the Bankruptcy Court for adjudication. The Bankruptcy Court will retain jurisdiction to adjudicate objections to Monthly Fee Statements. In the event that no objection is raised to a Monthly Fee Statement within the thirty (30) day period, the requested amount in the Monthly Fee Statement will be promptly paid by the Trustee, subject to any requirements under the Plan.

19.    **Creditors Committee Professional Fees**.

The Debtors will first apply the DIP financing funds of up to $600,000 and then, an additional maximum consideration of up to $500,000 will be made available from the TIP to the payment of the fees and expenses of the Committee's attorneys and financial advisors up to an allowed amount of $1.1 million. Any fees and expenses incurred by the Committee's attorneys and financial advisors during the Chapter 11 Cases and allowed in excess of such amount will be paid from Trust Cash and/or the Liquidating Creditor Trust recoveries prior to any distribution to Beneficiaries. The amount paid (a) from the initial $2.5 million in Trust Cash, or (b) from recoveries prior to any distribution to Beneficiaries shall be determined solely

by agreement between the Creditors Committee and its professionals prior to the Effective Date of the Plan.

### 20.     Limitation of Liability.

No recourse will ever be had, directly or indirectly, against the Trustee, its members, officers, directors, employees, professionals, representatives, agents, successors or assigns, by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge or note, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Liquidating Creditor Trust under this Plan or by reason of the creation of any indebtedness by the Liquidating Creditor Trust or the Trustee under this Plan.  All such liabilities under this Plan will be enforceable only against, and will be satisfied only out of, the assets of the Liquidating Creditor Trust.  The Liquidating Creditor Trust and the Trustee and their respective officers, directors, employees, professionals, representatives, agents, successors or assigns will not be liable for any act they may do, or omit to do hereunder in good faith and in the exercise of their sound judgment; provided, however, that this Section will not apply to any gross negligence or willful misconduct by the Liquidating Creditor Trust and the Trustee or their respective officers, directors, employees, professionals, representatives, agents, successors or assigns.

## VI.    Treatment of Claims and Interests Under the Plan

### A.    Classification and Treatment of Claims.

The following tables summarize the treatment of each Class under the Plan.  The tables also identify which Classes are entitled to vote on the Plan and the estimated recovery for Holders of Allowed Claims in each Class, pursuant to applicable provisions of the Bankruptcy Code.

### 1.    Treatment of Erickson Group Claims and Interests.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| --- | DIP Funding Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | Corporate Revolver Guaranty Claims | Impaired. | No (deemed to reject) | 0% |
| 4 | Erickson Group Guaranty Claims | Impaired. | Yes | TBD |
| 5 | Interests in Erickson Group | Impaired. | No (deemed to reject) | 0% |

## 2.    Treatment of ERC Claims and Interests.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| --- | DIP Funding Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | Corporate Revolver Claims | Impaired. | Yes | 49.4% |
| 4 | Interest Rate Swap Claims | Impaired. | Yes | 49.4% |
| 5 | Other Secured Claims[12] | Unimpaired. | No (deemed to accept) | 100% |
| 6 | UMBC Building Construction Loan Claims[13] | Impaired. | Yes | 66.8% |
| 7 | Management Agreement Claims | Impaired. | Yes | 100% |
| 8 | General Unsecured Claims | Impaired. | Yes | ------- |
| 9 | Interests in ERC | Impaired. | No (deemed to reject) | 0% |

_____

12  This Class includes, without limitation, PNC Bank's claim secured by the Corporate Headquarters building and certain letters of credit claims held by PNC Bank.

13  Although Holders of UMBC Building Construction Loan Claims may assert their Claims against more than one Debtor Estate, each such Claim is subject to the single satisfaction rule.

### 3. Treatment of Erickson Construction Claims and Interests.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| --- | DIP Funding Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | Mechanic's Lien Claims | Impaired. | No (deemed to reject) | 0% |
| 4 | Corporate Revolver Claims | Impaired. | Yes | 49.4% |
| 5 | UMBC Building Construction Loan Claims | Impaired. | Yes | 66.8% |
| 6 | Erickson Construction Letters of Credit Claims | Unimpaired. | No (deemed to accept) | 100% |
| 7 | General Unsecured Claims | Impaired. | Yes | ------- |
| 8 | Interests in Erickson Construction | Impaired. | No (deemed to reject) | 0% |

**4.      Treatment of Senior Campus Claims and Interests.**

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| --- | DIP Funding Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | UMBC Building Construction Loan Claims | Impaired. | Yes | 66.8% |
| 4 | Corporate Revolver Guaranty Claim | Impaired | No (deemed to reject) | 0% |
| 5 | General Unsecured Claims | Impaired. | Yes | ------- |
| 6 | Interests in Senior Campus | Impaired. | No (deemed to reject) | 0% |

**5.      Treatment of Ashburn Claims and Interests.**

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| --- | DIP Funding Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | Mechanic's Lien Claims | Unimpaired. | No (deemed to accept) | 100% |
| 4 | Ashburn Construction Loan Claims | Impaired. | Yes | 98.5% |
| 5 | Ashburn Community Loan Claims | Impaired. | Yes | 100% |
| 6 | Ashburn Junior Loan Claims | Impaired. | No (deemed to reject) | 0% |
| 7 | NFP Claims | Impaired. | No (deemed to reject) | 0% |
| 8 | General Unsecured Claims | Impaired. | Yes | -------- |
| 9 | Interests in Ashburn | Impaired. | No (deemed to reject) | 0% |

**6.      Treatment of Columbus Claims and Interests.**

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| --- | DIP Funding Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | Columbus Improvement Bond Claims | Impaired. | Yes | 100% |
| 4 | Mechanic's Lien Claims | Impaired. | Yes | -------- |
| 5 | Columbus Construction Loan Claims | Impaired. | Yes | -------- |
| 6 | Columbus Community Loan Claims | Impaired. | Yes | -------- |
| 7 | Columbus Junior Loan Claims | Impaired. | Yes | -------- |
| 8 | General Unsecured Claims | Impaired. | Yes | -------- |
| 9 | Interests in Columbus | Impaired. | No (deemed to reject) | 0% |

## 7. Treatment of Concord Claims and Interests.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| --- | DIP Funding Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | Mechanic's Lien Claims | Impaired. | Yes | -------- |
| 4 | Concord Construction Loan Claims | Impaired. | Yes | 97.4% |
| 5 | Concord Community Loan Claims | Impaired. | Yes | 100% |
| 6 | Concord Junior Claims | Impaired. | No (deemed to reject) | 0% |
| 7 | Other Secured Claims | Impaired. | Yes | TBD |
| 8 | NFP Claims | Impaired. | No (deemed to reject) | 0% |
| 9 | General Unsecured Claims | Impaired. | Yes | ------- |
| 10 | Interests in Concord | Impaired. | No (deemed to reject) | 0% |

## 8. Treatment of Concord GP Claims and Interests.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| --- | DIP Funding Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | Corporate Revolver Guaranty Claims | Impaired | No (deemed to reject) | 0% |
| 4 | General Unsecured Claims | Impaired. | Yes | ------- |
| 5 | Interests in Concord GP | Impaired. | No (deemed to reject) | 0% |

### 9. Treatment of Dallas Claims and Interests.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| --- | DIP Funding Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | Mechanic's Lien Claims | Impaired. | Yes | -------- |
| 4 | Dallas Construction Loan Claims | Impaired. | Yes | 35.7% |
| 5 | Texas A&M Note Claims | Impaired. | Yes | 82.8% |
| 6 | Dallas Community Loan Claims | Impaired. | Yes | 100% |
| 7 | Dallas Junior Loan Claims | Impaired. | No (deemed to reject) | 0% |
| 8 | NFP Claims | Impaired. | No (deemed to reject) | 0% |
| 9 | General Unsecured Claims | Impaired. | Yes | ------ |
| 10 | Interests in Dallas | Impaired. | No (deemed to reject) | 0% |

## 10.    Treatment of Dallas GP Claims and Interests.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| --- | DIP Funding Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | Corporate Revolver Guaranty Claim | Impaired | No (deemed to reject) | 0% |
| 4 | General Unsecured Claims | Impaired. | Yes | ------- |
| 5 | Interests in Dallas GP | Impaired. | No (deemed to reject) | 0% |

### 11.    Treatment of Houston Claims and Interests.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| --- | DIP Funding Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | Mechanic's Lien Claims | Impaired. | Yes | ------- |
| 4 | Houston Construction Loan Claims | Impaired. | Yes | 16.1% |
| 5 | Houston Community Loan Claims | Impaired. | Yes | 100% |
| 6 | Houston Junior Loan Claims | Impaired. | No (deemed to reject) | 0% |
| 7 | NFP Claims | Impaired. | No (deemed to reject) | 0% |
| 8 | General Unsecured Claims | Impaired. | Yes | ------- |
| 9 | Interests in Houston | Impaired. | No (deemed to reject) | 0% |

## 12. Treatment of Kansas Claims and Interests.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| --- | DIP Funding Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | Mechanic's Lien Claims | Impaired. | Yes | ------- |
| 4 | Kansas Special Assessment Bond Claims | Unimpaired. | No (deemed to accept) | 100% |
| 5 | Kansas Construction Loan Claims | Impaired. | Yes | 4.4% |
| 6 | Kansas Community Loan Claims | Impaired. | Yes | 100% |
| 7 | Kansas Junior Loan Claims | Impaired. | No (deemed to reject) | 0% |
| 8 | NFP Claims | Impaired. | No (deemed to reject) | 0% |
| 9 | General Unsecured Claims | Impaired. | Yes | -------- |
| 10 | Interests in Kansas | Impaired. | No (deemed to reject) | 0% |

### 13.    Treatment of Littleton Claims and Interests.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| --- | DIP Funding Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | Mechanic's Lien Claims | Impaired. | Yes | ------- |
| 4 | Littleton Construction Loan Claims | Impaired. | Yes | 87.5% |
| 5 | Littleton Community Loan Claims | Impaired. | Yes | 100% |
| 6 | Littleton Junior Loan Claims | Impaired. | Yes | 12% |
| 7 | Other Secured Claims | Impaired. | Yes | TBD |
| 8 | NFP Claims | Impaired. | No (deemed to reject) | 0% |
| 9 | General Unsecured Claims | Impaired. | Yes | ------ |
| 10 | Interests in Littleton | Impaired. | No (deemed to reject) | 0% |

EAST\42647303.46

### 14.    Treatment of Novi Claims and Interests.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| --- | DIP Funding Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | Mechanic's Lien Claims | Unimpaired. | Yes | ------- |
| 4 | Novi Construction Loan Claims | Impaired. | Yes | 79.4% |
| 5 | Novi Community Loan Claims | Impaired. | Yes | 100% |
| 6 | Novi Junior Loan Claims | Impaired. | No (deemed to reject) | 0% |
| 7 | Other Secured Claims | Impaired. | Yes | TBD |
| 8 | NFP Claims | Impaired. | No (deemed to reject) | 0% |
| 9 | General Unsecured Claims | Impaired. | Yes | -------- |
| 10 | Interests in Novi | Impaired. | No (deemed to reject) | 0% |

### 15.    Treatment of Warminster Claims and Interests.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | Mechanic's Lien Claims | Impaired. | Yes | -------- |
| 4 | Warminster Community Loan Claims | Impaired. | Yes | 100% |
| 5 | Warminster Purchase Option Deposit Refund Claims | Impaired. | Yes | 100% |
| 6 | Warminster Junior Loan Claims | Impaired. | Yes | 66.2% |
| 7 | Other Secured Claims | Impaired. | Yes | TBD |
| 8 | NFP Claims | Impaired. | No (deemed to reject) | 0% |
| 9 | General Unsecured Claims | Impaired. | Yes | ------- |
| 10 | Interests in Warminster | Impaired. | No (deemed to reject) | 0% |

**16.    Treatment of Warminster GP Claims and Interests.**

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | Corporate Revolver Guaranty Claim | Impaired | No (deemed to reject) | 0% |
| 4 | General Unsecured Claims | Impaired. | Yes | ------- |
| 5 | Interests in Warminster GP | Impaired. | No (deemed to reject) | 0% |

**B.     Treatment of Unclassified Claims under the Plan.**

**1.     Administrative Expense Claims.**

Except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to a different treatment, the Debtors shall pay to each Holder of an Allowed Administrative Expense Claim Cash in an amount equal to such Claim on the Effective Date, or as soon thereafter as is reasonably practicable; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, or liabilities arising under obligations incurred by the Debtors, as Debtors in Possession, in accordance with the Budget (as defined in the DIP Facility), shall be paid by the Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

Except as otherwise agreed by Coastwood, the Debtors shall pay $9 million Cash from the Cash Transaction Proceeds to Coastwood on the Closing Date if the Bankruptcy Court approves the treatment of the Auction Fee as an Allowed Administrative Expense Claim. Further, the Auction Fee shall be treated as a Payment in Full Claim pursuant to Section 6.3.12 of the Plan.

An estimate of the amount of Administrative Expense Claims and a summary of the allocation of the administrative expense costs amongst the Estates is set forth in Exhibit G hereto.

### 2. Compensation and Reimbursement Claims.

All parties seeking payment of Compensation and Reimbursement Claims (i) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is forty-five (45) days after the Effective Date, (ii) shall be paid in full from the Debtors' Cash on hand in such amounts as are allowed by the Bankruptcy Court (a) upon the later of (i) the Effective Date, (ii) the date upon which the order relating to any such Allowed Administrative Expense Claim is entered, or (b) upon such other terms as may be mutually agreed upon between the Holder of such an Allowed Administrative Expense Claim and the Debtors. The Debtors are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Plan Confirmation Date and until the Effective Date in the ordinary course and without the need for Bankruptcy Court approval subject to the requirement that invoices evidencing the amount sought will be distributed to those parties set forth in the Order Pursuant to 11 U.S.C. §§105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals [Dkt. No. 367] and payment shall be governed by such order, except for the provisions related to the 20% holdback.

### 3. Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a different treatment, each Holder of an Allowed Priority Tax Claim shall receive Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim. The Debtors reserve the right to prepay at any time under this option. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due. Any Claims asserted by a governmental unit on account of any penalties shall not be Priority Tax Claims and shall be subordinated to General Unsecured Claims.

### 4. DIP Funding Claims.

On the Effective Date, the Borrowers shall pay Cash to each Holder of an Allowed DIP Funding Claim in an amount equal to such Claim in full and complete satisfaction of such Claim through a credit against the Cash Transaction Proceeds and all obligations and commitments thereunder shall be terminated. Upon payment or satisfaction in full of all obligations under the DIP Facility, any and all liens and security interests securing obligations under the DIP Facility shall be deemed terminated and shall be of no further force and effect. In the event of any sale or disposition of the DIP Facility collateral, ERC Funding Co. LLC, the DIP lender shall have the right to credit bid any or all of the DIP Facility obligations under section 363(k) of the Bankruptcy Code or otherwise.

### C. Treatment of Classified Claims under the Plan.

#### 1. Erickson Group.

##### a. Other Priority Claims (Class 1).

Except to the extent that a Holder of an Allowed Other Priority Claim against Erickson Group's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Erickson Group and the Holder of the Allowed Other Priority Claim.

##### b. Secured Tax Claims (Class 2).

On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of such Allowed Secured Tax Claim is entitled, or (iii) such other Distribution as necessary to satisfy the requirements of the Bankruptcy Code. In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released. The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

##### c. Corporate Revolver Guaranty Claims (Class 3).

Recovery with respect to the Corporate Revolver Guaranty Claims shall be limited solely to Erickson Group's membership interest in ERC.

##### d. Erickson Group Guaranty Claims (Class 4).

The Committee and Lenders with Erickson Group Guaranty Claims (which guarantee claims are expressly reserved and not otherwise waived against Erickson Group) will discuss in good faith the terms under which the Liquidating Creditor Trust (or other third party or entity) may receive the right to prosecute collection claims arising from the GST Loan and distribution of proceeds therefrom. The Debtors make no representation as to the value or collectability of the GST Loan.

##### e. Interests in Erickson Group (Class 5).

Each Holder of an Interest in Erickson Group will not receive any Distribution on account of such Interest. Each such Interest shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors

or Reorganized Debtors on account of such Interests. Each such Interest will be cancelled as of the Effective Date.

2. **ERC.**[14]

a. Other Priority Claims (Class 1).

Except to the extent that a Holder of an Allowed Other Priority Claim against ERC's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between ERC and the Holder of the Allowed Other Priority Claim.

b. Secured Tax Claims (Class 2).

On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Secured Tax Claim is entitled, or (iii) such other Distribution as necessary to satisfy the requirements of the Bankruptcy Code. In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released. The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

c. Corporate Revolver Claims (Class 3).

The Corporate Revolver Claims shall be Allowed as of the Effective Date in the amount set forth in the Proofs of Claim timely filed by Wilmington Trust, as administrative agent for the Holders of the Corporate Revolver Claims or, if no Proofs of Claim are timely filed by Wilmington Trust, as agent, the Proofs of Claim timely filed by the Holders of the Corporate Revolver Claims. Wilmington Trust, as agent, shall be paid, on behalf of the Holders of Allowed Corporate Revolver Claims, on the Effective Date, $96,070,940 in Cash and an interest in the Cedar Crest Receivable (estimated currently to be equal to $3,074,020), which amounts shall be distributed upon receipt by Wilmington Trust, as agent, to such Holders in accordance with the Corporate Revolver loan documents and the Lender Allocation. Upon

---

14  Sovereign Bank ("*Sovereign*") believes that it has claims against ERC in an amount not less than $68,556,045. Sovereign further believes that the funds held by Point View Campus II, LLC are subject to Sovereign's perfected first priority security interest. The Debtors believe there is no merit to Sovereign's position.

receipt of the required payment as set forth in this section, Wilmington Trust, as agent, shall release its lien against the assets of ERC.

### d.      Interest Rate Swap Claims (Class 4).

On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Interest Rate Swap Claim shall receive a *pro rata* distribution of $2,349,000 in Cash and an interest in the Cedar Crest Receivable (estimated currently to be equal to $75,000).

### e.      Other Secured Claims (Class 5).

On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Other Secured Claim shall receive (a) reinstatement of such allowed Other Secured Claim; (b) payment of such Allowed Other Secured Claim in full in cash; or (c) such other treatment as the Company and each Holder shall agree. In the case of the secured claim of the Ann's Choice Trustee based on its liens in ERC's partnership interests in Warminster, those partnership interests shall be transferred to Redwood free and clear of the liens of the Ann's Choice Trustee in exchange for the treatment of other interests held by the Ann's Choice Trustee in these cases set forth in Section VI.C.15 below. The claim of PNC Bank related to a loan in the approximate amount of $1.2 million and secured by a first priority security interest in and mortgage on the Corporate Headquarters shall be Allowed as of the Effective Date and will be paid in full in Cash from the TIP on the Effective Date. The claims of PNC Bank related to letters of credit issued by PNC Bank for the benefit of ERC and its subsidiaries and affiliates shall be Allowed as of the Effective Date and shall continue to be secured by certificates of deposit pledged to PNC, including those letters of credit issued under the Letter of Credit Facility described in the Order Authorizing Debtors to Continue Their Liability and Other Insurance Programs and to Enter Into Financing Agreements Related Thereto entered on or about January 25, 2010, which order shall continue in full force and effect, unaffected by the Plan and the transactions contemplated therein.

### f.      UMBC Building Construction Loan Claims (Class 6).

The UMBC Building Construction Loan Claims shall be Allowed as of the Effective Date in the amount set forth in the Proofs of Claim timely filed by the Holders of the UMBC Building Construction Loan Claims or, if no Proof of Claim is timely filed by a Holder, the Proof of Claim timely filed by M&T Bank, as Agent for the Holders of the UMBC Building Construction Loan Claims. On the Effective Date or as soon thereafter as is reasonably practicable based on consultations among the Debtors and M&T Bank in its capacity as Agent, each Holder of an Allowed UMBC Building Construction Loan Claim shall (i) receive the property securing such Claim or (ii) the Debtors shall dispose of the property securing such Claim in a manner agreed upon by M&T Bank in its capacity as Agent, in full satisfaction of the Holder's Allowed Claim. To the extent that (y) Redwood has obtained a lease (the "***Redwood Lease***") in connection with the UMBC Building pursuant to the Definitive Agreement to which M&T Bank, in its capacity as Agent, has consented in writing, and the Debtors have assumed and assigned to M&T Bank the ground sublease, the Redwood Lease, if applicable, and any other lease relating to the UMBC Building ("***Additional Leases***") and any building improvements that M&T Bank in its capacity as Agent specifically requests that the Debtors

assume and assign to M&T Bank pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code prior to such transfer or other disposition of such property pursuant to clauses (i) or (ii) above; then (z) the ground sublease, the Redwood Lease, Additional Leases, and any so assumed, transferred and assigned shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such ground sublease (including those of the type described in sections 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment. Notwithstanding anything to the contrary in this Plan or any Order of the Court, the property securing the UMBC Building Construction Loan Claim shall not be transferred to the Liquidating Creditor Trust.

g. <u>Management Agreement Claims (Class 7).</u>

Each Holder of an Allowed Management Agreement Claim shall receive recovery in the form of a New Management Agreement.

h. <u>General Unsecured Claims (Class 8).</u>

This Class consists of three subclasses, as discussed more fully in Section V.5 hereof and Section 6.4 of the Plan. Each Holder of an Allowed General Unsecured Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust according to the subclassification of the Allowed General Unsecured Claim as set forth in Section V.5 and Section 6.4 of the Plan.

i. <u>Interests in ERC (Class 9).</u>

No Holder of an Interest in ERC will receive any Distribution on account of such Interest. Each such Interest shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Interests, on or after the Effective Date. Such Interests shall be cancelled.

**3. Erickson Construction.**

a. <u>Other Priority Claims (Class 1).</u>

Except to the extent that a Holder of an Allowed Other Priority Claim against Erickson Construction's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Erickson Construction and the Holder of the Allowed Other Priority Claim.

b. <u>Secured Tax Claims (Class 2).</u>

On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed

Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Secured Tax Claim is entitled, or (iii) such other Distribution as necessary to satisfy the requirements of the Bankruptcy Code. In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released. The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

c.      Mechanic's Lien Claims (Class 3).

Except to the extent a Holder of an Allowed Mechanic's Lien Claim agrees to less favorable treatment, each Holder of an Allowed Mechanic's Lien Claim shall receive the Allowed amount of such Claim in Cash in full satisfaction of such Claim on the Distribution Record Date if the Holder of the Allowed Mechanic's Lien Claim has a first priority security interest in the underlying collateral pursuant to applicable state law. Otherwise, the Holder of an Allowed Mechanic's Lien Claim shall receive a Distribution, if any, relative to its priority under applicable state law in full satisfaction of such Claim. Such Claims shall be satisfied through funds available at the various Campuses that the Claims are asserted against. To the extent Allowed Mechanic's Lien Claims are not paid in full, the unpaid portions of the Allowed Mechanic's Lien Claims will be treated as General Unsecured Claims and receive a Tier A Trade Class interest in the Liquidating Creditor Trust and receive distributions of the Trade Dividend pursuant to Section 6.4 of the Plan.

d.      Corporate Revolver Claims (Class 4).

The Corporate Revolver Claims shall be Allowed as of the Effective Date in the amount set forth in the Proofs of Claim timely filed by Wilmington Trust, as administrative agent for the Holders of the Corporate Revolver Claims or, if no Proofs of Claim are timely filed by Wilmington Trust, as agent, the Proofs of Claim timely filed by the Holders of the Corporate Revolver Claims. Wilmington Trust, as agent, shall be paid, on behalf of the Holders of Allowed Corporate Revolver Claims, on the Effective Date, $96,070,940 in Cash and an interest in the Cedar Crest Receivable (estimated currently to be equal to $3,074,020), which amounts shall be distributed upon receipt by Wilmington Trust, as agent, to such Holders in accordance with the Corporate Revolver loan documents and the Lender Allocation. Upon receipt of the required payment as set forth in this Section, Wilmington Trust, as agent, shall release its lien against the assets of ERC.

e.      UMBC Building Construction Loan Claims (Class 5).

The UMBC Building Construction Loan Claims shall be Allowed as of the Effective Date in the amount set forth in the Proofs of Claim timely filed by the Holders of the UMBC Building Construction Loan Claims or, if no Proof of Claim is timely filed by a Holder, the Proof of Claim timely filed by M&T Bank, as Agent for the Holders of the UMBC Building Construction Loan Claims. On the Effective Date or as soon thereafter as is reasonably practicable based on consultations among the Debtors and M&T Bank in its capacity as Agent, each Holder of an Allowed UMBC Building Construction Loan Claim shall (i) receive the property securing such Claim or (ii) the Debtors shall dispose of the property securing such

Claim in a manner agreed upon by M&T Bank in its capacity as Agent, in full satisfaction of the Holder's Allowed Claim.  To the extent that (y) Redwood has obtained a lease (the "**Redwood Lease**") in connection with the UMBC Building pursuant to the Definitive Agreement to which M&T Bank, in its capacity as Agent, has consented  in writing, and the Debtors have assumed and assigned to M&T Bank the ground sublease, the Redwood Lease, if applicable, and any other lease relating to the UMBC Building ("**Additional Leases**") and any building improvements that M&T Bank in its capacity as Agent specifically requests that the Debtors assume and assign to M&T Bank pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code prior to such transfer or other disposition of such property pursuant to clauses (i) or (ii) above; then (z) the ground sublease, the Redwood Lease, Additional Leases, and any so assumed, transferred and assigned shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such ground sublease (including those of the type described in sections 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment. Notwithstanding anything to the contrary in this Plan or any Order of the Court, the property securing the UMBC Building Construction Loan Claim shall not be transferred to the Liquidating Creditor Trust.

f.      Erickson Construction Letters of Credit Claims (Class 6).

The claims of PNC Bank related to Erickson Construction Letters of Credit shall be allowed and shall continue to be secured by certificates of deposit pledged to PNC, including those letters of credit issued under the Letter of Credit Facility described in the Order Authorizing Debtors to Continue Their Liability and Other Insurance Programs and to Enter Into Financing Agreements Related Thereto entered on or about January 25, 2010, which order shall continue in full force and effect, unaffected by the Plan and the transactions contemplated therein.

g.      General Unsecured Claims (Class 7).

This Class consists of three subclasses, as discussed more fully in Section V.5 hereof and Section 6.4 of the Plan.  Each Holder of an Allowed General Unsecured Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust according to the subclassification of the Allowed General Unsecured Claim as set forth in Section V.5 and Section 6.4 of the Plan.

h.      Interests in Erickson Construction (Class 8).

Each Holder of an Interest in Erickson Construction shall not receive or retain any interest or property or otherwise receive a Distribution on account of the Holder's Interest.  Such Interests shall be cancelled.

4.      **Senior Campus.**

a.      Other Priority Claims (Class 1).

Except to the extent that a Holder of an Allowed Other Priority Claim against Senior Campus Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an

amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Senior Campus and the Holder of the Allowed Other Priority Claim.

### b. Secured Tax Claims (Class 2).

On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Secured Tax Claim is entitled, or (iii) such other Distribution as necessary to satisfy the requirements of the Bankruptcy Code. In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released. The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

### c. UMBC Building Construction Loan Claims (Class 3).

The UMBC Building Construction Loan Claims shall be Allowed as of the Effective Date in the amount set forth in the Proofs of Claim timely filed by the Holders of the UMBC Building Construction Loan Claims or, if no Proof of Claim is timely filed by a Holder, the Proof of Claim timely filed by M&T Bank, as Agent for the Holders of the UMBC Building Construction Loan Claims. On the Effective Date or as soon thereafter as is reasonably practicable based on consultations among the Debtors and M&T Bank in its capacity as Agent, each Holder of an Allowed UMBC Building Construction Loan Claim shall (i) receive the property securing such Claim or (ii) the Debtors shall dispose of the property securing such Claim in a manner agreed upon by M&T Bank in its capacity as Agent, in full satisfaction of the Holder's Allowed Claim. To the extent that (y) Redwood has obtained a lease (the "***Redwood Lease***") in connection with the UMBC Building pursuant to the Definitive Agreement to which M&T Bank, in its capacity as Agent, has consented in writing, and the Debtors have assumed and assigned to M&T Bank the ground sublease, the Redwood Lease, if applicable, and any other lease relating to the UMBC Building ("***Additional Leases***") and any building improvements that M&T Bank in its capacity as Agent specifically requests that the Debtors assume and assign to M&T Bank pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code prior to such transfer or other disposition of such property pursuant to clauses (i) or (ii) above; then (z) the ground sublease, the Redwood Lease, Additional Leases, and any so assumed, transferred and assigned shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such ground sublease (including those of the type described in sections 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment. Notwithstanding anything to the contrary in this Plan or any Order of the Court, the property securing the UMBC Building Construction Loan Claim shall not be transferred to the Liquidating Creditor Trust.

d.      <u>Corporate Revolver Guaranty Claims (Class 4).</u>

Each Holder of an Allowed Corporate Revolver Guaranty Claim against Senior Campus' Estate will not receive any Distribution on account of such Claim.

e.      <u>General Unsecured Claims (Class 5).</u>

This Class consists of three subclasses, as discussed more fully in Section V.5 hereof and Section 6.4 of the Plan. Each Holder of an Allowed General Unsecured Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust according to the subclassification of the Allowed General Unsecured Claim as set forth in Section V.5 and Section 6.4 of the Plan.

f.      <u>Interests in Senior Campus (Class 6).</u>

Each Holder of an Interest in Senior Campus will not receive any Distribution on account of such Interest. Each such Interest shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Interests.

**5.      Ashburn.**

a.      <u>Other Priority Claims (Class 1).</u>

Except to the extent that a Holder of an Allowed Other Priority Claim against Ashburn's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Ashburn and the Holder of the Allowed Other Priority Claim.

b.      <u>Secured Tax Claims (Class 2).</u>

On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Secured Tax Claim is entitled, or (iii) such other Distribution as necessary to satisfy the requirements of the Bankruptcy Code. In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released. The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

c.  Mechanic's Lien Claims (Class 3).

Except to the extent a Holder of an Allowed Mechanic's Lien Claim agrees to less favorable treatment, each Holder of an Allowed Mechanic's Lien Claim shall receive the Allowed amount of such Claim in Cash in full satisfaction of such Claim on the Distribution Record Date if the Holder of the Allowed Mechanic's Lien Claim has a first priority security interest in the underlying collateral pursuant to applicable state law.  Otherwise, the Holder of an Allowed Mechanic's Lien Claim shall receive a Distribution, if any, relative to its priority under applicable state law in full satisfaction of such Claim.  To the extent Allowed Mechanic's Lien Claims are not paid in full, the unpaid portions of the Allowed Mechanic's Lien Claims will be treated as General Unsecured Claims and receive a Tier A Trade Class interest in the Liquidating Creditor Trust and receive distributions of the Trade Dividend pursuant to Section 6.4 of the Plan.

d.  Ashburn Construction Loan Claims (Class 4).

The Ashburn Construction Loan Claims shall be Allowed as of the Effective Date in the amount set forth in the Proof of Claim timely filed by the PNC Bank, National Association, as collateral and administrative agent for the Holders of the Ashburn Construction Loan Claims, or if no Proof of Claim is timely filed by such Agent, the Proofs of Claim timely filed by Holders of the Ashburn Construction Loan Claims.  PNC Bank, National Association shall be paid, on behalf of the Holders of Allowed Ashburn Construction Loan Claims, on the Effective Date,  $60,626,000 in Cash and an interest in the Cedar Crest Receivable (estimated currently to be equal to $732,000), which amounts shall be distributed by PNC Bank, as agent, to the Holders in accordance with the Ashburn Construction Loan documents and the Lender Allocation.  Upon receipt of the required payment as set forth in this Section, PNC Bank, as agent, shall release its lien against the assets of Ashburn.

e.  Ashburn Community Loan Claims (Class 5).

The Ashburn Community Loan shall be amended and restated at the outstanding balance amount.  Redwood Ashburn shall assume the Ashburn Community Loan, as modified.

f.  Ashburn Junior Loan Claims (Class 6).

No Holder of an Allowed Ashburn Junior Loan Claim will receive any Distribution on account of such Claim.  Each Holder of such Claim shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Claim, on or after the Effective Date.  The Holders of such Claims may receive a participation interest in the recoveries of the Liquidating Creditor Trust (subject to the requirements of Section 6.4 of the Plan, including but not limited to section 6.4.8) according to the subclassifications set forth in Section V.5 and Section 6.4 of the Plan.  On the Effective Date, the Acquisition Companies shall receive title to the Campus free and clear of any and all claims and encumbrances, subject to the payments set forth in the Plan.

g.     NFP Claims (Class 7).

NFP Claims shall be released and discharged as of the Effective Date. The applicable Reorganized Debtor and NFP shall enter into new agreements as more fully set forth in the Plan.

h.     General Unsecured Claims (Class 8).

This Class consists of three subclasses, as discussed more fully in Section V.5 hereof and Section 6.4 of the Plan. Each Holder of an Allowed General Unsecured Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust according to the subclassification of the Allowed General Unsecured Claim as set forth in Section V.5 and Section 6.4 of the Plan.

i.     Interests in Ashburn (Class 9).

Each Holder of an Interest in Ashburn will not receive any Distribution on account of such Interest. Each such Interest shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Interests.

6.     **Columbus.**

a.     Other Priority Claims (Class 1).

Except to the extent that a Holder of an Allowed Other Priority Claim against Columbus' Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Columbus and the Holder of the Allowed Other Priority Claim.

b.     Secured Tax Claims (Class 2).

On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Secured Tax Claim is entitled, or (iii) such other distribution as necessary to satisfy the requirements of the Bankruptcy Code. In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released. The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

c.   Columbus Improvement Bond Claims (Class 3).

The Columbus Debtor is surrendering the Hickory Chase Campus to the Holders of the Columbus Construction Loan Claims by means of a deed in lieu of foreclosure or the completion of an existing foreclosure process.  As a result of this surrender, the Columbus Debtor does not anticipate making a Distribution on any Allowed Claims in Class 3 through Class 9 with respect to the Columbus Debtor.  To the extent there is such a Distribution, each Holder of an Allowed Columbus Improvement Bond Claim shall receive a Distribution relative to the priority of its security interest.  The first priority tax lien securing the Columbus Improvement Bond Claim shall remain on the Hickory Chase Campus and be unaffected by this bankruptcy case.

d.   Mechanic's Lien Claims (Class 4).

The Columbus Debtor is surrendering the Hickory Chase Campus to the Holders of the Columbus Construction Loan Claims by means of a deed in lieu of foreclosure or the completion of an existing foreclosure process.  As a result of this surrender, the Columbus Debtor does not anticipate making a Distribution on any Allowed Claims in Class 3 through Class 9 with respect to the Columbus Debtor.  To the extent there is such a Distribution, each Holder of an Allowed Mechanic's Lien Claim shall receive a Distribution relative to the priority of its security interest.  Any liens securing Claims in this Class shall remain on the Hickory Chase Campus in their current relative priority and be unaffected by this bankruptcy case.

e.   Columbus Construction Loan Claims (Class 5).

The Columbus Debtor is surrendering the Hickory Chase Campus to the Holders of the Columbus Construction Loan Claims by means of a deed in lieu of foreclosure or the completion of an existing foreclosure process.  As a result of this surrender, the Columbus Debtor does not anticipate making a Distribution on any Allowed Claims in Class 3 through Class 9 with respect to the Columbus Debtor.  To the extent there is such a Distribution, each Holder of an Allowed Columbus Construction Loan Claim shall receive a Distribution relative to the priority of its security interest. Any liens securing Claims in this Class shall remain on the Hickory Chase Campus in their current relative priority and be unaffected by this bankruptcy case.  The Holders of Columbus Construction Loan Claims shall retain their deficiency claims and participate in the Liquidating Creditor Trust, as provided in Section 6.4 of the Plan and in the Trust documents.

f.   Columbus Community Loan Claims (Class 6).

The Columbus Debtor is surrendering the Hickory Chase Campus to the Holders of the Columbus Construction Loan Claims by means of a deed in lieu of foreclosure or the completion of an existing foreclosure process.  As a result of this surrender, the Columbus Debtor does not anticipate making a Distribution on any Allowed Claims in Class 3 through Class 9 with respect to the Columbus Debtor.  To the extent there is such a Distribution, each Holder of an Allowed Columbus Community Loan Claim shall receive a Distribution relative to the priority of its security interest. Any liens securing Claims in this Class shall remain on the Hickory Chase Campus in their current relative priority and be unaffected by this bankruptcy case.

g.    Columbus Junior Loan Claims (Class 7).

The Columbus Debtor is surrendering the Hickory Chase Campus to the Holders of the Columbus Construction Loan Claims by means of a deed in lieu of foreclosure or the completion of an existing foreclosure process.  As a result of this surrender, the Columbus Debtor does not anticipate making a Distribution on any Allowed Claims in Class 3 through Class 9 with respect to the Columbus Debtor.  To the extent there is such a Distribution, each Holder of an Allowed Columbus Junior Loan Claim shall receive a *pro rata* Distribution relative to the priority of its security interest.. Any liens securing Claims in this Class shall remain on the Hickory Chase Campus in their current relative priority and be unaffected by this bankruptcy case.

h.    General Unsecured Claims (Class 8).

This Class consists of three subclasses, as discussed more fully in Section V.5 hereof and Section 6.4 of the Plan.  Each Holder of an Allowed General Unsecured Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust according to the subclassification of the Allowed General Unsecured Claim as set forth in Section V.5 and Section 6.4 of the Plan.

i.    Interests in Columbus (Class 9).

Each Holder of an Interest in Columbus will not receive any Distribution on account of such Interest.  Each such Interest shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Interests.  Such Interests shall be cancelled.

**7.    Concord.**

a.    Other Priority Claims (Class 1).

Except to the extent that a Holder of an Allowed Other Priority Claim against Concord's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Concord and the Holder of the Allowed Other Priority Claim.

b.    Secured Tax Claims (Class 2).

On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Secured Tax Claim is entitled, or (iii) such other Distribution as necessary to satisfy the requirements of the Bankruptcy Code.  In the event the

Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released. The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid, pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

c.     Mechanic's Lien Claims (Class 3).

Except to the extent a Holder of an Allowed Mechanic's Lien Claim agrees to less favorable treatment, each Holder of an Allowed Mechanic's Lien Claim shall receive the Allowed amount of such Claim in Cash in full satisfaction of such Claim on the Distribution Record Date if the Holder of the Allowed Mechanic's Lien Claim has a first priority security interest in the underlying collateral pursuant to applicable state law. Otherwise, the Holder of an Allowed Mechanic's Lien Claim shall receive a Distribution, if any, relative to its priority under applicable state law in full satisfaction of such Claim. To the extent Allowed Mechanic's Lien Claims are not paid in full, the unpaid portions of the Allowed Mechanic's Lien Claims will be treated as General Unsecured Claims and receive a Tier A Trade Class interest in the Liquidating Creditor Trust and receive distributions of the Trade Dividend pursuant to Section 6.4 of the Plan.

d.     Concord Construction Loan Claims (Class 4).

The Concord Construction Loan Claims, including those Claims on account of the Concord Letters of Credit, shall be Allowed as of the Effective Date in the amount set forth in the Proof of Claim timely filed by the PNC Bank, National Association, as collateral and administrative agent for the Holders of the Concord Construction Loan Claims, or if no Proof of Claim is timely filed by such Agent, the Proofs of Claim timely filed by Holders of the Concord Construction Loan Claims. PNC Bank, National Association shall be paid, on behalf of the Holders of Allowed Concord Construction Loan Claims, on the Effective Date, $62,757,000 in Cash and an interest in the Cedar Crest Receivable (estimated currently to be equal to $637,000), which amounts shall be distributed by PNC Bank, as agent, to the Holders in accordance with the Concord Construction Loan documents and the Lender Allocation. Upon receipt of the required payment as set forth in this Section and return of the Concord Letters of Credit, undrawn, PNC Bank, as agent, shall release its lien against the assets of Concord.

e.     Concord Community Loan Claims (Class 5).

The Concord Community Loan shall be amended and restated at the outstanding balance amount. Redwood Concord shall assume the Concord Community Loan, as modified.

f.     Concord Junior Loan Claims (Class 6).

No Holder of an Allowed Concord Junior Loan Claim will receive any Distribution on account of such Claim. Each Holder of such Claim shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Claim, on or after the Effective Date. The Holders of such Claims may receive a participation interest in the recoveries of the Liquidating

Creditor Trust (subject to the requirements of Section 6.4 of the Plan, including but not limited to section 6.4.8) according to the subclassifications set forth in Section V.5 and Section 6.4 of the Plan. On the Effective Date, the Acquisition Companies shall receive title to the Campus free and clear of any and all claims and encumbrances.

g. <u>Other Secured Claims (Class 7)</u>.

On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Other Secured Claim shall receive (a) reinstatement of such allowed Other Secured Claim; (b) payment of such Allowed Other Secured Claim in full in cash; or (c) such other treatment as the Company and each Holder shall agree.

h. <u>NFP Claims (Class 8)</u>.

NFP Claims shall be released and discharged as of the Effective Date. The applicable Reorganized Debtor and NFP shall enter into new agreements as more fully set forth in the Plan.

i. <u>General Unsecured Claims (Class 9)</u>.

This Class consists of three subclasses, as discussed more fully in Section V.5 hereof and Section 6.4 of the Plan. Each Holder of an Allowed General Unsecured Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust according to the subclassification of the Allowed General Unsecured Claim as set forth in Section V.5 and Section 6.4 of the Plan.

j. <u>Interests in Concord (Class 10)</u>.

Each Holder of an Interest in Concord will not receive any Distribution on account of such Interest. Each such Interest shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Interests.

**8. Concord GP.**

a. <u>Other Priority Claims (Class 1)</u>.

Except to the extent that a Holder of an Allowed Other Priority Claim against Concord GP's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Concord GP and the Holder of the Allowed Other Priority Claim.

b. <u>Secured Tax Claims (Class 2)</u>.

On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized

Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Secured Tax Claim is entitled, or (iii) such other Distribution as necessary to satisfy the requirements of the Bankruptcy Code. In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released. The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

        c.        <u>Corporate Revolver Guaranty Claims (Class 3).</u>

Each Holder of an Allowed Corporate Revolver Guaranty Claim against Concord GP's Estate will not receive any Distribution on account of such Claim.

        d.        <u>General Unsecured Claims (Class 4).</u>

This Class consists of three subclasses, as discussed more fully in Section V.5 hereof and Section 6.4 of the Plan. Each Holder of an Allowed General Unsecured Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust according to the subclassification of the Allowed General Unsecured Claim as set forth in Section V.5 and Section 6.4 of the Plan.

        e.        <u>Interests in Concord GP (Class 5).</u>

Each Holder of an Interest in Concord GP will not receive any Distribution on account of such Interest. Each such Interest shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Interests.

**9.      Dallas.**

        a.        <u>Other Priority Claims (Class 1).</u>

Except to the extent that a Holder of an Allowed Other Priority Claim against Dallas' Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Dallas and the Holder of the Allowed Other Priority Claim.

        b.        <u>Secured Tax Claims (Class 2).</u>

On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed

Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Secured Tax Claim is entitled, or (iii) such other distribution as necessary to satisfy the requirements of the Bankruptcy Code. In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released. The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid, pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

c.     <u>Mechanic's Lien Claims (Class 3).</u>

Except to the extent a Holder of an Allowed Mechanic's Lien Claim agrees to less favorable treatment, each Holder of an Allowed Mechanic's Lien Claim shall receive the Allowed amount of such Claim in Cash in full satisfaction of such Claim on the Distribution Record Date if the Holder of the Allowed Mechanic's Lien Claim has a first priority security interest in the underlying collateral pursuant to applicable state law. Otherwise, the Holder of an Allowed Mechanic's Lien Claim shall receive a Distribution, if any, relative to its priority under applicable state law in full satisfaction of such Claim. To the extent Allowed Mechanic's Lien Claims are not paid in full, the unpaid portions of the Allowed Mechanic's Lien Claims will be treated as General Unsecured Claims and receive a Tier A Trade Class interest in the Liquidating Creditor Trust and receive distributions of the Trade Dividend pursuant to Section 6.4 of the Plan.

d.     <u>Dallas Construction Loan Claims (Class 4).</u>

The Dallas Construction Loan Claims shall be allowed as of the Effective Date in the amount set forth in the Proofs of Claim timely filed by the Holders of the Dallas Construction Loan Claim or, if no Proof of Claim is timely filed by a Holder, the Proof of Claim filed by Bank of America, National Association, as collateral and administrative agent for the Holders of the Dallas Construction Loan Claim. Bank of America, National Association shall be paid, on behalf of the Holders of Allowed Dallas Construction Loan Claim, on the Effective Date, $19,496,000 in Cash (including $2,000,000 in Cash from the TIP) and an interest in the Cedar Crest Receivable (estimated currently to be equal to $282,000), which amounts shall be distributed by Bank of America, National Association, as agent, to the Holders in accordance with the Dallas Construction Loan documents and the Lender Allocation. In addition, the holder of the Dallas Construction Loan Claim shall receive 84.4% of the gross recovery realized from any 505 action brought against the ad valorem taxing authority/ies with respect to the Dallas Campus real property and shall be paid those proceeds either (i) directly from the ad valorem taxing authorities or (ii) from the Debtor or its successor, within ten business days of its receipt of the taxing authorities' payment. All amounts received by Bank of America, National Association, pursuant to this section shall be distributed by Bank of America, National Association, as agent, to the Holders in accordance with the Dallas Construction Loan documents and the Lender Allocation. Upon receipt of the required payment as set forth in this Section, Bank of America, as agent, shall release its lien against the assets of Dallas, and Texas A&M as Holder, shall release their liens against the assets of Dallas.

e.    Texas A&M Note Claims (Class 5).

The Texas A&M Note Claim shall be allowed as of the Effective Date in the amount set forth in the Proof of Claim timely filed by the Holder(s) of the Texas A&M Note Claim. Each Holder of an Allowed Texas A&M Note Claim shall receive Cash in the amount of $3,440,000 on the Effective Date. In addition, the Holder(s) of the Texas A&M Note Claim shall receive 15.6% of the gross recovery realized from any Bankruptcy Code section 505 action brought against the ad valorem taxing authorities with respect to the Dallas Campus real property. The Holder(s) of the Texas A&M Note Claim shall be paid those proceeds either (i) directly from the ad valorem taxing authority/ies or (ii) from the Debtor or its successor, within ten business days of its receipt of the taxing authorities' payment.

f.    Dallas Community Loan Claims (Class 6).

The Dallas Community Loan shall be amended and restated at the outstanding balance amount. Redwood Dallas shall assume the Dallas Community Loan, as modified.

g.    Dallas Junior Loan Claims (Class 7).

Each Holder of an Allowed Dallas Junior Loan Claim shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Claim. Each Holder of an Allowed Dallas Junior Loan Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust on account of the Holder's Mezzanine Claim as set forth in Section 6.4 of the Plan. All documents evidencing or securing the Dallas Junior Loan shall be extinguished as of the Effective Date. On the Effective Date and pursuant to the terms of the Morgan Stanley Settlement, MSRESS III Dallas Campus, LP shall convey to the Acquisition Companies and the Acquisition Companies shall receive title to the Campus free and clear of any and all claims and encumbrances, subject to the payments set forth in the Plan.

h.    NFP Claims (Class 8).

NFP Claims shall be released and discharged as of the Effective Date. The applicable Reorganized Debtor and NFP shall enter into new agreements as more fully set forth in the Plan.

i.    General Unsecured Claims (Class 9).

This Class consists of three subclasses, as discussed more fully in Section V.5 hereof and Section 6.4 of the Plan. Each Holder of an Allowed General Unsecured Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust according to the subclassification of the Allowed General Unsecured Claim as set forth in Section V.5 and Section 6.4 of the Plan.

j.    Interests in Dallas (Class 10).

Each Holder of an Interest in Dallas will not receive any Distribution on

account of such Interest. Each such Interest shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Interests.

### 10. Dallas GP.

#### a. Other Priority Claims (Class 1).

Except to the extent that a Holder of an Allowed Other Priority Claim against Dallas GP's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Dallas GP and the Holder of the Allowed Other Priority Claim.

#### b. Secured Tax Claims (Class 2).

On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of such Allowed Secured Tax Claim is entitled, or (iii) such other Distribution as necessary to satisfy the requirements of the Bankruptcy Code. In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released. The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

#### c. Corporate Revolver Guaranty Claims (Class 3).

Each Holder of an Allowed Corporate Revolver Guaranty Claim against Dallas GP's Estate will not receive any Distribution on account of such Claim.

#### d. General Unsecured Claims (Class 4).

This Class consists of three subclasses, as discussed more fully in Section V.5 hereof and Section 6.4 of the Plan. Each Holder of an Allowed General Unsecured Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust according to the subclassification of the Allowed General Unsecured Claim as set forth in Section V.5 and Section 6.4 of the Plan.

#### e. Interests in Dallas GP (Class 5).

Each Holder of an Interest in Dallas GP will not receive any Distribution on account of such Interest. Each such Interest shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or

Reorganized Debtors on account of such Interests.

### 11. Houston.

a.    Other Priority Claims (Class 1).

Except to the extent that a Holder of an Allowed Other Priority Claim against Houston's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Houston and the Holder of the Allowed Other Priority Claim.

b.    Secured Tax Claims (Class 2).

On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Secured Tax Claim is entitled, or (iii) such other Distribution as necessary to satisfy the requirements of the Bankruptcy Code. In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released. The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid, pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

c.    Mechanic's Lien Claims (Class 3).

Except to the extent a Holder of an Allowed Mechanic's Lien Claim agrees to less favorable treatment, each Holder of an Allowed Mechanic's Lien Claim shall receive the Allowed amount of such Claim in Cash in full satisfaction of such Claim on the Distribution Record Date if the Holder of the Allowed Mechanic's Lien Claim has a first priority security interest in the underlying collateral pursuant to applicable state law. Otherwise, the Holder of an Allowed Mechanic's Lien Claim shall receive a Distribution, if any, relative to its priority under applicable state law in full satisfaction of such Claim. To the extent Allowed Mechanic's Lien Claims are not paid in full, the unpaid portions of the Allowed Mechanic's Lien Claims will be treated as General Unsecured Claims and receive a Tier A Trade Class interest in the Liquidating Creditor Trust and receive distributions of the Trade Dividend pursuant to Section 6.4 of the Plan.

d.    Houston Construction Loan Claims (Class 4).

The Houston Construction Loan Claims shall be Allowed as against Houston and Erickson Group as of the Effective Date in the amount set forth in the Proof of Claim timely filed by the PNC Bank, National Association, as collateral and administrative agent

for the Holders of the Houston Construction Loan Claims, or if no Proof of Claim is timely filed by such Agent, the Proofs of Claim timely filed by Holders of the Houston Construction Loan Claims. PNC Bank, National Association shall be paid, on behalf of the Holders of Allowed Houston Construction Loan Claims, on the Effective Date, $7,041,000 in Cash and an interest in the Cedar Crest Receivable (estimated currently to be equal to $135,000), which amounts shall be distributed by PNC Bank, as agent, to the Holders in accordance with the Houston Construction Loan documents and the Lender Allocation. Upon receipt of the required payment as set forth in this Section, PNC Bank, as agent, shall release its lien against the assets of Houston.

e.     Houston Community Loan Claims (Class 5).

The Houston Community Loan shall be amended and restated at the outstanding balance amount. Redwood Houston shall assume the Houston Community Loan, as modified.

f.     Houston Junior Loan Claims (Class 6).

Each Holder of an Allowed Houston Junior Loan Claim will not receive any Distribution on account of such Claim. All documents evidencing or securing the Houston Junior Loan shall be extinguished as of the Effective Date. On the Effective Date, the Acquisition Companies shall receive title to the Campus free and clear of any and all claims and encumbrances, subject to the payments set forth in the Plan.

g.     NFP Claims (Class 7).

NFP Claims shall be released and discharged as of the Effective Date. The applicable Reorganized Debtor and NFP shall enter into new agreements as more fully set forth in the Plan.

h.     General Unsecured Claims (Class 8).

This Class consists of three subclasses, as discussed more fully in Section V.5 hereof and Section 6.4 of the Plan. Each Holder of an Allowed General Unsecured Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust according to the subclassification of the Allowed General Unsecured Claim as set forth in Section V.5 and Section 6.4 of the Plan.

i.     Interests in Houston (Class 9).

Each Holder of an Interest in Houston will not receive any Distribution on account of such Interest. Each such Interest shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Interests.

## 12. Kansas.

### a. Other Priority Claims (Class 1).

Except to the extent that a Holder of an Allowed Other Priority Claim against Kansas' Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Kansas and the Holder of the Allowed Other Priority Claim.

### b. Secured Tax Claims (Class 2).

On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Secured Tax Claim is entitled, or (iii) such other distribution as necessary to satisfy the requirements of the Bankruptcy Code. In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released. The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid, pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

### c. Mechanic's Lien Claims (Class 3).

Except to the extent a Holder of an Allowed Mechanic's Lien Claim agrees to less favorable treatment, each Holder of an Allowed Mechanic's Lien Claim shall receive the Allowed amount of such Claim in Cash in full satisfaction of such Claim on the Distribution Record Date if the Holder of the Allowed Mechanic's Lien Claim has a first priority security interest in the underlying collateral pursuant to applicable state law. Otherwise, the Holder of an Allowed Mechanic's Lien Claim shall receive a Distribution, if any, relative to its priority under applicable state law in full satisfaction of such Claim. To the extent Allowed Mechanic's Lien Claims are not paid in full, the unpaid portions of the Allowed Mechanic's Lien Claims will be treated as General Unsecured Claims and receive a Tier A Trade Class interest in the Liquidating Creditor Trust and receive distributions of the Trade Dividend pursuant to Section 6.4 of the Plan.

### d. Kansas Special Assessment Bond Claims (Class 4).

Redwood-Kansas will assume Kansas' obligations under the Kansas Special Assessment Bonds.

e.    Kansas Construction Loan Claims (Class 5).

The Kansas Construction Loan Claims shall be Allowed as of the Effective Date in the amount set forth in the Proofs of Claim timely filed by the Holders of the Kansas Construction Loan Claims or, if no Proof of Claim is timely filed by a Holder, the Proof of Claim timely filed by PNC Bank, National Association, as collateral and administrative agent for the Holders of the Kansas Construction Loan Claims. PNC Bank, National Association shall be paid, on behalf of the Holders of Allowed Kansas Construction Loan Claims, on the Effective Date, $2,778,000 in Cash from the TIP, which amount shall be distributed by PNC Bank, as agent, to the Holders in accordance with the Kansas Construction Loan documents and the Lender Allocation. The Holders of Kansas Construction Loan Claims shall retain their deficiency claims and participate in the Liquidating Creditor Trust, as provided below and in the Trust documents. Upon receipt of the required payment as set forth in this Section, PNC Bank, as agent, shall release its lien against the assets of Kansas.

f.    Kansas Community Loan Claims (Class 6).

The Kansas Community Loan shall be reinstated in full. Redwood Kansas shall assume the Kansas Community Loan.

g.    Kansas Junior Loan Claims (Class 7).

Each Holder of an Allowed Kansas Junior Loan Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust on account of the Holder's Mezzanine Claim as set forth in Section 6.4 of the Plan. On the Effective Date and pursuant to the terms of the Morgan Stanley Settlement, MSRESS III Kansas Campus, LP shall convey to the Acquisition Companies and the Acquisition Companies shall receive title to the Campus free and clear of any and all claims and encumbrances.

h.    NFP Claims (Class 8).

NFP Claims shall be released and discharged as of the Effective Date. The applicable Reorganized Debtor and NFP shall enter into new agreements as more fully set forth in the Plan.

i.    General Unsecured Claims (Class 9).

This Class consists of three subclasses, as discussed more fully in Section V.5 hereof and Section 6.4 of the Plan. Each Holder of an Allowed General Unsecured Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust according to the subclassification of the Allowed General Unsecured Claim as set forth in Section V.5 and Section 6.4 of the Plan.

j.    Interests in Kansas (Class 10).

Each Holder of an Interest in Kansas will not receive any Distribution on account of such Interest. Each such Interest shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or

Reorganized Debtors on account of such Interests.

### 13. Littleton.

#### a. Other Priority Claims (Class 1).

Except to the extent that a Holder of an Allowed Other Priority Claim against Littleton's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Littleton and the Holder of the Allowed Other Priority Claim.

#### b. Secured Tax Claims (Class 2).

On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Secured Tax Claim is entitled, or (iii) such other distribution as necessary to satisfy the requirements of the Bankruptcy Code. In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released. The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid, pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims. In the event the Littleton Debtor determines to offer the Holder of an Allowed Secured Tax Claim against Littleton's Estate treatment under (i) or (ii) of this Section, the Holder of such Claim shall receive interest on such Claim at the statutory rate of 12% per annum.

#### c. Mechanic's Lien Claims (Class 3).

Except to the extent a Holder of an Allowed Mechanic's Lien Claim agrees to less favorable treatment, each Holder of an Allowed Mechanic's Lien Claim shall receive the Allowed amount of such Claim in Cash in full satisfaction of such Claim on the Distribution Record Date if the Holder of the Allowed Mechanic's Lien Claim has a first priority security interest in the underlying collateral pursuant to applicable state law. Otherwise, the Holder of an Allowed Mechanic's Lien Claim shall receive a Distribution, if any, relative to its priority under applicable state law in full satisfaction of such Claim. To the extent Allowed Mechanic's Lien Claims are not paid in full, the unpaid portions of the Allowed Mechanic's Lien Claims will be treated as General Unsecured Claims and receive a Tier A Trade Class interest in the Liquidating Creditor Trust and receive distributions of the Trade Dividend pursuant to Section 6.4 of the Plan.

d.    <u>Littleton Construction Loan Claims (Class 4).</u>

The Littleton Construction Loan Claims shall be Allowed as of the Effective Date in the amount set forth in the Proof of Claim timely filed by the Capmark Finance, Inc., as collateral and administrative agent for the Holders of the Littleton Construction Loan Claims, or if no Proof of Claim is timely filed by such Agent, the Proofs of Claim timely filed by Holders of the Littleton Construction Loan Claims. Capmark Finance, Inc., as collateral and administrative agent, shall be paid, on behalf of the Holders of Littleton Construction Loan Claims, on the Effective Date, $46,400,000 in Cash, and an interest in the Cedar Crest Receivable (estimated currently to be equal to $594,000) and 100% of the net proceeds from the sale of the Littleton Out-Parcel up to $6 million and 50% above $6 million. The Cash payment shall be distributed by Capmark Finance, Inc., as collateral and administrative agent for the Holders of the Littleton Construction Loan Claims, to the Holders in accordance with the Littleton Construction Loan documents and the Lender Allocation. Upon receipt of the required payment as set forth in this Section, Capmark Finance, Inc., as collateral and administrative agent for the Holders of the Littleton Construction Loan Claims, shall release its lien against the assets of Littleton; provided, however, Capmark Finance, Inc., as collateral and administrative agent for the Holders of the Littleton Construction Loan Claims, shall retain its lien against the Littleton Out-Parcel in an amount equal to its deficiency Claim after the Cash payments provided herein.

e.    <u>Littleton Community Loan Claims (Class 5).</u>

The Littleton Community Loan shall be reinstated in full. Redwood Littleton shall assume the Littleton Community Loan.

f.    <u>Littleton Junior Loan Claims (Class 6).</u>

Subject to the terms of the Morgan Stanley Settlement, each Holder of a Littleton Junior Loan Claim its *pro rata* Distribution in the form of an $1 million cash payment, paid from the TIP on account of the Littleton Junior Claims, and a contractual commitment to receive 50% of the net proceeds from the sale of the Littleton Out-Parcel above $6 million. In addition, each Holder of an Allowed Littleton Junior Loan Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust on account of the Holder's Mezzanine Claim as set forth in Section 6.4 of the Plan. All documents evidencing or securing the Littleton Junior Loan shall be extinguished as of the Effective Date. On the Effective Date, and pursuant to the terms of the Morgan Stanley Settlement, MSRESS III Denver Campus, LLC shall convey to the Acquisition Companies and the Acquisition Companies shall receive title to the Campus free and clear of any and all claims and encumbrances, subject to the payments set forth in the Plan.

g.    <u>Other Secured Claims (Class 7).</u>

The Other Secured Claim of PNC Bank, National Association, on account of the Littleton Letters of Credit shall be allowed. On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Other Secured Claim shall receive (a) reinstatement of such allowed Other Secured Claim; (b) payment of such Allowed Other Secured Claim in full in cash; or (c) such other treatment as the Company and each Holder shall agree.

h.      <u>NFP Claims (Class 8).</u>

NFP Claims shall be released and discharged as of the Effective Date. The applicable Reorganized Debtor and NFP shall enter into new agreements as more fully set forth in the Plan.

i.      <u>General Unsecured Claims (Class 9).</u>

This Class consists of three subclasses, as discussed more fully in Section V.5 hereof and Section 6.4 of the Plan. Each Holder of an Allowed General Unsecured Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust according to the subclassification of the Allowed General Unsecured Claim as set forth in Section V.5 and Section 6.4 of the Plan.

j.      <u>Interests in Littleton (Class 10).</u>

Each Holder of an Interest in Littleton will not receive any Distribution on account of such Interest. Each such Interest shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Interests.

**14.     Novi.**

a.      <u>Other Priority Claims (Class 1).</u>

Except to the extent that a Holder of an Allowed Other Priority Claim against Novi's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Novi and the Holder of the Allowed Other Priority Claim.

b.      <u>Secured Tax Claims (Class 2).</u>

On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Secured Tax Claim is entitled, or (iii) such other Distribution as necessary to satisfy the requirements of the Bankruptcy Code. In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released. The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid, pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

c.       <u>Mechanic's Lien Claims (Class 3).</u>

Except to the extent a Holder of an Allowed Mechanic's Lien Claim agrees to less favorable treatment, each Holder of an Allowed Mechanic's Lien Claim shall receive the Allowed amount of such Claim in Cash in full satisfaction of such Claim on the Distribution Record Date if the Holder of the Allowed Mechanic's Lien Claim has a first priority security interest in the underlying collateral pursuant to applicable state law. Otherwise, the Holder of an Allowed Mechanic's Lien Claim shall receive a Distribution, if any, relative to its priority under applicable state law in full satisfaction of such Claim. To the extent Allowed Mechanic's Lien Claims are not paid in full, the unpaid portions of the Allowed Mechanic's Lien Claims will be treated as General Unsecured Claims and receive a Tier A Trade Class interest in the Liquidating Creditor Trust and receive distributions of the Trade Dividend pursuant to Section 6.4 of the Plan.

d.       <u>Novi Construction Loan Claims (Class 4).</u>

The Novi Construction Loan Claims, including those claims on account of the Novi Letters of Credit, shall be allowed as of the Effective Date in the amount set forth in the Proof of Claim timely filed by the PNC Bank, National Association, as collateral and administrative agent for the Holders of the Novi Construction Loan Claims, or if no Proof of Claim is timely filed by such Agent, the Proofs of Claim timely filed by Holders of the Novi Construction Loan Claims. The Holder of the Allowed Novi Construction Loan Claim shall receive, on the Effective Date, $24,914,000 in Cash and $389,000 from the Cedar Crest Receivable, which amounts shall be distributed by PNC Bank, as agent, to the Holders in accordance with the Novi Construction Loan documents and the Lender Allocation. Upon receipt of the required payment and the Novi Letters of Credit, undrawn, as set forth in this Section, PNC Bank, as agent, shall release its lien against the assets of Novi.

e.       <u>Novi Community Loan Claims (Class 5).</u>

The Novi Community Loan shall be reinstated in full. Redwood Novi shall assume the Novi Community Loan.

f.       <u>Novi Junior Loan Claims (Class 6).</u>

Each Holder of an Allowed Novi Junior Loan Claim will not receive any Distribution on account of such Claims. All documents evidencing or securing the Novi Junior Loan shall be extinguished as of the Effective Date. On the Effective Date, the Acquisition Companies shall receive title to the Campus free and clear of any and all claims and encumbrances, subject to the payments set forth in the Plan.

g.       <u>NFP Claims (Class 7).</u>

NFP Claims shall be released and discharged as of the Effective Date. The applicable Reorganized Debtor and NFP shall enter into new agreements as more fully set forth in the Plan.

h.     General Unsecured Claims (Class 8).

This Class consists of three subclasses, as discussed more fully in Section V.5 hereof and Section 6.4 of the Plan.  Each Holder of an Allowed General Unsecured Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust according to the subclassification of the Allowed General Unsecured Claim as set forth in Section V.5 and Section 6.4 of the Plan.

i.     Interests in Novi (Class 9).

Each Holder of an Interest in Novi will not receive any Distribution on account of such Interest.  Each such Interest shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Interests.

**15.     Warminster.**

a.     Other Priority Claims (Class 1).

Except to the extent that a Holder of an Allowed Other Priority Claim against Warminster's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Warminster and the Holder of the Allowed Other Priority Claim.

b.     Secured Tax Claims (Class 2).

On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Secured Tax Claim is entitled, or (iii) such other Distribution as necessary to satisfy the requirements of the Bankruptcy Code.  In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released.  The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid, pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

c.     Mechanic's Lien Claims (Class 3).

Except to the extent a Holder of an Allowed Mechanic's Lien Claim agrees to less favorable treatment, each Holder of an Allowed Mechanic's Lien Claim shall receive the Allowed amount of such Claim in Cash in full satisfaction of such Claim on the Distribution Record Date if the Holder of the Allowed Mechanic's Lien Claim has a first priority

security interest in the underlying collateral pursuant to applicable state law. Otherwise, the Holder of an Allowed Mechanic's Lien Claim shall receive a Distribution, if any, relative to its priority under applicable state law in full satisfaction of such Claim. To the extent Allowed Mechanic's Lien Claims are not paid in full, the unpaid portions of the Allowed Mechanic's Lien Claims will be treated as General Unsecured Claims and receive a Tier A Trade Class interest in the Liquidating Creditor Trust and receive distributions of the Trade Dividend pursuant to Section 6.4 of the Plan.

d.  Warminster Community Loan Claims (Class 4).

Each Holder of an Allowed Warminster Community Loan Claim shall receive reinstated debt in the full amount of the Warminster Community Loan. Warminster shall assume, reinstate and/or ratify the Warminster Community Loan on terms mutually agreeable to Redwood, Ann's Choice and the Ann's Choice Trustee and consistent with the terms agreed to during the Auction, as reflected in the transcript of the Auction. All collateral securing the Warminster Community Loan shall be reinstated, assumed and/or ratified.

e.  Warminster Purchase Option Deposit Refund Agreement Claims (Class 5).

Each Holder of an Allowed Warminster Purchase Option Deposit Refund Agreement Claim shall receive reinstated debt in the full amount of the Holders Allowed Claim. Warminster shall assume the Warminster Purchase Option Deposit Refund Agreement as it currently exists or on terms mutually agreeable to Redwood, Ann's Choice and the Ann's Choice Trustee and consistent with the terms agreed to during the Auction, as reflected in the transcript of the Auction. In addition, an amendment to the Purchase Option Deposit Refund Agreement will provide that if Ann's Choice exercises its option to purchase the Ann's Choice Campus under that agreement and the going concern value is less than the $75 million dollar amount of the purchase option deposit, Redwood will pay the amount of such shortfall to Ann's Choice out of IEDs collected by Redwood, up to a maximum amount of $10,000,000, exclusive of such IEDs to be paid to the TIP. All collateral securing the Warminster Purchase Option Deposit Agreement shall be reinstated, assumed and/or ratified.

f.  Warminster Junior Loan Claims (Class 6).

Each Holder of an Allowed Warminster Junior Loan Claim shall on the Effective Date be transferred free and clear of any and all claims, liens, and encumbrances the following: (i) $8.2 million in good and collected funds, and (ii) its security deposit related to the Houston, Novi and Warminster campuses, in full satisfaction of such Holder's Allowed Claim. Contemporaneously with the transfer of such funds and security deposits to each such Holder of an Allowed Warminster Junior Loan Claim, title to the Campus shall on the Effective Date be transferred to Warminster free and clear of any and all claims, liens and encumbrances, except for those claims, liens and encumbrances associated with the Ann's Choice Bonds and claims, liens and encumbrances otherwise expressly preserved under the terms of the Plan. All documents evidencing or securing the Warminster Junior Loan shall be extinguished as of the Effective Date.

g.    Other Secured Claims (Class 7).

The Other Secured Claims of PNC Bank, National Association, on account of the Warminster Letters of Credit shall be Allowed. On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Other Secured Claim shall receive (a) reinstatement of such allowed Other Secured Claim; (b) payment of such Allowed Other Secured Claim in full in cash; or (c) such other treatment as the Company and each Holder shall agree.

h.    NFP Claims (Class 8).

The Working Capital Loan and Master Lease associated with the Warminster Campus shall be assumed as they currently exist or on terms mutually agreeable to Redwood, Ann's Choice and the Ann's Choice Trustee and consistent with the terms agreed to during the Auction, as reflected in the transcript of the Auction.

i.    General Unsecured Claims (Class 9).

This Class consists of three subclasses, as discussed more fully in Section V.5 hereof and Section 6.4 of the Plan. Each Holder of an Allowed General Unsecured Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust according to the subclassification of the Allowed General Unsecured Claim as set forth in Section V.5 and Section 6.4 of the Plan.

j.    Interests in Warminster (Class 10).

Each Holder of an Interest in Warminster will not receive any Distribution on account of such Interest. Each such Interest shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Interests. On the Effective Date or as soon thereafter as reasonably practicable, ERC shall assign its Interests in Warminster to PropCo free and clear of all liens encumbering such Interests.

### 16.    Warminster GP.

a.    Other Priority Claims (Class 1).

Except to the extent that a Holder of an Allowed Other Priority Claim against Warminster GP's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Warminster GP and the Holder of the Allowed Other Priority Claim.

b.    Secured Tax Claims (Class 2).

On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized

Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Secured Tax Claim is entitled, or (iii) such other Distribution as necessary to satisfy the requirements of the Bankruptcy Code. In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released. The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

c.      <u>Corporate Revolver Guaranty Claims (Class 3).</u>

Each Holder of an Allowed Corporate Revolver Guaranty Claim against Warminster GP's Estate will not receive any Distribution on account of such Claim.

d.      <u>General Unsecured Claims (Class 4).</u>

This Class consists of three subclasses, as discussed more fully in Section V.5 hereof and Section 6.4 of the Plan. Each Holder of an Allowed General Unsecured Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust according to the subclassification of the Allowed General Unsecured Claim as set forth in Section V.5 and Section 6.4 of the Plan.

e.      <u>Interests in Warminster GP (Class 5).</u>

Each Holder of an Interest in Warminster GP will not receive any Distribution on account of such Interest. Each such Interest shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Interests. On the Effective Date or as soon thereafter as reasonably practicable, ERC shall assign its Interest in Warminster GP to PropCo, which assignment shall be free and clear of all liens encumbering such Interests.

## VII.    Voting Procedures and Requirements

Please refer to information provided with the ballot in the Solicitation Package sent to you by the Voting Agent for further detailed voting instructions. Only Impaired Classes of Claims, which are expected to receive recovery above zero percent (0%) or where the Class' percentage of recovery is not yet designated, are entitled to vote. Please refer to Section 3 of the Plan and Article VI herein for estimated percentages of recovery for each Impaired Class. If the Claim or Claims you hold are not in one of those Classes, you are not entitled to vote and, thus you will not receive a ballot from the Voting Agent. Holders of Claims that are entitled to vote should read the ballot provided by the Voting Agent and follow the accompanying instructions carefully.

---

**ANY QUESTIONS CONCERNING THE BALLOT OR ANY OTHER CONTENTS OF THE SOLICITATION PACKAGE SHOULD BE DIRECTED TO THE VOTING AGENT AT (888) 909-0100 OR VIA EMAIL AT info@bmcgroup.com.**

---

### A. Vote Required for Acceptance by a Class.

A Class of Claims entitled to vote to accept or reject the Plan shall be deemed to accept the Plan if the Holders of Claims in such voting Class that hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Claims that vote in such Class vote to accept the Plan. A Class of Interests is deemed to accept the Plan if the Plan has been accepted by Holders of at least two-thirds (2/3) of the amount of the allowed Interests held by Holders of such Interests who vote in such Class.

### B. Classes Entitled to Vote.

Pursuant to section 1126 of the Bankruptcy Code, each Impaired Class of Claims or Interests that will receive a Distribution pursuant to this Plan may vote separately to accept or reject this Plan. Each Holder of an Allowed Claim in such an Impaired Class as of the Voting Record Date, shall receive a ballot and may cast a vote to accept or reject this Plan.

### C. Classes Not Entitled to Vote.

The following Holders of Claims are not entitled to vote if, as of the Voting Record Date, the Claim (a) has been disallowed, (b) is the subject of a pending objection, or (c) was listed on the Debtors' Schedules as unliquidated, contingent or disputed and a Proof of Claim was not filed or was filed for an unliquidated, contingent or disputed claim, unless on or before the Voting Record Date the Bankruptcy Court enters a Final Order directing otherwise. However, if a Claim is disallowed in part, the Holder shall be entitled to vote the Allowed portion of the Claim.

### D. Voting Procedures.

The Voting Agent will facilitate the solicitation and voting process. If you have any questions regarding voting procedures and your eligibility to vote to accept or reject the Plan or if you need additional copies of documents included in the Solicitation Package, please contact the Voting Agent at the below mailing address, phone number, and email address:

| If by regular mail: | If by messenger or overnight delivery: |
|---|---|
| ERC Ballot Processing | ERC Ballot Processing |
| c/o BMC Group Inc | c/o BMC Group Inc |
| PO BOX 3020 | 18750 Lake Drive East |
| Chanhassen, MN 55317-3020 | Chanhassen, MN 55317 |
| Telephone: (888) 909-0100 | Telephone: (888) 909-0100 |
| Email: info@bmcgroup.com | Email: info@bmcgroup.com |

**BALLOTS CAST BY HOLDERS OF CLAIMS AND/OR INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST BE <u>ACTUALLY</u> RECEIVED BY THE VOTING AGENT AT THE ABOVE ADDRESS BY THE VOTING DEADLINE. THE DEBTORS RESERVE THE RIGHT TO DECIDE WHETHER OR NOT TO COUNT BALLOTS RECEIVED BY THE VOTING AGENT AFTER THE VOTING DEADLINE.**

Please note that if the instructions on your ballot require you to return the ballot to your agent, financial institution, broker, or other nominee, or to their agent, you must deliver your ballot to the relevant party in sufficient time for the designated party to process the ballot and return it to the Voting Agent before the Voting Deadline. If a ballot is damaged or lost, you may contact the Voting Agent to request another ballot. Any ballot received by the Voting Agent which does not indicate an acceptance or rejection of the Plan will not be counted.

## VIII. Financial Information, Projections and Valuation[15]

### A. Introduction.

This Section provides summary information concerning the recent financial performance of the Debtors, as well as projections for years 2010-2014. This Section also sets forth an estimate of a going concern valuation for the Debtors.

The projections assume an Effective Date of April 30, 2010, with Allowed Claims treated in accordance with the Plan. Expenses related to the Chapter 11 Cases are assumed to be paid on the Effective Date. If the Debtors do not emerge from chapter 11 as currently scheduled, additional expenses of administering the bankruptcy Estates will be incurred until such time as a plan of reorganization is confirmed and becomes effective. Any additional, increased or decreased administrative expenses could significantly impact the Debtors' cash flows. In addition, the expenses estimated herein may actually be incurred in amounts which are significantly more or less than such estimates.

Section XI of this Disclosure Statement provides a discussion of some of the factors that could have a material effect on the information in this Section.

Any estimates of value are not intended to reflect the values that may be attainable in public or private markets. The value estimates also are not appraisals and are not intended to reflect the actual value that may be realized if assets are sold.

### B. Operations.

The Debtors' consolidated financial statements for the period ended September 30, 2009 are attached hereto as Exhibit B.

### C. Financial Projections.

The following projected balance sheets and financial projections (the "***Financial Projections***") reflect the operations of the Debtors.

Please note that the Financial Projections described below may differ from actual

---

15 The financial projections contained in this Section are estimates solely prepared by the Debtors. Neither the NSC, the NSC-NFPs, nor any other party were involved in the preparation of these financial projections and are not bound thereby in any respect.

performance and are highly dependent on certain assumptions. These assumptions include the growth of the retirement living and senior care industries, labor and other operating costs, inflation, and the level of investment required for capital expenditures and available working capital.

The Financial Projections assume that the Plan will be confirmed and consummated in accordance with its terms and that there will be no material changes in the current regulatory environment that will have an unexpected impact on the Debtors' operations. The Financial Projections assume an Effective Date of April 30, 2010, with Allowed Claims treated in accordance with the Plan. Expenses incurred as a result of the Chapter 11 Cases are assumed to be paid upon the Effective Date of the Plan. If the Debtors do not emerge from chapter 11 by April 30, 2010, as assumed for purposes of this analysis, additional bankruptcy expenses will be incurred until such time as a Plan is confirmed. These expenses could significantly impact the Debtors' results of operations and cash flows.

The Financial Projections should be read in conjunction with the assumptions, qualifications and footnotes to the Financial Projections set forth herein, the historical consolidated financial information (including the notes and schedules thereto). The Financial Projections were prepared by management in consultation with the Debtors' financial advisors in good faith based upon assumptions believed to be reasonable and applied in a manner consistent with past practice. The assumptions regarding the operations of the business leading to and after the assumed Effective Date were based, in part, on economic, competitive, and general business conditions prevailing at the time, as well as management's forecast for industry recovery and future performance.

The Debtors do not, as a matter of course, publicly disclose projections as to their future revenues, earnings, or cash flow. Accordingly, neither the Debtors nor the Reorganized Debtors intend to update or otherwise revise the Financial Projections to reflect circumstances existing since their preparation, the occurrence of unanticipated events, or changes in general economic or industry conditions, even in the event that any or all of the underlying assumptions are shown to be in error.

The Financial Projections were not prepared with a view toward complying with the guidelines for prospective financial statements published by the American Institute of Certified Public Accountants. The Financial Projections have not been compiled, or prepared for examination or review, by the Debtors' independent auditors.

While presented with numerical specificity, the Financial Projections are based upon a variety of assumptions and are subject to significant business, economic, and competitive uncertainties and contingencies, many of which are beyond the control of the Debtors. These assumptions were based, in part, on economic, competitive, and general business conditions prevailing at the time the Financial Projections were developed, as well as forecasts for industry recovery and future performance. Consequently, the inclusion of the Financial Projections herein should not be regarded as a representation by the Debtors or their financial advisors or other Professionals that the Financial Projections will be realized, and actual results may vary materially from those presented below. The industry in which the Debtors compete is highly competitive and the Debtors' earnings may be significantly adversely affected by changes in the competitive environment, changes in supply and demand dynamics, the price erosion of services

provided, regulatory changes and future improvements in technology. Due to the fact that such Financial Projections are subject to significant uncertainty and are based upon assumptions which may not prove to be correct, neither the Debtors nor any other person assumes any responsibility for their accuracy or completeness.

## Management Company

| ($ in thousands) | ROY 2010P [1] | 2011P | 2012P | 2013P | 2014P |
|---|---|---|---|---|---|
| Management Fees | $ 19,648 | $ 31,264 | $ 32,734 | $ 34,352 | $ 35,678 |
| Development & Construction Fees | 802 | 3,966 | 11,256 | 6,143 | 857 |
| Total Revenue | 20,450 | 35,230 | 43,990 | 40,495 | 36,534 |
| | | | | | |
| Development Expenses | (35,367) | (55,568) | (53,150) | (42,081) | (36,526) |
| Management Expenses | (40,810) | (62,704) | (57,099) | (52,623) | (50,878) |
| Other Expenses | (3,459) | (5,344) | (5,505) | (5,670) | (5,840) |
| Total Operating Expenses | (79,636) | (123,616) | (115,754) | (100,373) | (93,243) |
| | | | | | |
| Development Expenses Reimbursements | 35,367 | 55,568 | 53,150 | 42,081 | 36,526 |
| Management Expenses Reimbursements | 40,689 | 62,704 | 57,099 | 52,623 | 50,878 |
| Total Reimbursements | 76,056 | 118,272 | 110,249 | 94,704 | 87,403 |
| | | | | | |
| Net Operating Income | $ 16,870 | $ 29,886 | $ 38,486 | $ 34,825 | $ 30,695 |

Note:
(1) May through December of 2010

# Ashburn

**Landowner Cash Flow Projections** *($ in thousands)*

| *($ in thousands)* | ROY 2010P [1] | 2011P | 2012P | 2013P | 2014P |
|---|---|---|---|---|---|
| IED Collections Under Community Loan | $ 21,914 | $ 26,219 | $ 26,621 | $ 5,699 | $ - |
| Net Rent [2] | 757 | 2,111 | 2,220 | 3,201 | 3,457 |
| NFP Working Capital Interest | 18 | 84 | 129 | 85 | 26 |
| NFP Working Capital Repayment/(Advances) | (737) | (676) | 315 | 555 | 544 |
| Construction Costs | (5,937) | (11,601) | (5,552) | - | - |
| Other Landowner Expenses | (4,876) | (7,641) | (5,484) | (1,045) | (1,071) |
| **Operating Cash Flow** | **11,139** | **8,495** | **18,249** | **8,496** | **2,956** |
| Interest Expense | - | - | - | - | - |
| New Revolver Borrowings / (Repayments) | - | - | - | - | - |
| **Total Cash Flow** | **$ 11,139** | **$ 8,495** | **$ 18,249** | **$ 8,496** | **$ 2,956** |
| | | | | | |
| **Beginning Cash Balance** | **$ 1,900** | **$ 13,039** | **$ 21,534** | **$ 39,784** | **$ 48,279** |
| **Ending Cash Balance** | **$ 13,039** | **$ 21,534** | **$ 39,784** | **$ 48,279** | **$ 51,236** |

Note:
(1) May through December of 2010
(2) Offset by debt service on the Community Loan

| *($ in thousands)* | April '10 Pre-Transaction | Adjustments [1] Repaid | Discharged | April '10 Post-Transaction | 2010P | 2011P | 2012P | 2013P | 2014P |
|---|---|---|---|---|---|---|---|---|---|
| DIP Borrowings | $ 996 | $ (996) | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| STD/TIF Loans | - | | | | | | | | |
| Ashburn Construction Loan | 62,269 | (61,357) | (911) | - | | | | | |
| Other Debt | - | | | - | - | - | - | - | - |
| New Ashburn Revolver | | | | - | - | - | - | - | - |
| Senior Debt | 63,265 | (62,353) | (911) | - | - | - | - | - | - |
| Community Loan | 107,115 | - | - | 107,115 | 138,980 | 162,661 | 186,143 | 188,173 | 184,334 |
| Ashburn Mezzanine Loan | 52,672 | - | (52,672) | | | | | | |
| Other Debt | 159,787 | - | (52,672) | 107,115 | 138,980 | 162,661 | 186,143 | 188,173 | 184,334 |
| **Total Debt** | **$ 223,052** | **$ (62,353)** | **$ (53,584)** | **$ 107,115** | **$ 138,980** | **$ 162,661** | **$ 186,143** | **$ 188,173** | **$ 184,334** |

Note:
(1) Presentation does not represent fresh start adjustments and is not presented in accordance with GAAP.

# Concord

**Landowner Cash Flow Projections** *($ in thousands)*

| *($ in thousands)* | **ROY 2010P** [(1)] | **2011P** | **2012P** | **2013P** | **2014P** |
|---|---:|---:|---:|---:|---:|
| IED Collections Under Community Loan | $ 20,185 | $ 28,301 | $ 24,007 | $ 15,881 | $ - |
| Net Rent [(2)] | 1,330 | 4,818 | 3,390 | 5,293 | 6,039 |
| NFP Working Capital Interest | 53 | 359 | 479 | 439 | 366 |
| NFP Working Capital Repayment/(Advances) | (1,820) | (3,020) | 200 | 620 | 842 |
| Construction Costs | (4,632) | (12,897) | (8,628) | - | - |
| Other Landowner Expenses | (5,034) | (7,887) | (5,176) | (3,891) | (738) |
| **Operating Cash Flow** | **10,082** | **9,673** | **14,271** | **18,342** | **6,509** |
| Interest Expense | - | | | | |
| New Revolver Borrowings / (Repayments) | - | | | | |
| **Total Cash Flow** | **$ 10,082** | **$ 9,673** | **$ 14,271** | **$ 18,342** | **$ 6,509** |
| **Beginning Cash Balance** | **$ 6,300** | **$ 16,382** | **$ 26,056** | **$ 40,326** | **$ 58,668** |
| **Ending Cash Balance** | **$ 16,382** | **$ 26,056** | **$ 40,326** | **$ 58,668** | **$ 65,177** |

Note:
(1) May through December of 2010
(2) Offset by debt service on the Community Loan

| *($ in thousands)* | **April '10 Pre-Transaction** | **Adjustments** [(1)] **Repaid** | **Discharged** | **April '10 Post-Transaction** | **2010P** | **2011P** | **2012P** | **2013P** | **2014P** |
|---|---:|---:|---:|---:|---:|---:|---:|---:|---:|
| DIP Borrowings | $ 2,120 | $ (2,120) | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| STD/TIF Loans | - | - | - | - | - | - | - | - | - |
| Concord Construction Loan | 65,092 | (63,394) | (1,698) | - | - | - | - | - | - |
| Other Debt | - | - | - | - | - | - | - | - | - |
| New Concord Revolver | - | | | - | - | - | - | - | - |
| Senior Debt | 67,213 | (65,514) | (1,698) | - | - | - | - | - | - |
| Community Loan | 204,128 | - | - | 204,128 | 236,359 | 260,425 | 279,658 | 290,002 | 284,177 |
| Concord Mezzanine Loan | 26,336 | - | (26,336) | - | - | - | - | - | - |
| Other Debt | 230,464 | - | (26,336) | 204,128 | 236,359 | 260,425 | 279,658 | 290,002 | 284,177 |
| **Total Debt** | **$ 297,676** | **$ (65,514)** | **$ (28,034)** | **$ 204,128** | **$ 236,359** | **$ 260,425** | **$ 279,658** | **$ 290,002** | **$ 284,177** |

Note:
(1) Presentation does not represent fresh start adjustments and is not presented in accordance with GAAP.

# Dallas

**Landowner Cash Flow Projections** *($ in thousands)*

| *($ in thousands)* | ROY 2010P [(1)] | 2011P | 2012P | 2013P | 2014P |
|---|---|---|---|---|---|
| IED Collections Under Community Loan | $ 6,321 | $ 10,244 | $ 26,225 | $ 28,655 | $ 2,734 |
| Net Rent [(2)] | 651 | 991 | 1,934 | 4,106 | 5,384 |
| NFP Working Capital Interest | - | - | - | - | - |
| NFP Working Capital Repayment/(Advances) | - | - | - | - | - |
| Construction Costs | (665) | (10,709) | (12,123) | - | - |
| Other Landowner Expenses | (3,436) | (5,448) | (8,679) | (6,931) | (707) |
| **Operating Cash Flow** | **2,871** | **(4,922)** | **7,356** | **25,831** | **7,411** |
| Interest Expense | - | (17) | (2) | - | - |
| New Revolver Borrowings / (Repayments) | - | 368 | (368) | - | - |
| **Total Cash Flow** | **$ 2,871** | **$ (4,571)** | **$ 6,986** | **$ 25,831** | **$ 7,411** |
| **Beginning Cash Balance** | **$ 1,700** | **$ 4,571** | **$ -** | **$ 6,986** | **$ 32,817** |
| **Ending Cash Balance** | **$ 4,571** | **$ -** | **$ 6,986** | **$ 32,817** | **$ 40,227** |

Note:
(1) May through December of 2010
(2) Offset by debt service on the Community Loan

| *($ in thousands)* | April '10 Pre-Transaction | Adjustments [(1)] Repaid | Discharged | April '10 Post-Transaction | 2010P | 2011P | 2012P | 2013P | 2014P |
|---|---|---|---|---|---|---|---|---|---|
| DIP Borrowings | $ 1,272 | $ (1,272) | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| STD/TIF Loans | - | - | - | - | - | - | - | - | - |
| Dallas Construction Loan | 55,328 | (19,779) | (35,549) | - | - | - | - | - | - |
| Other Debt | 4,154 | (3,440) | (714) | - | - | - | - | - | - |
| New Dallas Revolver | - | - | - | - | - | 368 | - | - | - |
| Senior Debt | 60,753 | (24,491) | (36,263) | - | - | 368 | - | - | - |
| Community Loan | 86,978 | - | - | 86,978 | 94,813 | 103,874 | 128,624 | 155,448 | 155,828 |
| Dallas Mezzanine Loan | 19,319 | - | (19,319) | - | - | - | - | - | - |
| Other Debt | 106,297 | - | (19,319) | 86,978 | 94,813 | 103,874 | 128,624 | 155,448 | 155,828 |
| **Total Debt** | **$ 167,050** | **$ (24,491)** | **$ (55,581)** | **$ 86,978** | **$ 94,813** | **$ 104,242** | **$ 128,624** | **$ 155,448** | **$ 155,828** |

Note:
(1) Presentation does not represent fresh start adjustments and is not presented in accordance with GAAP.

## Houston

**Landowner Cash Flow Projections** *($ in thousands)*

| *($ in thousands)* | ROY 2010P [1] | 2011P | 2012P | 2013P | 2014P |
|---|---|---|---|---|---|
| IED Collections Under Community Loan | $ 4,151 | $ 13,801 | $ 10,772 | $ - | $ - |
| Net Rent [2] | 471 | 805 | 2,020 | 2,408 | 2,688 |
| NFP Working Capital Interest | - | 0 | - | - | - |
| NFP Working Capital Repayment/(Advances) | - | - | - | - | - |
| Construction Costs | (4,296) | (4,796) | - | - | - |
| Other Landowner Expenses | (3,484) | (5,515) | (3,025) | (635) | (651) |
| **Operating Cash Flow** | **(3,157)** | **4,295** | **9,767** | **1,773** | **2,037** |
| | | | | | |
| Interest Expense | (2) | (203) | - | - | - |
| New Revolver Borrowings / (Repayments) | 1,359 | (1,359) | - | - | - |
| **Total Cash Flow** | **$ (1,800)** | **$ 2,733** | **$ 9,767** | **$ 1,773** | **$ 2,037** |
| | | | | | |
| **Beginning Cash Balance** | **$ 1,800** | **$ -** | **$ 2,733** | **$ 12,500** | **$ 14,273** |
| **Ending Cash Balance** | **$ -** | **$ 2,733** | **$ 12,500** | **$ 14,273** | **$ 16,311** |

Note:
(1) May through December of 2010
(2) Offset by debt service on the Community Loan

| *($ in thousands)* | April '10 Pre-Transaction | Adjustments [1] Repaid | Discharged | April '10 Post-Transaction | 2010P | 2011P | 2012P | 2013P | 2014P |
|---|---|---|---|---|---|---|---|---|---|
| DIP Borrowings | $ 1,142 | $ (1,142) | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| STD/TIF Loans | - | - | - | | | | | | |
| Houston Construction Loan | 44,541 | (7,176) | (37,365) | - | - | - | - | - | - |
| Other Debt | - | - | - | | | | | | |
| New Houston Revolver | - | - | - | - | 1,359 | - | - | - | - |
| Senior Debt | 45,683 | (8,318) | (37,365) | - | 1,359 | - | - | - | - |
| | | | | | | | | | |
| Community Loan | 88,515 | - | - | 88,515 | 92,796 | 105,305 | 114,416 | 112,618 | 110,719 |
| Houston Mezzanine Loan | 25,300 | - | (25,300) | | | | | | |
| Other Debt | 113,815 | - | (25,300) | 88,515 | 92,796 | 105,305 | 114,416 | 112,618 | 110,719 |
| | | | | | | | | | |
| **Total Debt** | **$ 159,498** | **$ (8,318)** | **$ (62,665)** | **$ 88,515** | **$ 94,155** | **$ 105,305** | **$ 114,416** | **$ 112,618** | **$ 110,719** |

Note:
(1) Presentation does not represent fresh start adjustments and is not presented in accordance with GAAP.

## Kansas

**Landowner Cash Flow Projections** *($ in thousands)*

| ($ in thousands) | ROY 2010P [1] | 2011P | 2012P | 2013P | 2014P |
|---|---|---|---|---|---|
| IED Collections Under Community Loan | $ 3,447 | $ 5,844 | $ 542 | $ - | $ - |
| Net Rent [2] | - | 81 | 337 | 415 | 512 |
| NFP Working Capital Interest | 29 | 125 | 138 | 144 | 150 |
| NFP Working Capital Repayment/(Advances) | (1,079) | (262) | (72) | (61) | (47) |
| Construction Costs | - | - | - | - | - |
| Other Landowner Expenses | (1,713) | (2,420) | (686) | (640) | (656) |
| **Operating Cash Flow** | **684** | **3,368** | **258** | **(142)** | **(42)** |
| Interest Expense | (506) | (729) | (703) | (676) | (647) |
| TIF Bond Amortization | (490) | (515) | (540) | (565) | (595) |
| New Revolver Borrowings / (Repayments) | - | - | - | - | - |
| **Total Cash Flow** | **$ (312)** | **$ 2,124** | **$ (985)** | **$ (1,383)** | **$ (1,284)** |
| **Beginning Cash Balance** | **$ 4,347** | **$ 4,035** | **$ 6,159** | **$ 5,174** | **$ 3,791** |
| **Ending Cash Balance** | **$ 4,035** | **$ 6,159** | **$ 5,174** | **$ 3,791** | **$ 2,507** |

Note:
(1) May through December of 2010
(2) Offset by debt service on the Community Loan

| ($ in thousands) | April '10 Pre-Transaction | Adjustments [1] Repaid | Adjustments [1] Discharged | April '10 Post-Transaction | 2010P | 2011P | 2012P | 2013P | 2014P |
|---|---|---|---|---|---|---|---|---|---|
| DIP Borrowings | $ 1,055 | $ (1,055) | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| STD/TIF Loans | 14,950 | - | - | 14,950 | 14,460 | 13,945 | 13,405 | 12,840 | 12,245 |
| Kansas Construction Loan | 63,183 | (2,778) | (60,405) | - | - | - | - | - | - |
| Other Debt | - | - | - | - | - | - | - | - | - |
| New Kansas Revolver | - | - | - | - | - | - | - | - | - |
| Senior Debt | 79,188 | (3,833) | (60,405) | 14,950 | 14,460 | 13,945 | 13,405 | 12,840 | 12,245 |
| Community Loan | 33,484 | - | - | 33,484 | 38,226 | 43,622 | 43,374 | 42,547 | 41,681 |
| Kansas Mezzanine Loan | 27,527 | - | (27,527) | - | - | - | - | - | - |
| Other Debt | 61,011 | - | (27,527) | 33,484 | 38,226 | 43,622 | 43,374 | 42,547 | 41,681 |
| **Total Debt** | **$ 140,199** | **$ (3,833)** | **$ (87,932)** | **$ 48,434** | **$ 52,686** | **$ 57,567** | **$ 56,779** | **$ 55,387** | **$ 53,926** |

Note:
(1) Presentation does not represent fresh start adjustments and is not presented in accordance with GAAP.

# Littleton

**Landowner Cash Flow Projections** *($ in thousands)*

| *($ in thousands)* | ROY 2010P [1] | 2011P | 2012P | 2013P | 2014P |
|---|---|---|---|---|---|
| IED Collections Under Community Loan | $ 14,213 | $ 23,224 | $ 22,486 | $ - | $ - |
| Net Rent [2] | 1,192 | 2,272 | 3,319 | 3,806 | 4,144 |
| NFP Working Capital Interest | 8 | 5 | - | - | - |
| NFP Working Capital Repayment/(Advances) | (6) | 6 | - | - | - |
| Construction Costs | (9,118) | (10,165) | - | - | - |
| Other Landowner Expenses | (4,220) | (5,459) | (4,238) | (407) | (416) |
| **Operating Cash Flow** | **2,069** | **9,883** | **21,567** | **3,399** | **3,728** |
| Interest Expense | - | (43) | - | - | - |
| New Revolver Borrowings / (Repayments) | - | - | - | - | - |
| **Total Cash Flow** | **$ 2,069** | **$ 9,840** | **$ 21,567** | **$ 3,399** | **$ 3,728** |
| Beginning Cash Balance | **$ 2,100** | **$ 4,169** | **$ 14,009** | **$ 35,576** | **$ 38,975** |
| Ending Cash Balance | **$ 4,169** | **$ 14,009** | **$ 35,576** | **$ 38,975** | **$ 42,703** |

Note:
(1) May through December of 2010
(2) Offset by debt service on the Community Loan

| *($ in thousands)* | April '10 Pre-Transaction | Adjustments [1] Repaid | Adjustments [1] Discharged | April '10 Post-Transaction | 2010P | 2011P | 2012P | 2013P | 2014P |
|---|---|---|---|---|---|---|---|---|---|
| DIP Borrowings | $ 1,847 | $ (1,847) | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| STD/TIF Loans | - | - | - | - | | | | | |
| Littleton Construction Loan | 63,004 | (55,144) | (7,860) | - | | | | | |
| Other Debt | - | - | - | - | | | | | |
| New Littleton Revolver | | | | - | - | - | - | - | - |
| Senior Debt | 64,851 | (56,992) | (7,860) | - | - | - | - | - | - |
| Community Loan | 141,340 | - | - | 141,340 | 157,777 | 178,501 | 197,785 | 194,350 | 190,721 |
| Littleton Mezzanine Loan | 26,331 | (3,150) | (23,181) | - | | | | | |
| Other Debt | 167,672 | (3,150) | (23,181) | 141,340 | 157,777 | 178,501 | 197,785 | 194,350 | 190,721 |
| **Total Debt** | **$ 232,523** | **$ (60,142)** | **$ (31,041)** | **$ 141,340** | **$ 157,777** | **$ 178,501** | **$ 197,785** | **$ 194,350** | **$ 190,721** |

Note:
(1) Presentation does not represent fresh start adjustments and is not presented in accordance with GAAP.

# Novi

**Landowner Cash Flow Projections** *($ in thousands)*

| *($ in thousands)* | ROY 2010P [1] | 2011P | 2012P | 2013P | 2014P |
|---|---|---|---|---|---|
| IED Collections Under Community Loan | $ 5,327 | $ 15,854 | $ 26,278 | 18,621 | $ 9,904 |
| Net Rent [2] | 2,455 | 3,633 | 5,321 | 7,155 | 8,659 |
| NFP Working Capital Interest | 87 | 227 | 162 | 51 | - |
| NFP Working Capital Repayment/(Advances) | (2,491) | 500 | 902 | 1,089 | - |
| Construction Costs | (9,349) | (16,210) | (11,216) | (5,326) | - |
| Other Landowner Expenses | (2,961) | (5,607) | (7,820) | (6,151) | (2,438) |
| **Operating Cash Flow** | **(6,931)** | **(1,603)** | **13,628** | **15,440** | **16,125** |
| Interest Expense | - | (389) | (49) | - | - |
| New Revolver Borrowings / (Repayments) | 1,331 | 1,992 | (3,323) | - | - |
| **Total Cash Flow** | **$ (5,600)** | **$ 0** | **$ 10,257** | **$ 15,440** | **$ 16,125** |
| **Beginning Cash Balance** | **$ 5,600** | **$ -** | **$ 0** | **$ 10,257** | **$ 25,696** |
| **Ending Cash Balance** | **$ -** | **$ 0** | **$ 10,257** | **$ 25,696** | **$ 41,821** |

Note:
(1) May through December of 2010
(2) Offset by debt service on the Community Loan

| *($ in thousands)* | April '10 Pre-Transaction | Adjustments [1] | | April '10 Post-Transaction | 2010P | 2011P | 2012P | 2013P | 2014P |
|---|---|---|---|---|---|---|---|---|---|
| | | Repaid | Discharged | | | | | | |
| DIP Borrowings | $ 1,471 | $ (1,471) | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| STD/TIF Loans | - | | | | | | | | |
| Novi Construction Loan | 31,871 | (25,303) | (6,568) | - | - | - | - | - | - |
| Other Debt | - | | | | | | | | |
| New Novi Revolver | - | | | - | 1,331 | 3,323 | - | - | - |
| Senior Debt | 33,342 | (26,774) | (6,568) | - | 1,331 | 3,323 | - | - | - |
| Community Loan | 165,504 | - | - | 165,504 | 173,825 | 187,546 | 211,240 | 226,959 | 233,607 |
| Novi Mezzanine Loan | 18,716 | - | (18,716) | | | | | | |
| Other Debt | 184,220 | - | (18,716) | 165,504 | 173,825 | 187,546 | 211,240 | 226,959 | 233,607 |
| **Total Debt** | **$ 217,562** | **$ (26,774)** | **$ (25,284)** | **$ 165,504** | **$ 175,156** | **$ 190,869** | **$ 211,240** | **$ 226,959** | **$ 233,607** |

Note:
(1) Presentation does not represent fresh start adjustments and is not presented in accordance with GAAP.

# Warminster

**Landowner Cash Flow Projections** *($ in thousands)*

| *($ in thousands)* | **ROY 2010P** [1] | **2011P** | **2012P** | **2013P** | **2014P** |
|---|---|---|---|---|---|
| IEDs Available to Landowner | $ 4,362 | $ 4,902 | $ 22,914 | $ - | $ - |
| Net Rent [2] | 3,217 | 5,325 | 7,074 | 8,016 | 8,767 |
| NFP Working Capital Interest | - | - | - | 30 | 392 |
| NFP Working Capital Repayment/(Advances) | - | - | - | (321) | (5,007) |
| Construction Costs | (7,211) | (8,050) | - | - | - |
| Other Landowner Expenses | (3,563) | (4,753) | (3,750) | (233) | (237) |
| **Operating Cash Flow** | **(3,194)** | **(2,576)** | **26,238** | **7,491** | **3,915** |
| Interest Expense | (5) | (279) | (36) | - | - |
| New Revolver Borrowings / (Repayments) | 3,199 | 2,855 | (6,055) | - | - |
| **Total Cash Flow** | **$ -** | **$ -** | **$ 20,147** | **$ 7,491** | **$ 3,915** |
| **Beginning Cash Balance** | **$ -** | **$ -** | **$ -** | **$ 20,147** | **$ 27,638** |
| **Ending Cash Balance** | **$ -** | **$ -** | **$ 20,147** | **$ 27,638** | **$ 31,554** |

Note:
(1) May through December of 2010
(2) Offset by debt service on the Community Loan

| *($ in thousands)* | April '10 Pre-Transaction | Adjustments [1] Repaid | Discharged | April '10 Post-Transaction | 2010P | 2011P | 2012P | 2013P | 2014P |
|---|---|---|---|---|---|---|---|---|---|
| DIP Borrowings | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| STD/TIF Loans | - | - | - | - | - | - | - | - | - |
| New Warminster Revolver | - | - | - | - | 3,199 | 6,055 | - | - | - |
| Other Debt | - | - | - | - | - | - | - | - | - |
| Senior Debt | - | - | - | - | 3,199 | 6,055 | - | - | - |
| Community Loan | 276,759 | - | - | 276,759 | 280,484 | 281,892 | 300,905 | 296,728 | 292,273 |
| Purchase Option Deposit | 75,000 | - | - | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 |
| Warminster Mezzanine Loan | 19,500 | (12,912) | (6,588) | - | - | - | - | - | - |
| Other Debt | 371,259 | (12,912) | (6,588) | 351,759 | 355,484 | 356,892 | 375,905 | 371,728 | 367,273 |
| **Total Debt** | **$ 371,259** | **$ (12,912)** | **$ (6,588)** | **$ 351,759** | **$ 358,683** | **$ 362,947** | **$ 375,905** | **$ 371,728** | **$ 367,273** |

Note:
(1) Presentation does not represent fresh start adjustments and is not presented in accordance with GAAP.

***The Ann's Choice Trustee believes the Financial Projections for Warminster may reflect modifications to the Ann's Choice Bond Documents that have not yet been agreed to by Ann's Choice or the Ann's Choice Trustee.

The following is a summary of the analysis of the Redwood purchase transaction value as of February 10, 2010:

| | Transaction [1] Proceeds | Available [2] Cash | Committed [3] Capital | Other [4] Assets | Reinstated [5] Debt | Total |
|---|---|---|---|---|---|---|
| ERC | $ 95,702 | $ 26,169 | $ - | $ 15,449 | $ - | $ 137,320 |
| NSC | 9,000 | - | - | - | - | 9,000 |
| Other | - | - | 50,000 | - | - | 50,000 |
| Total Corporate & Other | $ 104,702 | $ 26,169 | $ 50,000 | $ 15,449 | $ - | $ 196,320 |
| | | | | | | |
| Ashburn | 68,775 | 3,535 | - | 732 | - | 73,042 |
| Concord | 59,866 | 13,882 | - | 637 | - | 74,386 |
| Dallas | 26,554 | 305 | - | 282 | - | 27,142 |
| Houston | 12,689 | (1,440) | - | 135 | - | 11,385 |
| Kansas | - | - | - | - | 14,950 | 14,950 |
| Littleton | 55,850 | (215) | - | 10,894 | - | 66,529 |
| Novi | 36,563 | (3,187) | - | 389 | - | 33,764 |
| Warminster | - | 2,178 | - | 4,712 | 75,000 | 81,890 |
| Total Campuses | $ 260,298 | $ 15,058 | $ - | $ 17,781 | $ 89,950 | $ 383,088 |
| | | | | | | |
| Total | $ 365,000 | $ 41,227 | $ 50,000 | $ 33,231 | $ 89,950 | $ 579,408 |

Notes:
(1) Represents initial allocation of value by Redwood and does not reflect the various settlement agreements amongst the various constituents.

(2) Represents cash on hand and escrowed IEDs net of retained cash.

(3) Committed Capital represents the $50 million Working Capital Facility provided by Redwood to further develop the Campuses.

(4) Represents value attributable to the out parcel of land at Littleton, the estimated value of UMBC Building, the estimated present value of the Cedar Crest IED Receivable and the security deposits realted to the HCP properties available for distribution at Warminster.

(5) Includes Warminster Purchase Option Deposit and Kansas TIF Bond and does not include Community Loans.

The Debtors believe the $365 million winning bid accurately reflects the market value of the Debtors' Assets. The Debtors believe that this a reasonable and accurate methodology based on the "market test" inherent in the sale process during which over 80 parties were contacted and the auction process that resulted in 25 rounds of bidding.

Additionally, the Plan and valuation of allocations of the total purchase price, embodied therein reflect a proposed compromise among various parties including the Lenders, Creditors Committee, and the Debtors, subject to confirmation of the Plan. Valuation of the Debtors' assets and allocation of the total purchase price among the Debtor Estates poses a complicated issue which is difficult to answer in a precise manner. The Debtors, together with the Lenders agreed that the most reasonable starting position was the allocation used by the bidders at the Auction. Administrative expenses and DIP financing costs were then allocated among the Estates, and accordingly, the Lenders' collateral by agreement. Thereafter, negotiations were commenced with the various Estate constituencies. A pool of funds was then created to resolve claims of nominally out of the money constituencies. The vast majority of interested parties in these Chapter 11 Cases resolved the valuation and allocation issues mooting the Creditors Committee's Motion for an Order Determining Appropriate Allocation of Value for Debtors' Plan of Reorganization [Dkt. No. 698]. The Plan embodies this compromise which is conditioned upon confirmation of the Plan.

IMPORTANT NOTE ON VALUATION: THE ABOVE VALUATION SUMMARY IS BASED SOLELY UPON THE PURCHASE TRANSACTION CONTEMPLATED UNDER THE DEFINITIVE AGREEMENT AND ASSUMES THAT THE PURCHASE TRANSACTION WILL CLOSE WITHIN THE TIMELINE SET FORTH IN THE

DEFINITIVE AGREEMENT. THE DEBTORS AND THEIR PROFESSIONALS, ACCORDINGLY, MAKE NO ASSURANCES THAT THE RECOVERABLE VALUES REFLECTED ABOVE WOULD BE REALIZED IF THE PURCHASE TRANSACTION DOES NOT CLOSE. MOREOVER, ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

THE VALUE CALCULATIONS PRESENTED HEREIN, WHICH ASSUME THE PURCHASE TRANSACTION IS CLOSED PURSUANT TO THE TERMS OF THE DEFINITIVE AGREEMENT, REPRESENT ESTIMATIONS AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE VALUE SET FORTH ABOVE IS NOT INTENDED TO BE AN ESTIMATION OF THE POST-SALE MARKET VALUE. THE VALUE CALCULATION WAS NOT PREPARED TO CONFORM TO THE UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE OF THE APPRAISAL FOUNDATION.

## IX. Governance of Reorganized Debtors

### A. Board of Managers.

The members of the initial board of directors or managers of the Reorganized Debtors will be disclosed in the Plan Supplement and pursuant to the terms of the Definitive Agreement.

### B. Officers.

The officers of the Debtors immediately prior to the Effective Date will serve as the initial officers of the Reorganized Debtors on and after the Effective Date and in accordance with any employment and severance agreements with the Reorganized Debtors and applicable non-bankruptcy law, unless Redwood designates replacement officers. On and after the Effective Date, the officers of the respective Reorganized Debtors will be determined by the Reorganized Debtors' respective boards of directors or managers.

### C. Continued Corporate Existence.

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date are amended by or in accordance with the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval. The foregoing shall be without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable state law.

### D. Transfer of Assets; Successor Liability.

The Restructuring Transactions may result in substantially all of the respective assets, properties, rights, liabilities, duties, and obligations of certain of the Reorganized Debtors vesting in one or more surviving, resulting, or acquiring companies. ***The Debtors will not be substantively consolidated for purposes of consummation of the Plan***. To the fullest extent permitted by applicable law, no Reorganized Debtor, no Acquisition Company, nor Redwood, nor their respective successors or assigns, nor their properties (including the assets transferred pursuant to the Restructuring Transactions) shall, as a result of confirmation of the Plan or consummation of the Restructuring Transactions contemplated by the Plan or the Definitive Agreement (a) be or be deemed to be a successor to the Debtors or their Estates; (b) have or be deemed to have, *de facto* or otherwise merged or consolidated with or into the Debtors or their Estates; or (c) be or be deemed to be a continuation or substantial continuation of the Debtors, their Estates, or any enterprise of the Debtors. Moreover, to the fullest extent permitted by applicable law, and without limiting the effect of the scope of the foregoing, except as is expressly set forth in the Plan or the Definitive Agreement, as a result of confirmation of the Plan and the Restructuring Transactions, no Reorganized Debtor, no Acquisition Company, nor Redwood, nor their respective successors or assigns, nor their respective properties (including the assets transferred pursuant to the Restructuring Transactions) shall have any successor or vicarious liabilities of any kind or character, including without limitation, any theory of antitrust, environmental, successor or transferee liability, labor law, *de facto* merger or substantial continuity, whether known or unknown, now existing or hereafter arising, asserted or unasserted, fixed or contingent, or liquidated or unliquidated with respect to the Debtors, their Estates, any enterprise of the Debtors, or any obligations of the Debtors or their Estates arising prior to the Effective Date, including, without limitation, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the assets transferred in the Restructuring Transactions prior to the Effective Date.

## X. Other Plan Components

### A. Distribution Procedures.

Only Allowed Claims and Interests may receive Distributions under and in accordance with the Plan.

#### 1. Timing and Conditions.

##### a. Distribution Record Date.

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Interests. The Debtors or the Reorganized Debtors shall have no obligation to recognize any ownership transfer of the Claims or Interests occurring on or after the Distribution Record Date. The Debtors, the Reorganized Debtors, or any party responsible for making Distributions shall be entitled to recognize and deal for all purposes of the Plan only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

b.    Date of Distributions.

Except as otherwise provided in the Plan, any distributions and deliveries to be made pursuant to the Plan shall be made on the Effective Date or as soon thereafter as is practicable. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

c.    Postpetition Interest.

Except as required by applicable bankruptcy law, postpetition interest shall not accrue on or after the Petition Date on account of any Claim. For the avoidance of doubt, nothing herein shall affect the continued accrual of interest on the Ann's Choice Bonds.

d.    Disbursing Agent.

All Distributions pursuant to the Plan shall be made by the Debtors or their named successor or assign, as Disbursing Agent, on or after the Effective Date or as otherwise provided in the Plan. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court, and, in the event that a Disbursing Agent is so ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Disbursing Agent.

e.    Powers of Disbursing Agent.

The Disbursing Agent may (i) effect all actions and execute all agreements, instruments, and other documents necessary to carry out the provisions of the Plan, (ii) make all Distributions contemplated thereby, and (iii) perform such other duties as may be required of the Disbursing Agent by any order of the Bankruptcy Court, pursuant to the Plan.

f.    Surrender of Instruments.

Pursuant to Bankruptcy Code section 1143, as a condition precedent to receiving any Distribution under the Plan, each holder of a certificated instrument or note must surrender such instrument or note held by it to the Disbursing Agent or its designee. Any holder of such instrument or note that fails to (i) surrender the instrument or note or (ii) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Disbursing Agent and furnish a bond in form, substance, and amount reasonably satisfactory to the Disbursing Agent before the fifth anniversary of the Plan Confirmation Date shall be deemed to have forfeited all rights and claims and may not participate any Distribution hereunder. Any Distribution so forfeited shall become property of the Reorganized Debtors. For the avoidance of doubt, the surrender and indemnity terms described herein shall not apply to any Bond Trustee or beneficial holder of bonds associated with any Bonded Community with respect to any Bond Documents, nor shall it apply to any agent, holder or participant in a syndicated or participated loan.

g.    Delivery of Distributions.

Subject to applicable Bankruptcy Rules, all Distributions to Holders of

Allowed Claims shall be made to the Disbursing Agent who shall transmit such Distribution to the applicable Holders of Allowed Claims or their designees. If any Distribution to a Holder of an Allowed Claim is returned as undeliverable, the Disbursing Agent shall use reasonable efforts to determine the correct current address of such Holder, but no Distribution to such Holder shall be made unless and until the Disbursing Agent has determined to the best of its ability the current address of such Holder, at which time a Distribution shall be made to such Holder without interest; provided that such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one (1) year from the Effective Date. After such date, all unclaimed property or interest in property shall revert to the respective Reorganized Debtor, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

h.      Manner of Payment.

All Distributions of Cash to the creditors of each of the Debtors under the Plan shall be made by the applicable Debtor or the Trustee of the Liquidating Creditor Trust to the applicable Disbursing Agent.

At the option of the Debtors or Redwood, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements, *provided*, *however*, that payment of the Auction Fee to Coastwood shall be made by wire transfer unless Coastwood consents otherwise which consent shall be in Coastwood's sole and absolute discretion.

i.      Minimum Distributions.

Holders of Allowed Claims in an amount which is less than $1,000.00 must request a Distribution for such Claim in writing to the Reorganized Debtors.

j.      Allocations Between Principal and Interest.

To the extent that any Allowed Claim entitled to a Distribution under the Plan includes both principal and accrued but unpaid interest, such Distribution shall be allocated to the principal amount (as determined for federal income tax purposes) of the Claim first, and then to accrued but unpaid interest. For the avoidance of doubt, nothing herein shall affect the application of funds pursuant to the terms of the documents relating to the Ann's Choice Bonds.

k.      Setoffs.

The Debtors and the Reorganized Debtors may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which a Distribution shall be made), any claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim the Debtors or the Reorganized Debtors may have against the Holder of such Claim.

### 2. Treatment of Disputed Claims.

a. Objections.

The Debtors and the Reorganized Debtors shall be entitled to file objections to all Claims that are otherwise not Allowed Claims under the Plan or otherwise, and Redwood shall be entitled to file an objection to any Claim which may affect the obligations of Redwood, as provided for under the Definitive Agreement and this Plan. Any objections to Claims shall be served and filed on or before the later of (i) one hundred eighty (180) days after the Effective Date or (ii) such later date as may be fixed by the Bankruptcy Court.

b. Estimation.

The Debtors or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Contingent Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to such objection. In the event that the Bankruptcy Court estimates any Contingent Claim or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim. The aforementioned objection, estimation, and resolution procedures are intended to be cumulative and rather than procedures that are exclusive of the others.

c. Payments and Distributions.

Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no Distribution shall be made on account of such Claim unless and until the Disputed Claim becomes an Allowed Claim.

At such time as a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall distribute to the Holder of such Claim, such Holder's *pro rata* portion of the property distributable with respect to the Class in which such Claim belongs. To the extent that all or a portion of a Disputed Claim is disallowed, the Holder of such Claim shall not receive any Distribution on account of the portion of such Claim that is disallowed and any property withheld pending the resolution of such Claim shall be reallocated *pro rata* to the Holders of Allowed Claims in the same Class.

d. Distributions After Effective Date.

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, a Distribution shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing

Agent shall provide to the Holder of such Claim, the Distribution to which such Holder is entitled pursuant to the applicable provisions of the Plan. For Disputed Claims that have not been Allowed as of the Effective Date, any Distributions made after the Effective Date to Holders of such Disputed Claims (which later become Allowed Claims after the Effective Date) shall be deemed to have been made on the Effective Date.

e.      <u>Disallowed Claims.</u>

All Claims held by persons or entities against whom or which any Debtor has commenced a proceeding asserting a cause of action under sections 542, 543, 544, 545, 547, 548, 549, and/or 550 of the Bankruptcy Code shall be deemed disallowed Claims pursuant to section 502(d) of the Bankruptcy Code and Holders of such Claims shall not be entitled to vote to accept or reject the Plan. Claims deemed disallowed pursuant to Section 9.7 of the Plan shall continue to be disallowed for all purposes until the avoidance action against such party has been settled or resolved by Final Order and any sums due to the Debtors or the Reorganized Debtors from such party have been paid.

**B.**      **Executory Contracts and Unexpired Leases.**

**1.**      **Executory Contracts and Unexpired Leases.**

Pursuant to section 365 of the Bankruptcy Code, a debtor in possession may assume or reject an executory contract or unexpired lease. A debtor in possession may reject any executory contract or unexpired lease that it has determined, within its exercise of its sound business judgment, would be burdensome to the estate to continue performing under the terms of such executory contract or unexpired lease. It is likewise within a debtor in possession's discretion to assume any executory contract or unexpired lease. If a debtor in possession assumes an executory contract or unexpired lease, the debtor in possession must cure any existing defaults thereunder or provide adequate assurance that it will promptly cure any defaults.

Section 10 of the Plan provides that all executory contracts and unexpired leases to which any of the Debtors are parties are hereby rejected as of the Effective Date except for an executory contract or unexpired lease that (i) previously has been assumed pursuant to Final Order of the Bankruptcy Court, (ii) is specifically designated as an executory contract or unexpired lease to be assumed in the Plan or in any Plan Supplement, or (iii) is the subject of a separate assumption motion filed by the Debtors under section 365 of the Bankruptcy Code prior to the Effective Date.

Assumption of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full, final, and complete release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults or provisions restricting the change in control of ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time prior to the effective date of assumption. Anything in the Schedules and any Proofs of Claim filed with respect to any executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other entity.

## 2. Cure of Defaults.

The Plan provides that except to the extent that different treatment has been agreed to by the nondebtor party or parties to any executory contract or unexpired lease to be assumed pursuant to the Plan, the Debtors shall, pursuant to sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within thirty (30) days of the Plan Confirmation Date, file and serve a pleading with the Bankruptcy Court listing the cure amounts of all executory contracts or unexpired leases to be assumed. The parties to such executory contracts or unexpired leases to be assumed by the Debtors shall have fifteen (15) days from service of such pleading to object to the cure amounts listed by the Debtors. If there are any objections filed, the Bankruptcy Court shall hold a hearing. The Debtors shall retain their right to reject any of their executory contracts or unexpired leases, including executory contracts or unexpired leases the assumption of which have been objected to based on any proposed cure amounts.

## 3. Rejection Damages Claims.

In the event that the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to the Plan results in damages to a counterparty to such executory contract or unexpired lease, a Claim for such damages, if not heretofore evidenced by a timely and properly filed Proof of Claim, shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, or their respective properties or interests in property as agents, successors, or assigns, unless a Proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Debtors and the Reorganized Debtors on or before the date that is thirty (30) days after the Effective Date or such later rejection date that occurs as a result of a dispute concerning amounts necessary to cure any defaults.

## 4. Assignment.

On and after the Effective Date, pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, the Debtors and Reorganized Debtors may transfer and assign any of their executory contracts or unexpired leases that have not been rejected to Redwood, the Acquisition Companies or any of their affiliates without any further act, authority, or notice *subject to* the unqualified right of Redwood, the Acquisition Companies, or an affiliate of such entities to refuse such transfer or assignment. Notwithstanding the above or any other provision of this Disclosure Statement, the Plan or any order on the Disclosure Statement and/or Plan, the foregoing shall not impair rights against any party not a Debtor under the Bond Documents.

## C. Effect of Confirmation.

## 1. Vesting of Assets.

Except as otherwise provided in this Plan and Definitive Agreement, as of the Effective Date, pursuant to section 114l(b) and (c) of the Bankruptcy Code, all property of the Debtors' Estates, and any property acquired by a Debtor or Reorganized Debtor under the Plan, shall vest in the Reorganized Debtors, the Liquidating Creditor Trust, or the Acquisition Companies, as applicable, free and clear of all claims, liens, encumbrances, charges, and other interests, except as expressly provided in the Plan, in the Liquidating Creditor Trust documents

and the Definitive Agreement. On or after the Effective Date, except as otherwise provided in, and subject to, the Plan and the Definitive Agreement, each Reorganized Debtor, the Liquidating Creditor Trust, and/or Acquisition Company may operate its business and may use, acquire, and dispose of property and compromise or settle any Claims or causes of action free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, without supervision or approval by the Bankruptcy Court, and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as provided herein. Without limiting the foregoing, each Reorganized Debtor may pay the charges it incurs on or after the Effective Date for Professionals' fees and expenses, disbursements, expenses or related support services (including fees relating to the preparation of Professional fee applications) without application to, or approval of, the Bankruptcy Court.

## 2.   Injunction.

Upon the Bankruptcy Court's entry of the Plan Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan or any Restructuring Transaction contemplated by the Definitive Agreement.

Except as otherwise provided in the Plan, all persons or entities who have held, now hold, or may hold Claims against any of the Debtors or Interests in the Debtors and all other parties in interest, along with their respective present and former employees, agents, officers, directors, principals, and affiliates, are permanently enjoined from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to such Claim or Interest against (a) the Debtors, (b) the Reorganized Debtors, (c) Redwood, the Creditors Committee and each of its members, the Liquidating Creditor Trust, the Trustee, the Corporate Revolver Lenders, the Construction Lenders, HCP, Inc., HCP ER2, LP, HCP ER3, LP, HCP ER6, LP, Agents, or the Lenders including any participants, the lenders under the UMBC Building Construction Loan, the holders of Participating Mezzanine Claims, the NSC, the NSC-NFPs, the Acquisition Companies, and (d) their Advisors, affiliates, employees, advisors, officers and directors, agents, and attorneys or any thereof and, in the case of Agents or Lenders, both in their capacities as Agents or Lenders and in any other capacities ((c) and (d) above, the "***Third Party Releasees***"); (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtors, the Reorganized Debtors, or the Third Party Releasees; (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, the Reorganized Debtors, or Third Party Releasees against the property or interests in property of the Debtors, the Reorganized Debtors, or Third Party Releasees; or (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtors, the Reorganized Debtors, or Third Party Releasees, with respect to such Claim or Interest. Such injunction shall extend to any successors of the Debtors, Reorganized Debtors, Third Party Releasees, and their respective properties and interest in properties. Notwithstanding the above, neither the foregoing terms nor any other provision of the Disclosure Statement, the Plan or any order on the Disclosure Statement and/or Plan shall release or in any manner limit (i) the obligations of any NSC-NFP or other party not a Debtor in these cases under any Bond Documents; (ii) any rights or claims by any Bond Trustee or beneficial bondholder against any NSC-NFP or other party not a Debtor based on obligations

under any Bond Documents; or (iii) any rights or claims by any NSC-NFP against any party not a Debtor in these cases based on obligations under any Bond Documents. Notwithstanding the foregoing, the Lenders and Agents shall not be enjoined from commencing any actions, enforcing or pursuing in any manner whatsoever the following claims against the NSC and NSC-NFPs the following: (A) claims for indemnity, contribution, cross claims, counter claims and third party claims in the event that any of the Agents and/or the Lenders are sued by any third party; (B) claims under the parties' subordination agreements to the extent that the NSC and NSC-NFPs receive any distributions from the bankruptcy estates, Creditors' Trust, the Debtors, the Reorganized Debtors or any other source related to the bankruptcy cases (except for the assumed Community Loans); and (C) that litigation commenced in Circuit Court for Baltimore County by PNC Bank, National Association against the NSC/NFPs, Case No. _____ (the "**NSC/NFP Carveout Claims**"). The Debtors reserve the right to amend or modify the language in this Section and Section 12.2 of the Plan. Any such amendment or modification will be included in a Plan Supplement filed with the Bankruptcy Court no later than five(5) Business Days prior to the Plan Confirmation Hearing.

### 3. Terms of Injunctions or Stays.

Unless otherwise provided in the Plan, all injunctions or stays pursuant to section 105 or 362 of the Bankruptcy Code arising under or entered during the Chapter 11 Cases, or otherwise, and in existence on the Plan Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay and to the extent consistent with the terms and provisions of this Plan. Notwithstanding the foregoing, the Lenders and Agents shall not be enjoined from commencing any actions, enforcing or pursuing in any manner the NSC/NFP Carveout Claims, nor shall the NSC-NFPs be enjoined from asserting any defense to said claims.

### 4. Indemnification.

Subject to applicable provisions of the Plan, any obligations of the Debtors pursuant to their corporate charters and bylaws to indemnify current directors, officers, agents, and/or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such directors, officers, agents, and/or employees, based upon any act or omission for or on behalf of the Debtors shall not be discharged or impaired by confirmation of the Plan, provided that the Reorganized Debtors shall not indemnify directors, officers, or employees of the Debtors for any matters that are determined by a Final Order of a court of competent jurisdiction to be excluded from any releases herein. Subject to applicable sections of this Plan, such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors hereunder and shall continue as obligations of the Reorganized Debtors unless such obligation previously was rejected by the Debtors pursuant to a Final Order or is the subject of a motion to reject pending on the Effective Date. Notwithstanding the foregoing, any such indemnification obligation in favor of a director, officer, agent, and/or employee of the Debtors who, as of the Petition Date, no longer was a director, officer, or employee of a Debtor shall terminate and be discharged pursuant to section 502(e) of the Bankruptcy Code or otherwise, as of the Effective Date: provided, however, that the Reorganized Debtors reserve the right to honor or reaffirm such indemnification obligations (other than those already rejected or terminated by a prior or subsequent Final Order of the Bankruptcy Court), whether or not executory, in which case such honoring or reaffirmation shall be in complete satisfaction,

discharge, and release of any Claim on account of such indemnification obligation. Redwood, the Acquisition Companies and any other affiliate of Redwood are not obligated to indemnify directors, officers, agents, or employees of the Debtors for any acts or omission occurring prior to the Closing Date. Further, the Liquidating Creditor Trust shall not be liable, directly or indirectly, for such indemnification obligations and such obligations shall be without prejudice to the Liquidating Creditor Trust.

### D. Releases and Exculpation.

#### 1. Releases.

As of the Effective Date, the Debtors, the Reorganized Debtors, and Third Party Releasees shall be deemed to be forever released and discharged from any and all Claims, obligations, suits, judgments, arbitrations, damages, rights, causes of action (including, without limitation, Bankruptcy Code chapter 5 causes of action) or liabilities, whether known or unknown, whether foreseen or unforeseen, based upon any action or omission, transaction or occurrence taking place on or before the Effective Date of the Plan in any way relating to the Debtors, the Chapter 11 Cases, the Estates, or the Plan, and/or which may have directly or indirectly impacted or affected in any way the value of any Claim or corresponding Distribution on any Claim against the Debtors. The Plan Confirmation Order will enjoin any prosecution of any Claim, debt, right, cause of action or liability which was or could have been asserted against the Debtors, Reorganized Debtors, or Third Party Releasees on or after the Effective Date, provided, however, that the foregoing will not operate as a waiver or release from any causes of action arising out of the gross negligence, willful misconduct, intentional fraud, or criminal liability of the Debtors, the Reorganized Debtors, or Third Party Releasees. The provisions of the Plan shall not operate as a release of any of the Debtors', the Reorganized Debtors', or Third Party Releasees' obligations under the Plan and the rights of the Debtors, the Reorganized Debtors, Redwood, or the Acquisition Companies and their affiliates, employees, advisors, officers and directors, successors, and assigns to enforce the Plan and the contracts, instruments, indentures and other agreements or documents delivered or assumed hereunder, including, without limitation, the Definitive Agreement. Notwithstanding the above, neither the foregoing terms nor any other provision of the Disclosure Statement, the Plan or any order on the Disclosure Statement and/or Plan shall release or in any manner limit (i) the obligations of any NSC-NFP or other party not a Debtor in these cases under any Bond Documents; (ii) any rights or claims by any Bond Trustee or beneficial bondholder against any NSC-NFP or other party not a Debtor based on obligations under any Bond Documents; or (iii) any rights or claims by any NSC-NFP against any party not a Debtor in these cases based on obligations under any Bond Documents. Notwithstanding the foregoing, the NSC/NFP Carveout Claims are not released or discharged. Nothing in this Section or under the Plan shall operate to release or in any manner limit (a) the obligations of any person or entity that is not one of the Debtors under any agreements or other documents, (b) the rights of any lender (or other creditor), or agent for such lender (or other creditor), with respect to any person or entity, or the property of any person or entity, that is not one of the Debtors relating to such obligations, or (c) the rights of any person or entity that is not one of the Debtors relating to such obligations. The Debtors reserve the right to amend or modify the language in this Section and Section 12.5 of the Plan. Any such amendment or modification will be included in a Plan Supplement filed with the Bankruptcy Court no later than five(5) Business Days prior to the Plan Confirmation Hearing.

## 2.    Releases by Holders of Claims and Interests.

Subject to the right of each creditor to opt-out with respect to the Third Party Releasees, as of the Effective Date,  the Debtors, the Reorganized Debtors, and Third Party Releasees shall be released from all claims (other than the rights of the Debtors and the Reorganized Debtors to enforce the Plan and the contracts, instruments, indentures and other agreements or documents delivered or assumed thereunder, including, without limitation, the Definitive Agreement) that may be asserted against them by each Holder of a Claim or Interest that votes in favor of the Plan (or is deemed to accept the Plan), provided, however, that the foregoing will not operate as a waiver or release from any causes of action arising out of the gross negligence, willful misconduct, intentional fraud, or criminal liability of any such person or entity.  Notwithstanding the above, neither the foregoing terms nor any other provision of the Disclosure Statement, the Plan or any order on the Disclosure Statement and/or Plan shall release or in any manner limit (i) the obligations of any NSC-NFP or other party not a Debtor in these cases under any Bond Documents; (ii) any rights or claims by any Bond Trustee or beneficial bondholder against any NSC-NFP or other party not a Debtor based on obligations under any Bond Documents; or (iii) any rights or claims by any NSC-NFP against any party not a Debtor in these cases based on obligations under any Bond Documents.  Notwithstanding the foregoing, the NSC/NFP Carveout Claims are not released or discharged.  Nothing in this Section or under the Plan shall operate to release or in any manner limit (a) the obligations of any person or entity that is not one of the Debtors under any agreements or other documents, (b) the rights of any lender (or other creditor), or agent for such lender (or other creditor), with respect to any person or entity, or the property of any person or entity, that is not one of the Debtors relating to such obligations, or (c) the rights of any person or entity that is not one of the Debtors relating to such obligations.  The Debtors reserve the right to amend or modify the language in this Section and Section 12.6 of the Plan.  Any such amendment or modification will be included in a Plan Supplement filed with the Bankruptcy Court no later than five(5) Business Days prior to the Plan Confirmation Hearing.

## 3.    Exculpation.

Notwithstanding anything provided in the Plan, as of the Effective Date, none of the Debtors, the Reorganized Debtors, or Third Party Releasees shall have or incur (including but not limited to claims or Causes of Action by any Lenders or participants) any liability for any claim, cause of action, or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the Chapter 11 Cases, the formulation, negotiation, dissemination, confirmation, consummation, or administration of the Plan, or property to be distributed under the Plan, or any other act or omission in connection with the Chapter 11 Cases, the Plan, or any contract, instrument, indenture, or other agreement or document related thereto or delivered thereunder, including, without limitation, the Definitive Agreement; provided, however, that the foregoing shall not affect the liability of any person that otherwise would result from any such act or omission to the extent that such act or omission is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, intentional fraud, or criminal conduct.  The foregoing shall not release or in any manner limit (i) the obligations of any NSC-NFP or other party not a Debtor in these cases under any Bond Documents; (ii) any rights or claims by any Bond Trustee or beneficial bondholder against any NSC-NFP or other party not a Debtor based on obligations under any Bond Documents; or (iii)

any rights or claims by any NSC-NFP against any party not a Debtor in these cases based on obligations under any Bond Documents. This Section shall not apply to the NSC/NFP Carveout Claims, the liability for which is fully preserved. Nothing in this Section or under the Plan shall operate to release or in any manner limit (a) the obligations of any person or entity that is not one of the Debtors under any agreements or other documents, (b) the rights of any lender (or other creditor), or agent for such lender (or other creditor), with respect to any person or entity, or the property of any person or entity, that is not one of the Debtors relating to such obligations, or (c) the rights of any person or entity that is not one of the Debtors relating to such obligations. The Debtors reserve the right to amend or modify the language in this Section and Section 12.7 of the Plan. Any such amendment or modification will be included in a Plan Supplement filed with the Bankruptcy Court no later than five(5) Business Days prior to the Plan Confirmation Hearing.

**E.      Preservation of Causes of Action/Reservation of Rights.**

Except as provided in Section 6.4 of the Plan (Liquidating Creditor Trust) or Section 12.5 of the Plan (Releases), nothing contained in the Plan (including Section 12 (but excluding Section 12.5) of the Plan), the Plan Documents, or in the Plan Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or causes of action that the Debtors, the Reorganized Debtors, Redwood, or the Acquisition Companies may have or which the Reorganized Debtors may choose to assert on behalf of their respective Estates under any provision of the Bankruptcy Code or any applicable non-bankruptcy law or rule, common law, equitable principle or other source of right or obligation, including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, the Reorganized Debtors, their officers, directors, or representatives; and (ii) the turnover of all property of the Debtors' estates. This Section shall not apply to any claims released, waived, relinquished, exculpated, compromised, or settled under the Plan or a pursuant to a Final Order. Any NSC/NFP Carveout Claims are not waived or relinquished by the Lenders or the Agents.

Except as expressly provided in the Plan, nothing contained in the Plan, the Plan Documents, or in the Plan Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, cause of action, right of setoff, or other legal or equitable defense. No entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any cause of action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available causes of action against them. The Debtor and the Reorganized Debtors expressly reserve all rights to prosecute any and all causes of action against any entity, except as otherwise expressly provided in the Plan. Specifically, any NSC/NFP Carveout Claims are not waived or relinquished by the Lenders or the Agents.

**F.      Administrative Provisions.**

**1.      Retention of Jurisdiction.**

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, consideration of the following matters:

(a)     motions and applications pursuant to section 365 of the Bankruptcy Code for the assumption or rejection of executory contracts or unexpired leases and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting from assumption and/or rejection;

(b)     any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Plan Confirmation Date;

(c)     matters related to ensuring Distributions to Holders of Allowed Claims are accomplished pursuant to the terms of the Plan;

(d)     matters related to Claims, including the determination of allowance, classification, priority, compromise, estimation, or payment of any Claim;

(e)     matters related to entering, implementing, or enforcing such orders as may be appropriate in the event the Plan Confirmation Order is stayed, reversed, revoked, modified, or vacated;

(f)     issuance of injunctions, entering and implementing other orders, and taking such other actions as may be necessary and appropriate to restrain interference by any person with the consummation, implementation, or enforcement of the Plan, the Plan Confirmation Order, or any other order of the Bankruptcy Court related to the Chapter 11 Cases;

(g)     determination of any application or other request to modify the Plan pursuant to section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, this Disclosure Statement for the Plan, or any order of the Bankruptcy Court, including the Plan Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)     determination of all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Plan Confirmation Date;

(i)     determination of disputes related to the interpretation, implementation, or enforcement of the Plan, the Plan Confirmation Order, any transactions or payments contemplated pursuant to the Plan and/or Plan Confirmation Order or under the Definitive Agreement, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)     any actions and/or issues in connection with such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation of the Plan;

(k)     any disputes arising out of, and to enforce any order approving alternative dispute resolution procedures to resolve personal injury, employment litigation, and similar claims pursuant to section 105(a) of the Bankruptcy Code;

(l)     determination of such other matters and for such other purposes as may be provided for or encompassed under the Plan Confirmation Order;

(m)     determination of matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(n)     determination of any other matters related to the Plan, the Disclosure Statement, the Plan Confirmation Order and related documents and not inconsistent with the Bankruptcy Code and Title 28 of the United States Code;

(o)     entering of a final decree closing the Chapter 11 Cases;

(p)     recovery of all assets of the Debtors and property of the Estates, wherever located; and

(q)     determination of any rights, Claims, or causes of action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

## 2.     Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Maryland, without giving effect to the principles of conflicts of laws, shall govern the rights, obligations, construction, and implementation of the Plan and the Restructuring Transactions consummated or to be consummated in connection therewith.

## 3.     Corporate Action.

On the Effective Date, all matters provided in the Plan that would otherwise require approval of the equity holders, directors, managers and/or members of one or more of the Debtors or Reorganized Debtors, including, without limitation, the election or appointment of managers, directors and officers of the Reorganized Debtors pursuant to the Plan, and amendments of the Debtors' organizational documents will be deemed to have occurred and will be in effect from and after the Effective Date pursuant to applicable general business organizations law of the state in which the Debtors or Reorganized Debtors are organized, without any requirement of further action by the equity holders, directors,  managers, and/or members of the Debtors or Reorganized Debtors.

## 4.     Modification or Amendments to the Plan and Plan Supplement.

The Plan and/or Plan Supplement may be amended, modified, or supplemented by the Debtors or the Reorganized Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, subject to the terms of the Definitive Agreement and subject to Redwood's prior consent, which consent shall by in Redwood's sole and absolute discretion.   In addition, after the Plan Confirmation Date and subject to the terms of the Definitive Agreement, the Debtors or the Reorganized Debtors may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Plan Supplement, or the Plan Confirmation Order, with respect to such matters as may be

necessary to carry out the purposes and effects of the Plan subject to Redwood's prior consent, which consent shall be in Redwood's sole and absolute discretion.

Subject to the terms of the Definitive Agreement, and further subject to Redwood's prior consent, which consent shall be in Redwood's sole and absolute discretion, the Debtors may make appropriate technical adjustments and modifications to the Plan or Plan Supplement prior to the Effective Date without further order or approval of the Bankruptcy Court.

### 5. Revocation or Withdrawal of the Plan.

Subject to the terms of the Definitive Agreement and subject to Redwood's prior consent, which consent shall be in Redwood's sole and absolute discretion, the Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date. Any such action may only be taken if it is in the exercise of the Debtors' fiduciary duty to their creditors. If the Debtors take such action, the Plan shall be deemed null and void. In such event, nothing contained in the Plan shall constitute or be deemed to be a waiver or release of any Claims by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in further proceedings involving the Debtors.

### 6. Exemption from Certain Transfer Taxes.

To the extent that the issuance of a security under the Plan falls within the exception of Bankruptcy Code section 1146(a), no stamp or similar tax is payable upon a transfer of such a security. Pursuant to section 1146(a) of the Bankruptcy Code, any issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan of reorganization, which is ultimately confirmed, is not taxable under any law imposing a stamp or similar tax. Moreover, any transfer of assets from a Debtor to a Reorganized Debtor, Acquisition Company, Redwood, or any other entity (including the contemplated transfer of real property by the mezzanine lenders, the disposition of the Littleton Out-Parcel and the transfer or other disposition of the property securing the UMBC Building Construction Loan Claims pursuant to the Plan) in accordance with, in contemplation of, or in connection with the Plan or the Definitive Agreement, including the transfer of assets pursuant to the Restructuring Transactions, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local government officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment pursuant to section 1146(a) of the Bankruptcy Code.

### 7. Section 1145 Exemption.

To the extent that any issuance of interests under this Plan is considered an offer or sale of a security within the meaning of section 1145 of the Bankruptcy Code, the issuance shall be exempt from registration under the Securities Act.

### 8. Binding Effect of Plan.

Upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, Redwood, the Acquisition Companies, and any and all Holders of Claims and Interests (irrespective of whether any such Holders of Claims and Interests failed to vote to accept or reject the Plan, voted to accept or reject the Plan, or are deemed to accept or reject the Plan), all entities that are parties to or are subject to the settlements, compromises, releases, exculpations, discharges, and injunctions described in the Plan, each entity acquiring or retaining property under the Plan and the Definitive Agreement, and any and all non-Debtor parties to executory contracts and unexpired lease with the Debtors.

### 9. Dissolution of Statutory Committees.

Except with respect to the prosecution of fee applications, any committees appointed pursuant to section 1102 of the Bankruptcy Code in the Chapter 11 Cases shall dissolve on the later of the Effective Date and the valid creation of the Liquidating Creditor Trust and appointment of the Trustee.

### 10. Dissolution of the Liquidating Creditor Trust.

The Liquidating Creditor Trust will terminate five (5) years after the Effective Date, however, the Trustee or the Bankruptcy Court may extend the term of the Liquidating Creditor Trust. Upon termination of the Liquidating Creditor Trust, all beneficial interests in the Liquidating Creditor Trust will be extinguished, the legal existence of the Liquidating Creditor Trust will terminate, and any remaining Trust Assets on such date will vest in the Reorganized Debtors free and clear of all claims, liens, encumbrances and other liabilities, in each case without further action of the Bankruptcy Court or any other court, administrative body or other agency. The Trustee may cause to be filed with any applicable governmental or other regulatory authority such certificate of dissolution or cancellation and any other certificates and documents as the Trustee, in its sole discretion, deems necessary to reflect the termination of the legal existence of the Liquidating Creditor Trust, and may take any other action it deems necessary or desirable to reflect the transfer of all remaining Trust Assets (if any) to the Reorganized Debtors.

### 11. Time.

Bankruptcy Rule 9006 shall apply to all computations of time periods prescribed or allowed by the Plan unless otherwise set forth in the Plan or provided by the Bankruptcy Court.

## XI. Risks and Considerations

### A. Bankruptcy Considerations.

*The Plan is a global compromise between the Lenders, Agents, HCP Entities, Morgan Stanley, the Creditors Committee, NSC, and the Office of the Texas Attorney General. If the Plan as proposed (especially, the agreed upon allocations) is not adopted, then the aforementioned parties may not support an alternative plan.*

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will confirm the Plan as proposed. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes. Although the Debtors believe that the Effective Date will occur soon after the Plan Confirmation Date, there can be no assurance as to such timing.

*Redwood has amended the Definitive Agreement to, among other things, extend the "drop dead date" with respect to the Purchase Transaction to April 30, 2010 on the condition that the Disclosure Statement will be approved by the Court on or before March 9, 2010.*

In the event the conditions precedent described in the Definitive Agreement and Section 11.1 of the Plan have not been satisfied, or waived (to the extent possible) by the Debtors or applicable party (as provided for in the Plan) as of the Effective Date, then the Plan Confirmation Order will be vacated, no Distributions will be made pursuant to the Plan, and the Debtors and all Holders of Claims and Interests will be restored to the status quo ante as of the day immediately preceding the Plan Confirmation Date as though the Plan Confirmation Date had never occurred.

The Plan provides for no Distribution to certain Classes as specified in Sections 3 and 4 of the Plan. The Bankruptcy Code conclusively deems these Classes to have rejected the Plan. Notwithstanding the fact that these Classes are deemed to have rejected the Plan, the Bankruptcy Court may confirm the Plan if at least one Impaired Class votes to accept the Plan (with such acceptance being determined without including the vote of any "insider" in such class). As to each Impaired Class that has not accepted the Plan, the Plan may be confirmed if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to these Classes. The Debtors believe that the Plan satisfies these requirements.

**B.      Risks Inherent in Financial Projections.**

Financial information contained herein has not been audited, reviewed or examined by the Debtors' independent public accountants. The Financial Projections for the Reorganized Debtors included herein are "forward-looking statements." Such forward-looking statements are subject to various risks and uncertainties that could cause actual results to differ materially from those reflected in the Financial Projections, including, but not limited to, the Reorganized Debtors' and Acquisition Companies' ability to operate their business consistent with the Financial Projections, comply with the covenants of their financing agreements, attract and retain key employees and residents, comply with the terms of their existing contracts and leases, and respond to adverse regulatory actions taken by federal and state governments. Future performance of the companies is, to a certain extent, subject to general economic, financial, competitive, legislative, regulatory and other influences that are beyond the Companies' control. While no assurance can be provided, based upon the current level of operations and anticipated increases in revenues and cash flows described in the Financial Projections, the Debtors believe that cash flow from operations and available Cash from the Working Capital Facility will be adequate to fund Distributions under the Plan and allow the emerging entities to continue operating the Business and meet their future liquidity needs. The Debtors do not undertake the

responsibility to update the Financial Projections on the occurrence of unanticipated events, which may cause actual results to differ from those expressed or implied by the Financial Projections contained herein.

## C. Competition.

Companies operating in the senior care or senior living industry face a high level of competition. The Reorganized Debtors and emerging Acquisition Companies will compete with numerous other companies providing similar long-term care alternatives to seniors, such as the myriad of services offered in the Debtors' continuing care retirement communities. There is no assurance that the Reorganized Debtors and emerging Acquisition Companies will be able to compete successfully and their reputation among seniors will develop and continue. Accordingly, the companies cannot predict what effect competitive pressures will have on the Business going forward.

## D. Government Regulation.

The senior care industry is heavily regulated by state and federal authorities. Each state in which ERC operates has different regulations with respect to long-term care facilities concerning, among other things, disclosure of financial statements, solvency of the facility, maintenance of a certain amount of reserves, and the refunding of IEDs.

The NFPs operating the Campuses are required to satisfy the regulations of each state where its facilities are located. Remedies for violations of these state regulations include temporary suspension of the facility's license, permitting residents to obtain liens, increased oversight of the facility, restricting the facility's ability to accept new residents, and closing the facility.

Regulation of the senior care industry is constantly evolving. State regulations may in the future adopt new laws, regulations, and/or policies regarding a wide variety of matters related to the senior care industry, which could directly or indirectly affect the operation, management and/or ownership of the Campuses. The Debtors are unable to predict the content of any new regulations that may affect the Business or what impact new regulations may have on the Business, including future financial performance.

## E. Transfer Restrictions.

The interests to be issued pursuant to the terms of the Plan have not been, nor will they be, registered under the Securities Act, or any state or blue sky securities laws, and are being offered to "accredited investors" as that term is defined in Rule 501(a) of the Securities Act. The interests cannot be transferred without registration under the Securities Act or, if applicable, the securities laws of any sate or other jurisdiction, unless such a transaction is exempt from registration.

## F. Lack of Marketability.

There is no readily available market for the interests issued pursuant to the Plan and no such market is expected to develop. The absence of such a market for the interests could

hinder the holders of such interests ability to resell the interests. The Debtors make no assurance that the holders of such interests will be able to liquidate the interests until the interests are redeemed.

Any interests issued in connection with the Restructuring Transactions under the Plan may not be listed on any public securities exchange. Accordingly, there is no assurance that a holder of newly issued interests will be able to sell such interests in the future on an active public securities market. The lack of a public market for trading such interests and other factors, such as future economic conditions, may lead to a higher or lower value than the value ascribed to such securities or interests under the Plan.

## G. No Duty to Update Disclosures.

The Debtors have no duty to update the information contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, or unless the Debtors are required to do pursuant to an order of the Bankruptcy Court. Delivery of the Disclosure Statement after the date hereof does not imply that the information contained herein has remained unchanged.

## H. Representations Outside this Disclosure Statement.

This Disclosure Statement contains representations concerning or related to the Debtors, the Reorganized Debtors, and the Plan that are authorized by the Bankruptcy Code and the Bankruptcy Court. Please be advised, that any representations or inducements outside this Disclosure Statement and any related documents which are intended to secure your acceptance or rejection of the Plan should not be relied upon by Holders of Claims that are entitled to vote to accept or reject the Plan.

## I. No Admission.

The information and representations contained herein shall not be construed to constitute an admission of, or be deemed evidence of, any legal effect of the Plan on the Debtors or Holders of Claims and Interests.

## J. Tax and Other Related Considerations.

The contents of this Disclosure Statement is not intended and should not be construed as tax, legal, business or other professional advice. Holders of Claims and/or Interests should seek advice from their own independent tax, legal or other professional advisors based on their own individual circumstances.

## XII. Plan Confirmation and Consummation

### A. Plan Confirmation Hearing.

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a Plan. On, or as promptly as practicable after the filing of the Plan and this Disclosure Statement, the Debtors will request pursuant to the requirements of the Bankruptcy Code and the Bankruptcy Rules, that the Bankruptcy Court

schedule the Plan Confirmation Hearing. Notice of the Plan Confirmation Hearing will be provided to all known creditors, equity holders or their representatives. The Plan Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Plan Confirmation Hearing or any subsequent adjourned Plan Confirmation Hearing.

Pursuant to Bankruptcy Code section 1128(b), any party in interest may object to confirmation of a plan of reorganization. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the particular Debtor or Debtors, the basis for the objection and the specific grounds of the objection, and must be filed with the Bankruptcy Court, with a copy to Chambers, together with proof of service thereof, and served upon (i) DLA Piper LLP (US), 1251 Avenue of the Americas, New York, New York 10020 (Attn: Tom Califano, Esq. and Jeremy R. Johnson, Esq.), attorneys for the Debtors, (ii) the Office of the United States Trustee for the Northern District of Texas, 1100 Commerce Street, Room 976, Dallas, TX 75242 (Attn: George F. McElreath and Nancy Sue Resnick), and (iii) such other parties as the Bankruptcy Court may order.

Bankruptcy Rule 9014 governs objections to confirmation of the Plan. **UNLESS AN OBJECTION TO CONFIRMATION OF THE PLAN IS TIMELY SERVED UPON THE PARTIES LISTED ABOVE AND FILED WITH THE BANKRUPTCY COURT, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT IN DETERMINING CONFIRMATION OF THE PLAN.**

### B. Plan Confirmation Requirements Under the Bankruptcy Code.

At the Plan Confirmation Hearing, the Bankruptcy Court will consider the terms of the Plan and determine whether the Plan terms satisfy the requirements set out in section 1129 of the Bankruptcy Code.

### C. Plan Consummation.

Upon confirmation of the Plan by the Bankruptcy Court, the Plan will be deemed consummated on the Effective Date. Distributions to Holders of Claims receiving a Distribution pursuant to the terms of the Plan will follow consummation of the Plan. Post-confirmation Estate expenses will be paid from the Wind Down Fund.

### D. Best Interests Test.

The Bankruptcy Code requires that, with respect to an impaired class of claims or interests, each holder of an impaired claim or interest in such class either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount (value) such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the effective date.

The Debtors' costs of a chapter 7 liquidation would necessarily include fees payable to a trustee in bankruptcy, as well as fees likely to be payable to attorneys, advisors, and other professionals that such a chapter 7 trustee may engage to carry out its duties under the

Bankruptcy Code. Other costs of liquidating the Debtors' Estates would include the expenses incurred during the bankruptcy cases and allowed by the Bankruptcy Court in the chapter 7 case, such as reimbursable compensation for the Debtors' professionals, including, but not limited to, attorneys, financial advisors, appraisers, accountants. In addition, claims would arise by reason of the Debtors' breach or rejection of contractual obligations and unexpired leases and executory contracts assumed or entered into by the Debtors during the pendency of the bankruptcy cases.

The foregoing types of claims, costs, expenses, and fees that may arise in a chapter 7 liquidation case would be paid in full from the proceeds of the sale of the Debtors' assets before the balance of those sales proceeds would be made available to pay pre-chapter 11 priority and unsecured claims. The Debtors believe that in a chapter 7 liquidation, no prepetition claims or interests would receive any distribution of property from the Estates.

The liquidation analysis is only an estimation of the probable amount of sales proceeds that may be generated as a result of a hypothetical chapter 7 liquidation of the Debtors' assets. In conducting this analysis, the Debtors and their Professionals relied on a set of assumptions. These assumptions are described below. The liquidation analysis is not a current fair valuation of the Debtors' assets and should not be considered indicative of the values that may be realized in an actual liquidation.

### E. Liquidation Analysis.

As noted above, the Debtors believe that under the proposed terms of the Plan all Holders of Impaired Claims and Interests will receive property with a value not less than the value such Holders would receive in a chapter 7 liquidation of the Debtors' assets. The Debtors' belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to Holders of Impaired Claims and Interests, including (a) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a chapter 7 trustee and professional advisors to the trustee, (b) the erosion in value of assets in a chapter 7 case in the context of the rapid liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, (c) the adverse effects on the Debtors' business as a result of the likely departure of key employees and the probable loss of Campus residents, (d) the substantial increases in claims, (e) the reduction of value associated with a chapter 7 trustee's operation of the Debtors' businesses, and (f) the substantial delay in Distributions to the Holders of Impaired Claims and Interests that would likely ensue in a chapter 7 liquidation and (ii) the liquidation analysis ("***Liquidation Analysis***") prepared by the Debtors' Professionals, which is attached hereto as Exhibit C.

The Debtors believe that any liquidation analysis is speculative, as such an analysis necessarily is premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors. Thus, there can be no assurance as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

For example, the liquidation analysis necessarily contains an estimate of the amount of Claims which will ultimately become Allowed Claims. This estimate is based solely

upon the Debtors' review of its books and records and the Debtors' estimates as to additional Claims that may be filed in the Chapter 11 Cases or that would arise in the event of a conversion of the case from chapter 11 to chapter 7. No order or finding has been entered by the Bankruptcy Court or any other court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis. In preparing the Liquidation Analysis, the Debtors have projected an amount of Allowed Claims that is at the lower end of a range of reasonableness such that, for purposes of the Liquidation Analysis, the largest possible liquidation dividend to holders of Allowed Claims can be assessed. The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including any determination of the value of any Distribution to be made on account of Allowed Claims under the Plan.

To the extent that confirmation of the Plan requires the establishment of amounts for the chapter 7 liquidation value of the Debtors, funds available to pay Claims, and the reorganization value of the Debtors, the Bankruptcy Court will determine those amounts at the Plan Confirmation Hearing. Accordingly, the attached Liquidation Analysis is provided solely to disclose to Holders of Claims the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein.

F.      Feasibility.

Pursuant to section 1129(a)(11) of the Bankruptcy Code, a debtor must demonstrate that a bankruptcy court's confirmation of a plan, is not likely to be followed by the liquidation or need for further financial reorganization of the debtor or its successor under the plan, unless such liquidation or reorganization is proposed under the plan. To determine the feasibility of the Plan, the Debtors have prepared the Financial Projections set forth in Section VIII hereof. Based on these Financial Projections, the Debtors reasonably believe that they will be able to make all Distributions required under the Plan. Therefore, the Bankruptcy Court's confirmation of the Plan is not likely to be followed by liquidation of the Reorganized Debtors or the need for further reorganization.

G.      Section 1129(b).

Section 1129(b) of the Bankruptcy Code provides that the Bankruptcy Court may confirm a plan even if a class of impaired claims or interests votes to reject the plan if the plan does not unfairly discriminate and is fair and equitable with respect to each impaired class of claims or interests that has not accepted the plan.

1.      No Unfair Discrimination.

The "no unfair discrimination" test requires that the plan not provide for unfair treatment with respect to classes of claims or interests that are of equal priority, but are receiving different treatment under the plan.

2.      Fair and Equitable.

The fair and equitable requirement applies to classes of claims of different priority and status, such as secured versus unsecured. The plan satisfies the fair and equitable

requirement if no class of claims receives more than 100% of the allowed amount of the claims in such class. Further, if a class of claims is considered a dissenting class ("**Dissenting Class**"), *i.e.*, a Class of Claims that is deemed to reject the Plan because the required majorities in amount and number of votes is not received from the Class, the following requirements apply:

a. *Class of Secured Claims:*

Each holder of an impaired secured claim either (i) retains its liens on the subject property, to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of the plan of at least the allowed amount of such claim, (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof) or (iii) receives the "indubitable equivalent" of its allowed secured claim.

b. *Class of Unsecured Creditors:*

Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the Dissenting Class will not receive any property under the plan.

c. *Class of Interests:*

Either (i) each interest holder will receive or retain under the plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to the interests of the Dissenting Class will not receive any property under the plan.

The Debtors believe the Plan will satisfy the "fair and equitable" requirement notwithstanding that certain Classes of Claims are deemed to reject the Plan because no Class that is junior to such Class will receive or retain any property on account of the Claims and Interests in such Class.

## XIII. Alternatives to Confirmation and Consummation of the Plan

The Debtors believe the Plan is in the best interests of creditors and should accordingly be accepted and confirmed. If the Plan as proposed, however, is not confirmed, the following three alternatives may be available to the Debtors: (i) a liquidation of the Debtors' assets pursuant to chapter 7 of the Bankruptcy Code; (ii) an alternative plan of reorganization may be proposed and confirmed; or (iii) the Debtors assets may be sold pursuant to Bankruptcy Code section 363.

### A. Chapter 7 Liquidation.

If a plan pursuant to chapter 11 of the Bankruptcy Code is not confirmed by the Bankruptcy Court, the Chapter 11 Cases may be converted to liquidation cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed, pursuant to applicable provisions of chapter 7 of the Bankruptcy Code, to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion

of the effect that a chapter 7 liquidation would have on the recoveries of Holders of Claims is set forth in Section XII.E hereof. The Debtors believe that such a liquidation would result in smaller distributions being made to the Debtors' creditors than those provided for in the Plan because (a) the likelihood that other assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion, (b) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals, (c) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations. In a chapter 7 liquidation, the Debtors believe that there would be little or no Distribution to Holders of Allowed Claims.

### B. Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code.

If the Plan is not confirmed, the Debtors, or any party in interest (if, pursuant to section 1121 of the Bankruptcy Code, the Debtors have not filed a plan within the time period prescribed under the Bankruptcy Code) may propose a different plan. Such a plan might involve either an alternative reorganization structure and continuation of the Business or an orderly liquidation of the Debtors' assets in a chapter 11 bankruptcy proceeding. The Debtors believe that the terms of the Plan result in the realization of the most value for Holders of Claims and Interests against the Debtors' Estates. If the Debtors were to liquidate their assets in the Chapter 11 Cases, the Debtors would still incur the expenses attendant with closing or winding down operations or transferring the Debtors' retirement community Business to new owners. Such a liquidation process would be carried out over a lengthier time period. Further, the appointment of a trustee is not required or usual in a chapter 11 case. Accordingly, expenses related to professional fees would most likely be less than professional fee expenses in a chapter 7 liquidation case.

### C. Section 363 Sale.

If the Plan as proposed is not confirmed, a sale ("*363 Sale*") of the Debtors' assets pursuant to Bankruptcy Code section 363 may be pursued by the Debtors. In such an instance, certain prepetition secured lenders may have a right to credit bid as consideration in whole or part for the assets to be acquired. After such a 363 Sale is consummated, a plan of reorganization pursuant to chapter 11 of the Bankruptcy Code may be filed with the Bankruptcy Court with respect to any remaining property of the Estates.

### XIV. Certain Federal Tax Consequences

**IMPORTANT DISCLOSURE IN COMPLIANCE WITH U.S. TREASURY DEPARTMENT CIRCULAR 230: HOLDERS OF CLAIMS AND HOLDERS OF INTERESTS ARE HEREBY NOTIFIED OF THE FOLLOWING: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED TO BE RELIED UPON, AND SHOULD NOT BE RELIED UPON, BY SUCH HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS OF CLAIMS OR HOLDERS OF INTERESTS UNDER THE INTERNAL REVENUE CODE AND OTHER APPLICABLE TAX LAW; (B) ANY TAX DISCUSSION IN THIS DISCLOSURE STATEMENT IS WRITTEN IN CONNECTION WITH THE PROMOTION OR**

**MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND HOLDERS OF INTERESTS SHOULD SEEK ADVICE FROM THEIR OWN INDEPENDENT TAX ADVISOR REGARDING THE TAX CONSEQUENCES OF THE TRANSACTIONS AND MATTERS DISCUSSED HEREIN.**

The following discussion summarizes certain U.S. federal income tax consequences to the Debtors and to certain Holders of Allowed Claims of the implementation of the Plan, including the consummation of the Restructuring Transactions pursuant thereto. This discussion does not address the U.S. federal income tax consequences to Holders of Allowed Claims who are unimpaired or otherwise entitled to payment in full in Cash under the Plan.

The following tax discussion is based on the Tax Code, the Treasury regulations promulgated thereunder (the "***Treasury Regulations***"), judicial authorities, published positions of the Internal Revenue Service ("***IRS***") and other applicable authorities, all as in effect on the date hereof and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the Restructuring Transactions are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or any other regulatory authority, or an opinion of counsel, with respect to any of the tax aspects of the Restructuring Transactions, and the discussion below is not binding upon the IRS or such other authorities. Thus, no assurance can be given that the IRS or such other authorities would not assert, or that a court would not sustain, a different position from any discussed herein.

This summary does not address foreign, state or local tax consequences of the Restructuring Transactions contemplated under the Plan, nor does it purport to address certain taxpayers (e.g., foreign persons, mutual funds, small business investment companies, regulated investment companies, banks and certain other financial institutions, insurance companies, tax-exempt organizations, holders that are, or hold existing notes through, pass-through entities, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, and persons holding existing notes that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction). If a partnership holds a Claim, the tax treatment of a partner will generally depend upon the status of the partner and upon the activities of the partnership. Moreover, the following discussion does not address U.S. federal taxes other than income taxes.

*The following discussion is for <u>informational purposes only</u> and is not a substitute for careful tax planning and individualized advice based upon the circumstances pertaining to each Holder of an Allowed Claim.*

**A.      Consequences to the Debtors.**

For federal income tax purposes, all of the Debtors, except Erickson Group, LLC, are treated as disregarded entities.  Thus, for federal income tax purposes, all items of income, loss, expense, deduction or credit of the Debtors are treated as realized and recognized by Erickson Group, LLC.

**1.      Sale Transaction and Funding of the Liquidating Creditor Trust**

The sale of assets pursuant to the Redwood Purchase Transaction will constitute a taxable transaction for federal income tax purposes as well as for state and local income and franchise tax purposes.  As such, Erickson Group will recognize taxable gain or loss in respect of each asset equal to the difference between the purchase price allocated to each such asset and Erickson Group's tax basis in each such asset. Since Erickson Group is taxable as a partnership for income tax purposes, such gain or loss will be allocated to the members of  Erickson Group.

For federal income tax purposes, the Debtors will treat the transfer of the Trust Assets, including the Causes of Action, unencumbered assets and Excluded Assets to the Liquidating Creditor Trust as a distribution of such assets by the Debtors to the Holders of Allowed Unsecured Claims in a taxable transaction followed by a transfer of such assets by such Holders to the Liquidating Creditor Trust.  These deemed distributions for federal income tax purposes will generally cause the Debtors to recognize gain or loss equal to the fair market value of the distributed assets less the tax basis of the Debtors in such assets.   Such gain or loss will allocated to the members of Erickson Group.

**2.      Cancellation of Debt.**

Ordinarily, the discharge or retirement of a debt instrument for less than the amount owed generates cancellation of indebtedness income ("***COD***"), which is includable in the debtor's gross income for federal income tax purposes.  COD recognized by a partnership is passed through by the partnership to its partners as an item of income.  Thus, any COD recognized by Erickson Group arising as a result of discharge of Claims pursuant to the Plan will be allocated to the members of Erickson Group.  A partner may be eligible to rely on an exception or election prescribed in Section 108 of the Tax Code to exclude its distributive share of the partnership's COD from gross income.

Members of Erikson Group should consult with their tax consultants as to the tax consequences resulting from the discharge of Claims pursuant to the Plan and the liquidation of the Debtors.

**B.      Consequences to Holders.**

**1.      Distributions in Discharge of Claims or Interests.**

The Debtors believe that, upon the receipt of cash, Liquidating Creditor Trust

interests, or unencumbered assets, a Holder will generally recognize gain or loss equal to (1) the amount of cash plus the fair market value of the unencumbered assets received and the Holder's *pro rata* share of the fair market value of the assets transferred to the Liquidating Creditor Trust less (2) the tax basis of the holder in the Claim Interest (except to the extent attributable to accrued but unpaid interest). However, a Holder may be unable to currently deduct any such loss. Note that a Holder must take into account the value of such Holder's share of the assets transferred to the Liquidating Creditor Trust for purposes of recognizing the gain or loss even if such Holder ultimately receives no distributions from the Liquidating Creditor Trust.

The characterization of gain or loss recognized by a Holder as capital or ordinary will be determined by a number of factors, including the tax status of the holder, whether the Claim or Interest constitutes a capital asset in the hands of the Holder, whether the Claim was acquired at a market discount, whether and to what extent the Holder previously had claimed a bad debt deduction, and the origin of the Claim. The deductibility of capital losses is subject to limitations. Any capital gain or loss recognized by a Holder will be long-term capital gain or loss if the Claim or Interest was held for more than one year.

For federal income tax purposes, the Debtors will treat each Holder that receives an interest in the Liquidating Creditor Trust as receiving from the Debtors in a taxable transaction its *pro rata* share of the assets transferred to the Liquidating Creditor Trust. The Holder will be treated as then contributing those assets in exchange for the interest in the Liquidating Creditor Trust. Absent definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Holders of interests in the Liquidating Creditor Trust are required to follow such treatment consistently.

2.      **Market Discount.**

Any Holder of a Claim with tax basis less than the amount payable at maturity (or possibly the "adjusted issue price") generally will be subject to the market discount rules of the Tax Code (unless such difference is less than a prescribed *de minimis* amount). Under the market discount rules, a Holder is required to treat any principal payment on, or any gain recognized on the sale, exchange, retirement or other disposition of, a Claim as ordinary income to the extent of the market discount that has not previously been included in income and is treated as having accrued on such Claim at the time of such payment or disposition.

Any market discount will be considered to accrue on a straight-line basis during the period from the date of acquisition of such Claims to their maturity date, unless the holder irrevocably elects to compute the accrual on a constant yield basis. This election can be made on a claim-by-claim basis.

3.      **Distributions in Discharge of Accrued Interest or OID.**

In general, to the extent that any distribution to a Holder of a Claim is received in satisfaction of accrued interest or amortized original issue discount ("***OID***") during its holding period, such amount will be taxable to the Holder as interest income (if not previously included in the Holder's gross income). Conversely, a Holder will generally recognize a loss to the extent any accrued interest or amortized OID was previously included in its gross income and is not paid in full.

Pursuant to the Plan, all distributions in respect of any Claim (other than distributions after the Effective Date from the Liquidating Creditor Trust) will be allocated first to the principal amount of such Claim, as determined for federal income tax purposes, and thereafter, to the remaining portion of such Claim, if any. However, there is no assurance that such allocation will be respected by the IRS or a court of law for federal income tax purposes.

Each Holder of a Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for tax purposes.

### 4. Taxation of the Liquidating Creditor Trust and Holders.

The Plan and the Trust Agreement provide that, for federal income tax purposes, it is intended that the Liquidating Creditor Trust be classified as a liquidating trust under Section 301.7701-4 of the Treasury Regulations, and that such liquidating trust be deemed owned by the Beneficiaries as grantors. Accordingly, for federal income tax purposes, it is intended that the Beneficiaries be treated as if they had received a distribution of an undivided interest in Trust Assets from the Debtors and then contributed such interests to the Liquidating Creditor Trust. The Trust Agreement (i) states that the Liquidating Creditor Trust's primary purpose is to liquidate the Trust Assets with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, its liquidating purpose and (ii) contain a fixed or determinable termination date that is generally not more than five (5) years from the date of its creation, which termination date may be extended for one or more finite terms subject to the approval of the Bankruptcy Court upon a finding that the extension is necessary to its liquidating purpose. Each such extension must be approved by the Bankruptcy Court 60 days prior to such termination. The Trustee will be responsible for filing all federal, state and local tax returns for its Trust. The Trustee will file all federal tax returns for the Trust as a grantor trust pursuant to Section 1.671-4(a) of the Treasury Regulations. The Trust Agreement generally provides that Beneficiaries must value the Trust Assets consistently with the values determined by the Trustee for federal, state, local and foreign income tax purposes. If such treatment is respected, the Liquidating Creditor Trust will not be subject to income tax. Instead, the Beneficiaries will be taxed on their allocable shares of income and gain of the Liquidating Creditor Trust as its grantors and deemed owners, whether or not they received any distributions from the Liquidating Creditor Trust in such taxable year. The holding period of an Beneficiary of the Liquidating Creditor Trust in its *pro rata* share of the assets held by the Liquidating Creditor Trust will begin on the day following their deemed distribution to the Beneficiary and their tax basis will be equal to their fair market value on the day of the distribution. There can be no assurance that the IRS will agree with the classification of the Liquidating Creditor Trust as a grantor trust for federal income tax purposes and a different classification of a Liquidating Trust could result in its being subject to income taxes and a different income tax treatment than its Beneficiaries.

### C. Information Reporting and Withholding.

All distributions to Holders of Allowed Claims and Interests under the Plan are subject to any applicable withholding obligations (including employment tax withholding). Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then-applicable rate. Backup withholding generally applies if the holder (1) fails to furnish its social security number or other taxpayer identification number ("*TIN*"); (2) furnishes an incorrect TIN; (3) fails properly to

report interest or dividends; or (4) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

***The foregoing summary has been provided for informational purposes only. All holders of Claims and Equity Interests are urged to consult their tax advisors concerning the federal, state, local and other tax consequences applicable under the Plan.***

# XV. Recommendation and Conclusion

The Debtors believe the Plan is in the best interests of all creditors and the Estates and urges the Holders of Impaired Claims entitled to vote to accept the Plan and to evidence such acceptance by properly voting and timely returning their ballots.

Dated:  March 8, 2010

Respectfully submitted,

Erickson Group, LLC
Erickson Retirement Communities, LLC
Ashburn Campus, LLC
Columbus Campus, LLC
Concord Campus, L.P.
Concord Campus GP, LLC
Dallas Campus, LP
Dallas Campus GP, LLC
Erickson Construction, LLC
Houston Campus, L.P.
Kansas Campus, LLC
Littleton Campus, LLC
Novi Campus, LLC
Senior Campus Services, LLC
Warminster Campus, L.P. and
Warminster Campus GP, LLC

## **Exhibit A**

Plan

**Exhibit B**

Financials

## Exhibit C

Liquidation Analysis

**<u>Exhibit D</u>**

Current Organizational Chart

## **Exhibit E**

Post-Effective Date Organizational Chart

## **Exhibit F**

Recovery Analysis

# **Exhibit G**

Administrative Expenses

## **Exhibit H**

Mechanic's Liens Summary

**<u>Exhibit I</u>**

Growth Participation Plan