**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 09-37010 (SGJ)** |
| | § | |
| **ERICKSON RETIREMENT** | § | **Chapter 11** |
| **COMMUNITIES, LLC,** *et al.* | § | |
| | § | **(Jointly Administered)** |
| **Debtors.** | § | |

DEBTORS' ~~THIRD~~**FOURTH** AMENDED JOINT PLAN OF
REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Vincent P. Slusher
State Bar No. 00785480
vince.slusher@dlapiper.com
DLA Piper LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas 75201
Telephone:  (214) 743-4572
Facsimile:  (972) 813-6267

Thomas R. Califano
New York State Bar No. 2286144
thomas.califano@dlapiper.com
Jeremy R. Johnson
New York State Bar No. 4307617
jeremy.johnson@dlapiper.com
Camisha L. Simmons
New York State Bar No. 4576294
Texas State Bar No. 24056328
camisha.simmons@dlapiper.com
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York  10020-1104
Telephone:  (212) 835-6000
Facsimile:  (212) 835-6001

Dated:  March ~~1,~~**8,** 2010

Section 1.      DEFINITIONS AND INTERPRETATION ....................................................1

    A.     Definitions .......................................................................................................1

    1.1    Acquisition Companies .....................................................................................1

    1.2    Administrative Expense Claim .........................................................................1

    1.3    Advisors ...........................................................................................................1

    1.4    Agents ..............................................................................................................1

    1.5    Allowed ............................................................................................................1

    1.6    Ann's Choice Bonds ........................................................................................2

    1.7    Ann's Choice Trustee ......................................................................................2

    1.8    Ashburn Community Loan ...............................................................................2

    1.9    Ashburn Community Loan Claim .....................................................................2

    1.10   Ashburn Construction Loan .............................................................................2

    1.11   Ashburn Construction Loan Claim ..................................................................2

    1.12   Ashburn Junior Loan .......................................................................................2

    1.13   Ashburn Junior Loan Claim .............................................................................2

    1.14   Assumed Liability ...........................................................................................2

    1.15   Auction ............................................................................................................2

    1.16   Auction Fee ......................................................................................................2

    1.17   B&R Notes ......................................................................................................2

    1.18   Bankruptcy Code ...........................................................................................~~2~~**3**

    1.19   Bankruptcy Court ............................................................................................3

    1.20   Bankruptcy Rules ............................................................................................3

    1.21   Beneficiaries ....................................................................................................3

    1.22   Bond Documents ..............................................................................................3

    1.23   Bond Trustee ...................................................................................................3

    1.24   Bonded Community ..........................................................................................3

    1.25   Borrower ..........................................................................................................3

    1.26   Business ...........................................................................................................3

    1.27   Business Day....................................................................................................3

    1.28   Campus ............................................................................................................3

    1.29   Cash .................................................................................................................3

    1.30   Cash Collateral ................................................................................................3

    1.31   Cash on Hand ...................................................................................................3

    1.32   Cash Transaction Proceeds ..............................................................................3

    1.33   Causes of Action .............................................................................................4

    1.34   Cedar Crest Receivable ...................................................................................4

    1.35   Chapter 11 Cases .............................................................................................4

    1.36   Claim................................................................................................................4

| 1.37 | Class | 4 |
|------|-------|---|
| 1.38 | Closing | 4 |
| 1.39 | Closing Date | 4 |
| 1.40 | Coastwood | ~~4~~**5** |
| 1.41 | Collateral | ~~4~~**5** |
| 1.42 | Columbus Community Loan | 5 |
| 1.43 | Columbus Community Loan Claim | 5 |
| 1.44 | Columbus Construction Loan | 5 |
| 1.45 | Columbus Construction Loan Claim | 5 |
| 1.46 | Columbus Improvement Bond Claim | 5 |
| 1.47 | Columbus Junior Loan | 5 |
| 1.48 | Columbus Junior Loan Claim | 5 |
| 1.49 | Compensation and Reimbursement Claim | 5 |
| 1.50 | Completed Campus | 5 |
| 1.51 | Concord Community Loan | 5 |
| 1.52 | Concord Community Loan Claim | 5 |
| 1.53 | Concord Construction Loan | 5 |
| 1.54 | Concord Construction Loan Claim | ~~5~~**6** |
| 1.55 | Concord Junior Loan | 6 |
| 1.56 | Concord Junior Loan Claim | 6 |
| ~~1.57~~ | ~~Construction Lender~~ | ~~6~~ |
| **1.57** | **Concord Letters of Credit** | **6** |
| 1.58 | **Construction Lender** | **6** |
| **1.59** | Contingent Claim | 6 |
| ~~1.59~~**1.60** | Company | 6 |
| ~~1.60~~**1.61** | Corporate Headquarters | 6 |
| ~~1.61~~ | ~~Corporate Revolver~~ | ~~6~~ |
| 1.62 | Corporate Revolver ~~Claim~~ | 6 |
| 1.63 | Corporate Revolver ~~Guaranty~~ Claim | 6 |
| 1.64 | ~~Dallas Community Loan~~ **Corporate Revolver Guaranty Claim** | ~~6~~**6** |
| 1.65 | Dallas Community Loan ~~Claim~~ | 6 |
| 1.66 | Dallas ~~Construction~~**Community** Loan **Claim** | 6 |
| 1.67 | Dallas Construction Loan ~~Claim~~ | 6 |
| 1.68 | Dallas ~~Junior~~**Construction** Loan ~~6~~ **Claim** | ~~6~~**7** |
| 1.69 | Dallas Junior Loan ~~Claim~~ | 7 |
| 1.70 | ~~Debtors~~**Dallas Junior Loan Claim** | 7 |
| 1.71 | Debtors **7** | |
| **1.72** | **Debtors** in Possession | 7 |

1.72**1.73** ........................................................................................................ Definitive Agreement 7

1.73**1.74** .......................................................................................................... Developing Campus 7

1.74**1.75** ......................................................................................................Development Agreement 7

1.75**1.76** ............................................................................................................................DevCo 7

1.76**1.77** ...................................................................................................................... DIP Facility 7

1.77**1.78** ............................................................................................................... DIP Funding Claim 7

1.78**1.79** ......................................................................................................Disbursing Agent 7**8**

1.79**1.80** ..................................................................................................Disclosure Statement 7**8**

1.80**1.81** ..........................................................................................................Disputed Claim 7**1.81** ~~Distribu~~

1.82 Distribution **8**

**1.83 Distribution** Record Date.........................................................................................8

1.83**1.84** ......................................................................................................................Effective Date 8

1.84 ~~ERC~~.....................................................................................................................................**8**

1.85 **ERC**...........................................................................................................................................**8**

**1.86 ERC Letters of Credit** ...............................................................................................**8**

**1.87 Erickson Construction Letters of Credit** ......................................................................**8**

**1.88 Erickson Construction Letters of Credit Claim** ...........................................................**8**

**1.89** Erickson Group Guaranty Claim .................................................................................8

1.86**1.90** ..................................................................................................................................Estate 8**9**

1.87**1.91** ..................................................................................................................... Final Order 8**9**

1.88**1.92** ...................................................................................... General Unsecured Claim 8

1.89 ~~GST Loan~~......................................................................................................................................8

1.90 ~~Holder~~.......................................................................................................................................9

1.91 ~~Houston Community Loan~~.......................................................................................91.92 Houston Commu


1.93 ~~Houston Construction Loan~~9**Growth Participation Plan means that certain Erickson Retirement Com**

1.94 ~~Houston Construction~~**GST** Loan ~~Claim~~ ...............................................................9

1.95 ~~Houston Junior Loan~~**Holder** ............................................................................9

1.96 Houston ~~Junior~~**Community** Loan ~~Claim~~...........................................................9

1.97 Houston ~~Junior~~**Community** Loan ~~Guaranty~~ Claim .............................................9

1.98 ~~IED~~**Houston Construction Loan** .....................................................................9


1.99 ~~Impaired~~ ..............................................................................9**Houston Construction Loan Claim 9**

1.100 ~~Interest~~**Houston Junior Loan** ...........................................................................9

1.101 ~~Interest Rate Swap~~**Houston Junior Loan** Claim ....................................9**10**

1.102 ~~Kansas Community~~**Houston Junior** Loan ~~9~~ **Guaranty Claim......................................10**

1.103 ~~Kansas Community Loan Claim~~**IED** .............................................................10

1.104 ~~Kansas Construction Loan~~**Impaired** ............................................................10

1.105 ~~Kansas Construction Loan Claim~~**Interest** .....................................................10

1.106 ~~Kansas Junior Loan~~**Interest Rate Swap Claim** .......................................................... 10

1.107 Kansas ~~Junior~~**Community** Loan ~~Claim~~ ........................................................... 10

1.108 Kansas **Community Loan Claim** ................................................................................**10**

**1.109 Kansas Construction Loan**.........................................................................................**10**

**1.110 Kansas Construction Loan Claim** .............................................................................**10**

**1.111 Kansas Junior Loan**....................................................................................................**10**

**1.112 Kansas Junior Loan Claim** ........................................................................................**10**

**1.113 Kansas** Special Assessment Bonds ............................................................................ ~~10~~**11**

~~1.109~~**1.114** ................................................................. Kansas Special Assessment Bond Claim ~~10~~**11**

~~1.110~~**1.115** ...............................................................................................Landowner ~~10~~**11**

~~1.111~~**1.116** ........................................................................................Landowner Debtor ~~10~~**11**

~~1.112~~**1.117** ...............................................................................Landowner Retained Cash ~~10~~**11**

~~1.113~~**1.118** ................................................................................................................Lenders ~~10~~**11**

~~1.114~~**1.119** ................................................................................................Lender Allocation ~~10~~**11**

~~1.115~~**1.120** .......................................................................................Liquidating Creditor Trust ~~10~~

~~1.116 Littleton Community Loan ........................................................................................ 11~~

~~1.117 Littleton Community Loan Claim .............................................................................. 11~~

~~1.118 Littleton Construction Loan ...................................................................................... 11~~

~~1.119 Littleton Construction Loan Claim .......................................................................... 111.120 Littleton Junior~~

1.121 Littleton ~~Junior~~**Community** Loan ~~Claim~~ ...................................................... 11

1.122 Littleton ~~Out-Parcel~~**Community Loan Claim** .............................................................. 11

1.123 ~~Management Agreement~~**Littleton Construction Loan** ................................................ 11

1.124 ~~Management Agreement Claims..........................~~ 11**Littleton Construction Loan Claim 11**

1.125 **Littleton Junior Loan** .................................................................................................**11**

**1.126 Littleton Junior Loan Claim** ......................................................................................**12**

**1.127 Littleton Letters of Credit** .........................................................................................**12**

**1.128 Littleton Out-Parcel**...................................................................................................**12**

**1.129 Management Agreement** .............................................................................................**12**

**1.130 Management Agreement Claims** ................................................................................**12**

**1.131** ManagementCo ............................................................................................ ~~11~~**12**

~~1.126~~**1.132** ......................................................................................................Master Lease ~~11~~**12**

~~1.127~~**1.133** ....................................................................................... Mechanic's Lien Claim ~~11~~**12**

~~1.128~~**1.134** .....................................................................................Medical Claims Cash ~~11~~**12**

~~1.129~~**1.135** ................................................................................ Morgan Stanley Settlement 12

~~1.130~~**1.136** .......................................................................New Management Agreement 12

~~1.131~~**1.137** ............................................................................................................NFP ~~12~~**13**

~~1.132~~**1.138** ..........................................................................NSC/NFP Carveout Claims ~~12~~**13**

~~1.133 NFP Claim ................................................................................................................... 12~~

1.134    Novi Community Loan .......................................................................................... 12

1.135    Novi Community Loan Claim ............................................................................... 12

1.136    Novi Construction Loan ...................................................................................... 12

1.137    Novi Construction Loan Claim ............................................................................ 12

1.138    Novi Junior Loan ................................................................................................ 12

1.139    Novi Junior Loan**NFP** Claim ............................................................................ ~~12~~**13**

1.140    ~~NSC~~**Novi Community Loan** ................................................................................ 13

1.141    **Novi Community Loan Claim** ........................................................................... **13**

1.142    **Novi Construction Loan** ................................................................................... **13**

1.143    **Novi Construction Loan Claim** ........................................................................ **13**

1.144    **Novi Junior Loan** ............................................................................................. **13**

1.145    **Novi Junior Loan Claim** ................................................................................... **13**

1.146    **Novi Letters of Credit** ...................................................................................... **13**

1.147    **NSC** .................................................................................................................. **13**

1.148    NSC Interim Payments ....................................................................................... ~~13~~**14**

~~1.142~~**1.149** ..................................................................................................... NSC-NFP ~~13~~**14**

~~1.143~~**1.150** .............................................................................................. NSC Payment ~~13~~**14**

~~1.144~~**1.151** ...................................................................................... NSC Payment Rebate ~~13~~**14**

~~1.145~~**1.152** ......................................................................................... Other Priority Claim ~~13~~**14**

~~1.146~~**1.153** ..................................................................................................... Petition Date ~~13~~**14**

~~1.147~~**1.154** ................................................................................................................. Plan ~~13~~**14**

~~1.148~~**1.155** ................................................................................ Plan Confirmation Date ~~13~~**14**

~~1.149~~**1.156** ............................................................................. Plan Confirmation Hearing ~~13~~**14**

~~1.150~~**1.157** ................................................................................ Plan Confirmation Order ~~13~~**14**

~~1.151~~**1.158** ................................................................................................ Plan Documents ~~13~~**14**

~~1.152~~**1.159** ................................................................................................. Plan Supplement ~~13~~**14**

~~1.153~~**1.160** ................................................................................................ Priority Tax Claim ~~13~~**14**

~~1.154~~**1.161** ........................................................................................................ Professional 14

~~1.155~~**1.162** .................................................................................................... Project Debt ~~14~~**15**

~~1.156~~**1.163** ................................................................................................... Proof of Claim ~~14~~**15**

1.157    PropCo .............................................................................................................. 14

1.158    Redwood ........................................................................................................... 14

1.159    Redwood Ashburn ............................................................................................. 14

1.160    Redwood Concord ............................................................................................. 14

1.161    Redwood Dallas ................................................................................................ 14

1.162    Redwood Houston .............................................................................................. 14

1.163    Redwood Kansas ............................................................................................... 14

1.164    Redwood Littleton ............................................................................................. 14

1.164    **PropCo** ............................................................................................................. **15**

1.165    Redwood ~~Novi~~ .................................................................................................... ~~14~~**15**

1.166    Redwood ~~Retained Employees~~ .......................................................... ~~14~~**Ashburn 15**

1.167    ~~Reorganized Debtors~~ ............................................................................ ~~14~~**Redwood Concord 15**

~~1.168~~    Restructuring Transactions ................................................................ 14

**1.168    Redwood Dallas ................................................................................. 15**

1.169    ~~Schedules~~**Redwood Houston** ...................................................... 15

1.170    ~~Secured Claim~~**Redwood Kansas** ...................................................... 15

1.171    ~~Secured Tax Claim~~**Redwood Littleton** ........................................... 15

1.172    ~~Securities Act~~**Redwood Novi** ......................................................... 15

1.173    ~~Sellers~~**Redwood Retained Employees** ........................................... 15

1.174    ~~STAMPS~~**Reorganized Debtors** ...................................................... 15

1.175    ~~Texas A&M Note~~**Restructuring Transactions** ............................... 15

1.176    ~~Texas A&M Note Claim~~ ................................................................... ~~15~~**Schedules 16**

1.177    ~~TIP~~ ..................................................................................................... ~~15~~**Secured Claim 16**

~~1.178~~    Transaction Proceeds ......................................................................... 15

**1.178    Secured Tax Claim .......................................................................... 16**

1.179    ~~Transferred Claims~~ ........................................................................... ~~15~~**Securities Act 16**

1.180    ~~Transferred Employees~~ ................................................................... ~~15~~**Sellers 16**

1.181    ~~Transferred Landowners~~ ................................................................. ~~15~~**STAMPS 16**

1.182    ~~Trust Agreement~~ .............................................................................. ~~15~~**Texas A&M Note 16**

1.183    ~~Trustee~~**Texas A&M Note Claim** ..................................................... 16

1.184    ~~UMBC Building~~**TIP** ......................................................................... 16

1.185    ~~UMBC Building Construction Loan~~**Transaction Proceeds** ............ 16

1.186    ~~UMBC Building Construction Loan Claim~~**Transferred Claims** ..... 16

1.187    ~~Unimpaired~~**Transferred Employees** ............................................... 16

1.188    ~~Voting Record Date~~**Transferred Landowners** .............................. 16

1.189    ~~Warminster Community Loan~~**Trust Agreement** ........................... 16

1.190    ~~Warminster Community Loan Claim~~ ................................................ ~~16~~

~~1.191~~    Warminster Junior Loan Claim ......................................................... 16

~~1.192~~    Warminster Purchase Option Deposit Refund Agreement ............... ~~16~~**Trustee 17**

**1.191    UMBC Building ................................................................................. 17**

**1.192    UMBC Building Construction Loan ............................................... 17**

1.193    ~~Warminster Purchase Option Deposit Refund Agreement~~**UMBC Building Construction Loan** Claim ............................................... ~~16~~**17**

1.194    **Unimpaired ....................................................................................... 17**

**1.195    Voting Record Date .......................................................................... 17**

**1.196    Warminster Community Loan .......................................................... 17**

**1.197    Warminster Community Loan Claim ............................................. 17**

**1.198    Warminster Junior Loan Claim ..................................................... 17**

**1.199    Warminster Letters of Credit** ..................................................................**17**

**1.200    Warminster Purchase Option Deposit Refund Agreement** ..................**17**

**1.201    Warminster Purchase Option Deposit Refund Agreement Claim** .........**17**

**1.202**    Working Capital Loan ......................................................................~~16~~**17**

    B.      Interpretation:  Application of Definitions and Rules of Construction........................~~16~~**17**

Section 2.      ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS....................................~~17~~**18**

    2.1      Administrative Expense Claims ..........................................................................~~17~~**18**

          2.1.1    Auction Fee Payment.............................................................................~~17~~**18**

    2.2      Compensation and Reimbursement Claims .........................................................~~17~~**18**

    2.3      Priority Tax Claims .............................................................................................~~17~~**18**

    2.4      DIP Funding Claims ...........................................................................................~~18~~**19**

Section 3.      CLASSIFICATION OF CLAIMS AND INTERESTS .........................................~~19~~**20**

Section 4.      TREATMENT OF CLAIMS AND INTERESTS ...............................................~~35~~**36**

    4.1      Erickson Group ...................................................................................................~~35~~**36**

          4.1.1    Other Priority Claims (Class 1) ...........................................................~~35~~**36**

          4.1.2    Secured Tax Claims (Class 2)...............................................................~~35~~**36**

          4.1.3    Corporate Revolver Guaranty Claims (Class 3) ...................................~~35~~**36**

          4.1.4    Erickson Group Guaranty Claims (Class 4)..........................................~~35~~**36**

          4.1.5    Interests in Erickson Group (Class 5) ..................................................~~35~~**36**

    4.2      ERC....................................................................................................................~~35~~**36**

          4.2.1    Other Priority Claims (Class 1) ...........................................................~~35~~**36**

          4.2.2    Secured Tax Claims (Class 2) ..............................................................~~36~~**37**

          4.2.3    Corporate Revolver Claims (Class 3) ...................................................~~36~~**37**

          4.2.4    Interest Rate Swap Claims (Class 4).....................................................~~36~~**37**

          4.2.5    Other Secured Claims (Class 5).............................................................~~36~~**37**

          4.2.6    UMBC Building Construction Loan Claims (Class 6) ..................~~36~~**37**

          4.2.7    Management Agreement Claims (Class 7) ....................................~~37~~**38**

          4.2.8    General Unsecured Claims (Class 8) .............................................~~37~~**38**

          4.2.9    Interests in ERC (Class 9).............................................................~~37~~**38**

    4.3      Erickson Construction.........................................................................................~~37~~**38**

          4.3.1    Other Priority Claims (Class 1) ...........................................................~~37~~**38**

          4.3.2    Secured Tax Claims (Class 2) ..............................................................~~37~~**38**

          4.3.3    Mechanic's Lien Claims (Class 3)........................................................~~38~~**39**

          4.3.4    Corporate Revolver Claims (Class 4) ...................................................~~38~~**39**

          4.3.5    UMBC Building Construction Loan Claims (Class 5) ..................~~38~~**39**

          4.3.6    ~~General Unsecured~~**Erickson Construction Letters of Credit** Claims (Class 6) ...............................................................................................~~38~~**39**

          4.3.7    **General Unsecured Claims (Class 7)**......................................................**40**

**4.3.8**    Interests in Erickson Construction (Class 78) ............................................ 3940

4.4      Senior Campus ............................................................................................ 3940

     4.4.1     Other Priority Claims (Class 1) ................................................ 3940

     4.4.2     Secured Tax Claims (Class 2) .................................................. 3940

     4.4.3     UMBC Building Construction Loan Claims (Class 3) ............. 3940

     4.4.4     Corporate Revolver Guaranty Claims (Class 4) ...................... 4041

     4.4.5     General Unsecured Claims (Class 5) ........................................ 4041

     4.4.6     Interests in Senior Campus (Class 6) ...................................... 4041

4.5      Ashburn ..................................................................................................... 4041

     4.5.1     Other Priority Claims (Class 1) ................................................ 4041

     4.5.2     Secured Tax Claims (Class 2) .................................................. 4041

     4.5.3     Mechanic's Lien Claims (Class 3) ........................................... 4041

     4.5.4     Ashburn Construction Loan Claims (Class 4) ......................... 4042

     4.5.5     Ashburn Community Loan Claims (Class 5) ............................ 4142

     4.5.6     Ashburn Junior Loan Claims (Class 6) .................................... 4142

     4.5.7     NFP Claims (Class 7) ............................................................... 4142

     4.5.8     General Unsecured Claims (Class 8) ........................................ 4142

     4.5.9     Interests in Ashburn (Class 9) .................................................. 4142

4.6      Columbus .................................................................................................. 4142

     4.6.1     Other Priority Claims (Class 1) ................................................ 4142

     4.6.2     Secured Tax Claims (Class 2) .................................................. 4143

     4.6.3     Columbus Improvement Bond Claims (Class 3) ..................... 4143

     4.6.4     Mechanic's Lien Claims (Class 4) ........................................... 4243

     4.6.5     Columbus Construction Loan Claims (Class 5) ...................... 4243

     4.6.6     Columbus Community Loan Claims (Class 6) ......................... 4243

     4.6.7     Columbus Junior Loan Claims (Class 7) ................................. 4244

     4.6.8     General Unsecured Claims (Class 8) ........................................ 4244

     4.6.9     Interests in Columbus (Class 9) ............................................... 4244

4.7      Concord ..................................................................................................... 4344

     4.7.1     Other Priority Claims (Class 1) ................................................ 4344

     4.7.2     Secured Tax Claims (Class 2) .................................................. 4344

     4.7.3     Mechanic's Lien Claims (Class 3) ........................................... 4344

     4.7.4     Concord Construction Loan Claims (Class 4) ......................... 4345

     4.7.5     Concord Community Loan Claims (Class 5) ............................ 4345

     4.7.6     Concord Junior Loan Claims (Class 6) .................................... 4345

     4.7.7     Other Secured Claims (Class 7) ............................................... 4445

     4.7.8     NFP Claims (Class 8) ............................................................... 4445

     4.7.9     General Unsecured Claims (Class 9) ........................................ 4445

     4.7.10    Interests in Concord (Class 10) ................................................ 4445

4.8      Concord GP ............................................................................................... 4446

4.8.1    Other Priority Claims (Class 1) ........................................................ ~~44~~**46**

4.8.2    Secured Tax Claims (Class 2) .......................................................... ~~44~~**46**

4.8.3    Corporate Revolver Guaranty Claims (Class 3) ............................... ~~44~~**46**

4.8.4    General Unsecured Claims (Class 4) ................................................ ~~44~~**46**

4.8.5    Interests in Concord GP (Class 5) ................................................... ~~44~~**46**

4.9      Dallas ............................................................................................................ ~~45~~**46**

4.9.1    Other Priority Claims (Class 1) ....................................................... ~~45~~**46**

4.9.2    Secured Tax Claims (Class 2) .......................................................... ~~45~~**46**

4.9.3    Mechanic's Lien Claims (Class 3) .................................................... ~~45~~**47**

4.9.4    Dallas Construction Loan Claims (Class 4) ..................................... ~~45~~**47**

4.9.5    Texas A&M Note Claims (Class 5) .................................................. ~~46~~**47**

4.9.6    Dallas Community Loan Claims (Class 6) ........................................ ~~46~~**47**

4.9.7    Dallas Junior Loan Claims (Class 7) ............................................... ~~46~~**48**

4.9.8    NFP Claims (Class 8) ...................................................................... ~~46~~**48**

4.9.9    General Unsecured Claims (Class 9) ................................................ ~~46~~**48**

4.9.10   Interests in Dallas (Class 10) ........................................................... ~~46~~**48**

4.10    Dallas GP ..................................................................................................... ~~46~~**48**

4.10.1   Other Priority Claims (Class 1) ....................................................... ~~46~~**48**

4.10.2   Secured Tax Claims (Class 2) .......................................................... ~~46~~**48**

4.10.3   Corporate Revolver Guaranty Claims (Class 3) ............................... ~~47~~**48**

4.10.4   General Unsecured Claims (Class 4) ................................................ ~~47~~**49**

4.10.5   Interests in Dallas GP (Class 5) ...................................................... ~~47~~**49**

4.11    Houston ........................................................................................................ ~~47~~**49**

4.11.1   Other Priority Claims (Class 1) ....................................................... ~~47~~**49**

4.11.2   Secured Tax Claims (Class 2) .......................................................... ~~47~~**49**

4.11.3   Mechanic's Lien Claims (Class 3) .................................................... ~~47~~**49**

4.11.4   Houston Construction Loan Claims (Class 4) .................................. ~~47~~**49**

4.11.5   Houston Community Loan Claims (Class 5) ..................................... ~~48~~**50**

4.11.6   Houston Junior Loan Claims (Class 6) ............................................ ~~48~~**50**

4.11.7   NFP Claims (Class 7) ...................................................................... ~~48~~**50**

4.11.8   General Unsecured Claims (Class 8) ................................................ ~~48~~**50**

4.11.9   Interests in Houston (Class 9) .......................................................... ~~48~~**50**

4.12    Kansas .......................................................................................................... ~~48~~**50**

4.12.1   Other Priority Claims (Class 1) ....................................................... ~~48~~**50**

4.12.2   Secured Tax Claims (Class 2) .......................................................... ~~48~~**50**

4.12.3   Mechanic's Lien Claims (Class 3) .................................................... ~~49~~**50**

4.12.4   Kansas Special Assessment Bond Claims (Class 4) ......................... ~~49~~**51**

4.12.5   Kansas Construction Loan Claims (Class 5) .................................... ~~49~~**51**

4.12.6   Kansas Community Loan Claims (Class 6) ....................................... ~~49~~**51**

4.12.7   Kansas Junior Loan Claims (Class 7) .............................................. ~~49~~**51**

4.12.8   NFP Claims (Class 8) ...................................................................... ~~49~~**51**

4.12.9  General Unsecured Claims (Class 9) ........................................ ~~49~~**51**

4.12.10 Interests in Kansas (Class 10) ............................................... ~~49~~**51**

4.13     Littleton ............................................................................. ~~49~~**51**

4.13.1  Other Priority Claims (Class 1) ........................................... ~~49~~**51**

4.13.2  Secured Tax Claims (Class 2) .............................................. ~~50~~**52**

4.13.3  Mechanic's Lien Claims (Class 3) ........................................ ~~50~~**52**

4.13.4  Littleton Construction Loan Claims (Class 4) ....................... ~~50~~**52**

4.13.5  Littleton Community Loan Claims (Class 5) ......................... ~~50~~**52**

4.13.6  Littleton Junior Loan Claims (Class 6) ................................. ~~50~~**53**

4.13.7  Other Secured Claims (Class 7) ........................................... ~~51~~**53**

4.13.8  NFP Claims (Class 8) ......................................................... ~~51~~**53**

4.13.9  General Unsecured Claims (Class 9) .................................... ~~51~~**53**

4.13.10 Interests in Littleton (Class 10) .......................................... ~~51~~**53**

4.14     Novi ................................................................................... ~~51~~**53**

4.14.1  Other Priority Claims (Class 1) ........................................... ~~51~~**53**

4.14.2  Secured Tax Claims (Class 2) .............................................. ~~51~~**53**

4.14.3  Mechanic's Lien Claims (Class 3) ........................................ ~~51~~**54**

4.14.4  Novi Construction Loan Claims (Class 4) ............................ ~~52~~**54**

4.14.5  Novi Community Loan Claims (Class 5) ............................... ~~52~~**54**

4.14.6  Novi Junior Loan Claims (Class 6) ...................................... ~~52~~**54**

4.14.7  Other Secured Claims (Class 7) ........................................... ~~52~~**54**

4.14.8  NFP Claims (Class 8) ......................................................... ~~52~~**54**

4.14.9  General Unsecured Claims (Class 9) .................................... ~~52~~**54**

4.14.10 Interests in Novi (Class 10) ................................................ ~~52~~**54**

4.15     Warminster ......................................................................... ~~52~~**55**

4.15.1  Other Priority Claims (Class 1) ........................................... ~~52~~**55**

4.15.2  Secured Tax Claims (Class 2) .............................................. ~~53~~**55**

4.15.3  Mechanic's Lien Claims (Class 3) ........................................ ~~53~~**55**

4.15.4  Warminster Community Loan Claims (Class 4) .................... ~~53~~**55**

4.15.5  Warminster Purchase Option Deposit Refund Agreement Claims (Class 5) ........................................................................................ ~~53~~**55**

4.15.6  Warminster Junior Loan Claim (Class 6) ............................ ~~53~~**56**

4.15.7  Other Secured Claims (Class 7) ........................................... ~~53~~**56**

4.15.8  NFP Claims (Class 8) ......................................................... ~~54~~**56**

4.15.9  General Unsecured Claims (Class 9) .................................... ~~54~~**56**

4.15.10 Interests in Warminster (Class 10) ...................................... ~~54~~**56**

4.16     Warminster GP ................................................................... ~~54~~**56**

4.16.1  Other Priority Claims (Class 1) ........................................... ~~54~~**56**

4.16.2  Secured Tax Claims (Class 2) .............................................. ~~54~~**57**

4.16.3  Corporate Revolver Guaranty Claims (Class 3) ................... ~~54~~**57**

4.16.4  General Unsecured Claims (Class 4) .................................... ~~54~~**57**

~~EAST\42647302.30~~

EAST\42647302.46

4.16.5   Interests in Warminster GP (Class 5)................................................................~~54~~**57**

Section 5.     ACCEPTANCE OR REJECTION OF THE PLAN ........................................~~55~~**57**

5.1.1   Impaired Classes........................................................................................~~55~~**57**
5.1.2   Acceptance by a Class ...............................................................................~~55~~**57**
5.1.3   Claims and Interests Not Entitled to Vote ................................................~~55~~**57**

Section 6.     MEANS FOR IMPLEMENTATION ..........................................................~~55~~**58**

6.1   Redwood Asset Purchase.................................................................................~~55~~**58**

6.1.1   Purchased Assets.......................................................................................~~55~~**58**
6.1.2   Excluded Assets ........................................................................................~~56~~**58**
6.1.3   Purchase Consideration.............................................................................~~57~~**59**

6.1.3.1  NSC Payment and NSC Payment Rebate .........................................~~57~~**60**

6.2   PropCo, DevCo and ManagementCo................................................................~~57~~**60**

6.2.1   PropCo ......................................................................................................~~57~~**60**
6.2.2   DevCo .......................................................................................................~~57~~**60**
6.2.3   ManagementCo .........................................................................................~~58~~**60**

6.2.3.1  Management of Bond Communities .................................................~~58~~**60**
6.2.3.2  Management Structure of ManagementCo .......................................~~58~~**61**

6.2.4   Assumption of Liabilities by Redwood .....................................................~~58~~**61**
6.2.5   Kansas.......................................................................................................~~58~~**61**
6.2.6   B&R Notes.................................................................................................~~58~~**61**
6.2.7   Working Capital Facility ..........................................................................~~59~~**61**
6.2.8   Employment Agreements ..........................................................................~~59~~**61**
6.2.9   Non-Competition Agreement ...................................................................~~59~~**62**
6.2.10  Remaining ERC Assets.............................................................................~~59~~**62**

6.3   Landowners, Erickson Construction, and Erickson Group.........................................~~59~~**62**

6.3.1   Ashburn.....................................................................................................~~59~~**62**

6.3.1.1  Transferred Assets ...........................................................................~~59~~**62**
6.3.1.2  The Community Loan and Other NFP Agreements ..........................~~60~~**62**
6.3.1.3  Guaranties ........................................................................................~~60~~**62**
6.3.1.4  New Ashburn Revolver ....................................................................~~60~~**62**

6.3.2   Columbus ..................................................................................................~~60~~**63**
6.3.3   Concord.....................................................................................................~~60~~**63**

6.3.3.1  Transferred Assets ...........................................................................~~60~~**63**
6.3.3.2  The Community Loan and Other NFP Agreements ..........................~~60~~**63**
6.3.3.3  Guaranties ........................................................................................~~61~~**63**
6.3.3.4  New Concord Revolver ....................................................................~~61~~**63**

6.3.4   Dallas .......................................................................................................~~61~~**64**

6.3.4.1 Transferred Assets ................................................................ 6164

6.3.4.2 The Community Loan and Other NFP Agreements ......................... 6164

6.3.4.3 Guaranties ..................................................................... 6164

6.3.4.4 New Dallas Revolver ......................................................... 6164

6.3.5 Houston .................................................................................. 6264

6.3.5.1 Transferred Assets ............................................................ 6264

6.3.5.2 The Community Loan and Other NFP Agreements ......................... 6265

6.3.5.3 Guaranties ..................................................................... 6265

6.3.5.4 New Houston Revolver ......................................................... 6265

6.3.6 Kansas .................................................................................. 6265

6.3.6.1 Transferred Assets ............................................................ 6265

6.3.6.2 The Community Loan and Other NFP Agreements ......................... 6365

6.3.6.3 Bonds and Other Debt ......................................................... 6365

6.3.6.4 New Kansas Revolver .......................................................... 6366

6.3.7 Littleton ................................................................................. 6366

6.3.7.1 Transferred Assets ............................................................ 6366

6.3.7.2 The Community Loan and Other NFP Agreements ......................... 6366

6.3.7.3 Guaranties ..................................................................... 6366

6.3.7.4 New Littleton Revolver ........................................................ 6466

**6.3.7.5 Littleton Letters of Credit ................................................... 67**

6.3.8 Novi ..................................................................................... 6467

6.3.8.1 Transferred Assets ............................................................ 6467

6.3.8.2 The Community Loan and Other NFP Agreements ......................... 6467

6.3.8.3 Guarantees ..................................................................... 6467

6.3.8.4 New Novi Revolver ............................................................. 6467

6.3.9 Warminster .............................................................................. 6467

6.3.9.1 Interests in Warminster ....................................................... 6467

6.3.9.2 Warminster Purchase Option Deposit ....................................... 6467

6.3.9.3 Development Rights ............................................................ 6568

6.3.9.4 Guarantees ..................................................................... 6568

6.3.9.5 Community Loan ................................................................ 6568

6.3.9.6 Other Warminster Bond Obligations ........................................ 6568

6.3.9.7 New Warminster Revolver ..................................................... 6568

6.3.9.8 TIP Funding ..................................................................... 6568

**6.3.9.9 Warminster Letters of Credit .................................................. 68**

6.3.10 Erickson Construction .................................................................. 6569

6.3.11 Erickson Group .......................................................................... 6669

6.3.12 Payment in Full Claims ................................................................ 6669

EAST\42647302.30

EAST\42647302.46

6.4    Liquidating Creditor Trust ....................................................... ~~66~~**69**

      6.4.1   Establishment of Liquidating Creditor Trust ................................ ~~66~~**69**

      6.4.2   Exclusions ................................................................................. ~~67~~**71**

      6.4.3   Purpose of Liquidating Creditor Trust ...................................... ~~68~~**71**

      6.4.4   Prosecution of Actions ............................................................. ~~68~~**71**

      6.4.5   Trust Funding .......................................................................... ~~68~~**71**

      6.4.6   D&O Indemnification ............................................................... ~~68~~**71**

      6.4.7   GST Loan and Collection ......................................................... ~~68~~**72**

      6.4.8   Participation ............................................................................ ~~68~~**72**

      6.4.9   Distributions to Three Subclasses of Claims ............................ ~~69~~**72**

      6.4.10  Lender Waivers ........................................................................ ~~71~~**74**

      6.4.11  Formation ................................................................................ ~~71~~**75**

      6.4.12  Claims Process ........................................................................ ~~71~~**75**

      6.4.13  Information Preservation and Production .................................. ~~72~~**75**

      6.4.14  Notice of Causes of Action ...................................................... ~~72~~**75**

      6.4.15  No Substantive Consolidation ................................................. ~~72~~**76**

      6.4.16  Tax Treatment of Transfers to Liquidating Creditor Trust ........... ~~72~~**76**

      6.4.17  Tax Treatment of Beneficiaries ............................................... ~~72~~**76**

      6.4.18  Trust Expenses ........................................................................ ~~72~~**76**

      6.4.19  Creditors Committee Professional Fees ................................... ~~73~~**76**

      6.4.20  Limitation of Liability ............................................................. ~~73~~**76**

Section 7.     GOVERNANCE OF REORGANIZED DEBTORS ................................. ~~73~~**77**

    7.1    Board of Managers .................................................................... ~~73~~**77**

    7.2    Officers ..................................................................................... ~~73~~**77**

    7.3    Continued Corporate Existence ................................................ ~~73~~**77**

    7.4    Transfer of Assets; Successor Liability ...................................... ~~74~~**77**

Section 8.     DISTRIBUTIONS ............................................................................. ~~74~~**78**

    8.1    Distribution Record Date ........................................................... ~~74~~**78**

    8.2    Date of Distributions ................................................................. ~~74~~**78**

    8.3    Postpetition Interest on Claims ................................................. ~~74~~**78**

    8.4    Disbursing Agent ...................................................................... ~~74~~**78**

    8.5    Powers of Disbursing Agent ...................................................... ~~75~~**78**

    8.6    Surrender Instruments ............................................................... ~~75~~**78**

    8.7    Delivery of Distributions ........................................................... ~~75~~**79**

    8.8    Manner of Payment ................................................................... ~~75~~**79**

    8.9    Setoffs ....................................................................................... ~~75~~**79**

    8.10  Minimum Distributions ............................................................. ~~76~~**79**

    8.11  Distributions After Effective Date ............................................ ~~76~~**79**

    8.12  Allocation of Distributions Between Principal and Interest ......... ~~76~~**79**

Section 9.    PROCEDURES FOR DISPUTED CLAIMS ................................................ ~~76~~80

9.1    Objections to Claims ................................................................................ ~~76~~80
9.2    Payments and Distributions with Respect to Disputed Claims ................ ~~76~~80
9.3    Estimation of Claims ............................................................................... ~~76~~80
9.4    Distributions Relating to Disputed Claims ............................................. ~~76~~80
9.5    Distributions after Allowance .................................................................. ~~77~~80
9.6    Preservations of Rights to Settle Claims ................................................ ~~77~~80
9.7    Disallowed Claims ................................................................................... ~~77~~81

Section 10.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................... ~~77~~81

10.1    General Treatment ................................................................................. ~~77~~81
10.2    Cure of Defaults .................................................................................... ~~78~~81
10.3    Rejection Claims .................................................................................... ~~78~~82
10.4    Assignment ............................................................................................ ~~78~~82
10.5    Indemnification Obligations .................................................................. ~~78~~82
10.6    Survival of Other Employment Arrangements ...................................... ~~79~~82

Section 11.    CONDITIONS PRECEDENT TO EFFECTIVE DATE ......................... ~~79~~83

11.1    Conditions Precedent ............................................................................ ~~79~~83
11.2    Effect of Failure of Conditions ............................................................. ~~80~~84

Section 12.    EFFECT OF CONFIRMATION ................................................................ ~~81~~84

12.1    Vesting of Assets ................................................................................... ~~81~~84
12.2    Injunction ............................................................................................... ~~81~~85
12.3    Term of Injunctions or Stays ................................................................. ~~82~~86
12.4    Injunction Against Interference with Plan ............................................ ~~82~~86
12.5    Releases ................................................................................................. ~~82~~86
12.6    Releases by Holders of Claims and Interests ........................................ ~~83~~87
12.7    Exculpation ............................................................................................ ~~83~~87
12.8    Retention of Causes of Action/Reservation of Rights ......................... ~~83~~88
12.9    Solicitation ............................................................................................ ~~84~~88
12.10    Transfer Tax Exemption ....................................................................... ~~84~~88
12.11    Section 1145 Exemption ....................................................................... ~~84~~89
12.12    Plan Supplement ................................................................................... ~~85~~89

Section 13.    RETENTION OF JURISDICTION .......................................................... ~~85~~89
Section 14.    MISCELLANEOUS PROVISIONS .......................................................... ~~86~~90

14.1    Payment of Statutory Fees ..................................................................... ~~86~~90
14.2    Dissolution of Statutory Committees .................................................... ~~86~~90

14.3    Dissolution of the Liquidating Creditor Trust ............................................. ~~86~~**90**

14.4    Substantial Consummation ........................................................ ~~86~~**91**

14.5    Request for Expedited Determination of Taxes ............................................ ~~86~~**91**

14.6    Amendments ...................................................................... ~~87~~**91**

      14.6.1  Modifications to Plan and Plan Supplement ................................... ~~87~~**91**

      14.6.2  Other Amendments ..................................................... ~~87~~**91**

14.7    Effectuating Documents and Further Transactions ........................................ ~~87~~**91**

14.8    Corporate Action ................................................................. ~~87~~**91**

14.9    Revocation or Withdrawal of the Plan ................................................. ~~87~~**92**

14.10  Continuing Exclusivity of Debtors' Right to Propose Plan ................................. ~~87~~**92**

14.11  Severability .................................................................... ~~88~~**92**

14.12  Governing Law .................................................................. ~~88~~**92**

14.13  Time .......................................................................... ~~88~~**92**

14.14  Binding Effect on Debtors, Redwood, Holders and Successors and Assigns ............. ~~88~~**92**

14.15  Effective Notice ................................................................. ~~89~~**93**

Erickson Group, LLC ("***Erickson Group***"); Erickson Retirement Communities, LLC ("***ERC***" or the "***Company***"); Ashburn Campus, LLC ("***Ashburn***"); Columbus Campus, LLC ("***Columbus***"); Concord Campus, L.P. ("***Concord***"); Concord Campus GP, LLC ("***Concord GP***"); Dallas Campus, LP ("***Dallas***"); Dallas Campus GP, LLC ("***Dallas GP***"); Erickson Construction, LLC ("***Erickson Construction***"); Houston Campus, L.P. ("***Houston***"); Kansas Campus, LLC ("***Kansas***"); Littleton Campus, LLC ("***Littleton***"); Novi Campus, LLC ("***Novi***"); Senior Campus Services, LLC ("***Senior Campus***"); Warminster Campus, L.P. ("***Warminster***"); and Warminster Campus GP, LLC ("***Warminster GP***") propose the following joint plan of reorganization pursuant to chapter 11 of the Bankruptcy Code:

## SECTION 1.    DEFINITIONS AND INTERPRETATION

### A.    **Definitions**.

The following terms used herein shall have the respective meanings defined below:

1.1    ***Acquisition Companies*** the following acquisition companies formed to acquire substantially all of the assets relating to the Business: Redwood, ManagementCo, DevCo, PropCo, Redwood Kansas, Redwood Concord, Redwood Dallas, Redwood Houston, Redwood Ashburn, Redwood Littleton, Redwood Novi, Redwood-ERC Tinton Falls II, LLC, and Redwood-ERC Senior Care, LLC.

1.2    ***Administrative Expense Claim*** means any Allowed Claim pursuant to Bankruptcy Code sections 503(b) and 507(a)(1) arising from actual, necessary cost or expense of administration of the Chapter 11 Cases and preservation of the Debtors' Estates.

1.3    ***Advisors*** means the Debtors' financial advisor, investment banker, accountant, and attorneys, and each of their respective employees, members, parent corporations, subsidiaries, affiliates and partners.

1.4    ***Agents*** means, collectively, PNC Bank, National Association, as collateral and administrative agent with respect to the syndicated Ashburn Construction Loan, syndicated Concord Construction Loan, syndicated Kansas Construction Loan and syndicated Houston Construction Loan, and as the lender with respect to the participated Novi Construction Loan; Capmark Finance, Inc., as collateral and administrative agent with respect to the syndicated Littleton Construction Loan; Bank of America, N.A., as collateral and administrative agent with respect to the syndicated Dallas Construction Loan; Wilmington Trust FSB, as collateral and administrative agent with respect to the syndicated Corporate Revolver; and Manufacturers and Traders Trust Company, as collateral and administrative agent with respect to the syndicated UMBC Building Construction Loan.

1.5    ***Allowed*** means, with respect to any Claim, (i) a Claim against a Debtor which has been listed on the Debtor's Schedules, as such Schedules may be amended from time to time pursuant to Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary Proof of Claim has been filed, (ii) any Claim for which a Proof of Claim was properly and timely filed in accordance with any order of the Bankruptcy Court, the Plan, the Bankruptcy Code, and the Bankruptcy Rules, as to which no objection to allowance has been interposed by a party in interest or as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective Holder, or (iii) any Claim expressly allowed by a Final Order or pursuant to this Plan. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed, and for which no Proof of Claim has been timely filed, is not considered Allowed and shall be expunged on the Effective Date without further action by the Debtors or the Reorganized Debtors and without any further notice to or action, order or approval of the Bankruptcy Court.

1.6     **Ann's Choice Bonds** means that certain issue of $81,945,000 Bucks County Industrial Development Authority Retirement Community Revenue Bonds (Ann's Choice, Inc. Facility) Series 2005 A and B.

1.7     **Ann's Choice Trustee** means Wells Fargo Bank, National Association, not individually but as indenture trustee under that certain Trust Indenture dated as of December 1, 2005 between Bucks County Industrial Development Authority and Manufacturers and Traders Trust Company, as trustee (the "Ann's Choice Indenture") and any successor trustee under the Ann's Choice Indenture.

1.8     **Ashburn Community Loan** means that certain loan between Ashby Ponds, Inc., as lender, and Ashburn, as borrower, with a balance of $107,114,950.

1.9     **Ashburn Community Loan Claim** means a Claim arising under the Ashburn Community Loan.

1.10    **Ashburn Construction Loan** means the loan made pursuant to that certain Construction Loan Agreement entered into as of May 31, 2007 in the maximum principal amount of $100 million, as amended from time to time, between Ashburn, as borrower, and the financial institutions, which are or may from time to time become parties thereto, and PNC Bank, as successor to Mercantile Safe Deposit and Trust Company, as the administrative agent.

1.11    **Ashburn Construction Loan Claim** means a Claim arising under the Ashburn Construction Loan.

1.12    **Ashburn Junior Loan** means that certain loan made and entered into as of May 31, 2007 by and between Strategic Ashby Ponds Lender LLC, a Delaware limited liability company, as lender, and Ashburn, as borrower.

1.13    **Ashburn Junior Loan Claim** means a Claim arising under the Ashburn Junior Loan.

1.14    **Assumed Liability** means a liability assumed by Redwood, the Transferred Landowners, or the Acquisition Companies pursuant to Section 2.3 of the Definitive Agreement.

1.15    **Auction** means the auction of the Debtors' Assets which commenced at 10:00 a.m. (prevailing Eastern Time) on December 22, 2009.

1.16    **Auction Fee** means $9 million **deemed Allowed** Administrative Expense Claim of Coastwood pursuant to the agreement made at the Auction, representing 10% of the difference between Redwood's prevailing all Cash bid of $365 million and $275 million.

1.17    **B&R Notes** means, all notes receivable due to ERC or any of its affiliates from each of Brooksby Village, Inc. and Riderwood Village, Inc., including, (i) the Second Amended and Restated Working Capital Promissory Note dated June 30, 2008 in the principal amount of $14,032,807.23 made by Brooksby Village, Inc. in favor of ERC; (ii) the Purchase Money Note dated June 30, 2008 in the amount of $19,715,086 made by Brooksby Village, Inc. in favor of Senior Living Limited Partnership; (iii) the Purchase Money Note in the amount of $2,698,039 made by Riderwood Village, Inc., in favor of Senior Living Limited Partnership; and (iv) the Second Amended and Restated Working Capital Promissory Note dated December 31, 2007 in the amount of $5,000,000 made by Riderwood Village, Inc. in favor of ERC.

EAST\42647302.30
EAST\42647302.46

1.18    ***Bankruptcy Code*** means title 11 of the United States Code.

1.19    ***Bankruptcy Court*** means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

1.20    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure and any local rules of the Bankruptcy Court applicable to the Chapter 11 Cases.

1.21    ***Beneficiaries*** means Holders of Allowed General Unsecured Claims against the Estates of ERC, Erickson Construction, and each of the Landowner Debtors as of the Effective Date, as beneficiaries of the Liquidating Creditor Trust, as defined in the Trust Agreement.

1.22    ***Bond Documents*** means any trust indenture, loan agreement, mortgage, security agreement, or any other agreement executed in connection with or otherwise serving as collateral in connection with tax exempt bond financing at one or more of the Bonded Communities.

1.23    ***Bond Trustee*** means any indenture trustee then serving as indenture trustee under any Bond Document, including without limitation the Ann's Choice Trustee.

1.24    ***Bonded Community*** means any of the retirement communities relating to the following Campuses: Ann's Choice, Linden Ponds, Monarch Landing, and Sedgebrook.

1.25    ***Borrower*** has the meaning defined in the DIP Facility.

1.26    ***Business*** means the Debtors' businesses as of the Petition Date, including managing, developing and owning continuing care retirement communities.

1.27    ***Business Day*** means any day of the calendar week, except Saturday, Sunday, a "legal holiday," as defined in Bankruptcy Rule 9006(a), or any day on which commercial banks are authorized or required by law to close in Baltimore, Maryland.

1.28    ***Campus*** means each of the following retirement communities: Ann's Choice; Ashby Ponds; Eagle's Trace; Fox Run Village; Hickory Chase; Highland Springs; Linden Ponds; Maris Grove; Monarch Landing; Sedgebrook; Tallgrass Creek; Wind Crest; Brooksby Village; Cedar Crest Village; Charlestown; Greenspring Village; Henry Ford Village; Oak Crest Village; Riderwood Village; and Seabrook Village. Various Campuses are full service facilities which offer residents a full lifecycle of services during their retirement years from independent living to skilled nursing care. These retirement communities provide affordable living accommodations and related healthcare and support services to a target market of middle income residents aged sixty two (62) years and older.

1.29    ***Cash*** means legal tender of the United States of America.

1.30    ***Cash Collateral*** means all cash collateral securing any Assumed Liability, pursuant to the terms of the Definitive Agreement.

1.31    ***Cash on Hand*** means Cash and cash equivalents held by the Company and Erickson Construction other than Medical Claims Cash and Cash Collateral.

1.32    ***Cash Transaction Proceeds*** means the Cash portion of the Transaction Proceeds, in the amount of $365,000,000, as adjusted pursuant to the Definitive Agreement (which adjustments include, without limitation, (i) deduction of the amount of all IEDs relating to Landowner Debtors collected after November 27, 2009, excluding those IEDs collected at Kansas and, after November 27,

EAST\42647302.30
EAST\42647302.46

2009, at Warminster, (ii) to the extent Cash on Hand as of the Closing is less than $10,000,000, deduction of such shortfall), and (iii) deduction of the amount of the NSC Payment which Redwood is responsible for making pursuant to the Definitive Agreement.

1.33 ***Causes of Action*** means any and all claims, causes of action and enforceable rights of a person against third parties, or assertable by a person or on behalf of its creditors, its estate, or itself, whether brought in the Bankruptcy Court or any other forum for recovery or avoidance, that has not been settled or resolved as of the Effective Date, of, among other things: (a) obligations, transfers of property or interests in property, offsets, debt forgiveness, Cash, and other types of kinds of property or interests in property or the value thereof, recoverable or avoidable pursuant to Chapter 5 of the Bankruptcy Code or other sections of the Bankruptcy Code or any applicable law ("***Chapter 5 Avoidance Actions***"); (b) damages, general or statutory or exemplary (or all) or other relief, including but not limited to actions relating to or based upon – (i) indebtedness owing to a person, (ii) fraud, negligence gross negligence, willful injury or misconduct, acts or malice, or any other tort actions, including but not limited to defamation, malicious prosecution, or tortious interference with contract, (iii) breaches of contract, (iv) violations of federal or state securities laws, (v) violations of applicable corporate, limited liability company or partnership laws, (vi) breaches of fiduciary or agency duties, including, but not limited to, the duties of care and/or loyalty, (vii) recharacterization, (viii) illegal dividends, (ix) misrepresentations, (x) causes of action based on disregard of the corporate form or piercing the corporate veil or other liability theories, (xi) corporate waste, (xii) corporate opportunity, (xiii) any theory of recovery against a lending institution not otherwise released by the Plan, including any action or any action causing harm to a person, (xiv) equitable or legal subordination, (xv) indemnity rights against third parties, or (xvi) any other action listed in Bankruptcy Rule 7001, and (c) damages or other relief based upon any other claim of a person to the extent not specifically compromised or released pursuant to the Plan ((b) and (c) above, "***Non-Avoidance Causes of Actions***").

1.34 ***Cedar Crest Receivable*** means the receivable ~~of~~**set forth on** the books of Point View Campus II, LLC **owed by Cedar Crest** in an amount equal to (i) the IEDs not yet received by Cedar Crest, plus (ii) the IEDs used by Cedar Crest to fund the reserves under the Cedar Crest Bonds, less (iii) the outstanding principal, interest and fees due to PPF MF 3900 Gracefield Road, LLC ("***PPF***") under that certain Promissory Note dated November 1, 2006 in the principal amount of $25,000,0000, which was subsequently amended and restated by the Amended and Restated Promissory Note dated July 28, 2009 in the principal amount of $26,250,000 and amended by that certain Modification Agreement dated July 28, 2009 among PVC II, Erickson Retirement Communities, LLC and PPF, after application of those funds currently being held for payment to PPF.

1.35 ***Chapter 11 Cases*** means the cases commenced in the Bankruptcy Court by the Debtors pursuant to chapter 11 of the Bankruptcy Code.

1.36 ***Claim*** means a "claim," as that term is described in Bankruptcy Code section 101(5), against the Debtors.

1.37 ***Class*** means any group of Claims or Interests classified in Section 3 of the Plan pursuant to Bankruptcy Code section 1122.

1.38 ***Closing*** means the closing of the transactions contemplated under the Definitive Agreement, pursuant to the terms thereof.

1.39 ***Closing Date*** means the date on which the Closing actually occurs or the date on which Redwood and ERC agree the Closing is deemed to occur.

EAST\42647302.30
EAST\42647302.46

1.40     ***Coastwood*** means ERC Investment Holdings, LLC, an entity formed by affiliates of Coastwood Senior Housing Partners, LLC, Kohlberg Kravis Roberts & Co., and Beecken Petty O'Keefe & Company, LLC.

1.41     ***Collateral*** means any property or interest in property of the Estate of any Debtor subject to a valid lien, charge, or other encumbrance to secure the payment or performance of a Claim.

1.42     ***Columbus Community Loan*** means that certain loan between Hickory Chase, Inc. and Columbus in the maximum principal amount of $493,262,437, with a current balance of zero ($0).

1.43     ***Columbus Community Loan Claim*** means a Claim arising under the Columbus Community Loan.

1.44     ***Columbus Construction Loan*** means that certain construction loan, dated April 16, 2008, in the maximum principal amount of $90 million, between Columbus, as borrower, and KeyBank National Association, as administrative agent, and Fifth Third Bank, as syndication agent, and the other lenders that are party thereto from time to time.

1.45     ***Columbus Construction Loan Claim*** means a Claim arising under the Columbus Construction Loan.

1.46     ***Columbus Improvement Bond Claim*** means a Claim arising under the Hickory Chase Community Authority Infrastructure Improvement Revenue Bonds Series 2008 (Hickory Chase Project), dated April 29, 2008.

1.47     ***Columbus Junior Loan*** means the loan made pursuant to that certain Loan Agreement made and entered into as of April 16, 2008 by and between Windsor OH Holdings, LLC, a Delaware limited liability company, as lender, and Columbus, as borrower, in the maximum principal amount of $21,350,000, as amended from time to time.

1.48     ***Columbus Junior Loan Claim*** means a Claim arising under the Columbus Junior Loan.

1.49     ***Compensation and Reimbursement Claim*** means a Claim for compensation for services rendered or reimbursement of expenses incurred through and including the Plan Confirmation Date pursuant to Bankruptcy Code section 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5).

1.50     ***Completed Campus*** means a Campus which is completely developed (mature) and no longer under construction.  The Completed Campuses are Brooksby Village; Cedar Crest Village; Charlestown; Greenspring Village; Henry Ford Village; Oak Crest Village; Riderwood Village; and Seabrook Village.

1.51     ***Concord Community Loan*** means the loan made pursuant to that certain Community Loan Agreement between Concord, as borrower, and Maris Grove, Inc., a Maryland non-profit corporation, as lender, with a balance of $204,127,559.

1.52     ***Concord Community Loan Claim*** means a Claim arising under the Concord Community Loan.

1.53     ***Concord Construction Loan*** means the loan made pursuant to that certain Construction Loan Agreement made and entered into as August 30, 2005 by and between Concord, as

EAST\42647302.30
EAST\42647302.46

borrower, the financial institutions that are or may from time to time become parties thereto and PNC Bank, National Association as successor to Mercantile-Safe Deposit and Trust Company, as administrative agent, in the maximum principal amount of $70 million.

1.54    ***Concord Construction Loan Claim*** means a Claim arising under the Concord Construction Loan.

1.55    ***Concord Junior Loan*** means that certain transaction entered into pursuant to that certain "Purchase Agreement" made and entered into as of October 11, 2005, by and among Concord, ERC, and Strategic Concord Landholder, LP, a Delaware limited partnership, in the principal amount of $25 million, as may be amended, modified and supplemented from time to time.

1.56    ***Concord Junior Loan Claim*** means a Claim arising under the Concord Junior Loan.

**1.57    *Concord Letters of Credit* means letters of credit numbered 18106171 and 18106910 issued by PNC Bank, National Association.**

**1.58**    ~~1.57~~ ***Construction Lender*** means each of the lenders under the Construction Loans made to each of the Landowner Debtors.

**1.59**    ~~1.58~~ ***Contingent Claim*** means any contingent or unliquidated Claim asserted or which may be asserted against the Debtors.

**1.60**    ~~1.59~~ ***Company*** means Erickson Retirement Communities, LLC.

**1.61**    ~~1.60~~ ***Corporate Headquarters*** means the real property at each of 701, 703, 705 and 813 Maiden Choice Lane, Baltimore, Maryland 21228.

**1.62**    ~~1.61~~ ***Corporate Revolver*** means the loan made pursuant to that certain Credit Agreement among ERC, the other loan parties thereto, the several lenders from time to time thereto, PNC Bank, National Association, as Administrative Agent, with PNC Capital Markets LLC, as Arranger, dated as of July 27, 2007, in the amount of $236.5 million, as amended, modified or otherwise supplemented from time to time.  Wilmington Trust FSB is successor Administrative Agent to PNC Bank, National Association.  The **Agent for the Corporate Revolver Lenders asserts that the** Corporate Revolver is projected to have an outstanding balance of approximately $190,682,573.00 as of December 31, 2009.

**1.63**    ~~1.62~~ ***Corporate Revolver Claim*** means any Claim arising under the Corporate Revolver.

**1.64**    ~~1.63~~ ***Corporate Revolver Guaranty Claim*** means a Claim arising from a guarantee of the Corporate Revolver.

**1.65**    ~~1.64~~ ***Dallas Community Loan*** means that certain loan between Dallas, as borrower, and Highland Springs, Inc., a Maryland non-profit corporation, as lender, with a balance of $86,977,930.

**1.66**    ~~1.65~~ ***Dallas Community Loan Claim*** means a Claim arising under the Dallas Community Loan.

**1.67**    ~~1.66~~ ***Dallas Construction Loan*** means that certain Revolving and Construction Loan between Bank of America, as Administrative Agent for itself and other lenders, and Dallas, as

EAST\42647302.30
EAST\42647302.46

borrower, for Highland Springs, Dallas, Texas, pursuant to the loan agreement, dated November 30, 2005, in the maximum principal amount of $ 70 million, as amended, restated, modified and supplemented from time to time.

**1.68** ~~1.67~~ *Dallas Construction Loan Claim* means a Claim arising under the Dallas Construction Loan.

**1.69** ~~1.68~~ *Dallas Junior Loan* means that certain transaction entered into pursuant to that certain "Purchase Agreement" made and entered into as of April 28, 2006 by and among Dallas, ERC, and MSRESS III Dallas Campus, L.P., a Delaware limited partnership, in the principal amount of $17.5 million, as may be amended, modified and supplemented from time to time.

**1.70** ~~1.69~~ *Dallas Junior Loan Claim* means a Claim arising under the Dallas Junior Loan.

**1.71** ~~1.70~~ *Debtors* means Erickson Group; ERC; Ashburn; Columbus; Concord; Concord GP; Dallas; Dallas GP; Erickson Construction; Houston; Kansas; Littleton; Novi; Senior Campus; Warminster; and Warminster GP.

**1.72** ~~1.71~~ *Debtors in Possession* means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to Bankruptcy Code sections 1101, 1107(a) and 1108.

**1.73** ~~1.72~~ *Definitive Agreement* means that certain Second Amended and Restated Master Purchase and Sale Agreement, effective as of February 16, 2010, among Redwood, ManagementCo, DevCo, PropCo, Redwood Kansas, Redwood Concord, Redwood Dallas, Redwood Houston, Redwood Ashburn, Redwood Littleton, Redwood Novi, Redwood-ERC Tinton Falls II, LLC, Redwood-ERC Senior Care, LLC and ERC, Erickson Group, LLC, a Maryland limited liability company, Concord, Dallas, Houston, Ashburn, Littleton, Novi, Kansas, Tinton Falls Campus II, LLC, a Maryland limited liability company, Senior Campus Care, LLC, a Maryland limited liability company, and Erickson Construction, LLC, a Maryland limited liability company, including any amendments.

**1.74** ~~1.73~~ *Developing Campus* means a Campus that is owned by a respective Landowner, has been opened for operation, but is under development and construction. Each of the following is a Developing Campus: Ann's Choice; Ashby Ponds; Eagles Trace; Fox Run Village; Hickory Chase; Highland Springs; Linden Ponds; Maris Grove; Monarch Landing; Sedgebrook; Tallgrass Creek; and Wind Crest.

**1.75** ~~1.74~~ *Development Agreement* means an agreement between a Landowner or other Campus owner and ERC pursuant to which ERC agrees to plan, administer, and supervise all design, development and construction services and activities of a Campus, and the Landowner (or other Campus owner) pays ERC a development fee.

**1.76** ~~1.75~~ *DevCo* means Redwood-ERC Development, LLC, a Maryland limited liability company formed by Redwood to enter into Development Agreements for the purpose of performing development-related services in connection with the Campuses.

**1.77** ~~1.76~~ *DIP Facility* means that certain Amended and Restated Super-Priority Debtor-in-Possession Loan Agreement, dated December 23, 2009, by and among ERC and each of the other parties named in Exhibit A thereto, as Co-Borrowers, Debtors and Debtors-in-Possession under Chapter 11 of the Bankruptcy Code and ERC Funding Co. LLC, as lender, in the principal amount of up to $20 million.

**1.78** ~~1.77~~ ***DIP Funding Claim*** means any Claim arising under the DIP Facility.

**1.79** ~~1.78~~ ***Disbursing Agent*** means any entity, including any Debtor, which acts as a Disbursing Agent under section 8.4 hereof.

**1.80** ~~1.79~~ ***Disclosure Statement*** means that certain disclosure statement relating to this Plan as amended or modified from time to time, including, among other things, all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to Bankruptcy Code section 1125.

**1.81** ~~1.80~~ ***Disputed Claim*** means a Claim (excluding the $2.5 million payment to be made to the Liquidating Creditor Trust pursuant to Section 6.4 herein) that has neither been Allowed or disallowed pursuant to a Final Order of the Bankruptcy Court, and  (a) if no Proof of Claim has been filed by the applicable deadline:  (i) a Claim that has been or hereafter is listed on the Schedules as disputed, contingent, or unliquidated; or (ii) a Claim that has been or hereafter is listed on the Schedules as other than disputed, contingent, or unliquidated, but as to which the Debtors or Reorganized Debtors or any other party in interest has interposed an objection or request for estimation which has not been withdrawn or determined by a Final Order; or (b) if a Proof of Claim or other request for payment has been filed by the applicable deadline:  (i) a Claim for which no corresponding Claim has been or hereafter is listed on the Schedules or Allowed in ~~the~~**this** Plan; (ii) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as other than disputed, contingent, or unliquidated, but the nature or amount of the Claim or as asserted in the Proof of Claim varies from the nature and amount of such Claim as listed on the Schedules to the extent of such variance; (iii) a Claim for which a corresponding Claim has been or hereafter is listed on the Schedules as disputed, contingent, or unliquidated; or (iv) a Claim for which a timely objection or request for estimation is interposed by the Debtors, the Reorganized Debtors or any other party in interest which has not been withdrawn or determined by a Final Order.

**1.82** ~~1.81~~ ***Distribution*** means Cash, property, interests in property or other value distributed to Holders of Allowed Claims, or their designated agents, under the Plan (excluding the $2.5 million payment to be made to the Liquidating Creditor Trust pursuant to Section 6.4 herein).

**1.83** ~~1.82~~ ***Distribution Record Date*** means five Business Days prior to the Plan Confirmation Date.  The $2.5 million payment to be made to the Liquidating Creditor Trust pursuant to Section 6.4 herein shall not be subject to the Distribution Record Date.

**1.84** ~~1.83~~ ***Effective Date*** means the first Business Day after the Plan Confirmation Date on which the conditions precedent specified herein and in the Definitive Agreement have been satisfied or waived.

**1.85** ~~1.84~~ ***ERC*** means Erickson Retirement Communities, LLC.

**1.86** ***ERC Letters of Credit* means letters of credit numbered 18106086, 18106388, 18106392, 18106690, 18107082, 18107083, 18107421, 18108167 issued by PNC Bank, National Association.**

**1.87** ***Erickson Construction Letters of Credit* means letter of credit numbered 18106730 issued by PNC Bank, National Association.**

**1.88** ***Erickson Construction Letters of Credit Claim* means a Claim arising under the Erickson Construction Letters of Credit.**

**1.89** ~~1.85~~ ***Erickson Group Guaranty Claim*** means a Claim arising from Erickson Group's guarantee of payment or performance of the respective obligors' obligations under the Concord

~~EAST\42647302.30~~
EAST\42647302.46

Construction Loan, Novi Construction Loan, Houston Construction Loan, and Littleton Construction Loan.

**1.90** ~~1.86~~ *Estate* means the estate created in each Debtor's chapter 11 bankruptcy case containing all property and other interests of the Debtor pursuant to Bankruptcy Code section 541.

**1.91** ~~1.87~~ *Final Order* means an order or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or Bankruptcy Rule 9024, may be filed relating to such order shall not cause such order to not be a Final Order.

**1.92** ~~1.88~~ *General Unsecured Claim* means any Claim asserted against any Debtor which is not included within the other specifically defined Classes hereunder or which is otherwise determined by the Bankruptcy Court to be a General Unsecured Claim, including any Claims arising from a guarantee of the Debtors' and ERC's non-debtor subsidiaries' prepetition obligations.

**1.93** *Growth Participation Plan* **means that certain Erickson Retirement Communities Amended and Restated Growth Participation Plan, effective as of January 1, 2009. The Growth Participation Plan is a profit sharing compensation program for managerial employees holding the title of manager and above.**

**1.94** ~~1.89~~ *GST Loan* means that certain loan in the original principal amount of $49,648,620 between Erickson Group, LLC, as lender and John C. Erickson GST Trust and 2002 Nancy A. Erickson GST Trust, as borrowers, dated as of May 4, 2005, as amended, modified, and supplemented from time to time.

**1.95** ~~1.90~~ *Holder* means the legal or beneficial holder of a Claim or Interest.

**1.96** ~~1.91~~ *Houston Community Loan* means that certain loan made pursuant to that certain Community Loan Agreement between Houston, as borrower, and Eagle's Trace, Inc., a Maryland non-profit corporation, as lender, with a balance of $88,515,330, as amended, modified and supplemented from time to time.

**1.97** ~~1.92~~ *Houston Community Loan Claim* means a Claim arising under the Houston Community Loan.

**1.98** ~~1.93~~ *Houston Construction Loan* means the loan made pursuant to that certain Construction Loan Agreement, amended and restated, dated September 15, 2004, in the maximum principal amount of $50 million, between Houston, as borrower, and PNC Bank, as successor to Mercantile-Safe Deposit and Trust Company, as administrative agent, and other lenders party thereto.

**1.99** ~~1.94~~ *Houston Construction Loan Claim* means a Claim arising under the Houston Construction Loan.

**1.100** ~~1.95~~ *Houston Junior Loan* means that certain transaction entered into pursuant to that certain "Purchase Agreement" made and entered into as of November 18, 2004 by and among CNL Retirement ER6, LP, a Delaware limited partnership and Houston, as may be amended, modified and supplemented from time to time.

**1.101** ~~1.96~~ *Houston Junior Loan Claim* means a Claim arising under that certain Houston Junior Loan.

**1.102** ~~1.97~~ *Houston Junior Loan Guaranty Claim* means a Claim arising from a guarantee of the Houston Junior Loan.

**1.103** ~~1.98~~ *IED* means the initial entrance deposit that the first resident to occupy each unit at a given Campus pays to the NFP operating the Campus pursuant to a residence and care agreement entered into between the resident and the respective NFP.

**1.104** ~~1.99~~ *Impaired* means, with respect to a Claim or Interest, that such Class of Claims or Interests is impaired, within the meaning of Bankruptcy Code section 1124.

**1.105** ~~1.100~~ *Interest* means the interest of any Holder of an equity security of any Debtor, within the meaning of Bankruptcy Code section 101(16), (17), represented by any issued and outstanding shares of common or preferred stock or other instrument evidencing a present ownership or membership interest in any of the Debtors, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest, including a partnership, limited liability company or similar interest in a Debtor.

**1.106** ~~1.101~~ *Interest Rate Swap Claim* means a Claim arising under that certain Master Agreement (related to the Corporate Revolver) between PNC Bank, National Association and ERC (Obligor), dated as of July 27, 2007.

**1.107** ~~1.102~~ *Kansas Community Loan* means that certain loan between Kansas, as borrower, and Tallgrass Creek, Inc., as lender, with a balance of $33,484,353, as may be amended, modified and supplemented from time to time.

**1.108** ~~1.103~~ *Kansas Community Loan Claim* means a Claim arising under the Kansas Community Loan.

**1.109** ~~1.104~~ *Kansas Construction Loan* means the loan made pursuant to that certain Construction Loan Agreement made and entered into as of April 3, 2007, in the maximum principal amount of $65 million, by and between Kansas, as borrower, the financial institutions that are or may from time to time become parties thereto and their respective successors and assigns and PNC Bank as successor to Mercantile-Safe Deposit and Trust Company, as Collateral and Administrative Agent for the Lenders.

**1.110** ~~1.105~~ *Kansas Construction Loan Claim* means a Claim arising under the Kansas Construction Loan.

**1.111** ~~1.106~~ *Kansas Junior Loan* means the loan made pursuant to that certain Loan Agreement made and entered into as of April 3, 2007 by and between MSRESS III Kansas Campus, L.P., a Delaware limited liability partnership, as lender, and Kansas, as borrower, in the maximum principal amount of $25 million.

EAST\42647302.30
EAST\42647302.46

**1.112** ~~1.107~~ *Kansas Junior Loan Claim* means a claim arising under the Kansas Junior Loan.

**1.113** ~~1.108~~ *Kansas Special Assessment Bonds* means the City of Overland Park, Kansas Transportation Development District Special Assessment Bonds Series 2006 (Tallgrass Creek Project) in the principal amount of $15 million, as amended, modified and supplemented from time to time.

**1.114** ~~1.109~~ *Kansas Special Assessment Bond Claim* means a Claim arising under the Kansas Special Assessment Bonds.

**1.115** ~~1.110~~ *Landowner* means each Debtor that is a direct or indirect wholly-owned subsidiary of ERC which owns the land (or is lessee under a sale/leaseback- junior loan) and improvements associated with a Developing Campus.

**1.116** ~~1.111~~ *Landowner Debtor* means Ashburn; Columbus; Concord; Dallas; Houston; Kansas; Littleton; Novi; and Warminster.

**1.117** ~~1.112~~ *Landowner Retained Cash* means the minimum cash balances to be retained by certain of the Landowners, as follows: (i) $1,900,000 by Ashburn Campus, LLC; (ii) $6,300,000 by Concord Campus, LP; (iii) $1,700,000 by Dallas Campus, LP; (iv) $1,800,000 by Houston Campus, LP; (v) $2,100,000 by Littleton Campus, LLC; and (vi) $5,600,000 by Novi Campus, LLC.

**1.118** ~~1.113~~ *Lenders* mean, collectively, those lenders, parties or participants to the Ashburn Construction Loan, Concord Construction Loan, Dallas Construction Loan, Houston Construction Loan, Littleton Construction Loan, Novi Construction Loan, Kansas Construction Loan, Corporate Revolver and the UMBC Building Construction Loan.

**1.119** ~~1.114~~ *Lender Allocation* means the allocation of Distributable Cash (as defined in Section 6.1.3) among the Debtors' ~~estates~~**Estates** and the creation and application of a transaction implementation pool (the "TIP"), as more fully described in the attached Exhibit B, and which terms are incorporated and a necessary part of this Plan.

**1.120** ~~1.115~~ *Liquidating Creditor Trust* means the grantor trust to be created upon the Effective Date for the benefit of the Beneficiaries.

**1.121** ~~1.116~~ *Littleton Community Loan* means that certain loan between Littleton, as borrower, and Wind Crest, Inc., a Maryland non-profit corporation, as lender, with a balance of $141,340,375.

**1.122** ~~1.117~~ *Littleton Community Loan Claim* means a Claim arising under the Littleton Community Loan.

**1.123** ~~1.118~~ *Littleton Construction Loan* means the loan made pursuant to that certain Construction Loan Agreement made as of March 29, 2006, in the maximum principal amount of $83 million, by and between Littleton, as borrower, and Capmark Finance, Inc., f/k/a GMAC Commercial Mortgage Corporation, a California corporation, as may be amended, modified and supplemented from time to time.

**1.124** ~~1.119~~ *Littleton Construction Loan Claim* means a Claim arising under the Littleton Construction Loan.

**1.125** ~~1.120~~ *Littleton Junior Loan* means that certain transaction entered into pursuant to that certain "Purchase Agreement" made and entered into as of October 11, 2006 by and among Littleton, ERC, and MSRESS III Denver Campus, LLC, a Delaware limited liability company, as may be amended, modified and supplemented from time to time.

**1.126** ~~1.121~~ *Littleton Junior Loan Claim* means a Claim arising under the Littleton Junior Loan.

**1.127** *Littleton Letters of Credit* **means letters of credit issued for the benefit of Littleton in favor of the Board of County Commissioners of the County of Douglas by PNC Bank, National Association, which letters of credit are numbered 18105092, 18106893, 18109581 and 18106895.**

**1.128** ~~1.122~~ *Littleton Out-Parcel* means the real property consisting of Lot 1, Block 1 (consisting of 12.5 acres) and Lot 1, Block 2 (consisting of 18 acres), as shown on the Erickson Subdivision Plat recorded on November 29, 2005 at Reception No. 2005113790, County of Douglas, State of Colorado.

**1.129** ~~1.123~~ *Management Agreement* means a management and marketing agreement entered into among an NFP and ERC pursuant to which ERC agrees to manage a Campus for a management fee.

**1.130** ~~1.124~~ *Management Agreement Claims* means a Claim arising under the Management Agreements.

**1.131** ~~1.125~~ *ManagementCo* means Redwood-ERC Management, LLC, a Maryland limited liability company formed by Redwood to acquire ERC's goodwill, personal and ongoing business relationships, trade secrets, know-how and knowledge in connection with the Business of providing management services to Retirement Communities, as well as certain other assets related to the management services aspect of the Business for the purpose of operating as the manager of certain Retirement Communities.

**1.132** ~~1.126~~ *Master Lease* means a master lease and use agreement entered into between a NFP and a respective Landowner whereby the NFP leases the land and the Developing Campus from the related Landowner.

**1.133** ~~1.127~~ *Mechanic's Lien Claim* means a Secured Claim arising from a valid, properly perfected, enforceable and non-avoidable mechanic's lien arising under state or other applicable law.

**1.134** ~~1.128~~ *Medical Claims Cash* means all cash held by ERC for the purpose of paying self-funded medical or dental claims, medical or dental insurance premiums (including stop-loss premiums), and related administrative expenses, including amounts reflected as accounts 10250 and 10255 on the ERC balance sheet.

**1.135** ~~1.129~~ *Morgan Stanley Settlement* means an agreement by and among by and among ERC, Erickson Construction, Erickson Group, Houston, Novi, Senior Campus, Littleton, Dallas, Kansas, MSRESS III Dallas Campus, L.P., MSRESS III Denver Campus, LLC, and MSRESS III Kansas Campus, L.P that will be filed as a Plan Supplement and which will provide for a settlement amongst such parties, subject to confirmation of the Plan.

**1.136** ~~1.130~~ *New Management Agreement* means a new management and marketing agreement entered into among an NFP and ManagementCo pursuant to which ManagementCo agrees to manage a Campus for a management fee. Each such new management agreement shall be effective as of Closing and will replace the existing Management Agreement with respect to the respective Campus. Each new management agreement shall have a minimum term of ten (10) years, subject to a three (3) year and seven (7) year right to review the management fee terms of the agreements to determine whether the fees reflect current market pricing and shall contain mutually agreeable terms consistent with the economic terms agreed to with the NSC on the record as part of the Auction. **To the extent that any party holds valid consent rights with regards to the contemplated New Management Agreements, such rights will continue to be enforceable to the extent that they are valid in the context of the Plan and related transactions. The Debtors reserve the right to seek approval of any new agreements and the Plan over the objection of such a party on any basis available to the Debtors.**

**1.137** ~~1.131~~ *NFP* means a non-profit organization that either owns a Campus or leases a Campus from the Landowner and operates the Campus. The following NFPs have leased the applicable Campuses from the applicable Landowners and entered into various agreements in connection therewith: Ann's Choice, Inc., a Maryland non-profit corporation; Ashby Ponds, Inc., a Maryland non-profit corporation; Eagle's Trace, Inc., a Maryland non-profit corporation; Fox Run Village, Inc., a Maryland non-profit corporation; Hickory Chase, Inc., a Maryland non-profit corporation; Highland Springs, Inc., a Maryland non-profit corporation; Linden Ponds, Inc., a Maryland non-profit corporation; Maris Grove, Inc., a Pennsylvania non-profit corporation; Monarch Landing, Inc., a Maryland non-profit corporation; Sedgebrook, Inc., a Maryland non-profit corporation; Tallgrass Creek, Inc., a Maryland non-profit corporation; and Wind Crest, Inc., a Maryland non-profit corporation.

**1.138** ~~1.132~~ *NSC/NFP Carveout Claims* shall have the meaning ascribed in Section 12.2.

**1.139** ~~1.133~~ *NFP Claim* means with respect to the Landowner Debtors, a Claim arising under the Working Capital Loans or Master Leases entered into between a respective Landowner and a respective NFP.

**1.140** ~~1.134~~ *Novi Community Loan* means that certain loan between Novi, as borrower, and Fox Run Village, Inc., as lender, with a balance of $165,504,127.

**1.141** ~~1.135~~ *Novi Community Loan Claim* means a Claim arising under the Novi Community Loan.

**1.142** ~~1.136~~ *Novi Construction Loan* means the loan made pursuant to that certain Construction Loan Agreement made and entered into as of February 12, 2002, in the maximum principal amount of $46 million, by and between Novi, as borrower, and PNC Bank, as successor to Mercantile-Safe Deposit and Trust Company, a Maryland banking corporation, as amended, modified and supplemented from time to time.

**1.143** ~~1.137~~ *Novi Construction Loan Claim* means a Claim arising under the Novi Construction Loan.

**1.144** ~~1.138~~ *Novi Junior Loan* means that certain transaction entered into pursuant to that certain "Purchase Agreement" made and entered into as February 28, 2003, by and among CNL Retirement ER2, LP, a Delaware limited partnership, as buyer, and Novi, as seller and lessee, as may be amended, modified and supplemented from time to time, in the principal amount of $17 million.

**1.145** ~~1.139~~ *Novi Junior Loan Claim* means a Claim under the Novi Junior Loan.

EAST\42647302.30
EAST\42647302.46

**1.146** *Novi Letters of Credit* **means letters of credit issued by PNC Bank, National Association numbered 18106429, 18106432, 18106433, 18106434, 18106435, 18106436, 18106437, 18106438, 18106440, 18107820, 18106431.**

**1.147** ~~1.140~~ *NSC* means National Senior Campuses, Inc., a non-profit corporation which supports the NSC-NFPs.

**1.148** ~~1.141~~ *NSC Interim Payments* means any payments the NSC and NSC-NFPs have received from the Debtors for reimbursement of certain professional fees and expenses incurred by the NSC and NSC-NFPs since the Petition Date in connection with the Debtors' restructuring efforts.

**1.149** ~~1.142~~ *NSC-NFP* means the following NFPs: Oak Crest Village, Inc., Greenspring Village, Inc., Riderwood Village, Inc., Brooksby Village, Inc., Seabrook Village, Inc., Cedar Crest Village, Inc., Ann's Choice, Inc., Maris Grove, Inc., Fox Run Village, Inc., Wind Crest, Inc., Ashby Ponds, Inc., Highland Springs, Inc., Eagle's Trace, Inc., Linden Ponds, Inc., Sedgebrook, Inc., Monarch Landing, Inc. and Tallgrass Creek, Inc.

**1.150** ~~1.143~~ *NSC Payment* means the $9 million payment to be made directly by Redwood at Closing on the Definitive Agreement from the Cash Transaction Proceeds to NSC, which payment will be distributed by NSC pursuant to Section 6.1.3.1 of the Plan.

**1.151** ~~1.144~~ *NSC Payment Rebate* means $2 million of the $9 million NSC Payment that NSC will pay to the TIP upon receipt of the NSC Payment pursuant to Section 6.1.3.1 of the Plan.

**1.152** ~~1.145~~ *Other Priority Claim* means any Claim entitled to priority pursuant to Bankruptcy Code section 507(a) other than an Administrative Expense Claim or Priority Tax Claim.

**1.153** ~~1.146~~ *Petition Date* means October 19, 2009, the date on which the Debtors' chapter 11 bankruptcy petitions were filed with the Bankruptcy Court.

**1.154** ~~1.147~~ *Plan* means this plan of reorganization under chapter 11 of the Bankruptcy Code as amended or modified from time to time.

**1.155** ~~1.148~~ *Plan Confirmation Date* means the date on which the Clerk of the Bankruptcy Court enters the Plan Confirmation Order (as defined below).

**1.156** ~~1.149~~ *Plan Confirmation Hearing* means the hearing to be held by the Bankruptcy Court to consider approval of the Plan, as such hearing may be adjourned or continued from time to time.

**1.157** ~~1.150~~ *Plan Confirmation Order* means any order entered by the Bankruptcy Court confirming the Plan pursuant to Bankruptcy Code section 1129.

**1.158** ~~1.151~~ *Plan Documents* means all documents, forms of documents, schedules, and exhibits to the Plan to be executed, delivered, assumed and/or performed in conjunction with consummation of the Plan on the Effective Date.

**1.159** ~~1.152~~ *Plan Supplement* means the compilation of all Plan Documents to be entered into as of the Effective Date. The Plan Supplement will be filed with the Clerk of the Bankruptcy Court no later than five (5) Business Days prior to the Plan Confirmation Hearing (or such later date as may be approved by the Bankruptcy Court on notice to parties in interest) and shall be considered a part of this Plan for all purposes.

EAST\42647302.30
EAST\42647302.46

**1.160** ~~1.153~~ *Priority Tax Claim* means any Allowed Claim of a governmental unit pursuant to Bankruptcy Code sections 502(i) and 507(a)(8); provided, however, any Claims for penalties asserted by governmental units shall not be Priority Tax Claims.

**1.161** ~~1.154~~ *Professional* means any professional firm or professional person retained by the Debtors in connection with these Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

**1.162** ~~1.155~~ *Project Debt* means the debt identified on Exhibit X to the Definitive Agreement.

**1.163** ~~1.156~~ *Proof of Claim* means a written statement conforming substantially to the appropriate official form and Bankruptcy Rule 3001 describing the basis and amount of a Claim or Interest, together with supporting documentation evidencing the such Claim or Interest, which complies with applicable provisions of the Plan, the Bankruptcy Code, other Bankruptcy Rules, and any orders of the Bankruptcy Court.

**1.164** ~~1.157~~ *PropCo* means Redwood-ERC Properties, LLC, a Maryland limited liability company formed by Redwood to acquire all ERC's right, title, and interest in the Transferred Landowners for the purpose of operating as owner of the acquired Campuses.

**1.165** ~~1.158~~ *Redwood* means Redwood-ERC Senior Living Holdings, LLC, a Maryland limited liability company.

**1.166** ~~1.159~~ *Redwood Ashburn* means Redwood-ERC Ashburn, LLC, a Maryland limited liability company.

**1.167** ~~1.160~~ *Redwood Concord* means Redwood-ERC Concord L.P., a Maryland limited partnership.

**1.168** ~~1.161~~ *Redwood Dallas* means Redwood-ERC Dallas, LLC, a Maryland limited liability company.

**1.169** ~~1.162~~ *Redwood Houston* means Redwood-ERC Houston, LLC, a Maryland limited liability company.

**1.170** ~~1.163~~ *Redwood Kansas* means Redwood-ERC Kansas, LLC, a Maryland limited liability company formed by Redwood to acquire certain assets of Kansas.

**1.171** ~~1.164~~ *Redwood Littleton* means Redwood-ERC Littleton, LLC, a Maryland limited liability company.

**1.172** ~~1.165~~ *Redwood Novi* means Redwood-ERC Novi, LLC, a Maryland limited liability company.

**1.173** ~~1.166~~ *Redwood Retained Employees* means all current officers, directors and employees of the Debtors employed by Redwood on the Effective Date through the ninety (90) day anniversary thereof, other than John Erickson and members of the Erickson family, including, but not limited to, those individuals listed on the annexed schedule **in Exhibit C hereto**.

**1.174** ~~1.167~~ *Reorganized Debtors* means the Debtor entities, as reorganized, or the Acquisition Companies, both as they exist on or after the Effective Date, pursuant to the terms of the Plan.

**1.175** ~~1.168~~ *Restructuring Transactions* means those transactions described in the Definitive Agreement and Section 6 hereof.

**1.176** ~~1.169~~ *Schedules* means the schedules of assets and liabilities and the statement of financial affairs filed by the Debtors pursuant to Bankruptcy Code section 521, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules as such schedules and statements have been or may be supplemented or amended from time to time through the Plan Confirmation Date.

**1.177** ~~1.170~~ *Secured Claim* means a Claim (i) secured by a valid and perfected lien on collateral that is enforceable pursuant to applicable law, the amount of which is equal to or less than the value of such collateral (a) as set forth in ~~the~~**this** Plan, (b) as agreed to by the Holder of such Claim and the Debtors, or (c) as determined by a Final Order in accordance with Bankruptcy Code section 506(a), or (ii) secured by the amount of any rights of setoff of the Holder thereof under Bankruptcy Code section 553.

**1.178** ~~1.171~~ *Secured Tax Claim* means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under Bankruptcy Code section 507(a)(8) (determined irrespective of any time limitations therein), and including any related Secured Claim for penalties.

**1.179** ~~1.172~~ *Securities Act* means the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder.

**1.180** ~~1.173~~ *Sellers* means ERC, Erickson Group, Concord, Dallas, Houston, Ashburn, Littleton, Novi, Kansas, Tinton Falls Campus II, LLC, Senior Campus Care, LLC, Warminster Campus, L.P., and Erickson Construction.

**1.181** ~~1.174~~ *STAMPS* means the Subordinated Taxable Adjustable Mezzanine Put Securities Series 2007 issued pursuant to that certain Trust Indenture, dated as of November 1, 2007 between ERC and The Bank of New York, as Trustee, as amended, modified and supplemented from time to time.

**1.182** ~~1.175~~ *Texas A&M Note* means that certain promissory note in the original amount of $4.4 million granted by Dallas to the Board of Regents of the Texas A&M University System, secured by a first priority mortgage on a portion of a certain parcel of land acquired by Dallas from Texas A&M University.

**1.183** ~~1.176~~ *Texas A&M Note Claim* means a Claim arising under the Texas A&M Notes.

**1.184** ~~1.177~~ *TIP* shall have the meaning set forth in Section ~~1.177~~**1.183** to this Plan and attached Exhibit B.

**1.185** ~~1.178~~ *Transaction Proceeds* means the gross proceeds received for the Purchased Assets, as defined in the Definitive Agreement.

**1.186** ~~1.179~~ *Transferred Claims* means the Transferred Chapter 5 Avoidance Actions (defined below) and the Transferred D&O Claims (defined below).

~~EAST\42647302.30~~
EAST\42647302.46

**1.187** ~~1.180~~ *Transferred Employees* means employees of the Debtors to whom Redwood has made an offer of employment that has been accepted to be effective upon the Closing.

**1.188** ~~1.181~~ *Transferred Landowners* means Warminster and Warminster GP.

**1.189** ~~1.182~~ *Trust Agreement* means the agreement, substantially in the form included in the Plan Documents, governing the operations of the Liquidating Creditor Trust, as it may be subsequently modified from time to time.

**1.190** ~~1.183~~ *Trustee* means the individual or entity designated and retained as the trustee to the Liquidating Creditor Trust, as of the Effective Date or as soon as reasonably practicable thereafter, as the fiduciary responsible for administering the Liquidating Creditor Trust.

**1.191** ~~1.184~~ *UMBC Building* means that certain building owned by ERC located at the following address: 5525 Research Park Drive, Baltimore, Maryland 21250.

**1.192** ~~1.185~~ *UMBC Building Construction Loan* means the loans made pursuant to that certain Building Loan Agreement between Erickson Construction, Senior Campus, Senior Campus Care, LLC, and SCL Realty, LLC, as Borrowers, ERC, as guarantor, Manufacturers and Traders Trust Company as Lender and Administrative Agent, and Wilmington Trust, FSB, as Lender, dated July 31, 2008.

**1.193** ~~1.186~~ *UMBC Building Construction Loan Claim* means a Claim arising under the UMBC Building Construction Loan.

**1.194** ~~1.187~~ *Unimpaired* means, with respect to a Claim or Interest, a Class of Claims or Interests that is not Impaired, within the meaning of Bankruptcy Code section 1124.

**1.195** ~~1.188~~ *Voting Record Date* means the date of the final hearing on the Disclosure Statement.

**1.196** ~~1.189~~ *Warminster Community Loan* means that certain loan agreement between Warminster and Ann's Choice, Inc., a Maryland non-profit corporation, relating to a loan with a balance of approximately $276,759,374 as of the Petition Date.

**1.197** ~~1.190~~ *Warminster Community Loan Claim* means a Claim arising under the Warminster Community Loan.

**1.198** ~~1.191~~ *Warminster Junior Loan Claim* means a Claim arising under that certain real estate financing contract between Warminster and HCP ER3 (f/k/a CNL Retirement ER3, LP), a Delaware limited partnership, as may be amended, modified and supplemented from time to time.

**1.199** *Warminster Letters of Credit* **means letters of credit numbered 18106642, 18106643 and 18107298 issued by PNC Bank, National Association.**

**1.200** ~~1.192~~ *Warminster Purchase Option Deposit Refund Agreement* means that certain amended and restated purchase option agreement dated December 1, 2005 by and among Warminster, ERC and Ann's Choice, Inc., including any obligations thereunder to refund the purchase option deposit described therein.

**1.201** ~~1.193~~ *Warminster Purchase Option Deposit Refund Agreement Claim* means a Claim arising under the Warminster Purchase Option Deposit Refund Agreement.

EAST\42647302.30
EAST\42647302.46

**1.202** ~~1.194~~ *Working Capital Loan* means a loan entered into between a Landowner and NFP, pursuant to which the Landowner loans the NFP the funds necessary to cover operating deficiencies of the NFP.

**B.      Interpretation:  Application of Definitions and Rules of Construction**.

Unless otherwise specified, all section or exhibit references in ~~the~~**this** Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein.  A term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the Plan.  The headings in ~~the~~**this** Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  Unless otherwise provided, any reference in ~~the~~**this** Plan to an existing document, exhibit or schedule means such document, exhibit or schedule as it may have been amended, restated, revised, supplemented or otherwise modified.  If a time or date is specified for any payments or other Distribution under the Plan, it shall mean on or as soon as reasonably practicable thereafter.  Further, where appropriate from a contextual reading of a term, each term includes the singular and plural form of the term regardless of how the term is stated and each stated pronoun is gender neutral.

**SECTION 2.     ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS**

2.1      *Administrative Expense Claims*.  Except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to a different treatment, the Debtors shall pay to each Holder of an Allowed Administrative Expense Claim Cash in an amount equal to such Claim on the Effective Date, or as soon thereafter as is reasonably practicable; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, or liabilities arising under obligations incurred by the Debtors, as Debtors in Possession, in accordance with the Budget (as defined in the DIP Facility), shall be paid by the Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

2.1.1      *Auction Fee Payment.*  ~~Subject to allowance as an Administrative Expense Claim~~**Except as otherwise agreed by Coastwood**, the Debtors shall pay $9 million Cash from the Cash Transaction Proceeds to Coastwood on ~~or immediately prior to the earlier of~~ the Closing Date ~~or the Effective Date.  The Debtors shall support a motion seeking to provide for~~**if the Bankruptcy Court approves the** treatment of the Auction Fee as an Allowed Administrative Expense Claim ~~against the Debtors' Estates, and stating that Coastwood is the Holder of such Claim~~.  Further, the Auction Fee shall be treated as a Payment in Full Claim pursuant to Section 6.3.12 herein.

2.2      *Compensation and Reimbursement Claims*.  All parties seeking payment of Compensation and Reimbursement Claims (i) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is forty-five (45) days after the Effective Date, (ii) shall be paid in full from the Debtors' Cash on hand in such amounts as are allowed by the Bankruptcy Court (a) upon the later of (i) the Effective Date, (ii) the date upon which the order relating to any such Allowed Administrative Expense Claim is entered, or (b) upon such other terms as may be mutually agreed upon between the Holder of such an Allowed Administrative Expense Claim and the Debtors.  The Debtors are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Plan Confirmation Date and until the Effective Date in the ordinary course and without the need for Bankruptcy Court approval, subject to the requirement that invoices evidencing the amount sought will be distributed to those parties set forth in the Order Pursuant

to 11 U.S.C. §§105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals [Dkt. No. 367] and payment shall be governed by such order, except for the provisions related to the 20% holdback.

2.3 ***Priority Tax Claims***.  Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a different treatment, each Holder of an Allowed Priority Tax Claim shall receive Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim.  The Debtors reserve the right to prepay at any time under this option.  All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due.  Any Claims asserted by a governmental unit on account of any penalties shall not be Priority Tax Claims and shall be subordinated to General Unsecured Claims.

2.4 ***DIP Funding Claims***.  On the Effective Date, the Borrowers shall pay Cash to each Holder of an Allowed DIP Funding Claim in an amount equal to such Claim in full and complete satisfaction of such Claim through a credit against the Cash Transaction Proceeds, and all obligations and commitments thereunder shall be terminated.  Upon payment or satisfaction in full of all obligations under the DIP Facility, any and all liens and security interests securing obligations under the DIP Facility shall be deemed terminated and shall be of no further force and effect.  In the event of any sale or disposition of the DIP Facility collateral, ERC Funding Co. LLC, the DIP lender shall have the right to credit bid any or all of the DIP Facility obligations under section 363(k) of the Bankruptcy Code or otherwise.

**SECTION 3.   CLASSIFICATION OF CLAIMS AND INTERESTS**

A.      The following table designates the Classes of Claims against and Interests in **Erickson Group** and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| --- | DIP Funding Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | Corporate Revolver Guaranty Claims | Impaired. | No (deemed to reject) | 0% |
| 4 | Erickson Group Guaranty Claims | Impaired. | Yes | TBD |
| 5 | Interests in Erickson Group | Impaired. | No (deemed to reject) | 0% |

B.    The following table designates the Classes of Claims against and Interests in **ERC**, a wholly owned subsidiary of Erickson Group, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|-------|------------|-----------|------------------|--------------------|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| --- | DIP Funding Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | Corporate Revolver Claims | Impaired. | Yes | ~~50.6~~**49.4**% |
| 4 | Interest Rate Swap Claims | Impaired. | Yes | ~~50.6~~**49.4**% |
| 5 | Other Secured Claims[1] | Unimpaired. | No (deemed to accept) | 100% |
| 6 | UMBC Building Construction Loan Claims[2] | Impaired. | Yes | 66.8% |
| 7 | Management Agreement Claims | Impaired. | Yes | 100% |
| 8 | General Unsecured Claims | Impaired. | Yes | -------- |
| 9 | Interests in ERC | Impaired. | No (deemed to reject) | 0% |

---

[1] This Class includes, without limitation, PNC Bank's claim secured by the Corporate Headquarters building and certain letters of credit claims held by PNC Bank.

[2] Although Holders of UMBC Building Construction Loan Claims may assert their Claims against more than one Debtor Estate, each such Claim is subject to the single satisfaction rule.

~~EAST\42647302.30~~
EAST\42647302.46

C.    The following table designates the Classes of Claims against and Interests in **Erickson Construction**, a wholly owned subsidiary of ERC, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| --- | DIP Funding Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | Mechanic's Lien Claims | Unimpaired. | No (deemed to accept) | 100% |
| 4 | Corporate Revolver Claims | Impaired. | Yes | ~~50.6~~49.4% |
| 5 | UMBC Building Construction Loan Claims | Impaired. | Yes | 66.8% |
| **6** | **Erickson Construction Letters of Credit Claims** | **Unimpaired.** | **No (deemed to accept)** | **100%** |
| ~~6~~7 | General Unsecured Claims | Impaired. | Yes | -------- |
| ~~7~~8 | Interests in Erickson Construction | Impaired. | No (deemed to reject) | 0% |

~~EAST\42647302.30~~
EAST\42647302.46

D.     The following table designates the Classes of Claims against and Interests in **Senior Campus**[3], a wholly owned subsidiary of ERC, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| --- | DIP Funding Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | UMBC Building Construction Loan Claims | Impaired. | Yes | 66.8% |
| 4 | Corporate Revolver Guaranty Claim | Impaired | No (deemed to reject) | 0% |
| 5 | General Unsecured Claims | Impaired. | Yes | ------- |
| 6 | Interests in Senior Campus | Impaired. | No (deemed to reject) | 0% |

---

[3] Except for its ownership interest in Houston, Senior Campus does not have any assets, and its only liabilities are the listed guaranty claims and intercompany claims.

EAST\42647302.30
EAST\42647302.46

E.     The following table designates the Classes of Claims against and Interests in **Ashburn**, a wholly owned subsidiary of ERC, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| --- | DIP Funding Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | Mechanic's Lien Claims | Unimpaired. | No (deemed to accept) | 100% |
| 4 | Ashburn Construction Loan Claims | Impaired. | Yes | 98.5% |
| 5 | Ashburn Community Loan Claims | Impaired. | Yes | 100% |
| 6 | Ashburn Junior Loan Claims | Impaired. | No (deemed to reject) | 0% |
| 7 | NFP Claims | Impaired. | No (deemed to reject) | 0% |
| 8 | General Unsecured Claims | Impaired. | Yes | -------- |
| 9 | Interests in Ashburn | Impaired. | No (deemed to reject) | 0% |

EAST\42647302.30
EAST\42647302.46

F.	The following table designates the Classes of Claims against and Interests in **Columbus**, a wholly owned subsidiary of ERC, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------|-----------|------------------|---------------------|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| --- | DIP Funding Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | Columbus Improvement Bond Claims | Impaired. | Yes | 100% |
| 4 | Mechanic's Lien Claims | Impaired. | Yes | ------- |
| 5 | Columbus Construction Loan Claims | Impaired. | Yes | -------- |
| 6 | Columbus Community Loan Claims | Impaired. | Yes | -------- |
| 7 | Columbus Junior Loan Claims | Impaired. | Yes | -------- |
| 8 | General Unsecured Claims | Impaired. | Yes | -------- |
| 9 | Interests in Columbus | Impaired. | No (deemed to reject) | 0% |

EAST\42647302.30
EAST\42647302.46

G.     The following table designates the Classes of Claims against and Interests in **Concord**, a direct or indirect wholly owned subsidiary of ERC, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| --- | DIP Funding Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | Mechanic's Lien Claims | Impaired. | Yes | ------- |
| 4 | Concord Construction Loan Claims | Impaired. | Yes | 97.4% |
| 5 | Concord Community Loan Claims | Impaired. | Yes | 100% |
| 6 | Concord Junior Loan Claims | Impaired. | No (deemed to reject) | 0% |
| 7 | Other Secured Claims | Impaired. | Yes | TBD |
| 8 | NFP Claims | Impaired. | No (deemed to reject) | 0% |
| 9 | General Unsecured Claims | Impaired. | Yes | -------- |
| 10 | Interests in Concord | Impaired. | No (deemed to reject) | 0% |

EAST\42647302.30
EAST\42647302.46

H.     The following table designates the Classes of Claims against and Interests in **Concord GP**[4], which is wholly owned by ERC, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| --- | DIP Funding Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | Corporate Revolver Guaranty Claim | Impaired | No (deemed to reject) | 0% |
| 4 | General Unsecured Claims | Impaired. | Yes | ------- |
| 5 | Interests in Concord GP | Impaired. | No (deemed to reject) | 0% |

---

[4] Except for its ownership interest in Concord, Concord GP does not have any assets, and except for the listed guaranty claims, it does not have any liabilities.

EAST\42647302.30
EAST\42647302.46

I. The following table designates the Classes of Claims against and Interests in **Dallas**, a direct or indirect wholly owned subsidiary of ERC, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| --- | DIP Funding Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | Mechanic's Lien Claims | Impaired. | Yes | ------- |
| 4 | Dallas Construction Loan Claims | Impaired. | Yes | 35.7% |
| 5 | Texas A&M Note Claims | Impaired. | Yes | 82.8% |
| 6 | Dallas Community Loan Claims | Impaired. | Yes | 100% |
| 7 | Dallas Junior Loan Claims | Impaired. | No (deemed to reject) | 0% |
| 8 | NFP Claims | Impaired. | No (deemed to reject) | 0% |
| 9 | General Unsecured Claims | Impaired. | Yes | -------- |
| 10 | Interests in Dallas | Impaired. | No (deemed to reject) | 0% |

EAST\42647302.30
EAST\42647302.46

J.    The following table designates the Classes of Claims against and Interests in **Dallas GP**[5], a wholly owned subsidiary of ERC, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| --- | DIP Funding Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | Corporate Revolver Guaranty Claim | Impaired | No (deemed to reject) | 0% |
| 4 | General Unsecured Claims | Impaired. | Yes | ------- |
| 5 | Interests in Dallas GP | Impaired. | No (deemed to reject) | 0% |

---

[5] Except for its ownership interest in Dallas, Dallas GP does not have any assets, and except for the listed guaranty claims, it does not have any liabilities.

EAST\42647302.30
EAST\42647302.46

K.	The following table designates the Classes of Claims against and Interests in **Houston**, a direct or indirect wholly owned subsidiary of ERC, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| --- | DIP Funding Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | Mechanic's Lien Claims | Impaired. | Yes | ------- |
| 4 | Houston Construction Loan Claims | Impaired. | Yes | 16.1% |
| 5 | Houston Community Loan Claims | Impaired. | Yes | 100% |
| 6 | Houston Junior Loan Claims | Impaired. | No (deemed to reject) | 0% |
| 7 | NFP Claims | Impaired. | No (deemed to reject) | 0% |
| 8 | General Unsecured Claims | Impaired. | Yes | -------- |
| 9 | Interests in Houston | Impaired. | No (deemed to reject) | 0% |

EAST\42647302.30
EAST\42647302.46

L.      The following table designates the Classes of Claims against and Interests in **Kansas**, a wholly owned subsidiary of ERC, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| --- | DIP Funding Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | Mechanic's Lien Claims | Impaired. | Yes | ------- |
| 4 | Kansas Special Assessment Bond Claims | Unimpaired. | No (deemed to accept) | 100% |
| 5 | Kansas Construction Loan Claims | Impaired. | Yes | 4.4% |
| 6 | Kansas Community Loan Claims | Impaired. | Yes | 100% |
| 7 | Kansas Junior Loan Claims | Impaired. | No (deemed to reject) | 0% |
| 8 | NFP Claims | Impaired. | No (deemed to reject) | 0% |
| 9 | General Unsecured Claims | Impaired. | Yes | -------- |
| 10 | Interests in Kansas | Impaired. | No (deemed to reject) | 0% |

M.      The following table designates the Classes of Claims against and Interests in **Littleton**, a wholly owned subsidiary of ERC, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| --- | DIP Funding Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | Mechanic's Lien Claims | Impaired. | Yes | ------- |
| 4 | Littleton Construction Loan Claims | Impaired. | Yes | 87.5% |
| 5 | Littleton Community Loan Claims | Impaired. | Yes | 100% |
| 6 | Littleton Junior Loan Claims | Impaired. | Yes | 12% |
| 7 | Other Secured Claims | Impaired. | Yes | TBD |
| 8 | NFP Claims | Impaired. | No (deemed to reject) | 0% |
| 9 | General Unsecured Claims | Impaired. | Yes | ------ |
| 10 | Interests in Littleton | Impaired. | No (deemed to reject) | 0% |

N.     The following table designates the Classes of Claims against and Interests in **Novi**, a wholly owned subsidiary of ERC, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| --- | DIP Funding Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | Mechanic's Lien Claims | Impaired. | Yes | ------- |
| 4 | Novi Construction Loan Claims | Impaired. | Yes | 79.4% |
| 5 | Novi Community Loan Claims | Impaired. | Yes | 100% |
| 6 | Novi Junior Loan Claims | Impaired. | No (deemed to reject) | 0% |
| 7 | Other Secured Claims | Impaired | Yes | TBD |
| 8 | NFP Claims | Impaired. | No (deemed to reject) | 0% |
| 9 | General Unsecured Claims | Impaired. | Yes | -------- |
| 10 | Interests in Novi | Impaired. | No (deemed to reject) | 0% |

O.     The following table designates the Classes of Claims against and Interests in **Warminster**, a direct or indirect wholly owned subsidiary of ERC, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | Mechanic's Lien Claims | Impaired. | Yes | ------- |
| 4 | Warminster Community Loan Claims | Impaired. | Yes | 100% |
| 5 | Warminster Purchase Option Deposit Refund Agreement Claims | Impaired. | Yes | 100% |
| 6 | Warminster Junior Loan Claims | Impaired. | Yes | 66.2% |
| 7 | Other Secured Claims | Impaired. | Yes | TBD |
| 8 | NFP Claims | Impaired. | No (deemed to reject) | 0% |
| 9 | General Unsecured Claims | Impaired. | Yes | -------- |
| 10 | Interests in Warminster | Impaired. | No (deemed to reject) | 0% |

EAST\42647302.30
EAST\42647302.46

P.    The following table designates the Classes of Claims against and Interests in **Warminster GP**[6], a wholly owned subsidiary of ERC, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, (iii) deemed to reject the Plan, or (iv) deemed to accept the Plan.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|
| --- | Administrative Expense Claims | Payment in full. | No | 100% |
| --- | Compensation and Reimbursement Claims | Payment in full. | No | 100% |
| --- | Priority Tax Claims | Payment in full. | No | 100% |
| 1 | Other Priority Claims | Unimpaired. | No (deemed to accept) | 100% |
| 2 | Secured Tax Claims | Unimpaired. | No (deemed to accept) | 100% |
| 3 | Corporate Revolver Guaranty Claim | Impaired | No (deemed to reject) | 0% |
| 4 | General Unsecured Claims | Impaired. | Yes | ------- |
| 5 | Interests in Warminster GP | Impaired. | No (deemed to reject) | 0% |

---

[6] Except for its ownership interest in Warminster, Warminster GP does not have any assets, and except for the listed guaranty claims, it does not have any liabilities.

EAST\42647302.30
EAST\42647302.46

**SECTION 4.    TREATMENT OF CLAIMS AND INTERESTS**

      4.1     *Erickson Group*.

      4.1.1     ***Other Priority Claims (Class 1)***.  Except to the extent that a Holder of an Allowed Other Priority Claim against Erickson Group's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Erickson Group and the Holder of the Allowed Other Priority Claim.

      4.1.2     ***Secured Tax Claims (Class 2)***.  On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of such Allowed Secured Tax Claim is entitled, or (iii) such other Distribution as necessary to satisfy the requirements of the Bankruptcy Code.  In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released.  The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

      4.1.3     ***Corporate Revolver Guaranty Claims (Class 3)***.  Recovery with respect to the Corporate Revolver Guaranty Claims shall be limited solely to Erickson Group's membership interest in ERC.

      4.1.4     ***Erickson Group Guaranty Claims (Class 4)***.  The Committee and Lenders with Erickson Group Guaranty Claims (which guarantee claims are expressly reserved and not otherwise waived against Erickson Group) will discuss in good faith the terms under which the Liquidating Creditor Trust (or other third party or entity) may receive the right to prosecute collection claims arising from the GST Loan and distribution of proceeds therefrom.  The Debtors make no representation as to the value or collectability of the GST Loan.

      4.1.5     ***Interests in Erickson Group (Class 5)***.  Each Holder of an Interest in Erickson Group will not receive any Distribution on account of such Interest.  Each such Interest shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Interests.  Each such Interest will be cancelled as of the Effective Date.

      4.2     ***ERC***.

      4.2.1     ***Other Priority Claims (Class 1)***.  Except to the extent that a Holder of an Allowed Other Priority Claim against ERC's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between ERC and the Holder of the Allowed Other Priority Claim.

EAST\42647302.30
EAST\42647302.46

4.2.2    ***Secured Tax Claims (Class 2)***.   On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Secured Tax Claim is entitled, or (iii) such other Distribution as necessary to satisfy the requirements of the Bankruptcy Code.  In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released.   The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

4.2.3    ***Corporate Revolver Claims (Class 3)***.   The Corporate Revolver Claims shall be Allowed as of the Effective Date in the amount set forth in the Proofs of Claim timely filed by Wilmington Trust, as administrative agent for the Holders of the Corporate Revolver Claims  or, if no ~~Proof~~**Proofs** of Claim ~~is~~**are** timely filed by Wilmington Trust, as agent~~,~~ the ~~Proof~~**Proofs** of Claim timely filed by the Holders of the Corporate Revolver Claims.  Wilmington Trust, as agent, shall be paid, on behalf of the Holders of Allowed Corporate Revolver Claims, on the Effective Date, $96,070,940 in Cash and an interest in the Cedar Crest Receivable (estimated currently to be equal to $3,074,020), which amounts shall be distributed upon receipt by Wilmington Trust, as agent, to such Holders in accordance with the Corporate Revolver loan documents and the Lender Allocation.  Upon receipt of the required payment as set forth in this section, Wilmington Trust, as agent, shall release its lien against the assets of ERC.

4.2.4    ***Interest Rate Swap Claims (Class 4)***.   On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Interest Rate Swap Claim shall receive a pro rata distribution of $2,349,000 in Cash and an interest in the Cedar Crest Receivable (estimated currently to be equal to $75,000).

4.2.5    ***Other Secured Claims (Class 5)***.   On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Other Secured Claim shall receive (a) reinstatement of such allowed Other Secured Claim; (b) payment of such Allowed Other Secured Claim in full in cash; or (c) such other treatment as the Company and each Holder shall agree.  In the case of the secured claim of the Ann's Choice Trustee based on its liens in ERC's partnership interests in Warminster, those partnership interests shall be transferred to Redwood free and clear of the liens of the Ann's Choice Trustee in exchange for the treatment of other interests held by the Ann's Choice Trustee in these cases set forth in Section 4.15.5 below.  The claim of PNC Bank related to a loan in the approximate amount of $1.2 million and secured by a first priority security interest in and mortgage on the Corporate Headquarters shall be Allowed as of the Effective Date and will be paid in full in Cash from the TIP on the Effective Date.  The claims of PNC Bank related to letters of credit issued by PNC Bank for the benefit of ERC and its subsidiaries and affiliates shall be Allowed as of the Effective Date and shall continue to be secured by certificates of deposit pledged to PNC, including those letters of credit issued under the Letter of Credit Facility described in the Order Authorizing Debtors to Continue Their Liability and Other Insurance Programs and to Enter Into Financing Agreements Related Thereto entered on or about January 25, 2010, which order shall continue in full force and effect, unaffected by the Plan and the transactions contemplated therein.

4.2.6    ***UMBC Building Construction Loan Claims (Class 6)***.   The UMBC Building Construction Loan Claims shall be Allowed as of the Effective Date in the amount set forth in the Proofs of Claim timely filed by the Holders of the UMBC Building Construction Loan Claims or, if no Proof of Claim is timely filed by a Holder, the Proof of Claim timely filed by M&T Bank, as Agent for the Holders of the UMBC Building Construction Loan Claims.   On the Effective Date or as soon

EAST\42647302.30
EAST\42647302.46

thereafter as is reasonably practicable based on consultations among the Debtors and M&T Bank in its capacity as Agent, each Holder of an Allowed UMBC Building Construction Loan Claim shall (i) receive the property securing such Claim or (ii) the Debtors shall dispose of the property securing such Claim in a manner agreed upon by M&T Bank in its capacity as Agent, in full satisfaction of the Holder's Allowed Claim.  To the extent that (y) Redwood has obtained a lease (the "***Redwood Lease***") in connection with the UMBC Building pursuant to the Definitive Agreement to which  M&T Bank, in its capacity as Agent, has consented  in writing, and the Debtors have assumed  and assigned to M&T Bank the ground sublease, the Redwood Lease, if applicable, and any other lease relating to the UMBC Building ("***Additional Leases***") and any building improvements that M&T Bank in its capacity as Agent specifically requests that the Debtors assume and assign to M&T Bank pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code prior to such transfer or other disposition of such property pursuant to clauses (i) or (ii) above; then (z) the ground sublease, the Redwood Lease, Additional Leases, and any so assumed, transferred and assigned shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such ground sublease (including those of the type described in sections 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment.  Notwithstanding anything to the contrary in this Plan or any Order of the Court, the property securing the UMBC Building Construction Loan Claim shall not be transferred to the Liquidating Creditor Trust.

    4.2.7 ***Management Agreement Claims (Class 7)***.  Each Holder of an Allowed Management Agreement Claim shall receive recovery in the form of a New Management Agreement.

    4.2.8 ***General Unsecured Claims (Class 8)***.  This Class consists of three subclasses, as discussed more fully in Section 6.4 hereof.  Each Holder of an Allowed General Unsecured Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust according to the subclassification of the Allowed General Unsecured Claim as set forth in Section 6.4.

    4.2.9 ***Interests in ERC (Class 9)***.  No Holder of an Interest in ERC will receive any Distribution on account of such Interest.  Each such Interest shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Interests, on or after the Effective Date.  Such Interests shall be cancelled.

    4.3  ***Erickson Construction***.

    4.3.1 ***Other Priority Claims (Class 1)***.  Except to the extent that a Holder of an Allowed Other Priority Claim against Erickson Construction's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Erickson Construction and the Holder of the Allowed Other Priority Claim.

    4.3.2 ***Secured Tax Claims (Class 2)***.  On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Secured Tax Claim is entitled, or (iii) such other Distribution as necessary to satisfy the requirements of the Bankruptcy Code.  In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released.  The Debtors and the Reorganized Debtors specifically reserve the right to challenge the

validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

        4.3.3   ***Mechanic's Lien Claims (Class 3)***.  Except to the extent a Holder of an Allowed Mechanic's Lien Claim agrees to less favorable treatment, each Holder of an Allowed Mechanic's Lien Claim shall receive the Allowed amount of such Claim in Cash in full satisfaction of such Claim on the Distribution Record Date if the Holder of the Allowed Mechanic's Lien Claim has a first priority security interest in the underlying collateral pursuant to applicable state law.  Otherwise, the Holder of an Allowed Mechanic's Lien Claim shall receive a Distribution, if any, relative to its priority under applicable state law in full satisfaction of such Claim.  Such Claims shall be satisfied through funds available at the various Campuses that the Claims are asserted against.  **To the extent Allowed Mechanic's Lien Claims are not paid in full, the unpaid portions of the Allowed Mechanic's Lien Claims will be treated as General Unsecured Claims and receive a Tier A Trade Class interest in the Liquidating Creditor Trust and receive distributions of the Trade Dividend pursuant to Section 6.4 of the Plan.**

        4.3.4   ***Corporate Revolver Claims (Class 4)***.  The Corporate Revolver Claims shall be Allowed as of the Effective Date in the amount set forth in the Proofs of Claim timely filed by Wilmington Trust, as administrative agent for the Holders of the Corporate Revolver Claims  or, if no ~~Proof~~**Proofs** of Claim ~~is~~**are** timely filed by Wilmington Trust, as agent~~,~~ the ~~Proof~~**Proofs** of Claim timely filed by the Holders of the Corporate Revolver Claims.   Wilmington Trust, as agent, shall be paid, on behalf of the Holders of Allowed Corporate Revolver Claims, on the Effective Date, $96,070,940 in Cash and an interest in the Cedar Crest Receivable (estimated currently to be equal to $3,074,020), which amounts shall be distributed upon receipt by Wilmington Trust, as agent, to such Holders in accordance with the Corporate Revolver loan documents and the Lender Allocation.  Upon receipt of the required payment as set forth in this section, Wilmington Trust, as agent, shall release its lien against the assets of ERC.

        4.3.5   ***UMBC Building Construction Loan Claims (Class 5)***.  The UMBC Building Construction Loan Claims shall be Allowed as of the Effective Date in the amount set forth in the Proofs of Claim timely filed by the Holders of the UMBC Building Construction Loan Claims or, if no Proof of Claim is timely filed by a Holder, the Proof of Claim timely filed by M&T Bank, as Agent for the Holders of the UMBC Building Construction Loan Claims.  On the Effective Date or as soon thereafter as is reasonably practicable based on consultations among the Debtors and M&T Bank in its capacity as Agent, each Holder of an Allowed UMBC Building Construction Loan Claim shall (i) receive the property securing such Claim or (ii) the Debtors shall dispose of the property securing such Claim in a manner agreed upon by M&T Bank in its capacity as Agent, in full satisfaction of the Holder's Allowed Claim.  To the extent that (y) Redwood has obtained a lease (the "***Redwood Lease***") in connection with the UMBC Building pursuant to the Definitive Agreement to which  M&T Bank, in its capacity as Agent, has consented  in writing, and the Debtors have assumed  and assigned to M&T Bank the ground sublease, the Redwood Lease, if applicable, and any other lease relating to the UMBC Building ("***Additional Leases***") and any building improvements that M&T Bank in its capacity as Agent specifically requests that the Debtors assume and assign to M&T Bank pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code prior to such transfer or other disposition of such property pursuant to clauses (i) or (ii) above; then (z) the ground sublease, the Redwood Lease, Additional Leases, and any so assumed, transferred and assigned shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such ground sublease (including those of the type described in sections 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment. Notwithstanding anything to the contrary in this Plan or any Order of the Court, the property securing the UMBC Building Construction Loan Claim shall not be transferred to the Liquidating Creditor Trust.

**4.3.6** *Erickson Construction Letters of Credit Claims (Class 6)*. **The claims of PNC Bank related to Erickson Construction Letters of Credit shall be allowed and shall continue to be secured by certificates of deposit pledged to PNC, including those letters of credit issued under the Letter of Credit Facility described in the Order Authorizing Debtors to Continue Their Liability and Other Insurance Programs and to Enter Into Financing Agreements Related Thereto entered on or about January 25, 2010, which order shall continue in full force and effect, unaffected by the Plan and the transactions contemplated therein.**

**4.3.7** ~~4.3.6~~ *General Unsecured Claims (Class ~~6~~7)*. This Class consists of three subclasses, as discussed more fully in Section 6.4 hereof. Each Holder of an Allowed General Unsecured Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust according to the subclassification of the Allowed General Unsecured Claim as set forth in Section 6.4.

**4.3.8** ~~4.3.7~~ *Interests in Erickson Construction (Class ~~7~~8)*. Each Holder of an Interest in Erickson Construction shall not receive or retain any interest or property or otherwise receive a Distribution on account of the Holder's Interest. Such Interests shall be cancelled.

4.4 *Senior Campus*.

4.4.1 *Other Priority Claims (Class 1)*. Except to the extent that a Holder of an Allowed Other Priority Claim against Senior Campus Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Senior Campus and the Holder of the Allowed Other Priority Claim.

4.4.2 *Secured Tax Claims (Class 2)*. On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Secured Tax Claim is entitled, or (iii) such other Distribution as necessary to satisfy the requirements of the Bankruptcy Code. In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released. The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

4.4.3 *UMBC Building Construction Loan Claims (Class 3)*. The UMBC Building Construction Loan Claims shall be Allowed as of the Effective Date in the amount set forth in the Proofs of Claim timely filed by the Holders of the UMBC Building Construction Loan Claims or, if no Proof of Claim is timely filed by a Holder, the Proof of Claim timely filed by M&T Bank, as Agent for the Holders of the UMBC Building Construction Loan Claims. On the Effective Date or as soon thereafter as is reasonably practicable based on consultations among the Debtors and M&T Bank in its capacity as Agent, each Holder of an Allowed UMBC Building Construction Loan Claim shall (i) receive the property securing such Claim or (ii) the Debtors shall dispose of the property securing such Claim in a manner agreed upon by M&T Bank in its capacity as Agent, in full satisfaction of the Holder's Allowed Claim. To the extent that (y) Redwood has obtained a lease (the "*Redwood Lease*") in connection with the UMBC Building pursuant to the Definitive Agreement to which M&T Bank, in its capacity as Agent, has consented in writing, and the Debtors have assumed and assigned to M&T Bank the ground sublease, the Redwood Lease, if applicable, and any other lease relating to the UMBC Building

EAST\42647302.30
EAST\42647302.46

("**Additional Leases**") and any building improvements that M&T Bank in its capacity as Agent specifically requests that the Debtors assume and assign to M&T Bank pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code prior to such transfer or other disposition of such property pursuant to clauses (i) or (ii) above; then (z) the ground sublease, the Redwood Lease, Additional Leases, and any so assumed, transferred and assigned shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such ground sublease (including those of the type described in sections 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment. Notwithstanding anything to the contrary in this Plan or any Order of the Court, the property securing the UMBC Building Construction Loan Claim shall not be transferred to the Liquidating Creditor Trust.

    4.4.4 **Corporate Revolver Guaranty Claims (Class 4)**. Each Holder of an Allowed Corporate Revolver Guaranty Claim against Senior Campus' Estate will not receive any Distribution on account of such Claim.

    4.4.5 **General Unsecured Claims (Class 5)**. This Class consists of three subclasses, as discussed more fully in Section 6.4 hereof. Each Holder of an Allowed General Unsecured Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust according to the subclassification of the Allowed General Unsecured Claim as set forth in Section 6.4.

    4.4.6 **Interests in Senior Campus (Class 6)**. Each Holder of an Interest in Senior Campus will not receive any Distribution on account of such Interest. Each such Interest shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Interests.

    4.5 **Ashburn**.

    4.5.1 **Other Priority Claims (Class 1)**. Except to the extent that a Holder of an Allowed Other Priority Claim against Ashburn's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Ashburn and the Holder of the Allowed Other Priority Claim.

    4.5.2 **Secured Tax Claims (Class 2)**. On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Secured Tax Claim is entitled, or (iii) such other Distribution as necessary to satisfy the requirements of the Bankruptcy Code. In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released. The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

    4.5.3 **Mechanic's Lien Claims (Class 3)**. Except to the extent a Holder of an Allowed Mechanic's Lien Claim agrees to less favorable treatment, each Holder of an Allowed Mechanic's Lien Claim shall receive the Allowed amount of such Claim in Cash in full satisfaction of such Claim on the Distribution Record Date if the Holder of the Allowed Mechanic's Lien Claim has a first priority security interest in the underlying collateral pursuant to applicable state law. Otherwise, the

Holder of an Allowed Mechanic's Lien Claim shall receive a Distribution, if any, relative to its priority under applicable state law in full satisfaction of such Claim. **To the extent Allowed Mechanic's Lien Claims are not paid in full, the unpaid portions of the Allowed Mechanic's Lien Claims will be treated as General Unsecured Claims and receive a Tier A Trade Class interest in the Liquidating Creditor Trust and receive distributions of the Trade Dividend pursuant to Section 6.4 of the Plan.**

4.5.4 ***Ashburn Construction Loan Claims (Class 4)***. The Ashburn Construction Loan Claims shall be Allowed as of the Effective Date in the amount set forth in the Proof of Claim timely filed by the PNC Bank, National Association, as collateral and administrative agent for the Holders of the Ashburn Construction Loan Claims, or if no Proof of Claim is timely filed by such Agent, the Proofs of Claim timely filed by Holders of the Ashburn Construction Loan Claims. PNC Bank, National Association shall be paid, on behalf of the Holders of Allowed Ashburn Construction Loan Claims, on the Effective Date, $60,626,000 in Cash and an interest in the Cedar Crest Receivable (estimated currently to be equal to $732,000), which amount shall be distributed by PNC Bank, as agent, to the Holders in accordance with the Ashburn Construction Loan documents and the Lender Allocation. Upon receipt of the required payment as set forth in this Section, PNC Bank, as agent, shall release its lien against the assets of Ashburn.

4.5.5 ***Ashburn Community Loan Claims (Class 5)***. The Ashburn Community Loan shall be amended and restated at the outstanding balance amount. Redwood Ashburn shall assume the Ashburn Community Loan, as modified.

4.5.6 ***Ashburn Junior Loan Claims (Class 6)***. No Holder of an Allowed Ashburn Junior Loan Claim will receive any Distribution on account of such Claim. Each Holder of such Claim shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Claim, on or after the Effective Date. **The Holders of such Claims may receive a participation interest in the recoveries of the Liquidating Creditor Trust (subject to the requirements of Section 6.4 of this Plan, including but not limited to section 6.4.8) according to the subclassifications set forth in Section 6.4 hereof.** On the Effective Date, the Acquisition Companies shall receive title to the Campus free and clear of any and all claims and encumbrances**, subject to the payments set forth in this Plan**.

4.5.7 ***NFP Claims (Class 7)***. NFP Claims shall be released and discharged as of the Effective Date. The applicable Reorganized Debtor and NFP shall enter into new agreements as more fully set forth in ~~the~~**this** Plan.

4.5.8 ***General Unsecured Claims (Class 8)***. This Class consists of three subclasses, as discussed more fully in Section 6.4 hereof. Each Holder of an Allowed General Unsecured Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust according to the subclassification of the Allowed General Unsecured Claim as set forth in Section 6.4.

4.5.9 ***Interests in Ashburn (Class 9)***. Each Holder of an Interest in Ashburn will not receive any Distribution on account of such Interest. Each such Interest shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Interests.

4.6 ***Columbus***.

4.6.1 ***Other Priority Claims (Class 1)***. Except to the extent that a Holder of an Allowed Other Priority Claim against Columbus' Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later

of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Columbus and the Holder of the Allowed Other Priority Claim.

4.6.2 **Secured Tax Claims (Class 2)**. On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Secured Tax Claim is entitled, or (iii) such other distribution as necessary to satisfy the requirements of the Bankruptcy Code. In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released. The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

4.6.3 **Columbus Improvement Bond Claims (Class 3)**. The Columbus Debtor is surrendering the Hickory Chase Campus to the Holders of the Columbus Construction Loan Claims by means of a deed in lieu of foreclosure or the completion of an existing foreclosure process. As a result of this surrender, the Columbus Debtor does not anticipate making a Distribution on any Allowed Claims in Class 3 through Class 9 with respect to the Columbus Debtor. To the extent there is such a Distribution, each Holder of an Allowed Columbus Improvement Bond Claim shall receive a Distribution, relative to the priority of its security interest. The first priority tax lien securing the Columbus Improvement Bond Claim shall remain on the Hickory Chase Campus and be unaffected by this bankruptcy case.

4.6.4 **Mechanic's Lien Claims (Class 4)**. The Columbus Debtor is surrendering the Hickory Chase Campus to the Holders of the Columbus Construction Loan Claims by means of a deed in lieu of foreclosure or the completion of an existing foreclosure process. As a result of this surrender, the Columbus Debtor does not anticipate making a Distribution on any Allowed Claims in Class 3 through Class 9 with respect to the Columbus Debtor. To the extent there is such a Distribution, each Holder of an Allowed Mechanic's Lien Claim shall receive a Distribution relative to the priority of its security interest. Any liens securing Claims in this Class shall remain on the Hickory Chase Campus in their current relative priority and be unaffected by this bankruptcy case.

4.6.5 **Columbus Construction Loan Claims (Class 5)**. The Columbus Debtor is surrendering the Hickory Chase Campus to the Holders of the Columbus Construction Loan Claims by means of a deed in lieu of foreclosure or the completion of an existing foreclosure process. As a result of this surrender, the Columbus Debtor does not anticipate making a Distribution on any Allowed Claims in Class 3 through Class 9 with respect to the Columbus Debtor. To the extent there is such a Distribution, each Holder of an Allowed Columbus Construction Loan Claim shall receive a Distribution relative to the priority of its security interest. Any liens securing Claims in this Class shall remain on the Hickory Chase Campus in their current relative priority and be unaffected by this bankruptcy case. **The Holders of Columbus Construction Loan Claims shall retain their deficiency claims and participate in the Liquidating Creditor Trust, as provided in Section 6.4 of the Plan and in the Trust documents. The Holders of Columbus Construction Loan Claims shall retain their deficiency claims and participate in the Liquidating Creditor Trust, as provided in Section 6.4 herein and in the Trust documents.**

4.6.6 **Columbus Community Loan Claims (Class 6)**. The Columbus Debtor is surrendering the Hickory Chase Campus to the Holders of the Columbus Construction Loan Claims by means of a deed in lieu of foreclosure or the completion of an existing foreclosure process. As a result of this surrender, the Columbus Debtor does not anticipate making a Distribution on any Allowed Claims in Class 3 through Class 9 with respect to the Columbus Debtor. To the extent there is such a Distribution,

each Holder of an Allowed Columbus Community Loan Claim shall receive a Distribution relative to the priority of its security interest. Any liens securing Claims in this Class shall remain on the Hickory Chase Campus in their current relative priority and be unaffected by this bankruptcy case.

4.6.7 *Columbus Junior Loan Claims (Class 7)*. The Columbus Debtor is surrendering the Hickory Chase Campus to the Holders of the Columbus Construction Loan Claims by means of a deed in lieu of foreclosure or the completion of an existing foreclosure process. As a result of this surrender, the Columbus Debtor does not anticipate making a Distribution on any Allowed Claims in Class 3 through Class 9 with respect to the Columbus Debtor. To the extent there is such a Distribution, each Holder of an Allowed Columbus Junior Loan Claim shall receive a pro rata Distribution relative to the priority of its security interest.. Any liens securing Claims in this Class shall remain on the Hickory Chase Campus in their current relative priority and be unaffected by this bankruptcy case.

4.6.8 *General Unsecured Claims (Class 8)*. This Class consists of three subclasses, as discussed more fully in Section 6.4 hereof. Each Holder of an Allowed General Unsecured Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust according to the subclassification of the Allowed General Unsecured Claim as set forth in Section 6.4.

4.6.9 *Interests in Columbus (Class 9)*. Each Holder of an Interest in Columbus will not receive any Distribution on of such Interest. Each such Interest shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Interests. Such Interests shall be cancelled.

4.7 *Concord*.

4.7.1 *Other Priority Claims (Class 1)*. Except to the extent that a Holder of an Allowed Other Priority Claim against Concord's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Concord and the Holder of the Allowed Other Priority Claim.

4.7.2 *Secured Tax Claims (Class 2)*. On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Secured Tax Claim is entitled, or (iii) such other Distribution as necessary to satisfy the requirements of the Bankruptcy Code. In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released. The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

4.7.3 *Mechanic's Lien Claims (Class 3)*. Except to the extent a Holder of an Allowed Mechanic's Lien Claim agrees to less favorable treatment, each Holder of an Allowed Mechanic's Lien Claim shall receive the Allowed amount of such Claim in Cash in full satisfaction of such Claim on the Distribution Record Date if the Holder of the Allowed Mechanic's Lien Claim has a first priority security interest in the underlying collateral pursuant to applicable state law. Otherwise, the Holder of an Allowed Mechanic's Lien Claim shall receive a Distribution, if any, relative to its priority under applicable state law in full satisfaction of such Claim. **To the extent Allowed Mechanic's Lien**

**Claims are not paid in full, the unpaid portions of the Allowed Mechanic's Lien Claims will be treated as General Unsecured Claims and receive a Tier A Trade Class interest in the Liquidating Creditor Trust and receive distributions of the Trade Dividend pursuant to Section 6.4 of the Plan.**

4.7.4   *Concord Construction Loan Claims (Class 4)*.   The Concord Construction Loan Claims**, including those Claims on account of the Concord Letters of Credit,** shall be Allowed as of the Effective Date in the amount set forth in the Proof of Claim timely filed by the PNC Bank, National Association, as collateral and administrative agent for the Holders of the Concord Construction Loan Claims, or if no Proof of Claim is timely filed by such Agent, the Proofs of Claim timely filed by Holders of the Concord Construction Loan Claims.   PNC Bank, National Association shall be paid, on behalf of the Holders of Allowed Concord Construction Loan Claims, on the Effective Date, $62,757,000 in Cash and an interest in the Cedar Crest Receivable (estimated currently to be equal to $637,000), which amounts shall be distributed by PNC Bank, as agent, to the Holders in accordance with the Concord Construction Loan documents and the Lender Allocation.   Upon receipt of the required payment as set forth in this Section **and return of the Concord Letters of Credit, undrawn,** PNC Bank, as agent, shall release its lien against the assets of Concord.

4.7.5   *Concord Community Loan Claims (Class 5)*.   The Concord Community Loan shall be amended and restated at the outstanding balance amount.   Redwood Concord shall assume the Concord Community Loan, as modified.

4.7.6   *Concord Junior Loan Claims (Class 6)*.   No Holder of an Allowed Ashburn Junior Loan Claim will receive any Distribution on account of such Claim.   Each Holder of such Claim shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Claim, on or after the Effective Date.   **The Holders of such Claims may receive a participation interest in the recoveries of the Liquidating Creditor Trust (subject to the requirements of Section 6.4 of this Plan, including but not limited to section 6.4.8) according to the subclassifications set forth in Section 6.4 hereof.** On the Effective Date, the Acquisition Companies shall receive title to the Campus free and clear of any and all claims and encumbrances.

4.7.7   *Other Secured Claims (Class 7)*.   On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Other Secured Claim shall receive (a) reinstatement of such allowed Other Secured Claim; (b) payment of such Allowed Other Secured Claim in full in cash; or (c) such other treatment as the Company and each Holder shall agree.

4.7.8   *NFP Claims (Class 8)*.   NFP Claims shall be released and discharged as of the Effective Date.   The applicable Reorganized Debtor and NFP shall enter into new agreements as more fully set forth in ~~the~~**this** Plan.

4.7.9   *General Unsecured Claims (Class 9)*.   This Class consists of three subclasses, as discussed more fully in Section 6.4 hereof.   Each Holder of an Allowed General Unsecured Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust according to the subclassification of the Allowed General Unsecured Claim as set forth in Section 6.4.

4.7.10   *Interests in Concord (Class 10)*.   Each Holder of an Interest in Concord will not receive any Distribution on of such Interest.   Each such Interest shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Interests.

~~EAST\42647302.30~~
EAST\42647302.46

4.8	*Concord GP*.

4.8.1	***Other Priority Claims (Class 1)***.  Except to the extent that a Holder of an Allowed Other Priority Claim against Concord GP's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Concord GP and the Holder of the Allowed Other Priority Claim.

4.8.2	***Secured Tax Claims (Class 2)***.  On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Secured Tax Claim is entitled, or (iii) such other Distribution as necessary to satisfy the requirements of the Bankruptcy Code.  In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released.  The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

4.8.3	***Corporate Revolver Guaranty Claims (Class 3)***.  Each Holder of an Allowed Corporate Revolver Guaranty Claim against Concord GP's Estate will not receive any Distribution on account of such Claim.

4.8.4	***General Unsecured Claims (Class 4)***.  This Class consists of three subclasses, as discussed more fully in Section 6.4 hereof.  Each Holder of an Allowed General Unsecured Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust according to the subclassification of the Allowed General Unsecured Claim as set forth in Section 6.4.

4.8.5	***Interests in Concord GP (Class 5)***.  Each Holder of an Interest in Concord GP will not receive any Distribution on on of such Interest.  Each such Interest shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Interests.

4.9	*Dallas*.

4.9.1	***Other Priority Claims (Class 1)***.  Except to the extent that a Holder of an Allowed Other Priority Claim against Dallas' Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Dallas and the Holder of the Allowed Other Priority Claim.

4.9.2	***Secured Tax Claims (Class 2)***.  On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Secured Tax Claim is entitled, or (iii) such other distribution

EAST\42647302.30
EAST\42647302.46

as necessary to satisfy the requirements of the Bankruptcy Code.  In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released.  The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

4.9.3   *Mechanic's Lien Claims (Class 3)*.  Except to the extent a Holder of an Allowed Mechanic's Lien Claim agrees to less favorable treatment, each Holder of an Allowed Mechanic's Lien Claim shall receive the Allowed amount of such Claim in Cash in full satisfaction of such Claim on the Distribution Record Date if the Holder of the Allowed Mechanic's Lien Claim has a first priority security interest in the underlying collateral pursuant to applicable state law.  Otherwise, the Holder of an Allowed Mechanic's Lien Claim shall receive a Distribution, if any, relative to its priority under applicable state law in full satisfaction of such Claim.  **To the extent Allowed Mechanic's Lien Claims are not paid in full, the unpaid portions of the Allowed Mechanic's Lien Claims will be treated as General Unsecured Claims and receive a Tier A Trade Class interest in the Liquidating Creditor Trust and receive distributions of the Trade Dividend pursuant to Section 6.4 of the Plan.**

4.9.4   *Dallas Construction Loan Claims (Class 4)*.  The Dallas Construction Loan Claims shall be ~~Allowed~~**allowed** as of the Effective Date in the amount set forth in the ~~Proof~~**Proofs** of Claim timely filed by the **Holders of the Dallas Construction Loan Claim or, if no Proof of Claim is timely filed by a Holder, the Proof of Claim filed by** Bank of America, National Association, as collateral and administrative agent for the Holders of the Dallas Construction Loan ~~Claims, or if no Proof of Claim is timely filed by such Agent, the Proofs of Claim timely filed by Holders of the Dallas Construction Loan Claims.  In addition, Bank of America, N.A., as collateral and administrative agent for the Holders of the Dallas Construction Loan Claims, shall be permitted as of the Effective Date as part of its Allowed Dallas Construction Loan Claims to setoff $34,531.09 in amounts held in deposit pursuant to the Expense Reserve Account (as defined in the Dallas Construction Loan Claim documents) without further motion, request and/or Bankruptcy Court approval against the portion of the Dallas Construction Loan Claims which is unsecured, without the requirement that Bank of America, N.A. setoff such amount against or credit such amount to the Cash distribution received by Bank of America, N.A., as collateral and administrative agent for the Holders of the Dallas Construction Loan Claims, pursuant to the Plan.~~ **Claim.**  Bank of America, National Association shall be paid, on behalf of the Holders of Allowed Dallas Construction Loan Claim, on the Effective Date,  $19,496,000 in Cash (~~inclusive of~~**including** $2,000,000 in Cash from the TIP) and an interest in the Cedar Crest Receivable (estimated currently to be equal to $282,000), which amounts shall be distributed by Bank of America, National Association, as agent, **to the Holders in accordance with the Dallas Construction Loan documents and the Lender Allocation.  In addition, the holder of the Dallas Construction Loan Claim shall receive 84.4% of the gross recovery realized from any 505 action brought against the ad valorem taxing authority/ies with respect to the Dallas Campus real property and shall be paid those proceeds either (i) directly from the ad valorem taxing authority/ies or (ii)  from the Debtor or its successor, within ten business days of its receipt of the taxing authorities' payment.  All amounts received by Bank of America, National Association, pursuant to this section shall be distributed by Bank of America, National Association, as agent,** to the Holders in accordance with the Dallas Construction Loan documents and the Lender Allocation.  Upon receipt of the required payment as set forth in this Section, Bank of America, as agent, shall release its lien against the assets of Dallas, and Texas A&M as Holder, shall release their liens against the assets of Dallas.

4.9.5   *Texas A&M Note Claims (Class 5)*.  The **Texas A&M Note Claim shall be allowed as of the Effective Date in the amount set forth in the Proof of Claim timely filed by the Holder(s) of the Texas A&M Note Claim.  Each** Holder of an Allowed Texas A&M Note Claim shall receive  ~~a distribution of $3,440,000.~~**Cash in the amount of $3,440,000 on the Effective Date.  In addition, the Holder(s) of the Texas A&M Note Claim shall receive 15.6% of the gross recovery**

**realized from any Bankruptcy Code section 505 action brought against the ad valorem taxing authorities with respect to the Dallas Campus real property. The Holder(s) of the Texas A&M Note Claim shall be paid those proceeds either (i) directly from the ad valorem taxing authority/ies or (ii) from the Debtor or its successor, within ten business days of its receipt of the taxing authorities' payment.**

4.9.6 *Dallas Community Loan Claims (Class 6)*. The Dallas Community Loan shall be amended and restated at the outstanding balance amount. Redwood Dallas shall assume the Dallas Community Loan, as modified.

4.9.7 *Dallas Junior Loan Claims (Class 7)*. Each Holder of an Allowed Dallas Junior Loan Claim shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Claim. Each Holder of an Allowed Dallas Junior Loan Claim may receive a participation interest in the recoveries of the Liquidating ~~Creditors~~**Creditor** Trust on account of the Holder's ~~Non-Consenting Construction Lender's Construction~~**Mezzanine** Claim as set forth in Section 6.4 of the Plan. All documents evidencing or securing the Dallas Junior Loan shall be extinguished as of the Effective Date. On the Effective Date and pursuant to the terms of the Morgan Stanley Settlement, MSRESS III Dallas Campus, LP shall convey to the Acquisition Companies and the Acquisition Companies shall receive title to the Campus free and clear of any and all claims and encumbrances**, subject to the payments set forth in this Plan**.

4.9.8 *NFP Claims (Class 8)*. NFP Claims shall be released and discharged as of the Effective Date. The applicable Reorganized Debtor and NFP shall enter into new agreements as more fully set forth in ~~the~~**this** Plan.

4.9.9 *General Unsecured Claims (Class 9)*. This Class consists of three subclasses, as discussed more fully in Section 6.4 hereof. Each Holder of an Allowed General Unsecured Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust according to the subclassification of the Allowed General Unsecured Claim as set forth in Section 6.4.

4.9.10 *Interests in Dallas (Class 10)*. Each Holder of an Interest in Dallas will not receive any Distribution on of such Interest. Each such Interest shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Interests.

4.10 *Dallas GP*.

4.10.1 *Other Priority Claims (Class 1)*. Except to the extent that a Holder of an Allowed Other Priority Claim against Dallas GP's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Dallas GP and the Holder of the Allowed Other Priority Claim.

4.10.2 *Secured Tax Claims (Class 2)*. On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of such Allowed Secured Tax Claim is entitled, or (iii) such other Distribution

as necessary to satisfy the requirements of the Bankruptcy Code. In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released. The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

4.10.3 *Corporate Revolver Guaranty Claims (Class 3)*. Each Holder of an Allowed Corporate Revolver Guaranty Claim against Dallas GP's Estate will not receive any Distribution on account of such Claim.

4.10.4 *General Unsecured Claims (Class 4)*. This Class consists of three subclasses, as discussed more fully in Section 6.4 hereof. Each Holder of an Allowed General Unsecured Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust according to the subclassification of the Allowed General Unsecured Claim as set forth in Section 6.4.

4.10.5 *Interests in Dallas GP (Class 5)*. Each Holder of an Interest in Dallas GP will not receive any Distribution on account of such Interest. Each such interest shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Interests.

4.11 *Houston*.

4.11.1 *Other Priority Claims (Class 1)*. Except to the extent that a Holder of an Allowed Other Priority Claim against Houston's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Houston and the Holder of the Allowed Other Priority Claim.

4.11.2 *Secured Tax Claims (Class 2)*. On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Secured Tax Claim is entitled, or (iii) such other Distribution as necessary to satisfy the requirements of the Bankruptcy Code. In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released. The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

4.11.3 *Mechanic's Lien Claims (Class 3)*. Except to the extent a Holder of an Allowed Mechanic's Lien Claim agrees to less favorable treatment, each Holder of an Allowed Mechanic's Lien Claim shall receive the Allowed amount of such Claim in Cash in full satisfaction of such Claim on the Distribution Record Date if the Holder of the Allowed Mechanic's Lien Claim has a first priority security interest in the underlying collateral pursuant to applicable state law. Otherwise, the Holder of an Allowed Mechanic's Lien Claim shall receive a Distribution, if any, relative to its priority under applicable state law in full satisfaction of such Claim. **To the extent Allowed Mechanic's Lien Claims are not paid in full, the unpaid portions of the Allowed Mechanic's Lien Claims will be treated as General Unsecured Claims and receive a Tier A Trade Class interest in the Liquidating Creditor Trust and receive distributions of the Trade Dividend pursuant to Section 6.4 of the Plan.**

- 49 -

4.11.4 **_Houston Construction Loan Claims (Class 4)_**.    The Houston Construction Loan Claims shall be Allowed as against Houston and Erickson Group as of the Effective Date in the amount set forth in the Proof of Claim timely filed by the PNC Bank, National Association, as collateral and administrative agent for the Holders of the Houston Construction Loan Claims, or if no Proof of Claim is timely filed by such Agent, the Proofs of Claim timely filed by Holders of the Houston Construction Loan Claims.  PNC Bank, National Association shall be paid, on behalf of the Holders of Allowed Houston Construction Loan Claims, on the Effective Date, $7,041,000 in Cash and and an interest in the Cedar Crest Receivable (estimated currently to be equal to $135,000), which amounts shall be distributed by PNC Bank, as agent, to the Holders in accordance with the Houston Construction Loan documents and the Lender Allocation.  Upon receipt of the required payment as set forth in this Section, PNC Bank, as agent, shall release its lien against the assets of Houston.

4.11.5 **_Houston Community Loan Claims (Class 5)_**.  The Houston Community Loan shall be amended and restated at the outstanding balance amount.  Redwood Houston shall assume the Houston Community Loan, as modified.

4.11.6 **_Houston Junior Loan Claims (Class 6)_**.  Each Holder of an Allowed Houston Junior Loan Claim will not receive any Distribution on account of such Claim.  All documents evidencing or securing the Houston Junior Loan shall be extinguished as of the Effective Date.  On the Effective Date, the Acquisition Companies shall receive title to the Campus free and clear of any and all claims and encumbrances**, subject to the payments set forth in this Plan**.

4.11.7 **_NFP Claims (Class 7)_**.  NFP Claims shall be released and discharged as of the Effective Date.  The applicable reorganized Debtor and NFP shall enter into new agreements as more fully set forth in ~~the~~**this** Plan.

4.11.8 **_General Unsecured Claims (Class 8)_**.    This Class consists of three subclasses, as discussed more fully in Section 6.4 hereof.  Each Holder of an Allowed General Unsecured Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust according to the subclassification of the Allowed General Unsecured Claim as set forth in Section 6.4.

4.11.9 **_Interests in Houston (Class 9)_**.  Each Holder of an Interest in Houston will not receive any Distribution on account of such Interest.  Each such Interest shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Interests.

4.12 **_Kansas_**.

4.12.1 **_Other Priority Claims (Class 1)_**.  Except to the extent that a Holder of an Allowed Other Priority Claim against Kansas' Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Kansas and the Holder of the Allowed Other Priority Claim.

4.12.2 **_Secured Tax Claims (Class 2)_**.  On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Secured Tax Claim is entitled, or (iii) such other distribution

as necessary to satisfy the requirements of the Bankruptcy Code.  In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released.  The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

4.12.3 ***Mechanic's Lien Claims (Class 3)***.  Except to the extent a Holder of an Allowed Mechanic's Lien Claim agrees to less favorable treatment, each Holder of an Allowed Mechanic's Lien Claim shall receive the Allowed amount of such Claim in Cash in full satisfaction of such Claim on the Distribution Record Date if the Holder of the Allowed Mechanic's Lien Claim has a first priority security interest in the underlying collateral pursuant to applicable state law.  Otherwise, the Holder of an Allowed Mechanic's Lien Claim shall receive a Distribution, if any, relative to its priority under applicable state law in full satisfaction of such Claim.  **To the extent Allowed Mechanic's Lien Claims are not paid in full, the unpaid portions of the Allowed Mechanic's Lien Claims will be treated as General Unsecured Claims and receive a Tier A Trade Class interest in the Liquidating Creditor Trust and receive distributions of the Trade Dividend pursuant to Section 6.4 of the Plan.**

4.12.4 ***Kansas Special Assessment Bond Claims (Class 4)***.  Redwood-Kansas will assume ~~the~~**Kansas'** obligations under the Kansas Special Assessment Bonds.

4.12.5 ***Kansas Construction Loan Claims (Class 5)***.  The Kansas Construction Loan Claims shall be Allowed as of the Effective Date in the amount set forth in the Proofs of Claim timely filed by the Holders of the Kansas Construction Loan Claims or, if no Proof of Claim is timely filed by a Holder, the Proof of Claim timely filed by PNC Bank, National Association, as collateral and administrative agent for the Holders of the Kansas Construction Loan Claims.  PNC Bank, National Association shall be paid, on behalf of the Holders of Allowed Kansas Construction Loan Claims, on the Effective Date, $2,778,000 in Cash from the TIP, which amount shall be distributed by PNC Bank, as agent, to the Holders in accordance with the Kansas Construction Loan documents and the Lender Allocation.  The Holders of Kansas Construction Loan Claims shall retain their deficiency claims and participate in the Liquidating Creditor Trust, as provided below and in the Trust documents.  Upon receipt of the required payment as set forth in this Section, PNC Bank, as agent, shall release its lien against the assets of Kansas.

4.12.6 ***Kansas Community Loan Claims (Class 6)***.  The Kansas Community Loan shall be reinstated in full.  Redwood Kansas shall assume the Kansas Community Loan.

4.12.7 ***Kansas Junior Loan Claims (Class 7)***.  Each Holder of an Allowed Kansas Junior Loan Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust on account of the Holder's ~~Non Consenting Construction Lender's Construction~~**Mezzanine** Claim as set forth in Section 6.4 of the Plan. On the Effective Date and pursuant to the terms of the Morgan Stanley Settlement, MSRESS III Kansas Campus, LP shall convey to the Acquisition Companies and the Acquisition Companies shall receive title to the Campus free and clear of any and all claims and encumbrances.

4.12.8 ***NFP Claims (Class 8)***.  NFP Claims shall be released and discharged as of the Effective Date.  The applicable Reorganized Debtor and NFP shall enter into new agreements as more fully set forth in ~~the~~**this** Plan.

4.12.9 ***General Unsecured Claims (Class 9)***.  This Class consists of three subclasses, as discussed more fully in Section 6.4 hereof.  Each Holder of an Allowed General Unsecured Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust according to the subclassification of the Allowed General Unsecured Claim as set forth in Section 6.4.

EAST\42647302.30
EAST\42647302.46

4.12.10 ***Interests in Kansas (Class 10)***.  Each Holder of an Interest in Kansas will not receive any Distribution on of such Interest.  Each such Interest shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Interests.

### 4.13    *Littleton*.

4.13.1    ***Other Priority Claims (Class 1)***.  Except to the extent that a Holder of an Allowed Other Priority Claim against Littleton's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Littleton and the Holder of the Allowed Other Priority Claim.

4.13.2    ***Secured Tax Claims (Class 2)***.  On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Secured Tax Claim is entitled, or (iii) such other distribution as necessary to satisfy the requirements of the Bankruptcy Code.  In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released.  The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.  **In the event the Littleton Debtor determines to offer the Holder of an Allowed Secured Tax Claim against Littleton's Estate treatment under (i) or (ii) of this Section, the Holder of such Claim shall receive interest on such Claim at the statutory rate of 12% per annum.**

4.13.3    ***Mechanic's Lien Claims (Class 3)***.  Except to the extent a Holder of an Allowed Mechanic's Lien Claim agrees to less favorable treatment, each Holder of an Allowed Mechanic's Lien Claim shall receive the Allowed amount of such Claim in Cash in full satisfaction of such Claim on the Distribution Record Date if the Holder of the Allowed Mechanic's Lien Claim has a first priority security interest in the underlying collateral pursuant to applicable state law.  Otherwise, the Holder of an Allowed Mechanic's Lien Claim shall receive a Distribution, if any, relative to its priority under applicable state law in full satisfaction of such Claim.  **To the extent Allowed Mechanic's Lien Claims are not paid in full, the unpaid portions of the Allowed Mechanic's Lien Claims will be treated as General Unsecured Claims and receive a Tier A Trade Class interest in the Liquidating Creditor Trust and receive distributions of the Trade Dividend pursuant to Section 6.4 of the Plan.**

4.13.4    ***Littleton Construction Loan Claims (Class 4)***.    The Littleton Construction Loan Claims shall be Allowed as of the Effective Date in the amount set forth in the Proof of Claim timely filed by the Capmark Finance, Inc., as collateral and administrative agent for the Holders of the Littleton Construction Loan Claims, or if no Proof of Claim is timely filed by such Agent, the Proofs of Claim timely filed by Holders of the Littleton Construction Loan Claims.  Capmark Finance, Inc., as collateral and administrative agent, shall be paid, on behalf of the Holders of Littleton Construction Loan Claims, on the Effective Date, $46,400,000 in Cash, and an interest in the Cedar Crest Receivable (estimated currently to be equal to $594,000) and 100% of the net proceeds from the sale of the Littleton Out-Parcel up to $6 million and 50% above $6 million.  The Cash payment shall be distributed by Capmark Finance, Inc., as collateral and administrative agent for the Holders of the Littleton Construction Loan Claims, to the Holders in accordance with the Littleton Construction Loan

EAST\42647302.30
EAST\42647302.46

documents and the Lender Allocation.  Upon receipt of the required payment as set forth in this Section, Capmark Finance, Inc., as collateral and administrative agent for the Holders of the Littleton Construction Loan Claims, shall release its lien against the assets of Littleton; provided, however, Capmark Finance, Inc., as collateral and administrative agent for the Holders of the Littleton Construction Loan Claims, shall retain its lien against the Littleton Out-Parcel in an amount equal to its deficiency Claim after the Cash payments provided herein.

4.13.5  ***Littleton Community Loan Claims (Class 5)***.  The Littleton Community Loan shall be reinstated in full.  Redwood Littleton shall assume the Littleton Community Loan.

4.13.6  ***Littleton Junior Loan Claims (Class 6)***.  Subject to the terms of the Morgan Stanley Settlement, each Holder of a Littleton Junior Loan Claim its pro rata Distribution in the form of an $1 million cash payment paid from the TIP on account of the Littleton Junior Claims, and a contractual commitment to receive 50% of the net proceeds from the sale of the Littleton Out-Parcel above $6 million.  In addition, each Holder of an Allowed Littleton Junior Loan Claim may receive a participation interest in the recoveries of the Liquidating ~~Creditors~~**Creditor** Trust on account of the Holder's ~~Non-Consenting Construction Lender's Construction~~**Mezzanine** Claim as set forth in Section 6.4 of the Plan.  All documents evidencing or securing the Littleton Junior Loan shall be extinguished as of the Effective Date.  On the Effective Date, and pursuant to the terms of the Morgan Stanley Settlement, MSRESS III Denver Campus, LLC shall convey to the Acquisition Companies and the Acquisition Companies shall receive title to the Campus free and clear of any and all claims and encumbrances**, subject to the payments set forth in this Plan**.

4.13.7  ***Other Secured Claims (Class 7)***.  **The Other Secured Claim of PNC Bank, National Association, on account of the Littleton Letters of Credit shall be allowed.**  On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Other Secured Claim shall receive (a) reinstatement of such allowed Other Secured Claim; (b) payment of such Allowed Other Secured Claim in full in cash; or (c) such other treatment as the Company and each Holder shall agree.

4.13.8  ***NFP Claims (Class 8)***.  NFP Claims shall be released and discharged as of the Effective Date.  The applicable Reorganized Debtor and NFP shall enter into new agreements as more fully set forth in ~~the~~**this** Plan.

4.13.9  ***General Unsecured Claims (Class 9)***.  This Class consists of three subclasses, as discussed more fully in Section 6.4 hereof.  Each Holder of an Allowed General Unsecured Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust according to the subclassification of the Allowed General Unsecured Claim as set forth in Section 6.4.

4.13.10  ***Interests in Littleton (Class 10)***.  Each Holder of an Interest in Littleton will not receive any Distribution on of such Interest.  Each such Interest shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Interests.

4.14  *Novi*.

4.14.1  ***Other Priority Claims (Class 1)***.  Except to the extent that a Holder of an Allowed Other Priority Claim against Novi's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date

for payment provided by any agreement or arrangement between Novi and the Holder of the Allowed Other Priority Claim.

4.14.2  **Secured Tax Claims** *(Class 2)*.  On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Secured Tax Claim is entitled, or (iii) such other Distribution as necessary to satisfy the requirements of the Bankruptcy Code.  In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released.  The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

4.14.3  **Mechanic's Lien Claims** *(Class 3)*.  Except to the extent a Holder of an Allowed Mechanic's Lien Claim agrees to less favorable treatment, each Holder of an Allowed Mechanic's Lien Claim shall receive the Allowed amount of such Claim in Cash in full satisfaction of such Claim on the Distribution Record Date if the Holder of the Allowed Mechanic's Lien Claim has a first priority security interest in the underlying collateral pursuant to applicable state law.  Otherwise, the Holder of an Allowed Mechanic's Lien Claim shall receive a Distribution, if any, relative to its priority under applicable state law in full satisfaction of such Claim.  **To the extent Allowed Mechanic's Lien are not paid in full, the unpaid portions of the Allowed Mechanic's Lien Claims will be treated as General Unsecured Claims and receive a Tier A Trade Class interest in the Liquidating Creditor Trust and receive distributions of the Trade Dividend pursuant to Section 6.4 of the Plan.**

4.14.4  **Novi Construction Loan Claims** *(Class 4)*.  The Novi Construction Loan Claims**, including those claims on account of the Novi Letters of Credit,** shall be allowed as of the Effective Date in the amount set forth in the Proof of Claim timely filed by the PNC Bank, National Association, as collateral and administrative agent for the Holders of the Novi Construction Loan Claims, or if no Proof of Claim is timely filed by such Agent, the Proofs of Claim timely filed by Holders of the Novi Construction Loan Claims.  The Holder of the Allowed Novi Construction Loan Claim shall receive, on the Effective Date, $24,914,000 in Cash and an interest in the Cedar Crest Receivable (estimated currently to be equal to $389,000), which amounts shall be distributed by PNC Bank, as agent, to the Holders in accordance with the Novi Construction Loan documents and the Lender Allocation.  Upon receipt of the required payment **and the Novi Letters of Credit, undrawn,** as set forth in this Section, PNC Bank, as agent, shall release its lien against the assets of Novi.

4.14.5  **Novi Community Loan Claims** *(Class 5)*.  The Novi Community Loan shall be reinstated in full.  Redwood Novi shall assume the Novi Community Loan.

4.14.6  **Novi Junior Loan Claims** *(Class 6)*.  Each Holder of an Allowed Novi Junior Loan Claim will not receive any Distribution on account of such Claim.  All documents evidencing or securing the Novi Junior Loan shall be extinguished as of the Effective Date.  On the Effective Date, the Acquisition Companies shall receive title to the Campus free and clear of any and all claims and encumbrances**, subject to the payments set forth in this Plan.**

4.14.7  **Other Secured Claims** *(Class 7)*.  On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Other Secured Claim shall receive (a) reinstatement of such allowed Other Secured Claim; (b) payment of such Allowed Other Secured Claim in full in cash; or (c) such other treatment as the Company and each Holder shall agree.

4.14.8 **NFP Claims (Class 8)**. NFP Claims shall be released and discharged as of the Effective Date. The applicable Reorganized Debtor and NFP shall enter into new agreements as more fully set forth in ~~the~~**this** Plan.

4.14.9 **General Unsecured Claims (Class 9)**. This Class consists of three subclasses, as discussed more fully in Section 6.4 hereof. Each Holder of an Allowed General Unsecured Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust according to the subclassification of the Allowed General Unsecured Claim as set forth in Section 6.4.

4.14.10 **Interests in Novi (Class 10)**. Each Holder of an Interest in Novi will not receive any Distribution on of such Interest. Each such Interest shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Interests.

4.15 **Warminster**.

4.15.1 **Other Priority Claims (Class 1)**. Except to the extent that a Holder of an Allowed Other Priority Claim against Warminster's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Warminster and the Holder of the Allowed Other Priority Claim.

4.15.2 **Secured Tax Claims (Class 2)**. On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Secured Tax Claim is entitled, or (iii) such other Distribution as necessary to satisfy the requirements of the Bankruptcy Code. In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released. The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

4.15.3 **Mechanic's Lien Claims (Class 3)**. Except to the extent a Holder of an Allowed Mechanic's Lien Claim agrees to less favorable treatment, each Holder of an Allowed Mechanic's Lien Claim shall receive the Allowed amount of such Claim in Cash in full satisfaction of such Claim on the Distribution Record Date or date of Distribution if the Holder of the Allowed Mechanic's Lien Claim has a first priority security interest in the underlying collateral pursuant to applicable state law. Otherwise, the Holder of an Allowed Mechanic's Lien Claim shall receive a Distribution, if any, relative to its priority under applicable state law in full satisfaction of such Claim. **To the extent Allowed Mechanic's Lien Claims are not paid in full, the unpaid portions of the Allowed Mechanic's Lien Claims will be treated as General Unsecured Claims and receive a Tier A Trade Class interest in the Liquidating Creditor Trust and receive distributions of the Trade Dividend pursuant to Section 6.4 of the Plan.**

4.15.4 **Warminster Community Loan Claims (Class 4)**. Each Holder of an Allowed Warminster Community Loan Claim shall receive reinstated debt in the full amount of the Warminster Community Loan. Warminster shall assume, reinstate and/or ratify the Warminster Community Loan on terms mutually agreeable to Redwood, Ann's Choice and the Ann's Choice Trustee

and consistent with the terms agreed to during the Auction, as reflected in the transcript of the Auction. All collateral securing the Warminster Community Loan shall be reinstated, assumed and/or ratified.

4.15.5 *Warminster Purchase Option Deposit Refund Agreement Claims (Class 5)*. Each Holder of an Allowed Warminster Purchase Option Deposit Refund Agreement Claim shall receive reinstated debt in the full amount of the Holders Allowed Claim. Warminster shall assume the Warminster Purchase Option Deposit Refund Agreement as it currently exists or on terms mutually agreeable to Redwood, Ann's Choice and the Ann's Choice Trustee and consistent with the terms agreed to during the Auction, as reflected in the transcript of the Auction. In addition, an amendment to the Purchase Option Deposit Refund Agreement will provide that if Ann's Choice exercises its option to purchase the Ann's Choice Campus under that agreement and the going concern value is less than the $75 million dollar amount of the purchase option deposit, Redwood will pay the amount of such shortfall to Ann's Choice out of IEDs **collected by Redwood**, up to a maximum amount of $~~10,000,000~~ **10,000,000, exclusive of such IEDs to be paid to the TIP.** Warminster's obligations under the Purchase Option Refund Deposit Agreement will be guaranteed by IEDs collected by Warminster after November 27, 2009 not to exceed $10 million. All collateral securing the Warminster Purchase Option Deposit Agreement ~~a~~ shall be reinstated, assumed and/or ratified.

4.15.6 *Warminster Junior Loan Claim (Class 6)*. Each Holder of an Allowed Warminster Junior Loan Claim shall ~~receive:~~**on the Effective Date be transferred free and clear of any and all claims, liens, and encumbrances the following:** (i) $8.2 million **in good and collected funds,** and (ii) its security deposit related to the Houston, Novi and Warminster campuses, in full satisfaction of the~~such~~ Holder's Allowed Claim. ~~All documents evidencing or securing the~~**Contemporaneously with the transfer of such funds and security deposits to each such Holder of an Allowed** Warminster Junior Loan ~~shall be extinguished as of the Effective Date. On the Effective Date, Warminster shall receive~~**Claim,** title to the Campus **shall on the Effective Date be transferred to Warminster** free and clear of any and all claims**, liens** and encumbrances, except for those claims, liens and encumbrances associated with the Ann's Choice Bonds and claims, liens and encumbrances otherwise expressly preserved under the terms of the Plan. **All documents evidencing or securing the Warminster Junior Loan shall be extinguished as of the Effective Date.**

4.15.7 *Other Secured Claims (Class 7)*. **The Other Secured Claims of PNC Bank, National Association, on account of the Warminster Letters of Credit shall be Allowed.** On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Other Secured Claim shall receive (a) reinstatement of such allowed Other Secured Claim; (b) payment of such Allowed Other Secured Claim in full in cash; or (c) such other treatment as the Company and each Holder shall agree.

4.15.8 *NFP Claims (Class 8)*. The Working Capital Loan and Master Lease associated with the Warminster Campus shall be assumed as they currently exist or on terms mutually agreeable to Redwood, Ann's Choice and the Ann's Choice Trustee and consistent with the terms agreed to during the Auction, as reflected in the transcript of the Auction.

4.15.9 *General Unsecured Claims (Class 9)*. This Class consists of three subclasses, as discussed more fully in Section 6.4 hereof. Each Holder of an Allowed General Unsecured Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust according to the subclassification of the Allowed General Unsecured Claim as set forth in Section 6.4.

4.15.10 *Interests in Warminster (Class 10)*. Each Holder of an Interest in Warminster will not receive any Distribution on of such Interest. Each such Interest shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Interests. On the Effective Date or as soon thereafter

- 56 -

as reasonably practicable, ERC shall assign its Interests in Warminster to PropCo free and clear of all liens encumbering such Interests.

      4.16    *Warminster GP*.

      4.16.1  *Other Priority Claims (Class 1)*.  Except to the extent that a Holder of an Allowed Other Priority Claim against Warminster GP's Estate has agreed to a different treatment of such Claim, each such Holder shall receive, in full satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between Warminster GP and the Holder of the Allowed Other Priority Claim.

      4.16.2  *Secured Tax Claims (Class 2)*.  On the Effective Date or as soon thereafter as is reasonably practicable, each Holder of an Allowed Secured Tax Claim shall receive, at the option of the Reorganized Debtors, (i) the proceeds of the sale or disposition of the Collateral securing such Allowed Secured Tax Claim to the extent of the value of the Holder's secured interest in the Allowed Secured Tax Claim, (ii) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the Holder of such Allowed Secured Tax Claim is entitled, or (iii) such other Distribution as necessary to satisfy the requirements of the Bankruptcy Code.  In the event the Reorganized Debtors treat a Claim under clause (i) of this Section, the liens securing such Secured Tax Claim shall be deemed released.  The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported liens relating to the Secured Tax Claims.

      4.16.3  *Corporate Revolver Guaranty Claims (Class 3)*.  Each Holder of an Allowed Corporate Revolver Guaranty Claim against Warminster GP's Estate will not receive any Distribution on account of such Claim.

      4.16.4  *General Unsecured Claims (Class 4)*.  This Class consists of three subclasses, as discussed more fully in Section 6.4 hereof.  Each Holder of an Allowed General Unsecured Claim may receive a participation interest in the recoveries of the Liquidating Creditor Trust according to the subclassification of the Allowed General Unsecured Claim as set forth in Section 6.4.

      4.16.5  *Interests in Warminster GP (Class 5)*.  Each Holder of an Interest in Warminster GP will not receive any Distribution on on of such Interest.  Each such Interest shall not receive or retain an interest in the Debtors, the Reorganized Debtors, the Estates, or other property or interests of the Debtors or Reorganized Debtors on account of such Interests.  On the Effective Date or as soon thereafter as reasonably practicable, ERC shall assign its Interest in Warminster GP to PropCo, which assignment shall be free and clear of all liens encumbering such Interests.

## SECTION 5.   ACCEPTANCE OR REJECTION OF THE PLAN

      5.1.1  *Impaired Classes*.  Pursuant to section 1126 of the Bankruptcy Code, each Impaired Class of Claims or Interests that will receive a Distribution pursuant to this Plan may vote separately to accept or reject this Plan.  Each Holder of an Allowed Claim in such an Impaired Class as of the Voting Record Date, shall receive a ballot and may cast a vote to accept or reject this Plan.

      5.1.2  *Acceptance by a Class*.  A Class of Claims entitled to vote to accept or reject this Plan shall be deemed to accept this Plan if the Holders of Claims in such voting Class that hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Claims that vote in such Class vote to accept this Plan.  A Class of Interests is deemed to accept this Plan if the Plan has been

accepted by Holders of at least 2/3 of the amount of the allowed Interests held by Holders of such Interests in who vote in such Class.

    5.1.3 ***Claims and Interests Not Entitled to Vote***. The following Holders of Claims are not entitled to vote if, as of the Voting Record Date, the Claim (a) has been disallowed, (b) is the subject of a pending objection, or (c) was listed on the Debtors' Schedules as unliquidated, contingent or disputed and a Proof of Claim was not filed or was filed for an unliquidated, contingent or disputed claim, unless on or before the Voting Record Date the Bankruptcy Court enters a Final Order directing otherwise. However, if a Claim is disallowed in part, the Holder shall be entitled to vote the Allowed portion of the Claim.

## SECTION 6. MEANS FOR IMPLEMENTATION

    6.1 ***Redwood Asset Purchase***.

    6.1.1 ***Purchased Assets***. As more fully described in Section 2.1 of the Definitive Agreement, Redwood formed the Acquisition Companies to acquire substantially all of the assets of the Sellers relating to the Business and the equity interests in the Transferred Landowners, other than certain excluded assets (the "***Purchased Assets***") free and clear of all liens and liabilities encumbering the assets, except for certain permitted encumbrances, including certain Community Loans, Special District Tax Bonds, and Purchase Option Deposits, and in the case of Warminster, certain other obligations and encumbrances associated with the Ann's Choice Bonds (as set forth in the Definitive Agreement) as restructured pursuant to the Plan. The Purchased Assets include, but are not limited to, the following: (i) the intellectual property owned or used by the Company in the Business (which will include all rights to the name "Erickson Retirement Communities" and variations thereof owned or in use by the Company); (ii) certain contracts and all tangible and intangible personal property owned or used by the Company in the Business; (iii) all original books and records relating to the Business; (iv) all of the Company's right, title, and interest in the B&R Notes; (v) Cash (other than Medical Claims Cash, Cash Collateral, and Landowner Retained Cash), including Cash equivalents, not to exceed $10,000,000; (vi) permits, to the extent transferrable pursuant to applicable law; (vii) ~~certain causes of action and rights of recovery related thereto, including avoidance actions arising under the Bankruptcy Code; (viii)~~) Medical Claims Cash, Cash Collateral, and Landowner Retained Cash available at Closing at the applicable Landowner; (~~ix~~**viii**) insurance policies; (~~x~~**ix**) furnishings, furniture, supplies, tools, machinery, monitoring and other equipment and other personal property and fixed assets; (~~xi~~**x**) Corporate Headquarters; (~~xii~~**xi**) all IEDs with respect to the Tallgrass Creek Campus and all IEDs collected after November 27, 2009 at Warminster campus, all of which remain subject to the terms of the applicable community loans; and (~~xiii~~**xii**) ERC's interests in the Transferred Landowners; (~~xiv~~**xiii**) all Transferred Claims (other than those described herein~~) with respect to ERC.  In addition,~~ **and those waived or released** pursuant to ~~Section 2.5 of the Definitive Agreement, Redwood has exclusive options to purchase Point View Campus II, LLC, Hingham Campus, LLC, Lincolnshire Campus, LLC and/or Naperville Campus, LLC (each of which is a wholly owned subsidiary of ERC), or any or all of their assets~~**the Plan).  The Cash Collateral, including certificates of deposit securing the Erickson Construction Letters of Credit and ERC Letters of Credit, shall be transferred subject to existing liens**. Unless provided otherwise in ~~the~~**this** Plan or in the Plan Documents, any valid liens with respect to the Purchased Assets, shall be satisfied and released to the extent of ~~payment on account~~**treatment** of Allowed Claims in accordance with the Plan.  From and after the sale of the Purchased Assets, Redwood shall permit each of the Bonded Communities known as Monarch Landing, Sedgebrook and Linden Ponds access to use intellectual property, personal property, permits, insurance or other Purchased Assets as and to the extent used by each such Bonded Community prior to the sale on reasonable business terms and under pricing consistent with industry standards and as mutually agreed by the Redwood, the applicable NSC-NFP, and the applicable Bond Trustee.  Such use shall cease one (1) year after the management agreement for the applicable Bonded Community is terminated.

6.1.2    ***Excluded Assets***.  The Purchased Assets shall exclude the following assets (the "***Excluded Assets***"):

6.1.2.1    Cash and Cash equivalents in excess of $10,000,000 (other than Medical Claims Cash, Cash Collateral, and Landowner Retained Cash);

6.1.2.2    all IEDs which have been placed in escrow pursuant to the Bankruptcy Court's Order Granting Motion Authorizing Additional Protections to Residents' Initial Entrance Deposits dated November 24, 2009 [D.I. No. 362] except those specifically referenced in Section 6.1.17;

6.1.2.3    the UMBC Building;

6.1.2.4    equity securities of, and other ownership interests of any kind in, affiliates of ERC other than the Transferred Landowners;

6.1.2.5    all contracts other than those contracts specifically included in the Purchased Assets pursuant to the terms of the Definitive Agreement, which contracts shall be rejected by the applicable Debtor in bankruptcy;

6.1.2.6    the organizational documents and minute books of ERC and the Excluded Affiliates (as defined in the Definitive Agreement);

6.1.2.7    permits and residents' records, if any, that ERC is prohibited by applicable law from transferring to ManagementCo;

6.1.2.8    personnel records for the Debtors' employees who are not Transferred Employees and, to the extent ERC is prohibited by applicable law from transferring such records to ManagementCo, for Transferred Employees;

6.1.2.9    all employee compensation and benefit plans, programs, policies and arrangements, including Employee Plans (defined in the Definitive Agreement);

~~6.1.2.11~~ **6.1.2.10** the Littleton Out-Parcel;

~~6.1.2.12~~ **6.1.2.11** the GST Loan; and

6.1.2.12    title to all real property, building, fixtures, and any and all other improvements made to the Bond Communities **(defined below)**.

_____

7  Other than as set forth herein regarding IEDs collected at Tallgrass Creek Campus and the Warminster Campus, all IEDs received at other Campuses and placed in escrow pursuant to the Bankruptcy Court's Order Granting Motion Authorizing Additional Protections to Residents**'** Initial Entrance Deposits dated November 24, 2009 [D.I. No. 362] will be treated**, as to the applicable NFP,** as follows – all such IEDs received will be considered as disbursements draws under the applicable community loans ~~and will be credited against each applicable secured lender's debt~~.  All such IEDs received after November 27, 2009 will result in a corresponding reduction in the Cash Transaction Proceeds **allocable to the applicable Campus** and will also be considered as draws under the applicable community loans.

6.1.3 ***Purchase Consideration***.  Redwood shall pay the Cash Transaction Proceeds at the Closing.  The Cash Transaction Proceeds (a) plus Cash on Hand at Closing (to the extent in excess of the $10,000,000 included in the Purchased Assets, if any) and (b) less the Landowner Retained Cash (which shall be retained by each applicable Landowner Debtor in accordance with the allocation described in the definition of "Landowner Retained Cash" which will be transferred to an Acquisition Company, to the extent available at the applicable Landowner at Closing) (collectively, the "***Distributable Cash***") will be available for distribution to Holders of Claims.  Redwood will acquire all IEDs with respect to the Tallgrass Creek Campus and, subject to the conditions set forth in Schedule 6.3.9.6 of the Plan, Warminster may use all IEDs escrowed after November 27, 2009 with respect to Warminster pursuant to the terms of the IED Orders.  Holders of certain Allowed Claims will be assigned an interest in up to $7 million of the Cedar Crest Receivable **as further set forth in this Plan**.  Funds that are collected on account of the Cedar Crest Receivable will flow through to Holders of Allowed Claims, as specified under the Plan, pursuant to the terms of the documents that will be included in the Plan Supplement.

6.1.3.1 ***NSC Payment and NSC Payment Rebate***.  At closing, the NSC Payment in the amount of $9 million shall be made by Redwood directly to NSC.  Immediately thereafter, NSC shall make the NSC Payment Rebate by transferring $2 million of the $9 million to the TIP.  NSC shall retain the full $7 million of the NSC Payment and all NSC Interim Payments in full without the need for any further court order or approval process, and free and clear of all claims (including without limitation (subordination, subrogation, ~~contributition~~**contribution**, setoff, ~~recoupement~~**recoupment**, assignment and lien claims) by the Debtors, the Lenders, Redwood, and any other person, which sums the NSC and the NSC-NFPS shall allocate and distribute among themselves as they determine appropriate to ~~address~~**satisfy and resolve claims and disputes with the Debtors, including** their 2009 purchase services ~~trueup~~**true up**, certain Medicare billing issues, and their pre and post-petition professional fees and expenses associated with the Debtors' restructuring efforts.

6.2 **PropCo, DevCo and ManagementCo**.

6.2.1 ***PropCo***.  Pursuant to the Definitive Agreement, ERC shall grant, sell, assign, transfer and deliver to PropCo all of its limited liability company interests in the Transferred Landowners, which hold property or assets in connection with a current or planned Campus.  On the Closing Date, Redwood will own 100% of PropCo.

6.2.2 ***DevCo***.  On the Closing Date, Redwood will own 100% of DevCo.  DevCo shall acquire all assets and properties of Erickson Construction other than its Cash on Hand.  Any Development Agreement relating to the three Bonded Communities that are not being acquired by Redwood under the Plan (the Linden Ponds, Monarch Landing and Sedgebrook Communities) shall be on terms reasonably acceptable to the relevant Bond Trustee and Redwood.

6.2.3 ***ManagementCo***.  ManagementCo shall be formed to (a) acquire the Company's goodwill, personal and ongoing business relationships, trade secrets, and know-how and (b) knowledge in connection with the Company's business of providing management services with respect to the Campuses, as well as other assets related to the management aspect of the Business as set forth in the Definitive Agreement.  ManagementCo will enter into New Management Agreements with certain Campuses, which New Management Agreements shall have a minimum term of ten (10) years, subject to a three (3) year and seven (7) year right to review the management fee terms of the agreements to determine whether the fees reflect current market pricing.  Pursuant to the New Management Agreements, ManagementCo will provide management services to the Developing Campuses and Completed Campuses, including the right to receive all management fees thereunder.  On the Closing Date, Redwood will own 100% of ManagementCo.  Any New Management Agreement relating to the three Bonded Communities that are not being acquired by Redwood under the Plan (the Linden Ponds, Monarch

EAST\42647302.30
EAST\42647302.46

Landing and Sedgebrook Communities) shall be on terms reasonably acceptable to the relevant Bond Trustee and Redwood.  **To the extent that any party holds valid consent rights with regards to the contemplated New Management Agreements, such rights will continue to be enforceable to the extent that they are valid in the context of the Plan and related transactions.  The Debtors reserve the right to seek approval of any new agreements and the Plan over the objection of such a party on any basis available to the Debtors.**

      6.2.3.1   <u>Management of Bond Communities</u>.  Redwood through ManagementCo will manage Linden Ponds (Hingham), located in Hingham, Massachussets; Sedgebrook (Lincolnshire), located in Lincolnshire, Illinois, and Monarch Landing (Naperville), located in Naperville, Illinois (collectively, the "**Bond Communities**") during the 90 day period immediately following the Plan Confirmation Date.  During this 90 day period, Redwood will negotiate (non-exclusively) with the applicable NFPs and Indenture Trustees in good faith to reach a resolution regarding the Bond Communities.  At the conclusion of this 90 day period, if the parties have reached a resolution, then the Debtors will facilitate an definitive agreement regarding a restructuring plan for the Bond Commuinities.  If Redwood does not reach a deal with the applicable NFPs and Indenture Trustee with respect to these Bond Communities at the close of the 90 day period, ERC's interests in the Bond Communities will be resolved pursuant to section 554 of the Bankruptcy Code, and Redwood will have no further obligation to manage the Bond Communities.

      6.2.3.2   <u>Management Structure of ManagementCo</u>.  ManagementCo will be run by an experienced management team that will include James C. Davis as Chairman. ManagementCo intends to enter into a consulting agreement with John Erickson under which John Erickson would make himself available to provide consulting and advisory services; provided, however, that John Erickson would not have any decision making authority in ManagementCo, PropCo or DevCo.

      6.2.4   *Assumption of Liabilities by Redwood*.  Except as otherwise provided in this Plan, neither Redwood nor any Acquisition Company will assume any obligation of the Company, other than obligations with respect to the period after the Closing Date under any agreement expressly assumed by an Acquisition Company in connection with the Restructuring Transactions contemplated under the Definitive Agreement.  However, the Purchased Assets will be transferred to the Acquisition Companies subject to certain debt obligations of the Landowners, including the Community Loans and the other Landowner obligations contemplated under the Definitive Agreement.

      6.2.5   *Kansas*.  Redwood Kansas will acquire the assets of Kansas in exchange for assuming the obligations under the Kansas Special Assessment Bonds in full.  Kansas shall assume the Kansas Community Loan.  All IEDs (relating both to units sold pre- and postpetition) will be included in the assets acquired by Redwood Kansas from Landowner.  The Holders of Kansas Construction Loan Claims shall retain their deficiency claims and participate in the Liquidating Creditor Trust, as provided herein  The assumed debt will not be guaranteed.

      6.2.6   *B&R Notes*.  Pursuant to the Definitive Agreement and the Plan Documents, Redwood shall acquire a 100% interest in the B&R Notes.

      6.2.7   *Working Capital Facility*.  Redwood will establish a $50,000,000 working capital facility ("**Working Capital Facility**") that will be available to fund, on a senior secured priming basis, working capital and/or project development needs of the Acquisition Companies and/or Transferred Landowners through an aggregate facility and/or through new revolvers at each Acquisition Company and/or Transferred Landowner.  The Working Capital Facility shall have a first lien on the assets of all the Acquisition Companies and/or Transferred Landowners, senior to any and all other indebtedness of the Acquisition Companies and/or Transferred Landowners and specific Campuses. Notwithstanding any other terms of the Disclosure Statement, Plan, or any orders relating to the

Disclosure Statement or Plan, to the extent the Working Capital Facility is made available to Warminster, it will be on terms mutually agreeable to Redwood and Ann's Choice, and, to the extent they have approval rights under the relevant Bond Documents, the Ann's Choice Trustee.

6.2.8 ***Employment Agreements***. As set forth in the Definitive Agreement, Redwood will have the opportunity during the due diligence investigation to identify and meet key employees of the Business and assess the compensation and benefits available to such employees and the likelihood such employees will accept employment with the applicable Acquisition Company and/or Transferred Landowner. It is anticipated that, at or before the Closing, the Acquisition Companies and/or Transferred Landowners will offer employment to certain employees and enter into employment agreements with these employees. Such employment agreements will contain customary provisions such as noncompetition, non-solicitation and confidentiality provisions.

6.2.9 ***Non-Competition Agreement***. At the Closing, Redwood, Erickson Group and ERC and certain of their members will enter into non-competition agreements for a mutually agreeable number of years pursuant to which the ERC and such shareholders will agree that it or they and its or their affiliates will not compete with Redwood's or the Acquisition Companies' and/or Transferred Landowners' operation of the Purchased Assets after the Closing and containing agreements not to solicit or hire the Acquisition Companies' and/or Transferred Landowners' employees. Notwithstanding the foregoing, Redwood and the Company shall reasonably cooperate with the Landowner, NFP and/or relevant Bond Trustee for the Bond Communities known as Monarch Landing, Sedgebrook or Linden Ponds to ensure the ease of transition of the new manager of the Purchased Assets. The obligation to "reasonably cooperate" shall terminate one (1) year after the applicable Management Agreement is terminated.

6.2.10 ***Remaining ERC Assets***. All assets of ERC which are not purchased **or otherwise transferred to Redwood** pursuant to the Definitive Agreement or otherwise transferred under the terms of this Plan will be liquidated in on orderly fashion.

6.3 ***Landowners, Erickson Construction, and Erickson Group***.

6.3.1 ***Ashburn***.

6.3.1.1 <u>Transferred Assets</u>. Ashburn shall grant, sell, assign, transfer and deliver to Redwood Ashburn, upon receipt by PNC Bank, National Association, as collateral and administrative agent for the Holders of the Ashburn Construction Loan Claims, $60,626,000 in Cash and $732,000 from the Cedar Crest Receivable as required under Section 4 of this Plan, and Redwood Ashburn shall purchase from Ashburn, free and clear of all liens and liabilities (except for expressly assumed liabilities, if any, by Redwood Ashburn and the liens securing such liabilities) all assets and properties of Ashburn of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible, owned, leased or licensed, including all real property, all Transferred Claims of Ashburn, and all transferred contracts to which Ashburn is a party, but not including any Excluded Assets.

6.3.1.2 <u>The Community Loan and Other NFP Agreements</u>. The Ashburn Community Loan shall be amended and restated at the outstanding balance amount and assumed by Redwood Ashburn, as modified. Redwood Ashburn's obligations under the Ashburn Community Loan shall be subordinate to all other debt owed by Redwood Ashburn or its successor (including, without limitation, any new capital equity funding or debt incurred by Redwood Ashburn or its successor). The Working Capital Loan agreement and note and other agreements between Ashburn and Ashby Ponds, Inc. will be terminated as of the Effective Date, and Redwood Ashburn and Ashby Ponds,

Inc. will enter into new agreements on mutually agreed upon terms consistent with the terms agreed to with the NSC on the record as part of the Auction.

                6.3.1.3    <u>Guaranties</u>.  All guarantees of the Ashburn Construction Loan, Ashburn Junior Loan and Concord Junior Loan will be terminated and released.

                6.3.1.4    <u>New Ashburn Revolver</u>.  Redwood will make available a revolver to fund costs of the borrower, including construction costs, marketing costs, departmental charges, development fees and taxes (the "***New Ashburn Revolver***").  Any funds drawn under the New Ashburn Revolver will be secured by a priming lien against the same collateral as the collateral that secured the prepetition debt, including IEDs.  The available commitment amount under the New Ashburn Revolver will be mutually determined by Redwood and borrower.  Redwood would provide a separate revolving facility for the purpose of funding reasonable working capital needs of Ashby Ponds, Inc., secured by a priming lien on funds received by Ashburn from Ashby Ponds, Inc (excluding proceeds of the Community Loan).

            6.3.2    ***Columbus***.  The indebtedness related to Columbus will not be restructured.  This Landowner's property is currently being foreclosed on by prepetition construction lenders.  This Landowner expects to liquidate the property by delivering to the construction lenders a deed in lieu of foreclosure prior to the Effective Date or allowing the construction lenders to complete their pending foreclosure process.

            6.3.3    ***Concord***.

                6.3.3.1    <u>Transferred Assets</u>.  Concord shall grant, sell, assign, transfer and deliver to Redwood Concord, upon receipt by PNC Bank, National Association, as collateral and administrative agent for the Holders of the Concord Construction Loan Claims, $62,757,000 in Cash and $637,000 from the Cedar Crest Receivable as required under Section 4 of this Plan, **<span style="color:blue">the Concord Letters of Credit, undrawn,</span>** and Redwood Concord shall purchase from Concord, free and clear of all liens and liabilities (except for expressly assumed liabilities, if any, by Redwood Concord and the liens securing such liabilities) all assets and properties of Concord of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible, owned, leased or licensed, including all real property, all Transferred Claims of Concord, and all transferred contracts to which Concord is a party, but not including any Excluded Assets.

                6.3.3.2    <u>The Community Loan and Other NFP Agreements</u>.  The Concord Community Loan shall be amended and restated at the outstanding balance amount and assumed by Redwood Concord, as modified.  Redwood Concord's obligations under the Concord Community Loan shall be subordinate to all other debt owed by Redwood Concord or its successor (including, without limitation, any new capital equity funding or debt incurred by Redwood Concord or its successor).  The Working Capital Loan agreement and note and other agreements between Concord and Maris Grove, Inc. will be terminated as of the Effective Date, and Redwood Concord and Maris Grove, Inc. will enter into new agreements on mutually agreed upon terms consistent with the terms agreed to with the NSC on the record as part of the Auction.

                6.3.3.3    <u>Guaranties</u>.  Except as set forth in Section 6.4.8 of this Plan with respect to the Erickson Group Guaranty Claims, all guarantees of the Concord Construction Loan, Concord Junior Loan and Ashburn Junior Loan will be terminated and released.

                6.3.3.4    <u>New Concord Revolver</u>.  Redwood will make available a revolver to fund costs of the borrower, including construction costs, marketing costs, departmental charges, development fees and taxes (the "***New Concord Revolver***").  Any funds drawn under the New

Concord Revolver will be secured by a priming lien against the same collateral as the collateral that secured the prepetition debt, including IEDs. The available commitment amount under the New Concord Revolver will be mutually determined by Redwood and borrower. Redwood will provide a separate revolving facility for the purpose of funding reasonable working capital needs of Maris Grove, Inc., secured by a priming lien on funds received by Concord from Maris Grove, Inc (excluding proceeds of the Community Loan).

### 6.3.4 *Dallas*.

6.3.4.1 <u>Transferred Assets</u>. Dallas shall grant, sell, assign, transfer and deliver to Redwood Dallas, upon receipt by the Holders of the Texas A & M Note of a distribution of $3,440,000 and by Bank of America, NA, as collateral and administrative agent for the Holders of the Dallas Construction Loan Claims, of $19,496,000 in Cash (inclusive of $2,000,000 in Cash from the TIP), allowance of the right of Bank of America, N.A., as collateral and administrative agent for the Holders of the Dallas Construction Loan Claims, to setoff $34,531.09 in amounts held in deposit pursuant to the Expense Reserve Account (as defined in the Dallas Construction Loan Claim documents) without further motion, request and/or Bankruptcy Court approval against the portion of the Dallas Construction Loan Claims that is unsecured, without the requirement that Bank of America, N.A. setoff such amount against or credit such amount to the Cash distribution received by Bank of America, N.A., as collateral and administrative agent for the Holders of the Dallas Construction Loan Claims, pursuant to the Plan and $282,000 from the Cedar Crest Receivable as required under Section 4, and Redwood Dallas shall purchase from Dallas, free and clear of all liens and liabilities (except for expressly assumed liabilities, if any, by Redwood Dallas and the liens securing such liabilities) all assets and properties of Dallas of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible, owned, leased or licensed, including all real property, all Transferred Claims of Dallas, and all transferred contracts to which Dallas is a party, but not including any Excluded Assets

6.3.4.2 <u>The Community Loan and Other NFP Agreements</u>. The Dallas Community Loan shall be amended and restated at the outstanding balance amount and assumed by Redwood Dallas, as modified. Redwood Dallas' obligations under the Dallas Community Loan shall be subordinate to all other debt owed by Redwood Dallas or its successor (including, without limitation, any new capital equity funding or debt incurred by Redwood Dallas or its successor). The Working Capital Loan agreement and note and other agreements between Dallas and Highland Springs, Inc. will be terminated as of the Effective Date, and Redwood Dallas and Highland Springs, Inc. will enter into new agreements on mutually agreed upon terms consistent with the terms agreed to with the NSC on the record as part of the Auction.

6.3.4.3 <u>Guaranties</u>. All guarantees of the Dallas Construction Loan, Texas A&M Note, and Dallas Junior Loan will be terminated and released.

6.3.4.4 <u>New Dallas Revolver</u>. Redwood will make available a revolver to fund costs of the borrower, including construction costs, marketing costs, departmental charges, development fees and taxes (the "***New Dallas Revolver***"). Any funds drawn under the New Dallas Revolver will be secured by a priming lien against the same collateral as the collateral that secured the prepetition secured debt, including IEDs. The available commitment amount under the New Dallas Revolver will be mutually determined by Redwood and borrower. Redwood will provide a separate revolving facility for the purpose of funding reasonable working capital needs of Highland Springs, Inc., secured by a priming lien on funds received by Dallas from Highland Springs, Inc. (excluding proceeds of the Community Loan).

### 6.3.5 *Houston*.

6.3.5.1    Transferred Assets.  Houston shall grant, sell, assign, transfer and deliver to Redwood Houston, upon receipt by PNC Bank, National Association, as collateral and administrative agent for the Holders of the Houston Construction Loan Claims, $7,041,000 in Cash and $135,000 from the Cedar Crest Receivable as required under Section 4 of this Plan and Redwood Houston shall purchase from Houston, free and clear of all liens and liabilities (except for expressly assumed liabilities, if any, by Redwood Houston and the liens securing such liabilities) all assets and properties of Houston of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible, owned, leased or licensed, including all real property, all Transferred Claims of Houston, and all transferred contracts to which Houston is a party, but not including any Excluded Assets.

6.3.5.2    The Community Loan and Other NFP Agreements.  The Houston Community Loan shall be amended and restated at the outstanding balance amount and assumed by Redwood Houston, as modified.  Redwood Houston's obligations under the Houston Community Loan shall be subordinate to all other debt owed by Redwood Houston or its successor (including, without limitation, any new capital equity funding or debt incurred by Redwood Houston or its successor).  The Working Capital Loan agreement and note and other agreements between Houston and Eagle's Trace, Inc. will be terminated as of the Effective Date, and Redwood Houston and Eagle's Trace, Inc. will enter into new agreements on mutually agreed upon terms consistent with the terms agreed to with the NSC on the record as part of the Auction.

6.3.5.3    Guaranties.  Except as set forth in Section 6.4.8 of this Plan with respect to the Erickson Group Guaranty Claims, all guarantees of the Houston Construction Loan and Houston Junior Loan will be terminated and released.

6.3.5.4    New Houston Revolver.  Redwood will make available a revolver to fund costs of the borrower, including construction costs, marketing costs, departmental charges, development fees and taxes (the "**New Houston Revolver**").  Any funds drawn under the New Houston Revolver will be secured by a priming lien against the same collateral as the collateral that secured the prepetition debt, including IEDs.  The available commitment amount under the New Houston Revolver will be mutually determined by Redwood and borrower.  Redwood will provide a separate revolving facility for the purpose of funding reasonable working capital needs of Eagles Trace, Inc., secured by a priming lien on funds received by Houston from Eagles Trace, Inc (excluding proceeds of the Houston Community Loan).

6.3.6    *Kansas*.

6.3.6.1    Transferred Assets.  Kansas shall grant, sell, assign, transfer and deliver to Redwood Kansas, upon receipt by PNC Bank, National Association, as collateral and administrative agent for the Holders of the Kansas Construction Loan Claims, $2,778,000 from the TIP as required under Section 4 of this Plan and Redwood Kansas shall purchase from Kansas, all assets of Kansas, free and clear of all liens and liabilities (except for Assumed Liabilities to be assumed by Redwood Kansas and the liens securing such liabilities) all assets and properties of Kansas of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible, owned, leased or licensed, including all real property, all Transferred Claims of Kansas, all  initial entrance deposits collected by Kansas,   and all transferred contracts to which Kansas is a party, but not including any Excluded Assets.

6.3.6.2    The Community Loan and Other NFP Agreements.  The Kansas Community Loan shall be amended and restated at the outstanding balance amount and assumed by Redwood Kansas, as modified.  Redwood Kansas' obligations under the Kansas Community Loan shall be subordinate to all other debt owed by Kansas or its successor (including, without limitation, any new capital equity funding or debt incurred by Redwood Kansas or its successor).  The Working Capital

Loan agreement and note and other agreements between Kansas and Tallgrass Creek, Inc. will be terminated as of the Effective Date, and Redwood Kansas and Tallgrass Creek, Inc. will enter into new agreements on mutually agreed upon terms consistent with the terms agreed to with the NSC on the record as part of the Auction.

    6.3.6.3 <u>Bonds and Other Debt</u>.  Redwood Kansas will acquire the assets of Kansas in exchange for the assumption of the obligations under the Kansas Special Assessment Bonds.  All IEDs at Tallgrass Creek Campus will be included in the assets to be acquired by Redwood Kansas from Kansas.  The Holders of guaranties from ERC and Erickson Construction will participate in the Liquidating Creditor Trust, as set forth therein

    6.3.6.4 <u>New Kansas Revolver</u>.  Redwood will make available a revolver to fund costs of the borrower, including construction costs, marketing costs, departmental charges, development fees and taxes (the "***New Kansas Revolver***").  Any funds drawn under the New Kansas Revolver will be secured by a priming lien against the all assets of Kansas, including IEDs, but junior to the Kansas Special Assessment Bonds.  The available commitment amount under the New Kansas Revolver will be mutually determined by Redwood and borrower.  Redwood will provide a separate revolving facility for the purpose of funding reasonable working capital needs of Tallgrass Creek, Inc., secured by a priming lien on funds received by Kansas from Tallgrass Creek, Inc. (excluding proceeds of the Kansas Community Loan).

   6.3.7 ***Littleton***.

    6.3.7.1 <u>Transferred Assets</u>.  Littleton shall grant, sell, assign, transfer and deliver to Redwood Littleton, upon receipt by Capmark Finance, Inc., as collateral and administrative agent for the Holders of the Littleton Construction Loan Claims, $46,400,000 in Cash, $594,000 from the Cedar Crest Receivable and 100% of the net proceeds from the sale of the Littleton Out-Parcel up to $6 million and 50% above $6 million as required under Section 4 of this Plan and Redwood Littleton shall purchase from Littleton, free and clear of all liens and liabilities (except for expressly assumed liabilities, if any, by Redwood Littleton and the liens securing such liabilities) all assets and properties of Littleton of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible, owned, leased or licensed, including all real property, all Transferred Claims of Littleton, and all transferred contracts to which Littleton is a party, but not including any Excluded Assets.

    6.3.7.2 <u>The Community Loan and Other NFP Agreements</u>.  The Littleton Community Loan shall be amended and restated at the outstanding balance amount and assumed by Littleton, as modified.  Redwood Littleton's obligations under the Littleton Community Loan shall be subordinate to all other debt owed by Redwood Littleton or its successor (including, without limitation, any new capital equity funding or debt incurred by Redwood Littleton or its successor).  The Working Capital Loan agreement and note and other agreements between Redwood Littleton and Wind Crest, Inc. will be terminated as of the Effective Date, and Redwood Littleton and Wind Crest, Inc. will enter into new agreements on mutually agreed upon terms consistent with the terms agreed to with the NSC on the record as part of the Auction.

    6.3.7.3 <u>Guaranties</u>.  Except as set forth in Section 6.4.8 of this Plan with respect to the Erickson Group Guaranty Claims, all guarantees of the Littleton Construction Loan and Littleton Junior Loan will be terminated and released.

    6.3.7.4 <u>New Littleton Revolver</u>.  Redwood will make available a revolver to fund costs of the borrower, including construction costs, marketing costs, departmental charges, development fees and taxes (the "***New Littleton Revolver***").  Any funds drawn under the New Littleton Revolver will be secured by a priming lien against the same collateral as the collateral that

secured the prepetition debt, including IEDs. The available commitment amount under the New Littleton Revolver will be mutually determined by Redwood and borrower. Redwood will provide a separate revolving facility for the purpose of funding reasonable working capital needs of Wind Crest, Inc., secured by a priming lien on funds received by Littleton from Wind Crest, Inc. (excluding proceeds of the Littleton Community Loan).

**6.3.7.5** **Littleton Letters of Credit. The claims of PNC Bank, National Association, on account of the Littleton Letters of Credit shall be deemed allowed as of the Effective Date. Unless PNC Bank, National Association agrees to different treatment, PNC shall not release its liens on those certificates of deposit pledged as collateral for the Littleton Letters of Credit except to the extent the Littleton Letters of Credit are returned, undrawn, to PNC Bank, National Association.**

6.3.8    *Novi*.

6.3.8.1    Transferred Assets. Novi shall grant, sell, assign, transfer and deliver to Redwood Novi, upon receipt by PNC Bank, National Association, as collateral and administrative agent for the Holders of the Novi Construction Loan Claims, $24,914,000 in Cash and $389,000 from the Cedar Crest Receivable as required under Section 4 of this Plan and Redwood Novi shall purchase from Novi, free and clear of all liens and liabilities (except for expressly assumed liabilities, if any, by Redwood Novi and the liens securing such liabilities) all assets and properties of Novi of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible, owned, leased or licensed, including all real property, all Transferred Claims of Novi, and all transferred contracts to which Novi is a party, but not including any Excluded Assets. **Redwood shall provide replacement adequate collateral to secure the Novi Letters of Credit in exchange for release of existing collateral.**

6.3.8.2    The Community Loan and Other NFP Agreements. The Novi Community Loan shall be amended and restated at the outstanding balance amount and assumed by Redwood Novi, as modified. Redwood Novi's obligations under the Novi Community Loan shall be subordinate to all other debt owed by Redwood Novi or its successor (including, without limitation, any new capital equity funding or debt incurred by Redwood Novi or its successor). The Working Capital Loan agreement and note and other agreements between Novi and Fox Run Village, Inc. will be terminated as of the Effective Date, and Redwood Novi and Fox Run Village, Inc. will enter into new agreements on mutually agreed upon terms consistent with the terms agreed to with the NSC on the record as part of the Auction.

6.3.8.3    Guarantees. Except as set forth in Section 6.4.8 of this Plan with respect to the Erickson Group Guaranty Claims, all guarantees of the Novi Construction Loan and Novi Junior Loan will be terminated and released.

6.3.8.4    New Novi Revolver. Redwood will make available a revolver to fund costs of the borrower, including construction costs, marketing costs, departmental charges, development fees and taxes (the "*New Novi Revolver*"). Any funds drawn under the New Novi Revolver will be secured by a priming lien against the same collateral as the collateral that secured the prepetition debt, including IEDs. The available commitment amount under the New Novi Revolver will be mutually determined by Redwood and borrower. Redwood will provide a separate revolving facility for the purpose of funding reasonable working capital needs of Fox Run Village, Inc., secured by a priming lien on funds received by Novi from Fox Run Village, Inc. (excluding proceeds of the Novi Community Loan).

6.3.9    *Warminster*.

6.3.9.1    Interests in Warminster.   ERC's ownership interests in Warminster will be transferred to PropCo.

6.3.9.2    Warminster Purchase Option Deposit.   The outstanding balance of the purchase option deposit refund obligation reflected in the Warminster Purchase Option Deposit Refund Agreement in the amount of $75,000,000 shall be reinstated in full.   The collateral securing the Warminster Purchase Option Deposit Refund Agreement shall remain unchanged. Warminster's obligations under the Purchase Option Refund Deposit Agreement will be guaranteed by IEDs collected by Warminster after November 27, 2009 not to exceed $10 million.   Any cross-defaults relating to other Landowners shall be eliminated.   Reorganized Warminster shall assume the Warminster Purchase Option Deposit Refund Agreement as it currently exists, or otherwise on terms mutually agreeable to Ann's Choice and the Ann's Choice Trustee.

6.3.9.3    Development Rights.   Redwood shall assume the existing Development Agreement relating to the Ann's Choice Campus or otherwise enter into a new Development Agreement on terms mutually agreeable to Redwood, Ann's Choice and the Ann's Choice Trustee.

6.3.9.4    Guarantees.   All guarantees of ERC and its affiliates will be terminated.   Redwood, DevCo and PropCo shall provide a new completion guaranty on the same terms as the existing completion guaranty associated with the Ann's Choice Bonded Community.

6.3.9.5    Community Loan.   The Warminster Community Loan shall be amended and restated at the outstanding balance amount and assumed by Warminster, on terms mutually agreeable to Redwood, Ann's Choice and the Ann's Choice Trustee.

6.3.9.6    Other Warminster Bond Obligations.   Warminster shall assume, reinstate and/or ratify the mortgage securing the Ann's Choice Bonds and Warminster and Warminster GP shall each assume, reinstate and/or ratify all other obligations, encumbrances, and agreements relating to the Ann's Choice Bonds to which it was a party as of the Petition Date.   Subject to the occurrence of the Effective Date, any IED funds relating to the Ann's Choice Campus that remain in escrow on the occurrence of a Trigger Event as that term is used in the Initial IED Order and Additional IED Procedures Order shall be released to Warminster and such formerly escrowed funds shall thereafter be available for use pursuant to the Bond Documents provided that there then exist no defaults under one or more of the provisions of the Bond Documents set forth in Schedule 6.3.9.6.   Any new Management Agreement and any amendments or modifications to the terms of any Master Lease relating to the Ann's Choice Campus shall be on terms reasonably acceptable to the Ann's Choice Trustee and Redwood.  **The Debtors reserve the right to seek approval of any new agreements and the Plan over the objection of such a party on any basis available to the Debtors.**

6.3.9.7    New Warminster Revolver.   Redwood will make available a revolver to fund costs of the borrower, including construction costs, marketing costs, departmental charges, development fees and taxes (the "***New Warminster Revolver***").   The available commitment amount under the New Warminster Revolver will be mutually determined by Redwood and borrower. Redwood will provide a separate revolving facility for the purpose of funding reasonable working capital needs of Ann's Choice Campus (together with the New Warminster Revolver, the "***New Warminster Revolvers***").   The terms of the New Warminster Revolvers must be mutually agreeable to Redwood and Ann's Choice and, to the extent they have approval rights under the relevant Bond Documents, the Ann's Choice Trustee.

6.3.9.8    TIP Funding.   The Warminster IEDs collected prior to November 27, 2009 will be transferred to the TIP.   To the extent that the Ann's Choice Trustee is

EAST\42647302.30
EAST\42647302.46

unwilling to facilitate the transfer, the Debtors reserve the right prior to or at the Plan Confirmation Hearing to seek the Court's intervention.

**6.3.9.9** **Warminster Letters of Credit.  The claims of PNC Bank, National Association, on account of the Warminster Letters of Credit shall be allowed as of the Effective Date.  Unless PNC agrees to different treatment, PNC Bank, National Association shall not release its liens on the certificates of deposit pledged to secure the Warminster Letters of Credit except to the extent the Warminster Letters of Credit are returned, undrawn, to PNC Bank, National Association.  Upon release of the liens on the certificates of deposit pledged to secure the Warminster Letters of Credit as set forth in this paragraph, such certificates of deposit shall then be Purchased Assets.**

6.3.10  *Erickson Construction*.  Erickson Construction shall grant, sell, assign, transfer and deliver to DevCo, and DevCo shall purchase from Erickson Construction, free and clear of all liens and liabilities, all assets and properties of Erickson Construction of every kind and description, wherever located, whether real, personal or mixed, tangible or intangible, owned, leased or licensed, including all transferred contracts to which Erickson Construction is a party, but not including any Excluded **Assets.  Unless PNC Bank, National Association agrees to different treatment, PNC shall not release the certificates of deposit pledged to secure the Erickson Construction Letters of Credit except to the extent Erickson Construction Letters of Credit and ERC Letters of Credit are returned, undrawn, to PNC Bank, National Association.  Following release of certificates of deposit as set forth in this paragraph, such certificates of deposit shall be Purchased** Assets.

6.3.11  *Erickson Group*.  Erickson Group will be liquidated and dissolved in accordance with applicable law, subject to the terms and conditions of the Plan.

6.3.12  *Payment in Full Claims*.  To the extent unpaid as of the Effective Date, Allowed Administrative Expense Claims (including, without limitation, the Auction Fee ~~to the extent allowed as an Administrative Expense Claim~~), Allowed Compensation and Reimbursement Claims, Allowed Priority Tax Claims, Allowed DIP Funding Claims, Allowed Other Priority Claims, Allowed Secured Tax Claims, and Allowed Mechanic's Lien Claims **(to the extent these Claims are not junior to other Claims pursuant to applicable state law)** shall be reserved for or paid from the Transaction Proceeds, subject to the terms and conditions of the Plan.

6.4  *Liquidating Creditor Trust*.

6.4.1  *Establishment of Liquidating Creditor Trust*.  On the Effective Date, the Liquidating Creditor Trust will be established pursuant to the Trust Agreement and other documents to be included in the Plan Supplement.  Under the Definitive Agreement, Redwood is acquiring the Causes of Action, counterclaims and defenses listed below which the Debtors would have otherwise been entitled to bring and which are not transferred, waived or released under the Plan.  Redwood will assign the Causes of Action listed below to the Liquidating Creditor Trust for the exclusive benefit of the Beneficiaries that consent to the Global Settlement.

- All Chapter 5 Avoidance Actions of ERC, Erickson Construction, and the Landowner Debtors (collectively, the "*Subject Debtors*"), including, but not limited to, actions against John Erickson and members of the Erickson family (the "*Transferred Chapter 5 Avoidance Actions*").  **Chapter 5 Avoidance Actions against** Redwood Retained Employees will be excluded from the Transferred Chapter 5 Avoidance Actions assigned to the Liquidating Creditor Trust.  Further and except with respect to John Erickson and members of the Erickson family, the Liquidating ~~Creditors~~**Creditor** Trust will covenant not to prosecute Chapter 5 Avoidance actions against employees of the Subject Debtors (including the Redwood Retained Employees) if (A) such

employees received transfers during the period ending October 18, 2008 and beginning on the date that the applicable statute of limitations for fraudulent conveyances for such transfer began to run and (B) such transfers during that period do not exceed $350,000, in the aggregate; *provided*, that the covenant not to sue will not apply to transfers to such employees within one (1) year prior to October 19, 2009 (such employees falling below the foregoing threshold, "***Non-Threshold Employees***").

- All Non-Avoidance Causes of Action against the directors and officers of the Subject Debtors in their capacities as such (the "***Transferred D&O Claims***").

The assignment of claims of the Subject Debtors and Erickson Group to the Trust (or other such third party with respect to assets of Erickson Group **other than the Estate Assigned Claims**) shall be exclusive of any and all claims or Causes of Action against the Lenders and Agents (and each of their respective affiliates, officers, directors, employees, agents, attorneys and advisors) both in their capacities as Lenders and/or Agents and in any other capacities, all of which claims and/or Causes of Action, including but not limited to Chapter 5 Avoidance Actions and any other avoidance actions, shall be expressly waived, pursuant to the Plan, by the Debtors, each of the Acquisition Companies, the Creditors Committee, the Liquidating Creditor Trust, Holders of each of the Ashburn Junior Loan Claims, Columbus Junior Loan Claims, Concord Junior Loan Claims, Dallas Junior Loan Claims, Houston Junior Loan Claim, Kansas Junior Loan Claim, Littleton Junior Loan Claim, Novi Junior Loan Claim, Warminster Junior Loan Claim, any other mezzanine lender, Holders of Claims under the STAMPS, the Lenders, Agents, and the NSC-NFPs and Holders of Allowed Claims that receive Distributions under the Plan **(subject to the right of each creditor to opt-out with respect to the Third Party Releases pursuant to Section 12.6 of the Plan)**.  In addition to the Causes of Action described above, on and after the Effective Date, the Debtors will assign the following Causes of Action to the Liquidating ~~Creditors~~**Creditor** Trust: (i) Non-Avoidance Causes of Action against all directors, officers, managing members and managers of Erickson Group (the "***Estate Assigned D&O Claims***"), (ii) all Chapter 5 Avoidance Actions of Erickson Group, other than such claims against Redwood Retained Employees (subject to the limitations described herein with respect to Non-Threshold Employees) (the "***Estate Assigned Chapter 5 Avoidance Actions***"), (iii) all Non-Avoidance Causes of Action not acquired by Redwood and not otherwise released by the Plan (together with the Estate Assigned D&O Claims and Estate Assigned Chapter 5 Avoidance Actions, the "***Estate Assigned Claims***"), (iv) unencumbered assets of the Debtors' Estates, and (v) Excluded Assets (excluding those Excluded Assets subject to prior liens, to the extent of the value of such liens, or other disposition pursuant to the terms of the Plan, including but not limited to the Littleton Out-Parcel and the UMBC Building) (collectively with the Transferred Claims and the Trust Cash, the "***Trust Assets***") (except for those assets held by Erickson Group that may be transferred to another third party entity, including but not limited to the GST Loan).  The Trust Assets transferred to the Liquidating Creditor Trust, subject to the applicable provisions of Section 6.4 of the Plan, will fully vest in, the Liquidating Creditor Trust, free and clear of all claims, liens, encumbrances and other liabilities, including all Claims against and Interests in the Debtors, with all Liquidating Creditor Trust proceeds to be distributed by the Trustee in accordance with the provisions of the Plan. The Debtors estimate that the value of the potential preference Causes of Action is approximately $7.5 million.  The Debtors believe that claims may exist with respect to D&O coverage but the Debtors express no opinion with respect to those claims.  **Any reference in ~~the~~this Plan to potential Causes of Action against any director, officer or other insider of any of the Debtors should not be construed to suggest that the Debtors believe that any such valid claim exists or is worthy of pursuit, and the confirmation of the Plan, and any agreements consummated pursuant to the Plan, shall be without prejudice to any such parties' defenses to any such potential claims and all  defenses to such potential claims under applicable bankruptcy and nonbankruptcy law shall be fully preserved.**  On the Effective Date, the Liquidating Creditor Trust will be provided with funding in an amount specified in the Plan Confirmation Order or other Plan Documents, which amount may be used as set forth in Section

EAST\42647302.30
EAST\42647302.46

6.4.18 of the Plan and as otherwise determined by the Creditors Committee and/or the Trustee of the Liquidating ~~Creditors~~**Creditor** Trust, including to pay the reasonable fees and expenses incurred by the Liquidating Creditor Trust or the Trustee in administering the Liquidating Creditor Trust. The Trustee will be appointed pursuant to the Plan Confirmation Order. Notwithstanding any provision of the Plan, the Disclosure Statement or any order on the Disclosure Statement and/or Plan, the Company's membership interests in Lincolnshire Campus, LLC, Naperville Campus, LLC and Hingham Campus, LLC shall remain subject to all liens granted to the relevant Bond Trustee under the relevant Bond Documents or such terms as agreed to by the parties. Nothing in this Section or otherwise in ~~the~~**this** Plan, and nothing in the Plan Confirmation Order, shall operate to transfer the Excluded Assets free and clear of, or release or in any manner affect, the claims, liens, encumbrances or other liabilities of any lender (or other creditor), or agent for such lender (or other creditor), against or with respect to any person or entity that is not one of the Debtors or the property of any such person or entity; *provided*, *however*, the Bond Trustee shall not be entitled to receive any distributions from the Trust Assets other than the Excluded Assets that are the subject of the Bond Trustee's liens.

    6.4.2 *Exclusions*. Holders of the following types of claims may not participate as Beneficiaries of the Liquidating Creditor Trust and will not be included in the definition of Beneficiary as used in the in Plan: (1) except for Permitted Non-Debtor Obligations (defined below), all deficiency claims of Corporate Revolver Lenders (including, but not limited to, deficiency Interest Rate Swap Claims), which shall be waived as against all of the Debtors except Erickson Group (the "***Revolver Deficiency Waiver***"), (2) except for Permitted Non-Debtor Obligations and the Non-Consenting Construction Lenders (defined below), all loan deficiency and guarantee claims of Construction Lenders, which shall be waived as against all of the Debtors except Erickson Group (the "***Construction Loan Deficiency Waivers***"), (3) all intercompany claims, (4) all obligations with respect to purchase option deposits, (5) claims under ~~that certain Erickson Retirement Communities Amended and Restated~~**the** Growth Participation Plan~~, effective as of January 1, 2006~~ (6) except for Permitted Non-Debtor Obligations, guarantees of ERC's non-debtor subsidiaries' prepetition obligations, (7) UMBC Building Construction Loan deficiency claims, (8) all mezzanine loan/sale-leaseback deficiency claims and guarantee claims that have been waived in writing or pursuant to the Plan, (9) community loan claims, (10) NFP Claims, and (11) purchase deposit claims (the "***Excluded Claims***")**.  Claims arising under the Growth Participation Plan are expressly excluded because pursuant to the terms of the Growth Participation Plan, payments under the plan are deferred until all outstanding obligations owed to the Debtors' lenders are paid in full**. Notwithstanding the foregoing, in the event **that an NFP is entitled to any distribution from** the Liquidating Creditor Trust ~~brings an avoidance action against a Lender or Agent and recovers on same, then if said Lender or Agent had a right of subrogation to a NSC NFP unsecured claim, that claim~~**, then such distribution shall be paid to the Agent with whom that NFP is party to a subordination agreement, and such Claim** shall not be an Excluded Claim ~~to the sole extent that the pro rata share of the avoidance action recovery against such Lender or Agent upon said NSC NFP unsecured claim may be turned over to such Lender or Agent~~**(for the avoidance of doubt, NFPs are not entitled to a distribution from the Liquidating Creditor Trust pursuant to the terms of the Plan)**. For the avoidance of doubt, Holders of General Unsecured Claims against Erickson Group do not assign or waive such ~~claims~~**Claims** or the treatment of such ~~claims~~**Claims**.

    6.4.3 *Purpose of Liquidating Creditor Trust*. The purposes of the Liquidating Creditor Trust are (i) to liquidate any non-cash Trust Assets; (ii) to prosecute and resolve the Causes of Action; (iii) to maximize recovery of the Trust Assets for the benefit of Beneficiaries; and (iv) to distribute the proceeds of the Trust Assets to Beneficiaries.

    6.4.4 *Prosecution of Actions*. The Liquidating Creditor Trust may commence adversary or other legal proceedings to pursue any Causes of Action. Proceeds recovered through any such proceeding will be deposited into the Liquidating Creditor Trust and will be distributed by the Trustee to Beneficiaries in accordance with the provisions of the Plan. The Trustee will have the

authority to settle any and all Causes of Action without the need for approval by the Bankruptcy Court. Further, the Trustee may, in its discretion, elect to abandon any non-cash Trust Assets.

6.4.5 **Trust Funding**. On the Effective Date, the Liquidating Creditor Trust will be provided with funding in an amount of $2.5 million in Cash (the "**Trust Cash**") from the TIP, which amount may be used as set forth in Section 6.4.18 of the Plan and as otherwise determined by the Trustee, including to pay the reasonable fees and expenses incurred by the Liquidating Creditor Trust or the Trustee in administering the Liquidating Creditor Trust.

6.4.6 **D&O Indemnification**. The Liquidating Creditor Trust shall not be liable, directly or indirectly, for the Debtors' postpetition obligation to indemnify directors and officers under the Plan.

6.4.7 **GST Loan and Collection**. Under the Plan and/or the Plan Documents, the rights of Erickson Group with respect to GST Loan will be assigned to the Liquidating ~~Creditors~~**Creditor** Trust (or other third party or entity) for the benefit of Construction Lenders with Erickson Group Guaranty Claims (which guarantee claims are expressly reserved and not otherwise waived against Erickson Group). The Committee and lenders with Erickson Group Guaranty Claims will discuss in good faith the terms under which the Liquidating Creditor Trust (or other third party or entity) may receive the right to prosecute collection claims arising from the GST Loan and distribution of proceeds therefrom.

6.4.8 **Participation**. A Beneficiary may only participate in the recoveries of the claims and Causes of Action assigned to the Liquidating Creditor Trust if such Beneficiary consents to the global settlement (the "**Global Settlement**") between the Creditors Committee and the Debtors. Any Beneficiary that does not consent to the Global Settlement will not be a beneficiary of (i) the Revolver Deficiency Waivers, (ii) Construction Loan Deficiency Waivers, (iii) the Lender Pay-Over Waivers (defined below), (iv) the Trust Cash, (v) the recoveries from the claims and Causes of Actions assigned to the Liquidating Creditor Trust and (vi) recoveries from any other Trust Asset. Any objection filed by a Beneficiary to the Global Settlement or vote against the Plan and the releases contained therein, will disqualify a Beneficiary from participating in the Liquidating ~~Creditors~~**Creditor** Trust.

6.4.9 **Distributions to Three Subclasses of Claims**.

**Tier A Subclass – Trade Claims:**

(a) *Participants*: Tier A will consist of Beneficiaries that that are not Holders of (i) a mezzanine loan/sale-leaseback deficiency claim, (ii) mezzanine loan/sale-leaseback guarantee claim, (iii) Permitted Non-Debtor Obligations (defined below) or (iv) Participating Construction Claims (defined below) (collectively, the "**Trade Class**"). **The Trade Class shall include Allowed General Unsecured Claims held by current and former employees of the Debtors (excluding Claims arising under the Growth Participation Plan).**

(b) *Recovery*: Tier A shall receive, *pro rata*, the first $7 million of dividends paid by the Liquidating Creditor Trust ("**Trade Dividend**"). Following the payment of the Trade Dividend in full, Tier A will not be entitled to any further distributions from the Liquidating Creditor Trust, subject to the Proration Trigger Event (defined below).

**Tier B Subclass – Construction Claims:**

(a) *Participants*: Tier B will consist of Beneficiaries which are Holders of the following:

EAST\42647302.30
EAST\42647302.46

(i) guarantees by a Subject Debtor of pre-petition obligations (including letters of credit) of non-debtor ERC subsidiaries or affiliates ("***Permitted Non-Debtor Obligations***"), *provided* that Permitted Non-Debtor Obligations shall not include (i) any claim held by, (ii) guarantees of pre-petition obligations of, or (iii) letters of credit issued to the following: John Erickson, any member of the Erickson family, any trust or special purpose vehicle created or managed primarily for the benefit of John Erickson or any member of the Erickson family ("***Excluded Insider Obligations***") and;

(ii) deficiency and guarantee claims of the construction lenders (the "***Construction Claims***") to Columbus (the "***Columbus Lender***") and Kansas (the "***Non-Consenting Construction Lenders***"). For the avoidance of doubt, the Non-Consenting Construction Lenders are not waiving their deficiency and guaranty claims.

(b) *Recovery*: Tier B will not receive any distribution from the Liquidating Creditor Trust until the Trade Dividend has been paid in full. Thereafter Tier B shall participate in all dividends from the Liquidating Creditor Trust, *pro rata*, with other Tier B participants only, up to $2 million (the "***Tier C Trigger Event***"), and thereafter, with Tier C participants *pro rata*, subject to the Proration Trigger Event (defined below).

(c) *Limitations*:

(i) The amount of Permitted Non-Debtor Obligations that may participate in Tier B shall be capped at $21 million (the "***Participating Permitted Non-Debtor Obligations***"). To the extent that Permitted Non-Debtor Obligations exceed $21 million (the "***Excess Permitted Non-Debtor Obligations***"), the Participating Permitted Non-Debtor Obligations of each Tier B participant shall be reduced *pro rata*. The holders of Excess Permitted Non-Debtor Obligations shall be deemed to have waived the right to receive a distribution from the Liquidating Creditor Trust on account of such excess amounts.

(ii) The amount of Construction Claims of the Non-Consenting Construction Lenders that may participate in Tier B shall be capped at $70 million (the "***Participating Construction Claims***"). To the extent that Construction Claims exceed $70 million (the "***Excess Construction Claims***"), the Participating Construction Claims of each Tier B participant shall be reduced *pro rata*. The holders of Excess Construction Claims shall be deemed to have waived the right to receive a distribution from the Liquidating Creditor Trust on account of such excess amounts.

(iii) Holders of Permitted Non-Debtor Obligations and the Columbus Lender shall use their respective reasonable good faith efforts to satisfy their claims first from the assets of the applicable non-debtor ERC subsidiary or affiliate or Columbus collateral, respectively, before seeking to enforce their right to receive a distribution from the Liquidating Creditor Trust. To the extent that a holder of a Participating Permitted Non-Debtor Obligation or the Columbus Lender has received payment in respect of their claims from the assets of the applicable non-debtor ERC subsidiary or affiliate or Columbus collateral, respectively, such payment will be deemed to be first applied to such creditors' respective Excess Permitted Non-Debtor Obligation or Excess Construction Claim and then to reduce the amount of its Participating Permitted Non-Debtor Obligations or Participating Construction Claims, respectively.

(iv) For the avoidance of doubt, holders of Participating Construction Claims shall only be entitled to one distribution on account of their deficiency and guarantee claims.

**Tier C Subclass– Mezzanine/Sale-Lease Back Claims:**

(d)    *Participants*:  Tier C will consist of Beneficiaries that hold mezzanine loan/sale-leaseback guarantee claims and deficiency claims that have not been voluntarily waived in writing ("***Mezzanine Claims***").

(e)    *Recovery*:  Tier C shall not participate in dividends from the Liquidating Creditor Trust until the occurrence of the Tier C Trigger Event.  Thereafter, Tier C shall participate with Tier B in all dividends of the Liquidating Creditor Trust, pro rata, subject to the Proration Trigger Event (defined below).

(f)    *Limitations*:

(i)    The amount of Mezzanine Claims that may participate in Tier C shall be capped at $100 million ("***Participating Mezzanine Claims***").  To the extent that mezzanine loan/sale-leaseback guarantee claims and deficiency claims that have not been voluntarily waived in writing exceed $100 million (the "***Excess Mezzanine Claims***"), the Participating Mezzanine Claims of each Tier C participant shall be reduced *pro rata*.  The holders of Excess Mezzanine Claims shall be deemed to have waived the right to receive a distribution from the Liquidating Creditor Trust on account of such excess amounts.

(ii)    For the avoidance of doubt, holders of Participating Mezzanine Claims shall only be entitled to one distribution on account of their mezzanine loan/sale-lease back deficiency claims and guarantee claims.

**STAMPS:**

(g)    *Stamps Pay-Over Obligation and Tier A Subclass Participation*:  For purposes of distributions from the Liquidating Creditor Trust and subject to (b) below, the holders of STAMPS shall participate in Tier A, *provided*, *however*, any amount distributable to the STAMPS shall be paid to the holders of Senior Indebtedness[8], subject to the Lender Pay-Over Waivers (defined below) in Tier A *pro rata* (the "***STAMPS Pay-Over Obligation***").  To the extent permitted under section 13.10 of the STAMPS Indenture (defined below), the fees of the STAMPS indenture trustee, up to $250,000, will not be subject to the STAMPS Pay-Over Obligation (the "***STAMP Fees***").

(h)    *Waiver of Stamps Pay-Over Obligation*.  Without limiting the Lender Pay-Over Waivers, upon the occurrence of the Proration Trigger Event, the ~~Stamps~~**STAMPS** Pay-Over Obligation shall be deemed waived in its entirety and, thereafter, holders of the STAMPS shall be entitled to a *pro rata* share of all Liquidating Creditor Trust distributions.

---

[8] "Senior Indebtedness" shall have the meaning ascribed to such term in that Trust Indenture, dated November 1, 2007, by and among, Erickson Retirement Communities, LLC and The Bank of New York, as Trustee (the "***STAMPS Indenture***").

EAST\42647302.30
EAST\42647302.46

Proration Trigger Event:

            (i)       Relevant Definitions:

            (i)      "***Tier A Percentage Recovery***" means the quotient of $7 million divided by the total amount of Allowed Claims entitled to participate in Tier A plus the STAMP Fees, but excluding all other Claims of the STAMPS.

            (ii)     "***Tier B/C Percentage Recovery***" means the quotient of the total amount of distributions made by the Liquidating Creditor Trust to Tier B and Tier C participants, in the aggregate, divided by the total amount of Allowed Claims entitled to participate in Tier B and Tier C, in the aggregate.

            (j)     *Application*:  As set forth above, upon the payment of the Trade Dividend to Tier A, in full, Tier A will not be entitled to participate in any further distributions from the Liquidating ~~Creditors~~**Creditor** Trust.  However, if as a result of future distributions to participants in Tier B and Tier C, the Tier B/C Percentage Recovery equals or exceeds the Tier A Percentage Recovery (the "***Proration Trigger Event***"), all subsequent distributions from the Liquidating Creditor Trust will then be made to Tier A, Tier B and Tier C, *pro rata*.

### 6.4.10  *Lender Waivers*.

          Subordination/Pay-Over:  Corporate Revolver Lenders, Construction Lenders and holders of Permitted Non-Debtor Obligations will waive all subordination and pay-over rights with respect to distributions from the Liquidating Creditor Trust and the recipients thereof (the "***Lender Pay-Over Waivers***"); *provided* that a Lender Pay-Over Waiver shall only be effective with respect to a holder of mezzanine loan/sale-leaseback deficiency claims or mezzanine loan/sale-leaseback guarantee claims if the beneficiary of such waiver shall have first entered into a settlement agreement, acceptable to the relevant lenders granting such waiver.

          Subrogation:  The grant of an effective Lender Pay-Over Waiver shall include a lender's waiver of subrogation rights with respect to (1) Excess Mezzanine Claims or (2) mezzanine loan/sale-leaseback deficiency claims or mezzanine loan/sale-leaseback guarantee claims voluntarily waived by holders thereof in writing.

          6.4.11  ***Formation***.  The Creditors Committee shall have authority with respect to drafting the definitive trust documents, governance and selection of a Trustee, subject to approval by the Bankruptcy Court.  The Creditors Committee shall consult with the Agents with respect to the drafting and governance of the Liquidating Creditor Trust

          6.4.12  ***Claims Process***.  The Liquidating Creditor Trust will have the right to object to Claims in connection with the post-Effective Date Claims allowance process; *provided* that the Liquidating Creditor Trust shall not object to any Claims of the Corporate Revolver Lenders and Construction Lenders, lenders under the UMBC Building Construction Loan, and Agents, all of which shall be Allowed.  Prior to the Effective Date, the Debtors shall consult with the Creditors Committee in connection with such Claims allowance process.

          6.4.13  ***Information Preservation and Production***.  The Debtors and the Acquisition Companies will agree to preserve all documents and electronic data and provide access to such information to the Liquidating Creditor Trust to facilitate the prosecution of any and all Causes of Action, including but not limited to Chapter 5 Avoidance Actions and claims related to director and officers, the GST Loan and other claims.  The Debtors' and Acquisition Companies' obligation to

EAST\42647302.30
EAST\42647302.46

preserve documents and electronic data pursuant to this Section 6.4.13 shall terminate on the first year anniversary of the Effective Date**, *provided*, that the Debtors, the Acquisition Companies and the Trustee shall negotiate in good faith the terms under which such documents and electronic data shall be transferred to the possession of the Liquidating Creditor Trust, at the Liquidating Creditor Trust's expense at the conclusion of the one year period**.

6.4.14  ***Notice of Causes of Action***.   Subject to the releases and limitations expressly described herein **and under the Plan** (including with respect to the Redwood Retained Employees), the intent of the Global Settlement and the Plan is to transfer all claims, Causes of Action, counter-claims and other defenses of the Debtors (including the right to recoveries therefrom) to the Liquidating Creditor Trust**, with certain exceptions expressly set forth in this Plan**.   The Liquidating ~~Creditors~~**Creditor** Trust is receiving such Causes of Action as the representative of the estate under section 1123(b)(3)(B) of the Bankruptcy Code and Trustee shall have standing to prosecute such Causes of Action.   Neither the Creditors Committee nor the Trustee have commenced an investigation of the Debtors**'** books and records with respect to potential Causes of Action.   To the extent that a Cause of Action against a Holder of a Claim against or Interest in the Debtors or any other party, is not specifically identified or described in ~~the~~**this** Plan, the failure to identify such Cause of Action should not be construed as a waiver or defense to such Cause of Action.  **For the avoidance of doubt, no claims or Causes of Action against the Lenders and Agents (and each of their respective affiliates, officers, directors, employees, agents, attorneys and advisors) shall be transferred to the Liquidating Creditor Trust, the Trustee shall not have standing to pursue such claims or Causes of Action, and all such claims and Causes of Action shall be waived, released and discharged pursuant to the Plan.**

6.4.15  ***No Substantive Consolidation***.   The formation and implementation of the Liquidating Creditor Trust is not, and shall not be deemed, to constitute or cause in effect a substantive consolidation of the Debtors and distributions from the Liquidating Creditor Trust shall be made accordingly.    The governing body of the Liquidating Creditor Trust shall endeavor to ~~apportion~~**account for** creditor recoveries amongst the creditors of the various Estates to the extent possible.

6.4.16  ***Tax Treatment of Transfers to Liquidating Creditor Trust***.   The transfer of the Trust Assets to the Liquidating Creditor Trust will be treated for all purposes of the Internal Revenue Code of 1986, as amended, e.g., Sections 61(a)(12), 483, 1001, 1012 and 1274, as a deemed transfer first to Beneficiaries (in proportion to the fair market value of the Liquidating Creditor Trust interests received by each) in exchange for the Claims held by each that are to be satisfied by the interests in the Liquidating Creditor Trust.   This will be followed by a deemed transfer by each such Beneficiary to the Liquidating Creditor Trust.

6.4.17  ***Tax Treatment of Beneficiaries***.   Beneficiaries will be treated as the grantors of the Liquidating Creditor Trust, and the Trustee will file tax returns for the Liquidating Creditor Trust as a "grantor trust" pursuant to Section 1.671-4(a) of the U.S. Treasury Regulations. Items of income, gain, loss, expense and other tax items will be allocated to those Beneficiaries that would be entitled to receive such items if they constituted cash distributions or reductions therefrom and such Beneficiaries shall be responsible for the payment of taxes on a current basis that result from such allocations.

6.4.18  ***Trust Expenses***.   All Liquidating Creditor Trust expenses will be charged against and paid from either the Trust Cash or the proceeds of any Causes of Action and proceeds from asset sales of other Trust Assets as determined by the Creditors Committee and the Trustee, as applicable.   All such expenses will be paid by the Trustee when due and payable.   Counsel and any other professionals retained by the Trustee or the Liquidating Creditor Trust (the "***Trust Professionals***") will submit monthly statements ("***Monthly Fee Statements***") for services rendered and costs incurred to the

EAST\42647302.30
EAST\42647302.46

Trustee for review and approval. The Trustee will have thirty (30) days from receipt of each Monthly Fee Statement to object to the Monthly Fee Statement. In the event that any objection is received by the relevant Trust Professional and cannot be promptly resolved by the Trust Professional and the Trustee, the dispute will be submitted by the Trustee to the Bankruptcy Court for adjudication. The Bankruptcy Court will retain jurisdiction to adjudicate objections to Monthly Fee Statements. In the event that no objection is raised to a Monthly Fee Statement within the thirty (30) day period, the requested amount in the Monthly Fee Statement will be promptly paid by the Trustee, subject to any requirements under the Plan.

6.4.19 **Creditors Committee Professional Fees**. The Debtors will first apply funds of the DIP financing funds of up to $600,000 and then, an additional maximum consideration of up to $500,000 will be made available from the TIP to the payment of the fees and expenses of the Committee's attorneys and financial advisors up to an allowed amount of $1.1 million. Any fees and expenses incurred by the Committee's attorneys and financial advisors during the Chapter 11 Cases and allowed in excess of such amount will be paid from Trust Cash and/or the Liquidating Creditor Trust recoveries prior to any distribution to Beneficiaries. The amount paid (a) from the initial $2.5 million in Trust Cash, or (b) from recoveries prior to any distribution to Beneficiaries shall be determined solely by agreement between the Creditors Committee and its professionals prior to the Effective Date of the Plan.

6.4.20 **Limitation of Liability**. No recourse will ever be had, directly or indirectly, against the Trustee, its members, officers, directors, employees, professionals, representatives, agents, successors or assigns, by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge or note, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Liquidating Creditor Trust under this Plan or by reason of the creation of any indebtedness by the Liquidating Creditor Trust or the Trustee under this Plan. All such liabilities under this Plan will be enforceable only against, and will be satisfied only out of, the assets of the Liquidating Creditor Trust. The Liquidating Creditor Trust and the Trustee and their respective officers, directors, employees, professionals, representatives, agents, successors or assigns will not be liable for any act they may do, or omit to do hereunder in good faith and in the exercise of their sound judgment; provided, however, that this Section will not apply to any gross negligence or willful misconduct by the Liquidating Creditor Trust and the Trustee or their respective officers, directors, employees, professionals, representatives, agents, successors or assigns.

## SECTION 7. GOVERNANCE OF REORGANIZED DEBTORS

7.1 **Board of Managers**. The members of the initial board of directors or managers of the Reorganized Debtors will be disclosed in the Plan Supplement and pursuant to the terms of the Definitive Agreement.

7.2 **Officers**. The officers of the Debtors immediately prior to the Effective Date will serve as the initial officers of the Reorganized Debtors on and after the Effective Date and in accordance with any employment and severance agreements with the Reorganized Debtors and applicable non bankruptcy law, unless Redwood designates replacement officers. On and after the Effective Date, the officers of the respective Reorganized Debtors will be determined by the Reorganized Debtors' respective boards of directors or managers.

7.3 **Continued Corporate Existence**. Except as otherwise provided herein, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) in

effect prior to the Effective Date are amended by or in accordance with the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval. The foregoing shall be without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable state law.

7.4 ***Transfer of Assets; Successor Liability***. The Restructuring Transactions may result in substantially all of the respective assets, properties, rights, liabilities, duties, and obligations of certain of the Reorganized Debtors vesting in one or more surviving, resulting, or acquiring companies. To the fullest extent permitted by applicable law, no Reorganized Debtor, no Acquisition Company, nor Redwood, nor their respective successors or assigns, nor their properties (including the assets transferred pursuant to the Restructuring Transactions) shall, as a result of confirmation of the Plan or consummation of the Restructuring Transactions contemplated by the Plan or the Definitive Agreement (a) be or be deemed to be a successor to the Debtors or their Estates; (b) have or be deemed to have, de facto or otherwise merged or consolidated with or into the Debtors or their Estates; or (c) be or be deemed to be a continuation or substantial continuation of the Debtors, their Estates, or any enterprise of the Debtors. Moreover, to the fullest extent permitted by applicable law, and without limiting the effect of the scope of the foregoing, except as is expressly set forth in ~~the~~**this** Plan or the Definitive Agreement, as a result of confirmation of the Plan and the Restructuring Transactions, no Reorganized Debtor, no Acquisition Company, nor Redwood, nor their respective successors or assigns, nor their respective properties (including the assets transferred pursuant to the Restructuring Transactions) shall have any successor or vicarious liabilities of any kind or character, including without limitation, any theory of antitrust, environmental, successor or transferee liability, labor law, *de facto* merger or substantial continuity, whether known or unknown, now existing or hereafter arising, asserted or unasserted, fixed or contingent, or liquidated or unliquidated with respect to the Debtors, their Estates, any enterprise of the Debtors, or any obligations of the Debtors or their Estates arising prior to the Effective Date, including, without limitation, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the assets transferred in the Restructuring Transactions prior to the Effective Date.

## SECTION 8.  DISTRIBUTIONS

8.1 ***Distribution Record Date***. As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Interests. The Debtors or the Reorganized Debtors shall have no obligation to recognize any ownership transfer of the Claims or Interests occurring on or after the Distribution Record Date. The Debtors, the Reorganized Debtors, or any party responsible for making Distributions shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

8.2 ***Date of Distributions***. Except as otherwise provided herein, any distributions and deliveries to be made hereunder shall be made on the Effective Date or as soon thereafter as is practicable. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

8.3 ***Postpetition Interest on Claims***. Except as required by applicable bankruptcy law, postpetition interest shall not accrue on or after the Petition Date on account of any Claim. For the avoidance of doubt, nothing herein shall affect the continued accrual of interest on the Ann's Choice Bonds.

8.4     ***Disbursing Agent***.  All Distributions hereunder shall be made by the Debtors or their named successor or assign, as Disbursing Agent, on or after the Effective Date or as otherwise provided herein.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court, and, in the event that a Disbursing Agent is so ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Disbursing Agent.

8.5     ***Powers of Disbursing Agent***.  The Disbursing Agent may (i) effect all actions and execute all agreements, instruments, and other documents necessary to carry out the provisions of this Plan, (ii) make all Distributions contemplated hereby, and (iii) perform such other duties as may be required of the Disbursing Agent by  any order of the Bankruptcy Court, pursuant to the Plan.

8.6     ***Surrender Instruments***.  Pursuant to Bankruptcy Code section 1143, as a condition precedent to receiving any Distribution under the Plan, each holder of a certificated instrument or note must surrender such instrument or note held by it to the Disbursing Agent or its designee.  Any holder of such instrument or note that fails to (i) surrender the instrument or note or (ii) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Disbursing Agent and furnish a bond in form, substance, and amount reasonably satisfactory to the Disbursing Agent before the fifth anniversary of the Plan Confirmation Date shall be deemed to have forfeited all rights and claims and may not participate any Distribution hereunder.  Any Distribution so forfeited shall become property of the Reorganized Debtors.  For the avoidance of doubt, the surrender and indemnity terms described herein shall not apply to any Bond Trustee or beneficial holder of bonds associated with any Bonded Community with respect to any Bond Documents, nor shall it apply to any agent, holder or participant in a syndicated or participated loan.  .

8.7     ***Delivery of Distributions***.  Subject to applicable Bankruptcy Rules, all Distributions to Holders of Allowed Claims shall be made to the Disbursing Agent who shall transmit such Distribution to the applicable Holders of Allowed Claims or their designees.  If any Distribution to a Holder of an Allowed Claim is returned as undeliverable, the Disbursing Agent shall use reasonable efforts to determine the correct current address of such Holder, but no Distribution to such Holder shall be made unless and until the Disbursing Agent has determined to the best of its ability the current address of such Holder, at which time a Distribution shall be made to such Holder without interest; provided that such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one (1) year from the Effective Date.  After such date, all unclaimed property or interest in property shall revert to the respective Reorganized Debtor, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

8.8     ***Manner of Payment***.

8.8.1     All Distributions of Cash to the creditors of each of the Debtors under the Plan shall be made by the applicable Debtor or the Trustee of the Liquidating Creditor Trust to the applicable Disbursing Agent.

8.8.2     At the option of the Debtors or Redwood, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements, *provided*, *however*, that payment of the Auction Fee to Coastwood shall be made by wire transfer unless Coastwood consents otherwise which consent shall be in Coastwood's sole and absolute discretion.

8.9     ***Setoffs***.  The Debtors and the Reorganized Debtors may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which a Distribution shall be made), any claims of any nature whatsoever that the Debtors or the Reorganized

EAST\42647302.30
EAST\42647302.46

Debtors may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim the Debtors or the Reorganized Debtors may have against the Holder of such Claim.

8.10    *Minimum Distributions*.  Holders of Allowed Claims in an the amount which is less than $1,000.00 must request a Distribution for such Claim in writing to the Reorganized Debtors.

8.11    *Distributions After Effective Date*.  To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, a Distribution shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim, the Distribution to which such Holder is entitled pursuant to the applicable provisions of the Plan.  For Disputed Claims that have not been Allowed as of the Effective Date, any Distributions made after the Effective Date to Holders of such Disputed Claims (which later become Allowed Claims after the Effective Date) shall be deemed to have been made on the Effective Date.

8.12    *Allocation of Distributions Between Principal and Interest*.  To the extent that any Allowed Claim entitled to a Distribution under the Plan includes both principal and accrued but unpaid interest, such Distribution shall be allocated to the principal amount (as determined for federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.  For the avoidance of doubt, nothing herein shall affect the application of funds pursuant to the terms of the documents relating to the Ann's Choice Bonds.

## SECTION 9.    PROCEDURES FOR DISPUTED CLAIMS

9.1    *Objections to Claims*.  The Debtors and the Reorganized Debtors shall be entitled to file objections to all Claims that are otherwise not Allowed Claims under this Plan or otherwise, and Redwood shall be entitled to file an objection to any Claim which may affect the obligations of Redwood, as provided for under the Definitive Agreement and this Plan.  Any objections to Claims shall be served and filed on or before the later of (i) one hundred eighty (180) days after the Effective Date or (ii) such later date as may be fixed by the Bankruptcy Court.

9.2    *Payments and Distributions with Respect to Disputed Claims*.  Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no Distribution shall be made on account of such Claim unless and until the Disputed Claim becomes an Allowed Claim.

9.3    *Estimation of Claims*.  The Debtors or the Reorganized Debtors at any time request that the Bankruptcy Court estimate any Contingent Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to such objection.  In the event that the Bankruptcy Court estimates any Contingent Claim or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim.  The aforementioned objection, estimation, and resolution procedures are intended to be cumulative and rather than procedures that are exclusive of the others.

9.4     ***Distributions Relating to Disputed Claims***.  At such time as a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall distribute to the Holder of such Claim, such Holder's pro rata portion of the property distributable with respect to the Class in which such Claim belongs.  To the extent that all or a portion of a Disputed Claim is disallowed, the Holder of such Claim shall not receive any Distribution on account of the portion of such Claim that is disallowed and any property withheld pending the resolution of such Claim shall be reallocated pro rata to the Holders of Allowed Claims in the same Class.

9.5     ***Distributions after Allowance***.  To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, a Distribution shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim, the Distribution to which such Holder is entitled hereunder.

9.6     ***Preservations of Rights to Settle Claims***.  Except as provided in Section 6.4 of the Plan (Liquidating Creditor Trust) or Section 12.5 of the Plan (Releases), nothing contained in ~~the~~**this** Plan (including Section 12 (but excluding Section 12.5) of the Plan), the Plan Documents, or in the Plan Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or causes of action that the Debtors, the Reorganized Debtors, Redwood, or the Acquisition Companies may have or which the Reorganized Debtors may choose to assert on behalf of their respective Estates under any provision of the Bankruptcy Code or any applicable non-bankruptcy law or rule, common law, equitable principle or other source of right or obligation, including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, the Reorganized Debtors, their officers, directors, or representatives; and (ii) the turnover of all property of the Debtors' estates.  This Section shall not apply to any claims released, waived, relinquished, exculpated, compromised, or settled under the Plan or a pursuant to a Final Order.  ~~Nothing~~**Except as expressly provided in this Plan, nothing** contained in ~~the~~**this** Plan, the Plan Documents, or in the Plan Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, cause of action, right of setoff, or other legal or equitable defense.  No entity may rely on the absence of a specific reference in ~~the~~**this** Plan, the Plan Supplement, or the Disclosure Statement to any cause of action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available causes of action against them.  The Debtor and the Reorganized Debtors expressly reserve all rights to prosecute any and all causes of action against any entity, except as otherwise expressly provided in ~~the~~**this** Plan.

9.7     ***Disallowed Claims***.  All Claims held by persons or entities against whom or which any Debtor has commenced a proceeding asserting a cause of action under sections 542, 543, 544, 545, 547, 548, 549, and/or 550 of the Bankruptcy Code shall be deemed disallowed Claims pursuant to section 502(d) of the Bankruptcy Code and Holders of such Claims shall not be entitled to vote to accept or reject the Plan.  Claims deemed disallowed pursuant to this Section shall continue to be disallowed for all purposes until the avoidance action against such party has been settled or resolved by Final Order and any sums due to the Debtors or the Reorganized Debtors from such party have been paid.

## SECTION 10.  EXECUTORY CONTRACTS AND UNEXPIRED LEASES

10.1     ***General Treatment***.  All executory contracts and unexpired leases to which any of the Debtors are parties are hereby rejected as of the Effective Date except for an executory contract or unexpired lease that (i) previously has been assumed pursuant to Final Order of the Bankruptcy Court, (ii) is specifically designated as an executory contract or unexpired lease to be assumed in ~~the~~**this** Plan or in any Plan Supplement, or (iii) is the subject of a separate assumption motion filed by the Debtors under section 365 of the Bankruptcy Code prior to the Effective Date.

10.1.1  Assumption of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full, final, and complete release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults or provisions restricting the change in control of ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time prior to the effective date of assumption.  Anything in the Schedules and any Proofs of Claim filed with respect to any executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other entity.

10.2  *Cure of Defaults*.  Except to the extent that different treatment has been agreed to by the nondebtor party or parties to any executory contract or unexpired lease to be assumed pursuant to Section 10.1 hereof, the Debtors shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within thirty (30) days of the Plan Confirmation Date, file and serve a pleading with the Bankruptcy Court listing the cure amounts of all executory contracts or unexpired leases to be assumed. The parties to such executory contracts or unexpired leases to be assumed by the Debtors shall have fifteen (15) days from service to object to the cure amounts listed by the Debtors.  If there are any objections filed, the Bankruptcy Court shall hold a hearing.  The Debtors shall retain their right to reject any of their executory contracts or unexpired leases, including executory contracts or unexpired leases the assumption of which have been objected to based on any proposed cure amounts.

10.3  *Rejection Claims*.  In the event that the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to the Plan results in damages to a counterparty to such executory contract or unexpired lease, a Claim for such damages, if not heretofore evidenced by a timely and properly filed Proof of Claim, shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, or their respective properties or interests in property as agents, successors, or assigns, unless a Proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Debtors and the Reorganized Debtors on or before the date that is thirty (30) days after the Effective Date or such later rejection date that occurs as a result of a dispute concerning amounts necessary to cure any defaults.

10.4  *Assignment*.  On and after the Effective Date, pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, the Debtors and Reorganized Debtors may transfer and assign any of their executory contracts or unexpired leases that have not been rejected to Redwood, the Acquisition Companies or any of their affiliates without any further act, authority, or notice *subject to* the unqualified right of Redwood, the Acquisition Companies, or an affiliate of such entities to refuse such transfer or assignment.  Notwithstanding the above or any other provision of the Disclosure Statement, the Plan or any order on the Disclosure Statement and/or Plan, the foregoing shall not impair rights against any party not a Debtor under the Bond Documents.

10.5  *Indemnification Obligations*.  Subject to applicable provisions of this Plan, any obligations of the Debtors pursuant to their corporate charters and bylaws to indemnify current directors, officers, agents, and/or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such directors, officers, agents, and/or employees, based upon any act or omission for or on behalf of the Debtors shall not be discharged or impaired by confirmation of the Plan, provided that the Reorganized Debtors shall not indemnify directors, officers, or employees of the Debtors for any matters that are determined by a Final Order of a court of competent jurisdiction to be excluded from any releases herein.  Subject to applicable sections of this Plan, such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors hereunder and shall continue as obligations of the Reorganized Debtors unless such obligation previously was rejected by the Debtors pursuant to a Final Order or is the subject of a motion to reject pending on the Effective Date.  Notwithstanding the foregoing, any such indemnification obligation in favor of a director, officer, agent, and/or employee of

the Debtors who, as of the Petition Date, no longer was a director, officer, or employee of a Debtor shall terminate and be discharged pursuant to section 502(e) of the Bankruptcy Code or otherwise, as of the Effective Date:  provided, however, that the Reorganized Debtors reserve the right to honor or reaffirm such indemnification obligations (other than those already rejected or terminated by a prior or subsequent Final Order of the Bankruptcy Court), whether or not executory, in which case such honoring or reaffirmation shall be in complete satisfaction, discharge, and release of any Claim on account of such indemnification obligation.  Redwood and the Acquisition Companies and any other affiliate of Redwood are not obligated to indemnify directors, officers, agents, or employees of the Debtors for any acts or omission occurring prior to the Closing Date.  Further, the Liquidating Creditor Trust shall not be liable, directly or indirectly, for such indemnification obligations and such obligations shall be without prejudice to the Liquidating Creditor Trust.

       10.6    *Survival of Other Employment Arrangements*.  As set forth in the Definitive Agreement, Redwood will have the opportunity during the due diligence investigation to identify and meet key employees of the Business and assess the compensation and benefits available to such employees and the likelihood such employees will accept employment with the applicable Acquisition Company and/or Transferred Landowner.  It is anticipated that, at or before the Closing, the Acquisition Companies and/or Transferred Landowners will offer employment to certain employees and enter into employment agreements with these employees.  Such employment agreements will contain customary provisions such as noncompetition, non-solicitation and confidentiality provisions.  Redwood will be liable for only those employment agreements expressly acquired pursuant to the Definitive Agreement.

## SECTION 11.  CONDITIONS PRECEDENT TO EFFECTIVE DATE

       11.1    *Conditions Precedent*.  Pursuant to Article VIII of the Definitive Agreement, the occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

       (a)    the Plan Confirmation Order, in form and substance satisfactory to the Redwood shall have been entered and shall be in full force and effect and there shall not be a stay or injunction in effect with respect thereto;

       (b)    all actions, documents, and agreements necessary to implement the Plan, including, without limitation, all actions, documents, and agreements necessary to implement the Restructuring Transactions contemplated under the Definitive Agreement, shall have been effected or executed, and the Closing shall have occurred;

       (c)    the Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents necessary to implement the Plan and the terms of the Definitive Agreement and that are required by law, regulation, or order;

       (d)    (i) execution of New Management Agreements satisfactory to ManagementCo (to be effective as of Closing) to replace all existing Management Agreements and (ii) have a minimum term of ten (10) years, subject to a three (3) year and seven (7) year right to review the management fee terms of the agreements to determine whether the fees reflect current market pricing and (iii) termination of all Management Agreements existing on October 19, 2009;

       (e)    approval of the terms of the Definitive Agreement by relevant third parties as described in the Definitive Agreement, if required;

       (f)    the absence of any material adverse change in the Company's business, financial condition, prospects, assets or operations since October 19, 2009; provided that no material adverse change shall be deemed to arise from the bankruptcy filing;

(g)        absence of pending or threatened litigation regarding the Definitive Agreement or the transactions to be contemplated thereby;

(h)        delivery of customary legal opinions, closing certificates and other documentation required for the Closing;

(i)        the terms of any bankruptcy procedures, orders and/or this Plan being acceptable to Redwood in its sole and absolute discretion;

(j)        absence of any pending or threatened government action or any law that has the effect of or actually does prevent consummation of the Restructuring Transactions contemplated under the Definitive Agreement;

(k)        ERC, Erickson Group, and other affiliates of ERC as Redwood may identify prior to Closing shall have each changed their respective entity name to a different name satisfactory to Redwood;

(l)        such affiliates of ERC as Redwood may identify prior to Closing have been dissolved;

(m)        the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 applicable to the consummation of the transactions contemplated under the Definitive Agreement shall have expired or been terminated;

(n)        Redwood shall have entered into a lease satisfactory to Redwood with respect to the UMBC Building;

(o)        all necessary third parties shall have agreed to Redwood's $50,000,000 Working Capital Facility, the purpose of which is to fund post-Closing working capital and project development needs of the Acquisition Companies;

(p)        the Debtors' release of NSC, the NSC-NFPs, their affiliates and their respective directors, officers, agents, counsel and advisors from any liability in form and substance satisfactory to such entities and individuals;

(q)        as contemplated under this Plan;

(r)        the release of the Lenders' Agents as contemplated under this Plan;

(s)        delivery of the Cash Transaction Proceeds;

(t)        funding of the TIP with (i) a contribution of $2 million from the NSC (NSC Payment Rebate); (ii) IEDs collected at Warminster through and including November 27, 2009 in the approximate amount of $1.516 million; (iii) Cash proceeds of PNC certificates of deposit with numbers ending -6514 (in the approximate amount of $115,007.79) and -9562 (in the approximate amount of $550,000), *conditioned upon* the return, undrawn, of both original PNC letters of credit numbered 18106643 and 17106642, which were issued to the Township of Warminster; and (iv) the delivery of an effective assignment of ERC's interest in the first $7 million received on account of the Cedar Crest Receivable.  This condition precedent may be waived, modified, or extended by agreement of the Debtors and the Agents; and

(u)     satisfaction of any other conditions to Closing set forth in the Definitive Agreement.

11.2     ***Effect of Failure of Conditions***.  If the Definitive Agreement is terminated  in accordance with its terms after the Plan Confirmation Date or, if the Definitive Agreement is still in effect, the conditions precedent specified in Section 11.1 have not been satisfied or waived by one hundred twenty (120) days after the Plan Confirmation Date, then (i) the Plan Confirmation Order shall be vacated, (ii) no distributions under the Plan shall be made, (iii) the Debtors and all Holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Plan Confirmation Date as though the Plan Confirmation Date never occurred, and (iv) all of the Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors or otherwise.

## SECTION 12.  EFFECT OF CONFIRMATION

12.1     ***Vesting of Assets***.  Except as otherwise provided in this Plan and Definitive Agreement, as of the Effective Date, pursuant to section 114l(b) and (c) of the Bankruptcy Code, all property of the Debtors' Estates, and any property acquired by a Debtor or Reorganized Debtor under the Plan, shall vest in the Reorganized Debtors, the Liquidating Creditor Trust, or the Acquisition Companies, as applicable, free and clear of all claims, liens, encumbrances, charges, and other interests, except as expressly provided herein, in the Liquidating Creditor Trust documents and the Definitive Agreement.  On or after the Effective Date, except as otherwise provided in, and subject to, the Plan and the Definitive Agreement, each Reorganized Debtor, Liquidating Creditor Trust, and/or Acquisition Company may operate its business and may use, acquire, and dispose of property and compromise or settle any Claims or causes of action free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, without supervision or approval by the Bankruptcy Court, and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as provided herein.  Without limiting the foregoing, each Reorganized Debtor may pay the charges it incurs on or after the Effective Date for Professionals' fees and expenses, disbursements, expenses or related support services (including fees relating to the preparation of Professional fee applications) without application to, or approval of, the Bankruptcy Court.

12.2     ***Injunction***.  Except as otherwise provided in ~~the~~**this** Plan ~~(including Section 6.4 of the Plan)~~, all persons or entities who have held, now hold, or may hold Claims against any of the Debtors or Interests in the Debtors and all other parties in interest, along with their respective present and former employees, agents, officers, directors, principals, and affiliates, are permanently enjoined from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to such Claim or Interest against (a) the Debtors, (b) the Reorganized Debtors, (c) Redwood, the Creditors Committee and each of its members, the Liquidating Creditor Trust, the Trustee, the Corporate Revolver Lenders, the Construction Lenders, HCP, Inc., HCP ER2, LP, HCP ER3, LP, HCP ER6, LP, Agents, or the Lenders including any participants, the lenders under the UMBC Building Construction Loan, the holders of Participating Mezzanine Claims, the NSC, the NSC-NFPs, the Acquisition Companies, and (d) their Advisors, affiliates, employees, advisors, officers and directors, agents, and attorneys or any thereof and, in the case of Agents or Lenders, both in their capacities as Agents or Lenders and in any other capacities ((c) and (d) above, the "***Third Party Releases***"); (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtors, the Reorganized Debtors, or the Third Party Releases; (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, the Reorganized Debtors, or Third Party Releases against the property or interests in property of the Debtors, the Reorganized Debtors, or  Third Party Releases; or (iv) asserting any right of setoff, subrogation, or recoupment of any

kind against any obligation due from the Debtors, the Reorganized Debtors, or Third Party Releasees, with respect to such Claim or Interest. Such injunction shall extend to any successors of the Debtors, Reorganized Debtors, Third Party Releasees, and their respective properties and interest in properties. Notwithstanding the above, neither the foregoing terms nor any other provision of the Disclosure Statement, the Plan or any order on the Disclosure Statement and/or Plan shall release or in any manner limit (i) the obligations of any NSC-NFP or other party not a Debtor in these cases under any Bond Documents; (ii) any rights or claims by any Bond Trustee or beneficial bondholder against any NSC-NFP or other party not a Debtor based on obligations under any Bond Documents; or (iii) any rights or claims by any NSC-NFP against any party not a Debtor in these cases based on obligations under any Bond Documents. Notwithstanding the foregoing, the Lenders and Agents shall not be enjoined from commencing any actions, enforcing or pursuing in any manner whatsoever the following claims against the NSC and NSC-NFPs the following: (A) claims for indemnity, contribution, cross claims, counter claims and third party claims in the event that any of the Agents and/or the Lenders are sued by any third party; (B) claims under the parties' subordination agreements to the extent that the NSC and NSC-NFPs receive any distributions from the bankruptcy estates, Creditors' Trust, the Debtors, the Reorganized Debtors or any other source related to the bankruptcy cases (except for the assumed Community Loans); and (C) that litigation commenced in Circuit Court for Baltimore County by PNC Bank, National Association against the NSC/NFPs, Case No. _____ (the "*NSC/NFP Carveout Claims*"). **Nothing in this Section shall operate to release or in any manner limit (a) the obligations of any person or entity that is not one of the Debtors under any agreements or other documents, (b) the rights of any lender (or other creditor), or agent for such lender (or other creditor), with respect to any person or entity, or the property of any person or entity, that is not one of the Debtors relating to such obligations, or (c) the rights of any person or entity that is not one of the Debtors relating to such obligations. The Debtors reserve the right to amend or modify the language in this Section. Any such amendment or modification will be included in a Plan Supplement filed with the Bankruptcy Court no later than five(5) Business Days prior to the Plan Confirmation Hearing.**

12.3     ***Term of Injunctions or Stays***.  Unless otherwise provided in ~~the~~**this** Plan, all injunctions or stays pursuant to section 105 or 362 of the Bankruptcy Code arising under or entered during the Chapter 11 Cases, or otherwise, and in existence on the Plan Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay and to the extent consistent with the terms and provisions of this Plan. Notwithstanding the foregoing, the Lenders and Agents shall not be enjoined from commencing any actions, enforcing or pursuing in any manner the NSC/NFP Carveout Claims, nor shall the NSC-NFPs be enjoined from asserting any defense to said claims.

12.4     ***Injunction Against Interference with Plan***.  Upon the Bankruptcy Court's entry of the Plan Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the Debtors', the Reorganized Debtors', Redwood's, or the Acquisition Companies' and their affiliates, employees, advisors, officers and directors, and agents implementation or consummation of the Plan or any Restructuring Transaction contemplated by the Definitive Agreement and to the extent consistent with the terms and provisions of this Plan. Notwithstanding the foregoing, the Lenders and Agents shall not be enjoined from commencing any actions, enforcing or pursuing in any manner the NSC/NFP Carveout Claims; nor shall the NSC-NFPs be enjoined from asserting any defense to said claims.

12.5     ***Releases***.  ~~Subject to Section 6.4 of the Plan, as~~**As** of the Effective Date, the Debtors, the Reorganized Debtors, and Third Party Releasees shall be deemed to be forever released and discharged from any and all Claims, obligations, suits, judgments, arbitrations, damages, rights, causes of action (including, without limitation, Bankruptcy Code chapter 5 causes of action) or liabilities, whether known or unknown, whether foreseen or unforeseen, based upon any action or omission, transaction or

occurrence taking place on or before the Effective Date of the Plan in any way relating to the Debtors, the Chapter 11 Cases, the Estates, or the Plan, and/or which may have directly or indirectly impacted or affected in any way the value of any Claim or corresponding Distribution on any Claim against the Debtors. The Plan Confirmation Order will enjoin any prosecution of any Claim, debt, right, cause of action or liability which was or could have been asserted against the Debtors, Reorganized Debtors, or Third Party Releasees on or after the Effective Date, provided, however, that the foregoing will not operate as a waiver or release from any causes of action arising out of the gross negligence, willful misconduct, intentional fraud, or criminal liability of the Debtors, the Reorganized Debtors, or Third Party Releasees. The provisions of the Plan shall not operate as a release of any of the Debtors', the Reorganized Debtors', or Third Party Releasees' obligations under the Plan and the rights of the Debtors, the Reorganized Debtors, Redwood, or the Acquisition Companies and their affiliates, employees, advisors, officers and directors, successors, and assigns to enforce the Plan and the contracts, instruments, indentures and other agreements or documents delivered or assumed hereunder, including, without limitation, the Definitive Agreement. Notwithstanding the above, neither the foregoing terms nor any other provision of the Disclosure Statement, the Plan or any order on the Disclosure Statement and/or Plan shall release or in any manner limit (i) the obligations of any NSC-NFP or other party not a Debtor in these cases under any Bond Documents; (ii) any rights or claims by any Bond Trustee or beneficial bondholder against any NSC-NFP or other party not a Debtor based on obligations under any Bond Documents; or (iii) any rights or claims by any NSC-NFP against any party not a Debtor in these cases based on obligations under any Bond Documents. Notwithstanding the foregoing, the NSC/NFP Carveout Claims are not released or discharged. **Nothing in this Section shall operate to release or in any manner limit (a) the obligations of any person or entity that is not one of the Debtors under any agreements or other documents, (b) the rights of any lender (or other creditor), or agent for such lender (or other creditor), with respect to any person or entity, or the property of any person or entity, that is not one of the Debtors relating to such obligations, or (c) the rights of any person or entity that is not one of the Debtors relating to such obligations. The Debtors reserve the right to amend or modify the language in this Section. Any such amendment or modification will be included in a Plan Supplement filed with the Bankruptcy Court no later than five(5) Business Days prior to the Plan Confirmation Hearing.**

12.6 *Releases by Holders of Claims and Interests*. Subject to ~~Section 6.4 herein and~~ the right of each creditor to opt-out with respect to the Third Party Releasees, as of the Effective Date, the Debtors, the Reorganized Debtors, and Third Party Releasees shall be released from all claims (other than the rights of the Debtors and the Reorganized Debtors to enforce the Plan and the contracts, instruments, indentures and other agreements or documents delivered or assumed thereunder, including, without limitation, the Definitive Agreement) that may be asserted against them by each Holder of a Claim or Interest that votes in favor of the Plan (or is deemed to accept the Plan), provided, however, that the foregoing will not operate as a waiver or release from any causes of action arising out of the gross negligence, willful misconduct, intentional fraud, or criminal liability of any such person or entity. Notwithstanding the above, neither the foregoing terms nor any other provision of the Disclosure Statement, the Plan or any order on the Disclosure Statement and/or Plan shall release or in any manner limit (i) the obligations of any NSC-NFP or other party not a Debtor in these cases under any Bond Documents; (ii) any rights or claims by any Bond Trustee or beneficial bondholder against any NSC-NFP or other party not a Debtor based on obligations under any Bond Documents; or (iii) any rights or claims by any NSC-NFP against any party not a Debtor in these cases based on obligations under any Bond Documents. Notwithstanding the foregoing, the NSC/NFP Carveout Claims are not released or discharged. **Nothing in this Section shall operate to release or in any manner limit (a) the obligations of any person or entity that is not one of the Debtors under any agreements or other documents, (b) the rights of any lender (or other creditor), or agent for such lender (or other creditor), with respect to any person or entity, or the property of any person or entity, that is not one of the Debtors relating to such obligations, or (c) the rights of any person or entity that is not**

**one of the Debtors relating to such obligations. The Debtors reserve the right to amend or modify the language in this Section. Any such amendment or modification will be included in a Plan Supplement filed with the Bankruptcy Court no later than five(5) Business Days prior to the Plan Confirmation Hearing.**

12.7    ***Exculpation***.    Notwithstanding anything provided in ~~the~~**this** Plan, as of the Effective Date, none of the Debtors, the Reorganized Debtors, or Third Party Releasees shall have or incur (including but not limited to claims or Causes of Action by any Lenders or participants) any liability for any claim, cause of action, or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the Chapter 11 Cases, the formulation, negotiation, dissemination, confirmation, consummation, or administration of the Plan, or property to be distributed under the Plan, or any other act or omission in connection with the Chapter 11 Cases, the Plan, or any contract, instrument, indenture, or other agreement or document related thereto or delivered thereunder, including, without limitation, the Definitive Agreement; provided, however, that the foregoing shall not affect the liability of any person that otherwise would result from any such act or omission to the extent that such act or omission is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, intentional fraud, or criminal conduct. The foregoing shall not release or in any manner limit (i) the obligations of any NSC-NFP or other party not a Debtor in these cases under any Bond Documents; (ii) any rights or claims by any Bond Trustee or beneficial bondholder against any NSC-NFP or other party not a Debtor based on obligations under any Bond Documents; or (iii) any rights or claims by any NSC-NFP against any party not a Debtor in these cases based on obligations under any Bond Documents. This Section shall not apply to the NSC/NFP Carveout Claims, the liability for which is fully preserved.  **Nothing in this Section shall operate to release or in any manner limit (a) the obligations of any person or entity that is not one of the Debtors under any agreements or other documents, (b) the rights of any lender (or other creditor), or agent for such lender (or other creditor), with respect to any person or entity, or the property of any person or entity, that is not one of the Debtors relating to such obligations, or (c) the rights of any person or entity that is not one of the Debtors relating to such obligations. The Debtors reserve the right to amend or modify the language in this Section. Any such amendment or modification will be included in a Plan Supplement filed with the Bankruptcy Court no later than five(5) Business Days prior to the Plan Confirmation Hearing.**

12.8    ***Retention of Causes of Action/Reservation of Rights***.

12.8.1    Except as provided in Section 6.4 of the Plan (Liquidating Creditor Trust) or Section 12.5 of the Plan (Releases), nothing contained in ~~the~~**this** Plan (including Section 12 (but excluding Section 12.5) of the Plan), the Plan Documents, or in the Plan Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or causes of action that the Debtors, the Reorganized Debtors, Redwood, or the Acquisition Companies may have or which the Reorganized Debtors may choose to assert on behalf of their respective Estates under any provision of the Bankruptcy Code or any applicable non-bankruptcy law or rule, common law, equitable principle or other source of right or obligation, including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, the Reorganized Debtors, their officers, directors, or representatives; and (ii) the turnover of all property of the Debtors' estates. This Section shall not apply to any claims released herein. Any NSC/NFP Carveout Claims are not waived or relinquished by the Lenders or the Agents.

12.8.2    Except as expressly provided in ~~the~~**this** Plan, nothing contained herein, the Plan Documents, or in the Plan Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, cause of action, right of setoff, or other legal or equitable defense. No entity may rely on the absence of a specific reference in ~~the~~**this** Plan, the Plan Supplement, or the Disclosure Statement to

any cause of action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available causes of action against them. The Debtor and the Reorganized Debtors expressly reserve all rights to prosecute any and all causes of action against any entity, except as otherwise expressly provided in ~~the~~**this** Plan. Specifically, any NSC/NFP Carveout Claims are not waived or relinquished by the Lenders and Agents.

12.9 ***Solicitation***. As of and subject to the occurrence of the Plan Confirmation Date: (i) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation and (ii) the Debtors and each of their respective directors, officers, employees, their affiliates, agents, and Advisors shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance, and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan

12.10 ***Transfer Tax Exemption***. To the extent that the issuance of a security under the Plan falls within the exception of Bankruptcy Code section 1146(a), no stamp or similar tax is payable upon a transfer of such a security. Pursuant to section 1146(a) of the Bankruptcy Code, any issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan of reorganization, which is ultimately confirmed, is not taxable under any law imposing a stamp or similar tax. Moreover, any transfer of assets from a Debtor to a Reorganized Debtor, Acquisition Company, Redwood, or any other entity (including the contemplated transfer of real property by the mezzanine lenders, the disposition of the Littleton Out-Parcel and the transfer or other disposition of the property securing the UMBC Building Construction Loan Claims pursuant to the Plan) in accordance with, in contemplation of, or in connection with the Plan or the Definitive Agreement, including the transfer of assets pursuant to the Restructuring Transactions, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local government officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment pursuant to section 1146(a) of the Bankruptcy Code.

12.11 ***Section 1145 Exemption***. To the extent that any issuance of interests under this Plan is considered an offer or sale of a security within the meaning of section 1145 of the Bankruptcy Code, the issuance shall be exempt from registration under the Securities Act.

12.12 ***Plan Supplement***. A draft form of the Plan Documents to be entered into as of the Effective Date and any other appropriate documents shall be contained in the Plan Supplement and filed with the Clerk of the Bankruptcy Court by no later than five (5) Business Days prior to the Plan Confirmation Hearing. Upon the filing of the Plan Supplement, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during the Court's regular business hours. Documents to be included in the Plan Supplement will be posted at http://www.bmcgroup.com/ERC as they become available, but no later than five (5) Business Days prior to the Plan Confirmation Hearing.

**SECTION 13.  RETENTION OF JURISDICTION**

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)	to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)	to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Plan Confirmation Date;

(c)	to ensure that Distributions to holders of Allowed Claims are accomplished as provided herein;

(d)	to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim;

(e)	to enter, implement, or enforce such orders as may be appropriate in the event the Plan Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)	to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation, or enforcement of the Plan, the Plan Confirmation Order, or any other order of the Bankruptcy Court;

(g)	to hear and determine any application to modify the Plan in accordance with applicable provisions of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the~~the~~**this** Plan, the Disclosure Statement for the Plan, or any order of the Bankruptcy Court, including the Plan Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)	to hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Plan Confirmation Date;

(i)	to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Confirmation Order, any transactions or payments contemplated hereby or under the Definitive Agreement, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)	to take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation;

(k)	to hear any disputes arising out of arising out of, and to enforce any order approving alternative dispute resolution procedures to resolve personal injury, employment litigation, and similar claims pursuant to section 105(a) of the Bankruptcy Code;

(l)	to determine such other matters and for such other purposes as may be provided in the Plan Confirmation Order;

(m)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(n)     to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(o)     to enter a final decree closing the Chapter 11 Cases;

(p)     to recover all assets of the Debtors and property of the Debtors' Estates, wherever located; and

(q)     to hear and determine any rights, Claims, or causes of action held by or accruing to the Debtors pursuant to the Bankruptcy Code or any applicable federal statute or legal theory.

## SECTION 14.  MISCELLANEOUS PROVISIONS

14.1     ***Payment of Statutory Fees***.  On the Effective Date, and thereafter as may be required, the Debtors shall pay all fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

14.2     ***Dissolution of Statutory Committees***.  Except with respect to the prosecution of fee applications, any committees appointed pursuant to section 1102 of the Bankruptcy Code in the Chapter 11 Cases shall dissolve on the later of the Effective Date and the valid creation of the Liquidating Creditor Trust and appointment of the Trustee.

14.3     ***Dissolution of the Liquidating Creditor Trust***.  The Liquidating Creditor Trust will terminate five (5) years after the Effective Date, however, the Trustee or the Bankruptcy Court may extend the term of the Liquidating Creditor Trust.  Upon termination of the Liquidating Creditor Trust, all beneficial interests in the Liquidating Creditor Trust will be extinguished, the legal existence of the Liquidating Creditor Trust will terminate, and any remaining Trust Assets on such date will vest in the Reorganized Debtors free and clear of all claims, liens, encumbrances and other liabilities, in each case without further action of the Bankruptcy Court or any other court, administrative body or other agency. The Trustee may cause to be filed with any applicable governmental or other regulatory authority such certificate of dissolution or cancellation and any other certificates and documents as the Trustee, in its sole discretion, deems necessary to reflect the termination of the legal existence of the Liquidating Creditor Trust, and may take any other action it deems necessary or desirable to reflect the transfer of all remaining Trust Assets (if any) to the Reorganized Debtors.

14.4     ***Substantial Consummation***.  On the Effective Date, the Plan shall be deemed to be substantially consummated within the meaning set forth in section 1101 and pursuant to section 1127(b) of the Bankruptcy Code.

14.5     ***Request for Expedited Determination of Taxes***.  The Reorganized Debtors shall have the right to request an expedited determination of the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to a tax in accordance with section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

14.6    *Amendments*.

14.6.1  ***Modifications to Plan and Plan Supplement***.  The Plan and/or Plan Supplement may be amended, modified, or supplemented by the Debtors or the Reorganized Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, subject to the terms of the Definitive Agreement and subject to Redwood's prior consent, which consent shall by in Redwood's sole and absolute discretion.  In addition, after the Plan Confirmation Date and subject to the terms of the Definitive Agreement, the Debtors or the Reorganized Debtors may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in ~~the~~**this** Plan, the Plan Supplement, or the Plan Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan subject to Redwood's prior consent, which consent shall be in Redwood's sole and absolute discretion.

14.6.2  ***Other Amendments***.  Subject to the terms of the Definitive Agreement, and further subject to Redwood's prior consent, which consent shall be in Redwood's sole and absolute discretion, the Debtors may make appropriate technical adjustments and modifications to the Plan or Plan Supplement prior to the Effective Date without further order or approval of the Bankruptcy Court.

14.7    ***Effectuating Documents and Further Transactions***.  Each of the officers of the Reorganized Debtors is authorized, in accordance with his or her authority under the resolutions of the applicable board of directors or members, to execute, deliver, file, or record such contracts, instruments, certificates, deeds, bills of sale, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

14.8    ***Corporate Action***.  On the Effective Date, all matters provided in ~~the~~**this** Plan that would otherwise require approval of the equity holders, directors, managers, and/or members of one or more of the Debtors or Reorganized Debtors, including, without limitation, the election or appointment of managers, directors and officers of the Reorganized Debtors pursuant to the Plan, and amendments of the Debtors' organizational documents will be deemed to have occurred and will be in effect from and after the Effective Date pursuant to applicable general business organizations law of the state in which the Debtors or Reorganized Debtors are organized, without any requirement of further action by the equity holders, directors, managers, and/or members of the Debtors or Reorganized Debtors.

14.9    ***Revocation or Withdrawal of the Plan***.  Subject to the terms of the Definitive Agreement and subject to Redwood's prior consent, which consent shall be in Redwood's sole and absolute discretion, the Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date.  Any such action may only be taken if it is in the exercise of the Debtors' fiduciary duty to their creditors.  If the Debtors take such action, the Plan shall be deemed null and void.  In such event, nothing contained herein shall constitute or be deemed to be a waiver or release of any Claims by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in further proceedings involving the Debtors.

14.10   ***Continuing Exclusivity of Debtors' Right to Propose Plan***.  The Debtors are currently operating within the exclusivity period under Bankruptcy Code section 1121.  Accordingly, the Debtors retain, and the Debtors and Redwood are sharing the exclusive right to amend or modify the Plan and to solicit acceptances of such amended or modified Plan.

14.11   ***Severability***.  If, prior to the entry of the Plan Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors (such request being subject to Redwood's prior consent,

which consent shall be in Redwood's sole and absolute discretion), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Plan Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms. No alteration or interpretation of the Plan pursuant to this Section shall operate to modify or amend the terms and conditions of the Definitive Agreement unless such modification or amendment has been consented to as required pursuant to the Definitive Agreement.

14.12 ***Governing Law***. Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Maryland, without giving effect to the principles of conflicts of laws, shall govern the rights, obligations, construction, and implementation of the Plan and the Restructuring Transactions consummated or to be consummated in connection therewith.

14.13 ***Time***. Bankruptcy Rule 9006 shall apply to all computations of time periods prescribed or allowed by the Plan unless otherwise set forth herein or provided by the Bankruptcy Court.

14.14 ***Binding Effect on Debtors, Redwood, Holders and Successors and Assigns***. Upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, Redwood, the Acquisition Companies, and any and all Holders of Claims and Interests (irrespective of whether any such Holders of Claims and Interests failed to vote to accept or reject the Plan, voted to accept or reject the Plan, or are deemed to accept or reject the Plan), all entities that are parties to or are subject to the settlements, compromises, releases, exculpations, discharges, and injunctions described in ~~the~~**this** Plan, each entity acquiring or retaining property under ~~the~~**this** Plan and the Definitive Agreement, and any and all non-Debtor parties to executory contracts and unexpired lease with the Debtors.

14.15    **_Effective Notice_**.  All notices, requests, and demands to or upon the Debtors in the Chapter 11 Cases shall be in writing and, unless otherwise provided herein, shall be deemed to have been duly given or made when actually delivered or, if by facsimile transmission, when received and telephonically confirmed to the below recipients:

> Erickson Retirement Communities, LLC
> 701 Maiden Choice Lane
> Baltimore, Maryland  21228
> Attn:  Gerald F. Doherty, Esq.
> Telephone:  (410) 402-2350
> Facsimile:  (410) 402-2348
>
> -and-
>
> DLA PIPER LLP US
> Attn:  Thomas R. Califano, Esq.
> Jeremy R. Johnson, Esq.
> Camisha L. Simmons, Esq.
> 1251 Avenue of the Americas
> New York, New York  10020
> Telephone:  (212) 335-4500
> Facsimile:  (212) 335-4501
>
> with copies to:
>
> DLA PIPER LLP US
> Attn:  Vincent P. Slusher
> 1717 Main Street, Suite 4600
> Dallas, Texas 75201
> Telephone:  (214) 743-4572
> Facsimile:  (972) 813-6267

| Dated:  March ~~1~~ **8,** 2010<br>Baltimore, Maryland | Respectfully submitted, |
|---|---|
|  | Erickson Group, LLC<br>Erickson Retirement Communities, LLC<br>Ashburn Campus, LLC<br>Columbus Campus, LLC<br>Concord Campus, L.P.<br>Concord Campus GP, LLC<br>Dallas Campus, LP<br>Dallas Campus GP, LLC<br>Erickson Construction, LLC<br>Houston Campus, L.P.<br>Kansas Campus, LLC<br>Littleton Campus, LLC<br>Novi Campus, LLC<br>Senior Campus Services, LLC<br>Warminster Campus, L.P. and<br>Warminster Campus GP, LLC<br><br>By: _____<br>    Name:  Gerald Doherty<br>    Title:  Executive Vice President<br>           and General Counsel |

EAST\42647302.30
EAST\42647302.46

## EXHIBITS TO THE PLAN

**Exhibit A**      Definitive Agreement

**Exhibit B**      TIP

**Exhibit C**      **Redwood Retained Employees**

## **Exhibit A**

Definitive Agreement

## **Exhibit B**

TIP

**Exhibit C**

**Redwood Retained Employees**

Document comparison by Workshare Professional on Monday, March 08, 2010 10:23:48 AM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://EASTDMS/EAST/42647302/30 |
| Description | #42647302v30<EAST> - ERC:  Amended Plan |
| Document 2 ID | interwovenSite://EASTDMS/EAST/42647302/46 |
| Description | #42647302v46<EAST> - ERC:  Amended Plan |
| Rendering set | DLAPiper |

| Legend: | |
|---|---|
| **Insertion** | |
| Deletion | |
| Moved from | |
| **Moved to** | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 720 |
| Deletions | 766 |
| Moved from | 6 |
| Moved to | 6 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 1498 |